ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF BERKELEY** | ) | **NINTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| SOUTH CAROLINA PUBLIC SERVICE | ) | C.A. No.: 2024-CP-08-_____ |
| AUTHORITY, a/k/a SANTEE COOPER, an | ) | |
| agency of the State of South Carolina, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **SUMMONS** |
| CHINA JUSHI USA CORPORATION; | ) | (JURY TRIAL DEMANDED) |
| JUSHI USA FIBERGLASS CO., LTD.; | ) | |
| LINDAU CHEMICALS, INC.; MILLIKEN | ) | |
| & COMPANY; and WASTE | ) | |
| MANAGEMENT OF SOUTH CAROLINA, | ) | |
| INC., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**TO THE DEFENDANTS ABOVE-NAMED:**

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to the Complaint upon the subscribers at 291 S. Pine Street, Spartanburg, South Carolina 29302, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

November 26, 2024

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF BERKELEY** | ) | **NINTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| SOUTH CAROLINA PUBLIC SERVICE | ) | C.A. No.: 2024-CP-08-_____ |
| AUTHORITY, a/k/a SANTEE COOPER, an | ) | |
| agency of the State of South Carolina, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| CHINA JUSHI USA CORPORATION; | ) | (JURY TRIAL DEMANDED) |
| JUSHI USA FIBERGLASS CO., LTD.; | ) | |
| LINDAU CHEMICALS, INC.; MILLIKEN | ) | |
| & COMPANY; and WASTE | ) | |
| MANAGEMENT OF SOUTH CAROLINA, | ) | |
| INC., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

Plaintiff, SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, by and through the undersigned counsel, brings this action against the above-named Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

## STATEMENT OF THE CASE

1.     Plaintiff, South Carolina Public Service Authority ("Santee Cooper" or "Plaintiff"), brings this action to address Defendants' ongoing contamination of the Broad River, Saluda River, Congaree River, Santee River, Lake Marion, and Lake Moultrie, including their tributaries (collectively "Santee River Basin"), with  certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2.      As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to surface waters, which travel downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, thereby contaminating Plaintiff's properties and the domestic water supply for over 234,000 water customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.      Plaintiff provides wholesale drinking water to local water providers in various counties in South Carolina, including Berkeley County. It owns and occupies riparian lands on Lake Marion in Santee, South Carolina; and on Lake Moultrie in Moncks Corner, South Carolina. On these respective properties, Plaintiff operates the Lake Marion Surface Water Treatment Plant ("SWTP"), the Lake Moultrie SWTP, and their related buildings, improvements, and equipment that make up these water transmission systems. Plaintiff's SWTPs draw raw water from Lake Marion and Lake Moultrie for treatment before distributing treated water to customers.

4.      Defendants own and/or operate industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes. Defendants then discharge wastewater contaminated with these products to surface waters in the Santee River Basin upstream of Plaintiff's water intakes. Defendants discharge PFAS-contaminated wastewater via certain public wastewater treatment plants ("WWTPs"). These WWTPs include the Columbia

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

WWTP in Columbia, South Carolina; the Little River WWTP in Laurens, South Carolina; and the Tosch's Creek WWTP in Union, South Carolina.

5.      Industrial wastewater from Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes. Defendants' PFAS are discharged upstream of, and flow downstream to, Plaintiff's SWTPs. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with PFAS.

6.      Defendants' PFAS contaminate Plaintiff's water sources at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

7.      As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the acquisition, installation, and operation of water treatment technologies at Plaintiff's SWTPs that will remove Defendants' PFAS from drinking water. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**DISCLAIMER**

8.     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.      Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 14-1-80 and 58-31-30 of the South Carolina Code.

11.     This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

12.     Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Berkeley County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Berkeley County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## PARTIES

### I.     Plaintiff

13.     Plaintiff Santee Cooper is a public corporation and agency of the State of South Carolina vested with authority, among other things, to acquire, treat, distribute, and sell drinking water. S.C. CODE ANN. § 58-31-30; *see also id.* §§ 58-31-10 to -740.

14.     Plaintiff owns several properties at issue, beginning with its SWTPs. The first is located at 817 Water Plant Road, Moncks Corner, South Carolina 29461, where it operates the Lake Moultrie SWTP, which services the Lake Moultrie Regional Water System. The Lake Moultrie SWTP is riparian to, and draws raw water from, Lake Moultrie. The second is located at 149 Graveyard Rock Road, Santee, South Carolina 29142, where it operates the Lake Marion SWTP, which services the Lake Marion Regional Water System. The Lake Marion SWTP is riparian to, and draws raw water from, Lake Marion. In addition to its SWTPs, Plaintiff also owns all lands beneath Lake Marion and Lake Moultrie up to their high-water marks.

15.     The Lake Moultrie Water System utilizes 20 miles of transmission pipeline that delivers drinking water throughout the Lake Moultrie Water Agency, which consists of wholesale customers Berkely County, City of Goose Creek, Moncks Corner Public Works Commission, and the Summerville Commissioners of Public Works. Ultimately, the Lake Moultrie Water system delivers drinking water to approximately 234,000 water subscribers of Plaintiff's wholesale customers.

16.     The Lake Marion Water System utilizes over 46 miles of transmission pipeline to serve, currently, five wholesale customers within the Lake Marion Regional Water Agency, which consists of Berkeley, Calhoun, Dorchester, and Orangeburg Counties and the Town of Santee. At

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the retail level, the Lake Marion Water System ultimately delivers drinking water to approximately 3,000 water subscribers.

## II.    Defendants

17.    Defendants **China Jushi USA Corporation** and **Jushi USA Fiberglass Co., Ltd. (collectively "Jushi")** are South Carolina corporations that operate a facility located at 2971 Shop Road, Columbia, South Carolina 29209. There, Jushi uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of fiberglass products. As part of its processes, the Jushi facility discharges industrial wastewater with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Jushi's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Jushi's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

18.    Defendant **Lindau Chemicals, Inc. ("Lindau")** is a South Carolina corporation that owns and operates an industrial facility located at 731 Rosewood Drive, Columbia, South Carolina 29201. There, Lindau uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in organic chemical manufacturing. As part of its processes, the Lindau facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Lindau's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Lindau's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

19.    Defendant **Milliken & Company ("Milliken")** is a Delaware corporation with its principal place of business in South Carolina. Milliken owns or has owned at least three facilities at issue in this case: (1) the Cedar Hill Plant, located at 225 Bob Little Road, Jonesville, South Carolina 29353; (2) the Gilliland Plant, located at 1108 Church Street, Laurens, South Carolina 29360; and (3) the Monarch Mill, located at 129 Monarch Highway, Union, South Carolina 29379. At each facility, Milliken uses and/or used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of Milliken's processes, the Cedar Hill and Gilliland Plant discharge industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP and the Little River WWTP, respectively. The Tosch's Creek WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. The Little River WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Saluda River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. While Monarch Mill is no longer operational, wastewater lagoons on the property remain contaminated with these PFAS and their precursors, which discharge from the property to tributaries upstream of the Broad River, Lake Marion, and Lake Moultrie. Milliken's PFAS resist environmental degradation, flow downstream from the Broad and Saluda Rivers, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

20.    Defendant **Waste Management of South Carolina, Inc. ("WM")** is a South Carolina corporation, and it operates the Richland Landfill located at 1047 Highway Church Road, Elgin, South Carolina 29045. WM discharges leachate from its landfill, which contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Columbia WWTP. The Columbia WWTP cannot remove these PFAS from WM's leachate before the WWTP discharges WM's PFAS into the Congaree River upstream of Lake Marion and Lake Moultrie. WM's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

21.     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

22.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

23.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include well-known substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in PFAS products utilized by Defendants.

24.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

8

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

25.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

26.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water.

27.     While there are thousands of different PFAS chemicals, according to EPA current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, EPA warns that negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

28.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

29.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

30.    Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS. U.S.E.P.A., *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)* (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf. The advisory levels were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems." *Id.*

31.    On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water. Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016). Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."

32.    EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses,

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals." *Id.*

33.     On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels. Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022). EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer." *Id.* Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

34.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer." *Id.* For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

35.     In March of 2023, EPA issued proposed maximum contaminant level ("MCL")s and maximum contaminant level goal ("MCLG")s for PFOA, PFOS, PFHxS, PFNA, PFBS, and

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

GenX Chemicals. PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142). An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

36.     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe." *Id.* Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found." *Id.*

37.     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety." *Id.* If greater than 1.0, then "potential risk is indicated." *Id.*

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

38.    EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses." U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

39.    EPA finalized its proposed MCLs and MCLGs on April 10, 2024. U.S.E.P.A., *PFAS Nat'l Primary Drinking Water Regulation Rulemaking* (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version). In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., *Final PFAS Nat'l Drinking Water Regulation Landing Page*, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

40.    The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts." U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024). According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk." U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

41.    EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations. By 2027, Plaintiff must begin conducting and reporting regular PFAS monitoring, and by 2029, Plaintiff must comply with all MCLs. Plaintiff has conducted a diligent investigation into this issue, is seeking to address it in an expedited manner, and for this reason seeks prompt relief from the Court.

## II.    Contamination of Lake Marion and Lake Moultrie with PFAS

42.    Lake Marion and Lake Moultrie were formed by the construction of the Santee Dam and Pinopolis Dam in the 1940s. They sit near the tail end of the Santee River Basin, downstream of, and hydrologically connected to, the Broad River, Saluda River, Congaree River, and Santee River.

43.    Defendants' industrial facilities, and/or their applicable WWTPs, operate upstream of Lake Marion and Lake Moultrie.

44.    PFAS sampling of the Broad River, Saluda River, Congaree River, Lake Marion, and Lake Moultrie confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout these bodies of water. These PFAS flow downstream and contaminate the water at Plaintiff's water intakes on Lake Marion and Lake Moultrie at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

45.    Defendants are, or were, owners and operators of manufacturing plants and related industrial facilities throughout or upstream of the Santee River Basin. In their industrial processes, Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA,

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PFBS, and/or GenX Chemicals. Defendants' industrial processes generate industrial wastewater containing these PFAS, which Defendants ultimately discharge to surface waters upstream of Lake Marion and Lake Moultrie.

46.     Defendants' PFAS and their precursors flow downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, damaging Plaintiff's property and contaminating its water sources.

47.     The Lake Marion SWTP utilizes membrane filtration technology, and the Lake Moultrie SWTP utilizes conventional water treatment technology, which do not remove PFAS from water, and the SWTPs require new water treatment technologies to do so.

48.     All Defendants knew or should have known that the water treatment technologies used by the direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

**III.     Defendants have harmed Plaintiff and Plaintiff's community.**

49.     For decades, and unknown to Plaintiff, Defendants have discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Santee River Basin, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

50.     Defendants' conduct has proximately caused the contamination of the Santee River Basin; and of Plaintiff's land, its Lake Marion and Lake Moultrie SWTPs, and its water distribution

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

51.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, or negligently engaged in conduct or omissions that proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties, its right to use Lake Marion and Lake Moultrie, and has caused Plaintiff additional past, present, and future injury to property.

52.     Unlike Plaintiff, Defendants knew well before EPA's publications that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health. Despite their knowledge, Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Santee River Basin, which they knew or should have known contaminated Plaintiff's properties.

## FIRST CAUSE OF ACTION

### Private Nuisance

53.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

54.     Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water, and the transmission of treated water to customers in Berkeley County and other counties.

55.     Plaintiff owns riparian land abutting Lake Marion and Lake Moultrie, and Plaintiff has a property right in the reasonable use of these waters, including for the provision of water to its customers. Plaintiff also owns the land beneath each lake, up to the high-water mark.

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

56.     Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors at concentrations exceeding those EPA deems unsafe for consumption.

57.     Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

58.     Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

59.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

60.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Santee River Basin and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

61.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

62.     The ongoing contamination of Lake Marion, Lake Moultrie, and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its riparian use of Lake Marion and Lake Moultrie to supply potable water to its customers.

63.     Defendants' interference with Plaintiff's use of its properties can be abated by funding the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

64.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

65.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

66.     Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water, and the transmission of treated water to customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties.

67.     Plaintiff's wholesale customers sell the water Plaintiff provides to their customers, who use it for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

68.     Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals, as demonstrated by

18

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

EPA. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

69.     Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with future acquisition, installation, and operation of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's riparian right to use Lake Marion and Lake Moultrie; interference with the use of Plaintiff's SWTPs and water distribution systems; and lost revenue.

70.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, and Plaintiff's properties.

71.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

72.     As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

73.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

74.     Defendants' ongoing contamination constitutes a continuing nuisance and an irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

75.     Defendants' contamination of potable water with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

76.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

### THIRD CAUSE OF ACTION

### Trespass

77.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

78.     Plaintiff owns, possesses, and actively exercises its right to use its land, SWTPs, and related buildings, improvements, and equipment that make up its water transmission systems.

79.     Defendants Jushi, Lindau, and Milliken intentionally discharged and continue to discharge PFAS to their applicable WWTPs, notwithstanding that they knew and/or reasonably should have known that:

(a)     these WWTPs cannot remove their PFAS from wastewater before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

     (b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of potable water to its customers;

     (c)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS the Defendants discharge to these WWTPs; and, thereby,

     (d)    water contaminated with high concentrations of these Defendants' PFAS invades Plaintiff's properties.

80.    Defendant WM intentionally delivered and delivers PFAS-contaminated leachate to the Columbia WWTP, notwithstanding that WM knew and/or reasonably should have known that:

     (a)    the WWTP cannot remove its PFAS from the leachate before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

     (b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of potable water to its customers;

     (e)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS it sends to the WWTP; and, thereby,

     (c)    water contaminated with high concentrations of WM's PFAS invades Plaintiff's properties.

81.    Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

82.     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

83.     Defendants Jushi, Lindau, and Milliken intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs. Defendant WM intends that its PFAS-contaminated leachate be disposed of by the Columbia WWTP. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and riparian rights.

84.     Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTPs, and related buildings, improvements, and equipment that make up its water transmission systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

85.     As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

86.     Defendants' ongoing trespasses can be abated by requiring Defendants to fund the acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

87.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

88.     Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals

22

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTPs, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

89.     Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, and dose-additive; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including those in the Santee River Basin—were vulnerable to the contamination that has taken and now takes place.

90.     Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Santee River Basin, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

91.     As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; future costs of acquiring, installing, and operating adequate water treatment technologies; and other damages to be proved at trial.

92.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief:

(a)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)     Enter a judgment and decree against all Defendants requiring them to abate their trespasses onto Plaintiff's properties;

(c)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the acquisition, installation, and operation of treatment technology capable of removing them;

(d)     Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)     Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)

24

ELECTRONICALLY FILED - 2024 Nov 26 4:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

November 26, 2024

ELECTRONICALLY FILED - 2024 Dec 05 8:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

C.A. No. 2024-CP-08-03336

*Plaintiff,*

v.

CHINA JUSHI USA CORPORATION; JUSHI
USA FIBERGLASS CO., LTD.; LINDAU
CHEMICALS, INC.; MILLIKEN & COMPANY;
AND WASTE MANAGEMENT OF SOUTH
CAROLINA, INC.,

*Defendants.*

**ACCEPTANCE OF SERVICE
ON BEHALF OF
LINDAU CHEMICALS, INC.**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt

via email of the Summons and Second Amended Complaint in the above captioned matter on

behalf of Defendant Lindau Chemicals, Inc. ("Lindau"), effective this 5th day of December, 2024,

with no further service on Lindau being necessary.

　_s/Ian T. Duggan_____
Ian T. Duggan
Callison Tighe & Robinson, LLC
P.O. Box 1390
Columbia, SC 29202-1390
803-404-6900
ianduggan@callisontighe.com
*Counsel for Lindau Chemicals, Inc.*

ELECTRONICALLY FILED - 2024 Dec 06 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

C.A. No. 2024-CP-08-03336

*Plaintiff*,

v.

CHINA JUSHI USA CORPORATION; JUSHI
USA FIBERGLASS CO., LTD.; LINDAU
CHEMICALS, INC.; MILLIKEN & COMPANY;
AND WASTE MANAGEMENT OF SOUTH
CAROLINA, INC.,

**AMENDED
ACCEPTANCE OF SERVICE
ON BEHALF OF
LINDAU CHEMICALS, INC.**

*Defendants*.

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Summons and Complaint as filed November 26, 2024, in the above captioned matter on behalf of Defendant Lindau Chemicals, Inc. ("Lindau"), effective this 5th day of December, 2024, with no further service on Lindau being necessary.

*s/ Ian T. Duggan*
Ian T. Duggan
Callison Tighe & Robinson, LLC
P.O. Box 1390
Columbia, SC 29202-1390
803-404-6900
ianduggan@callisontighe.com
*Counsel for Lindau Chemicals, Inc.*



ELECTRONICALLY FILED - 2024 Dec 18 3:16 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF BERKELEY | ) | NINTH JUDICIAL CIRCUIT |
| | ) | |
| South Carolina Public Service Authority, | ) | |
| a/k/a Santee Cooper, an agency of the State | ) | |
| of South Carolina | ) | **AFFIDAVIT OF SERVICE** |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Case No. 2024-CP-08-03336 |
| China Jushi USA Corporation; Jushi USA | ) | |
| Fiberglass Co., Ltd.; Lindau Chemicals, Inc.; | ) | |
| Milliken & Company; and Waste | ) | |
| Management of South Carolina | ) | |
| Defendants. | ) | |

I, **Jarvis Blanding, Sr.**, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service:

**SERVED:** David Hawkins

**WITH:** Letter from John B. White Jr. P.A., Summons (Jury Trial Demanded) and Complaint (Jury Trial Demanded)

**AT:** 2111 Ballenger Road, Wellford, SC 29385

**ON:** December 16, 2024 at 7:12am

**MANNER OF SERVICE:** Personally

_____
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this 18th day of December, 2024.

_____
NOTARY PUBLIC for the State of South Carolina
My Commission Expires: May 31, 2029

ELECTRONICALLY FILED - 2024 Dec 19 1:49 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF BERKELEY | ) | CASE NO: 2024-CP-08-03336 |
| | ) | |
| South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | **AFFIDAVIT OF SERVICE** |
| | ) | |
| vs. | ) | |
| | ) | |
| China Jushi USA Corporation, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned, Debbie Brothers being duly sworn, says that she served the foregoing: **COVER LETTER, SUMMONS AND COMPLAINT** in the above captioned action upon the Defendant **CHINA JUSHI USA CORPORATION** by delivering the same to:

**( )** the individual personally, or

**(X) PAMELA JOHNSON, Paralegal for National Registered Agents, Inc., Registered Agent** person served as authorized/designated to receive service for the defendant and leaving with him/her one (1) copy of the same at **2 Office park Court Suite 103, Columbia, SC** on the **13th day** of **December, 2024,** at **9:20 a.m.**

The Affiant further says, that upon information and belief, she know the person so served to be the defendant mentioned and described in the documents served and that the affiant is not a party to nor interested in the action.

_____
Debbie Brothers

SWORN TO before me this 17 day of _December_, 2024

_____
Notary Public for S.C.
My Commission Expires: 3-6-2025

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, an agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE ADMISSION OF HANNAH CORY CALDWELL**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hannah Cory Caldwell, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mrs. Caldwell's admission and received no objection.

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Mrs. Caldwell is a member in good standing with her local bar association, and the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 27, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority a/k/a Santee Cooper, an Agency of the State of South Carolina, | 2024-CP-08-03336 | In the Court of Common Pleas Ninth Judicial Circuit |
| **Plaintiff** | **Case No.** | **Tribunal** |
| **vs.** | **Mailing Address of Tribunal:** | |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc; Milliken & Company et al, | | 300-B California Avenue |
| **Defendant** | | Moncks Corner, SC 29461 |

Comes now ___Hannah Cory Caldwell___, applicant herein, and respectfully represents the following:

    1. Applicant resides at:

428 Glenwood Road
**Street Address**

| Birmingham, AL | Jefferson | Alabama | 35216 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |

205-271-7113
**Telephone**

    2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. , with offices at

2131 Magnolia Avenue South
**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 205-328-2200 | 205-370-6021 | 205-324-7896 | hcaldwell@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

    3. Applicant has been retained personally or as a member of the above-named law firm by

South Carolina Public Service Authority a/k/a Santee Cooper to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

    4. Since September 19th of 2019 , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of Alabama where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/19/2019 |
| United States District Court Northern District of Alabama | 10/24/2019 |
| United States District Court Southern District of Alabama | 10/24/2019 |
| United States District Court Middle District of Alabama | 10/24/2019 |
| Alabama State Courts | 10/24/2019 |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is ___John B. White___ of the ___John B. White Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P. O. Box 2465 (29304)

**Street Address**

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 864-594-5988 | 864-590-8701 | 864-594-5870 | jwhite@johnbwhite.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5996
_____
South Carolina Bar Number
(You must provide Bar Number)

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See attached Exhibit A |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____11ᵗʰ_____ day of _December_ 20_24_

_Jerry C. Caldwell_
APPLICANT

# VERIFICATION

STATE OF _Alabama_                           )

COUNTY OF _Jefferson_                    )

I, _____Hannah Cory Caldwell_____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this __14th__ day of _December_, 20 _24_

_____
(Notary Signature)

Notary Public for the State of _Alabama_

My Commission Expires: _October 22, 2028_

[Notary Seal: HEATHER L. JONES — MY COMMISSION EXPIRES OCTOBER 22, 2028 — NOTARY PUBLIC — STATE OF ALABAMA]

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this __12th__ day of _December_, 20 _24_

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this __12th__ day of _December_, 20 _24_

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 10/18/2024 | John B. White | Granted |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ **Hannah Cory Caldwell** _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 19, 2019 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 5, 2024 _____ with the seal of the Supreme Court of Alabama attached.



*Megan B. Rhodebeck*

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2025 Jan 08 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, an agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC VICE ADMISSION OF HANNAH CORY CALDWELL**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Hannah Cory Caldwell, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China
                      Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**            Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-01-07 17:05:32     page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 08 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE
ADMISSION OF HIRLYE RAY
LUTZ, III**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hirlye Ray Lutz, III, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Lutz's admission and received no objection.

Mr. Lutz is a member in good standing with his local bar association, and the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 27, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
## IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

South Carolina Public Service Authority, a/k/a Santee Cooper, an Agency of the State of South Carolina

_____
Plaintiff

In The Court of Common Pleas

Ninth Judicial Circuit
_____
Tribunal

2024-CP-08-03336
_____
Case No.

China Jushi USA Corporation: Jushi USA Fiberglass Co., LTD Lindau Chemicals, Inc.; Milliken  & Company et al,
_____
Defendant

Mailing Address of Tribunal:

300-B California Avenue
_____
Moncks Corner, SC 29461
_____

Comes now _Hirlye Ray Lutz, III_____, applicant herein, and respectfully represents the following:

1. Applicant resides at:

412 Ves Trace
_____
Street Address

Vestavia Hills
_____
City

Jefferson
_____
County

Alabama
_____
State

35216
_____
Zip Code

205-207-7106
_____
Telephone

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of) Cory Watson, P.C._____, with offices at

2131 Magnolia Avenue South
_____
Street Address

Birmingham
_____
City

Jefferson
_____
County

Alabama
_____
State

35205
_____
Zip Code

205-328-2200
_____
Primary Telephone

205-914-1502
_____
Cell Phone

205-324-7896
_____
Fax Number

rlutz@corywatson.com
_____
Email Address

3. Applicant has been retained personally or as a member of the above-named law firm by The City of Florence, South Carolina to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since _September 27th_ of _2006_____, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of _Alabama_____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/26/2006 |
| United States District Court Northern District of Alabama | 10/19/2006 |
| United States District Court Middle District of Alabama | 10/19/2006 |
| United States District Court Southern District of Alabama | 10/19/2006 |
| United States District Court Western District of Wisconsin | 5/24/2013 |
| United States District Court Southern District of Indiana | 12/16/2011 |
| Please see the attachment below for remaining courts. | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is <u>Marghretta Shisko</u>          of the <u>John B. White, Jr., P.A.</u>
law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-706-8701 | 864-594-5870 | mshisko@johnbwhite.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

*Page 2 of 4*

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

100106
South Carolina Bar Number
(You must provide Bar Number)

| Yes - See attached Exhibit A |
| --- |

 11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
| --- |

 12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____ 11th _____ day of _____ December _____, 20 24

_____
APPLICANT

# VERIFICATION

STATE OF <u>SOUTH CAROLINA</u>          )

COUNTY OF <u>JEFFERSON</u>          )

I, <u>Hirlye Ray Lutz, III</u>, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___1th___ day of ___December___, 20 _24_

_____
(Notary Signature)

Notary Public for the State of ___Alabama___
My Commission Expires: ___October 22, 2028___

(Notary seal: HEATHER L. JONES, MY COMMISSION EXPIRES OCTOBER 22, 2028, NOTARY PUBLIC, STATE OF ALABAMA)

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___12th___ day of ___December___, 20 _24_

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ~~19th~~ ___12th___ day of ___December___, 20 _24_

_____

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ATTACHMENT TO PRO HAC VICE APPLICATION OF HIRLYE R. LUTZ, III**

| Court | Date Admitted: |
|---|---|
| US Court of Appeals for the 9th Circuit | 12/30/2011 |
| US Court of Appeals for the 11th Circuit | 2/5/2014 |
| US Court of Appeals for the 5th Circuit | 6/30/2015 |

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/3/2024 | John B. White | Granted |
| Laurens County Sewer Commission v. Cone Mills Receiver, LLC et al | Active | 8/22/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation,  et al | Active | 8/22/2024 | John B. White | Granted |
| South Carolina Public Service Authority v. China Jushi USA Corporation, et al | Active | 12/11/2024 | John B. White | Pending |

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that **Hirlye Ray Lutz III** was duly and legally admitted to practice law by the Supreme Court of Alabama on **September 26, 2006** and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on **December 5, 2024** with the seal of the Supreme Court of Alabama attached.



Megan B. Rhodebeck

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2025 Jan 08 9:37 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC
VICE ADMISSION OF HIRLYE RAY
LUTZ, III**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Hirlye Ray Lutz, III, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**    South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**    2024CP0803336

**Type:**    Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-01-07 17:06:23    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 08 9:37 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE
ADMISSION OF FRANK JEROME
TAPLEY**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Frank Jerome Tapley, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Tapley's admission and received no objection.

Mr. Tapley is a member in good standing with his local bar association, and the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 27, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority a/k/a Santee Cooper, an Agency of the State of South Carolina, | 2024-CP-08-03336 | In the Court of Common Pleas Ninth Judicial Circuit |
| Plaintiff | Case No. | Tribunal |
| vs. | | Mailing Address of Tribunal: |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc.; Milliken & Company et al, | | 300-B California Avenue |
| Defendant | | Moncks Corner, SC 29461 |

Comes now ___Frank Jerome Tapley___, applicant herein, and respectfully represents the following:

1. Applicant resides at:

230 Lucerne Blvd.
**Street Address**

| Homewood | Jefferson | Alabama | 35209 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |

205-207-7112
**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. , with offices at

2131 Magnolia Avenue South
**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 205-328-2200 | 205-370-1116 | 205-324-7896 | jtapley@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by
South Carolina Public Service Authority, a/k/a Santee Cooper to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since ___September 26th___ of ___2003___, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of ___Alabama___ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/27/2003 |
| Florida Supreme Court | 4/25/2006 |
| Tennessee Supreme Court | 2/17/2022 |
| United States District Court Northern District of Alabama | 10/22/2003 |
| United States District Court Middle District of Alabama | 10/22/2003 |
| United States District Court Southern District of Alabama | 10/22/2003 |
| Please see the attachment for remaining court admission information. | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is ___John B. White___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)

**Street Address**

| Spartanburg | Spartanburg | South Carolina | 29305 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-590-8701 | 864-594-5870 | jwhite@johnbwhite.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5996
--------------------------------------

South Carolina Bar Number
(You must provide Bar Number)

10.   Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See attached Exhibit A |
| --- |

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
| --- |

12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____ 11th _____ day of _DECEMBER_, 20 _24_

_____
APPLICANT

**VERIFICATION**

STATE OF  ALABAMA                    )

COUNTY OF  JEFFERSON             )

I,                    Frank Jerome Tapley                    , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ____11th____ day of ____December____, 20 _24_

_____
(Notary Signature)

Notary Public for the State of  _Alabama_

My Commission Expires: _October 22, 2028_

**LOCAL COUNSEL CONSENT**

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this _____ day of _December_, 20 _24_

_____
LOCAL COUNSEL OF RECORD

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this _____ day of _December_, 20 _24_

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ATTACHMENT TO PRO HAC VICE APPLICATION OF FRANK JEROME TAPLEY**

| Court | Date Admitted: |
|---|---|
| USDC Northern District of Florida | 12/16/2005 |
| USDC Middle District of Florida | 6/13/2007 |
| USDC Southern District of Indiana | 12/16/2011 |
| US Court of Appeals for the 9th Circuit | 12/30/2011 |
| USDC Southern District of Florida | 4/18/2012 |
| USDC Western District of Wisconsin | 5/24/2013 |
| US Court of Appeals for the 5th Circuit | 6/30/2015 |
| US Court of Appeals for the 11th Circuit | 8/23/2017 |
| US Eastern District of Arkansas | 11/11/2019 |
| US Western District of Arkansas | 11/11/2019 |
| US Court of Appeals for the 6th Circuit | 5/13/2021 |
| USDC Western District of Tennessee | 2/15/2023 |
| United States Supreme Court | 3/20/2023 |
| USDC Northern District of Ohio | 4/13/2023 |
| USDC Eastern District of Tennessee | 5/25/2023 |
| USDC Middle District of Tennessee | 8/14/2023 |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/9/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | John B. White | Granted |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 8/22/2024 | John B. White | Granted |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800333336

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ **Frank Jerome Tapley** _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 26, 2003 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 4, 2024 _____ with the seal of the Supreme Court of Alabama attached.



Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2025 Jan 08 9:35 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC
VICE ADMISSION OF FRANK
JEROME TAPLEY**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Frank Jerome Tapley, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Jan 08 9:35 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



### Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**     Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-01-07 17:05:14    page 2 of 2

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, an agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE ADMISSION OF BRETT COOPER THOMPSON**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Brett Cooper Thompson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Thompson's admission and received no objection.

Mr. Thompson is a member in good standing with his local bar association, and the Verified

Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary

information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 27, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
## IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, | 2024-CP-08-03336 | In the Court of Common Pleas Ninth Judicial Circuit |
| Plaintiff | Case No. | Tribunal |
| **vs.** | | |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc.; Milliken & Company et al, | Mailing Address of Tribunal: | 300-B California Avenue |
| | | Moncks Corner, SC 29461 |
| Defendant | | |

Comes now  Brett Cooper Thompson                               , applicant herein, and respectfully represents the following:

    1.  Applicant resides at:

5216 10th Terrace South

Street Address

| | | | |
|---|---|---|---|
| Birmingham | Jefferson | Alabama | 35222 |
| City | County | State | Zip Code |
| 205-207-7623 | | | |
| Telephone | | | |

    2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C.                                                                                , with offices at

2131 Magnolia Avenue South

Street Address

| | | | |
|---|---|---|---|
| Birmingham | Jefferson | Alabama | 35205 |
| City | County | State | Zip Code |
| 205-328-2200 | 615-870-8952 | 205-324-7896 | bthompson@corywatson.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

    3.  Applicant has been retained personally or as a member of the above-named law firm by South Carolina Public Service Authority, a/k/a Santee Cooper                to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

    4.  Since  September 30th of 2011                               , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of Alabama                where Applicant regularly practices law.  Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

5.  List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/30/2011 |
| United States District Court Northern District of Alabama | 10/19/2011 |
| United States District Court Middle District of Alabama | 10/19/2011 |
| United States District Court Southern District of Alabama | 3/7/2018 |
|  |  |
|  |  |
|  |  |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6.  Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?  If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7.  Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?  If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8.  Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9.  Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ____Marghretta Shisko____ of the ____John B. White, Jr., P.A.____

law firm, which has offices at:

____291 S. Pine Street/ P.O. Box 2465 (29304)____
Street Address

| Spantanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-590-3907 | 864-594-5870 | mshisko@johnbwhitelaw.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

*Page 2 of 4*

1001D6e

South Carolina Bar Number
(You must provide Bar Number)

10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See Attached Exhibit A |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this ____13th____ day of ___December___, 20 _24_

_____
APPLICANT

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# VERIFICATION

STATE OF ___Alabama___ )

COUNTY OF ___Jefferson___ )

I, ___Brett Cooper Thompson___, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___13th___ day of ___December___, 20 ___24___

_____
(Notary Signature)

Notary Public for the State of ___Alabama___
My Commission Expires: ___9/15/28___

*(Notary seal: SKYLER VAN LEEMPUT — MY COMMISSION EXPIRES SEPTEMBER 15, 2028 — NOTARY PUBLIC — STATE OF ALABAMA)*

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___16th___ day of ___December___, 20 ___24___

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___16th___ day of ___December___, 20 ___24___

_____

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/15/2024 | John B. White | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | John B. White | Granted |
| Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC, et al | Active | 8/22/2024 | John B. White | Granted |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/13/2024 | John B. White | Pending |

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 11:50 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of Alabama



# Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that **Brett Cooper Thompson** was duly and legally admitted to practice law by the Supreme Court of Alabama on **September 30, 2011** and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on **December 4, 2024** with the seal of the Supreme Court of Alabama attached.



Megan B. Rhodebeck

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2025 Jan 08 9:37 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC
VICE ADMISSION OF BRETT
COOPER THOMPSON**

Having considered the Motion of Marghretta H. Shisko, on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Brett Cooper Thompson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**    South Carolina Public Service Authority , plaintiff, et al VS   China
                     Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**            Order/Pro Hac Vice


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-01-07 17:06:44    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 08 9:37 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE
ADMISSION OF ROBERT AKIRA
WATSON**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Robert Akira Watson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Watson's admission and received no objection.

Mr. Watson is a member in good standing with his local bar association, and the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: December 27, 2024

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /John B. White, Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority a/k/a Santee Cooper, an Agency of the State of South Carolina | 2024-CP-08-03336 | In the Court of Common Pleas Ninth Judicial Circuit |
| Plaintiff | Case No. | Tribunal |
| **vs.** | Mailing Address of Tribunal: | |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc; Milliken & Company et al, | | 300-B California Avenue |
| Defendant | | Moncks Corner, SC 29461 |

Comes now  Robert Akira Watson                                    , applicant herein, and respectfully represents the following:

1. Applicant resides at:

5816 Southhall Rd.
_____
**Street Address**

| Birmingham, AL | Jefferson | Alabama | 35222 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |

205-207-7121
_____
**Telephone**

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C.                                                              , with offices at

2131 Magnolia Avenue South
_____
**Street Address**

| Birmingham | Jefferson | Alabama | 35205 |
|---|---|---|---|
| **City** | **County** | **State** | **Zip Code** |
| 205-328-2200 | 205-354-3666 | 205-324-7896 | awatson@corywatson.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by

South Carolina Public Service Authority a/k/a Santee Cooper         to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since  September 25th of  2020                , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of  Alabama                where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

5.  List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Alabama Supreme Court | 9/25/2020 |
| United States District Court Northern District of Alabama | 11/16/2020 |
| United States District Court Southern District of Alabama | 12/2/2020 |
| | |
| | |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6.  Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency?  If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7.  Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked?  If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8.  Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked?  If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9.  Please be aware that local counsel must be Rule 403 certified.  Local counsel of record associated

with Applicant in this case is ___John B. White.___ of the ___John B. White, Jr., P.A.___

law firm, which has offices at:

___291 S Pine Street/ P.O. Box 2465 (29304)___
Street Address

| ___Spartanburg___ | ___Spartanburg___ | ___South Carolina___ | ___29308___ |
|---|---|---|---|
| City | County | State | Zip Code |
| ___864-594-5988___ | ___864-590-8701___ | ___864-594-5870___ | ___jwhite@johnbwhite.com___ |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5996
_____
South Carolina Bar Number
(You must provide Bar Number)

     10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See attached Exhibit A |
|---|

     11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

     12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____ 14th _____ day of _December_, 20 _24_

_____
APPLICANT

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## VERIFICATION

STATE OF   Alabama                         )

COUNTY OF   Jefferson                      )

I,   Robert Akira Watson                                         , do hereby swear or affirm under penalty
of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know
the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on
information and belief, and that as to those matters I believe them to be true.  I understand that I am under a
continuing duty to promptly update the information provided in the application until the tribunal has ruled on the
motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing
duty to promptly update the information provided in the application as long as I continue to appear pro hac vice
in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the
motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this   11th   day of   December   , 20 24

_____
(Notary Signature)

Notary Public for the State of   Alabama

My Commission Expires:  October 22, 2028

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules
Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this   10th   day of   December   , 20 24

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by
mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC
29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this
_____ day of   December   , 20 24

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Woodruff-Roebuck Water District v. AFL Telecommunications, LLC, et al | Active | 7/3/2024 | Marghretta Shisko | Granted |
| Laurens County Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/22/2024 | Marghretta Shisko | Granted |
| City of Florence, South Carolina v. Burlington Industries, Inc. | Active | 12/11/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2024 Dec 27 12:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# The Supreme Court of Alabama



## Certificate Of Admission

I, Megan B. Rhodebeck, Clerk of the Supreme Court of Alabama, do hereby certify that _____ Robert Akira Watson _____ was duly and legally admitted to practice law by the Supreme Court of Alabama on _____ September 25, 2020 _____ and is now an attorney in good standing at the Bar of this Court, as shown by the records of said Court on file in this office.

I further certify that the Supreme Court of Alabama is the highest court of record in this State.

Done on _____ December 4, 2024 _____ with the seal of the Supreme Court of Alabama attached.



Megan B. Rhodebeck

Megan B. Rhodebeck
Clerk of the Supreme Court of Alabama

ELECTRONICALLY FILED - 2025 Jan 08 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC
VICE ADMISSION OF ROBERT
AKIRA WATSON**

Having considered the Motion of John B. White, Jr., on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Robert Akira Watson, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**    South Carolina Public Service Authority , plaintiff, et al VS    China Jushi Usa Corporation , defendant, et al

**Case Number:**    2024CP0803336

**Type:**    Order/Pro Hac Vice


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-01-07 17:06:03    page 2 of 2

ELECTRONICALLY FILED - 2025 Jan 08 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jan 17 10:16 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

C.A. No. 2024-CP-08-03336

*Plaintiff,*

**ACCEPTANCE OF SERVICE
ON BEHALF OF
MILLIKEN & COMPANY**

v.

CHINA JUSHI USA CORPORATION; JUSHI
USA FIBERGLASS CO., LTD.; LINDAU
CHEMICALS, INC.; MILLIKEN & COMPANY;
AND WASTE MANAGEMENT OF SOUTH
CAROLINA, INC.,

*Defendants.*

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Summons and Complaint in the above captioned matter on behalf of Defendant Milliken & Company ("Milliken"), effective this ~~19th day of December, 2024~~ 16th day of January, 2025 *jbc*, with no further service on Milliken being necessary.

Jameson B. Carroll
Carroll & Weiss LLP
2870 Peachtree Rd. NW, Ste. 193
Atlanta, GA 30305-2918
404-514-5061
jcarroll@carrollweiss.com

*Counsel for Milliken & Company*

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

Plaintiff,

v.

China Jushi USA Corporation *et al.*,

Defendants.

C.A. No. 2024-CP-08-03336

## PLAINTIFFS' STATUS CONFERENCE STATEMENT

Plaintiffs in this consolidated litigation[1] are local and regional public utilities and water authorities who share a common challenge: the contamination of their water sources and properties with certain perfluoroalkyl substances ("PFAS").

The Environmental Protection Agency's recent publications mark a significant advancement in the scientific understanding of PFAS toxicity. While the EPA previously advised that PFOA and PFOS—the two most studied PFAS compounds—could be safely consumed at levels of up to 70 parts per trillion ("ppt") over a lifetime, the agency now makes clear that **no safe level exists** for consuming these chemicals. Building on this understanding, the EPA has enacted maximum contaminant levels under the Safe Drinking Water Act for PFOA, PFOS, and four

---

[1] The undersigned represent Plaintiffs Woodruff-Roebuck Water District; Greenwood Commissioners of Public Works; Laurens County Water and Sewer Commission; Grand Strand Water and Sewer Authority; City of Florence, South Carolina; South Carolina Public Service Authority (Santee Cooper); City of Union, South Carolina; and City of Clinton, South Carolina. Pursuant to the Supreme Court's consolidation order, this litigation also includes additional local public utilities and water authorities.

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

additional PFAS types ("MCL PFAS"). These regulations prohibit water authorities from delivering drinking water containing MCL PFAS concentrations above these newly defined thresholds, with enforcement to begin in 2029.

However, like the vast majority of water providers, Plaintiffs rely on conventional water treatment technologies that are unable to remove PFAS. And MCL PFAS, including PFOA and PFOS, currently contaminate their drinking water, which leaves Plaintiffs' treatment plants at levels above the EPA limits. Not only does the PFAS contamination pose an obstacle to Plaintiffs' legal compliance and injure Plaintiffs' property interests—according to the EPA, it directly threatens public health and the environment. Indeed, even if Plaintiffs were subject to no regulation, the EPA's stance alone compels that Plaintiffs act to protect their own interests and those of their customers and communities.

Plaintiffs serve cities and counties across the state, providing water to over 800,000 residences and businesses. When accounting for spouses, children, employees, tenants, patients, and other individuals in these communities, the PFAS contamination problem in Plaintiffs' water supplies impacts **well over a million South Carolina residents**—approaching or exceeding 25% of the state's population.

The contamination spreads through South Carolina's rivers, lakes, and streams—surface waters that Plaintiffs are authorized to withdraw, treat, and provide to customers. It is largely driven by private industries that utilize MCL PFAS in their manufacturing processes, generating PFAS-laden wastewater. These industries discharge wastewater into local treatment plants, which process and release it into the same surface waters that Plaintiffs rely on for drinking water. Unfortunately, as at Plaintiffs' water facilities, PFAS bypass the conventional treatment systems used by wastewater treatment plants and flow unhindered into the state's surface waters. These

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

contaminated waters then pass through Plaintiffs' water plants just as easily and into homes and businesses across the state.

Plaintiffs commenced this litigation not only to protect their own rights, but also because the PFAS contamination presents a critical public health and infrastructural challenge—a burden that neither Plaintiffs nor their customers can, or should, bear alone. Plaintiffs' surface water treatment plants require upgraded treatment technologies to provide PFAS-free water. And Plaintiffs believe that the financial burden of these upgrades should not fall on their drinking water customers and communities, who bear no responsibility for this contamination. Instead, those who caused and profited from the contamination must be held accountable to ensure this crisis is justly resolved. Plaintiffs are seeking to do so both comprehensively and urgently.

Plaintiffs have named numerous industries as defendants due to their alleged discharge of PFAS-contaminated wastewater, either directly to South Carolina surface waters or indirectly through their applicable wastewater treatment providers. Plaintiffs also anticipate adding as defendants the chemical suppliers of PFAS-discharging defendants upon receiving discovery revealing their identities. Thus, Plaintiffs anticipate that the number of parties and scope of discovery in this litigation will be significant.

Discovery topics will include:

- The identities of the suppliers of products containing or degrading to MCL PFAS used by Defendants;

- The type and volume of PFAS-containing products supplied to and used by Defendants;

- The industrial processes employed by Defendants who use these products and cause their discharge;

- The chemical composition of the products at issue, including the mechanisms by which the MCL PFAS are present in the products;

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

- The fate and transport of these products—i.e., the means by which they are used, disposed of, and eventually reach surface waters, Plaintiffs' water sources, and Plaintiffs' properties;

- Defendants' historical knowledge of the chemical properties of, and the environmental and health risks posed by, these products; and

- Instructions, if any, from Defendants' chemical suppliers as to the nature of these products and their proper disposal.

Based on the experience of Plaintiffs' counsel in litigating PFAS cases involving complex topics of chemistry, industry history, and fate and transport, Plaintiffs believe that this discovery will require extensive document production, witness testimony from officers and employees of Plaintiffs and all Defendants, and property inspections.

The volume of complex matters in this case presents unique challenges in organizing and managing recurring issues—both in discovery and in substantive litigation.

Plaintiffs, therefore, make the following recommendations:

1. *Appointment of Leadership*. Leadership counsel will provide the Court with the means for efficiently contacting all parties in each case for scheduling matters, and it will aid the parties in informally resolving issues that require consent or agreement among the parties.

2. *Consolidated Case Number*. A consolidated case number provides a centralized docket for all filings concerning consolidated matters.

3. *Initial Disclosures*. Core discovery topics applicable to all cases can be covered at the outset in each case, including the following:

   a. Sales records of products containing MCL PFAS;

   b. Identification of suppliers of MCL PFAS;

   c. Applicable insurance policies;

   d. The analytical results of any PFAS testing conducted by the responding party;

   e. Previous depositions in other cases by any party concerning PFAS; and

   f. Identification of experts.

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

4. *Discovery Protocols.* Standard discovery protocols inform the parties of this Court's expectations in how to approach matters that can otherwise cause delay, such as disputes and scheduling difficulties. Protocols should cover matters such as:

   a. Objections to written discovery, including the prohibition of both boilerplate and general objections, and requiring clarity as to whether the responding party is withholding responsive information based on an objection;

   b. Special interrogatories;

   c. Property inspection procedures, including scheduling and setting protocols for PFAS-sampling methods and parameters;

   d. Standard procedures for resolving discovery disputes, including meet and confer processes and resolution with the Court;

   e. Privilege logs;

   f. Document requests made to Plaintiffs via the Freedom of Information Act;

   g. Subpoenas;

   h. Production of documents and electronically stored information;

   i. Deposition scheduling and conduct; and

   j. Protective orders, including confidentiality designations for documents and testimony produced in discovery.

5. *Periodic Conferences before the Court.* Regular conferences before this Court will aid efficiencies in many ways, including dispute resolution and maintaining discovery scheduling.

6. *Consolidated Briefing.* Except for motions involving facts unique to a particular Defendant, consolidated briefing will prevent frequent repetition and bloat from overburdening the parties and the Court, while maintaining full and fair representation of the parties' views on the facts and their legal arguments.

7. *Setting Trial Dates.* Firm trial dates aid all parties in completing discovery and readying the case for resolution. Plaintiffs recommend January 2027.

Due to the volume of parties and factual complexities in these cases, Plaintiffs believe that a Case Management Order streamlining these matters as outlined above will significantly contribute to resolving this case in the most efficient and timely manner possible.

Respectfully submitted,

   _/s/ John B. White. Jr._

ELECTRONICALLY FILED - 2025 Jan 23 11:33 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

January 17, 2025

ELECTRONICALLY FILED - 2025 Jan 27 11:06 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of South Carolina

RE:  PFAS Litigation

## O R D E R

Pursuant to the provisions of Article V, Section 4 of the South Carolina Constitution, I find that assigning a single circuit judge to dispose of all matters arising out of the PFAS litigation currently pending and to be filed in the state court system will promote the effective and expeditious disposition of this litigation through uniform rulings and will conserve the judicial resources of the parties, their counsel, and the judiciary.  Therefore,

IT IS ORDERED that the Honorable Grace Gilchrist Knie be vested with exclusive jurisdiction to hear and dispose of all PFAS litigation cases.  Judge Knie shall decide all pretrial motions and other pretrial matters, including appropriate scheduling deadlines and admission of counsel *pro hac vice* pursuant to Rule 404, SCACR, arising out of the PFAS cases filed in the state court system. Judge Knie shall have jurisdiction in all circuits in the state to dispose of all pretrial matters arising out of the PFAS litigation and may schedule such hearings as may be necessary at any time without regard as to whether there is a term of court scheduled.

IT IS FURTHER ORDERED that for administrative purposes and convenience, upon the filing of a new action involving PFAS litigation, the clerk of court shall notify Judge Knie, via email, of such filing within five business days. This notification shall include the case caption, including the docket number, as well as the name of the attorney or party signing the pleadings.  Judge Knie shall then direct the clerk of court as to the preferred method for transmitting the pleadings and additional filings to her office.

IT IS FURTHER ORDERED that Judge Knie shall have jurisdiction to issue case management orders directing the consolidation of certain pretrial matters within the PFAS litigation.

IT IS FURTHER ORDERED that this is not a consolidation for trial purposes.  At the conclusion of all pretrial matters, any party may move to have

trial ready cases transferred to the trial roster of the court of original jurisdiction or the court of appropriate venue for trial. Judge Knie shall preside over the trials of all PFAS cases.

This order shall remain in effect until amended or rescinded by the Chief Justice.

_____ C.J.
FOR THE COURT
John W. Kittredge
Chief Justice of South Carolina

Columbia, South Carolina
August 14, 2024

ELECTRONICALLY FILED - 2025 Jan 27 11:06 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jan 27 11:06 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of South Carolina

### RE: Local PFAS Litigation

---

## ORDER

---

Pursuant to the provisions of Article V, section 4 of the South Carolina Constitution, I find that assigning a single circuit judge to dispose of all matters arising out of the PFAS litigation brought by publicly-owned water providers seeking damages within their local districts (Local PFAS Litigation) currently pending and to be filed in the state court system will promote the effective and expeditious disposition of this litigation through uniform rulings and will conserve the judicial resources of the parties, their counsel, and the judiciary. Therefore,

IT IS ORDERED that the Honorable Grace Gilchrist Knie be vested with exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases. Judge Knie shall decide all pretrial motions and other pretrial matters, including appropriate scheduling deadlines and admission of counsel *pro hac vice* pursuant to Rule 404, SCACR, arising out of the Local PFAS Litigation cases filed in the state court system. Judge Knie shall have jurisdiction in all circuits in the state to dispose of all pretrial matters arising out of the Local PFAS Litigation and may schedule such hearings as may be necessary at any time without regard to whether there is a term of court scheduled.

IT IS FURTHER ORDERED that for administrative purposes and convenience, upon the filing of a new action involving Local PFAS Litigation, the clerk of court shall notify Judge Knie, via email, of such filing within five business days. This notification shall include the case caption, including the docket number, as well as the name of the attorney or party signing the pleadings. Judge Knie shall then direct the clerk of court as to the preferred method for transmitting the pleadings and additional filings to her office.

IT IS FURTHER ORDERED that Judge Knie shall have jurisdiction to issue case management orders directing the consolidation of certain pretrial matters within the Local PFAS Litigation.

IT IS FURTHER ORDERED that this is not a consolidation for trial purposes. At the conclusion of all pretrial matters, any party may move to have trial ready cases transferred to the trial roster of the court of original jurisdiction or the court of appropriate venue for trial. Judge Knie shall preside over the trials of all Local PFAS Litigation cases.

This order supersedes the PFAS Litigation Order dated August 14, 2024, and shall remain in effect until amended or rescinded by the Chief Justice.

John W. Kittredge
Chief Justice of South Carolina

Columbia, South Carolina
October ___7___, 2024

ELECTRONICALLY FILED - 2025 Jan 27 11:06 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

       *Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

       *Defendants.*

**MEMORANDUM IN SUPPORT OF
CHINA JUSHI USA CORPORATION
AND JUSHI USA FIBERGLASS CO.,
LTD.'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT**

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

LEGAL STANDARD.......................................................................................... 2

ARGUMENT ...................................................................................................... 3

I.    PLAINTIFF FAILS TO STATE A CAUSE OF ACTION AGAINST JUSHI USA.................................................................................................................. 3

    A.    Plaintiff's Negligence, Gross Negligence and/or Recklessness Claim: Plaintiff fails to allege facts establishing a duty, breach, causation, or recoverable damages. ........................................................................... 3

        1.    No duty of care.................................................................... 3

        2.    No breach. .......................................................................... 4

        3.    No proximate causation. ..................................................... 5

        4.    No recoverable damages. .................................................... 6

    B.    Plaintiff's Public and Private Nuisance Claims: Plaintiff fails to allege the requisite control, proximate causation, or exclusive possession........................................................................ 7

        1.    No requisite control............................................................ 7

        2.    No proximate causation. ..................................................... 8

        3.    No exclusive possession. .................................................... 9

    C.    Plaintiff's Trespass Claim:  Plaintiff fails to allege a tangible invasion, direct causation, or exclusive possession................................. 9

        1.    No tangible invasion. ......................................................... 9

        2.    No direct causation. ......................................................... 10

        3.    No exclusive possession. .................................................. 11

II.    THE MUNICIPAL COST RECOVERY RULE BARS RECOVERY OF COSTS PLAINTIFF SEEKS AS DAMAGES. ............................................. 11

CONCLUSION.................................................................................................. 12

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Cleveland-Cliffs Iron Co.*,
  602 N.W.2d 215 (Mich. Ct. App. 1999) ...............................................................10

*Akers v. Hard*,
  275 S.C. 100, 267 S.E.2d 536 (1980) ................................................................2, 4

*Allen v. Union Oil & Mfg. Co.*,
  59 S.C. 571, 38 S.E. 274 (1901) .........................................................................10

*Babb v. Lee County Landfill S.C.*,
  *LLC*, 405 S.C. 129 (2013) ............................................................................. *passim*

*Balfour Beatty Infrastructure, Inc. v. Rummel, Klepper & Kahl, LLP*,
  155 A.3d 445 (Md. 2017) .......................................................................................6

*Baltzeger v. Carolina Midland Ry. Co.*,
  54 S.C. 242 (1899) .................................................................................................9

*Charleston Cnty. Sch. Dist. v. Laidlaw Transit, Inc.*,
  348 S.C. 420, 559 S.E.2d 362 (Ct. App. 2001)......................................................2

*Charleston Dev. Co., LLC v. Alami*,
  433 S.C. 533 (Ct. App. 2021) ................................................................................9

*Clark v. Greenville Cnty.*,
  313 S.C. 205, 437 S.E.2d 117 (1993) ..................................................................7, 8

*Doe v. Greenville Cnty. Sch. Dist.*,
  375 S.C. 63 (2007) .................................................................................................3

*Graham v. Town of Latta*,
  417 S.C. 164, 789 S.E.2d 71 (Ct. App. 2016).....................................................10

*Gray v. S. Facilities, Inc.*,
  256 S.C. 558 (1971) ...............................................................................................7

*Home Sales, Inc. v. City of N. Myrtle Beach*,
  299 S.C. 70, 382 S.E.2d 463 (Ct. App. 1989)....................................................5, 8

*Huggins v. Citibank, N.A.*,
  355 S.C. 329 (2003) ...............................................................................................3

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Fund v. Philip Morris, Inc.*,
   196 F.3d 818 (7th Cir. 1999) ................................................................12

*Jackson v. Bermuda Sands, Inc.*,
   383 S.C. 11, 677 S.E.2d 612 (Ct. App. 2009)....................................................5

*Johnson v. Paynesville Farmers Union Coop. Oil Co.*,
   817 N.W.2d 693 (Minn. 2012)..............................................................10

*McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*,
   373 S.C. 43 (2007) ........................................................................3

*Overcash v. S.C. Elec. & Gas Co.*,
   364 S.C. 569, 614 S.E.2d 619 (2005) ........................................................2

*Rhodes v. E.I. du Pont de Nemours & Co.*,
   657 F. Supp. 2d 751 (S.D.W. Va. 2009) ....................................................10

*Richardson's Restaurants, Inc. v. Nat'l Bank of S.C.*,
   304 S.C. 289 (1991) ...................................................................6, 7

*S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*,
   289 S.C. 373 (1986) ......................................................................3

*Sapp v. Ford Motor. Co.*,
   386 S.C. 143 (S.C.S. Ct.) ...............................................................6, 7

*Skywaves I Corp. v. Branch Banking & Tr. Co.*,
   423 S.C. 432, 814 S.E.2d 643 (Ct. App. 2018)..............................................2, 4

*Snow v. City of Columbia*,
   305 S.C. 544, 409 S.E.2d 797 (Ct. App. 1991)..............................................5, 10

*Spence v. Spence*,
   368 S.C. 106, 628 S.E.2d 869 (2006) ........................................................2

*Torres v. Putnam Cnty.*,
   541 S.E.2d 133 (Ga. App. 2000)............................................................12

*United States v. Standard Oil Co. of Cal.*,
   332 U.S. 301 (1947) .....................................................................11

*White v. Whitney Mfg. Co.*,
   60 S.C. 254 (1901).......................................................................11

*Williams v. Preiss-Wal Pat III, LLC*,
   17 F. Supp. 3d 528 (D.S.C. 2014).........................................................3

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Other Authorities**

Economic-Loss Doctrine, 74 Am. Jur. 2d Torts § 23 ......................................................6

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## PRELIMINARY STATEMENT

Plaintiff South Carolina Public Services Authority a/k/a Santee Cooper ("Plaintiff") seeks to hold China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd. (collectively "Jushi USA") liable for the costs Plaintiff asserts it will incur in the future to acquire, install, and operate water treatment technologies at Plaintiff's water treatment plants to remove PFAS from drinking water. Plaintiff asserts that it is required to incur these costs because of new federal regulations that will take effect in 2029. Plaintiff seeks to recover its future compliance costs from Jushi USA under theories of negligence, gross negligence, recklessness, private nuisance, public nuisance and trespass, alleging that Jushi USA discharged wastewater containing PFAS into the Columbia Wastewater Treatment Plant ("Columbia WWTP"), which, in turn, discharged treated wastewater containing PFAS into the Congaree River, which flowed downstream to Lake Marion and Lake Moultrie from which Plaintiff withdrew water containing PFAS, which plaintiff alleges it is unable to treat to remove PFAS.[1]

The Court should dismiss Plaintiff's claims to recover its future compliance costs from Jushi USA for multiple reasons. First, each of Plaintiff's claims fails to state a cause of action against Jushi USA.

**Negligence, Gross Negligence and/or Recklessness**. Plaintiff fails to allege facts establishing that Jushi USA owes Plaintiff a legal duty of care, that Jushi breached any such duty, or that Jushi USA's discharge of industrial wastewater into the Columbia WWTP is the proximate cause of Plaintiff's alleged harm. The economic loss doctrine also

---

[1] While Plaintiff has alleged that "Jushi" discharged PFAS to the Columbia WWTP, *see, e.g.*, Compl. ¶¶ 17, 79, Jushi USA Fiberglass Co., Ltd. is a sales company that does not manufacture any products or discharge any wastewater from the Jushi facility located at 2971 Shop Road, Columbia, South Carolina 29209.

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

bars Plaintiff's claim for future compliance costs in the absence of any physical injury or damage to Plaintiff's property.

**Private Nuisance and Public Nuisance**. Plaintiff fails to allege facts establishing the requisite control and proximate causation necessary to state a private or public nuisance claim, and Plaintiff's private nuisance claim additionally fails because alleged contamination of a *public* body of water cannot state a claim for *private* nuisance.

**Trespass**. Plaintiff's trespass claim should be dismissed because PFAS particles measured in parts per trillion cannot constitute a tangible invasion as is required to state a claim for trespass, Jushi USA's alleged conduct is not the direct cause of the trespass alleged, and Plaintiff's riparian rights do not amount to exclusive possessory rights that would support a trespass claim for any "invasion" of Lake Marion and Lake Moultrie.

Second, Plaintiff, a public corporation and state agency, is barred, under the municipal cost recovery rule, from recovering, as tort damages, future public expenditures Plaintiff will make in the performance of its governmental functions.

## LEGAL STANDARD

A "failure to state facts sufficient to constitute a cause of action" warrants dismissal under SCRCP 12(b)(6). *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). If the "facts alleged and inferences reasonably deducible therefrom" do not "entitle the plaintiff to relief under any theory," the court should dismiss the complaint. *Id*. Courts assume the truth of "well pled facts." *Overcash v. S.C. Elec. & Gas Co.*, 364 S.C. 569, 572, 614 S.E.2d 619, 620 (2005). But "conclusory allegation[s]," *Skywaves I Corp. v. Branch Banking & Tr. Co.*, 423 S.C. 432, 455 n.9, 814 S.E.2d 643, 656 n.9 (Ct. App. 2018), "bare assertion[s]," *Akers v. Hard*, 275 S.C. 100, 102,

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

267 S.E.2d 536, 537 (1980), and "conclusions of law" do not suffice to avoid dismissal, *Charleston Cnty. Sch. Dist. v. Laidlaw Transit, Inc.*, 348 S.C. 420, 426, 559 S.E.2d 362, 365 (Ct. App. 2001).

## ARGUMENT

**I.     Plaintiff Fails to State a Cause of Action Against Jushi USA.**

**A.   Plaintiff's Negligence, Gross Negligence and/or Recklessness Claim: Plaintiff fails to allege facts establishing a duty, breach, causation, or recoverable damages.**

To prevail on a negligence claim, gross negligence claim, or claim of recklessness "a plaintiff must establish duty, breach, causation, and damages." *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 153 (2013) (citing *Sherrill v. Southern Bell Tel. & Tel. Co.*, 260 S.C. 494, 499 (1973)). Plaintiff fails to allege facts sufficient to establish each of these required elements as to China Jushi USA.

### *1.   No duty of care.*

As an initial matter, Plaintiff does not allege and cannot establish that Jushi USA owes Plaintiff a legal duty of care—an essential element of its claims. *Huggins v. Citibank, N.A.*, 355 S.C. 329, 332 (2003). The existence of such a duty is a question of law for the courts. *Doe v. Greenville Cnty. Sch. Dist.*, 375 S.C. 63 (2007). A duty of care "may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 373 S.C. 43, 47–8 (2007). "It is the relationship between the parties, not the potential 'foreseeability of injury,' that determines whether the law will recognize a duty in a given context." *Williams v. Preiss-Wal Pat III, LLC*, 17 F. Supp. 3d 528, 535 (D.S.C. 2014) (citing *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 619 (2003)). "[F]oreseeability of injury, in and of itself, does not give rise to a duty." *Shaw*, 426 S.C. at 198, 826 S.E.2d at 283 (quoting *McCullough*, 373 S.C. at 48, 644 S.E.2d at 46). South Carolina courts "will not extend the concept of a legal duty of care in tort

liability beyond reasonable limits." *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 377 (1986).

Plaintiff alleges that Jushi USA has "a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals," but Plaintiff's allegation is insufficient to establish that Jushi USA owes a legal duty *to Plaintiff*. Compl. ¶ 88. While Plaintiff alleges that Jushi USA "knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, and dose-additive; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including those in the Santee River Basin—were vulnerable to the contamination that has taken and now takes place," Compl. ¶ 89, South Carolina law is clear that foreseeability alone, independent of a relationship, is not sufficient to establish a legal duty. Plaintiff does not allege, nor is there, any relationship between Plaintiff and Jushi USA that would support a conclusion that Jushi USA owes Plaintiff a duty of care. Compl. ¶ 88.

### 2. *No breach.*

Plaintiff also alleges no facts that would support a conclusion that Jushi USA breached any duty owed Plaintiff. Plaintiff does not, for example, allege facts that would support a conclusion that Jushi USA failed to "use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals." Indeed, Plaintiff does not allege facts that would even support a conclusion Jushi USA handled, used, or disposed of any "products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals." Plaintiff's allegations are, at best, the type of "conclusory allegation[s]," *Skywaves I Corp.,* 423 S.C. at 455 n.9., and "bare assertion[s]," *Akers* , 275 S.C. at 102, 267 S.E.2d at 537, , South Carolina courts have deemed insufficient to state a claim.

### 3. *No proximate causation.*

Plaintiff also fails to allege any facts that would support a conclusion that Jushi USA's conduct was the proximate cause of the harm alleged. *See Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (Ct. App. 1989); *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). Proximate cause requires "proof of causation in fact and legal cause." *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 16, 677 S.E.2d 612, 615 (Ct. App. 2009). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence," while "[l]egal cause is proved by establishing foreseeability." *Id.*

Here, Plaintiff fails in its attempt to characterize a remote and attenuated chain of events as proximate causation. Plaintiff alleges it was harmed by Jushi USA's use and discharge of "products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of fiberglass products." Compl. ¶ 17. But Plaintiff admits that Jushi USA "discharges industrial wastewater with products that contain or degrade to these PFAS"—not to Plaintiff's property—but to the Columbia WWTP. *Id.* The Columbia WWTP, in turn discharges— again, not to Plaintiff's property—to the Congaree River, which is "upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie." *Id.* Once it was discharged by the Columbia WWTP, flowed down the Congaree River, and reached Lake Marion and Lake Moultrie, the wastewater Jushi discharged to the Columbia WWTP was allegedly comingled with wastewater of other Defendants that Plaintiff alleges contains PFAS (and undoubtedly was comingled with water from numerous other sources that contained PFAS). *Id.* ¶ 18. Importantly, even with this attenuated chain of events, Plaintiff would not have suffered the harm it alleges but for its own action— drawing water from Lake Marion and Lake Moultrie into its intake systems. The attenuated chain

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

of events and multiple actors required for Plaintiff to suffer the alleged harm precludes a finding that Jushi USA's conduct was the "proximate cause" of Plaintiff's injury.

### 4. *No recoverable damages.*

Plaintiff's claims are also squarely foreclosed by the economic loss doctrine. Plaintiff fails to allege any identified damage or physical injury to its property, which precludes its claim to recover purely economic losses. "'Economic loss' is defined generally as pecuniary loss or damage other than physical harm to persons or property." Economic-Loss Doctrine, 74 Am. Jur. 2d Torts § 23; see also Economic Losses, 18 Md. L. Encycl. Prods. Liab. § 31 ("'Economic damages' in contrast to damages for personal injury or physical harm to tangible things, are intangible economic losses resulting from the inferior quality or unfitness of a product to adequately serve the purpose for which it was purchased."). The economic loss doctrine generally prohibits recovery in tort for purely economic losses that arise independent from damage to persons or property. W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 9A, 681 (5th Ed. 1984). "The economic loss doctrine represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Balfour Beatty Infrastructure, Inc. v. Rummel, Klepper & Kahl, LLP*, 155 A.3d 445, 451–52 (Md. 2017) (internal citations omitted).

As South Carolina courts have explained, "[t]ort liability only lies where there is damage done to other property or personal[] injury." *Sapp v. Ford Motor. Co.*, 386 S.C. 143, 147 (S.C.S. Ct.). "Tort law . . . is rooted in the concept of protecting society as a whole from *physical harm to person or property.*" *Id.* (emphasis added). "[P]roof of actual damage is an essential element of the tort" of negligence in South Carolina. *Richardson's Restaurants, Inc. v. Nat'l Bank of S.C.*, 304 S.C. 289, 296 (1991). "There is no liability if there is no actual damage." *Id.* The damages

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

element "requires a plaintiff to establish *physical injury or property damage.*" *Babb*, 405 S.C. at 153 (emphasis added). South Carolina courts are "cautious in permitting negligence actions where there is neither personal injury nor property damage." *Sapp*, 386 S.C. at 149.

Here, the only identified damages Plaintiff alleges relate to costs it will incur in the future to "remov[e] Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals" and "future costs to acquir[e], install[], and operat[e] adequate water treatment technologies." Compl. ¶ 91. Plaintiff alleges in a conclusory fashion that these costs "result[] from injury to its properties." However, Plaintiff fails to allege any facts to support the claimed injury to property or even identify what property Plaintiff contends was injured. Plaintiff does not assert, for instance, that its water filtration systems were physically damaged or nonfunctional because of Jushi USA's conduct, only that "Plaintiff's existing water treatment processes cannot remove" PFAS from the water that Plaintiff, by its own action, introduced into its facilities. Compl. ¶ 6. As pled, Plaintiff's negligence claim fails to identify any "physical injury or property damage" that would allow it to recover the purely economic losses it seeks as damages. *See Gray v. S. Facilities, Inc.*, 256 S.C. 558, 566–71 (1971) (finding property owner could not recover for diminution of the value of property resulting from oil fire in adjacent river that did not cause physical damage to his property); *see Richardson's Restaurants, Inc.*, 304 S.C. at 296 (finding "no liability if there is no actual damage"). For this additional reason, Plaintiff's negligence claim, gross negligence claims, and recklessness claim against Jushi USA fails as a matter of law and should be dismissed.

**B. Plaintiff's Public and Private Nuisance Claims: Plaintiff fails to allege the requisite control, proximate causation, or exclusive possession.**

   *1. No requisite control.*

Under South Carolina law, a defendant can be held liable for nuisance only if he had "control over [the] property at the time of the alleged nuisance." *Clark v. Greenville Cnty.*, 313

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

S.C. 205, 210, 437 S.E.2d 117, 119 (1993). The control required is *physical control* over the property at the time of the nuisance. The Supreme Court thus has held that, "one who has no control over property at the time of the alleged nuisance cannot be held liable," affirming the dismissal of a nuisance claim against defendants who allegedly deposited "hazardous waste" at a landfill because the plaintiff "neither alleged nor produced any evidence that the corporate respondents had control over the [property] or the hazardous waste once it was deposited at the [property]." *Id.*

The facts Plaintiffs allege align squarely with those of *Clark*. Plaintiff alleges that Jushi USA "discharges industrial wastewater with products that contain or degrade to these PFAS"—not to Plaintiff's property—but to the Columbia WWTP, which in turn "discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie." Compl. ¶ 17. Plaintiff does not allege that Jushi USA had control over the Columbia WWTP or the industrial wastewater after it was discharged to the Columbia WWTP, just as the plaintiffs in *Clark* did not allege that the corporate defendants had control over the landfill that created the nuisance, or the hazardous waste after it was deposited at the landfill. Because Plaintiff fails to allege the requisite control under *Clark*, Plaintiff fails to state a cause of action against Jushi USA for public or private nuisance. *Clark*, 313 S.C. at 210, 437 S.E.2d at 119.

### 2. *No proximate causation.*

Proximate cause also is an essential element of a claim for public and private nuisance. *See Home Sales, Inc.*, 299 S.C. at 82, 382 S.E.2d at 469. As noted above, with respect to Plaintiff's negligence claim, Plaintiff fails to allege facts that would support a conclusion that Jushi USA proximately caused the injury Plaintiff complains of. Simply put, the chain of events between Jushi USA's alleged conduct and the alleged interference with Plaintiff's use and enjoyment of its downstream property—i.e., Jushi USA's discharge of industrial wastewater to the Columbia

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

WWTP, the Columbia WWTP's discharge to Lake Congaree, Lake Congaree's waters flowing downstream to Lake Marion and Lake Moultrie, Plaintiff's withdrawal of water from Lake Marion and Lake Moultrie into its water systems—is too attenuated to establish proximate causation. Compl. ¶¶ 6, 17. As a result, Plaintiff's public and private nuisance claims fail for this additional reason.

### 3. *No exclusive possession.*

In addition, Plaintiff's *private* nuisance claim should be dismissed because an alleged contamination of a public body of water cannot state a claim for private nuisance. A private nuisance "produces damage to but one or two persons, and cannot be said to be public." *Charleston Dev. Co., LLC v. Alami*, 433 S.C. 533, 547–48 (Ct. App. 2021) (quoting *Deason v. S. Ry. Co.*, 142 S.C. 328, 334 (1927)); *see also Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248 (1899) ("A private nuisance affects only one person or a determinate number of persons." (quoting 16 Am. & Eng. Enc. Law at 926)). Because Plaintiff is just one of the many riparian landowners with property located along Lake Marion and Lake Moultrie, Plaintiff cannot sustain its private nuisance claim based on an alleged and unsubstantiated discharge of industrial wastewater containing PFAS into the Columbia WWTP, which then discharges into the Congaree River, which then flows downstream to the subject lakes. Compl. ¶ 17. The harm alleged—the indirect, downstream contamination of Lake Marion and Lake Moultrie—is public in nature. It cannot support a private nuisance claim.

### C. Plaintiff's Trespass Claim: Plaintiff fails to allege a tangible invasion, direct causation, or exclusive possession.

### 1. *No tangible invasion.*

Plaintiff's trespass claim fails because Plaintiff does not allege "an invasion by a physical, tangible thing." *Babb*, 405 S.C. at 145, 747 S.E.2d at 476. "South Carolina adheres to the

traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Id.* at 145. "[I]ntangible invasions . . . cannot give rise to a trespass action." *Babb*, 405 S.C. at 149, 150–52 (concluding that allowing trespass actions for "microscopic and atomic particles" would lead to public uncertainty as to what constitutes a trespass and "would transform trespass into nuisance" where plaintiffs could recover for "even the most ephemeral intrusion").

PFAS particles in the water are infinitesimal, microscopic, particles, which are "visibly undetectable and transient." *Id.* at 146 (citation omitted). Plaintiff acknowledges that PFAS particles are measured in "parts per trillion." Compl. ¶ 30. They are, therefore, "intangible . . . particles" insufficient to support a trespass action, *Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 772 (S.D.W. Va. 2009) (rejecting PFAS trespass action); *see, e.g.*, *Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215, 223 (Mich. Ct. App. 1999); *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 700–01 (Minn. 2012). Because Plaintiff does not sufficiently allege an invasion of a tangible thing, its trespass claim should be dismissed.

### 2. *No direct causation.*

Trespass requires that the "invasion" be the "direct result" of the defendant's actions. *See, e.g.*, *Graham v. Town of Latta*, 417 S.C. 164, 192, 789 S.E.2d 71, 86 (Ct. App. 2016); *Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *see also Allen v. Union Oil & Mfg. Co.*, 59 S.C. 571, 578, 38 S.E. 274, 276 (1901) ("A trespass is a direct . . . invasion of one's property."). The defendant's alleged conduct must be "the immediate cause" of the invasion. *Snow*, 305 S.C. at 554, 409 S.E.2d at 802.

Plaintiff tacitly admits that the alleged PFAS "trespass" was not the direct result of Jushi USA's conduct. Plaintiff alleges that Jushi USA discharged industrial wastewater to the Columbia WWTP. Compl. ¶ 17. The Columbia WWTP controlled how and where it discharged treated wastewaters and whether those wastewaters were discharged with PFAS contamination. Jushi

10

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

USA had no control over what happened to the wastewater it discharged to the Columbia WWTP, and it certainly had no control over the entry of the wastewater onto Plaintiff's property—Plaintiff did by purposefully withdrawing water from Lake Moultrie and Lake Marion. Compl. ¶ 6. Because Plaintiff, rather Jushi USA, is the "immediate cause" of the trespass complained of, Plaintiff's trespass claim against Jushi USA should be dismissed.

### 3. *No exclusive possession.*

To the extent Plaintiff alleges that the trespass at issue is the indirect, introduction of PFAS contaminated wastewater into Lake Marion and Lake Moultrie (through the Columbia WWTP and Congaree River), Plaintiff's trespass claim fails because Plaintiff does not have exclusive possession over those public waterways. South Carolina courts are clear that trespass only protects one's right to the exclusive possession of their own property, and Plaintiff does not have exclusive possession of Lake Marion or Lake Moultrie. *Babb*, 405 S.C. at 139. Plaintiff alleges that it "owns and occupies riparian lands on Lake Marion in Santee, South Carolina; and on Lake Moultrie in Moncks Corner, South Carolina." Compl. ¶ 3. However, while it is well settled that a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property *in the water itself*, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265 (1901) (emphasis added). Because Plaintiff does not possess exclusive property rights over Lake Marion and Lake Moultrie, Plaintiff cannot maintain a trespass claim based on any alleged "invasion" of those bodies of water with PFAS contamination.

## II.     The Municipal Cost Recovery Rule Bars Recovery of Costs Plaintiff Seeks as Damages.

The municipal cost recovery rule establishes that public expenditures made in the performance of governmental functions are not recoverable in tort. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 315–17 (1947) (holding that the "exercise of judicial power to

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

establish [] new liability . . . would be intruding within a field properly within [the legislature's] control"). Attempts by government entities to sue manufacturers over response costs are seen as an end run around the democratic process. *See Int'l Bhd. of Teamsters, Local 734 Health & Welfare Fund v. Philip Morris, Inc.*, 196 F.3d 818, 825 (7th Cir. 1999); *see also Torres v. Putnam Cnty.*, 541 S.E.2d 133, 136 & n.4 (Ga. App. 2000) (allegation that defendant "caus[ed] the county to spend money enforcing its laws and protecting its citizens" failed to state a claim).

Plaintiff is "a public corporation and agency of the State of South Carolina vested with authority . . . to acquire, treat, distribute, and sell drinking water." Compl. ¶ 13 (citing S.C. CODE ANN. § 58-31-30; *see also id.* §§ 58-31-10 to -740). As a public, governmental entity, Plaintiff cannot claim relief from the Court for alleged damages to upgrade its water filtration systems.

## CONCLUSION

For the foregoing reasons, Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd. respectfully submit that the Court should dismiss Plaintiff's Complaint against them in its entirety.

Respectfully submitted,

Dated: February 12, 2025

*s/ Celine Amini*

Celine Amini (Bar No. 106206)
Randall M. Levine (*pro hac vice* forthcoming)
April Knight (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: (202) 739-3000
F: (202) 739-3001
celine.amini@morganlewis.com
randall.levine@morganlewis.com
april.knight@morganlewis.com

*Attorneys for Defendants China Jushi USA*
*Corporation and Jushi USA Fiberglass Co.,*
*Ltd.*

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2025 I served a copy of the foregoing

**MEMORANDUM IN SUPPORT OF CHINA JUSHI USA CORPORATION AND JUSHI**

**USA FIBERGLASS CO., LTD.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

on all counsel of record by CM/ECF Electronic Delivery, and on the following Defendant via

USPS First Class Mail:

Waste Management of South Carolina, Inc.
c/o CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC 29223

<div align="right">

*s/ Celine Amin*          
Celine Amini

</div>

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

---

|  |  |
|---|---|
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY a/k/a SANTEE COOPER, an agency of the State of South Carolina, | |
| *Plaintiff,* | **CHINA JUSHI USA CORPORATION AND JUSHI USA FIBERGLASS CO., LTD.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| v. | |
| CHINA JUSHI USA CORPORATION, et al., | |
| *Defendants.* | |

Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd. (collectively "Jushi USA"), by and through their undersigned counsel, and pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure, hereby move the Court to dismiss all claims asserted against Jushi USA in the Complaint filed by the Plaintiff, South Carolina Public Service Authority a/k/a Santee Cooper ("Plaintiff"). A separate memorandum of law shall follow separately.

[Signatures on following page]

1

Respectfully submitted,

Dated: February 12, 2025

_s/ Celine Amini_

Celine Amini (Bar No. 106206)
Randall M. Levine (*pro hac vice* forthcoming)
April Knight (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: (202) 739-3000
F: (202) 739-3001
celine.amini@morganlewis.com
randall.levine@morganlewis.com
april.knight@morganlewis.com

*Attorneys for Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.*

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2025 I served a copy of the foregoing **CHINA JUSHI USA CORPORATION AND JUSHI USA FIBERGLASS CO., LTD.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT** on all counsel of record by CM/ECF Electronic Delivery, and on the following Defendant via USPS First Class Mail:

Waste Management of South Carolina, Inc.
c/o CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC 29223

*s/ Celine Amin*
Celine Amini

ELECTRONICALLY FILED - 2025 Feb 12 6:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | | | |
|---|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** | |
| | ) | | |
| **COUNTY OF BERKELEY** | ) | **NINTH JUDICIAL CIRCUIT** | |
| | ) | | |
| | ) | | |
| SOUTH CAROLINA PUBLIC SERVICE | ) | C.A. No. 2024-CP-08-03336 | |
| AUTHORITY, a/k/a SANTEE COOPER, | ) | | |
| | ) | | |
| *Plaintiff,* | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| CHINA JUSHI USA CORPORATION; | ) | | |
| JUSHI USA FIBERGLASS CO., LTD.; | ) | | |
| LINDAU CHEMICALS, INC.; | ) | | |
| MILLIKEN & COMPANY; and WASTE | ) | | |
| MANAGEMENT OF SOUTH | ) | | |
| CAROLINA, INC., | ) | | |
| | ) | | |
| *Defendants.* | ) | | |
| | ) | | |

### MILLIKEN & COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant MILLIKEN & COMPANY ("Milliken"), pursuant to Rules 8(a), 12(b)(1), and

12(b)(6) of the South Carolina Rules of Civil Procedure, hereby submits its Memorandum of

Law in Support of its Motion to Dismiss all claims asserted against it in Plaintiff's Complaint,

respectfully stating as follows:

### INTRODUCTION

Plaintiff's four causes of against Milliken arise from allegations Milliken used per- and

polyfluoroalkyl chemicals (known as "PFAS") at three of its facilities in South Carolina[1];

Milliken discharged those chemicals to wastewater treatment facilities; the facilities did not treat

---

[1] In fact, none of the facilities ever used PFAS in its operations. If Milliken's motion to dismiss is not granted, Milliken will file a summary judgment motion on that basis, providing the undisputed evidence no PFAS allegedly present in plaintiff's water supply could have come from the Monarch mill or the Gilliland or Cedar Hill plants.

the wastewater properly, and PFAS flowed into plaintiff's water intakes. (Plaintiff also alleges one site is "contaminated" with PFAS, which also makes its way to plaintiff's intakes.) Plaintiff contends it will have to upgrade its facilities to remove PFAS to meet new U.S. Environmental Protection Agency ("EPA") standards set to take effect in 2029, and demands Milliken and its codefendants foot the bill.

Despite those allegations, plaintiff's Complaint does not state a claim against Milliken. Based on the allegations in the Complaint itself, plaintiff's claims fail for four reasons:

1. **The claims are not ripe.** Plaintiff contends it will be required to acquire, install, and operate new "water treatment technologies" in the future, but the Complaint itself acknowledges it is currently testing its water to determine whether and to what extent it is over the future limit – if that limit survives court challenges and the change in presidential administrations. At this point, whether plaintiff will need to undertake any work is in question.

2. **Milliken did not control the discharge at issue.** Plaintiff itself admits the three facilities discharged their wastewater to treatment plants ("WWTPs") at Tosch's Creek and Little River, and there is no allegation Milliken violated any permit or regulation in doing so. It is the Tosch's Creek and Little River facilities that are alleged to have discharged PFAS into rivers upstream from plaintiff's intakes in Lake Marion and Lake Moultrie. It is the operator of those facilities, not Milliken, who may be liable for any failure to remove PFAS from its discharge, and for discharging them in a manner that could impact plaintiff. For that reason, Milliken did not owe plaintiff a duty of care to support a negligence claim and its actions cannot form the basis for a nuisance claim.

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

3. **An alleged contamination of public waters is not a private nuisance.** South Carolina law does not permit a claim for private nuisance for an act that affects the general public.

4. **Voluntary acceptance of intangible matter cannot be a trespass.** Plaintiff's trespass claim fails for two reasons: PFAS molecules constitute "intangible" matter, and plaintiff brought any PFAS onto its property by its own actions.

For all those reasons, plaintiff's claims fail as a matter of law and should be dismissed.

## ARGUMENT AND CITATION TO AUTHORITY

### A. PLAINTIFF'S CLAIMS ARE NOT RIPE FOR ADJUDICATION

### 1. A claim is not ripe for adjudication until there is a cognizable injury.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Plan. Corp.*, 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004) (quoting *Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (S.C. App. 1998)). Justiciability includes whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010) (citing *Jackson v. State*, 331 S.C. 486, 490 n.2, 489 S.E.2d 915, 917 n.2 (1997)). Where, as explained below, a claim presents only "a contingent, hypothetical or abstract dispute," the claim is not ripe for adjudication and must be dismissed. *See Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983); *see also Peoples Fed. Sav. & Loan Ass'n of S.C.*, 358 S.C. at 477, 596 S.E.2d at 60 ("A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute.") (citation

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

omitted).[2] *See also Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 557, 606 S.E.2d 752, 759 (2004) (affirming dismissal of complaint where claims were contingent in nature and therefore not yet ripe for adjudication).[3]

### 2. Plaintiff has not shown it will need to act to meet new EPA standards.

In this case, plaintiff's own allegations demonstrate it has not yet suffered any legally cognizable injury due to PFAS, and in fact it might never suffer such injury. Indeed, while EPA's standards for "maximum contaminant levels" ("MCLs") of PFAS became final in April 2024 (Compl. ¶ 42), it has not yet been determined how, if at all, the rule will impact the plaintiff or its ability to provide acceptable drinking water. Most importantly, plaintiff will not be required to comply with the MCLs until April 26, 2029. (*Id.* ¶ 44). Prior to that date is a three-year "initial monitoring" period that runs through April 26, 2027. (*Id.*; *see also* PFAS Nat'l Primary Drinking Water Reg., 89 Fed. Reg. 32,532, 32,633 (Apr. 26, 2024) (codified at 40 CFR Parts 141 and 142).)

Plaintiff does not allege any facts demonstrating it will have to take action of any sort to comply with the 2029 MCLs. In fact, plaintiff has not alleged that it has incurred any costs or expenses whatsoever due to the presence of PFAS in its source water. Rather, it is seeking "expenses associated with ***future*** acquisition, installation, and operation of required treatment technologies." (Compl. ¶ 69 (emphasis added)). Nothing in the Complaint indicates plaintiff has

---

[2] *See also Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (claim is unripe if "plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'") (citation omitted); *South Carolina v. U.S.*, 912 F.3d 720, 730 (4th Cir. 2019) (claim unripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013))).

[3] *See also Kiawah Prop. Owners Grp. v. Pub. Serv. Comm'n of S.C.*, 357 S.C. 232, 242-43, 593 S.E.2d 148, 154 (2004) (no justiciable controversy where plaintiffs "assert only that the loan provisions may have some negative impact in the future" on water utility's customers); *McClanahan v. Richland Cnty. Council*, 350 S.C. 433, 441, 567 S.E.2d 240, 244 (2002) (property owner's claim based on adoption of land use plan not yet implemented is unripe); *see also, e.g.*, *Tracy v. Tracy*, 384 S.C. 91, 100, 682 S.E.2d 14, 18 (S.C. App. 2009) (determining case not ripe for review where appellant not yet exposed to liability due to appellee's conduct).

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

changed its operations either since EPA finalized the MCLs in April or as a result of any PFAS in Lake Marion or Lake Moultrie.

      **3.**    **The standards at issue may never go into effect.**

      This status quo may continue indefinitely. Plaintiff's testing during the initial monitoring period may indicate plaintiff will not have to make any capital investments to remain in compliance with applicable regulations. And that's if the MCLs go into effect at all: In June 2024, three sets of plaintiffs filed challenges to the EPA's PFAS rule in actions currently pending before the D.C. Circuit Court of Appeals. *See* Pet. for Rev., *The Chemours Co. v. EPA*, No. 24-1192 (D.C. Cir. June 10, 2024)[4]; Pet. for Rev, *Nat'l Assoc. of Mfrs. v. EPA*, No. 24-1191 (D.C. Cir. June 10, 2024)[5]; Pet. for Rev, *Am. Water Works Assoc. v. EPA*, No. 24-1188 (D.C. Cir. June 7, 2024)[6]. Changes to the MCLs that could result from these cases could also affect the extent to which plaintiff must take any action to comply, if at all; and the MCLs could simply be changed or eliminated entirely based on differing priorities of the incoming Trump Administration.[7] Indeed, the effective date for the new MCLs were paused 60 days for review by executive order on January 20, 2025, along with other similarly situated pending rules.[8] These circumstances preclude plaintiff's claims from being ripe at this time. *See Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 364, 815 S.E.2d 446, 457 (2018) (finding action was not ripe because claim "depends on there being no changes to the law regarding surface water withdrawals"). Because of these numerous contingencies and the resulting uncertainty, the facts alleged by plaintiff demonstrate at most "the mere threat of potential injury," which is "too

---

[4] Available at https://www.epa.gov/system/files/documents/2024-06/chemours- v.-epa_d.c.cir_.pdf.
[5] Available at https://www.fbm.com/content/uploads/2024/06/24-1191_Documents.pdf.
[6] Available at https://www.awwa.org/Portals/0/AWWA/Government/062124Insiders/AWWA-v- EPA-No-1188-DC-Cir-Filed-Petition.pdf.
[7] *See, e.g.,* https://www.usatoday.com/story/news/investigations/2024/11/08/water-activists-worried-about-trump-presidency/76110402007/.
[8] https://www.whitehouse.gov/presidential-actions/2025/01/regulatory-freeze-pending-review/.

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

contingent or remote to support present adjudication." *Waters v. S.C. Land Res. Cons. Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (quoting *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc*., 849 F. Supp. 1083, 1086 (D.S.C. 1991)). For this reason alone, plaintiff's claims are not ripe for adjudication and should be dismissed.

### 4. South Carolina law does not allow a public utility like plaintiff to recover the costs of providing its statutory services.

Plaintiff's claims should also be dismissed because it is a public utility authorized by statute to provide a service to the public at large. Under the municipal cost recovery rule, a public entity cannot recover in tort the cost incurred in providing its services – for example, a fire department cannot sue a person who left a space heater plugged in for the cost of its response. *See, e.g.*, *Walker County v. Tri-State Crematory*, 284 Ga. App. 34, 36–37 (2007) (county cannot sue crematorium for cost occurred in cleaning up contaminated site); *Pittsburgh v. Equitable Gas*, 512 A.2d 83, 84 (Pa. Cmwlth. Ct. 1986) (city cannot sue gas provider for cost of emergency response after explosion).

Here, plaintiff is authorized – and, indeed, directed – to provide clean water to residents in its service area pursuant to the State Safe Water Drinking Act, S.C. Code § 44-55-10, *et seq*., and enabling regulations. But nothing in the statute authorizes a public water utility to recover the cost of providing that service from an entity it contends makes that service necessary. *See id*.; *see also United States v. Standard Oil Co. of Cal.*, 332 U.S. 301 (1947) (reversing judgment for federal government seeking recovery for cost of treating soldier insured in accident because recovery not authorized by Congress); *Pittsburgh*, 512 A.2d at 84 (city may not recover absent authorization from legislature). Nor has any South Carolina court authorized a claim as plaintiff purports to assert here. It should be dismissed.

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## B. **PLAINTIFF'S NEGLIGENCE CLAIM FAILS FOR A LACK OF DUTY**

### 1. A duty requires a relationship between the parties, not mere foreseeability of injury.

It is well-settled in South Carolina (and everywhere) that an "essential element in a negligence action is 'the existence of a legal duty of care owed by the defendant to the plaintiff.'" *Shaw v. Psychemedics Corp.*, 426 S.C. 194, 197, 826 S.E.2d 281, 282 (2019) (quoting *Oblachinski v. Reynolds*, 391 S.C. 557, 561, 706 S.E.2d 844, 845-46 (2011)). "If there is no duty, then the defendant in a negligence action is entitled to judgment as a matter of law." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 135-36, 638 S.E.2d 650, 656 (2006) (citing *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999)). "An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McPherson v. CSX Transp., Inc.*, No. 4:16-cv-2725, 2017 WL 1135291, at *2 (D.S.C. Mar. 27, 2017) (citing *Madison ex rel. Bryant*, 371 S.C. at 136, 638 S.E.2d at 656-57). "However, South Carolina courts 'will not extend the concept of a legal duty of care in tort liability beyond reasonable limits,'" and without more, "[f]oreseeability of injury, in and of itself, does not give rise to a duty." *Shaw*, 426 S.C. at 198, 826 S.E.2d at 283 (quoting *McCullough*, 373 S.C. at 48, 644 S.E.2d at 46); *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003).

### 2. Milliken does not owe a legal duty of care to the plaintiff.

Here, plaintiff does not allege any facts that suggest the existence of a relationship between it and Milliken sufficient to establish a legal duty of care. Plaintiff does not allege any duty "created by statute, a contractual relationship, status, property interest, or some other special circumstance," but instead alleges only that the "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

unreasonable risk of harm to others." (*See* Compl. ¶ 88). But South Carolina does not recognize or impose such a broad and oversimplified duty of care. Just the opposite, because under South Carolina law, "**one who has no control owes no duty**." *Miller v. City of Camden*, 329 S.C. 310, 314, 494 S.E.2d 813, 815 (1997) (citing *Clark v. Greenville Cnty.*, 313 S.C. 205, 209, 437 S.E.2d 117, 119 (1993) (emphasis added)); *see also Ellis v. Tall Ships Charleston, LLC*, 593 F. Supp. 3d 253, 268 (D.S.C. 2022) ("Under South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." (quoting *Faile v. S.C. Dep't of Juv. Just.*, 350 S.C. 315, 334, 566 S.E.2d 536, 546 (2002))).

Milliken disposed its wastewater to the Tosch's Creek and Little River WWTPs, in accordance with its permits, so those treatment facilities could treat the wastewater. Milliken had no further duty to ensure that the either WWTP would treat the wastewater in a way that avoids any risk of harm to third parties – in fact, it had no power to do so – and therefore owed no duty to the plaintiff. *See, e.g.*, *Oulla v. Velazques*, 427 S.C. 428, 444, 831 S.E.2d 450, 458 (S.C. App. 2019) (sod manufacturer that placed pallets on truck trailer that later fell, leading to accident, did not owe legal duty to injured motorist to ensure pallets were properly secured). As a result of the absence of any duty, plaintiff's Fourth Cause of Action in the Complaint should be dismissed.

### C.  <u>MILLIKEN IS ENTITLED TO DISMISSAL OF BOTH NUISANCE CLAIMS</u>

#### 1.  **Milliken cannot be liable for nuisance because it lacked control over the property directly responsible for the alleged nuisance.**

##### a.  **Control is an essential element of nuisance.**

Under black letter South Carolina law, Milliken cannot be held liable to plaintiff under a nuisance theory based upon its alleged disposal of industrial wastewater at the Tosch's Creek and Little River WWTPs, which Milliken did not own, operate, or control. (See Compl. ¶ 83 (Milliken intends its wastewater 'be discharged to [its] applicable WWTPs"). Rather, nuisance

8

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

law is primarily a mechanism for resolving "conflicting interests of landowners," and to effect a "balancing of the[ir] correlative rights." *See DeBorde v. St. Michael & All Angels Episcopal Church*, 272 S.C. 490, 502, 252 S.E.2d 876, 882 (1979); *Winget v. Winn-Dixie Stores, Inc*., 242 S.C. 152, 159, 130 S.E.2d 363, 367 (1963). For that reason, the South Carolina Supreme Court has made clear that "one who has no control over property at the time of the alleged nuisance cannot be held liable therefor." *Clark v. Greenville Cnty*., 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993). As such, in the absence of allegations evidencing control, a nuisance claim fails and must be dismissed. *See id.*; *see also Weatherford v. E.I. Dupont de Neumours & Co.*, No. 4:22-cv-1427, 2023 WL 11015357, at *6 (D.S.C. Sept. 27, 2023) (dismissing nuisance claim because "Plaintiffs have not alleged Defendants had control over the PFAS once they were sold to the textile plants").

### b.  The Supreme Court has already ruled defendants cannot be liable for delivering waste to a landowner who allegedly causes nuisance.

The South Carolina Supreme Court's decision in *Clark v. Greenwood County* is directly on point. In that case, the plaintiffs were property owners who alleged their properties had been contaminated by hazardous chemical waste disposed of at a nearby landfill. *See* 313 S.C. at 206-07, 437 S.E.2d at 118. As a result, the property owners filed suit against five corporations that had used the landfill. *Id.* at 207, 118. The trial court ruled that because the corporate respondents did not own or control the landfill, "no action for private nuisance could be maintained against the corporate respondents." *Id.* at 209, 119. On appeal, the Supreme Court affirmed, explaining that "[t]he only issue we need address is whether one must own or have control of the property allegedly used as a nuisance;" and held ***control was indeed a prerequisite to any action for nuisance***: "[W]e now hold one who has no control over property at the time of the alleged nuisance cannot be held liable therefor." *Id.* at 209-10, 119. Thus, because "appellants neither

alleged nor produced any evidence the corporate respondents had control over the landfill or the hazardous waste once it was deposited at the landfill," the court concluded that "the trial judge correctly ruled the corporate respondents could not be liable for nuisance because they had no control over the property allegedly used as a nuisance." *Id.* at 210, 119.

Here, plaintiff's Complaint alleges Tosch's Creek and Little River wastewater treatment facilities – not Milliken – discharged wastewater into "surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie." (Compl. ¶ 79(a). Just like in *Greenwood County*, the allegation in this case is that Milliken discharged wastewater *to* the Tosch's Creek and Little River WWTPs, which occurs prior to (and entirely separate and apart from) any discharge *by* the Tosch's Creek and Little River WWTPs.[9] (*See id.* ¶¶ 4, 79, 83). Because Milliken had no control over the Tosch's Creek and Little River WWTPs, it "had no control over the property allegedly used as a nuisance." *See Greenwood Cnty.*, 313 S.C. at 210, 437 S.E.2d at 119. Accordingly, plaintiff's private and public nuisance claims against Milliken – the First and Second Causes of Action – both fail as a matter of law and must be dismissed.

> ## 2. Plaintiff's private nuisance claim also fails because plaintiff alleges an injury to the public at large.

Plaintiff's private nuisance claim against Milliken should also be dismissed because the alleged contamination of a public water body cannot form the basis of this claim. "A private nuisance affects only one person or a determinate number of persons," whereas a "nuisance is

---

[9] Plaintiff attempts to dodge the impact of *Greenwood County* by tacking on an allegation that while Milliken's Monarch mill is "no longer operational" (it closed twom decades ago), there are still "wastewater lagoons" on the property containing PFAS, which somehow discharge themselves "from the property to tributaries" upstream of Lake Marion and Lake Moultrie, both well over 100 miles away. (Compl. ¶ 19.) In South Carolina, a nuisance is "a substantial and unreasonable interference with the plaintiff's use and enjoyment of his land." *FOC Lawshe Ltd. P'ship v. Int'l Paper Co.*, 574 S.E.2d 228, 231 (S.C. App. 2002). Regardless of the magnitude of plaintiff's alleged harm due to the conduct of all defendants together, nothing in the Complaint suggests the alleged presence of chemicals in "lagoons" more than 100 miles away interferes with plaintiff's use of its land in a "substantial and unreasonable" manner.

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248, 32 S.E. 358, 360 (1899); *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (S.C. App. 1989) ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured.").[10]

Plaintiff's Complaint makes clear its claims against Milliken are based on the alleged contamination of Lake Marion and Lake Moultrie, the location of plaintiff's water intakes, as well as the Santee River Basin. (Compl. ¶¶ 1, 19.) Plaintiff's nuisance claim therefore involves an alleged nuisance that is "public in nature," which "will not support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97. For this additional reason, the First Cause of Action for private nuisance should be dismissed.

### D.  MICROSCOPIC PARTICLES BROUGHT IN VOLUNTARILY CANNOT FORM THE BASIS OF A TRESPASS CLAIM

#### 1.    South Carolina follows the traditional rule that a trespass requires "an invasion by a physical, tangible thing."

The Supreme Court has definitively stated South Carolina follows the traditional rule that "only recognizes intrusions by physical, tangible things as capable of constituting a trespass." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 152, 747 S.E.2d 468, 480 (2013). Under the traditional rule, the interference must be "with the right to exclusive possession," as opposed to "merely interfer[ing] with the right to use and enjoyment." *Id.* at 151, 747 S.E.2d at 480. Thus, intrusions by "microscopic particulates" or similarly intangible "infiltration[s] of contaminants

---

[10] *See also Charleston Dev. Co. v. Alami*, 433 S.C. 533, 547-48, 860 S.E.2d 687, 695 (S.C. App. 2021) (a private nuisance "produces damage to but one or two persons, and cannot be said to be public."); *accord Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) ("when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source, such as a well drilled on private property, the presence of the pollutants in the public water supply will not support a private nuisance claim.").

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

onto a plaintiff's property" – while potentially giving rise to a nuisance claim – do not constitute an actionable trespass under South Carolina law. *Id.* at 144-52, 476-80.

In adhering to the traditional rule that requires "an invasion by a physical, tangible thing," the Supreme Court recognized it was "an imperfect rule" that may not incorporate the pure scientific definition of matter. *Id.* at 150, 479. Nevertheless, the court held the traditional rule remained "superior" to the alternate rules which require the adoption of an uncertain "substantiality requirement," because it "possesses the virtues of clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id.* at 149-51, 479-80. The Court further explained that the traditional rule preserves "the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *Id.* at 151-52, 480.

By retaining the traditional rule, the Supreme Court expressly rejected "divergent" cases in Oregon and Alabama, which held intrusions of "fluoride particles" and "sulfoxide emissions" respectively were sufficient to constitute a trespass despite their "intangible nature." *Id.* at 146-49, 747 S.E.2d at 477-78 (rejecting *Martin v. Reynolds Metals Co.*, 342 P.2d 790 (1959) and *Borland v. Sanders Lead Co.*, 369 So. 2d 523 (Ala. 1979)). Instead, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co.* that concluded dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion," but instead "become[s] a part of the ambient circumstances" of the space on which it settles. *See Babb,* 405 S.C. at 149-50, 747 S.E.2d at 479; *see also* 237 Mich. App. 51, 67-70, 602 N.W.2d 215, 222-24 (1999).

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

### 2. Plaintiff alleges trespass only by "intangible matter."

In this case, plaintiff's trespass claim is based on the alleged contamination from PFAS molecules, which are precisely the kind of "intangible matter" the Supreme Court held "are insufficient to constitute a trespass." *See Babb*, 405 S.C. at 144-52, 747 S.E.2d at 476-80. Indeed, plaintiff's own Complaint demonstrates PFAS molecules are microscopic particles — measured, if at all, in the parts per ***trillion*** – that cannot be visibly seen, felt, or otherwise perceived in water or any other medium. (*See* Compl. ¶¶ 30-31, 33-34, 36-37, 40). Moreover, the damages plaintiff alleges from the PFAS contamination are not to its right to the exclusive possession of its property but are based on the alleged "losses to the use and enjoyment of its property rights" (*id.* ¶ 5) and the alleged "interference with Plaintiff's right to use and enjoy its property" and "use Lake Marion and Lake Moultrie (*id.* ¶ 51), which can be remedied only through a claim for nuisance, not trespass. *Babb*, 405 S.C. at 139, 149-52, 747 S.E.2d at 473, 479-80. For these reasons, plaintiff's allegations do not state an actionable claim for trespass under South Carolina law, and its Third Cause of Action should be dismissed.

### 3. Plaintiff does not enjoy exclusive possession of the water from Lake Marion or Lake Moultrie.

Plaintiff's trespass claim also fails for other reasons. First, plaintiff does not sufficiently allege a physical invasion of its property. As the South Carolina Supreme Court has made clear, trespass protects only the "right to ***exclusive*** possession." *See Babb*, 405 S.C. at 150-51, 747 S.E.2d at 479- 80 (2013) (emphasis added). Here, plaintiff does not hold an exclusive right to the water from Lake Marion or Lake Moultrie, only a riparian right of reasonable use. *See White v. Whitney Mfg. Co.*, 60 S.C. 254, 265, 38 S.E. 456, 460 (1901) (it is a "well-settled rule of law" that while a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property in the water itself, but a simple usufruct").

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

### 4.     Any PFAS allegedly on plaintiff's property was drawn there by plaintiff's own actions.

Second, though plaintiff alleges PFAS contamination is present on its property, it concedes this alleged contamination only occurs as a result of its own actions, when plaintiff turns on its water pumps to draw water from Lake Marion or Lake Moultrie. (Compl. ¶ 82). That does not constitute an actionable trespass under South Carolina law, which must be based on "an affirmative act" by the defendant, and "the invasion of the land must be intentional." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (S.C. App. 1991). An act is only intentional if "done with knowledge that it will to a substantial certainty result in the entry of the foreign matter" on the plaintiff's land. *Sales v. S.C. Dep't of Transp.*, No. 2014-000582, 2016 WL 3607225, at *2 (S.C. App. June 30, 2016) (quoting Restatement (Second) of Torts § 158 cmt. i (1965)). Here, there could be no "substantial certainty" PFAS would enter plaintiff's property, because it can only occur when plaintiff affirmatively acts to activate of its water pumps. Plaintiff's affirmative action to pump water onto its property is the third additional reason its trespass claim fails: any PFAS allegedly enters its property through its own voluntary decision.  *See Ravan v. Greenville Cnty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (S.C. App. 1993) ("The essence of trespass is the unauthorized entry onto the land of another."). *See also Util. Bd. of Tuskegee v. 3M Co.*, No. 2:22-cv-420, 2023 WL 1870912, at *16 (M.D. Ala. Feb. 9, 2023) (dismissing similar trespass claim asserted by water system because "unlike other indirect trespasses, Defendants' PFAS did not cross onto UBT's boundary line by a natural process. Rather, UBT pulls the water onto its property through an intake system from a public waterway (over which UBT does not have exclusive possession)"). Just as it was in that case, plaintiff's Third Cause of Action should be dismissed.

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## CONCLUSION

Even if Milliken had ever used PFAS at the mill at issue – which it did not – plaintiff's claims against Milliken fail for several reasons: They are not ripe because it is uncertain whether it will ever suffer the injury alleged. They are barred by the statute of limitations because it has been several years since Milliken owned or operated the mill. And even if the claims were valid despite those proscriptions, each claim would fail because they are not supported by South Carolina law. Milliken's motion should be granted and all claims against it dismissed.

Respectfully submitted, this 12th day of February, 2025.

*/s/ Rachael L. Anna*
Rachel L. Anna (SC Bar No. 100486)
Rita Bolt Barker (SC Bar No. 77600)
WYCHE, P.A.
200 East Broad Street, Suite 400
Greenville, SC 29601-2892
Tel: (864) 242-8200
Fax: (864) 235-8900
ranna@wyche.com
rbarker@wyche.com

-and-

Jameson B. Carroll (*pro hac vice* admission to be sought)
Michael Weiss (*pro hac vice* admission to be sought)
CARROLL & WEISS LLP
2870 Peachtree Rd NW, Suite 193
Atlanta, GA 30305-2918
Tel: (404) 514-5061
jcarroll@carrollweiss.com
mweiss@carrollweiss.com

*ATTORNEYS FOR DEFENDANT*
*MILLIKEN & COMPANY*

ELECTRONICALLY FILED - 2025 Feb 12 4:36 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2025 I served a copy of the foregoing **MILLIKEN & COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** on all counsel of record by CM/ECF Electronic Delivery, and on the Defendants, via USPS First Class Mail, addressed as follows:

Jushi USA Fiberglass Co., Ltd.
c/o URS Agents, LLC
2 Office Park Court, Suite 103
Columbia, SC 29223

Lindau Chemicals, Inc.
c/o Timothy J. Robinson
731 Rosewood Drive
Columbia, SC 29201

China Jushi USA Corporation
c/o URS Agents, LLC
2 Office Park Court, Suite 103
Columbia, SC 29223

Waste Management of South Carolina, Inc.
c/o CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC 29223

*/s/ Rachael L. Anna*
Rachael L. Anna

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, an agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**MOTION FOR PRO HAC VICE ADMISSION OF HAMILTON JORDAN**

The undersigned local counsel hereby moves, together with the attached Application and Affidavit, that Hamilton Jordan, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, be admitted *pro hac vice* in the above captioned matter. As local counsel I understand that:

1. I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2. All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted *pro hac vice*; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted *pro hac vice*.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Jordan's admission and received no objection.

1

Mr. Jordan's is a member in good standing with his local bar association, and the Verified Application for Admission *Pro Hac Vice* in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Dated: February 26, 2025

RESPECTFULLY SUBMITTED,

**JOHN B. WHITE JR., PA**

By: *s /Marghretta H. Shisko*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Griffin L. Lynch (SC Bar No. 72518)
Christopher R. Jones (SC Bar No. 101265)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
glynch@johnbwhitelaw.com
cjones@johnbwhitelaw.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT

**VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE***
**IN THE STATE OF SOUTH CAROLINA**

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

South Carolina Public Service Authority,
a/k/a Santee Cooper, an agency of the
State of South Carolina,

2024-CP-08-03336
_____
Case No.

In The Court of Common Pleas Ninth
Judicial Circuit
Tribunal

vs.

China Jushi USA Corporation; Jushi USA
Fiberglass Co., LTD.; Lindau Chemicals, Inc.;
Milliken & Company et al,
Defendant

Mailing Address of Tribunal:

300-B California Avenue
Moncks Corner, SC 29461
_____

Comes now  Hamilton Jordan _____, applicant herein, and respectfully represents the following:

    1.  Applicant resides at:

██████████

Street Address

██████    Davidson    Nashville    ██████

City    County    State    Zip Code

████

Telephone

    2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Cory Watson, P.C. _____, with offices at

1033 Demonbreun St. #300

Street Address

Nashville        Tennessee    37203

City    County    State    Zip Code

615-903-4660    334-714-1783    866-327-4000    hjordan@corywatson.com

Primary Telephone    Cell Phone    Fax Number    Email Address

    3.  Applicant has been retained personally or as a member of the above-named law firm by

South Carolina Public Service Authority a/k/a Santee Cooper _____ to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

    4.  Since  October 19th  of  2017 _____, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of Tennessee _____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Tennessee Supreme Court | 10/19/2017 |
| Tennessee State Courts | 10/19/2017 |
| United States District Court Eastern District of Tennessee | 3/16/2022 |
| United States District Court Middle District of Tennessee | 10/21/2019 |
| North Carolina State Courts | 7/21/2023 |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is _Marghretta Shisko_____ of the _John B. White, Jr., P.A._____

law firm, which has offices at:

291 S. Pine Street/ P.O. Box 2465 (29304)
Street Address

| Spartanburg | Spartanburg | South Carolina | 29302 |
|---|---|---|---|
| City | County | State | Zip Code |
| 864-594-5988 | 864-590-3907 | 864-594-5870 | mshisko@johnbwhitelaw.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

100106
_____
South Carolina Bar Number
(You must provide Bar Number)

     10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| Yes - See Attached Exhibit A |
| --- |

     11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
| --- |

     12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____20th_____ day of _____December_____, 20_24_

_____
APPLICANT

*Page 3 of 4*

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**VERIFICATION**

STATE OF <u>TENNESSEE</u>                    )

COUNTY OF <u>DAVIDSON</u>                    )

I, _____<u>Hamilton Jordan</u>_____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___<u>20th</u>___ day of __<u>December</u>___, 20 <u>24</u>

_____
(Notary Signature)

Notary Public for the State of ___<u>Alabama</u>___

My Commission Expires: ___<u>9/15/28</u>___

**LOCAL COUNSEL CONSENT**

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___<u>30th</u>___ day of __<u>December</u>___, 20 <u>24</u>

_____
LOCAL COUNSEL OF RECORD

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___<u>30th</u>___ day of __<u>December</u>___, 20 <u>24</u>

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Exhibit A**

**Application to Appear *Pro Hac Vice* in South Carolina**

| Case Name | Status | Date of Application | Local Counsel | Granting/ Pending |
|---|---|---|---|---|
| Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al | Active | 8/21/2024 | Marghretta Shisko | Granted |
| The City of Union, South Carolina v. Milliken & Company, et al | Active | 12/20/2024 | Marghretta Shisko | Pending |

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# *Supreme Court of Tennessee*
# *Certificate of Good Standing*

I, James M. Hivner, Clerk of the Supreme Court of the State of Tennessee, do hereby certify that

## *Hamilton G. Jordan*

is a licensed and practicing attorney of the Courts of this State, having been admitted to practice on October 19, 2017, and is presently in good standing. The Supreme Court is the Court of last resort in Tennessee.

In testimony whereof, I have set my hand and affixed the seal of the Court on this the 20th day of December, 2024.

James M. Hivner
Clerk of the Supreme Court of Tennessee

By: *Kim Meador, D.C.*
Kim Meador, D.C.

ELECTRONICALLY FILED - 2025 Feb 26 4:40 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

January 9, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:     South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Hamilton Jordan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Hamilton Jordan
        Marghretta Shisko

ELECTRONICALLY FILED - 2025 Mar 04 10:07 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Plaintiff,

v.

CHINA JUSHI USA CORPORATION, *et al.*,

Defendants.

CASE NO. 2024-CP-08-03336

**ORDER GRANTING PRO HAC
VICE ADMISSION OF HAMILTON
JORDAN**

Having considered the Motion of Marghretta H. Shisko., on behalf of Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina, to admit Hamilton Jordan, of Cory Watson, P.C., 2131 Magnolia Avenue South, Birmingham, Alabama 35205, *pro hac vice*, to appear on behalf of the Plaintiff in the above captioned matter and the Verified Application for Admission *Pro Hac Vice* in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**    South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**    2024CP0803336

**Type:**    Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-03-03 18:55:35    page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 04 10:07 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina

Plaintiff,

v.

China Jushi USA Corporation, et.al

Defendants.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

Case No. 2024-CP-08-03336

**MOTION OF DEFENDANT LINDAU CHEMICALS, INC. TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM IN SUPPORT OF MOTION**

**TO:    SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER AND ITS COUNSEL**

**YOU WILL PLEASE TAKE NOTICE** that Defendant Lindau Chemicals, Inc. (hereinafter "Lindau") moves under Rules 8(a), 12(b)(1) and 12(b)(6) of the South Carolina Rules of Civil Procedure (SCRCP) to dismiss the Complaint filed by South Carolina Public Service Authority, a/k/a Santee Cooper (hereinafter "Santee Cooper"). This Motion is supported by the following memorandum and such other matters as may be properly presented to the Court at the time of the hearing.

## INTRODUCTION

Lindau is a specialty organic chemical manufacturer with a facility in Columbia, South Carolina that produces curing agents for epoxy resins and paint resins used in concrete and masonry coatings and paints. As its name suggests, Lindau does use chemicals in its production process but based on its investigation to date, Lindau is not aware of per- or polyfluoroalkyl substances ("PFAS") chemicals ever being used in its production process and is not aware of any products that contain PFAS.

1

Even assuming that Plaintiff Santee Cooper could support its bare, unsubstantiated claims that Lindau "uses products that contain or degrade to" PFAS chemicals, Plaintiff's claims against Lindau suffer from a number of deficiencies and fail to state a valid cause of action and should be dismissed. Compl. ¶ 18. Essentially, Plaintiff Santee Cooper seeks to hold Lindau liable for the cost of future upgrades to address alleged PFAS contamination at Plaintiff's surface water treatment plants more than fifty (50) miles downstream from the Lindau facility.[1] Plaintiff alleges that the upgrades are necessary to meet U.S. Environmental Protection Agency regulations that are being challenged in litigation in federal court.[2]

Plaintiff Santee Cooper cannot connect Lindau's lawfully permitted discharges from its facility to the Plaintiff's surface water treatment plants. The journey from Lindau's wastewater outfall to Lake Marion and Lake Moultrie is a long and winding one, with much processing and dilution along the way. Pursuant to Lindau's Industrial User permit, Lindau discharges less than 60,000 gallons of its wastewater per day from its facility to the City of Columbia Wastewater Treatment Plant ("WWTP"). The Columbia WWTP then treats Lindau's wastewater – as part of the 35 <u>million</u> gallons of wastewater it treats daily on average[3] – and discharges the treated

---

[1] http://www.bluetrailsguide.org/assets/pdfs/blue-trails/congaree-river-blue-trail-map.pdf?1e5620. A court may take judicial notice of a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." SCRE Rule 201(b)(2). "'[G]eographical information is especially appropriate for judicial notice.'" *Prioleau v. Wallace*, No. 5:24-cv-1171, 2024 WL 3416605, at *1, n.2 (D.S.C. May 24, 2024) (quoting *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984)), *adopted by* 2024 WL 3412324 (D.S.C. July 15, 2024)). The distance between the City of Columbia wastewater treatment plant and Plaintiff's Lake Marion Regional Water System, the closer of the two surface water treatment plants, is more than 50 miles.
[2] *American Water Works Association, et al., v. U.S. Environmental Protection Agency*, Case No. 24-1188 (D.C. Cir. 2024).
[3] https://columbiascwater.net/about-wastewater/ ("The plant is a biological oxidation extended aeration sewage treatment facility that has a rated capacity of 60 million gallons per day (MGD) and treats an average of 35 MGD of sewage."); https://www.congareeriverkeeper.org/congaree-river

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

wastewater to the Congaree River, which has an average flow of 2.9 <u>billion</u> gallons per day.[4] The Congaree then flows downstream approximately 50 miles before meeting up with the Wateree River, which together then flow into and form Lake Marion and Lake Moultrie.

Despite this highly implausible scenario and with nothing more than bare allegations to support its claims, Plaintiff sues Lindau alleging four separate causes of action that read like Plaintiff's facilities and Defendant Lindau's facilities are next door neighbors. Plaintiff pursues four causes of action: (1) private nuisance, (2) public nuisance, (3) trespass, and (4) negligence, gross negligence and/or recklessness.

The four causes of action in the Complaint fail to state facts sufficient to sustain the causes of action. A brief summary of the reasons the causes of action fail is as follows:

1. **Private and Public Nuisance** (Counts 1 and 2) – Plaintiff fails to state facts supporting Lindau's required control over the wastewater at the time of the alleged nuisance, and Plaintiff's allegations of contaminated public waterways do not support a claim for private nuisance;

2. **Trespass** (Count 3) – Plaintiff fails to allege an invasion by a "tangible thing;" that the PFAS entry onto Plaintiff's property was the intentional, immediate result of Lindau's actions; or that Plaintiff has "exclusive possession" over the Congaree River, Lake Marion, or Lake Moultrie; and

3. **Negligence, Gross Negligence, or Recklessness** (Count 4) – Lindau owes no duty of care to Plaintiff; Lindau did not proximately cause Plaintiff's alleged downstream harm; and Plaintiff's alleged damages are not recoverable in tort.

In addition to failing to state a cause of action, Plaintiff's claims also fail because: (1) the claims are not ripe for adjudication, (2) Plaintiff lacks standing under the *parens patriae* doctrine

---

[4] https://www.congareeriverkeeper.org/congaree-river: streamflow in the Congaree River has been monitored continuously by the U.S. Geological Survey for 70 years. During that period, flows have averaged 8,800 cfs. 1 cfs is equivalent to 325,850 gallons per day. https://cvwd.org/197/CFS-Conversions

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

to bring its claims, and (3) the Municipal Cost Recovery rule bars the recovery of the costs that Plaintiff seeks as damages.

## LEGAL STANDARD

Under SCRCP 12(b)(6), a defendant may move to dismiss based on a failure to state facts sufficient to constitute a cause of action. *Baird v. Charleston Cty.*, 333 S.C. 519, 527, 511 S.E.2d 69, 73 (1999). If the "facts alleged and inferences reasonably deducible therefrom" do not "entitle the plaintiff to relief under any theory," the court should dismiss the complaint. *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). While a pleading under Rule 8(a)(2), "shall contain . . . a short and plain statement of the facts showing that the pleader is entitled to relief," even under the liberal standard applicable on a motion to dismiss, a mere conclusory allegation, unsupported by any particularized allegations of fact, is insufficient. *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986).[5]

\*\*\*

---

[5] Alternatively, under Rule 12(b)(6), a motion to dismiss can convert to a motion for summary judgment in the following situation:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state facts sufficient to constitute a cause of action, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Rule 12(b)(6); *Baird,* 333 S.C. at 528, 511 S.E.2d at 73.

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## ARGUMENT

**I.     This Court should dismiss Plaintiff's action against Lindau for failure to state sufficient facts to establish any of the common law tort causes of action in its Complaint.**

At the outset, Plaintiff's conclusory allegations in the one paragraph of the Complaint that specifically mentions Lindau are not enough to meet the general pleading standard and rather are the type of allegation that is "unsupported by any particularized allegations of fact" and is insufficient to state a claim. Compl. ¶ 18; *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986).  Plaintiff fails to state one fact supporting its claim that Lindau "uses products that contain or degrade" to PFAS.  Without more, it is fundamentally unfair to drag Lindau into this litigation simply because it is a chemical company and thus the Court should dismiss Lindau from this case.

### A.  Plaintiff fails to allege facts to support its public and private nuisance claims.

#### 1.  Plaintiff's nuisance claims fail to state facts establishing that Lindau had control over its wastewater at the time it was discharged into the Congaree River.

In South Carolina, a nuisance exists when a defendant's conduct results in an "unreasonable interference" with the plaintiff's use and enjoyment of land. *Strong v. Winn-Dixie Stores, Inc.*, 240 S.C. 244, 253, 125 S.E.2d 628, 632 (1962). Fundamentally though, a defendant can be liable for nuisance *only* if it had "control over the property at the time of the alleged nuisance." *Clark v. Greenville Cty.*, 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993). Because public and private nuisance claims differ only in the persons affected, not in "the nature or character of the thing or activity itself" (*Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (Ct. App. 1989)), the requirement for control applies to both public and private nuisance claims.

In *Clark v. Greenville County*, plaintiffs who owned property near a landfill operated by Greenville County asserted a private nuisance[6] claim against five companies who had used the landfill to dispose of their hazardous waste. *Id*. at 206, 437 S.E.2d. at 118. In affirming the trial court's summary judgment, the Supreme Court of South Carolina narrowed the analysis to one issue: "whether one must own or have control of the property allegedly used as a nuisance." *Id*. at 209, 437 S.E.2d. at 119. Citing established South Carolina case law that nuisance is based on a defendant's use of its *own* property, the Supreme Court held that control of the property used to create the nuisance is fundamental to establishing a nuisance claim. *Id*. Because the plaintiffs "neither alleged nor produced any evidence [the companies] had control over the landfill or the hazardous waste once it was deposited at the landfill," the Supreme Court concluded that the "trial judge correctly ruled the [company defendants] could not be liable for nuisance" because they "had no control over the property allegedly used as a nuisance." *Id*. at 210, 437 S.E.2d. at 119; *see also Weatherford v. E.I. Dupont de Neumours & Co.,* No. 4:22-CV-01427-RBH, 2023 WL 11015357, at *6 (D.S.C. Sept. 27, 2023) (dismissing nuisance cause of action because plaintiffs did not allege "[d]efendants had control over the PFAS once they were sold").

Here, Lindau Chemical's wastewater – which Plaintiff alleges without support contains PFAS – does not interfere with Plaintiff's "use and enjoyment," if at all, until it enters its property through one of Plaintiff's water intakes at Lake Marion or Lake Moultrie, after a long downstream journey in the Congaree River. At the time Lindau's wastewater enters the Congaree River, Lindau has no control over it and Plaintiff has stated no facts supporting this requisite control; instead, Plaintiff concedes that Lindau relinquishes control over the wastewater *to the Columbia WWTP*

---

[6] The *Greenville County* plaintiffs also asserted negligence, trespass, and strict liability claims against the five companies. The Supreme Court of South Carolina affirmed the trial court's summary judgment "since the record [was] devoid of any evidence caused by contamination from the landfill." *Greenville Cty.*, 313 S.C. at 209, 437 S.E.2d at 119.

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

before it is discharged to the river system. Compl. ¶ 18. Therefore, like the *Clark* and *Weatherford* defendants who "had no control over the landfill or the hazardous waste once it was deposited at the landfill," Lindau also has no control over the wastewater it sends to the Columbia WWTP once it enters the Columbia WWTP facility. Without this requisite control, Lindau cannot be liable for nuisance in South Carolina and this Court should dismiss Plaintiff's nuisance claims.

### 2. Plaintiff's allegations of contaminated public waterways do not support a claim for private nuisance.

Additionally, Plaintiff's private nuisance claim is not legally supportable because the alleged contamination of a public body of water cannot support a claim for private nuisance. A private nuisance '"produces damage to but one or two persons, and cannot be said to be public.'" *Charleston Dev. Co., LLC v. Alami*, 433 S.C. 533, 547–48, 860 S.E.2d 687, 695 (Ct. App. 2021) (quoting Deason v. S. Ry. Co., 142 S.C. 328, 334, 140 S.E. 575, 577 (1927)). First, as an agency of the State of South Carolina (Compl. ¶ 13), Plaintiff's duty is public in nature, not private. *Rice Hope Plantation v. S.C. Pub. Serv. Auth.,* 216 S.C. 500, 516, 59 S.E.2d 132, 138 (1950) (Santee Cooper, "[m]anifestly, a quasi-municipal corporation, as an agency of the State, is also in a real sense a part of the State, and shares in its sovereignty; and . . . was created for the convenient accomplishment of what must be regarded as an important governmental function.") (internal quotations omitted); S.C. Code Ann. § 58-31-80 ("Santee Cooper "is a corporation owned completely by the people of the State" for a "public purpose" and is operated "for the benefit of all the people of the State.").

Second, while Plaintiff may be a steward of Lake Marion and Lake Moultrie, the Congaree River and the lakes are open to and enjoyed by the public for recreation and as sources of public drinking water. As such, the harm being alleged by Plaintiff, a state agency, if such harm exists at all, is public in nature and damages an indefinite number of people and, thus, the alleged harm

7

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

does not support a private nuisance claim. *See, e.g., Rhodes v. E.I. du Pont de Nemours & Co.,* 636 F.3d 88, 96-97 (4th Cir. 2011) (holding "that when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source . . . the presence of the pollutants in the public water supply will not support a private nuisance claim"); *Priselac v. Chemours Co.*, No. 7:20-CV-190-D, 2022 U.S. Dist. LEXIS 54845, at *15 (E.D.N.C. Mar. 28, 2022) (holding that plaintiff failed to state a private nuisance claim because she shared her interest in clean water from the utility company equally with members of the general public who also get their water from public utility authority).

**B.  Plaintiff's trespass claim fails to state facts sufficient to constitute a trespass.**

1.  **Plaintiff fails to allege an invasion by a "tangible thing."**

Whereas nuisance is an unreasonable interference with a party's use and enjoyment of its land, trespass "'is the invasion of the interest in the exclusive possession of land, as by entry upon it.'" *Babb v. Lee Cty. Landfill SC, LLC,* 405 S.C. 129, 139, 747 S.E.2d 468, 473 (2013) (*quoting* the Restatement (Second) of Torts). In its seminal 2013 case, *Babb v. Lee County Landfill*, the Supreme Court of South Carolina declared that "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Id*. at 145, 747 S.E.2d at 476. "Microscopic and atomic particles" are intangible and thus are incapable of constituting a trespass. *Id*. at 152, 747 S.E.2d at 480.

In *Babb*, the United States District Court for the District of South Carolina certified specific questions about environmental torts to the Supreme Court of South Carolina so the District Court could resolve a lawsuit brought by plaintiffs residing near a landfill. *Id*. at 135, 747 S.E.2d at 471. One of the questions required the Supreme Court to consider whether a "physical, tangible invasion [must] occur for a trespass to arise." *Id*.  In reaching its conclusion that trespass in South Carolina

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

does indeed require a "physical, tangible invasion," the Court analyzed cases from other jurisdictions that had adopted the divergent view that intangible matter such as "fluoride gases and microscopic particulates" could constitute a trespass. *Id*. at 146-47, 747 S.E.2d at 477.

Reasoning that maintaining "the distinction between trespass and nuisance is important due to the extra protection needed for the right of exclusive possession" that is unique to trespass, the Supreme Court reaffirmed South Carolina's requirement for a "physical, tangible invasion," a test, "while not perfect, provides a workable rule that roughly tracks the line between those things that interfere with the right to exclusive possession, and thus, are a trespass, and those that merely interfere with the right to use and enjoyment, and thus, are a nuisance." *Id*. at 151, 747 S.E.2d at 180.

Here, Plaintiff points to only microscopic, intangible matter as the basis for its allegation that Lindau has trespassed: "Defendants' PFAS invades Plaintiff's properties." Compl. ¶ 79(d). To plead this alleged invasion, Plaintiff relies on regulatory limits that measure PFAS particles in "parts per trillion." Compl. ¶¶ 39-41. The alleged PFAS molecules are invisible, minute particles akin to the fluoride and microscopic particulates that the Supreme Court rejected as the type of matter that could constitute a trespass. Therefore, because Plaintiff fails to allege an invasion of a "tangible thing," this Court should dismiss the trespass claim.

### 2. Plaintiff fails to allege facts showing that the PFAS entry onto Plaintiff's property was the intentional, immediate result of Lindau's actions.

Trespass is an intentional tort that requires an invasion that is the "direct result" of the defendant's conduct. *Graham v. Town of Latta*, 417 S.C. 164, 192-93, 789 S.E.2d 71, 86 (Ct. App. 2016); *Snow v. Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). The defendant must intend the conduct that constitutes the invasion. *Snow*, 305 S.C. at 554, 409 S.E.2d at 802.

In *Snow*, the plaintiffs sued the City of Columbia for damage to their residence caused by the discharge of water from a water main owned and maintained by the City. *Id*. at 545, 409S.E.2d at 798. In affirming the trial court's directed verdict on plaintiff's trespass claim in favor of the City, the Court of Appeals stated that "the immediate cause of the entry on the [plaintiffs'] land was the discharge of water from the leaking pipe joint," which the City was not aware of before the plaintiffs brought it to the City's attention. *Id*. "Since the event which constituted the entry was not a voluntary act of the City, an action for trespass will not lie." *Id*.

Relying upon *Snow*, and putting aside that PFAS is intangible matter that does not support a claim for trespass, Plaintiff's additional trespass allegations are also inadequate. To proceed with a trespass claim, Plaintiff must state facts showing that Lindau's conduct was the "immediate cause of the entry" on Plaintiff's property and that Lindau intended for its wastewater to enter Plaintiff's property. When Lindau discharges its wastewater through its outfalls, it only intends to send its wastewater to the Columbia WWTP for treatment, not for it to enter Plaintiff's property. Plaintiff does state allegations of intent in its Complaint, but these allegations support Lindau's intent to discharge to the Columbia WWTP (Compl. ¶ 79), *not* an intent to enter Plaintiff's property.

Furthermore, Lindau's discharge is not the "immediate cause for entry" onto Plaintiff's property. Most immediately, it is Plaintiff's own mechanical withdrawal from Lake Marion and Lake Moultrie that brings the water onto its property, and secondarily, it is Columbia WWTP's discharge of its treated effluent into the Congaree River that eventually places the wastewater into these downstream lakes. Accordingly, Plaintiff's trespass claim against Lindau fails to state facts showing that the alleged PFAS entry was the intentional, immediate result of Lindau's actions.

10

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

3. **Plaintiff's trespass claim fails because it does not have "exclusive possession" of the Congaree River, Lake Marion, or Lake Moultrie.**

Finally, to succeed on a trespass claim, the claimant or party alleging the trespass must have <u>exclusive</u> possession of the property. *Babb,* 405 S.C. at 139, 747 S.E.2d at 473. Here, the State of South Carolina owns Lake Marion and Lake Moultrie and "the state owns the property below the high water mark of a navigable stream." S.C. Code Ann. § 58-31-170; *Sierra Club v. Kiawah Resort Assocs.*, 318 S.C. 119, 128, 456 S.E.2d 397, 402 (1995). "This property is part of the Public Trust." *Id*. The underlying premise of the Public Trust Doctrine is that "some things are considered too important to society to be owned by one person." *Id*. As such, the South Carolina Constitution declares that "[a]ll navigable waters shall forever remain public highways free to the citizens of the State and the United States." S.C. CONST. art. XIV, § 4.

Additionally, it is well settled in South Carolina that while a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands…[h]e has no property in the water itself, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265 (1901).

To the extent Plaintiff alleges that the trespass at issue is the indirect, introduction of PFAS contaminated wastewater into Lake Marion and Lake Moultrie (through the Columbia WWTP and Congaree River), Plaintiff's trespass claim fails because Plaintiff, while having ownership rights, does not have *exclusive* possession over those public waterways; they must be shared with the "citizens of the State and the United States." Pursuant to the Public Trust Doctrine (though not specifically cited), Plaintiff states that it "owns all lands beneath Lake Marion and Lake Moultrie up to their high-water marks." Compl. ¶ 3. Plaintiff also states that it "owns and occupies riparian lands on Lake Marion in Santee, South Carolina; and on Lake Moultrie in Moncks Corner, South Carolina." *Id*. Through its indirect reference to the Public Trust Doctrine and its direct reference

11

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

to its riparian rights, both of which by their very nature run counter to exclusive possession, Plaintiff admits that while it has these ownership rights in Lake Marion and Lake Moultrie, it does not enjoy *exclusive* possession of these lakes, and thus Plaintiff cannot maintain a trespass claim based on any alleged "invasion" of those bodies of water with PFAS contamination.

In conclusion on Plaintiff's trespass claim, the claim fails for the three reasons set forth above: (1) the failure to allege an invasion by a tangible thing, (2) the failure to allege facts showing that the PFAS entry onto Plaintiff's property was the intentional, immediate result of Lindau's actions, and (3) the failure due to Plaintiff's lack of "exclusive possession" of the Congaree River, Lake Marion, or Lake Moultrie.

### C. Plaintiff fails to allege facts to support its negligence, gross negligence, or recklessness claim.[7]

Before analyzing the individual elements of Plaintiff's negligence claims, the Court should consider the broader context of the situation here and recognize that it cannot possibly give rise to a negligence claim. The context is this: Plaintiff alleges that (i.) a facility fifty (50) miles away from the Plaintiff's surface water treatment plant (ii.) may have used or unknowingly discharged miniscule amounts of certain chemical compounds, (iii.) which chemical compounds have only recently been discovered, (iv.) and the discharge of which was not prohibited by the facility's discharge permits, (v.) in water sent to a licensed municipal wastewater treatment plant, (vi.) and that these actions constituted legal negligence in such a way as to injure the Plaintiff. On its face, this allegation betrays credibility.

Analyzing the claim in the context of the legal elements, to prevail on a negligence claim, a plaintiff must establish that the defendant owed a duty to the plaintiff, that a breach of that duty

---

[7] Plaintiff groups its negligence, gross negligence, and recklessness claim under one cause of action, the fourth one, and thus Lindau also addresses negligence, gross negligence, and recklessness collectively under "negligence."

occurred by an act of omission or commission, and that such breach of duty was the proximate cause of plaintiff's injuries. *Sherrill v. S. Bell Tel. & Tel. Co.*, 260 S.C. 494, 499, 197 S.E.2d 283, 285 (1973). The plaintiff must also establish damages. *Babb,* 405 S.C. at 153, 747 S.E.2d at 481.

1. **Lindau owes no duty of care to Plaintiff.**

The threshold question in a negligence action is whether the defendant owed a duty of care to the plaintiff. *Bishop v. South Carolina Dept. of Mental Health*, 331 S.C. 79, 86, 502 S.E.2d 78, 81 (1998). Whether such a duty exists is a question of law for the courts. *Huggins v. Citibank, N.A.*, 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003).

"Under South Carolina law, 'there is no general duty to control the conduct of another or to warn a third person or potential victim of danger.'" *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F.Supp.3d 667, 682 (D.S.C. Oct. 19, 2021) (citing *Faile v. S.C. Dep't of Juv. Just.*, 566 S.E.2d 536, 546 (S.C. 2002)). A duty of care "may be created by statute, a contractual relationship, status, property interest, or some other special circumstance" such as a professional duty. *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 373 S.C. 43, 47–48, 52, 644 S.E.2d 43, 46, 49 (2007). "It is the relationship between the parties, not the potential 'foreseeability of injury,' that determines whether the law will recognize a duty in a given context." *Williams v. Preiss-Wal Pat III, LLC*, 17 F. Supp. 3d 528, 535 (D.S.C. 2014) (citing *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003)). "Foreseeability of injury, in and of itself, does not give rise to a duty." *Charleston Dry Cleaners* 355 S.C. at 618, 586 S.E.2d at 588. South Carolina courts will not extend the concept of a legal duty of care in tort liability "beyond reasonable limits." *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 377 (1986).

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Here, the link between Plaintiff and Lindau is far too attenuated to create a duty flowing between them. While Plaintiff makes a conclusory allegation that Lindau "[has] a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals" (Compl. ¶ 88), that allegation fails to establish any type of link between Lindau and Plaintiff that would give rise to a duty. Moreover, Plaintiff's "foreseeability" allegations in Paragraph 89 of the Complaint – that Lindau "knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, and dose-additive; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including those in the Santee River Basin—were vulnerable to the contamination that has taken and now takes place" – do not alone, independent of a relational link, create a legal duty. As a matter of law, Lindau owes no duty to Plaintiff and this Court should dismiss Plaintiff's negligence, gross negligence, and recklessness cause of action.[8]

## 2. Lindau did not proximately cause Plaintiff's alleged downstream harm.

Plaintiff must show a causal connection – proximate causation – between Lindau's conduct and Plaintiff's own injury to recover under negligence. *Steele v. Rogers*, 306 S.C. 546, 549, 413 S.E.2d 329, 331 (Ct. App. 1992). To establish proximate causation, the plaintiff must prove both causation in fact and legal cause. *Id*. at 550, 413 S.E.2d at 332. "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id*. While proximate causation is typically a question for the jury, "when only one reasonable inference can be drawn from all of the evidence, then the

---

[8] It goes without saying that if Lindau does not owe a duty to Plaintiff, then Lindau could not breach any duty, and Plaintiff therefore cannot meet the second element of negligence.

14

question becomes one of law for the court and there is no issue for submission to the jury, and it is the duty of the trial judge" to decide. *Kirkland v. Hardwicke Chem. Co.*, 262 S.C. 520, 522-23, 205 S.E.2d 831, 832 (1974) (reversing the trial court's judgment against the defendant chemical company because the only reasonable inference that could be drawn was that the chemical company did not proximately cause the downstream landowner's alleged damages).

Here, Plaintiff's allegations that Lindau's discharge of its wastewater to the Columbia WWTP constitutes proximate causation fail because Lindau's wastewater discharge to the Columbia WWTP is too remote and attenuated to cause Plaintiff's alleged injury. Plaintiff does not provide facts showing "but for" Lindau's wastewater discharge, Plaintiff would not have suffered its alleged harm, nor does Plaintiff provide facts establishing that a more than 50-mile upstream discharge to a licensed municipal WWTP could foreseeably result in Plaintiff's alleged damages. Plaintiff admits that Lindau "discharges industrial wastewater" – not to Plaintiff's property – but "to the Columbia WWTP." Compl. ¶ 18. The Columbia WWTP, in turn discharges – not to Plaintiff's property – but to the Congaree River, which is "upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie." *Id*. Once the Columbia WWTP treats Lindau's wastewater (and all its other residential and industrial users' wastewater), and then discharges the treated effluent to the Congaree River, the treated effluent eventually reaches Lake Marion and Lake Moultrie. During this downstream voyage, Lindau's wastewater is allegedly comingled with the wastewater of the other Defendants' wastewater that Plaintiff alleges contains PFAS (and undoubtedly is comingled along the way with water from numerous other PFAS sources). Compl. ¶¶ 17, 19-20. Importantly, and in addition to this attenuated chain of events, Plaintiff would not have suffered the harm it alleges but for its own action – mechanically drawing water from Lake Marion and Lake Moultrie through its intake systems. The attenuated chain of events and multiple

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

actors required for Plaintiff to suffer the alleged harm leads to only one reasonable inference, that Lindau did not proximately cause Plaintiff's downstream harm, and thus this Court should dismiss Plaintiff's negligence claim.

<div align="center">3.   <b>Plaintiff's alleged damages are not recoverable in tort.</b></div>

To prevail on a negligence claim, Plaintiff must also establish damages that are recoverable in tort. *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. "Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage." *Id*.

In this case, the only damages that Plaintiff identifies are the speculative and yet-to-be-established "future costs of acquiring, installing, and operating adequate water treatment technologies," not any quantifiable physical injury or property damage. Compl. ¶ 91. Plaintiff pleads no facts alleging Lindau injured its physical property or its water treatment facility. Accordingly, Plaintiff fails to allege damages that are recoverable under a negligence claim, and the Court should dismiss Plaintiff's negligence, gross negligence, and recklessness claim.

## II.     Plaintiff's claims are not ripe for adjudication.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct.App.1998). A "contingent, hypothetical or abstract dispute" is not an active case or controversy and thus is not appropriate for judicial determination. *Peoples Fed. Sav. & Loan Ass'n v. Res. Planning Corp.*, 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004).

While the basis of Plaintiff's Complaint is the future need to comply – in 2029 – with EPA's maximum contaminant levels ("MCLs") for PFAS in the drinking water it provides, Plaintiff fails to allege any facts establishing it has suffered current or past harm that would support an active case or controversy and instead relies only on allegations that it will need to take future

<div align="center">16</div>

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

actions, such as the "*future* acquisition, installation, and operation of required treatment technologies" (Compl. ¶ 69 (emphasis added)). Moreover, the drinking water PFAS MCLs are currently being challenged in multiple lawsuits before the federal D.C. Circuit. The future 2029 compliance deadline, the future actions that Plaintiff alleges it will need to take, and the regulatory uncertainty surrounding the drinking water PFAS MCLs are, at this point in time, contingent, hypothetical, and abstract, and thus this Court should dismiss Plaintiff's Complaint as nonjusticiable.

### III. Plaintiff Lacks *Parens Patriae* Standing and the Municipal Cost Recovery rule bars the recovery of costs Plaintiff seeks as damages.

While Santee Cooper has the power "to sue and be sued," S.C. Code Ann. § 58-31-30(A)(2), it "lacks the sovereignty to maintain a suit under the doctrine of *parens patriae*;" instead it "must establish it is a real party in interest in order to maintain a suit" and "must allege an infringement of its own proprietary interests or statutory rights to establish standing." *Cnty. of Lexington, S.C. v. City of Columbia*, 303 S.C. 300, 301, 400 S.E.2d 146, 147 (1991). As such, to the extent that Santee Cooper makes allegations on behalf of "Plaintiff's customers, and . . . all residents in Plaintiff's community," Compl. ¶ 68, these claims should be dismissed.

In a similar way, under the common law rule known as the "free public service" or "municipal cost recovery doctrine," "a government entity cannot sue a tortfeasor to recover the costs of public services that were made necessary because of the defendant's negligence." Richard C. Ausness, *The Current State of Opioid Litigation*, 70 S.C. L. Rev. 565, 603 (2019). In other words, "[t]he general common-law rule in force . . . provides that, absent authorizing legislation, the cost of public services for protection from . . . safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." *D.C. v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984). The logic behind this doctrine is that

17

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

attempts by government entities to recover costs for the services they provide from tortfeasors are seen as an end-run around the democratic process. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 315–17 (1947) (holding that the "exercise of judicial power to establish [] new liability . . . would be intruding within a field properly within [the legislature's] control").

While the application of this doctrine in South Carolina does not appear to have been specifically addressed by South Carolina appellate courts, most states that have considered similar attempts by government entities to recover the costs of providing public services have concluded that such claims should not be allowed as a matter of public policy. *See, e.g.*, *Torres v. Putnam Cnty.*, 246 Ga. App. 544, 548, 541 S.E.2d 133, 136 (2000) ("the county alleges that the appellants have injured the county's property only by causing the county to spend money enforcing its laws and protecting its citizens. We find no authority for the position that such an expenditure of public funds in performing a public duty required by law implicates any private right."); *Bd. of Sup'rs of Fairfax Cnty., VA v. U.S. Home Corp.*, 18 Va. Cir. 181 (1989) ("The cost of public services for protection from a safety hazard is to be borne by the public as a whole, not assessed against a tortfeasor whose negligence creates the need for the service."); *State Highway & Pub. Works Comm'n v. Cobb*, 215 N.C. 556, 2 S.E.2d 565, 567 (1939) ("there is no statute law, and certainly no common law principle, authorizing" the recovery of funds paid out to recover a fugitive from the fugitive in civil litigation); *see also Municipal Firearm Litigation: Ill Conceived from Any Angle*, 32 Conn. L. Rev. 1277, 1296 (2000) ("Every jurisdiction to have squarely addressed this issue has adopted the common law rule that public expenditures made in the performance of governmental functions are not recoverable, absent a specific authorizing statute.") (internal quotations omitted).

Therefore, as a public, governmental entity, pursuant to the Municipal Cost Recovery rule, Plaintiff cannot claim relief from the Court for alleged damages to upgrade its water treatment systems and Plaintiff's Complaint should be dismissed.

## CONCLUSION

For these reasons, this Court should dismiss Plaintiff Santee Cooper's claims against Defendant Lindau Chemicals, Inc. with prejudice, or, in the alternative, issue summary judgment in its favor, and grant such other and further relief as is just and proper.

Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

*s/ Ian T. Duggan*
D. Reece Williams, III, Bar No. 6120
Ian T. Duggan, Bar No. 80074
P.O. Box 1390
1812 Lincoln Street, Second Floor (29201)
Columbia, South Carolina 29202
Ph: 803-404-6900
Fax: 803-404-6902
reecewilliams@callisontighe.com
ianduggan@callisontighe.com

**EARTH AND WATER LAW, LLC**

John A. Sheehan (*pro hac vice*)
Edward (Ned) B. Witte (*pro hac vice*)
Heather A. Davis (*pro hac vice*)
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20004
Tel: 202-280-6362
john.sheehan@earthandwatergroup.com
ned.witte@earthandwatergroup.com
heather.davis@earthandwatergroup.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

Columbia, South Carolina
March 17, 2025

19

ELECTRONICALLY FILED - 2025 Mar 17 5:05 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

*Plaintiff*,

v.

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

*Defendants*.

Case No. 2024-CP-08-03336

**MOTION FOR ADMISSION**
***PRO HAC VICE***
*(of Heather A. Davis)*

Pursuant to Rule 404 of the South Carolina Appellate Court Rules, Ian T. Duggan, of Callison Tighe & Robinson, LLC, respectfully requests the Court enter an Order permitting Heather A. Davis to appear *pro hac vice* in this litigation as counsel for Defendant Lindau Chemicals, Inc. and would show the Court as follows:

1.     Heather A. Davis is a member in good standing of the State of North Carolina and practices law under the name of Earth & Water Law, LLC with an office at 1455 Pennsylvania Avenue N, Suite 400, Washington, DC 20004.

2.     Ms. Davis is handling this matter in association with Ian T. Duggan of Callison Tighe & Robinson, LLC, who is a member of good standing of the South Carolina Bar.

3.     This motion is supported by the attached Verified Application for Admission *Pro Hac Vice* of Heather A. Davis, and Certificate of Good Standing, copies of which have been served by mail on the South Carolina Supreme Court Office of Bar Admissions, along with a $250 check made payable to the South Carolina Supreme Court, pursuant to Rule 404 of the South Carolina Appellate Court Rules.

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

THEREFORE, the movant prays for an Order of the Court permitting the appearance of

Heather A. Davis, *pro hac vice*, in this action as counsel for Defendant Lindau Chemicals, Inc.

Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

*s/ Ian T. Duggan*
Ian T. Duggan, SC Bar No. 80074
D. Reece Williams, III, SC Bar No. 6120
1812 Lincoln Street, Suite 200
P. O. Box 1390
Columbia, SC  29202-1390
Telephone: 803-404-6900
Facsimile: 803-404-6902
Email: ianduggan@callisontighe.com
Email: reecewilliams@callisontighe.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

March 18, 2025
Columbia, South Carolina



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 13, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:    South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Heather A. Davis be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M. J. Thames
Bar Admissions Coordinator

cc:    Heather A. Davis
Ian T. Duggan

ELECTRONICALLY FILED - 2025 Mar 13 22:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

RECEIVED

MAR 1 0 2025

S.C. SUPREME COURT

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority, a/k/a Santee Cooper | 2024-CP-08-03336 | Common Pleas for Berkeley County |
| Plaintiff | Case No. | Tribunal |
| vs. | Mailing Address of Tribunal: | The Hon. Leah Guerry Dupree |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc.; Milliken & Company; and Waste Management of South Carolina, Inc. | | Berkeley County Clerk of Court P.O. Box 219 Moncks Corner, SC 29461 |
| Defendants | | |

Comes now  Heather A. Davis                              , applicant herein, and respectfully represents the following:

   1.  Applicant resides at:
11900 Mountain Crest Circle
Street Address

| Charlotte | Mecklenburg | NC | 28216 |
|---|---|---|---|
| City | County | State | Zip Code |

(281)546-1200
Telephone

   2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)
Earth & Water Law, LLC                                                    , with offices at

1455 Pennsylvania Ave N, Suite 400
Street Address

| Washington, DC | n/a | n/a (District of Columbia) | 20004 |
|---|---|---|---|
| City | County | State | Zip Code |
| 202-280-6362 | 281-546-1200 | | heather.davis@earthandwatergroup.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

   3.  Applicant has been retained personally or as a member of the above-named law firm by
Lindau Chemicals, Inc.                                      to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

   4.  Since        12th       of   May 2017                        , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of

*Page 1 of 4*

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

North Carolina_____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| Texas | November 6, 2003 |
| Wisconsin | April 23, 2008 |
| North Carolina | May 12, 2017 |
| Kentucky | January 29, 2025 |
| United States District Court for the Western District of Wisconsin | October 10, 2010 |
| United States District Court for the Southern District of Texas | February 26, 2004 |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Wisconsin – inactive; Texas – non-practicing; U.S. District Court, Southern District of Texas -- inactive

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is Ian T. Duggan_____ of the Callison Tighe & Robinson, LLC_____

law firm, which has offices at:

1812 Lincoln Street, Suite 200_____
Street Address

| Columbia | Richland | South Carolina | 29201 |
|---|---|---|---|
| City | County | State | Zip Code |
| 803-404-6900 | 703-431-1514 | 803-404-6902 | ianduggan@callisontighe.com |

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Primary Telephone          Cell Phone          Fax Number          Email Address
  80074
South Carolina Bar Number
(You must provide Bar Number)

     10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| No |
|----|

     11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|-----|

     12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____27th_____ day of _____February_____, 20 _25_

_____
APPLICANT

*Page 3 of 4*

# VERIFICATION

STATE OF  North Carolina          )

COUNTY OF  Mecklenburg          )

I,          Heather A. Davis          , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this _____ day of  February , 20  25

_____
(Notary Signature)

Notary Public for the State of _____

My Commission Expires: _____

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this _____ day of  ~~February~~ March , 20  25

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this _____ day of  ~~February~~ March , 20  25

_____

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Mar 18 12:42 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# Supreme Court
## OF THE STATE OF NORTH CAROLINA



RECEIVED

MAR 1 0 2025

S.C. SUPREME COURT

I, Grant E. Buckner, Clerk of the Supreme Court of North Carolina, do hereby certify that on May 12, 2017, license to practice as an Attorney and Counselor at Law in all the Courts of this State was issued by the North Carolina Board of Law Examiners to

## Heather Aline Davis

according to the certified list of licentiates reported by the Secretary of said Board and filed in my office as required by statute.

To the date of this certificate, no order revoking said license has been filed with this Court and no order suspending same is in effect.

WITNESS my hand and the Seal of the Supreme Court of North Carolina at office in Raleigh, this February 18, 2025.

Grant E. Buckner
Clerk of the Supreme Court
of the State of North Carolina

ELECTRONICALLY FILED - 2025 Mar 26 1:20 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

Case No. 2024-CP-08-03336

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

                              *Plaintiff*,

v.

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

                              *Defendants*.

**ORDER GRANTING
*PRO HAC VICE* ADMISSION TO
HEATHER A. DAVIS**

This matter came before the Court upon Motion of Ian T. Duggan of Callison Tighe & Robinson, LLC, attorneys for Defendant Lindau Chemicals, Inc., to admit Heather A. Davis *pro hac vice,* to appear in this case as counsel on behalf of Defendant Lindau Chemicals, Inc.  This Motion is made pursuant to Rule 404 of the South Carolina Appellate Court Rules.

Having considered the Motion and the application submitted in support thereof,

It is therefore hereby ordered that the Motion is granted and Heather A. Davis, is admitted *pro hac vice* to represent Defendant Lindau Chemicals, Inc. in this matter for purposes of this lawsuit only.

AND IT IS SO ORDERED.

(Signature Page to Follow)

ELECTRONICALLY FILED - 2025 Mar 26 1:20 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



Berkeley Common Pleas

**Case Caption:**   South Carolina Public Service Authority , plaintiff, et al VS   China
Jushi Usa Corporation , defendant, et al

**Case Number:**   2024CP0803336

**Type:**   Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 13:04:04    page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

*Plaintiff*,

v.

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

*Defendants*.

Case No. 2024-CP-08-03336

**MOTION FOR ADMISSION**
***PRO HAC VICE***
*(of John Sheehan)*

Pursuant to Rule 404 of the South Carolina Appellate Court Rules, Ian T. Duggan, of Callison Tighe & Robinson, LLC, respectfully requests the Court enter an Order permitting John Sheehan to appear *pro hac vice* in this litigation as counsel for Defendant Lindau Chemicals, Inc. and would show the Court as follows:

1.      John Sheehan is a member in good standing of the District of Columbia and practices law under the name of Earth & Water Law, LLC with an office at 1455 Pennsylvania Avenue N, Suite 400, Washington, DC 20004.

2.      Mr. Sheehan is handling this matter in association with Ian T. Duggan of Callison Tighe & Robinson, LLC, who is a member of good standing of the South Carolina Bar.

3.      This motion is supported by the attached Verified Application for Admission *Pro Hac Vice* of John Sheehan, and Certificate of Good Standing, copies of which have been served by mail on the South Carolina Supreme Court Office of Bar Admissions, along with a $250 check made payable to the South Carolina Supreme Court, pursuant to Rule 404 of the South Carolina Appellate Court Rules.

THEREFORE, the movant prays for an Order of the Court permitting the appearance of John Sheehan, *pro hac vice*, in this action as counsel for Defendant Lindau Chemicals, Inc.

Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

*s/ Ian T. Duggan*
Ian T. Duggan, SC Bar No. 80074
D. Reece Williams, III, SC Bar No. 6120
1812 Lincoln Street, Suite 200
P. O. Box 1390
Columbia, SC  29202-1390
Telephone: 803-404-6900
Facsimile: 803-404-6902
Email: ianduggan@callisontighe.com
Email: reecewilliams@callisontighe.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

March 18, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 13, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:    South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting John Sheehan be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M. J. Thames
Bar Admissions Coordinator

cc:    John Sheehan
Ian T. Duggan



# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

RECEIVED
MAR 1 0 2025
S.C. SUPREME COURT

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority, a/k/a Santee Cooper | 2024-CP-08-03336 | Common Pleas for Berkeley County |
| Plaintiff | Case No. | Tribunal |
| vs. | | Mailing Address of Tribunal: |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc.; Milliken & Company; and Waste Management of South Carolina, Inc. | | The Hon. Leah Guerry Dupree<br><br>Berkeley County Clerk of Court<br>P.O. Box 219<br>Moncks Corner, SC 29461 |
| Defendants | | |

Comes now  John Sheehan                                    , applicant herein, and respectfully represents the following:

    1.  Applicant resides at:

9720 Carriage Road
Street Address

| Kensington | Montgomery | Maryland | 20895 |
|---|---|---|---|
| City | County | State | Zip Code |

301-980-5032
Telephone

    2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Earth & Water Law, LLC                                    , with offices at

1455 Pennsylvania Ave N, Suite 400
Street Address

| Washington, DC | n/a | n/a<br>(District of Columbia) | 20004 |
|---|---|---|---|
| City | County | State | Zip Code |
| 301-980-5032 | 301-980-5032 | n/a | john.sheehan@earthandwatergroup.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

    3.  Applicant has been retained personally or as a member of the above-named law firm by

Lindau Chemicals, Inc.                                    to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

    4.  Since   October   of  1986                          , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

n/a_____ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| United States Supreme Court | 1990 |
| United States Court of Appeals for the Fifth Circuit | October 30, 2024 |
| United States Court of Appeals for the Sixth Circuit | February 14, 2024 |
| United States District Court for the District of Western Michigan | November 27, 2023 |
| United States District Court for the District of Columbia | January, 2009 |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is Ian T. Duggan_____ of the Callison Tighe & Robinson, LLC_____

law firm, which has offices at:

1812 Lincoln Street, Suite 200
_____
Street Address

| Columbia | Richland | South Carolina | 29201 |
|---|---|---|---|
| City | County | State | Zip Code |
| 803-404-6900 | 703-431-1514 | 803-404-6902 | ianduggan@callisontighe.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

80074
_____
South Carolina Bar Number
(You must provide Bar Number)

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| No |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____24th_____ day of ___February___, 20_25_

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## VERIFICATION

STATE OF _Maryland_ )

COUNTY OF _Montgomery_ )

I,        John Sheehan        , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___24___ day of ___February___, 20 _25_

_____
(Notary Signature)

Notary Public for the State of _Maryland_

My Commission Expires: _May 9, 2027_

> FARAHNAZ PAKSIMA
> Notary Public - State of Maryland
> Montgomery County
> My Commission Expires May 9, 2027

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission _Pro Hac Vice_ to the South Carolina Bar.

DATED this ___5th___ day of ___March___, 20 _25_

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___5th___ day of ___March___, 20 _25_

_____

ELECTRONICALLY FILED - 2025 Mar 18 12:46 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336





RECEIVED

MAR 1 0 2025

S.C. SUPREME COURT

On behalf of JULIO A. CASTILLO, Clerk of the District of Columbia Court of Appeals,
the District of Columbia Bar does hereby certify that

## John A Sheehan

was duly qualified and admitted on October 8, 1986 as an attorney and counselor entitled to
practice before this Court; and is, on the date indicated below, an Active member in good
standing of this Bar.

In Testimony Whereof,
I have hereunto subscribed my
name and affixed the seal of this
Court at the City of
Washington, D.C., on February 06, 2025.

*JULIO A. CASTILLO*
*Clerk of the Court*

Issued By:

*David Chu - Director, Membership*
*District of Columbia Bar Membership*

For questions or concerns, please contact the D.C. Bar Membership Office at 202-626-3475 or email
membersevices@dcbar.org.

ELECTRONICALLY FILED - 2025 Mar 26 1:17 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Case No. 2024-CP-08-03336

*Plaintiff*,

v.

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

*Defendants*.

**ORDER GRANTING
*PRO HAC VICE* ADMISSION TO
JOHN SHEEHAN**

This matter came before the Court upon Motion of Ian T. Duggan of Callison Tighe & Robinson, LLC, attorneys for Defendant Lindau Chemicals, Inc., to admit John Sheehan *pro hac vice,* to appear in this case as counsel on behalf of Defendant Lindau Chemicals, Inc. This Motion is made pursuant to Rule 404 of the South Carolina Appellate Court Rules.

Having considered the Motion and the application submitted in support thereof,

It is therefore hereby ordered that the Motion is granted and John Sheehan, is admitted *pro hac vice* to represent Defendant Lindau Chemicals, Inc. in this matter for purposes of this lawsuit only.

AND IT IS SO ORDERED.

(Signature Page to Follow)



Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**     Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 13:04:09     page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 26 1:17 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

Case No. 2024-CP-08-03336

*Plaintiff*,

v.

**MOTION FOR ADMISSION**
***PRO HAC VICE***
*(of Edward B. Witte)*

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

*Defendants*.

Pursuant to Rule 404 of the South Carolina Appellate Court Rules, Ian T. Duggan, of Callison Tighe & Robinson, LLC, respectfully requests the Court enter an Order permitting Edward B. Witte to appear *pro hac vice* in this litigation as counsel for Defendant Lindau Chemicals, Inc. and would show the Court as follows:

1.      Edward B. Witte is a member in good standing of the State of Wisconsin and practices law under the name of Earth & Water Law, LLC with an office at 1455 Pennsylvania Avenue N, Suite 400, Washington, DC 20004.

2.      Mr. Witte is handling this matter in association with Ian T. Duggan of Callison Tighe & Robinson, LLC, who is a member of good standing of the South Carolina Bar.

3.      This motion is supported by the attached Verified Application for Admission *Pro Hac Vice* of Edward B. Witte, and Certificate of Good Standing, copies of which have been served by mail on the South Carolina Supreme Court Office of Bar Admissions, along with a $250 check made payable to the South Carolina Supreme Court, pursuant to Rule 404 of the South Carolina Appellate Court Rules.

THEREFORE, the movant prays for an Order of the Court permitting the appearance of

Edward B. Witte, *pro hac vice*, in this action as counsel for Defendant Lindau Chemicals, Inc.

Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

*s/ Ian T. Duggan*
Ian T. Duggan, SC Bar No. 80074
D. Reece Williams, III, SC Bar No. 6120
1812 Lincoln Street, Suite 200
P. O. Box 1390
Columbia, SC  29202-1390
Telephone: 803-404-6900
Facsimile: 803-404-6902
Email: ianduggan@callisontighe.com
Email: reecewilliams@callisontighe.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

March 18, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 14, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:    South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Edward B. Witte be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar-Admissions Coordinator

cc:    Edward B. Witte
Ian T. Duggan

ELECTRONICALLY FILED - 2025 Mar 17 12:49 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

RECEIVED
MAR 1 0 2025
S.C. SUPREME COURT

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
## IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Public Service Authority, a/k/a Santee Cooper | 2024-CP-08-03336 | Common Pleas for Berkeley County |
| Plaintiff | Case No. | Tribunal |
| vs. | Mailing Address of Tribunal: | |
| China Jushi USA Corporation; Jushi USA Fiberglass Co., LTD.; Lindau Chemicals, Inc.; Milliken & Company; and Waste Management of South Carolina, Inc. | | The Hon. Leah Guerry Dupree |
| | | Berkeley County Clerk of Court P.O. Box 219 Moncks Corner, SC 29461 |
| Defendants | | |

Comes now  Edward B. Witte                          , applicant herein, and respectfully represents the following:

1.  Applicant resides at:

9086 North Bayside Drive

Street Address

| Bayside | Milwaukee | WI | 53217 |
|---|---|---|---|
| City | County | State | Zip Code |

414-305-2267

Telephone

2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Earth & Water Law, LLC                          , with offices at

1455 Pennsylvania Ave N, Suite 400

Street Address

| Washington, DC | n/a | n/a (District of Columbia) | 20004 |
|---|---|---|---|
| City | County | State | Zip Code |
| 202-280-6362 | 414-305-2267 | | ned.witte@earthandwatergroup.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

3.  Applicant has been retained personally or as a member of the above-named law firm by

Lindau Chemicals, Inc.                          to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4.  Since     September  of  1989                    , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of

*Page 1 of 4*

<u>Wisconsin</u> where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| State Court of Wisconsin | September 13, 1989 |
| Supreme Court of Wisconsin | September 13, 1989 |
| State Court of Oregon | May 2023 |
| Supreme Court of Oregon | May 2023 |
| | |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is <u>Ian T. Duggan</u> of the <u>Callison Tighe & Robinson, LLC</u>

law firm, which has offices at:

<u>1812 Lincoln Street, Suite 200</u>
Street Address
| <u>Columbia</u> | <u>Richland</u> | <u>South Carolina</u> | <u>29201</u> |
|---|---|---|---|
| City | County | State | Zip Code |
| <u>803-404-6900</u> | <u>703-431-1514</u> | 803-404-6902 | ianduggan@callisontighe.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

*Page 2 of 4*

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

80074
South Carolina Bar Number
(You must provide Bar Number)

10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

No

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

Yes

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this  4th  5th      day of     March     , 20 25

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## VERIFICATION

STATE OF ____Maine____ )

COUNTY OF ____Hancock____ )

I, ____Edward B. Witte____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this __5th__ day of ~~February~~ March, 20 _25_

_____
(Notary Signature)

Notary Public for the State of ____Maine____

My Commission Expires: __October 31st 2025__

Katrina A. Eaton
Notary Public, State of Maine
My Commission Expires October 31, 2025

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this __5th__ day of ~~February~~ March, 20 _25_

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this __5th__ day of ~~February~~ March, 20 _25_

_____



**Samuel A. Christensen**
Clerk

# WISCONSIN SUPREME COURT
## OFFICE OF THE CLERK
110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

RECEIVED
MAR 1 0 2025
S.C. SUPREME COURT

ELECTRONICALLY FILED - 2025 Mar 18 12:39 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## *CERTIFICATE OF GOOD STANDING*

*I, Samuel A. Christensen, Clerk of the Supreme Court of Wisconsin certify that the records of this office show that:*

*EDWARD B. WITTE*

*was admitted to practice as an attorney within this state on September 13, 1989 and is presently in good standing in this court.*

*Dated: February 10, 2025*



*SAMUEL A. CHRISTENSEN*
*Clerk of Supreme Court*

ELECTRONICALLY FILED - 2025 Mar 26 1:17 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER, an
agency of the State of South Carolina,

*Plaintiff*,

v.

CHINA JUSHI USA CORPORATION;
JUSHI USA FIBERGLASS CO., LTD.;
LINDAU CHEMICALS, INC.; MILLIKEN &
COMPANY; AND WASTE MANAGEMENT
OF SOUTH CAROLINA, INC.,

*Defendants*.

Case No. 2024-CP-08-03336

**ORDER GRANTING
*PRO HAC VICE* ADMISSION TO
EDWARD B. WITTE**

This matter came before the Court upon Motion of Ian T. Duggan of Callison Tighe & Robinson, LLC, attorneys for Defendant Lindau Chemicals, Inc., to admit Edward B. Witte *pro hac vice,* to appear in this case as counsel on behalf of Defendant Lindau Chemicals, Inc.  This Motion is made pursuant to Rule 404 of the South Carolina Appellate Court Rules.

Having considered the Motion and the application submitted in support thereof,

It is therefore hereby ordered that the Motion is granted and Edward B. Witte, is admitted *pro hac vice* to represent Defendant Lindau Chemicals, Inc. in this matter for purposes of this lawsuit only.

AND IT IS SO ORDERED.

(Signature Page to Follow)



Berkeley Common Pleas

**Case Caption:**   South Carolina Public Service Authority , plaintiff, et al VS   China
                    Jushi Usa Corporation , defendant, et al

**Case Number:**    2024CP0803336

**Type:**           Order/Pro Hac Vice


It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 13:03:59     page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 26 1:17 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

SOUTH CAROLINA PUBLIC SERVICE
AUMTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

         *Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

         *Defendants.*

**MOTION FOR ADMISSION**
*PRO HAC VICE*

The undersigned local counsel hereby moves, together with the attached application and certification of the South Carolina Office of Admissions, that Mark V. Donatiello of Morgan, Lewis & Bockius LLP, 502 Carnegie Center, Princeton, New Jersey, be admitted pro hac vice in the above captioned matter. As local counsel I understand that:

1.    I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2.    All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted pro hac vice; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted pro hac vice.

3. Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4. Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Donatiello's admission and received no objection.

Mr. Donatiello is a member in good standing with his local bar association, and the Verified Application for Admission Pro Hac Vice in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

<div style="margin-left:40%">

Respectfully submitted,

</div>

Dated: March 19, 2025

<div style="margin-left:40%">

*s/ Celine Amini*
Celine Amini (Bar No. 106206)
Randall M. Levine (*pro hac vice* forthcoming)
April Knight (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: (202) 739-3000
F: (202) 739-3001
celine.amini@morganlewis.com
randall.levine@morganlewis.com
april.knight@morganlewis.com

Mark V. Donatiello (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
T: (609) 919-6476
F: (609) 919-6600

*Attorneys for Defendants China Jushi USA*
*Corporation and Jushi USA Fiberglass Co., Ltd.*

</div>

ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

South Carolina Pub. Serv. Auth.
Plaintiff

vs.

China Jushi USA Corp., et al.
Defendant

2024-CP-08-03336
Case No.

Mailing Address of Tribunal:
300-B California Avenue
Moncks Corner, SC 29461

Court of Common Pleas
Tribunal

Comes now  Mark V. Donatiello                    , applicant herein, and respectfully represents the following:

1.  Applicant resides at:
100 Albert Way, Apt. 1352
Street Address

Princeton
City

Mercer
County

NJ
State

08540
Zip Code

973-978-6985
Telephone

2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)
Morgan Lewis Bockius LLP                                        , with offices at

502 Carnegie Center
Street Address

Princeton
City

Mercer
County

NJ
State

08540
Zip Code

609-919-6476
Primary Telephone

973-978-6985
Cell Phone

609-919-6600
Fax Number

Mark.Donatiello@MorganLewis.com
Email Address

3.  Applicant has been retained personally or as a member of the above-named law firm by
China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.        to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4.  Since        October    of  2024                        , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of
New Jersey                      where Applicant regularly practices law.  Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

*Page 1 of 4*

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| New Jersey | 10/31/2025 |
| Texas | 11/04/2016 |
| Eastern District of Michigan | 10/10/2017 |
| U.S. Court of Appeals for the District of Columbia | 04/15/2019 |
| U.S. District Court for the District of Columbia | 03/28/2018 |
|  |  |
|  |  |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Did not renew in U.S. District Court for the District of Columbia

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is Celine Amini                    of the Morgan, Lewis & Bockius LLP

law firm, which has offices at:

 1111 Pennsylvania Avenue, NW
Street Address

| Washington | DC | DC | 20004 |
|---|---|---|---|
| City | County | State | Zip Code |
| 202 739-3000 |  | 202 739-3001 | Celine.Amini@morganlewis.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

106206
_____
South Carolina Bar Number
(You must provide Bar Number)

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| No |
|----|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|-----|

12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this  4th               day of     March        , 20 25

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Mar 20 1:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# VERIFICATION

STATE OF  New Jersey                    )

COUNTY OF  Mercer                       )

I,          Mark V. Donatiello                            , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this    4th    day of    March    , 20  25

_____
(Notary Signature)

Notary Public for the State of    New Jersey

My Commission Expires:  September 17, 2029

JOYCE WONG
A Notary Public of New Jersey
My Commission Expires September 17, 2029

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this    7th    day of    march    , 20 25

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this _____ day of    March    , 20 25

_____

ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

# Supreme Court of New Jersey



# Certificate of Good Standing

This is to certify that **MARK VINCENT DONATIELLO**
(*No.* **491652024** ) *was constituted and appointed an Attorney at Law of New Jersey on* **October 31, 2024** *and, as such, has been admitted to practice before the Supreme Court and all other courts of this State as an Attorney at Law, according to its laws, rules, and customs.*

*I further certify that as of this date, the above-named is an Attorney at Law in Good Standing. For the purpose of this Certificate, an attorney is in "Good Standing" if the Court's records reflect that the attorney: 1) is current with all assessments imposed as a part of the filing of the annual Attorney Registration Statement, including, but not limited to, all obligations to the New Jersey Lawyers' Fund for Client Protection; 2) is not suspended or disbarred from the practice of law; 3) has not resigned from the Bar of this State; and 4) has not been transferred to Disability Inactive status pursuant to Rule 1:20-12.*

*Please note that this Certificate does not constitute confirmation of an attorney's satisfaction of the administrative requirements of Rule 1:21-1(a) for eligibility to practice law in this State.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Supreme Court, at Trenton, this 25th day of February, 2025.*

Clerk of the Supreme Court

ELECTRONICALLY FILED - 2025 Mar 17 2:43 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336
ELECTRONICALLY FILED - 2025 Mar 20 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 13, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:     South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

        Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Mark V. Donatiello be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Mark V. Donatiello
        Celine Amini

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

      *Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

      *Defendants.*

**ORDER GRANTING
MOTION FOR ADMISSION
*PRO HAC VICE***

Having considered the Motion for Admission of Mark V. Donatiello of Morgan, Lewis & Bockius LLP, 502 Carnegie Center, Princeton, New Jersey, *pro hac vice*, appearing on behalf of Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd., in the above captioned matter and the Verified Application for Admission Pro Hac Vice in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Mar 26 1:18 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



Berkeley Common Pleas

**Case Caption:**      South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**      2024CP0803336

**Type:**      Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 13:04:29    page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 26 1:18 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF BERKELEY** | **NINTH JUDICIAL CIRCUIT** |
| | **C.A. No.: 2024-CP-08-03336** |
| **SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE COOPER, an agency of the State of South Carolina,** | |
| *Plaintiff,* | **WASTE MANAGEMENT OF SOUTH CAROLINA, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT OF MOTION** |
| *v.* | |
| **CHINA JUSHI USA CORPORATION; JUSHI USA FIBERGLASS CO., LTD; LINDAU CHEMICALS, INC.; MILLIKEN & COMPANY; and WASTE MANAGEMENT OF SOUTH CAROLINA, INC.,** | |
| *Defendants.* | |

Defendant Waste Management of South Carolina, Inc. ("WMSC"), by and through its undersigned counsel, hereby moves the Court pursuant to Rules 8(a), 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure to dismiss all claims asserted against it in the Complaint filed by the Plaintiff, South Carolina Public Service Authority a/k/a Santee Cooper ("Santee Cooper"), respectfully stating as follows:

## I.     INTRODUCTION

Santee Cooper's Complaint is subject to dismissal on multiple grounds. First, this dispute is not ripe for judicial review. Santee Cooper, a drinking water provider, bases its claims on newly promulgated drinking water standards for certain per- and polyfluoroalkyl substances ("PFAS") that Santee Cooper does not have to comply with until 2029. Even assuming the standards go into effect at that time as written (they are currently being challenged in federal court), it is unknowable what measures, if any, Santee Cooper will have to take to meet them. It is only still the first year

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

of the rule's initial three-year initial testing period. Santee Cooper does not allege that it has incurred any costs—or taken any action at all—due to the new rule or on account of PFAS-contaminated water. The costs it is seeking to recover—future expenses it might incur to acquire and operate a new water treatment system—are inherently conjectural and contingent. Accordingly, this lawsuit is premature.

If Santee Cooper's claims are allowed to proceed now, there is a potential that Santee Cooper will receive an unwarranted windfall. Santee Cooper asks the Court to speculate that the condition of its source water five years from now will be the same as it is today—that there will be no changes to PFAS contributions (such as would results from the installation of third-party wastewater pretreatment systems), river flow rates, or any other developments that will moot Santee Cooper's claims before 2029. Furthermore, in the event Santee Cooper's claims do become ripe, they will lie only against any parties legally responsible for contributing PFAS to Santee Cooper's source water at that time, not today.

Santee Cooper's claims against WMSC also fail on additional grounds. The injuries Santee Cooper ascribes to WMSC arise from the alleged discharge of PFAS from a wastewater treatment plant owned and operated by the City of Columbia, a third-party, not WMSC, into the Congaree River, upriver of Santee Cooper's water intakes on Lake Marion and Lake Moultrie. Santee Cooper alleges that WMSC is one of Columbia's customers that delivers wastewater to Columbia for treatment, but WMSC does not have any control over Columbia's operations or discharges. South Carolina law does not allow Santee Cooper to sue WMSC for Columbia's discharges. Each of Santee Cooper's causes of action against WMSC is deficient for the following reasons:

1.  The alleged contamination of a river affects the general public and cannot support a claim for private nuisance;

2.  PFAS molecules are "intangible" matter that as a matter of law cannot constitute a trespass;

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

3.     Santee Cooper has no claim for trespass where PFAS only allegedly entered its property as a result of its own actions;

4.     WMSC owes no duty to Santee Cooper and therefore cannot be liable for negligence; and

5.     Santee Cooper does not allege that it suffered any physical injury or property damage as required for a valid negligence claim.

For these reasons, and as explained in more detail below, the Complaint should be dismissed.

## II.     ARGUMENT AND CITATION OF AUTHORITY

### A.     Santee Cooper's Claims Are Not Ripe.

"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct. App. 1998). This includes an assessment of whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc*., 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). A claim is not ripe and should be dismissed when it presents "a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co*., 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

Santee Cooper's allegations demonstrate that it has not yet suffered any legally cognizable injury due to PFAS, and it might never. Although the U.S. Environmental Protection Agency's PFAS drinking water standards ("maximum contaminant levels" or "MCLs") became final in April 2024, (Compl., ¶ 39), it has not yet been determined how, if at all, the rule will impact Santee Cooper. Santee Cooper will not have to comply with the MCLs until 2029. (*Id*., ¶ 41.) Before that there is a three-year "initial monitoring" period that runs through 2027. (*Id*.; *see also* 89 Fed. Reg. 32532, 32633 (April 26, 2024) (codified at 40 CFR Parts 141 and 142).)

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Santee Cooper does not allege any facts indicating that, at this time, it is doing anything other than waiting to see if and when it will have to take action to comply with the 2029 standards. Santee Cooper has not alleged it has incurred any costs or expenses due to PFAS in its source water. Rather, it is seeking "expenses associated with the *future* acquisition, installation, and operation of *required* treatment technologies[.]" (Compl., ¶ 69) (emphasis added). Nothing in the Complaint indicates that Santee Cooper's operations have changed at all from the period before the MCLs were finalized in April or as a result of PFAS in Lake Marion or Lake Moultrie.

This status quo may continue indefinitely. Santee Cooper's testing during the initial monitoring period may indicate Santee Cooper will not be required to make any capital investments to remain in compliance with applicable regulations. It is also uncertain whether the MCLs will remain valid law by the time they would be applicable to Santee Cooper. In June 2024, three sets of plaintiffs filed challenges to EPA's rule in actions currently pending before the Court of Appeals for the D.C. Circuit. *See American Water Works Association, et al. v. U.S. EPA*, Case No. 24-1188; *National Association of Manufacturers, et al. v. U.S. EPA*, Case No. 24-1191; *The Chemours Company FC, LLC v. U.S. EPA*, Case No. 24-1192. The potential changes that could result from these cases (or for other reasons) preclude Santee Cooper's claims from being ripe at this time. *See Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 364, 815 S.E.2d 446, 457 (2018) (finding that action was not ripe because the plaintiff's claim "depends on there being no changes to the law regarding surface water withdrawals."). Because of these numerous uncertainties, the facts alleged by Santee Cooper demonstrate, at most, "the mere threat of potential injury," which is "too contingent or remote to support present adjudication." *Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (quoting *Thrifty Rent–*

4

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

*A–Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc*., 849 F. Supp. 1083, 1086 (D.S.C. 1991)). Accordingly, Santee Cooper's claims are not ripe and should be dismissed.

**B.** **Each of Santee Cooper's Causes of Action Against WMSC are Legally Deficient.**

*1.* *Santee Cooper Has No Claim For Nuisance Against WMSC Because WMSC Does Not Control the Source of the Alleged Nuisance.*

As a matter of South Carolina law, WMSC cannot be liable to Santee Cooper for nuisance for delivering leachate to a wastewater treatment plant. Nuisance law is a mechanism for resolving "conflicting interests of ***landowners***" and balancing their competing rights. *Winget v. Winn-Dixie Stores, Inc*., 242 S.C. 152, 159, 130 S.E.2d 363, 367 (1963) (emphasis added); *see also O'Cain v. O'Cain*, 322 S.C. 551, 560, 473 S.E.2d 460, 465 (Ct. App. 1996). It follows, the South Carolina Supreme Court has held, that "one who has no control over property at the time of the alleged nuisance cannot be held liable therefor." *Clark v. Greenville Cnty*., 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993). The alleged nuisance for which Santee Cooper alleges WMSC is responsible arises solely from Columbia's discharges from its wastewater treatment plant. WMSC has no control over that facility and cannot be liable for its discharges.

The *Greenville County* decision is indistinguishable in all material respects. In *Greenville County*, the plaintiffs alleged that their properties were contaminated by hazardous waste that escaped from a nearby landfill. They sued the landfill as well as a number of corporations that sent hazardous waste to the landfill for disposal. The South Carolina Supreme Court affirmed judgment for the corporations on the nuisance claim because plaintiffs "neither alleged nor produced any evidence the corporate respondents had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id*. at 210. 437 S.E.2d at 119. Likewise, Santee Cooper concedes that control of Santee Cooper's wastewater is passed to Columbia before any PFAS is discharged into

the river, and Santee Cooper does not allege that WMSC has any control over Columbia's treatment facility.

In line with this reasoning, a South Carolina federal court, in *Weatherford v. E.I. Dupont de Neumours & Co.*, No. 4:22-CV-01427-RBH, 2023 WL 11015357 (D.S.C. Sept. 27, 2023), recently found that *Greenville County* compelled it to dismiss analogous PFAS nuisance claims. In *Weatherford*, the plaintiffs alleged that their wells were contaminated with PFAS which had been discharged from a textile facility's wastewater treatment plant. They brought claims against the companies that manufactured and distributed the PFAS to that facility. The court dismissed the nuisance claims because those defendants were not alleged to have control over the manufacturing facility (*id.* at * 6), despite the plaintiffs' allegation that the defendants "knew [the PFAS they supplied] would go into the water and soil surrounding the textile plant." *Id.* at * 1. The same result is required here. Accordingly Counts 1 (private nuisance) and 2 (public nuisance) should be dismissed.[1]

### 2. Santee Cooper's Allegations of Contamination of Lake Marion and Lake Moultrie Do Not State a Claim for Private Nuisance.

Santee Cooper's private nuisance claim should be dismissed for the additional reason that the alleged contamination of a public water body cannot be the basis of a private nuisance claim. A private nuisance "produces damage to but one or two persons, and cannot be said to be public." *Charleston Dev. Co., LLC v. Alami*, 433 S.C. 533, 547-48, 860 S.E.2d 687, 695 (Ct. App. 2021) (quoting *Deason v. S. Ry. Co.*, 142 S.C. 328, 334, 140 S.E. 575, 577 (1927)); *see also Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248, 32 S.E. 358, 360 (1899) ("A private nuisance affects

---

[1] WMSC's lack of control over Columbia's plant precludes Santee Cooper's public and private nuisance claims, as the difference between the two causes of action is based only on the persons affected, not "the nature or character of the thing or activity itself." *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81, 382 S.E.2d 463, 469 (Ct. App. 1989).

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

only one person or a determinate number of persons." (quoting 16 Am. & Eng. Enc. Law, 926));
*accord Rhodes v. E.I. du Pont de Nemours & Co.,* 636 F.3d 88, 96-97 (4th Cir. 2011) (holding
"that when a release of pollutants directly affects a municipal water supply and does not interfere
with any private water source…the presence of the pollutants in the public water supply will not
support a private nuisance claim.")  Santee Cooper is just one of the many riparian landowners
abutting Lake Marion and Lake Moultrie.

>    ### 3.    *Santee Cooper's Allegations Do Not Support a Trespass Claim under South Carolina Law.*

>    a.    PFAS particles are "intangible" matter that cannot support a trespass claim.

South Carolina follows the traditional rule that there must be "an invasion by a physical,
tangible thing for a trespass to exist." *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 145, 747
S.E.2d 468, 476 (2013).  To be sufficiently "tangible," the invasion must "interfere with the right
to exclusive possession" and not "merely interfere with the right to use and enjoyment." *Id*. at 151,
747, S.E.2d at 480. Invasion by "microscopic particulates" are not "tangible" and can support, if
anything, only a nuisance claim, but do not constitute trespass. *Id.* at 146, 747 S.E.2d at 477.

PFAS molecules are quintessentially "intangible." The alleged PFAS at issue in this case
are measured, if at all, in the parts per ***trillion.*** (Compl., ¶¶ 30-41). Santee Cooper does not allege
(nor could it) that PFAS can be seen, felt, or otherwise perceived in water.  PFAS in water is the
equivalent of dust in air, which is "intangible" under the traditional rule that South Carolina
follows.  As the court explained in *Adams v. Cleveland-Cliffs Iron Co*., 237 Mich. App. 51, 69
(1999)— the case which persuaded the *Babb* Court to adopt the traditional rule—while "dust
particles are tangible objects in a strict sense that they can be touched and are comprised of physical
elements" they cannot form the basis of a trespass claim because dust "does not normally present
itself as a significant physical intrusion."  PFAS molecules likewise "do not normally occupy the

land [or water] on which they settle in any meaningful sense" but rather "simply become a part of the ambient circumstances of that space." *Id.* at 70.

PFAS are also equivalent to the microscopic fluoride particles that were the subject of the trespass action in *Martin v. Reynolds Metals Co.,* 221 Or. 86 (1959) (PFAS—per- and polyfluoroalkyl substances—are all fluorinated compounds) (Compl., ¶¶ 27-28). Although the *Martin* court found trespass liability, the *Babb* court specifically rejected *Martin* and this expanded theory of trespass law. Santee Cooper's claims are squarely at odds with *Babb.*

The nature of Santee Cooper's claims confirms that dismissal is the correct result. The core of Santee Cooper's complaint is that its ability to use its property to provide drinking water to its customers is (or rather, will be) negatively impacted. Its allegations do not implicate its "right to the exclusive, peaceable possession of [its] property." *Babb*, 405 S.C. at 139, 747 S.E.2d at 473 (quoting *Ravan v. Greenville Cnty.*, 315 S.C. 447, 463, 434 S.E.2d 296, 306 (Ct. App. 1993)). It is thus nuisance law that provides the remedy, if there is in fact a wrong (which there is not).[2] In all respects, this case is a quintessential nuisance matter and Santee Cooper's attempts to dress it in other tort theories should be rejected.

        b.    <u>The alleged contamination of Lake Marion and Lake Moultrie cannot constitute a trespass to Santee Cooper.</u>

Santee Cooper's trespass claim also fails because Santee Cooper does not sufficiently allege that there has been any invasion of Santee Cooper's property. Trespass protects only the "rights of **exclusive** possession." *Babb*, 405 S.C. at 141, 747 S.E.2d at 475 (emphasis added).

---

[2] *See also City of Lake Elmo v. 3M Co.,* 237 F. Supp. 3d 877, 888 (D. Minn. 2017) (finding that complaint alleging contamination of groundwater used for drinking water with PFAS stated a claim for nuisance but not trespass because plaintiff "is complaining of an invasion of the right to use and enjoy its land, rather than to exclusively possess its land" and "[b]ecause [plaintiff] does not allege that [defendant] prevented it from possessing the groundwater, the trespass claim fails.")

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Santee Cooper has no such right in the lake water, only a riparian right of reasonable use. *See White v. Whitney Mfg. Co*., 60 S.C. 254, 265, 38 S.E. 456, 460 (1901) (holding that although a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . . [h]e has no property in the water itself, but a simple usufruct." (quotation omitted)).

Although Santee Cooper alleges that PFAS have been present on the property it owns, it concedes the PFAS got there only as a result of Santee Cooper's own actions: the alleged invasion occurs only when Santee Cooper turns on its water pumps. (Compl., ¶ 82). This does not constitute a trespass under South Carolina law, which requires that the trespass be caused by a defendant's "affirmative act [and that] the invasion of the land must be intentional . . . ." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). An act is only "intentional" if it "is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter" on the plaintiff's land. *Sales v. S.C. Dep't of Transportation*, No. 2014-000582, 2016 WL 3607225, at *2 (S.C. Ct. App. June 30, 2016) (quoting Restatement (Second) of Torts § 158 cmt. i (1965)). There can be no such certainty that any PFAS will enter Santee Cooper's property when that does not occur absent Santee Cooper's intervening acts. Likewise, there is no trespass because Santee Cooper's instrumental role prevents the presence of PFAS there from being "unauthorized." *See Ravan v. Greenville Cnty*., 315 S.C. 447, 464, 434 S.E.2d 296, 306 (Ct. App. 1993) ("The essence of trespass is the unauthorized entry onto the land of another.").

Multiple courts have recently found that a drinking water utility has no cause of action for trespass where it voluntarily draws PFAS contaminated water from a public water source. *See Utilities Bd. of Tuskegee v. 3M Co., Inc.,* No. 2:22-cv-420-WKW, 2023 WL 1870912, at *16 (M.D. Ala. Feb. 9, 2023) ("As alleged, the facts here do not sound in trespass because, unlike other indirect trespasses, Defendants' PFAS did not cross onto [plaintiff's] boundary line by a natural

9

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

process."); *see also W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1235 (N.D. Ala. 2016). This Court should reach the same conclusion and dismiss Count 3.

       **4.**       ***Santee Cooper Has Failed to State a Claim for Negligence Against WMSC.***

        a.     <u>WMSC Owes No Duty to Santee Cooper.</u>

It is well-settled under South Carolina law that "[a]n essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.*, 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003). There can be no negligence liability unless the parties "have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 373 S.C. 43, 47, 644 S.E.2d 43, 46 (2007). Such a duty "may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006). Importantly, "[f]oreseeability of injury, in and of itself, does not give rise to a duty." *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003).

Santee Cooper does not allege any facts that suggest any relationship between WMSC and Santee Cooper sufficient to establish a duty. Santee Cooper does not allege that it and WMSC have any contractual, business, or other relationship of any kind on which a duty could be found.

With respect to duty, the Complaint asserts only that all of the "Defendants have a duty to use due care in the handling, use and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." (Compl., ¶ 88.) But South Carolina does not impose such a broad and general duty. To the contrary, "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656 (2006). Furthermore, "one who has

2:25-cv-10305-RMG    Date Filed 08/08/25    Entry Number 1-1    Page 219 of 993

no control owes no duty." *Miller v. City of Camden*, 329 S.C. 310, 314, 494 S.E.2d 813, 815 (1997). Accordingly, in delivering its wastewater to the Columbia wastewater treatment plant, WMSC had no duty to ensure that Columbia treated the wastewater in a way that did not risk harm to third parties and thus owed no duty to Santee Cooper. *See, e.g., Oulla v. Velazques*, 427 S.C. 428, 444, 831 S.E.2d 450, 458 (Ct. App. 2019) (finding that sod manufacturer that placed sod on truck which subsequently fell and injured motorist did not owe a duty to motorist to ensure that the sod was properly secured).

> b.   <u>Santee Cooper has not alleged a type of damages that are recoverable under a negligence theory.</u>

Santee Cooper's negligence claim also fails because Santee Cooper alleges no facts that would establish the damages element of such a claim, which "requires a plaintiff to establish physical injury or property damage." *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. As explained above, Santee Cooper does not own the water in Lake Marion or Lake Moultrie but merely has a conditional right to use it. *See Whitney Mfg. Co*., 60 S.C. at 265, 38 S.E. at 460. The Complaint makes unexplained references to damage or injury to property, but it does not allege any facts showing that anything other than river or lake water has or could be damaged by PFAS. Instead, the Complaint reveals that Santee Cooper's alleged damages are only (contingent) losses in property *value* and (potential) operating cost increases in the future. Such damages are not "physical injury or property damage" recoverable in negligence. *See Gray v. S. Facilities, Inc*., 256 S.C. 558, 183 S.E.2d 438 (1971) (finding that property owner could not recover for diminution of the value of his property resulting from oil fire in adjacent river that did not cause physical damage to his property).

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

### III.  CONCLUSION

For all of the foregoing reasons, WMSC's Motion to Dismiss should be granted, and all of the claims that Santee Cooper has asserted against it should be dismissed.

Respectfully submitted,

COSMICH SIMMONS & BROWN, PLLC

By:  _s/ Robert O. Meriwether_
    Robert O. Meriwether
    SC Bar No. 0009828
    E-Mail:  robert.meriwether@cs-law.com
    Telephone: (803) 529-1783
    James B. Glenn
    SC Bar No. 077731
    E-Mail: jase.glenn@cs-law.com
    Telephone: (803) 529-1782
    2711 Middleburg Drive, Suite 216
    Columbia, SC 29204

    Counsel for Defendant WASTE MANAGEMENT
    OF SOUTH CAROLINA, INC.

March 19, 2025
Columbia, South Carolina

12

ELECTRONICALLY FILED - 2025 Mar 19 2:57 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I served a copy of the foregoing **Waste Management of South Carolina, Inc.'s Motion to Dismiss Plaintiff's Complaint and Memorandum of Law in Support of Motion** on all counsel of record by CM/ECF Electronic Delivery.

*s/ Robert O. Meriwether*
Robert O. Meriwether

Columbia, South Carolina

March 19, 2025

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

   *Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

   *Defendants.*

**MOTION FOR ADMISSION**
*PRO HAC VICE*

The undersigned local counsel hereby moves, together with the attached application and certification of the South Carolina Office of Admissions, that April Knight of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004, be admitted pro hac vice in the above captioned matter. As local counsel I understand that:

1.  I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2.  All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted pro hac vice; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted pro hac vice.

3.    Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4.    Undersigned counsel hereby certifies that they contacted counsel of record regarding Ms. Knight's admission and received no objection.

Ms. Knight is a member in good standing with his local bar association, and the Verified Application for Admission Pro Hac Vice in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Respectfully submitted,

Dated: March 19, 2025

*s/ Celine Amini*
Celine Amini (Bar No. 106206)
Randall M. Levine (*pro hac vice* forthcoming)
April Knight (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: (202) 739-3000
F: (202) 739-3001
celine.amini@morganlewis.com
randall.levine@morganlewis.com
april.knight@morganlewis.com

Mark V. Donatiello (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
T: (609) 919-6476
F: (609) 919-6600

*Attorneys for Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.*

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided.  Provide an answer for every question asked.  In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Pub. Serv Auth. | 2024-CP-08-03336 | Court of Common Pleas |
| Plaintiff | Case No. | Tribunal |

vs.

| | |
|---|---|
| China Jushi USA Corp., et al. | Mailing Address of Tribunal: |
| Defendant | 300-B California Avenue |
| | Moncks Corner, SC 29461 |

Comes now  April Knight _____, applicant herein, and respectfully represents the following:

 1.   Applicant resides at:
  1115 Ellingwood Dr
Street Address

| Accokeek | PG | Maryland | 20607 |
|---|---|---|---|
| City | County | State | Zip Code |

 (202) 739-5833
Telephone

 2.   Applicant is an attorney and a member of the law firm of (or practices law under the name of)
Morgan, Lewis & Bockius LLP _____, with offices at

1111 Pennsylvania Avenue, NW
Street Address

| Washington | DC | DC | 20004 |
|---|---|---|---|
| City | County | State | Zip Code |
| (202) 739-3000 | (202) 739-5833 | (202) 739-3001 | april.knight@morganlewis.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

 3.   Applicant has been retained personally or as a member of the above-named law firm by
 China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.     to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

 4.   Since     April     of  2024 _____, Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia where Applicant regularly practices law.  Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| New York | April 20, 2023 |
| District of Columbia | April 2, 2024 |
| | |
| | |
| | |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is <u>Celine Amini</u>                    of the <u>Morgan, Lewis & Bockius LLP</u>

law firm, which has offices at:

<u>1111 Pennsylvania Avenue, NW</u>
Street Address
<u>Washington</u>                <u>DC</u>                <u>DC</u>                <u>2004</u>
City                        County                State                Zip Code
<u>(202) 739-3000</u>                                <u>(202) 739-3001</u>        <u>celine.amini@morganlewis.com</u>
Primary Telephone        Cell Phone        Fax Number        Email Address

<u>106206</u>
South Carolina Bar Number
(You must provide Bar Number)

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

10.    Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| No |
| --- |

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
| --- |

12.  Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this _____ 26 _____ day of _____ February _____, 20 25

_____
APPLICANT

*Page 3 of 4*

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

District of Columbia
City of Washington, D.C.

# VERIFICATION

STATE OF ~~DC~~ _____ )

COUNTY OF ~~DC~~ _____ )

I, _____April Knight_____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true. I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice. Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding. Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___26th___ day of ___February___, 20 25

_____
(Notary Signature)

Notary Public for the ~~State of~~ District of Columbia
My Commission Expires: ___02/14/2026___

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___26th___ day of ___February___, 20 25

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___27th___ day of ___February___, 20 25

_____

*Page 4 of 4*

ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336



On behalf of JULIO A. CASTILLO, Clerk of the District of Columbia Court of Appeals,
the District of Columbia Bar does hereby certify that

## *April Rose Knight*

was duly qualified and admitted on April 2, 2024 as an attorney and counselor entitled to
practice before this Court; and is, on the date indicated below, an Active member in good
standing of this Bar.

*In Testimony Whereof,
I have hereunto subscribed my
name and affixed the seal of this
Court at the City of
Washington, D.C., on February 20, 2025.*

**JULIO A. CASTILLO**
**Clerk of the Court**

Issued By:

*David Chu - Director, Membership*
*District of Columbia Bar Membership*

*For questions or concerns, please contact the D.C. Bar Membership Office at 202-626-3475 or email
memberservices@dcbar.org.*

ELECTRONICALLY FILED - 2025 Mar 07 2:25 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336
ELECTRONICALLY FILED - 2025 Mar 20 11:18 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 4, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:    South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting April
Knight be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been
paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    April Knight
       Celine Amini

ELECTRONICALLY FILED - 2025 Mar 26 4:01 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

| | |
|---|---|
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY a/k/a SANTEE COOPER, an agency of the State of South Carolina, | |
| *Plaintiff,* | |
| v. | **ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE*** |
| CHINA JUSHI USA CORPORATION, et al., | |
| *Defendants.* | |

Having considered the Motion for Admission of April Knight of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC, *pro hac vice*, appearing on behalf of Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd., in the above captioned matter and the Verified Application for Admission Pro Hac Vice in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**



Berkeley Common Pleas

**Case Caption:**      South Carolina Public Service Authority , plaintiff, et al VS   China
                       Jushi Usa Corporation , defendant, et al

**Case Number:**       2024CP0803336

**Type:**              Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 15:59:33     page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 26 4:01 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

---

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

　　　　*Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

　　　　*Defendants.*

**MOTION FOR ADMISSION**
*PRO HAC VICE*

---

The undersigned local counsel hereby moves, together with the attached application and certification of the South Carolina Office of Admissions, that Randall M. Levine of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004, be admitted pro hac vice in the above captioned matter. As local counsel I understand that:

1.　I will personally sign each pleading, motion, discovery procedure, or other document that I serve or file in this court.

2.　All pleadings and other documents that I file in this case will contain my name, firm name, address, and phone number and those of my associate counsel admitted pro hac vice; and service of all pleadings and notices as required shall be sufficient if served upon me, and it is my responsibility to serve my associate counsel admitted pro hac vice.

3.      Unless excused by the court, I will be present at all pretrial conferences, hearings, and trials and may attend discovery proceedings. I will be prepared to actively participate, if necessary.

4.      Undersigned counsel hereby certifies that they contacted counsel of record regarding Mr. Levine's admission and received no objection.

Mr. Levine is a member in good standing with his local bar association, and the Verified Application for Admission Pro Hac Vice in the State of South Carolina setting forth the necessary information required by Rule 404(d), SCACR, is attached to and incorporated into this motion.

Respectfully submitted,

Dated: March 19, 2025

*s/ Celine Amini*

Celine Amini (Bar No. 106206)
Randall M. Levine (*pro hac vice* forthcoming)
April Knight (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: (202) 739-3000
F: (202) 739-3001
celine.amini@morganlewis.com
randall.levine@morganlewis.com
april.knight@morganlewis.com

Mark V. Donatiello (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
T: (609) 919-6476
F: (609) 919-6600

*Attorneys for Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.*

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| South Carolina Pub. Serv. Auth. | 2024-CP-08-03336 | Court of Common Pleas |
| Plaintiff | Case No. | Tribunal |
| vs. | | |
| | Mailing Address of Tribunal: | |
| China Jushi USA Corp., et al. | 300-B California Avenue | |
| Defendant | Moncks Corner, SC 29461 | |

Comes now   Randall M. Levine   , applicant herein, and respectfully represents the following:

1.   Applicant resides at:

3015 Rodman Street NW

| | | | |
|---|---|---|---|
| Washington, DC | n/a | District of Columbia | 20008 |
| City | County | State | Zip Code |

(202) 373-6541
Telephone

2.   Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Morgan, Lewis & Bockius LLP   , with offices at

1111 Pennsylvania Avenue, NW
Street Address

| | | | |
|---|---|---|---|
| Washington | DC | DC | 20004 |
| City | County | State | Zip Code |
| (202) 739-3000 | (202) 373-6541 | (202) 739-3001 | randall.levine@morganlewis.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

3.   Applicant has been retained personally or as a member of the above-named law firm by
China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd.   to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4.   Since   August   of   2008   , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| U.S. Court of Appeals for the Second Circuit | 4/21/2015 |
| U.S. Court of Appeals for the Third Circuit | 10/24/2024 |
| U.S. Court of Appeals for the Seventh Circuit | 07/12/2024 |
| U.S. Court of Appeals for the Ninth Circuit | 12/21/2015 |
| U.S. District Court of Southern District of New York | 3/13/2018 |
| District of Columbia | 08/11/2008 |
| New York State | 01/24/2007 |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

| Yes |
|---|

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

| No |
|---|

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

| No |
|---|

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

| No |
|---|

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is <u>Celine Amini</u>          of the <u>Morgan, Lewis & Bockius LLP</u>

law firm, which has offices at:

<u>1111 Pennsylvania Avenue, NW</u>
Street Address

| <u>Washington</u> | <u>DC</u> | <u>DC</u> | <u>20004</u> |
|---|---|---|---|
| City | County | State | Zip Code |
| <u>(202) 739-3000</u> | | <u>(202) 739-3001</u> | <u>celine.amini@morganlewis.com</u> |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

<u>106206</u>
South Carolina Bar Number
(You must provide Bar Number)

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

10.     Has Applicant previously filed an application to appear *pro hac vice* in South Carolina cases? If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

| No |
|---|

11. Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

| Yes |
|---|

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this ___26th___ day of ___February___ , 20 _25_

_____
APPLICANT

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

District of Columbia
City of Washington, D.C.

# VERIFICATION

~~STATE OF~~  DC        )

~~COUNTY OF~~  DC       )

I, _____Randall M. Levine_____, do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___26th___ day of ___February___, 20 _25_

_____
(Notary Signature)

Notary Public for the ~~State of~~ District of Columbia
My Commission Expires: ___02/14/2026___

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this ___26th___ day of ___February___, 20 _25_

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___27th___ day of ___February___, 20 _25_

_____

ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336



On behalf of JULIO A. CASTILLO, Clerk of the District of Columbia Court of Appeals, the District of Columbia Bar does hereby certify that

## *Randall M Levine*

*was duly qualified and admitted on August 11, 2008 as an attorney and counselor entitled to practice before this Court; and is, on the date indicated below, An Active member in good standing of this Bar.*

*In Testimony Whereof, I have hereunto subscribed my name and affixed the seal of this Court at the City of Washington, D.C., on February 20, 2025.*

**JULIO A. CASTILLO**
**Clerk of the Court**

Issued By:

*David Chu - Director, Membership*
*District of Columbia Bar Membership*

*For questions or concerns, please contact the D.C. Bar Membership Office at 202-626-3475 or email memberservices@dcbar.org.*

ELECTRONICALLY FILED - 2025 Mar 07 2:26 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336
ELECTRONICALLY FILED - 2025 Mar 20 11:12 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

March 4, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:     South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

        Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Randall Levine be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Randall Levine
        Celine Amini

ELECTRONICALLY FILED - 2025 Mar 26 4:02 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

*Plaintiff,*

v.

CHINA JUSHI USA CORPORATION,
et al.,

*Defendants.*

**ORDER GRANTING
MOTION FOR ADMISSION
*PRO HAC VICE***

Having considered the Motion for Admission of Randall M. Levine of Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC, *pro hac vice*, appearing on behalf of Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd., in the above captioned matter and the Verified Application for Admission Pro Hac Vice in support thereof, it is hereby

ORDERED that said motion is granted.

**(Judicial E-Signature to Follow)**

ELECTRONICALLY FILED - 2025 Mar 26 4:02 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**     Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-03-26 15:59:28     page 2 of 2

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT 1

STATE OF SOUTH CAROLINA
COUNTY OF GREENWOOD

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Greenwood Commissioners of Public Works,

*Plaintiff,*

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants.*

C.A. No. 2024-CP-24-00735

STATE OF SOUTH CAROLINA
COUNTY OF LAURENS

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Laurens County Water and Sewer Commission,

*Plaintiff,*

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants.*

C.A. No. 2024-CP-30-00734

i

ELECTRONICALLY FILED - 2025 Aug 28 2:39 PM - GREENWOOD - COMMON PLEAS - CASE#2024CP2400735

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION
## <u>TO DEFENDANTS' MOTIONS TO DISMISS</u>

Plaintiffs, Greenwood Commissioners of Public Works ("GCPW") and Laurens County Water and Sewer Commission ("LWSC") (collectively "Plaintiffs"), hereby respond to all pending motions to dismiss filed by Defendants Cryovac, Inc. and Cryovac, LLC (collectively "Cryovac"); First Source Worldwide, LLC ("First Source"); Fitesa Simpsonville, Inc. ("Fitesa"); Milliken & Company ("Milliken"); Opperman Webbing, Inc. ("Opperman"); T&S Brass and Bronze Works, Inc. ("T&S"); and Unichem Specialty Chemicals, LLC ("Unichem").[1]

---

[1] Each Defendant filed separate memoranda in support of their motions to dismiss, which share uniform pagination for each's respective briefing in GPCW's and LWSC's cases. In citations, Plaintiffs abbreviate these memoranda to "MIS" as applicable to both cases.

# TABLE OF CONTENTS

INDEX OF ACRONYMS ................................................................................................. v

I.     FACTUAL BACKGROUND ................................................................................ 1

II.    STANDARD OF REVIEW ................................................................................... 3

III.   ARGUMENT ........................................................................................................ 5

   A.   Plaintiffs' claims for relief are justiciable. ................................................... 5

     1.   Plaintiffs clearly have standing to seek relief for past, present, and future property injuries............................................................................................................. 5

     2.   Defendants' position is self-defeating.......................................................... 8

   B.   Plaintiffs state actionable claims for trespass. ........................................... 10

     1.   The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law. ......................... 10

     2.   Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiffs' properties constitute affirmative, intentional acts.............. 12

   C.   Plaintiffs state actionable claims for public and private nuisance. ............... 15

     1.   Plaintiffs allege that Defendants controlled their properties and products that cause the contamination of Lake Greenwood and Plaintiffs' properties. .......................... 15

     2.   Plaintiffs have suffered private property injuries that confer rights of action for both private and public nuisance..................................................................................... 18

   D.   Plaintiffs state actionable claims for negligence.......................................... 24

     1.   Defendants owed Plaintiffs duties of care................................................... 24

     2.   Plaintiffs sufficiently allege that Unichem breached its duties.................... 30

     3.   Plaintiffs sufficiently allege that Unichem's breach proximately caused Plaintiffs' injuries................................................................................................................. 32

     4.   Plaintiffs allege actionable damages. ......................................................... 34

     5.   Plaintiffs have not assumed the risk of PFAS contamination. ................... 34

   E.   The "free public services doctrine" does not apply here, if it exists in South Carolina at all. ............................................................................................................. 36

   F.   Plaintiffs' claims against Milliken are not barred by the statute of limitations. ........... 39

     1.   Milliken cannot genuinely maintain that Plaintiffs' claims are both unripe and time-barred. ...................................................................................................... 40

     2.   The limitations period continues to run as to Plaintiffs' nuisance and trespass claims. ....................................................................................................................... 41

     3.   In any event, Milliken ignores the discovery rule.................................... 45

G.    Defendants' causation arguments should be rejected. .................................................. 46

   1.    Cryovac's and Unichem's traceability arguments are premature............................ 46

   2.    The Mauldin Road WWTP's receipt and discharge of Unichem's contaminated wastewater is not a superseding cause. ...................................................... 48

H.    This Court should not stay this case or decline jurisdiction. ....................................... 50

I.    The Mauldin Road WWTP is not a necessary party. ................................................. 53

IV.    CONCLUSION............................................................................................................... 54

## INDEX OF ACRONYMS

**Chemical Substances**

| | |
|---|---|
| **PFAS** | Perfluoroalkyl and polyfluoroalkyl substances. Refers to the entire class of synthetic chemicals known for their water-, grease- and stain-resistant properties. |
| **PFOS** | Perfluorooctane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOS. |
| **PFOA** | Perfluorooctanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOA. |
| **PFNA** | Perfluorononanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFHxS** | Perfluorohexane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFBS** | Perfluorobutanesulfonic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **HFPO-DA** | Hexafluoropropylene Oxide Dimer Acid. Also referred to as "GenX chemicals." One of the six PFAS regulated under the Safe Drinking Water Act |
| **MCL PFAS** | Refers to all PFAS subject to maximum contaminant levels and maximum contaminant level goals under the Safe Drinking Water Act. Includes PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA (aka "GenX chemicals") |

**Regulatory and Legal Terms**

| | |
|---|---|
| **DES** | South Carolina Department of Environmental Services, formerly known as the Department of Health and Environmental Control ("DHEC"). |
| **MCL** | Maximum Contaminant Level. Enacted and enforced pursuant to regulations passed under the Safe Drinking Water Act. Stands for the maximum allowable level of a contaminant that a public water system may deliver to a user. |
| **MCLG** | Maximum Contaminant Level Goal. Enacted pursuant to regulations passed under the Safe Drinking Water act. Stands for the maximum level of |

v

| | a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons will occur. |
|---|---|
| **SDWA** | Safe Drinking Water Act. The congressional legislation authorizing regulations that, among other things, set MCLs and MCLGs. |
| **SCSDWA** | South Carolina Safe Drinking Water Act. The state-level analogue to the SDWA. |
| **WWTP** | Wastewater Treatment Plant. A facility that receives wastewater from residential and/or industrial users. |
| **SWTP** | Surface Water Treatment Plant. A facility used by public water systems, like Plaintiffs, that withdraws water from a water source, treats the water to make it fit for human consumption, and distributes the water to users. |

# I.   FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Reedy River, the Saluda River, and Lake Greenwood with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiffs rely on these vital water sources to supply potable drinking water to tens of thousands of South Carolinians. Greenwood & Laurens First Amended Complaints (collectively "Complaints"), ¶¶ 1-3. Defendants, all operators of industrial facilities, have systematically discharged PFAS into the rivers that feed Lake Greenwood, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiffs' use of their properties, including their water treatment and distribution infrastructure. *Id.* at ¶¶ 4–6, 45–52. Defendants' pollution has rendered Plaintiffs' water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 53–56.

Plaintiffs are public water utilities responsible for supplying safe drinking water to their respective communities. *Id.* at ¶¶ 13–15. GCPW serves approximately 23,500 residents in Greenwood and Abbeville Counties, drawing water from Lake Greenwood via its surface water treatment plant ("SWTP") on the Lake's western bank. GCPW Complaint, ¶¶ 2, 3, 13–15. Located on the opposite bank, the LWSC draws water from Lake Greenwood via a pump station, treats the water at its SWTP, and supplies it to approximately 40,000 residents in Laurens County. LWSC Complaint, ¶¶ 2, 3, 13–15.

Concentrated in the Greenville metro area upstream, Defendants—companies engaged in textile, chemical, and other manufacturing operations—utilize products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater to municipal wastewater treatment plants ("WWTPs"). Complaints, ¶¶ 4, 5, 16–23, 48. The receiving WWTPs use conventional methods that are ineffective at treating PFAS. *Id.* at ¶¶ 49–

1

51. Therefore, Defendants' PFAS-contaminated wastewater passes through the treatment works into the Reedy and Saluda Rivers unabated, flowing downstream to Lake Greenwood. *Id.* at ¶¶ 45–47, 49–51.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiffs'. *Id.* at ¶¶ 52, 56. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id.* at ¶¶ 5–6, 24–25. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id.* at ¶¶ 25, 27, 29. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id.* at ¶¶ 24–25.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id.* at ¶¶ 30, 35, 36, 37, 39. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), in 2009 and 2016. *Id.* at ¶¶ 33–35. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id.* at ¶¶ 36–37. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and PFOS and at 10 ppt for perfluorononanoic acid ("PFNA"),

2

perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id.* at ¶¶ 42–43. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id.* at ¶¶ 38–39, 43. MCL compliance is due by April 2029. *Id.* at ¶ 44.

As a direct and foreseeable result of Defendants improper, ongoing use and disposal of PFAS, Plaintiffs' properties have been contaminated by Defendants' PFAS—including their land, SWTPs, and supporting infrastructures. *Id.* at ¶¶ 53–55. Worse, Plaintiffs cannot currently provide potable drinking water that is free of these toxic chemicals. *Id.* at ¶¶ 53–56. Plaintiffs' water treatment systems were never designed to, and in fact do not, remove PFAS. *Id.* at ¶¶ 6, 53–56. Plaintiffs now suffer, and will continue to suffer, significant property injuries resulting in enormous operational and financial burdens. *Id.* at ¶¶ 53–56. Plaintiffs seek both monetary and equitable relief to remedy the past, present, and future PFAS contamination of their properties and protect their communities from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 53–56, 66–67, 78–79, Prayer for Relief.

## II.  STANDARD OF REVIEW

"Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). "In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint." *Id.* "If the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted if

facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory." *Id.* "When considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000). "It is a well-settled principle that in resolving a Rule 12(b)(6) motion to dismiss, the court is limited to a consideration of the allegations contained within the four corners of the complaint." *Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 559, 713 S.E.2d 604, 608 (2011).

Pleadings are to be liberally construed "to do substantial justice to all parties." *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000) (quoting Rule 8(f), SCRCP). "The purpose of pleadings is to place the adversary on notice as to what the issues are." *Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975). Rule 8, SCRCP, "requires a litigant to plead the ultimate facts which will be proved at trial, not the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987). "Ultimate facts fall somewhere between the verbosity of evidentiary facts and the sparsity of 'legal conclusions.'" *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 473, 597 S.E.2d 881, 884 (Ct. App. 2004) (quoting *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001)). A motion to dismiss should not be granted "if facts sufficient to constitute a cause of action can be fairly gathered from the complaint, however uncertain, defective, or imperfect the allegations of the complaint may be." *Riedman Corp. v. Jarosh*, 289 S.C. 191, 192, 345 S.E.2d 732, 733 (Ct. App. 1986). "Further, a judgment on the pleadings is considered to be a drastic procedure by our courts." *Russell v. City of Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991).

Rule 12(b)(6) permits the trial court to address the sufficiency of a pleading stating a claim, but it is not a vehicle for addressing the underlying merits of the claim. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925, (S.C. App. 2021).

### III. ARGUMENT

**A.     Plaintiffs' claims for relief are justiciable.**

Defendants' primary grounds for dismissal are that Plaintiffs' claims are not justiciable—reasoning that Plaintiffs will suffer no injury until the compliance deadline for PFAS MCLs arrives. Cryovac MIS, at 6–7; First Source MIS, at 3–6; Fitesa MIS, at 5–8; Milliken MIS, at 3–7; Opperman MIS, at 3–6; T&S MIS, at 5–10; Unichem MIS, at 3–5. This argument is easily resolved, and its flaws are immediately apparent:

(1)     *It distorts Plaintiffs' claims*. Defendants recast Plaintiffs' case as fundamentally concerning regulatory compliance issues rather than what they actually are: straightforward state-law claims arising from past, present, and future property injuries. South Carolina law unquestionably empowers Plaintiffs to seek redress for them.

(2)     *It is inherently self-contradictory*. Defendants assert that Plaintiffs' only injuries are their need to comply with PFAS MCLs. But if the financial burdens of MCL compliance were Plaintiffs' injuries—and they are not—Plaintiffs would still have standing under Defendants' own premise.

**1.     Plaintiffs clearly have standing to seek relief for past, present, and future property injuries.**

Defendants argue that because enforcement of PFAS MCLs will not begin until April 2029, Plaintiffs' obligations to comply remain speculative. They also cite pending litigation in the D.C. Circuit[2] to suggest that the PFAS MCLs might change, further speculating that any injury Plaintiffs face is uncertain. Both contentions fail for the same reason: they assert, contrary

---

[2] *See Am. Water Works Ass'n v. Env't Prot. Agency*, No. 24-118 (D.C. Cir. Oct. 7, 2024).

to the pleadings, that Plaintiffs' injuries arise from regulatory obligations rather than from Defendants' ongoing contamination of their properties.

Plaintiffs' complaints speak for themselves. These are not regulatory compliance claims but straightforward state-law causes of action based on Defendants ongoing contamination of their land, SWTPs, infrastructures, and water sources with PFAS chemicals. *See* Complaints, ¶¶ 1–7, 57–95. According to the nation's leading authority on environmental science and public health, no level of these chemicals—PFOA and PFOS in particular—is safe for human consumption.[3] And according to the operative pleadings, Defendants knew this well before EPA publicized it, and they have in the past and continue to introduce them into Plaintiffs' properties and water sources. *See* Complaints, ¶¶ 53–56.

The injuries resulting from Defendants' contamination are not hypothetical—they are real, present harms. Among other injuries, Plaintiffs have:

- lost the ability to supply water free from unsafe concentrations of PFAS, *id.* at ¶ 73;

- incurred significant costs in investigating and identifying the sources of PFAS contamination, *id.*;

- suffered the presence of hazardous chemicals in their water treatment plants, supporting infrastructure, and water sources, which they have a legal right to use, *id.*; and

---

[3] Notably, neither EPA's scientific findings concerning PFOA and PFOS, nor its MCL Goal of zero ppt for each chemical, is challenged in the D.C. Circuit litigation that Defendants emphasize. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734 (D.C. Cir. Oct. 7, 2024); **Ex. 2**, Br. for Pet'rs Nat'l Ass'n of Mfrs., Am. Chemistry Council, and The Chemours Co., *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078731 (D.C. Cir. Oct. 7, 2024). Instead, the parties challenge MCLs for mixtures of PFHxA, PFNA, PFBS, and GenX Chemicals, and they complain that EPA's enforceable limits for PFOA and PFOS were too close to the MCL Goals to be economically feasible, posing risks to water affordability. *See id.*; *see also* **Ex. 3**, Resp't Proof Br., No. 24-1188, Doc. 2091318 (D.C. Cir. Dec. 23, 2024) (EPA brief, highlighting that "no Petitioner has articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants").

- experienced diminution in property value. *Id.*

Nothing about these injuries is "conjectural" or "contingent" on future events.[4] *See Jowers v. S.C. Dep't of Health & Env't Servs.*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018). Courts routinely recognize chemical contamination of private property as a property injury. *See infra* §§ B, C, D.

Ripeness and standing, though distinct, "boil down to the same question" here: whether Plaintiffs have already sustained an actual injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)) (standing and ripeness can merge when the issue is whether an injury has occurred); *Crescent Homes SC, LLC v. CJN, LLC*, 2024 WL 4831180, at 7 (S.C. Nov. 20, 2024) (South Carolina justiciability principles align with federal "case or controversy" requirements). Under the operative pleadings and controlling law, the only answer is yes.

Defendants cannot rewrite Plaintiffs' claims to suit their motions. The allegations set forth ongoing and future property injuries from PFAS contamination—not injuries tied to the burdens of complying with a regulatory standard. Taking the pleadings as alleged, as the Court must, resolves the question of justiciability.

---

[4] Several Defendants selectively isolate Plaintiffs' allegations that they will incur "expenses associated with future acquisition, installation, and operation" of PFAS filtration for the dual propositions that (1) these are the only damages Plaintiffs seek and (2) these damages hinge on the need to comply with MCLs. *See, e.g.,* Milliken MIS, at 5; Opperman MIS, at 2; Unichem MIS, at 4. Both are plainly false. *See* Complaints, ¶ 62, 64, 73, 76, 88, 94. In reality, Plaintiffs listed the expenses of installing treatment technologies to remove Defendants' PFAS as one of many "special injuries" they have incurred that are different "in kind" from the public's injury of being exposed to Defendants' PFAS in drinking water. *Id.* at ¶ 73.

2.    **Defendants' position is self-defeating.**

Defendants' arguments do not just mis-frame this case. Even taking their framework at face value, it collapses under its own contradictions. Their principal authority, *American Water Works Association*, involves associations representing water authorities—like Plaintiffs—challenging the PFAS MCLs. But Defendants miss why those associations have standing to do so: ***their members face concrete, imminent financial harm due to compliance costs***. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734, at 15–17 (D.C. Cir. Oct. 7, 2024);[5] *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592–93 (D.C. Cir. 2023). Thus, even under Defendants' own framing—that Plaintiffs' injuries stem only from MCL compliance—the very litigation they cite demonstrates why Plaintiffs would have standing to act now. *See id.*

Defendants cannot have it both ways: Plaintiffs' cases cannot be unripe based on litigation acknowledging the present, *ripe* financial burdens imposed by MCL compliance. As that litigation shows, compliance is neither remote nor contingent. EPA itself recognizes that it demands significant, long-term capital improvements:

> For purposes of this [economic analysis], the EPA assumes that the [PFAS MCLs] will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension date for MCL compliance, this analysis assumes that capital improvements (*i.e., installation of treatment technologies*) for systems taking action under the rule take effect five years after the date on which the regulations is promulgated, or in 2029.

**Ex. 4**, U.S. Env't Prot. Agency, *Econ. Analysis for the Final Per- and Polyfluoroalkyl Substances Nat'l Primary Drinking Water Regul.*, at 2–3 (2024), EPA Doc. No. EPA-815-R-24-001 (emphasis added) (hereafter "*Economic Analysis*"); *see also* U.S. Env't Prot. Agency, *PFAS Nat'l*

---

[5] EPA has not challenged the associations' standing. *See* **Ex. 3**, Resp't Proof Br., *Am. Water Works Assoc.*, No. 24-118, Doc. 2091318.

*Primary Drinking Water Regul.*, 89 Fed. Reg. 32532, 32533 (2024) ("EPA is extending the compliance deadline for all systems nationwide to meet the MCL to allow additional time for capital improvements."). This process is extensive, costly, and time-consuming. Among other things, it requires pilot programs to test treatment methods, engineering analyses to evaluate and select the best treatment option, facility design, bidding and contract negotiations, material procurement, and full-scale construction. *See Econ. Analysis*, Table 5-11 (setting out cost elements for implementing water treatment upgrades). History teaches that this takes years.[6] Defendants' notion that Plaintiffs must wait until April 26, 2029 is belied by their own reasoning.

Defendants' true position is this: they speculate that Plaintiffs' already-ripe case might become moot[7] if regulations change. That is not how justiciability works. Since *Marbury v. Madison*, 5 U.S. 137 (1803), courts adjudicate existing disputes like this one. The only

---

[6] For example, in the building phase alone, it took the West Morgan – East Lawrence Water & Sewer Authority over four years to complete its new reverse osmosis treatment facility designed to remove PFAS. *See* WHNT News 19, *Lawsuit funded water treatment plant being built in Lawrence County* (Feb. 17, 2020) (construction begins in Feb. 2020), *available at* https://whnt.com/news/lawsuit-funded-water-treatment-plant-being-built-in-lawrence-county; W. Morgan – E. Lawrence Water & Sewer Auth., *JD Sims – RM Hames Water Facility* (distribution of reverse osmosis-treated water begins May 1, 2024), *available at* https://dev.dv1ojdbghmtyn. amplifyapp.com/JDsimsRMHamesWaterFacility. And despite completing its pilot program in April of 2018, Brunswick County, North Carolina has still not completed construction of its reverse osmosis system. *See* Brunswick Cnty, N.C., *Gen-X / PFAS Information FAQs - What is Brunswick County doing to remove PFAS contaminates from drinking water?* (initiated pilot program to determine best method to remove PFAS from drinking water, choosing reverse osmosis), *available at* https://www.brunswickcountync.gov/ Faq.aspx?QID=447; Brunswick Cnty., N.C., *Northwest Water Treatment Plant Expansion & Reverse Osmosis Treatment Upgrades* (reverse osmosis will be operational by spring 2025).

[7] Mootness is a third component of justiciability, where a case for which a plaintiff has standing at its outset becomes moot due to events that occur during the case's pendency. *See Sloan v. Greenville Cnty.*, 356 S.C. 531, 547, 552, 590 S.E.2d 338, 347, 349 (2003). By arguing that the MCLs might change in a way that affects Plaintiffs' cases, Defendants are masking mootness under the veil of ripeness.

"hypothetical" posed is a change in existing, legally binding law. Defendants' position turns Article III on its head.

**B.    Plaintiffs state actionable claims for trespass.**

**1.    The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law.**

Defendants argue that Plaintiffs allege only invasions of intangible substances that do not amount to trespass under South Carolina law. *See* Cryovac MIS, at 12–13; Milliken MIS, at 14–15; First Source MIS, at 8–9; Fitesa MIS, at 8–9; Opperman MIS, at 8–10; T&S MIS, at 14; Unichem MIS, at 10–12. They rely on *Babb v. Lee Cnty. Landfill SC, LLC*, where the South Carolina Supreme Court answered various certified questions on property-related torts. 405 S.C. 129, 747 S.E.2d 468 (2013). As to trespass, the *Babb* court held that South Carolina law does not recognize a claim arising "solely from invisible odors" because the law requires "intrusions by physical, tangible things." *Id.* at 144–52, 747 S.E.2d at 476–80. Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that fall outside this threshold. *See, e.g.,* First Source MIS, at 10; Milliken MIS, at 14.

At least one South Carolina court has explicitly rejected Defendants' argument. In *State of South Carolina v. 3M Company*, the Richland County Court of Common Pleas distinguished *Babb* in this way:

> [The State]'s trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of PFAS product resulting in contamination that the State alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates the State natural resources and property "indefinitely."

**Ex. 5**, Order, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 6 (S.C. Ct. Comm. Pl. July 23, 2024).

The same holds true here, but these cases are even further removed from *Babb*. Defendants have discharged **wastewater** carrying **PFAS products**—indisputably tangible substances—into Plaintiffs' properties. *See* Complaints, ¶¶ 2–5, 16–23, 82–89. Before and after *Babb*, South Carolina courts have repeatedly held that chemical contamination via water is actionable trespass, even if individual contaminants are microscopic. *See, e.g.*, *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 423, 453 S.E.2d 908, 912 (1995) (noting jury returned trespass verdict in favor of plaintiffs whose properties were either within plume of chemically-contaminated groundwater or adjacent to contaminated creek); *Kelly v. Para-Chem S., Inc.,* 311 S.C. 223, 224–26, 428 S.E.2d 703, 704 (1993) (affirming jury verdict on trespass via groundwater contamination); *Weatherford v. E.I. du Pont & Co.*, 2023 WL 11015357, at *5 (Sept. 27, 2023) (plaintiff stated claim for trespass under South Carolina law involving PFAS contamination via wastewater discharges to river and agricultural sludge); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (under South Carolina law, plaintiff stated trespass claim concerning PCB contamination of plaintiff's property via stormwater discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (under South Carolina law, a jury can find a trespass where defendant's chemicals migrated to plaintiff's land through groundwater), *aff'd*, 996 F.2d 1212 (4th Cir. 1993) (affirming plaintiff's verdict on trespass); *see also In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995) (under South Carolina law, whether defendant trespassed onto plaintiffs' properties with TCE-contaminated groundwater submitted to jury); *cf. Babb*, 405 S.C. at 143, 747 S.E.2d at 476 (labeling water a "physical invasion").

Defendants' misconstruction of *Babb* ignores decades of precedent recognizing that chemical contamination via water is a physical invasion sufficient for trespass. According to

Plaintiffs' allegations—which must be accepted as true at this stage—Defendants' products and wastewater physically invaded and altered Plaintiffs' properties (and continue to do so). Complaints, ¶¶ 16–23, 48–54, 82–89. This is classic trespass under South Carolina law.

### 2. Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiffs' properties constitute affirmative, intentional acts.

Defendants also claim that Plaintiffs' allegations foreclose any finding that they affirmatively or intentionally intruded onto Plaintiffs' properties. Cryovac MIS, at 11–12; Milliken MIS, at 16–17; First Source MIS, at 13–14; Fitesa MIS, at 10–11; Opperman MIS, at 12–14; T&S MIS, at 15; Unichem MIS, at 10–11. They reason that intent is necessarily absent because their PFAS-contaminated wastewater first passes through WWTPs and into Lake Greenwood before Plaintiffs "voluntarily" withdraw it. *See id.* Defendants are mistaken: intent exists where, as alleged, they know the consequences of their affirmative acts.

There is no dispute here that, for actionable trespass, "there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). But a trespasser need only "intend the act which constitutes the unwarranted entry onto another's land"—he "need not intend the damaging consequence of his entry." *Id.* Thus, Plaintiffs have sufficiently alleged intent "by showing that [Defendants] acted voluntarily" in their discharges and "that [they] knew or should have known the result that would follow": the entry into and contamination of Plaintiffs' properties.[8]

---

[8] Most Defendants point out that Plaintiffs lack the right of exclusive possession of Lake Greenwood. *See, e.g.*, Milliken MIS, at 16; T&S MIS, at 14. This is true but irrelevant. Plaintiffs never alleged a trespass of Lake Greenwood, but instead that Defendants trespassed "into [their] properties, including [their] SWTP[s], and related buildings, improvements, and equipment that make up [their] water treatment and distribution system[s]." Complaints, ¶ 87.

Plaintiffs' allege exactly that. Their complaints explicitly state that Defendants conducted their discharges when they knew or should have known:

- that their respective WWTPs cannot remove PFAS from their wastewater before they pass through to the Reedy and Saluda Rivers;

- Plaintiffs draw water from Lake Greenwood for the provision of potable water to their customers;

- the water Plaintiffs draw from Lake Greenwood is contaminated with PFAS they discharged; and

- water contaminated with their PFAS products invades Plaintiffs' properties.

Complaints, ¶¶ 48–52, 82–83. This is more than sufficient to allege affirmative, intentional acts under South Carolina law. Defendants' primary authority is easily distinguished on this very ground—where the plaintiff *admitted* that the defendant lacked the requisite intent. *See Snow*, 305 S.C. at 554, 409 S.E.2d at 802-03 ("Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property.").

The fact that Defendants' contaminated wastewater passes through their WWTPs and into Plaintiffs' water intakes does not negate their intent. As numerous cases show, where a defendant knows or should know an invasion will occur as a result of its conduct, then the requisite intent is established—regardless of intervening events.[9] *See Weatherford*, 2023 WL 11015357, at *5 (where supplier of PFAS products knew of PFAS hazards and the textile processes used by their customers that results in their discharge to surface waters, continuing sale without warning and concealing the dangers was sufficiently affirmative and intentional for trespass); *Comm'rs of*

---

[9] This aligns with fundamental principles of causation. "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*" by the actor. *Glenn v. 3M Co.*, 440 S.C. 34, 74, 890 S.E.2d 569, 590 (2023) (quoting *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016)).

*Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (defendants' sale of mislabeled flushable wipes are "affirmative or willful acts, even if the actual flushing of the wipes into the Plaintiff's sewer system is done by third parties"); *Shockley*, 793 F. Supp. at 673–74 (jury could find trespass where defendant intentionally delivered hazardous chemicals to independent chemical reclamation facility, from which defendant knew or should have known the chemicals invaded plaintiffs' properties). This case is no different: the controlling allegations state that Defendants knew their PFAS products passed through their applicable WWTPs and invaded Plaintiffs' properties. Complaints, ¶¶ 48–52, 82–83.[10]

Several Defendants frame Plaintiffs' water withdrawal as an issue of consent or authorization instead of intent, arguing that withdrawing water from Lake Greenwood *authorizes* the invasion of their PFAS-contaminated wastewater. *See* Fitesa MIS, at 10 ("Plaintiff[s themselves] authorized the entry of the water onto [their] propert[ies]."); T&S MIS, at 15 (running water intakes "invites and authorizes" the PFAS contamination of Plaintiffs' properties). Defendants cite no authority for this radical proposition. By that logic, any water provider consents to chemical contamination simply by performing its essential function—even when that contamination directly compromises its purpose.

---

[10] Defendants' appeal to Alabama trespass law also fails. Many cite *Utilities Bd. of Tuskegee v. 3M Co.*, 2023 WL 1870912, at *16 (M.D. Ala. 2023) for the proposition that trespass must occur by "natural process" instead of withdrawal from Lake Greenwood. Nothing in South Carolina law requires that trespass occur by "natural process"—a trespass occurs where a defendant affirmatively acts and knows or should know that an intrusion will occur. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *Weatherford*, 2023 WL 11015357, at *5; *Costco*, 2021 WL 5908758, at *8. Likewise, Alabama law allows consent to trespass even where obtained by fraud or mistake—precisely what 3M argued in *Tuskegee*. *See Tuskegee*, Def. 3M Co.'s Mot. to Dismiss, 2022 WL 18357105 (Oct. 3, 2022); *see also Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1370 (N.D. Ala. 2008) ("The alleged contamination with hazardous substances, even if fraudulently concealed by Defendants, does not negate the Plaintiff's consent. Even consent procured by fraud will negate a trespass claim."). Not so in South Carolina. *See Costco*, 2021 WL 5908758, at *8.

Even if Plaintiffs implicitly authorized some water to enter their property, that does not extend to the wrongful introduction of PFAS-contaminated wastewater. *See* Complaints, ¶ 84. On the contrary, consent is no defense when an entry abuses or exceeds the scope of authorization. *See Costco*, 2021 WL 5908758, at *8 (flushing mislabeled wipes into the plaintiff's sewer system not authorized and invited because "consent to enter property is not a defense to trespass 'if a wrongful act is done in excess of and in abuse of authorized entry'" (*quoting Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (applying South Carolina law)). Defendants identify nothing in the pleadings suggesting that Plaintiffs knew of and consented to entry of harmful PFAS that their treatment systems cannot remove. *See* Fitesa MIS, at 10; T&S MIS, at 15. In fact, the only pleadings on this issue are Plaintiffs' *express disavowals* of consent. *See* Complaints, ¶ 84.

The pleadings allege all that is required to state a claim for trespass. Defendants affirmatively and intentionally discharged PFAS-contaminated wastewater, knowing it would ultimately invade Plaintiffs' properties. The path their contaminated wastewater followed was known, predictable, and foreseeable; and the performance of Plaintiffs' routine operations in no way authorizes the entry of hazardous chemicals.

## C. Plaintiffs state actionable claims for public and private nuisance.

### 1. Plaintiffs allege that Defendants controlled their properties and products that cause the contamination of Lake Greenwood and Plaintiffs' properties.

Each Defendant argues that it lacked the requisite "control" over its contribution to the nuisance. *See* Cryovac MIS, at 10; Milliken MIS, at 11–12; First Source MIS, at 6–8; Fitesa MIS, at 13–14; Opperman MIS, at 6–8; T&S MIS, at 15–17; Unichem MIS, at 7–9. As some put it, they "had no control over the instrumentality alleged to have caused the nuisance 'at the time of the alleged nuisance.'" Fitesa MIS, at 13 (quoting *Clark v. Greenville Cnty.*, 313 S.C. 205,

210, 437 S.E.2d 117, 119 (1993)); Cryovac MIS, at 10 (same); Unichem MIS, at 7 (same). Put plainly, Defendants disclaim control over their PFAS-contaminated wastewater that they continually discharge to maintain an ongoing PFAS contamination. The argument defeats itself: Defendants assert powerlessness over a problem they not only created but actively perpetuate.

Defendants rest their arguments on a shared, but flawed, premise that they merely discharge PFAS-contaminated wastewater to WWTPs, and the nuisance occurs only when the WWTPs release Defendants' PFAS. This reduces to one misdirection: labelling the WWTPs' properties as the source of the PFAS contamination instead of their own. *See* Complaints, ¶¶ 17–23, 48–52.  Defendants' blame-shifting is an artificial attempt to sever control that, in reality, masks a misplaced causation argument.

Defendants principally rely on *Clark v. Greenville County*, but *Clark* exposes Defendants' sleight-of-hand. There, plaintiffs asserted nuisance claims against corporate defendants that sent hazardous chemicals to a landfill, which contaminated the plaintiffs' nearby properties. 313 S.C. at 209, 437 S.E.2d at 119. The *Clark* court explained:

> Generally, a private nuisance is "that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person *of his own property, personal or real.*" Nuisance law is based on the premise that "[e]very citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property."

*Id.* (quoting *Peden v. Furman Univ.*, 155 S.C. 1, 16, 151 S.E. 907, 912 (1930)).

Upholding the trial court's summary judgment in the defendants' favor, the court reasoned that the plaintiffs "neither alleged nor produced any evidence [that] the [defendants] had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id.* at 210, 437 S.E.2d at 119. Thus, the defendants "could not be liable for nuisance because they had no control over ***the property allegedly used as a nuisance***." *Id.* (emphasis added).

*Clark*'s reasoning certainly applies, but not in the way that Defendants' claim. The "property allegedly used as a nuisance" here does not belong to the WWTPs, which received Defendants' contaminated wastewater, but to Defendants themselves.[11] *Id.* Plaintiffs have alleged Defendants:

- ***own and control*** the PFAS products they use and dispose of at their industrial plants, *see* Complaints, ¶¶ 17–23, 48–52; and

- ***own and control*** the industrial plants where they use PFAS products, generate PFAS-laden wastewater, and continually discharge it through a direct connection to the WWTPs, aware that it passes through the WWTPs and to Plaintiffs' properties. *See id.*

According to the operative pleadings, Defendants knowingly use their "own property, personal [and] real" in a way that "prevent[s Plaintiffs] from enjoying the use of their property." *Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Holding them responsible is not only consistent with *Clark*— it is precisely what *Clark* demands.

Defendants repeatedly discharge their own PFAS-contaminated wastewater from their own facilities, fully aware that it bypasses the WWTPs ***unchanged*** and flows directly into surface waters and Plaintiffs' properties. *See* Complaints, ¶¶ 17–23, 47–52. Yet Defendants fragment their control into isolated snapshots—where it exists only at the moment of discharge and vanishes the moment it enters the WWTP. This strains credulity. WWTPs do not add to, modify, or affect Defendants' PFAS in any way; they are connected to Defendants by direct sewer lines and merely pass through what Defendants introduce. Complaints, ¶¶ 17–23. Defendants' position would allow industrial polluters to endlessly discharge toxins to surface waters yet have "no control" because the current carries them downstream. *But see infra* at 22

---

[11] Defendants cannot unilaterally redefine the "property allegedly used as a nuisance" to be the WWTPs. *See Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 557, 713 S.E.2d 604, 607 (2011) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, the circuit court must base its ruling solely upon the allegations set forth on the face of the complaint.").

17

n.16 (compiling nuisance cases of downstream contamination). *Clark* does not support—let alone require—this absurd result.[12]

In the end, Defendants' argument is not about control. They do not even dispute that they own both the PFAS products they discharge and the facilities from which those discharges originate. Shifting blame to their WWTPs does nothing to extinguish their control over what Plaintiffs allege are the sources of the nuisance—it merely proposes that WWTPs are superseding causes. But where Defendants knowingly discharged PFAS products into a system they knew did not remove it—as the controlling allegations say—this too fails as a matter of law. *See Glenn*, 440 S.C. at 74, 890 S.E.2d at 590; *see also Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989) ("In order to constitute an actionable nuisance, a wrongful act of the defendant must be shown and the maintenance of the nuisance must be the natural and proximate cause of the injury suffered by the plaintiff." (citation omitted)).

2.  **Plaintiffs have suffered private property injuries that confer rights of action for both private and public nuisance.**

Because the Reedy River, Saluda River, and Lake Greenwood are "public water bodies," Defendants also assert that Plaintiffs suffer no private property injuries that could support either a public or private nuisance. Cryovac MIS, at 10–11; Milliken MIS, at 13; First Source MIS, at

---

[12] Milliken separately argues that it cannot have control over past discharges at the Judson Mill because it no longer owns it. Milliken MIS, at 12 n.10. This fails for the same reasons. PFAS persist in the environment and do not simply dissipate with time. When Milliken owned it, Milliken controlled the Judson Mill and the PFAS products it discharged, knowing the hazardous properties and persistence of the products it discharged and the consequences downstream. Despite the passing of time, Milliken controlled its PFAS products and its mill when it mattered for legal purposes. The Restatement reflects this logical rule. *See* RESTATEMENT (SECOND) OF TORTS, § 840A (Oct. 2024 Update) (a seller of land "upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuation of the nuisance after he transfers the land").

8–10; Fitesa MIS, at 11–12; Opperman MIS, at 8–10; T&S MIS, at 17; Unichem MIS, at 9. In doing so, Defendants ignore Plaintiffs' allegations to manufacture grounds for dismissal. The pleadings clearly establish that Defendants' contamination directly injures Plaintiffs' private properties—precisely the injuries required for both private and public nuisance. *See, e.g., Overcash v. S.C. Elec. and Gas Co.*, 364 S.C. 569, 573, 614 S.E.2d 619, 620–21 (2005).

The "well-beaten path" of South Carolina nuisance law provides a clear and consistent framework. *Id.* Like trespass, private nuisance protects property interests—but while trespass protects exclusive possession, nuisance law remedies interferences with use and enjoyment. *Babb*, 405 S.C. at 139, 747 S.E.2d at 473.

Public nuisances are distinct from private nuisances, not in the nature of the wrongful act, but in the rights and number of people affected. *Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22.[13] Public nuisance protects *public* rights—such as public order, health, and morals. *Id.* As such, public nuisances are by default redressable only by public authorities. *See id.* at 573–74, 614 S.E.2d at 621; *Burrell v. Kirkland*, 242 S.C. 201, 204, 130 S.E.2d 470, 471 (1963); *Bowlin v. George*, 239 S.C. 429, 434, 123 S.E.2d 528, 530 (1962). But if a public nuisance also causes "special injury" to an individual, that person has standing to sue both for his private injury and to abate the entire public nuisance. *See id.*[14]

---

[13] *See also Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469 ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *State v. Turner*, 198 S.C. 487, 18 S.E.2d 372, 376 (1942) (a public nuisance "affects the surrounding community generally or the people of some local neighborhood; it is sufficient if it operates upon such members of the public as are brought into contact with the conditions that constitute the alleged nuisance"); *Morison v. Rawlinson*, 193 S.C. 25, 32, 7 S.E.2d 635, 638 (1940) ("A nuisance to be a public nuisance must be in a particular place or where the public frequently congregate, or where members of the public are likely to come within the range of its influence . . . .").

[14] This has been called a "mixed nuisance" because, "while producing injury to the public at large, [it] does some special damage to some individual or class of individuals." 23 S.C. Jur.

Courts have "encounter[ed] difficulty" in defining "special injury" in both private and public nuisance contexts, but a consistent principle emerges. *Bowlin*, 239 S.C. at 432, 123 S.E.2d at 530. A private nuisance is actionable if it interferes with a private property right—even if many others suffer similarly. *Id.* at 434, 123 S.E.2d at 530–31 ("[A]n injury to private property . . . is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however, numerous may be the cases of similar damage arising from the same cause." (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103–04 (1866)); *accord Brown v. Hendricks*, 211 S.C. 395, 401, 45 S.E.2d 603, 605–06. The key distinction is whether the nuisance affects a *public* right (shared by all) or a *private* right (tied to property). *See Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31. Private property injuries are "special" because they involve specific, legal interests—not a general harm to the public. *Id.* at 435, 123 S.E.2d at 531 ("[Plaintiff] is not complaining of the violation of a right of a public nature or one held in common with the rest of the public. He alleges the invasion of a private right, namely, the interference with the reasonable enjoyment of his property and the depreciation in its value. We think it is quite clear that he is entitled to maintain this action.").

In the public nuisance context, courts ask whether the plaintiff's injury is "different in kind and not merely in degree from that suffered by the public at large." *Huggin v. Gaffney Dev.*, 229 S.C. 340, 344, 92 S.E.2d 883, 884–85 (1956). This aligns with private nuisance cases, highlighting the same "in kind" difference between public and private rights. *Id.* at 344–45, 92 S.E.2d at 884–85 (holding that a landowner adjacent to public road suffered an injury different in kind from the public because the obstruction of a public road deprived him of property access

---

Public Nuisance, § 4 (Feb. 2025) (citing *Deason v. S. Ry. Co.*, 142 S.C. 328, 338, 140 S.E.2d 575, 579 (1927)).

and economic value, whereas the public merely lost use of the road); *see also Jones v. Seaboard Air Line Ry. Co.*, 67 S.C. 181, 192, 45 S.E. 188, 192–93 (1903) (a landowner's rights to use riparian land undisturbed and to free access of the stream are different "in kind" from the public right to navigate the waterway). Indeed, the South Carolina Supreme Court recently reaffirmed that "special" injuries are those affecting real and personal property rights—not personal injury or public harms. *See Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22.

South Carolina law thus provides a firm foundation: a private property injury is inherently special because it implicates private property rights, not public ones. *See id.*; *Bowlin*, 239 S.C. at 432–34, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85. This means two things:

(1)  A private nuisance claim concerning private property injury is not barred merely because others suffer similar harm; and

(2)  A plaintiff with a private property injury suffers a harm "different in kind" from a violation of a public right.

These principles apply squarely to Plaintiffs' nuisance claims. As authorized water providers and property owners, Plaintiffs use their properties *specifically* to provide clean water to customers. Complaints, ¶¶ 58, 70. By saturating the Reedy River, Saluda River, Lake Greenwood, and even Plaintiffs' plants and infrastructures with chemicals that EPA deems unsafe for consumption, Defendants have not just *interfered with* Plaintiffs' property use—they have damaged Plaintiffs' properties directly and *fundamentally compromised* their use and Plaintiffs' essential business. Complaints, ¶¶ 53, 58–73. The resulting injuries are both undeniable and expressly detailed in the pleadings, including:

- Plaintiffs' inability to use their properties to provide their customers with drinking water free from Defendants' chemicals;

- the costs of investigating the cause of the contamination and upgrading Plaintiffs' facilities so that they can remove Defendants' chemicals; and

21

- diminution in property value.

*Id.* These are not "general public" harms; they are discrete, property-based injuries recognized under South Carolina law. *See Babb*, 405 S.C. at 129–144, 747 S.E.2d at 472–76; *Bowlin*, 239 S.C. at 434–35, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

In the face of these well-pleaded injuries, Defendants miss the point by focusing on the subject surface waters being "public waters." *See, e.g.,* T&S MIS, at 17; Milliken MIS, at 13. While the surface waters at issue may be "public,"[15] the property injuries alleged are *private*. And a century of South Carolina caselaw confirms that contaminating public waters still results in private injury when it interferes with private property rights. *See, e.g., Johnson*, 317 S.C. at 422, 453 S.E.2d at 912–13 (Defendants' chemicals migrated not only through groundwater, but also down creek and injured property of several plaintiffs adjacent to creek); *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96 (holding that a riparian landowner adjacent to a navigable waterway suffered an injury different in kind from the public's lost navigational use, where obstructions altered the river's natural flow, causing direct harm to the landowner's property and agricultural use).[16]

---

[15] Plaintiffs assume for sake of argument that Lake Greenwood is a "public water body," though Defendants cite no authority for this proposition.

[16] *See also Bailey v. Lyman Printing & Finishing Co.*, 245 S.C. 13, 17–24, 138 S.E.2d 410, 415 (1964) (even non-riparian landowners stated nuisance claim where gases from waste discharged to Middle Tyger River interfered with plaintiffs' use and enjoyment of their homes); *Conestee Mills v. City of Greenville*, 160 S.C. 10, 13–14, 158 S.E. 113, 114–15 (1931) (sewage contamination of the Reedy River flowed downstream, interfering with the plaintiff's use of its property adjacent to the river); *Duncan v. Union-Buffalo Mills Co.*, 110 S.C. 302, 306, 96 S.E. 522, 523–24 (1918) (sewage discharged to Buffalo Creek interfered with use and enjoyment of downstream land owners adjacent to Buffalo Creek); *Lowe v. Ottaray Mills*, 93 S.C. 420, 424–26, 77 S.E. 135, 136–37 (1913) (cotton mill discharged sewage to creek upstream of plaintiff's property, which rendered his land unfit for use as dairy farm); *Williams v. Haile Gold Mining Co.*, 85 S.C. 1, 5–7, 66 S.E. 117, 118 (1909) (chemically-contaminated mine tailings discharged to stream, interfering with downstream owner's ability to farm his land).

Nor can Defendants equate Plaintiffs' private injuries with the "injury allegedly suffered by the public at large." *See, e.g.*, Fitesa MIS, at 13 (arguing Plaintiffs' inability to supply PFAS-free water is "no different than the injury allegedly suffered by public at large"); Milliken MIS, at 13 (same). The "injury allegedly suffered by the public at large" is community-wide exposure to PFAS-contaminated drinking water—a *public health* issue. Complaints, ¶¶ 71–72. *See Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22; *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469. Plaintiffs are not suffering this injury to greater "degree" than the public, e.g., by exposure to more PFAS than others, or by suffering PFAS-related illness. Needless to say, Plaintiffs do not consume water at all. Instead, their lands, SWTPs, and infrastructures are directly subjected to chemical contamination, undermining their essential use and causing substantial devaluation—private property injuries "different in kind" to the public drinking water exposure. *See Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85; *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96.[17]

Even Defendants' own authorities undermine their positions. They lean on cases where municipal water **customers** asserted private nuisance claims based on the PFAS contamination of water they purchased from their utilities. *See Rhodes v. E.I. du Pont de Nemours and Co.*, 636 F.3d 88, 92–93, 96–97 (4th Cir. 2011); *Priselac v. Chemours Co.*, 2022 WL 909406, at *1, 5 (E.D.N.C. Mar. 28, 2022). Their holdings—that the interest in clean drinking water is only a

---

[17] Defendants identify nothing inside or outside the pleadings showing that **any** other persons (1) withdraw water from Lake Greenwood, much less for the purpose of selling drinking water; (2) suffer direct property contamination; or (3) have suffered any property injury as a result of the contamination. Even if such persons exist, Plaintiffs' injuries would still be different in kind from the public exposed to Defendants' PFAS in drinking water. *See Jones*, 67 S.C. at 191–202, 45 S.E. at 192–93 (alleged right violated was "not the right of navigation, or any other right which [the plaintiffs] held in common with the public, but the right to the unimpaired use of their lands on the banks of the river" as riparians); *see also Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22; *Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

23

public interest not redressable by private nuisance—are both unremarkable and consistent with Plaintiffs' own allegations. Plaintiffs affirm that this as a public interest in their complaints—contrasting the public drinking water exposure from the direct contamination, devaluation, and interference with their own private properties and business operations. Complaints, ¶¶ 71–73. Defendants' authority **underscores** this dispositive difference: while the *Priselac* water customers' interest in PFAS-free drinking water from the Cape Fear Public Utility Authority was "shared equally" with the general public, 2022 WL 909406, at *5, the Authority itself stated a claim for private nuisance for interference with its own property in its own PFAS-contamination case. *See Cape Fear Pub. Util. Auth. v. Chemours Co. FC, LLC*, 2019 WL 13300188, at *6 (E.D.N.C. Apr. 19, 2019). This exact, and sensible, distinction applies here.

Defendants have indeed created and continue to maintain a public health issue affecting tens of thousands within Plaintiffs' communities. But Plaintiffs alone bear the burden of commercially supplying clean water, while their private properties suffer direct PFAS contamination and interference with their essential functions. These are private, intimately unique, and "special" injuries that Defendants cannot ignore or circumvent.[18]

D.      **Plaintiffs state actionable claims for negligence.**

1.      **Defendants owed Plaintiffs duties of care.**

Many Defendants uniformly cite the same or similar case law stating that a duty of care may only be created "by statute, a contractual relationship, status, property interest, or some

---

[18] In passing, Unichem argues in conclusory fashion that "nothing is a nuisance which the law itself authorizes." Unichem MIS, at 9–10 (quoting *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469). Setting aside its unsupported suggestion that discharging PFAS is "lawful," Unichem ignores hornbook law that purported "lawful" conduct "may become a nuisance by reason of circumstances, location, or surroundings." *Neal v. Darby*, 282 S.C. 277, 286, 318 S.E.2d 18, 23 (Ct. App. 1984) (holding that a federally and state-permitted landfill could constitute a nuisance due to its location near residential areas and a primary water source).

other special circumstance" to argue that they owe Plaintiffs no duty with respect to their

discharge of PFAS. T&S MIS, at 17–18; Opperman MIS, at 15; Milliken MIS, at 9–10; First

Source MIS, at 15; Fitesa MIS, at 15. In doing so, however, they conflate two fundamental tenets

of South Carolina tort law: (1) while an *affirmative* duty to act may only be created in certain

circumstances, (2) once a party voluntarily undertakes an act, it must exercise due care in doing

so.

Defendants rely on the false presupposition that Defendants are innocent third parties

whom Plaintiffs haled into court for their failure to remedy PFAS pollution caused (or not

remediated) by others. This is not so. Instead, by voluntarily engaging in their various industries,

Defendants were required under South Carolina law to do so with due care. That is the duty

underpinning Plaintiffs' negligence claims, a duty long recognized in this State. *See Joyner v.*

*S.C. Ry. Co.*, 26 S.C. 49, 51–52, 1 S.E. 52, 53 (1887) ("[T]he law has determined as a general

rule . . . that the presence of due care negatives negligence, and that the absence of such care

constitutes negligence."). This Court should not allow Defendants to obfuscate their roles in the

pollution of South Carolina waters and attempt to escape liability through a distortion of South

Carolina tort law.

A fair and complete statement of the law Defendants invoke is:

> An affirmative legal duty may be created by statute, a contractual relationship,
> status, property interest, or some other special circumstance. Moreover, it has long
> been the law that one who assumes to act, even though under no obligation to do
> so, thereby becomes obligated to act with due care.

*Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006) (citations

omitted); *see also Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) ("At

common law, where there is no duty to act, but an act is voluntarily undertaken, the actor

assumes a duty to use due care."); *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100–01, 374

S.E.2d 910, 913 (Ct. App. 1988) ("Ordinarily, the common law imposes no duty on a person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm *not created by his own wrongful act*. In other words, a person has no duty to protect another from harm *inflicted by a third person*." (emphases added)).

Plaintiffs do not allege that Defendants owed them a duty of care to control others, ensure a third party (such as a WWTP) removed PFAS from South Carolina waters, or warn Plaintiffs about PFAS discharged by others. Instead, Plaintiffs allege that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." Complaints, ¶ 91. Importantly, Plaintiffs do not invoke an affirmative duty disconnected from the conduct Defendants voluntarily performed at their industrial facilities—the law thus requires no contract, statute, special relationship between Plaintiffs and Defendants, or other prerequisite to establish their duties. *See Edward's of Byrnes Downs v. Charleston Sheet Metal Co.*, 253 S.C. 537, 542, 172 S.E.2d 120, 122 (1970) (recognizing there is a "common law duty to exercise due care to avoid injury or damage to others").[19]

Almost a century ago, the South Carolina Supreme Court approved the following jury instruction concerning the requirement to act with due care:

---

[19] Many defendants also argue they had no duty of care to Plaintiffs because the PFAS they discharged passed through a WWTP before reaching Plaintiffs' property and they therefore lacked "control" over it. This is a disingenuous argument that the Court should ignore. Although Defendants may have not had control over the PFAS after it left their facilities, or when it passed through the WWTPs, they certainly had control over the PFAS before discharging it into the environment, and that is the point in time out of which their duty to Plaintiffs arises.

> Negligence is the failure to exercise due care. The law enjoins upon every individual, you and me and every individual each in our conduct with reference to anybody else, the duty of exercising due care under all of the circumstances attending our activities, and the failure to exercise that due care which the surrounding circumstances justly require is called negligence, and if one is injured by reason of that negligence, if that negligence itself, that failure to exercise due care under the circumstances is the direct cause of bringing about some injury or damage to the person of another, then that negligence we call actionable.

*Parker v. Simmons*, 163 S.C. 42, 54, 161 S.E. 169, 173 (1931). This duty remains to this day.

Additionally, Defendants owe Plaintiffs a duty because, in discharging PFAS, they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[20]

South Carolina courts have consistently recognized that parties who release pollution into the environment owed a duty to those exposed to the pollutants and were thus subject to negligence liability. For example, in *Chestnut v. AVX Corp.*, the plaintiff property owners brought suit against the defendant, a manufacturer of electronic components the production of which involved a degreasing chemical called trichloroethylene ("TCE"). 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015). The plaintiffs alleged that "TCE escaped respondent's plant and migrated beyond

---

[20] The Restatement further supports the fact that Defendants misconstrue or misrepresent the duty they owe to Plaintiffs, as is explained above. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 cmt. l ("*Relationship with affirmative duties to act*. The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another."); *id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.").

27

the boundaries of respondent's property, contaminating surrounding properties and groundwater." *Id.* In evaluating the plaintiffs' negligence claim on appeal, the Supreme Court found "the complaint sufficiently [pled] a negligence cause of action." *Id.* at 228, 776 S.E.2d at 84. The court explained,

> In *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), we held a plaintiff could maintain an environmental negligence suit based upon offensive odors if the complaint alleged either "physical injury [to the plaintiff] or property damage." *Id.* at 153, 747 S.E.2d at 481. Here, appellants have pled all four elements of a negligence claim: *duty*, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is "worthless," "damaged," and "devalued" by the "harmful" and "dangerous" chemicals on the real property that adjoins their properties.

*Id.* (emphasis added). If defendants can be held liable under a negligence theory for their discharge of TCE or "offensive odors" into the environment, so too can the defendants in this litigation be held liable for their discharge of PFAS.

Similarly, in *Ravan v. Greenville County*, several landowners sued Greenville County in its capacity as the operator of a landfill, along with several corporate entities that disposed of waste at the landfill, for damage to their properties. 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993). Waste Management of South Carolina, Inc., as successor in interest to Spartan Waste Control, was included as a defendant due to Spartan's disposal of toxic chemicals at the landfill on behalf of industrial plants, which later contaminated a plaintiff's property. *Id.* at 466–67, 434 S.E.2d 296, 308. On appeal, Waste Management argued it did not owe a duty of care to the affected plaintiff, and if a duty existed, it was limited to the safe transport of the waste to the landfill. *Id.* at 467, 434 S.E.2d at 308. The court agreed "that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control," *id.* at 468, 434 S.E.2d at 309; however, because Waste Management, and not its customers, chose the location for disposal of the waste, its "role consisted of more

than the mere hauling of waste to the landfill." *Id.* at 469, 434 S.E.2d at 309. "Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to" the affected landowner. *Id.*

Here too, Defendants released PFAS into the environment, and it passed through a third party (in *Ravan*, a landfill, and here, the WWTPs) before reaching Plaintiff's property. As in *Ravan*, Defendants owe a duty of care to Plaintiff. *See also Conestee Mills v. Greenville*, 160 S.C. 10, 27, 158 S.E. 113, 119 (1931) (finding the City of Greenville, as the entity that built and constructed the city's sewer system, was liable to a downstream property owner for discharge of the sewage into the Reedy River, which then contaminated the plaintiff's property); *id.* at 26, 158 S.E. at 119 ("It is the duty of the commissioners of the sewer district to construct the sewer so that it will not become a nuisance to any neighborhood or to any particular inhabitant thereof; and it is the duty of the city, after the sewer has been turned over to it, to avoid the same result by properly maintaining and repairing the sewer after it is constructed." (quoting *Jones v. Sewer Improv. Dist.*, 177 S.W. 888, 889 (Ark. 1915))); *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024) (finding the plaintiffs' allegations that the defendant landfill, which allowed "'pollution, noxious fumes, odors, dust, gases including methane gas, particulate matter, and trash' to escape from their property and invade Plaintiffs' properties," and that the defendant owed the plaintiffs a duty of reasonable care, were "sufficient to state a claim for negligence" and defeat the defendant's motion to dismiss).

Finally, other courts who have recently considered this question in the context of PFAS contamination consistently rule that defendants such as those in this litigation owe a duty of care to those injured by the PFAS. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1324 (N.D. Ga. 2021) (finding the defendants "have a duty to exercise reasonable care in their use and disposal

of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various . . . facilities to avoid pollution of the State's waterways and injury to members of the downstream public who consume the water as part of their public drinking water supply"); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 164 (D. Mass. 2023) (agreeing with the magistrate judge's ruling that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (ruling a discharger of PFAS "has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users"); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (finding "Defendants had a duty of care with regard to the proper handling of PFAS"); *see also Peeler v. SRG Glob. Coatings, LLC*, C.A. No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *6-7 (E.D. Mo. Oct. 30, 2024); *Brown v. Corteva, Inc.*, C.A. No. 7:23-CV-1409-D, 2024 WL 4229937, at *4 (E.D.N.C. Sep. 18, 2024); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021); *Utils. Bd. of Tuskegee v. 3M Co.*, C.A. No. 2:22-CV-420-WKW, 2023 WL 1870912, at *9-11 (M.D. Ala. Feb. 9, 2023).

### 2.    Plaintiffs sufficiently allege that Unichem breached its duties.

Unichem uniquely argues Plaintiffs fail to sufficiently allege it breached its duty. Unichem MIS, at 13–14. This is false—Plaintiffs' more than adequately plead all elements of negligence, giving Unichem notice of the claims brought against it. That is all the law requires.

Rules 8 and 12(b)(6) control here.

In considering a motion to dismiss under Rule 12(b)(6), a court must base its ruling solely on the allegations set forth in the complaint. If the facts alleged and inferences reasonably deducible therefrom, viewed in the light most favorable to

30

the plaintiff, would entitle the plaintiff to relief on any theory, dismissal under Rule 12(b)(6) is improper.

*Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 74–75, 753 S.E.2d 846, 850 (2014) (citation omitted). "The purpose of a pleading is fair notice to the opponent and the court." *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001) (quoting James F. Flanagan, *South Carolina Civil Procedure* 59 (2d ed. 1996)). "In this state, Rule 8, SCRCP, mandates that a pleading contain 'ultimate facts' rather than 'evidentiary facts' to state a cause of action." *Id.* (quoting Flanagan, *South Carolina Civil Procedure* at 58–59). "Ultimate facts fall somewhere between the verbosity of 'evidentiary facts' and the sparsity of 'legal conclusions.'" *Id.* (quoting Flanagan, *South Carolina Civil Procedure* at 59).

Plaintiffs allege that Defendants owed Plaintiffs "a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others, *which includes preventing the direct and/or indirect discharge of these PFAS*" to South Carolina waters. Complaints, ¶ 91. Plaintiffs also allege Defendants breached this duty by allowing PFAS "to escape their premises and contaminate" South Carolina waters. *Id.* ¶ 93. In support, Plaintiffs allege that each Defendant, including Unichem, discharged PFAS-contaminated wastewater at specific industrial facilities, and water sampling has confirmed the presence of PFAS in the bodies of water to which the defendants directly or indirectly discharge their wastewater. *Id.* at ¶¶ 23, 47.

These allegations, "and [the] inferences reasonably deducible therefrom, viewed in the light most favorable to" Plaintiffs, state negligence claims and provide fair notice to Defendants, including Unichem. *Carnival Corp.*, 407 S.C. at 74–75, 753 S.E.2d at 850. Requiring more, such as the precise process by which the PFAS leaves Defendants' facilities, will be revealed through the discovery process and is not mandated by Rule 8, SCRCP. *See Watts*, 346 S.C. at 240, 550

31

S.E.2d at 871; *Hardwick v. Liberty Mut. Ins. Co.*, 243 S.C. 162, 168, 133 S.E.2d 71, 73 (1963) ("This court has held many times that when the facts are peculiarly within the knowledge of the defendant, the plaintiff is not required to plead with the certainty that might otherwise be required.").

> **3.     Plaintiffs sufficiently allege that Unichem's breach proximately caused Plaintiffs' injuries.**

Unichem's causation arguments fail as well—Plaintiffs have sufficiently pleaded that its breaches proximately caused their injuries.

"Proximate cause requires proof of both causation in fact and legal cause." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

At this stage, Plaintiffs must only plead—not *prove*—causation. *See Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) ("Ordinarily, the question of proximate cause is one of fact for the jury . . . ." (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998))). They have done so.

As for causation in fact, Plaintiffs allege that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants each discharged PFAS into a body of water upstream of Plaintiff's properties, PFAS does not naturally degrade in the environment, and the PFAS Defendants discharged flowed downstream onto Plaintiff's properties, thereby harming it.

Complaints, ¶¶ 16–25. Although Plaintiffs' properties have been contaminated by multiple sources of PFAS, these allegations, along with the inferences reasonably deducible therefrom, are enough to sufficiently plead that Defendants are "but for" causes of their injuries.

"As to legal cause, 'foreseeability is considered "the touchstone . . . ," and it is determined by looking to the natural and probable consequences of the defendant's act or omission.' In most cases, foreseeability ends up being addressed as question of fact for the jury." *Wickersham v. Ford Motor Co.*, 432 S.C. 384, 390, 853 S.E.2d 329, 332 (2020) (quoting *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006)). A plaintiff is not required to prove "the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her [wrongful conduct] would probably cause injury to someone." *Hurd*, 353 S.C. at 613, 579 S.E.2d at 145 (citing *Greenville Mem'l Auditorium v. Martin*, 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990)).

Here, Plaintiffs' injuries were the "natural and probable consequences" of Defendants' wrongful conduct and were, therefore, foreseeable. Again, Plaintiffs allege that PFAS do not naturally degrade in the environment and Defendants knew that PFAS are hazardous to human health, Complaints, ¶¶ 24–25, 56; thus, it was entirely foreseeable to Defendants that the PFAS, once discharged from their facilities, would persist in South Carolina waters and invade the properties of downstream landowners. Moreover, the fact that Defendants' wastewater in some cases flowed through a WWTP before reaching Plaintiff's property does not change this analysis, as Plaintiffs also allege that Defendants knew or should have known that the WWTPs were unable to remove Defendants' PFAS from the water they treated and discharged. Complaints, ¶ 52. *See Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 ("The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen in the

33

exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury.").

### 4. Plaintiffs allege actionable damages.

Several Defendants argue Plaintiffs' negligence claims should be dismissed because they have not alleged physical injury or damage to their property. T&S MIS, at 20–21; Opperman MIS, at 16–17; First Source MIS, at 16–17. For reasons already discussed, *see supra* §§ B & C, this is baseless. The pleadings are replete with allegations that Defendants have contaminated and injured Plaintiffs' *properties. See, e.g.,* Complaints, ¶¶ 1–2, 5, 94. *See Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015) ("Here, appellants have pled all four elements of a negligence claim: duty, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is 'worthless,' 'damaged,' and 'devalued' by the 'harmful' and 'dangerous' chemicals on the real property that adjoins their properties.").

Defendants label Plaintiff's damages allegations as "unexplained and conclusory," lacking "facts showing that anything other than water from a public waterway has or could have been damaged by PFAS." Opperman MIS, at 16; First Source MIS, at 16. This only ignores the pleadings: Defendants have put toxic and environmentally persistent chemicals that are unsafe to consume in drinking water into the lands, SWTPs, and infrastructure of water providers. To the extent Plaintiff's allegations on the damage to their properties are concise, this merely reflects that their property injuries are obvious.

### 5. Plaintiffs have not assumed the risk of PFAS contamination.

T&S argues that by voluntarily assuming the role of a drinking water provider, which necessarily requires the intake of South Carolina's waters, Plaintiffs have assumed the risk of PFAS exposure and contamination. T&S MIS, 19–20. This is incorrect.

34

In South Carolina, assumption of risk can be either express or implied. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 79, 508 S.E.2d 565, 569 (1998). "Implied assumption of risk is further divided into the categories of 'primary' and 'secondary' implied assumption of risk." *Id.* Here, T&S argues that Plaintiffs' drinking water operations "constitute[] a primary implied assumption of the risk for any alleged injury [they] now complain[] of." T&S MIS, at 19.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. "Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Id.* ("In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists." (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994))).

But as demonstrated above, T&S and other Defendants owed Plaintiffs a duty "to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." Complaints, ¶ 91. Plaintiffs incorporate their arguments concerning the existence of Defendants' duty of care, which are dispositive here.

Regardless, PFAS contamination is not a risk inherent in the provision of potable water to Plaintiff's customers. *See Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. As Plaintiffs allege, PFAS are "man-made chemicals that do not occur naturally in the environment." Complaints, ¶ 24. As a result, if it were not for Defendants' tortious conduct in discharging PFAS to the

35

environment, there would be no PFAS in Plaintiffs' water supply. Neither T&S nor other Defendants should be allowed to create a hazard that did not previously exist, then attempt to escape liability by shielding itself behind the very same risk it created. T&S also argues Plaintiffs "freely and voluntarily" exposed themselves to PFAS, T&S MIS, 19–20, but this also misses the mark. Plaintiffs are required to provide potable water to their customers, and they must intake and process water from Lake Greenwood, regardless of the contaminants in the water. It strains credulity to suggest that Plaintiffs have freely and voluntarily exposed themselves to Defendants' PFAS.

**E.      The "free public services doctrine" does not apply here, if it exists in South Carolina at all.**

Multiple Defendants argue that the free public services doctrine (also known as the municipal cost recovery rule) bars Plaintiffs from recovering the costs they incur from removing Defendants' PFAS from the drinking water they supply to their customers. *See* Fitesa MIS, at 16; Milliken MIS, at 6–7; T&S MIS, at 10–12; Unichem MIS, at 14. The free public services doctrine is underdeveloped, if existing at all, in South Carolina jurisprudence.[21] Nevertheless, in certain jurisdictions it generally provides "that absent specific statutory authorization or damage to government-owned property, a county [or other governmental entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) (emphasis removed) (quoting *Walker Cnty. v. Tri-State Crematory*, 642 S.E.2d 324, 327 (Ga. App. 2007)). Defendants' only

---

[21] Defendants cite no South Carolina cases in support of their arguments, and Plaintiffs' Westlaw searches for "free public services doctrine" and "municipal cost recovery rule" returned no South Carolina cases addressing the doctrine. As a result, dismissal should not be granted on this basis. *See Madison v. Am. Home Prod. Corp.*, 358 S.C. 449, 451, 595 S.E.2d 493, 494 (2004) ("As a general rule, important questions of novel impression should not be decided on a motion to dismiss.").

real basis for applying the doctrine here is the fact that Plaintiffs are governmental entities. *See* Fitesa MIS, at 16; Milliken MIS, at 6–7; T&S MIS, at 10–12; Unichem MIS, at 14.

The free public services doctrine rests on the premise that legislative authorities have the power to allocate the costs of providing "free" public services as they see fit, such as "spread[ing] [costs] by taxes," or by authorizing recovery "by statute or regulation." *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323, 324 (9th Cir. 1983). By that rationale, courts should not intrude upon these legislative determinations about cost allocation by permitting tort recovery. *Id.* at 324 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314–17 (1947)) ("If the government has chosen the bear the costs for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.").

Even if ultimately recognized in this jurisdiction, the free public services doctrine does not apply here for the simple reason that Plaintiffs' respective provision of drinking water "to paying customers is neither free nor public as contemplated by the doctrine." *See Johnson*, 563 F. Supp. 3d at 1311. Rather, Plaintiffs only provide drinking water to those customers who pay for the service. *See generally* Complaints (repeatedly stating that Plaintiffs supply drinking water to *customers*).

As *Flagstaff* clarifies, "it is the identity of the claimant and the nature of the cost that combine" under the doctrine "to deny recovery." 719 F.2d at 324. By focusing only on either Plaintiff's "identity" as a governmental entity to invoke the free public services doctrine, Defendants erroneously bypass "the nature of the cost" for which the doctrine precludes

37

recovery.[22] Here, the costs of the enhanced water treatment for which each Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson*, 563 F. Supp. 3d at 1311; *see also* S.C. Code Ann. § 5-31-1150 (it is a misdemeanor for a person to use municipal water without a contract for water service). Unlike the costs of fire or police services, which are allocated across the public via taxes, the Legislature has authorized municipalities and special purpose districts like GCPW and LWSC, respectively, to charge water and sewer users for these services. S.C. Code Ann. § 5-31-670. Indeed, it is telling that ***none*** of Defendants' authorities involve the free public services doctrine barring recovery by a water, sewer, or other public utility—or any service funded by billing customers.

In addition, the free public service doctrine recognizes exceptions for "where the acts of a private party create a public nuisance which the government seeks to abate" and "where the government incurs expenses to protect its own property." *Flagstaff*, 719 F.2d at 324; *see also Johnson*, 563 F. Supp. 3d at 1311 (indicating doctrine does not apply where recovery is sought for "damage to government-owned property"). Both Plaintiffs plainly allege both a public nuisance and damage to their properties. *See, e.g.*, Complaints ¶¶ 1–3, 5–7, 14, 53, 55, 56, 69–80.

Furthermore, in a case involving a challenge to the water rate set by the City of Conway, the Supreme Court recognized that a public water provider "has a proprietary interest" in the water it sells to its customers, "as evidenced by [its] unilateral ability to sell or lease it." *Sloan v.*

---

[22] T&S at least acknowledges that "the nature of the cost" is part of the analysis. Ultimately, however, T&S fails to properly apply this factor to "the services provided by Plaintiff[s]" by simply assuming that because they are generic "municipal services," the funding for Plaintiffs' provision of drinking water has already been set in stone by the Legislature. T&S MIS, at 12. In so doing, T&S collapses "the nature of the cost" into Plaintiffs' identities as governmental entities—really focusing only on this governmental status just as the other Defendants do.

*City of Conway*, 347 S.C. 324, 329, 555 S.E.2d 684, 686 (2001). It is such water (along with Plaintiffs' other properties), in which each Plaintiff has a proprietary interest, that has been damaged by Defendants' tortious conduct. By stating the free public services doctrine applies to "public expenditures made in the performance of ***governmental functions***" (emphasis added)—not proprietary functions, at least Fitesa, T&S, and Unichem, in fact, appear to expressly concede that the doctrine does not apply to the present cases. *See* Fitesa MIS, at 16; T&S MIS, at 10; Unichem MIS, at 14.

Finally, Milliken contends that Plaintiffs must identify a specific statute or South Carolina judicial decision "that authorizes a public water utility to recover the cost of providing" clean water from a tortfeasor. Milliken MIS, at 7. This argument has no support from any of the authorities Milliken cites, and in any case, as Plaintiffs have already demonstrated, the free public services doctrine does not apply to Plaintiffs' provision of drinking water to paying customers as a general matter, nor to claims involving damage to government property or for public nuisance.

**F.      Plaintiffs' claims against Milliken are not barred by the statute of limitations.**

Plaintiffs' claims against Milliken center on its former Judson Mill complex, which historically discharged PFAS to the Reedy River system via the Mauldin Road WWTP and which continues to leach these toxic chemicals directly into a tributary of the Reedy River today. *See* Complaints, ¶ 20. Milliken argues these claims are time-barred because it ceased manufacturing operations at Judson Mill in 2015 and sold the property in 2017. Milliken MIS, at 7–8. Because it ceased operations at Judson Mill in 2015, Milliken further argues that the doctrines of continuing nuisance and continuing trespass do not apply to extend the statute of limitations. Milliken MIS, at 8–9.

Because Rule 12(b)(6) "tests the sufficiency of the complaint," a motion to dismiss under this provision "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 533 (D.S.C. 2021) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). As such, "courts may only resolve a statute of limitations defense at the motion to dismiss stage if 'all facts necessary to the affirmative defense ***clearly appear*** on the face of the complaint.'" *Id.* (cleaned up) (quoting *Goodman*, 494 F.3d at 464); *see also Spence v. Spence*, 368 S.C. 106, 123 628 S.E.2d 869, 878 (2006) ("[A]n affirmative defense ordinarily may not be asserted in a motion to dismiss under Rule 12(b)(6) unless the allegations of the complaint demonstrate the existence of the affirmative defense.").

Milliken cannot meet its burden of showing that Plaintiffs' claims are barred by the statute of limitations.

### 1.    Milliken cannot genuinely maintain that Plaintiffs' claims are both unripe and time-barred.

Milliken argues in the same briefing both that Plaintiffs' claims are barred by the passage of time and that Plaintiffs "ha[ve] not yet suffered any legally cognizable injury due to PFAS, and in fact might never suffer such injury." Milliken MIS, at 4. This contradiction is irreconcilable: a lawsuit cannot be time-barred and unripe at the same time.

South Carolina law underscores the absurdity of this position. A tort generally becomes actionable when the injury occurs. *See Murphy v. Owens-Corning Fiberglas Corp.*, 356 S.C. 592, 598, 590 S.E.2d 479, 482 (2003). But the statute of limitations begins to run "from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct" at issue. *Dean v. Ruscon Corp.*, 321 S.C. 360, 363, 468 S.E.2d 645, 647 (1996).

40

These principles define when claims accrue and expire, but Milliken argues that Plaintiffs' claims exist in a quantum state—both too late and too early at once. This is nonsense. Both propositions cannot be true at the same time—it must be one or neither (as indeed is the case because Plaintiffs have suffered actionable injuries and have brought claims well within the limitations period). By advancing these two irreconcilable positions, Milliken undermines the credibility of both.

### 2. The limitations period continues to run as to Plaintiffs' nuisance and trespass claims.

South Carolina recognizes the closely related doctrines of continuing nuisance and continuing trespass. *See Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (Ct. App. 2001). A continuing nuisance is an "unreasonable interference with the plaintiff's use and enjoyment of his property" "that is intermittent or periodical" or "which occurs so often that it is said to be continuing although it is not necessarily constant or unceasing." *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001). Likewise, a continuing trespass is "any intentional invasion of the plaintiff's interest in the exclusive possession of his property" that "is intermittent or periodical and occurs so often it is said to be continuing, although it is not necessarily constant or unceasing." *Parker v. Plexico*, 2008 WL 9843973, at *2 (Ct. App. June 27, 2008) (quoting *Hedgepath*, 348 S.C. at 357, 559 S.E.2d at 337).

Continuing nuisances and trespasses are distinguished from permanent nuisances and trespasses according to whether "abatement is reasonably and practicably possible." *Silvester*, 344 S.C. at 287, 543 S.E.2d at 567. The classification of a nuisance or trespass as continuing versus permanent has implications for the statute of limitations:

> When the nuisance [or trespass] is continuing and the injury is abatable, the statute of limitations does not run merely from the original intrusion on the property and

41

cannot be a complete bar. Rather, a new statute of limitations begins to run after each separate invasion of the property.

*Id.* (citations omitted).

Here, Plaintiffs have plainly alleged that the public and private nuisances and trespasses upon their properties posed by Milliken's Judson Mill are continuing: During the time it operated the facility, Milliken "used products that contain or degrade to [MCL PFAS] in the manufacture of textile products," and it discharged the resulting "industrial wastewater contaminated with . . . PFAS" to the local WWTP, which in turn discharged Milliken's PFAS to the Reedy River. Complaints, ¶ 20. Crucially, Milliken's historically-discharged PFAS are highly "persisten[t] in the environment," *id.* at ¶ 25; "remain in the environment from decades of legacy industrial use," *id.* at ¶ 31; and "have caused, *and continue to cause*, contamination" of Plaintiffs' water supplies such that "Plaintiff[s] cannot use [their] property and property rights to provide water that is either free of all PFOA or PFOS, or compliant with EPA's MCLs." *Id.* at ¶ 53 (emphasis added).

Plaintiffs also aver that because "Milliken did not remediate Judson Mill upon its closure, . . . the site remains contaminated with [MCL] PFAS and their precursors that migrate to Brushy Creek and the Reedy River via groundwater migration and stormwater discharges." *Id.* at ¶ 20; *see also id.* at ¶¶ 66 (alleging "continuing irreparable injury" to Plaintiffs' "use and enjoyment" of property "for which there is no adequate remedy at law"), 78 (alleging "continuing threat to public health, safety, and order"), 85 (alleging "Defendants' invasions of Plaintiff[s'] properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff[s'] water pumps are active").

Furthermore, Plaintiffs allege that abatement to redress the ongoing injuries caused by the nuisance and trespasses is "reasonably and practicably possible," *Silvester*, 344 S.C. at 287, 543 S.E.2d at 567, via "the acquisition, installation, and operation of water treatment technologies at

Plaintiff[s'] SWTP[s] that will remove Defendants' PFAS from drinking water." *Id.* at ¶¶ 7. Consequently, Plaintiffs plead claims for nuisance and trespass against Milliken for which the statute of limitations continues to run.

Milliken's only real objection to this application of continuing nuisance and trespass doctrines is that Milliken cannot abate the PFAS discharges from the Judson Mill because it no longer owns or controls the site today. Milliken MIS, at 8–9. It contends that requiring Defendants to fund water treatment technology capable of removing their PFAS from Plaintiffs' drinking water "is not abatement" but "simply compensating a plaintiff for its injury." *Id.* at 8.

Milliken's understanding of abatement is too narrow. Abatement is an equitable remedy, and courts in equity have significant discretion to tailor relief in order to affect whatever justice under the given circumstances requires. *See Carter v. Lake City Baseball Club*, 218 S.C. 255, 269–70, 272–73, 62 S.E.2d 470, 476–77, 478 (1950) (restating courts' equitable power "to issue mandatory injunctions to abate existing nuisances," and enjoining school from hosting professional baseball games); S.C. Code Ann. § 15-43-20 (authorizing "action[s] in equity" to abate nuisances); 58 AM. JUR. 2D *Nuisances* § 261 (Jan. 2025 update) ("[C]ourts of equity have jurisdiction to grant relief against either public or private nuisances by compelling their abatement or enjoining them."); *id.* at § 262 ("Equity has jurisdiction in the case of a continuing nuisance, and according to some authority, such jurisdiction continues even though the acts contributing to such nuisance have been discontinued prior to commencement of the suit."); *see also Thomerson v. DeVito*, 430 S.C. 246, 253 n.4, 259, 844 S.E.2d 378, 382 n.4, 385 (2020) (reaffirming that "[a] request for monetary relief" does not necessarily "convert what is otherwise an equitable claim to a legal claim"). Regardless of whether Milliken is presently able to stop PFAS from migrating from the Judson Mill into the Reedy River, implementing enhanced

43

water treatment at Plaintiffs' facilities is a feasible and practical way to abate the nuisances and trespasses Plaintiffs complain of. It is therefore within a court's equitable power to order Milliken to assist this effort.

In addition, Plaintiffs note that among the relief they seek is the equitable remedy of "a declaratory judgment." Complaints, ¶ 2. Pursuant to section 15-53-120 of the South Carolina Code, "[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper." Should the Court declare that Plaintiffs' property rights are being infringed by Defendants' tortious conduct, and that the presence of Defendants' PFAS in Plaintiffs' water sources and drinking water constitute a nuisance, then "necessary and proper" relief could include ordering Defendants to fund abatement efforts on Plaintiffs' properties. *See, e.g.*, *Bank of Augusta v. Sanchez Motor Co.*, 249 S.C. 53, 60, 152 S.E.2d 676, 679 (1967) (quoting 22 AM. JUR. 2D *Declaratory Judgments* § 100) (holding that "consequential or incidental relief" may be granted under the declaratory judgment statute); *Robinson v. Asbill*, 328 S.C. 450, 452–53, 492 S.E.2d 400, 401 (App. 1997) (same); *Paduch v. City of Johnson City*, 896 S.W.2d 767 (Tenn. 1995) (holding that "[t]he further relief authorized by" Tennessee's analogous statute "may include the award of damages"); 22 AM. JUR. 2D *Declaratory Judgments* § 253 (Jan. 2025 update) (providing that the further incidental and consequential relief pursuant to a declaratory judgment may include monetary damages and injunctive relief).

Finally, Milliken misapplies *Hedgepath*. *See* Milliken MIS, at 9. While *Hedgepath* did involve a defendant ceasing operations and selling the contaminated site, this fact was incidental to the claims being time-barred—not the basis for the court's decision. *See Hedgepath*, 348 S.C. at 358–59, 559 S.E.2d 337–38. Nothing in *Hedgepath* establishes a general rule that a defendant's cessation of harmful conduct triggers the limitations period or that a nuisance ceases

44

to be continuing. *See id*. Instead, the *Hedgepath* plaintiffs' claims were barred because they really alleged a permanent nuisance, as demonstrated by the "single indivisible injury to their property for alleged permanent injury by pollution," to which the discovery rule applied. *Id*. The *Hedgepath* plaintiffs' arguments about a continuing nuisance were a red herring. *See id*. at 358, 559 S.E.2d at 337. Here, by contrast, Plaintiffs clearly plead a continuing nuisance, with injuries to their property rights and to public health that will continue for as long as the contamination persists. *See* Complaints, ¶¶ 55, 66, 74, 76, 78, 85, 88.

> **3.     In any event, Milliken ignores the discovery rule.**

As stated above, South Carolina follows the discovery rule. *Dean*, 321 S.C. at 363, 468 S.E.2d at 647 (statute begins to run "from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct"). When this date occurs "is an objective, rather than a subjective, question." *Hedgepath*, 348 S.C. at 356, 559 S.E.2d at 336. Milliken must therefore demonstrate that based on the face of their respective complaints, Plaintiffs had notice of their claims against Milliken earlier than August 23, 2021 (i.e., three years from when Plaintiffs added Milliken to the lawsuits). *See Spence*, 368 S.C. at 123 628 S.E.2d at 878.

Milliken attempts to bootstrap this notice by pointing to Plaintiffs' allegation that Milliken operated the Judson Mill "between approximately 1960 and 2015." Milliken MIS, at 7. But the closure of a facility, without more, does not provide a downstream water utility—which Milliken stresses is "60 miles away" from Plaintiffs' SWTPs, *id*. at 12 n.10—notice that it has claims against the operator of that facility for polluting its drinking water supply with unsafe concentrations of PFAS. By improperly conflating the date of its facility closure with the date triggering the statute of limitations, Milliken fails to carry its burden in arguing its affirmative defense.

45

**G.     Defendants' causation arguments should be rejected.**

**1.     Cryovac's and Unichem's traceability arguments are premature.**

Cryovac and Unichem seek dismissal on grounds that Plaintiffs fail to sufficiently allege that "the PFAS allegedly discharged by [these Defendants] is the same PFAS that is allegedly present in the water Plaintiff[s] draw[] from Lake Greenwood." Cryovac MIS, at 8; *see also* Unichem MIS, at 6–7. They point to Plaintiffs' allegations that PFAS have been used in many different applications, are environmentally persistent, are water soluble and highly mobile in water bodies, and "remain in the environment from decades of legacy use." Cryovac MIS, at 6 (citing Complaints, ¶¶ 25, 29, 31); Unichem MIS, at 8 (same). These characteristics, according to Defendants, fatally undercut Plaintiffs' allegations that they caused Plaintiffs' injuries because they raise the specter that the PFAS contaminating Plaintiffs' water sources and properties originates from "some other third party." Unichem MIS, at 6; *see also* Cryovac MIS, at 8–9.

These arguments are premature and conflate the pleading standard at this early stage of litigation with actual proof of Plaintiffs' claims. *See Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 180, 826 S.E.2d 585, 587 (2019) ("Rule 12(b)(6) . . . address[es] the sufficiency of a pleading stating a claim; it is not a vehicle for addressing the underlying merits of the claim.").[23] Proof of Plaintiff's claims will of course require discovery, including expert discovery, pertaining to the "fate and transport" of the PFAS at issue—from their discharge at Defendants' facilities, to the WWTPs and surface waters receiving these facilities' wastewater, and downstream to Plaintiffs' water intakes. Right now, Plaintiffs have pleaded more than

---

[23] Challenges to subject matter jurisdiction implicate Rule 12(b)(1) for which Defendants may introduce evidence outside the pleadings—however, neither Cryovac nor Unichem have done so. Their facial challenge must accept the facts as pleaded. *See Springmasters, Inc. v. D&M Mfg.,* 303 S.C. 528, 531–32, 402 S.E.2d 192, 193–94 (Ct. App. 1991).

46

enough facts to demonstrate that PFAS discharged by Cryovac and Unichem have contaminated

Plaintiffs' water sources and properties:

- Cryovac and Unichem discharge wastewater contaminated with MCL PFAS and/or their precursors to the Lower Reedy WWTP and Mauldin Road WWTP, respectively, as a result of these Defendants' usage of products containing or degrading to these PFAS in their industrial processes. *See* Complaints, ¶¶ 17, 21; *see also id.* at ¶ 48.

- The Lower Reedy and Mauldin Road WWTPs both use "conventional wastewater treatment methods to treat wastewater, which are unable to remove PFAS." *Id.* at ¶¶ 49–50.

- As a result, the Lower Reedy and Mauldin Road WWTPs both discharge effluent "contaminated with Defendants'"—which includes Cryovac's and Unichem's— products that contain or degrade to [MCL PFAS] into the Reedy River upstream of Lake Greenwood." *Id.*

- "PFAS sampling of the Saluda River, Reedy River, and Lake Greenwood confirms the presence of [MCL PFAS] throughout these bodies of water, . . . at levels exceeding EPA's MCLs and MCLGs at [Plaintiffs'] water intakes. Indeed, sampling at [Plaintiffs'] water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* at ¶ 47.

- Plaintiffs' "existing water treatment processes cannot remove" PFAS from the drinking water Plaintiffs provide their customers. *Id.* at ¶ 6.

- Therefore, in order to provide drinking water that is free from Cryovac, Unichem, and other Defendants' PFAS, Plaintiffs must implement new treatment technologies that are capable of removing PFAS. *Id.* ¶¶ 6, 53.

In arguing that the environmental persistence, water solubility, and mobility of PFAS

undermine allegations of causation, Cryovac and Unichem have it backwards. These are the very

qualities that explain how the chemicals resist breakdown and travel many miles downstream to

Plaintiffs' water intakes—a distance that Cryovac and Unichem also criticize. *See* Cryovac MIS,

at 9 (quoting Complaints, ¶ 45) ("Plaintiff alleges that the rivers where the defendants allegedly

discharge wastewater-containing PFAS 'flow downstream through Greenville, South Carolina

and, from there, feed Lake Greenwood *roughly 35 miles downstream*.'"); Unichem MIS, at 6–7

("Likewise, Plaintiff does not provide facts supporting that any PFAS allegedly used by Unichem

in the short time it has owned the facility migrated more than 50 miles to Plaintiff's water intakes.").

Clearly, the possible existence of other sources of PFAS does not negate Plaintiffs' unambiguous allegations that Cryovac and Unichem are themselves sources. *See Gentry v. Yonce*, 337 S.C. 1, 5, 522 S.E.2d 137, 139 (1999) (providing that the complaint must be viewed "in the light most favorable to the plaintiff, and with every doubt resolved in his behalf," when deciding a Rule 12(b)(6) motion), *overruled in part on other grounds by Proctor v. Whitlark & Whitlark, Inc.*, 414 S.C. 318, 778 S.E.2d 888 (2015); *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1353–54 (N.D. Ga. 2021) (denying dismissal based on argument that "because PFAS are ubiquitous, Plaintiff fails to state a claim against [defendant]"). Existing South Carolina PFAS cases already bear this out. *See, e.g.*, **Ex. 5**, Order on MTDs, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 4 (S.C. Ct. Comm. Pl. July 23, 2024) (holding State's allegations that PFAS manufacturers produced PFAS and PFAS-containing products, "caused widespread contamination of the State's natural resources and property," and contaminated "identifie[d] areas in the State" "adequately pled causation"); *Weatherford v. E.I. du Pont de Nemours & Co.*, No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *4–5 (D.S.C. Sept. 27, 2023) (holding that allegations of PFAS' persistence and tendency to leach from wastewater and biosolids, of defendants' knowledge about PFAS and their customer's manufacturing processes, and of defendants failure to provide proper disposal instructions to their customer sufficiently alleged proximate causation).

### 2.     The Mauldin Road WWTP's receipt and discharge of Unichem's contaminated wastewater is not a superseding cause.

Unichem further argues that Plaintiffs' claims should be dismissed on the basis that the PFAS "in Lake Greenwood was ***not*** put there by Unichem," because Unichem sends its PFAS

48

laden wastewater to the Mauldin Road WWTP, which then discharges Unichem's PFAS to the river system feeding Lake Greenwood. Unichem MIS, at 7. In substance, Unichem argues that the Mauldin Road WWTP's actions—receiving Unichem's wastewater and not removing the PFAS from this wastewater—are a superseding cause that terminates Unichem's liability. As already discussed above, the controlling allegations foreclose this argument.

"The touchstone of proximate cause in South Carolina is foreseeability," meaning that "the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842–43 (Ct. App. 1997). "For an intervening force to be a superseding cause that relieves an actor from liability, the intervening cause must be a cause that could not have been reasonably foreseen or anticipated." *Id.* at 467, 494 S.E.2d at 844.

The Mauldin Road WWTP's actions here do not constitute a superseding cause. Plaintiffs allege that Unichem "discharges industrial wastewater contaminated with products that contain or degrade to [MCL] PFAS to the Mauldin Road WWTP," Complaints, ¶ 23, which "utilizes conventional wastewater treatment methods" that "are unable to remove PFAS." *Id.* at ¶ 49. The pleadings allege that Unichem possessed actual or constructive knowledge of these facts: "All Defendants knew or should have known that th[e] [Mauldin Road, Lower Reedy, and Piedmont Regional] WWTPs utilize conventional treatment methods for wastewater that cannot remove Defendants' PFAS." *Id.* at ¶ 52. Further, "[a]ll Defendants also know or should have known that the WWTPs discharge treated effluent contaminated with their PFAS chemicals to the [Reedy and Saluda] rivers, contaminating the water that Plaintiff[s] draws for [their] customers." *Id.*; *see also id.* at ¶ 83.

49

The Amended Complaints plainly demonstrate that the Mauldin Road WWTP was a foreseeable, passive conduit for Unichem's PFAS to enter the river system and contaminate Plaintiffs' downstream water sources and facilities.[24] Courts presiding over PFAS contamination cases have rejected very similar superseding causation arguments by entities that supply PFAS-containing products to customers that discharge those products directly or indirectly (via WWTPs) to surface waters. *See Weatherford*, 2023 WL 11015357, at *4–5 (also drawing attention to plaintiffs' allegations "that PFAS are not biodegradable, persist in the environment and the human body, and leach into the groundwater and soil as a result of the wastewater created during the normal textile processes"); *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1332–33 (N.D. Ga. 2022).

## H.    This Court should not stay this case or decline jurisdiction.

Fitesa and T&S ask the Court to stay or dismiss these cases so that they can be referred to the South Carolina Department of Environmental Services ("DES"). Fitesa MIS, at 3, 16–17; T&S MIS, at 21–23. They invoke the doctrine of primary jurisdiction as the basis for the stay or dismissal, vaguely contending that "the legislature [has] entrusted [DES] with addressing the exact harm alleged here" via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120. Fitesa MIS, at 17; T&S MIS, at 22. This unjustified delay tactic falls well outside the scope of the primary jurisdiction doctrine. *See Local Union No. 189, Amalgamated Meat Cutters Etc. v. Jewel Tea Co., Inc.*, 381 U.S. 676, 686 (1965) (Frankfurter, J., dissenting) ("[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative proceeding when the case must

---

[24] This rebuttal applies equally to Unichem's proximate causation argument. *See* Unichem MIS, at 13–14.

eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" (quoting *Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481 (1958))).

Where a case or a factual issue therein is beyond "the conventional experience of judges" and "within the special competence" of an administrative agency, the primary jurisdiction doctrine provides courts discretion to stay a case or dismiss it without prejudice in order to refer the matter to the agency. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 449–50 (M.D.N.C. 2015). The doctrine is intended to promote "desirable uniformity" in regulation and leverage "the expert and specialized knowledge of the agenc[y] involved." *W. Pac. R.R. Co.*, 352 U.S. at 64.

This case involves only South Carolina common law claims, including claims of private and public nuisance, trespass, and negligence, gross negligence, and/or recklessness. These claims are firmly within this Court's conventional experience and competence. *See Nix v. The Chemours Company FC*, 2023 WL 6471690, at *6 (E.D.N.C. Oct. 4, 2023) (observing the plaintiffs' state law property claims "fit comfortably within" the court's expertise but not the state environmental agency's). Plaintiffs assert no claims under the SCSDWA, its federal analogue, or any other state or federal statute.

To invoke DES's purported exclusive authority to enforce the SCSDWA, Defendants suggest that the SCSDWA preempts cases such as this, involving common law claims against upstream polluters for contaminating a public water supply. *See* Fitesa MIS, at 3, 17; T&S MIS, at 22. But nothing in the plain text of the act indicates a legislative desire to do so. Moreover, courts interpreting the federal SDWA have routinely held that the statute does not preempt state

common law claims. *See, e.g.*, *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1271, 1273 (N.D. Ala. 2020); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 597–98 (M.D. La. 2003); *Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1107 (Cal. 2002). Defendants' notion that DES possesses some unique authority or expertise necessary to resolving this case is belied by the fact the PFAS MCLs were issued *by EPA*, not DES.

Plaintiffs are also unaware of—and neither Fitesa nor T&S identify—any action by DES to control the PFAS discharges by either Defendant.[25] This reality reinforces the conclusion that a judgment for Plaintiffs would not interfere with DES's regulation of PFAS. *See Parris*, 595 F. Supp. 3d at 1313 (emphasizing that the Georgia environmental agency "has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia" and has not "taken enforcement action against [defendant]," in denying stay). And even if DES was currently taking action against Fitesa's or T&S's PFAS discharges, that, too, would not necessarily require staying or dismissing this case under primary jurisdiction doctrine. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 683 (W.D. Mich. 2021); *Cape Fear Pub. Util. Auth. v. The Chemours Company FC, LLC*, 2019 WL 13300188, at *10 (E.D.N.C. Apr. 19, 2019); *Dew v. E.I. du Pont de Nemours and Co.*, 2019 WL 13117100, at *10 (E.D.N.C. Apr. 17, 2019); *Yadkin Riverkeeper*, 141 F. Supp. 3d at 451.

Finally, Fitesa and T&S are not the first defendants in a PFAS contamination lawsuit to assert primary jurisdiction as grounds for a stay or dismissal. To date, most—and very likely *all*—of these attempts have been unsuccessful. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Parris*, 595 F. Supp. 3d at 1312–13; *Zimmerman*, 542 F. Supp. 3d at 683; *Cape Fear Pub. Util. Auth.*,

---

[25] To be clear, DES has recently begun to include monitoring requirements for PFAS when discharge permits come up for renewal. However, these monitoring requirements do not set limits for the amount of PFAS that permittees may release via their wastewater discharges.

2019 WL 13300188, at *10; *Dew*, 2019 WL 13117100, at *10. Defendants' attempt should meet the same result.

## I.    The Mauldin Road WWTP is not a necessary party.

"It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue." *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010); *see also Smith v. Tiffany*, 419 S.C. 548, 564, 799 S.E.2d 479, 488 (2017) (recognizing "two centuries of common law establishing a plaintiff's right to choose which tortfeasors, if any, she will sue"). Setting itself against this foundational principle, T&S argues that the Mauldin Road WWTP is an "indispensable party" under Rule 19. But T&S's basis is not Rule 19—it only rehashes Defendants' misplaced blame towards their WWTPs for the PFAS contamination that the Complaints allege Defendants knew passed through. T&S MIS, at 13–14.

T&S carries the burden on its motion to dismiss, but it does not even explain how Rule 19 applies. The Rule says:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(a), SCRCP. Put differently, Rule 19 only requires the joinder of "necessary parties"— "one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Ex parte Gov't Employee's Ins. Co. v. Goethe*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007) (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)).

T&S does not carry its burden—nor can it. Complete relief between Plaintiffs and T&S can be achieved without involving any WWTP, which have no "interest relating to the subject of

[this] action." Rule 19(a)(2). This Court "ha[s] no need to ascertain or settle [the WWTPs'] rights before it determine[s] the rights of" the current parties to this action, and joinder would be improper. *Goethe*, 373 S.C. at 136, 644 S.E.2d at 701; *see also id.* at 137, 644 S.E.2d at 701 (finding a party's joinder is unnecessary when its interest "is merely tangential to" the action).

## IV. CONCLUSION

Based on the foregoing, Plaintiffs GCPW and LWSC respectfully ask that this Court deny Defendants' motions in full and allow all of Plaintiffs' claims to survive dismissal and proceed to discovery in this litigation.

Respectfully submitted,

_/s/ John B. White, Jr._
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

February 28, 2025

# EXHIBIT 2

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corp. *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff, Grand Strand Water and Sewer Authority ("GSWSA" or "Plaintiff"), hereby

responds to all pending motions filed by Defendants Domtar Paper Company, LLC ("Domtar");

Elevate Textiles, Inc. ("Elevate"); Fiber Industries, LLC ("Fiber"); GFL Environmental USA,

Inc. ("GFL"); Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (collectively

"Mohawk"); Nan Ya Plastics Corporation, America ("Nan Ya"); PRET Advanced Materials, LLC

("PRET"); Red Rock Disposal, LLC ("RRD"); Sampson County Disposal, LLC ("SCD"); and

Waste Industries, LLC ("Waste Industries").[1]

---

[1] Defendants filed separate memoranda in support of their motions to dismiss, which share uniform pagination for each's respective briefing in this case. In citations, Plaintiff abbreviates these memoranda to "MIS." Plaintiff references consolidated briefing filed by GFL and Waste Industries as "GFL MIS," and it references consolidated briefing filed by RRD and SCD as "RRD MIS."

i

# TABLE OF CONTENTS

INDEX OF ACRONYMS ........................................................................................ iv

I.     FACTUAL BACKGROUND ........................................................................ 1

II.    STANDARD OF REVIEW ......................................................................... 4

III.   ARGUMENT ............................................................................................ 5

   A.    Plaintiff's claims for relief are justiciable. ............................................... 5

      1.   Plaintiff clearly has standing to seek relief for past, present, and future property injuries. ........................................................................................... 6

      2.   Defendants' position is self-defeating. ..................................................... 8

   B.    Plaintiff states actionable claims for trespass. ........................................ 10

      1.   The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law. ......................... 10

      2.   Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts. ........... 12

   C.    Plaintiff states actionable claims for public and private nuisance. ............................... 16

      1.   Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters. ............... 16

      2.   Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance. ....................................................................... 19

   D.    Plaintiff states actionable claims for negligence. ........................................ 25

      1.   Defendants owed Plaintiff duties of care. ............................................... 25

      2.   Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries. ........................................................................................... 31

      3.   Plaintiff alleges actionable damages. ...................................................... 33

      4.   Plaintiff has not assumed the risk of PFAS contamination. ................................... 33

   E.    The "free public services doctrine" does not apply here, if it exists in South Carolina at all. ............................................................................................................... 35

   F.    The Safe Drinking Water Act does not preempt Plaintiff's claims. .............................. 38

   G.    Defendants' causation arguments should be rejected. ................................................ 40

      1.   Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct. ........................................................................................... 40

      2.   PRET's causation arguments are also unavailing. .................................................. 43

   H.    This Court has personal jurisdiction over RRD and SCD. ........................................... 46

ii

1.  Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions. ................................................................... 47

2.  North Carolina law governs Plaintiff's claims against RRD and SCD.................... 47

3.  This Court has personal jurisdiction over RRD and SCD. ...................................... 48

I.  Plaintiff properly seeks an award of attorney's fees and prejudgment interest. ........... 53

J.  This Court should not stay this case or decline jurisdiction. ........................................ 54

K.  The United States is not a necessary party.................................................................. 57

IV.  CONCLUSION............................................................................................................. 64

## INDEX OF ACRONYMS

**Chemical Substances**

| | |
|---|---|
| **PFAS** | Perfluoroalkyl and polyfluoroalkyl substances. Refers to the entire body of synthetic chemicals known for their water-, grease- and stain-resistant properties. |
| **PFOS** | Perfluorooctane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOS. |
| **PFOA** | Perfluorooctanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOA. |
| **PFNA** | Perfluorononanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFHxS** | Perfluorohexane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFBS** | Perfluorobutanesulfonic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **HFPO-DA** | Hexafluoropropylene Oxide Dimer Acid. Also referred to as "GenX chemicals." <br><br> One of the six PFAS regulated under the Safe Drinking Water Act |
| **MCL PFAS** | Refers to all PFAS subject to maximum contaminant levels and maximum contaminant level goals under the Safe Drinking Water Act. Includes PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA (aka "GenX chemicals") |

**Regulatory and Legal Terms**

| | |
|---|---|
| **DES** | South Carolina Department of Environmental Services, formerly known as the Department of Health and Environmental Control ("DHEC"). |
| **MCL** | Maximum Contaminant Level. Enacted and enforced pursuant to regulations passed under the Safe Drinking Water Act. Stands for the maximum allowable level of a contaminant that a public water system may deliver to a user. |
| **MCLG** | Maximum Contaminant Level Goal. Enacted pursuant to regulations passed under the Safe Drinking Water act. Stands for the maximum level of |

| | a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons will occur. |
|---|---|
| **SDWA** | Safe Drinking Water Act. The congressional legislation authorizing regulations that, among other things, set MCLs and MCLGs. |
| **SCSDWA** | South Carolina Safe Drinking Water Act. The state-level analogue to the SDWA. |
| **WWTP** | Wastewater Treatment Plant. A facility that receives wastewater from residential and/or industrial users. |
| **SWTP** | Surface Water Treatment Plant. A facility used by public water systems, like Plaintiff, that withdraws water from a water source, treats the water to make it fit for human consumption, and distributes the water to users. |

# I. FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Pee Dee River Watershed,[2] the Waccamaw River, and the Intracoastal Waterway with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiff relies on these vital water sources to supply potable drinking water to over 100,000 South Carolinians. Second Amended Complaint ("Complaint"), ¶¶ 1–3. Defendants, all operators of industrial facilities, have systematically discharged PFAS into these waters, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiff's use of its properties, including its water treatment and distribution infrastructure. *Id.* at ¶¶ 4–6, 48–62. Defendants' pollution has rendered Plaintiff's water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 63–66.

Plaintiff is a special purpose district responsible for supplying safe drinking water to over 115,000 residents in Horry County. *Id.* at ¶¶ 2–3, 15–17. Plaintiff operates two surface water treatment plants ("SWTPs"): the Bull Creek SWTP and the Myrtle Beach SWTP. *Id.* at ¶ 16. The Bull Creek SWTP draws water from Bull Creek, which branches off the main stem of the Great Pee Dee River just upstream from the SWTP's intake, whereas the Myrtle Beach SWTP draws water from the Intracoastal Waterway.

Upstream from Plaintiff, at various locations within the Pee Dee River Watershed, Defendants—companies currently and formerly engaged in textile and other manufacturing operations—have utilized products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater either directly to surface waters or to

---

[2] By "Pee Dee River Watershed," Plaintiff refers to the Great Pee Dee River, Little Pee Dee River, Lynches River, Lumber River, Lake Swamp, Black Creek, Bull Creek, and the tributaries thereof.

1

municipal wastewater treatment plants ("WWTPs"). *Id.* at ¶¶ 4–5, 18–26, 51. In addition, some Defendants are engaged in waste management operations that generate PFAS-containing leachate wastewater, which these Defendants haul to an upstream WWTP for disposal. *Id.* at ¶¶ 22, 54. The treatment works used by "direct" discharger Defendants and the WWTPs that receive wastewater from "indirect" discharger Defendants use conventional methods that are ineffective at treating PFAS. *Id.* at ¶¶ 5, 18–26, 62. Therefore, Defendants' PFAS-contaminated wastewater passes through the treatment works into the Pee Dee River Watershed unabated, flowing downstream to Bull Creek. *Id.* at ¶¶ 48–55.

Plaintiff's Bull Creek and Myrtle Beach SWTPs were never designed to, and in fact do not, remove PFAS. *Id.* at ¶¶ 6, 56, 61, 63–66. The same is true of the Bucksport Regional WWTP and Conway WWTP that Plaintiff also operates. *Id.* at ¶¶ 57–60. "Because the Bull Creek SWTP cannot remove Defendants' PFAS from the water Plaintiff draws from Bull Creek, the water that sewer customers send to the Bucksport and Conway WWTPs remains contaminated with Defendants' PFAS." *Id.* at ¶ 59. The Bucksport and Conway WWTPs discharge Defendants' PFAS to the Waccamaw River, which carries the pollutants downstream to the Intracoastal Waterway, where they contaminate the Myrtle Beach SWTP and the drinking water Plaintiff treats at this facility. *Id.* at ¶¶ 60–61.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiff's. *Id.* at ¶¶ 62, 66. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id.* at ¶¶ 5–6, 27–28. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater

and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id*. at ¶¶ 28, 30, 32. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id*. at ¶¶ 27–28.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id*. at ¶¶ 33, 38–40, 42. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), in 2009 and 2016. *Id*. at ¶¶ 36–38. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id*. at ¶¶ 39–40. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and PFOS and at 10 ppt for perfluorononanoic acid ("PFNA"), perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id*. at ¶¶ 45–46. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id*. at ¶¶ 41–42, 46. The MCLs compliance is due by April 2029. *Id*. at ¶ 47.

As a direct and foreseeable result of Defendants' improper, ongoing use and disposal of PFAS, Plaintiff's properties have been contaminated by Defendants' PFAS—including their land, SWTPs, and supporting infrastructures. *Id.* at ¶¶ 63–66. Worse, Plaintiff cannot currently provide

potable drinking water that is free of these toxic chemicals. *Id.* at ¶ 63. Plaintiff now suffers, and

will continue to suffer, significant property injuries resulting in enormous operational and

financial burdens. *Id.* at ¶ 65. Plaintiff seeks both monetary and equitable relief to remedy the

past, present, and future PFAS contamination of its properties and protect its community from

the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 74–77, 86–89, 99–101, 110, Prayer for

Relief.

## II. STANDARD OF REVIEW

"Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a

failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106,

116, 628 S.E.2d 869, 874 (2006). "In considering such a motion, the trial court must base its

ruling solely on allegations set forth in the complaint." *Id.* "If the facts and inferences drawn

from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would

entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to

state a claim is improper." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted if

facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under

any theory." *Id.* "When considering such motion, the court must regard all properly pleaded

factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App.

2000). "It is a well-settled principle that in resolving a Rule 12(b)(6) motion to dismiss, the court

is limited to a consideration of the allegations contained within the four corners of the

complaint." *Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 559, 713 S.E.2d 604, 608

(2011).

Pleadings are to be liberally construed "to do substantial justice to all parties." *Quality

Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000) (quoting Rule

8(f), SCRCP). "The purpose of pleadings is to place the adversary on notice as to what the issues

are." *Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975). Rule 8, SCRCP, "requires a litigant to plead the ultimate facts which will be proved at trial, not the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987). "Ultimate facts fall somewhere between the verbosity of evidentiary facts and the sparsity of 'legal conclusions.'" *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 473, 597 S.E.2d 881, 884 (Ct. App. 2004) (quoting *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001)). A motion to dismiss should not be granted "if facts sufficient to constitute a cause of action can be fairly gathered from the complaint, however uncertain, defective, or imperfect the allegations of the complaint may be." *Riedman Corp. v. Jarosh*, 289 S.C. 191, 192, 345 S.E.2d 732, 733 (Ct. App. 1986). "Further, a judgment on the pleadings is considered to be a drastic procedure by our courts." *Russell v. City of Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991).

Rule 12(b)(6) permits the trial court to address the sufficiency of a pleading stating a claim, but it is not a vehicle for addressing the underlying merits of the claim. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925, (S.C. App. 2021).

### III. ARGUMENT

#### A.     Plaintiff's claims for relief are justiciable.

Defendants' primary grounds for dismissal are that Plaintiff's claims are not justiciable—reasoning that Plaintiff will suffer no injury until the compliance deadline for PFAS MCLs arrives. Domtar MIS, at 3–5; Elevate MIS, at 3–6; Fiber MIS, at 5–6; GFL MIS, at 8–10; Mohawk MIS, at 4–5; Nan Ya MIS, at 4–8; PRET MIS, at 8–9; RRD MIS, at 7–9. This argument is easily resolved, and its flaws immediately apparent:

(1)     *It distorts Plaintiff's claims.* Defendants recast Plaintiff's case as fundamentally concerning regulatory compliance issues rather than what they actually are: straightforward state-law claims arising from past, present, and future property

5

injuries. South Carolina law unquestionably empowers Plaintiff to seek redress for them.

(2) *It is inherently self-contradictory*. Defendants assert that Plaintiff's only injuries are its need to comply with PFAS MCLs. But if the financial burdens of MCL compliance were Plaintiff's injuries—and they are not—Plaintiff would still have standing under Defendants' own premise.

## 1. Plaintiff clearly has standing to seek relief for past, present, and future property injuries.

Defendants argue that because enforcement of PFAS MCLs will not begin until April 2029, Plaintiff's obligations to comply remain speculative. They also cite pending litigation in the D.C. Circuit[3] to suggest that the PFAS MCLs might change, further speculating that any injury Plaintiff faces is uncertain. Both contentions fail for the same reason: they assert, contrary to the pleadings, that Plaintiff's injuries arise from regulatory obligations rather than from Defendants' ongoing contamination of their properties.

Plaintiff's complaint speaks for itself. These are not regulatory compliance claims but straightforward state-law causes of action based on Defendants' ongoing contamination of its land, SWTP, infrastructure, and water sources with PFAS chemicals. *See* Complaint, ¶¶ 1–7, 67–111. According to the nation's leading authority on environmental science and public health, no level of these chemicals—PFOA and PFOS in particular—is safe for human consumption.[4] And

---

[3] *See Am. Water Works Ass'n v. Env't Prot. Agency*, No. 24-118 (D.C. Cir. Oct. 7, 2024).

[4] Notably, neither EPA's scientific findings concerning PFOA and PFOS, nor its MCL Goal of zero ppt for each chemical, is challenged in the D.C. Circuit litigation that Defendants emphasize. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734 (D.C. Cir. Oct. 7, 2024); **Ex. 2**, Br. for Pet'rs Nat'l Ass'n of Mfrs., Am. Chemistry Council, and The Chemours Co., *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078731 (D.C. Cir. Oct. 7, 2024). Instead, the parties challenge MCLs for mixtures PFHxA, PFNA, PFBS, and GenX Chemicals, and they complain that EPA's enforceable limits for PFOA and PFOS were too close to the MCL Goals to be economically feasible, posing risks to water affordability. *See id.*; *see also* **Ex. 3**, Resp't Proof Br., No. 24-1188, Doc. 2091318 (D.C. Cir. Dec. 23, 2024) (EPA brief, highlighting that "no Petitioner has

according to the operative pleadings, Defendants knew this well before EPA publicized it, and they have in the past and continue to introduce them into Plaintiff's properties and water sources. *See* Complaint, ¶¶ 63–66.

The injuries resulting from Defendants' contamination are not hypothetical—they are real, present harms. Among other injuries, Plaintiff has:

- lost the ability to supply water free from unsafe concentrations of PFAS, *id.* at ¶ 83;

- incurred significant costs in investigating and identifying the sources of PFAS contamination, *id.*;

- suffered the presence of hazardous chemicals in its water treatment plants, supporting infrastructure, and water sources, which they have a legal right to use, *id.*; and

- experienced diminution in property value. *Id.*

Nothing about these injuries is "conjectural" or "contingent" on future events.[5] *See Jowers v. S.C. Dep't of Health & Env't Servs.*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018). Courts routinely recognize chemical contamination of private property as a property injury. *See infra* §§ B, C, D.

Ripeness and standing, though distinct, "boil down to the same question" here: whether Plaintiff has already sustained an actual injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007))

---

articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants").

[5] Several Defendants selectively isolate Plaintiff's allegations that it will incur "expenses associated with future acquisition, installation, and operation" of PFAS filtration for the dual propositions that (1) these are the only damages Plaintiff seeks and (2) these damages hinge on the need to comply with MCLs. *See, e.g.,* Fiber MIS, at 6; GFL MIS, at 9; Mohawk MIS, at 4–5. Both are plainly false. *See* Complaint, ¶ 72, 74, 83, 86, 101, 110. In reality, Plaintiff listed the expenses of installing treatment technologies to remove Defendants' PFAS as one of many "special injuries" it has incurred that are different "in kind" from the public's injury of being exposed to Defendants' PFAS in drinking water. *Id.* at ¶ 83.

(standing and ripeness can merge when the issue is whether an injury has occurred); *Crescent Homes SC, LLC v. CJN, LLC*, 2024 WL 4831180, at *7* (S.C. Nov. 20, 2024) (South Carolina justiciability principles align with federal "case or controversy" requirements). Under the operative pleadings and controlling law, the only answer is yes.

Defendants cannot rewrite Plaintiff's complaint to suit their motions. The allegations set forth ongoing and future property injuries from PFAS contamination—not injuries tied to the burdens of complying with a regulatory standard. Taking the pleadings as alleged, as the Court must, resolves the question of justiciability.

### 2.     Defendants' position is self-defeating.

Defendants' arguments do not just mis-frame this case. Even taking their framework at face value, it collapses under its own contradictions. Their principal authority, *American Water Works Association*, involves associations representing water authorities—like Plaintiff— challenging the PFAS MCLs. But Defendants miss why those associations have standing to do so: ***their members face concrete, imminent financial harm due to compliance costs***. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734, at 15–17 (D.C. Cir. Oct. 7, 2024);[6] *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592–93 (D.C. Cir. 2023). Thus, even under Defendants' own framing—that Plaintiff's injuries stem only from MCL compliance—the very litigation they cite demonstrates why Plaintiff would have standing to act now. *See id.*

Defendants cannot have it both ways: Plaintiff's case cannot be unripe based on litigation acknowledging the present, ***ripe*** financial burdens imposed by MCL compliance. As that

---

[6] EPA has not challenged the associations' standing. *See* **Ex. 3**, Resp't Proof Br., *Am. Water Works Assoc.*, No. 24-118, Doc. 2091318.

litigation shows, compliance is neither remote nor contingent. EPA itself recognizes that it demands significant, long-term capital improvements:

> For purposes of this [economic analysis], the EPA assumes that the [PFAS MCLs] will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension date for MCL compliance, this analysis assumes that capital improvements *(i.e., installation of treatment technologies)* for systems taking action under the rule take effect five years after the date on which the regulations is promulgated, or in 2029.

**Ex. 4**, U.S. Env't Prot. Agency, *Econ. Analysis for the Final Per- and Polyfluoroalkyl Substances Nat'l Primary Drinking Water Regul.*, at 2–3 (2024), EPA Doc. No. EPA-815-R-24-001 (emphasis added) (hereafter "*Economic Analysis*"); *see also* U.S. Env't Prot. Agency, *PFAS Nat'l Primary Drinking Water Regul.*, 89 Fed. Reg. 32532, 32533 (2024) ("EPA is extending the compliance deadline for all systems nationwide to meet the MCL to allow additional time for capital improvements."). This process is extensive, costly, and time-consuming. Among other things, it requires pilot programs to test treatment methods, engineering analyses to evaluate and select the best treatment option, facility design, bidding and contract negotiations, material procurement, and full-scale construction. *See Econ. Analysis*, Table 5-11 (setting out cost elements for implementing water treatment upgrades). History teaches that this takes years.[7] Defendants' notion that Plaintiff must wait until April 26, 2029 is belied by their own reasoning.

---

[7] For example, in the building phase alone, it took the West Morgan – East Lawrence Water & Sewer Authority over four years to complete its new reverse osmosis treatment facility designed to remove PFAS. *See* WHNT News 19, *Lawsuit funded water treatment plant being built in Lawrence County* (Feb. 17, 2020) (construction begins in Feb. 2020), *available at* https://whnt.com/news/lawsuit-funded-water-treatment-plant-being-built-in-lawrence-county; W. Morgan – E. Lawrence Water & Sewer Auth., *JD Sims – RM Hames Water Facility* (distribution of reverse osmosis-treated water begins May 1, 2024), *available at* https://dev.dv1ojdbghmtyn. amplifyapp.com/JDsimsRMHamesWaterFacility. And despite completing its pilot program in April of 2018, Brunswick County, North Carolina has still not completed construction of its reverse osmosis system. *See* Brunswick Cnty, N.C., *Gen-X / PFAS Information FAQs - What is Brunswick County doing to remove PFAS contaminates from drinking water?* (initiated pilot program to determine best method to remove PFAS from drinking water, choosing reverse osmosis), *available at* https://www.brunswickcountync.gov/ Faq.aspx?QID=447; Brunswick

Defendants' true position is this: they speculate that Plaintiff's already-ripe case might become moot[8] if regulations change. That is not how justiciability works. Since *Marbury v. Madison*, 5 U.S. 137 (1803), courts adjudicate existing disputes like this one. The only "hypothetical" posed is a change in existing, legally binding law. Defendants' position turns Article III on its head.

**B.     Plaintiff states actionable claims for trespass.**

**1.     The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law.**

Defendants argue that Plaintiff alleges only invasions of intangible substances that do not amount to trespass under South Carolina law. *See* Domtar MIS, at 5–7; Elevate MIS, at 9–11; Fiber MIS, at 7–8; GFL MIS, at 12–13; Mohawk MIS, at 8–9; Nan Ya MIS, at 12–13; PRET MIS, at 14–15; RRD MIS, at 11–12. They rely on *Babb v. Lee Cnty. Landfill SC, LLC*, where the South Carolina Supreme Court answered various certified questions on property-related torts. 405 S.C. 129, 747 S.E.2d 468 (2013). As to trespass, the *Babb* court held that South Carolina law does not recognize a claim arising "solely from invisible odors" because the law requires "intrusions by physical, tangible things." *Id.* at 144-52, 747 S.E.2d at 476-80. Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that fall outside this threshold. *See, e.g.,* Mohawk MIS, at 9; RRD MIS, at 11.

---

Cnty., N.C., *Northwest Water Treatment Plant Expansion & Reverse Osmosis Treatment Upgrades* (reverse osmosis will be operational by spring 2025).

[8] Mootness is a third component of justiciability, where a case for which a plaintiff has standing at its outset becomes moot due to events that occur during the case's pendency. *See Sloan v. Greenville Cnty.*, 356 S.C. 531, 547, 552, 590 S.E.2d 338, 347, 349 (2003). By arguing that the MCLs might change in a way that affects Plaintiff's case, Defendants are masking mootness under the veil of ripeness.

At least one South Carolina court has explicitly rejected Defendants' argument. In *State of South Carolina v. 3M Company*, the Richland County Court of Common Pleas distinguished *Babb* in this way:

> [The State]'s trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of PFAS product resulting in contamination that the State alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates the State natural resources and property "indefinitely."

**Ex. 5**, Order, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 6 (S.C. Ct. Comm. Pl. July 23, 2024).

The same holds true here, but these cases are even further removed from *Babb*. Defendants have discharged ***wastewater*** or ***leachate*** carrying ***PFAS products***—indisputably tangible substances—into Plaintiff's properties. *See* Complaint, ¶¶ 2–5, 18–26, 92–101. Before and after *Babb*, South Carolina courts have repeatedly held that chemical contamination via water is actionable trespass, even if individual contaminants are microscopic. *See, e.g.*, *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 423, 453 S.E.2d 908, 912 (1995) (noting that jury returned trespass verdict in favor of plaintiffs whose properties were either within plume of chemically-contaminated groundwater, or adjacent to contaminated creek); *Kelly v. Para-Chem S., Inc.*, 311 S.C. 223, 224-26, 428 S.E.2d 703, 704 (1993) (affirming jury verdict on trespass via groundwater contamination); *Weatherford v. E.I. du Pont & Co.*, 2023 WL 11015357, at *5 (Sept. 27, 2023) (plaintiff stated claim for trespass under South Carolina law involving PFAS contamination via wastewater discharges to river and agricultural sludge); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (under South Carolina law, plaintiff stated trespass claim concerning PCB contamination of plaintiff's property via stormwater discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (under South Carolina law, a jury can find a trespass where defendant's chemicals migrated to

11

plaintiff's land through groundwater), *aff'd*, 996 F.2d 1212 (4th Cir. 1993) (affirming plaintiff's verdict on trespass); *see also In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995) (under South Carolina law, whether defendant trespassed onto Plaintiff's properties with TCE-contaminated groundwater submitted to jury); *c.f. Babb*, 405 S.C. at 143, 747 S.E.2d at 476 (labeling water a "physical invasion").

Defendants' misconstruction of *Babb* ignores decades of precedent recognizing that chemical contamination via water is a physical invasion sufficient for trespass. According to Plaintiff's allegations—which must be accepted as true at this stage—Defendants' products and wastewater physically invaded and altered Plaintiff's properties (and continue to do so). Complaint, ¶¶ 18–26, 51–64, 92–101. This is classic trespass under South Carolina law.

## 2. Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts.

Defendants also claim that Plaintiff's allegations foreclose any finding that they affirmatively or intentionally intruded onto Plaintiff's properties. Domtar MIS, at 7–8; Elevate MIS, at 12–13; Fiber MIS, at 8–10; GFL MIS, at 14–15; Mohawk MIS, at 9–10; Nan Ya MIS, at 14–16; PRET MIS, at 15–17; RRD MIS, at 13–14. They reason that intent is necessarily absent because their PFAS-contaminated wastewater first passes through WWTPs and into the Pee Dee River Watershed and Waccamaw River before Plaintiff "voluntarily" withdraws it. *See id.* Defendants are mistaken: intent exists where, as alleged, they know the consequences of their affirmative acts.

There is no dispute here that, for actionable trespass, "there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). But a trespasser need only "intend the act which constitutes the unwarranted entry onto another's

land"—he "need not intend the damaging consequence of his entry." *Id.* Thus, Plaintiff have sufficiently alleged intent "by showing that [Defendants] acted voluntarily" in their discharges and "that [they] knew or should have known the result that would follow": the entry into and contamination of Plaintiff's properties.[9]

Plaintiff alleges just that. Its complaint explicitly states that Defendants conducted their discharges when they knew or should have known:

- that their respective WWTPs cannot remove PFAS from their wastewater before they pass through to the Pee Dee River Watershed and Waccamaw River, in the case of industrial users of the Lake City, Johnsonville, and Lumberton WWTPs;

- that their PFAS wastewater is discharged directly to the Great Pee Dee River or Black Creek, in the case of direct dischargers of wastewater;

- Plaintiff draws water from Bull Creek and the Intracoastal Waterway for the provision of potable water to its customers;

- the water Plaintiff draws from both sources is contaminated with PFAS Defendants discharged; and

- water contaminated with their PFAS products invades Plaintiff's properties.

Complaint, ¶¶ 51–62, 92–93. This is more than sufficient to allege affirmative, intentional acts under South Carolina law. Defendants' primary authority is easily distinguished on this very ground—where the plaintiff *admitted* that the defendant lacked the requisite intent. *See Snow*, 305 S.C. at 554, 409 S.E.2d at 802-03 ("Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property.").

---

[9] Most Defendants point out that Plaintiff lacks the right of exclusive possession of Bull Creek, the Intracoastal Waterway, and upstream surface waters. *See, e.g.,* Domtar MIS, at 6–7; Elevate MIS, at 11–12. This is true but irrelevant. Plaintiff never alleged a trespass of Bull Creek or the Intracoastal Waterway, but instead that Defendants trespassed "into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution system." Complaint, ¶ 99.

ELECTRONICALLY FILED 2025 Feb 28 3:47 PM MERCERLY COMMON PLEAS CASE#2022CP2603336

The fact that some Defendants' contaminated wastewater first passes through their WWTPs—or that other Defendants' direct discharges take place many miles upstream—does not negate their intent. As numerous cases show, where a defendant knows or should know an invasion will occur as a result of its conduct, then the requisite intent is established—regardless of intervening events.[10] *See Weatherford*, 2023 WL 11015357, at *5 (where supplier of PFAS products knew of PFAS hazards and the textile processes used by their customers that results in their discharge to surface waters, continuing sale without warning and concealing the dangers was sufficiently affirmative and intentional for trespass); *Comm'rs of Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (defendants' sale of mislabeled flushable wipes are "affirmative or willful acts, even if the actual flushing of the wipes into the Plaintiff's sewer system is done by third parties"); *Shockley*, 793 F. Supp. at 673–74 (jury could find trespass where defendant intentionally delivered hazardous chemicals to independent chemical reclamation facility, from which defendant knew or should have known the chemicals invaded Plaintiff's properties). This case is no different: the controlling allegations state that Defendants knew their PFAS products passed through their applicable WWTPs and invaded Plaintiff's properties. Complaint, ¶¶ 51–62, 92–93.[11]

---

[10] This aligns with fundamental principles of causation. "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*" by the actor. *Glenn v. 3M Co.*, 440 S.C. 34, 74, 890 S.E.2d 569, 590 (2023) (quoting *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016)).

[11] Defendants' appeal to Alabama trespass law also fails. Many cite *Utilities Bd. of Tuskegee v. 3M Co.*, 2023 WL 1870912, at *16 (M.D. Ala. 2023) for the proposition that trespass must occur by "natural process" instead of withdrawal from Bull Creek and the Intracoastal Waterway. Nothing in South Carolina law requires that trespass occur by "natural process"—a trespass occurs where a defendant affirmatively acts and knows or should know that an intrusion will occur. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *Weatherford*, 2023 WL 11015357, at *5; *Costco*, 2021 WL 5908758, at *8. Likewise, Alabama law allows consent to trespass even where obtained by fraud or mistake—precisely what 3M argued in *Tuskegee*. *See Tuskegee*, Def. 3M

Several Defendants frame Plaintiff's water withdrawal as an issue of consent or authorization instead of intent, arguing that withdrawing water from Bull Creek and the Intracoastal Waterway *authorizes* the invasion of their PFAS-contaminated wastewater. *See* Mohawk MIS, at 9 ("Plaintiff *voluntarily* draws water into its facility by activating its pumps."). Defendants cite no authority for this radical proposition. By that logic, any water provider consents to chemical contamination simply by performing its essential function—even when that contamination directly compromises its purpose.

Even if Plaintiff implicitly authorized some water to enter its properties, that does not extend to the wrongful introduction of PFAS-contaminated wastewater. *See* Complaint, ¶ 148. On the contrary, consent is no defense when an entry abuses or exceeds the scope of authorization. *See Costco*, 2021 WL 5908758, at *8 (flushing mislabeled wipes into the plaintiff's sewer system not authorized and invited because "consent to enter property is not a defense to trespass 'if a wrongful act is done in excess of and in abuse of authorized entry'" (*quoting Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (applying South Carolina law)). Defendants identify nothing in the pleadings suggesting that Plaintiff knew of and consented to entry of harmful PFAS that their treatment systems cannot remove. In fact, the only pleadings on this issue are Plaintiff's *express disavowals* of consent. *See* Complaint, ¶ 148.

Plaintiff alleges all that is required to state a claim for trespass. Defendants affirmatively and intentionally discharged PFAS-contaminated wastewater, knowing it would ultimately

---

Co.'s Mot. to Dismiss, 2022 WL 18357105 (Oct. 3, 2022); *see also Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1370 (N.D. Ala. 2008) ("The alleged contamination with hazardous substances, even if fraudulently concealed by Defendants, does not negate the Plaintiff's consent. Even consent procured by fraud will negate a trespass claim."). Not so in South Carolina. *See Costco*, 2021 WL 5908758, at *8.

15

invade Plaintiff's properties. The paths their contaminated wastewater followed were known, predictable, and foreseeable; and the performance of Plaintiff's routine operations in no way authorizes the entry of hazardous chemicals.

**C.      Plaintiff states actionable claims for public and private nuisance.**

   **1.      Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters.**

Both operators of separate landfills, RRD and SCD argue that they lacked the requisite "control" over the source of the nuisance. RRD MIS, at 9–10. They emphasize that "nuisance law is a mechanism for resolving 'conflicting interests of ***landowners***,'" RRD MIS, at 9, and since they send PFAS-contaminated leachate[12] to the Lumberton WWTP, they contend that they lack the requisite control. *Id.* Put plainly, Defendants disclaim control over their PFAS-contaminated leachate that they continually dispose of to maintain an ongoing PFAS contamination. The argument defeats itself: Defendants assert powerlessness over a problem they not only created but actively perpetuate.

RRD and SCD rest their argument on a flawed premise that they merely sent PFAS-contaminated leachate to the Lumberton WWTP, and the nuisance occurs only when the WWTP releases their PFAS. *Id.* at 9. This reduces to one misdirection: labelling the Lumberton WWTP's property as the source of the PFAS contamination instead of their own. *See* Complaint, ¶¶ 22, 54–62.  This deflection is an artificial attempt to sever control that, in reality, masks a misplaced causation argument.

_____

[12] Leachate is the polluted wastewater that forms when rain or other liquids seep through landfilled wastes, carrying chemicals and other pollutants with it.
.

Defendants principally rely on *Clark v. Greenville County*, but *Clark* exposes their sleight-of-hand. There, plaintiffs asserted nuisance claims against corporate defendants that sent hazardous chemicals to a landfill, which contaminated the Plaintiff's nearby properties. 313 S.C. at 209, 437 S.E.2d at 119. The *Clark* court explained:

> Generally, a private nuisance is "that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person *of his own property, personal or real.*" Nuisance law is based on the premise that "[e]very citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property."

*Id.* (quoting *Peden v. Furman Univ.*, 155 S.C. 1, 16, 151 S.E. 907, 912 (1930)).

Upholding the trial court's summary judgment in the defendants' favor, the court reasoned that the plaintiffs "neither alleged nor produced any evidence [that] the [defendants] had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id.* at 210, 437 S.E.2d at 119. Thus, the defendants "could not be liable for nuisance because they had no control over ***the property allegedly used as a nuisance***." *Id.* (emphasis added).

*Clark*'s reasoning certainly applies, but not in the way that Defendants' claim. The "property allegedly used as a nuisance" here does not belong to the WWTPs, which received Defendants' contaminated leachate, but to Defendants themselves.[13] Here, Defendants ***are the landfill***, and they control the PFAS-contaminated leachate that they send from their own properties to the Lumberton WWTP, aware that the PFAS passes through to Plaintiff's properties. Complaint, ¶¶ 22, 54. According to the operative pleadings, Defendants knowingly use their "own property, personal [and] real" in a way that "prevent[s Plaintiff] from enjoying the use of

---

[13] Defendants cannot unilaterally redefine the "property allegedly used as a nuisance" to be the Lumberton WWTP. *See Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 557, 713 S.E.2d 604, 607 (2011) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, the circuit court must base its ruling solely upon the allegations set forth on the face of the complaint.").

[its] property." *Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Holding them responsible is not only consistent with *Clark*—it is precisely what *Clark* demands.

Defendants repeatedly send their own PFAS-contaminated leachate from their own landfills, fully aware that it bypasses the WWTPs ***unchanged*** and flows directly into surface waters and Plaintiff's properties. *See* Complaint, ¶¶ 22, 50, 54–62. Yet Defendants fragment their control into isolated snapshots—where it exists only at the moment of their custody and vanishes the moment it enters the WWTP. This strains credulity. The Lumberton WWTP does not add to, modify, or affect Defendants' PFAS in any way, and it merely passes through what Defendants introduce. Complaint, ¶ 22. Defendants' position would allow industrial polluters to endlessly discharge toxins to surface waters yet have "no control" because the current carries them downstream. *See infra* at 23 n.17 (compiling nuisance cases of downstream contamination). *Clark* does not support—let alone require—this absurd result.

In the end, Defendants' argument is not about control. They do not even dispute that they own the Red Rock Disposal and Sampson County Landfills or that they control the PFAS-contaminated leachate they send to the Lumberton WWTP. Shifting blame to the WWTP does nothing to extinguish their control over what Plaintiff alleges are the sources of the nuisance—it merely proposes that the WWTP is a superseding cause. But where Defendants knowingly send PFAS-contaminated leachate into a system they knew did not remove PFAS—as the controlling allegations say—this too fails as a matter of law. *See Glenn*, 440 S.C. at 74, 890 S.E.2d at 590, *supra* at 14 n.10; *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989) ("In order to constitute an actionable nuisance, a wrongful act of the defendant must

be shown and the maintenance of the nuisance must be the natural and proximate cause of the injury suffered by the plaintiff." (citation omitted)).[14]

### 2. Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance.

Because the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway are "public water bodies," Defendants also assert that Plaintiff suffers no private property injuries that could support either a public or private nuisance. Domtar MIS, at 5; Elevate MIS, at 7–8; Fiber MIS, at 10; GFL MIS, at 11–12; Mohawk MIS, at 6–7; Nan Ya MIS, at 9–10; PRET MIS, at 8–9; RRD MIS, at 10–11. Defendants ignore Plaintiff's allegations to manufacture grounds for dismissal. The pleadings clearly establish that Defendants' contamination directly injures Plaintiff's private properties—precisely the injuries required for both private and public nuisance. *See, e.g., Overcash v. S.C. Elec. and Gas Co.*, 364 S.C. 569, 573, 614 S.E.2d 619, 620-21 (2005).

The "well-beaten path" of South Carolina nuisance law provides a clear and consistent framework. *Id.* Like trespass, private nuisance protects property interests—but while trespass protects exclusive possession, nuisance law remedies interferences with use and enjoyment. *Babb*, 405 S.C. at 139, 747 S.E.2d at 473.

---

[14] PRET asserts a similar control argument without citation to authority. *See* PRET MIS, at 10. The same reasoning forecloses dismissal for PRET: it owns and controls the PFAS products and its facility from which it discharges those products, knowing that they bypass the Johnsonville WWTP and continually contaminate Plaintiff's properties adjacent to Bull Creek and its supporting infrastructure. Complaint, ¶ 26, 62, 65–66. PRET also states that it could not have interfered with Plaintiff's use of its property adjacent to the Intracoastal Waterway and its Myrtle Beach SWTP because the Johnsonville WWTP does not discharge upstream of either. PRET MIS, at 10. Plaintiff's complaint explains why this is incorrect. Complaint, ¶¶ 68–69. The same PFAS that bypass the Johnsonville WWTP and Plaintiff's Bull Creek SWTP, and ultimately flow to customers' taps, also flow in the sewer water received by Plaintiff's Bucksport and Conway WWTPs. *Id.* These WWTPs cannot remove PRET's PFAS any more than the Johnsonville WWTP, and they pass through to the Waccamaw River upstream of the Myrtle Beach SWTP. *Id.*

Public nuisances are distinct from private nuisances, not in the nature of the wrongful act, but in the rights and number of people affected. *Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22.[15] Public nuisance protects *public* rights—such as public order, health, and morals. *Id.* As such, public nuisances are by default redressable only by public authorities. *See id.* at 573–74, 614 S.E.2d at 621; *Burrell v. Kirkland*, 242 S.C. 201, 204, 130 S.E.2d 470, 471 (1963); *Bowlin v. George*, 239 S.C. 429, 434, 123 S.E.2d 528, 530 (1962). But if a public nuisance also causes "special injury" to an individual, that person has standing to sue both for his private injury and to abate the entire public nuisance. *See id.*[16]

Courts have "encounter[ed] difficulty" in defining "special injury" in both private and public nuisance contexts, but a consistent principle emerges. *Bowlin*, 239 S.C. at 432, 123 S.E.2d at 530. A private nuisance is actionable if it interferes with a private property right—even if many others suffer similarly. *Id.* at 434, 123 S.E.2d at 530–31 ("[A]n injury to private property . . . is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however, numerous may be the cases of similar damage arising from the same cause." (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103–04 (1866)); *accord Brown v. Hendricks*, 211 S.C. 395, 401, 45 S.E.2d 603, 605–06. The key distinction is whether

---

[15] *See also Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469 ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *State v. Turner*, 198 S.C. 487, 18 S.E.2d 372, 376 (1942) (a public nuisance "affects the surrounding community generally or the people of some local neighborhood; it is sufficient if it operates upon such members of the public as are brought into contact with the conditions that constitute the alleged nuisance"); *Morison v. Rawlinson*, 193 S.C. 25, 32, 7 S.E.2d 635, 638 (1940) ("A nuisance to be a public nuisance must be in a particular place or where the public frequently congregate, or where members of the public are likely to come within the range of its influence . . . .").

[16] This has been called a "mixed nuisance" because, "while producing injury to the public at large, [it] does some special damage to some individual or class of individuals." 23 S.C. Jur. Public Nuisance, § 4 (Feb. 2025) (citing *Deason v. S. Ry. Co.*, 142 S.C. 328, 338, 140 S.E.2d 575, 579 (1927)).

the nuisance affects a *public* right (shared by all) or a *private* right (tied to property). *See Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31. Private property injuries are "special" because they involve specific, legal interests—not a general harm to the public. *Id.* at 435, 123 S.E.2d at 531 ("[Plaintiff] is not complaining of the violation of a right of a public nature or one held in common with the rest of the public. He alleges the invasion of a private right, namely, the interference with the reasonable enjoyment of his property and the depreciation in its value. We think it is quite clear that he is entitled to maintain this action.").

In the public nuisance context, courts ask whether the plaintiff's injury is "different in kind and not merely in degree from that suffered by the public at large." *Huggin v. Gaffney Dev.*, 229 S.C. 340, 344, 92 S.E.2d 883, 884–85 (1956). This aligns with private nuisance cases, highlighting the same "in kind" difference between public and private rights. *Id.* at 344–45, 92 S.E.2d at 884–85 (holding that a landowner adjacent to public road suffered an injury different in kind from the public because the obstruction of a public road deprived him of property access and economic value, whereas the public merely lost use of the road); *see also Jones v. Seaboard Air Line Ry. Co.*, 67 S.C. 181, 192, 45 S.E. 188, 192–93 (1903) (a landowner's rights to use riparian land undisturbed and to free access of the stream are different "in kind" from the public right to navigate the waterway). Indeed, the South Carolina Supreme Court recently reaffirmed that "special" injuries are those affecting real and personal property rights—not personal injury or public harms. *See Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22.

South Carolina law thus provides a firm foundation: a private property injury is inherently special because it implicates private property rights, not public ones. *See id.*; *Bowlin*, 239 S.C. at 432–34, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85. This means two things:

(1)    A private nuisance claim concerning private property injury is not barred merely because others suffer similar harm; and

(2)    A plaintiff with a private property injury suffers a harm "different in kind" from a violation of a public right.

These principles apply squarely to Plaintiff's nuisance claims. As an authorized water provider and property owner, Plaintiff uses its properties *specifically* to provide clean water to customers. Complaint, ¶¶ 68, 80. By saturating the Pee Dee River Watershed, Bull Creek, the Waccamaw River, Intracoastal Waterway, and even Plaintiff's plants and infrastructures with chemicals that EPA deems unsafe for consumption, Defendants have not just *interfered with* Plaintiff's property use—they have damaged Plaintiff's properties directly and *fundamentally compromised* their use and Plaintiff's essential business. Complaint, ¶¶ 63–66, 71–74, 82–88. The resulting injuries are both undeniable and expressly detailed in the pleadings, including:

- Plaintiff's inability to use its properties to provide its customers with drinking water free from Defendants' chemicals;

- the costs of investigating the cause of the contamination and upgrading Plaintiff's facilities so that it can remove Defendants' chemicals; and

- diminution in property value.

*Id.* These are not "general public" harms; they are discrete, property-based injuries recognized under South Carolina law. *See Babb*, 405 S.C. at 129–144, 747 S.E.2d at 472–76; *Bowlin*, 239 S.C. at 434–35, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

In the face of these well-pleaded injuries, Defendants miss the point by focusing on the subject surface waters being "public waters." While the surface waters at issue may be "public," the property injuries alleged are *private*. And a century of South Carolina caselaw confirms that contaminating public waters still results in private injury when it interferes with private property rights. *See, e.g., Johnson*, 317 S.C. at 422, 453 S.E.2d at 912–13 (Defendants' chemicals migrated not only through groundwater, but also down creek and injured property of several

22

plaintiffs adjacent to creek); *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96 (holding that a riparian landowner adjacent to a navigable waterway suffered an injury different in kind from the public's lost navigational use, where obstructions altered the river's natural flow, causing direct harm to the landowner's property and agricultural use).[17]

Nor can Defendants equate Plaintiff's private injuries with the "injury allegedly suffered by the public at large." *See, e.g.,* Elevate MIS, at 9 (arguing Plaintiff's inability to supply PFAS-free water is the same as the public injury). The "injury allegedly suffered by the public at large" is community-wide exposure to PFAS-contaminated drinking water—a *public health* issue. Complaint, ¶¶ 81–82. *See Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22; *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469. Plaintiff is not suffering this injury to greater "degree" than the public, e.g., by exposure to more PFAS than others, or by suffering PFAS-related illness. Needless to say, Plaintiff does not consume water at all. Instead, its lands, SWTPs, and infrastructures are directly subjected to chemical contamination, undermining their essential use and causing substantial devaluation—private property injuries "different in kind" to the public

---

[17] *See also Bailey v. Lyman Printing & Finishing Co.*, 245 S.C. 13, 17–24, 138 S.E.2d 410, 415 (1964) (even non-riparian landowners stated nuisance claim where gases from waste discharged to Middle Tyger River interfered with Plaintiff's use and enjoyment of their homes); *Conestee Mills v. City of Greenville*, 160 S.C. 10, 13–14, 158 S.E. 113, 114–15 (1931) (sewage contamination of the Reedy River flowed downstream, interfering with the plaintiff's use of its property adjacent to the river); *Duncan v. Union-Buffalo Mills Co.*, 110 S.C. 302, 306, 96 S.E. 522, 523–24 (1918) (sewage discharged to Buffalo Creek interfered with use and enjoyment of downstream land owners adjacent to Buffalo Creek); *Lowe v. Ottaray Mills*, 93 S.C. 420, 424–26, 77 S.E. 135, 136–37 (1913) (cotton mill discharged sewage to creek upstream of plaintiff's property, which rendered his land unfit for use as dairy farm); *Williams v. Haile Gold Mining Co.*, 85 S.C. 1, 5–7, 66 S.E. 117, 118 (1909) (chemically-contaminated mine tailings discharged to stream, interfering with downstream owner's ability to farm his land).

23

drinking water exposure. *See Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85; *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96.[18]

Defendants' own authorities underscore the flaw in their arguments. They lean on cases where municipal water **customers** asserted private nuisance claims based on the PFAS contamination of water they purchased from their utilities. *See, e.g.,* Mohawk MIS, at 7 (citing *Rhodes v. E.I. du Pont de Nemours and Co.*, 636 F.3d 88, 92–93, 96–97 (4th Cir. 2011); *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986)). Their holdings—that the interest in clean drinking water is only a public right—are both unremarkable and consistent with Plaintiff's own allegations. Plaintiff affirms that this as a public interest in its complaint— contrasting the public drinking water exposure from the direct contamination, devaluation, and interference with its own private properties and business operations. *Compare* Complaint, ¶¶ 81– 82, *with id.* at ¶ 83. Defendants can neither ignore the property injuries that Plaintiff expressly alleges nor conflate them with the public exposure to PFAS-contaminated drinking water.

Defendants have indeed created and continue to maintain a public health issue affecting over a hundred thousand people within Plaintiff's community. But Plaintiff alone bears the burden of commercially supplying clean water, while its private properties suffer direct PFAS

---

[18] Defendants identify nothing inside or outside the pleadings showing that **any** other persons (1) withdraw water from Bull Creek and the Intracoastal Waterway, much less for the purpose of selling drinking water; (2) suffer direct property contamination; or (3) have suffered any property injury as a result of the contamination. Even if such persons exist, Plaintiff's injuries would still be different in kind from the public exposed to Defendants' PFAS in drinking water. *See Jones*, 67 S.C. at 191–202, 45 S.E. at 192–93 (alleged right violated was "not the right of navigation, or any other right which [the plaintiffs] held in common with the public, but the right to the unimpaired use of their lands on the banks of the river" as riparians); *see also Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22; *Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

ELECTRONICALLY FILED 2025CP2603336 - 2025CP2603336 - NUMBER CY COMMON PLEAS SC

contamination and interference with their essential functions. These are private, intimately

unique, and "special" injuries that Defendants cannot ignore or circumvent.

**D.  Plaintiff states actionable claims for negligence.**

**1.  Defendants owed Plaintiff duties of care.**

Many Defendants uniformly cite the same or similar case law stating that a duty of care

may only be created "by statute, a contractual relationship, status, property interest, or some

other special circumstance" to argue that they owe Plaintiff no duty with respect to their

discharge of PFAS. PRET MIS, at 17; Elevate MIS, at 14; RRD MIS, at 14; Nan Ya MIS, at 16;

Mohawk MIS, at 11; Fiber MIS, at 12; GFL MIS, at 15; Domtar MIS, at 8. In doing so, however,

they conflate two fundamental tenets of South Carolina tort law: (1) while an *affirmative* duty to

act may only be created in certain circumstances, (2) once a party voluntarily undertakes an act,

it must exercise due care in doing so.

Defendants rely on the false presupposition that Defendants are innocent third parties

whom Plaintiff haled into court for their failure to remedy PFAS pollution caused (or not

remediated) by others. This is not so. Instead, by voluntarily engaging in their various industries,

Defendants were required under South Carolina law to do so with due care. That is the duty

underpinning Plaintiff's negligence claims, a duty long recognized in this State. *See Joyner v.

S.C. Ry. Co.*, 26 S.C. 49, 51–52, 1 S.E. 52, 53 (1887) ("[T]he law has determined as a general

rule . . . that the presence of due care negatives negligence, and that the absence of such care

constitutes negligence."). This Court should not allow Defendants to obfuscate their roles in the

pollution of South Carolina waters and attempt to escape liability through a distortion of South

Carolina tort law.

A fair and complete statement of the law Defendants invoke is:

> An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance. Moreover, it has long been the law that one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care.

*Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006) (citations omitted); *see also Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) ("At common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care."); *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100–01, 374 S.E.2d 910, 913 (Ct. App. 1988) ("Ordinarily, the common law imposes no duty on a person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm *not created by his own wrongful act*. In other words, a person has no duty to protect another from harm *inflicted by a third person*." (emphases added)).

Plaintiff does not allege that Defendants owed it a duty of care to control others, ensure a third party (such as a WWTP) removed PFAS from South Carolina waters, or warn Plaintiff about PFAS discharged by others. Instead, Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Importantly, Plaintiff does not invoke an affirmative duty disconnected from the conduct Defendants voluntarily performed at their industrial facilities— the law thus requires no contract, statute, special relationship between Plaintiff and Defendants, or other prerequisite to establish their duties. *See Edward's of Byrnes Downs v. Charleston Sheet*

*Metal Co.*, 253 S.C. 537, 542, 172 S.E.2d 120, 122 (1970) (recognizing there is a "common law duty to exercise due care to avoid injury or damage to others").[19]

Almost a century ago, the South Carolina Supreme Court approved the following jury instruction concerning the requirement to act with due care:

> Negligence is the failure to exercise due care. The law enjoins upon every individual, you and me and every individual each in our conduct with reference to anybody else, the duty of exercising due care under all of the circumstances attending our activities, and the failure to exercise that due care which the surrounding circumstances justly require is called negligence, and if one is injured by reason of that negligence, if that negligence itself, that failure to exercise due care under the circumstances is the direct cause of bringing about some injury or damage to the person of another, then that negligence we call actionable.

*Parker v. Simmons*, 163 S.C. 42, 54, 161 S.E. 169, 173 (1931). This duty remains to this day.

Additionally, Defendants owe Plaintiff a duty because, in discharging PFAS, they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[20]

---

[19] Many Defendants also argue they had no duty of care to Plaintiff because the PFAS they discharged passed through a WWTP before reaching Plaintiff's property and they therefore lacked "control" over it. This is a disingenuous argument that the Court should ignore. Although Defendants may have not had control over the PFAS after it left their facilities, or when it passed through the WWTPs, they certainly had control over the PFAS before discharging it into the environment, and that is the point in time out of which their duty to Plaintiff arises.

[20] The Restatement further supports the fact that Defendants misconstrue or misrepresent the duty they owe to Plaintiff, as is explained above. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 cmt. l ("*Relationship with affirmative duties to act*. The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another."); *id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional

South Carolina courts have consistently recognized that parties who release pollution into the environment owed a duty to those exposed to the pollutants and were thus subject to negligence liability. For example, in *Chestnut v. AVX Corp.*, the plaintiff property owners brought suit against the defendant, a manufacturer of electronic components the production of which involved a degreasing chemical called trichloroethylene ("TCE"). 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015). The plaintiffs alleged that "TCE escaped respondent's plant and migrated beyond the boundaries of respondent's property, contaminating surrounding properties and groundwater." *Id.* In evaluating the Plaintiff's negligence claim on appeal, the Supreme Court found "the complaint sufficiently [pled] a negligence cause of action." *Id.* at 228, 776 S.E.2d at 84. The court explained,

> In *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), we held a plaintiff could maintain an environmental negligence suit based upon offensive odors if the complaint alleged either "physical injury [to the plaintiff] or property damage." *Id.* at 153, 747 S.E.2d at 481. Here, appellants have pled all four elements of a negligence claim: *duty*, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is "worthless," "damaged," and "devalued" by the "harmful" and "dangerous" chemicals on the real property that adjoins their properties.

*Id.* (emphasis added). If defendants can be held liable under a negligence theory for their discharge of TCE or "offensive odors" into the environment, so too can the defendants in this litigation be held liable for their discharge of PFAS.

Similarly, in *Ravan v. Greenville County*, several landowners sued Greenville County in its capacity as the operator of a landfill, along with several corporate entities that disposed of waste at the landfill, for damage to their properties. 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993). Waste Management of South Carolina, Inc., as successor in interest to Spartan Waste

---

harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.").

Control, was included as a defendant due to Spartan's disposal of toxic chemicals at the landfill on behalf of industrial plants, which later contaminated a plaintiff's property. *Id.* at 466–67, 434 S.E.2d 296, 308. On appeal, Waste Management argued it did not owe a duty of care to the affected plaintiff, and if a duty existed, it was limited to the safe transport of the waste to the landfill. *Id.* at 467, 434 S.E.2d at 308. The court agreed "that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control," *id.* at 468, 434 S.E.2d at 309; however, because Waste Management, and not its customers, chose the location for disposal of the waste, its "role consisted of more than the mere hauling of waste to the landfill." *Id.* at 469, 434 S.E.2d at 309. "Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to" the affected landowner. *Id.*

   Here too, Defendants released PFAS into the environment, and it passed through a third party (in *Ravan*, a landfill, and here, the WWTPs) before reaching Plaintiff's property. As in *Ravan*, Defendants owe a duty of care to Plaintiff. *See also Conestee Mills v. Greenville*, 160 S.C. 10, 27, 158 S.E. 113, 119 (1931) (finding the City of Greenville, as the entity that built and constructed the city's sewer system, was liable to a downstream property owner for discharge of the sewage into the Reedy River, which then contaminated the plaintiff's property); *id.* at 26, 158 S.E. at 119 ("It is the duty of the commissioners of the sewer district to construct the sewer so that it will not become a nuisance to any neighborhood or to any particular inhabitant thereof; and it is the duty of the city, after the sewer has been turned over to it, to avoid the same result by properly maintaining and repairing the sewer after it is constructed." (quoting *Jones v. Sewer Improv. Dist.*, 177 S.W. 888, 889 (Ark. 1915))); *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024) (finding the Plaintiff's allegations that the defendant landfill,

which allowed "'pollution, noxious fumes, odors, dust, gases including methane gas, particulate matter, and trash' to escape from their property and invade Plaintiff's properties," and that the defendant owed the plaintiffs a duty of reasonable care, were "sufficient to state a claim for negligence" and defeat the defendant's motion to dismiss).

Finally, other courts that recently considered this question in the context of PFAS contamination consistently rule that defendants such as those in this litigation owe a duty of care to those injured by the PFAS. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1324 (N.D. Ga. 2021) (finding the defendants "have a duty to exercise reasonable care in their use and disposal of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various . . . facilities to avoid pollution of the State's waterways and injury to members of the downstream public who consume the water as part of their public drinking water supply"); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 164 (D. Mass. 2023) (agreeing with the magistrate judge's ruling that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (ruling a discharger of PFAS "has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users"); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (finding "Defendants had a duty of care with regard to the proper handling of PFAS"); *see also Peeler v. SRG Glob. Coatings, LLC*, C.A. No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *6-7 (E.D. Mo. Oct. 30, 2024); *Brown v. Corteva, Inc.*, C.A. No. 7:23-CV-1409-D, 2024 WL 4229937, at *4 (E.D.N.C. Sep. 18, 2024); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021);

*Utils. Bd. of Tuskegee v. 3M Co.*, C.A. No. 2:22-CV-420-WKW, 2023 WL 1870912, at \*9-11 (M.D. Ala. Feb. 9, 2023).

    **2.**    **Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries.**

    PRET and Nan Ya argue that they could not have proximately caused Plaintiff's injuries as a matter of law. PRET MIS, at 18–19; Nan Ya MIS, at 4. This fails under straightforward principles.

    "Proximate cause requires proof of both causation in fact and legal cause." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

    At this stage, Plaintiff must only plead—not *prove*—causation. *See Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) ("Ordinarily, the question of proximate cause is one of fact for the jury . . . ." (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998))). It has done so.

    As for causation in fact, Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants each discharged PFAS into a body of water upstream of Plaintiff's properties, PFAS does not naturally degrade in the environment, and the PFAS Defendants discharged flowed downstream onto Plaintiff's properties, thereby harming it. Complaint, ¶¶ 18–28. Although Plaintiff's properties have been contaminated by multiple

sources of PFAS, these allegations, along with the inferences reasonably deducible therefrom, are enough to sufficiently plead that Defendants are "but for" causes of their injuries.

"As to legal cause, 'foreseeability is considered "the touchstone . . . ," and it is determined by looking to the natural and probable consequences of the defendant's act or omission.' In most cases, foreseeability ends up being addressed as question of fact for the jury." *Wickersham v. Ford Motor Co.*, 432 S.C. 384, 390, 853 S.E.2d 329, 332 (2020) (quoting *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006)). A plaintiff is not required to prove "the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her [wrongful conduct] would probably cause injury to someone." *Hurd*, 353 S.C. at 613, 579 S.E.2d at 145 (citing *Greenville Mem'l Auditorium v. Martin*, 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990)).

Here, Plaintiff's injuries were the "natural and probable consequences" of Defendants' wrongful conduct and were, therefore, foreseeable. Again, Plaintiff alleges that PFAS do not naturally degrade in the environment and Defendants knew that PFAS are hazardous to human health, Complaint, ¶¶ 27–28, 66; thus, it was entirely foreseeable to Defendants that the PFAS, once discharged from their facilities, would persist in South Carolina waters and invade the properties of downstream landowners. Moreover, the fact that Defendants' wastewater in some cases flowed through a WWTP before reaching Plaintiff's properties does not change this analysis, as Plaintiff also alleges that Defendants knew or should have known that the WWTPs were unable to remove Defendants' PFAS from the water they treated and discharged. Complaint, ¶ 62. *See Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 ("The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen

32

in the exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury.")

3.    **Plaintiff alleges actionable damages.**

Several Defendants argue Plaintiff's negligence claim should be dismissed because it has not alleged physical injury or damage to their property. Fiber MIS, at 13; GFL MIS, at 16–17; Mohawk MIS, at 12–13; Nan Ya MIS, at 17–18; PRET MIS, at 20; RRD MIS, at 15–16. For reasons already discussed, *see supra* §§ B & C, this is baseless. The pleadings are replete with allegations that Defendants have contaminated and injured Plaintiff's *properties. See, e.g.,* Complaint, ¶¶ 1–7, 18–26, 55, 61, 63–65, 110. *See Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015) ("Here, appellants have pled all four elements of a negligence claim: duty, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is 'worthless,' 'damaged,' and 'devalued' by the 'harmful' and 'dangerous' chemicals on the real property that adjoins their properties.").

Defendants label Plaintiff's damages allegations as "unexplained and conclusory," lacking "facts showing that anything other than water from a public waterway has or could have been damaged by PFAS." Nan Ya MIS, at 17; *see also* GFL MIS, at 16; Mohawk MIS, at 12; PRET MIS, at 20; RRD MIS, at 15. This simply ignores the pleadings: Defendants have put toxic and environmentally persistent chemicals that are unsafe to consume in drinking water into the lands, SWTPs, and infrastructure *of a water provider*. To the extent Plaintiff's allegations on the damage to its properties are concise, this merely reflects that its property injuries are obvious.

4.    **Plaintiff has not assumed the risk of PFAS contamination.**

T&S argues that by voluntarily assuming the role of a drinking water provider, which necessarily requires the intake of South Carolina's waters, Plaintiff has assumed the risk of PFAS exposure and contamination. T&S MIS, 19–20. This is incorrect.

33

In South Carolina, assumption of risk can be either express or implied. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 79, 508 S.E.2d 565, 569 (1998). "Implied assumption of risk is further divided into the categories of 'primary' and 'secondary' implied assumption of risk." *Id.* Here, T&S argues that Plaintiff's drinking water operations "constitute[] a primary implied assumption of the risk for any alleged injury [they] now complain[] of." T&S MIS, at 19.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. "Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Id.* ("In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists." (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994))).

But as demonstrated above, T&S and other Defendants owed Plaintiff a duty "to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Plaintiff incorporates its arguments concerning the existence of Defendants' duty of care, which are dispositive here.

Regardless, PFAS contamination is not a risk inherent in the provision of potable water to Plaintiff's customers. *See Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. As Plaintiff alleges, PFAS are "man-made chemicals that do not occur naturally in the environment." Complaint, ¶ 27. As a result, if it were not for Defendants' tortious conduct in discharging PFAS to the

environment, there would be no PFAS in Plaintiff's water supply. Neither T&S nor other Defendants should be allowed to create a hazard that did not previously exist, then attempt to escape liability by shielding itself behind the very same risk it created. T&S also argues Plaintiff "freely and voluntarily" exposed itself to PFAS, T&S MIS, 19–20, but this also misses the mark. Plaintiff is required to provide potable water to their customers, and it must intake and process water from Bull Creek and the Intracoastal Waterway, regardless of the contaminants in the water. It strains credulity to suggest that Plaintiff has freely and voluntarily exposed itself to Defendants' PFAS.

E.     **The "free public services doctrine" does not apply here, if it exists in South Carolina at all.**

Multiple Defendants argue that the free public services doctrine (also known as the municipal cost recovery rule) bars Plaintiff from recovering the costs it incurs from removing Defendants' PFAS from the drinking water they supply to their customers. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23. The free public services doctrine is underdeveloped, if existing at all, in South Carolina jurisprudence.[21] Nevertheless, in certain jurisdictions it generally provides "that absent specific statutory authorization or damage to government-owned property, a county [or other governmental entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) (emphasis removed) (quoting *Walker Cnty. v. Tri-State Crematory*, 642 S.E.2d 324, 327 (Ga. App. 2007)). Defendants' only

---

[21] Defendants cite no South Carolina cases in support of their arguments, and Plaintiff's Westlaw searches for "free public services doctrine" and "municipal cost recovery rule" returned no South Carolina cases addressing the doctrine. As a result, dismissal should not be granted on this basis. *See Madison v. Am. Home Prod. Corp.*, 358 S.C. 449, 451, 595 S.E.2d 493, 494 (2004) ("As a general rule, important questions of novel impression should not be decided on a motion to dismiss.").

real basis for applying the doctrine here is the fact that Plaintiff is a governmental entity. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23.

The free public services doctrine rests on the premise that legislative authorities have the power to allocate the costs of providing "free" public services as they see fit, such as "spread[ing] [costs] by taxes," or by authorizing recovery "by statute or regulation." *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323, 324 (9th Cir. 1983). By that rationale, courts should not intrude upon these legislative determinations about cost allocation by permitting tort recovery. *Id.* at 324 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314–17 (1947)) ("If the government has chosen the bear the costs for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.").

Even if ultimately recognized in this jurisdiction, the free public services doctrine does not apply here for the simple reason that Plaintiff's provision of drinking water "to paying customers is neither free nor public as contemplated by the doctrine." *See Johnson*, 563 F. Supp. 3d at 1311. Rather, Plaintiff only provides drinking water to those customers who pay for the service. *See generally* Complaint (repeatedly stating that Plaintiff supplies drinking water to *customers*).

As *Flagstaff* clarifies, "it is the identity of the claimant and the nature of the cost that combine" under the doctrine "to deny recovery." 719 F.2d at 324. By focusing only on either Plaintiff's "identity" as a governmental entity to invoke the free public services doctrine, Defendants erroneously bypass "the nature of the cost" for which the doctrine precludes

recovery.[22] Here, the costs of the enhanced water treatment for which Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson*, 563 F. Supp. 3d at 1311; *see also* S.C. Code Ann. § 5-31-1150 (it is a misdemeanor for a person to use municipal water without a contract for water service). Unlike the costs of fire or police services, which are allocated across the public via taxes, the Legislature has authorized special purpose districts like Plaintiff to charge water and sewer users for these services. S.C. Code Ann. § 5-31-670. Indeed, it is telling that ***none*** of Defendants' authorities involve the free public services doctrine barring recovery by a water, sewer, or other public utility—or any service funded by billing customers.

In addition, the free public service doctrine recognizes exceptions for "where the acts of a private party create a public nuisance which the government seeks to abate" and "where the government incurs expenses to protect its own property." *Flagstaff*, 719 F.2d at 324; *see also Johnson*, 563 F. Supp. 3d at 1311 (indicating doctrine does not apply where recovery is sought for "damage to government-owned property"). Plaintiff plainly alleges both a public nuisance and damage to its properties. *See, e.g.*, Complaint, ¶¶ 1–3, 5–7, 16, 63, 65–66, 79-90.

Furthermore, in a case involving a challenge to the water rate set by the City of Conway—one of Plaintiff's wholesale customers—the Supreme Court recognized that a public water provider "has a proprietary interest" in the water it sells to its customers, "as evidenced by [its] unilateral ability to sell or lease it." *Sloan v. City of Conway*, 347 S.C. 324, 329, 555 S.E.2d 684, 686 (2001). It is such water (along with Plaintiff's other properties), in which Plaintiff has a

---

[22] T&S at least acknowledges that "the nature of the cost" is part of the analysis. Ultimately, however, T&S fails to properly apply this factor to "the services provided by Plaintiff[s]" by simply assuming that because they are generic "municipal services," the funding for Plaintiff's provision of drinking water has already been set in stone by the Legislature. T&S MIS, at 12. In so doing, T&S collapses "the nature of the cost" into Plaintiff's identities as governmental entities—really focusing only on this governmental status just as the other Defendants do.

proprietary interest, that has been damaged by Defendants' tortious conduct. By stating the free public services doctrine applies to "public expenditures made in the performance of *governmental functions*" (emphasis added)—not proprietary functions, Defendants necessarily concede that the doctrine cannot apply here. Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22.

**F.    The Safe Drinking Water Act does not preempt Plaintiff's claims.**

Elevate and Nan Ya present vague, unsupported, and conclusory arguments that Plaintiff's claims "*may . . .* intrude on regulatory territory reserved for federal oversight" and "should be decided under federal law"—namely, the Safe Drinking Water Act ("SDWA"). Elevate MIS, at 5–6; Nan Ya MIS, at 7–8. They cite a single case merely listing the three types of federal preemption (express, field, and conflict) but do not state which type supposedly applies to Plaintiff's state common law claims, and they cite no other authority suggesting that Plaintiff's claims are preempted. Defendants' failure to identify—much less articulate—a preemption theory underscores that this argument lacks both substance and merit. *See Normandy Corp. v. S.C. Dep't of Educ.*, 386 S.C. 393, 409, 688 S.E.2d 136, 144 (Ct. App. 2009) ("Courts should not lightly infer preemption."); *see also Eggleston v. UPS*, 428 S.C. 373, 381, 834 S.E.2d 713, 717 (Ct. App. 2019) ("[W]hen a plaintiff invokes traditional elements of tort law and the issue of preemption arises, 'the courts almost uniformly have resolved against federal preemption.'" (quoting *Jimenez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344, 348 (D.P.R. 2011)); *Jamison v. Ford Motor Co.*, 373 S.C. 248, 265, 644 S.E.2d 755, 763-64 (Ct. App. 2007) ("[C]ommon law tort actions are historically within the scope of the States' police powers and are safe from preemption by a federal statute unless Congress reveals a clear and manifest purpose to preempt.").

By contrast, it is *unambiguous* that the SDWA imposes no preemption here.

First, Defendants identify no SDWA provision that imposes express preemption—because there is none. *See generally* 42 U.S.C. §§ 300f to 300j-27. In fact, the SDWA contains several "savings clauses" that communicate exactly the opposite: that Congress intended to establish "a joint federal-state system" "to assure that water supply systems serving the public meet minimum national standards for protection of public health." *Manufactured Hous. Inst. v. United States EPA*, 467 F.3d 391, 401 (4th Cir. 2006). *See* 42 U.S.C.S. § 300g-2 (providing that "a State has primary enforcement responsibility for public water systems" if it meets certain requirements); 42 U.S.C.S. § 300g-3(e) ("Nothing in this title shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting drinking water regulations or public water systems, but no such law or regulation shall relieve any person of any requirement otherwise applicable under this title."); 42 U.S.C.S. § 300j-8(e) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute ***or common law*** to seek enforcement of any requirement prescribed by or under this title ***or to seek any other relief***." (emphases added)).

By allowing states to assume "primary enforcement responsibility for public water systems," § 300g-2, and "adopt or enforce any law or regulation respecting drinking water regulations or public water systems," § 300g-3(e), Congress also clearly did not attempt to "occup[y] the field" of water pollution regulation such that it "left no room for the states to supplement it" when it enacted the SDWA. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (observing that "[a]lthough Congress intended to dominate the field of pollution regulation" in enacting the Clean Water Act, the Act's "saving clause negates the inference that Congress 'left no room' for state causes of action"); *Perry v. Fleetwood Enters.*, C.A. No. 2:06-

39

cv-502-MEF (WO), 2007 WL 2893410, at *5 (M.D. Ala. Sep. 28, 2007) ("The presence of a saving clause suggests that Congress did not intend to occupy the field.").

Nor do Plaintiff's claims conflict with the SDWA, as to implicate conflict preemption. "Implied conflict preemption occurs in one of two ways—either where compliance with both federal and state regulations is physically impossible or where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Priester v. Cromer*, 401 S.C. 38, 44, 736 S.E.2d 249, 252 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, Plaintiff's claims do not preclude Defendants from complying with the SDWA, nor do the claims otherwise hinder the SDWA in any way. In fact, the goals of the SDWA are advanced through this litigation.

Defendants' arguments have not succeeded elsewhere. *See, e.g., State v. Monarch Chems., Inc.*, 443 N.Y.S.2d 967, 969 (N.Y. Sup. Ct. 1981) (considering whether the SDWA, along with other federal statutes, preempted state law, and finding "this argument lacks merit"); *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1273 (N.D. Ala. 2020) (ruling the plaintiffs' "state law causes of action . . . are not preempted by the SDWA"); *accord Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 697–98 (2003) (holding that the SDWA did not completely preempt plaintiff's claims). Nor should they here.

## G.    Defendants' causation arguments should be rejected.

### 1.    Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct.

Defendants Elevate and Nan Ya both make the identical conclusory assertion that Plaintiff lacks standing because it "has failed to allege facts which show a causal connection between Plaintiff's alleged injury and Defendant's conduct." Elevate MIS, at 7; Nan Ya MIS, at 8. Neither Defendant provides any explanation or support for this assertion. As a result, the Court should

not consider it. *Cf. First Sav. Bank v. McClean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (S.C. 1994) (movant "deemed to have abandoned" issue on appeal where he "fails to provide arguments or supporting authority for his assertion").

Moreover, Plaintiff has pled more than enough facts to demonstrate that Elevate and Nan Ya's respective use and discharges of PFAS have caused injury to Plaintiff by contaminating its water sources and properties:

- Elevate and Nan Ya discharge wastewater contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals ("MCL PFAS") and/or their precursors directly to surface waters and indirectly to the Lake City WWTP, respectively, as a result of these Defendants' usage of products containing or degrading to these PFAS in their industrial processes. *See* Complaint, ¶¶ 20, 25; *see also id.* at ¶¶ 51–53.

- The treatment processes employed by Elevate's "Richmond Plant do[] not remove [its] PFAS," and those PFAS are discharged "into the Great Pee Dee River upstream of Plaintiff's Bull Creek intake." *Id.* at ¶ 20; *see also id.* at ¶ 52.

- Similarly, the treatment processes used by the Lake City WWTP, which receives Nan Ya's wastewater discharge, "cannot remove Nan Ya's PFAS, and the WWTP discharges water contaminated with Nan Ya's PFAS into Lake Swamp upstream of Bull Creek." *Id.* at ¶ 25; *see also id.* at ¶ 53.

- The Great Pee Dee River, which receives Elevate's PFAS-laden wastewater, flows downstream before branching off to Bull Creek, upon which Plaintiff's Bull Creek water intake is sited. *See id.* at ¶¶ 20, 48. Meanwhile, Lake Swamp, which receives Nan Ya's PFAS-laden wastewater, subsequently joins the Lynches River, then the Great Pee Dee River, and finally Bull Creek. *See id.* at ¶¶ 25, 48.

- "PFAS sampling of Bull Creek, the Great Pee Dee River, [and] Lynches River . . . confirms the presence of [MCL PFAS] throughout these bodies of water. These PFAS flow downstream and contaminate Plaintiff's water intake on Bull Creek at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* at ¶ 50.

- Plaintiff's "Bull Creek SWTP utilizes conventional water treatment technologies" that are not capable of removing PFAS. *Id.* at ¶ 56.

- Finished drinking water treated by Plaintiff's Bull Creek SWTP (and contaminated with Defendants' PFAS) is distributed to customers that are served by Plaintiff's Bucksport Regional WWTP and Conway WWTP for their sewer services. Neither of these WWTPs serves industrial users. *Id.* at ¶¶ 57–59.

- Plaintiff's Bucksport Regional and Conway WWTPs "utilize conventional wastewater treatment methods," which also cannot remove PFAS. These WWTPs "both discharge to the Waccamaw River upstream of the Intracoastal Waterway," which is the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶¶ 60–61.

- Like the Bull Creek SWTP, Plaintiff's Myrtle Beach SWTP uses conventional water treatment methods that do not remove PFAS. Hence, Defendants' PFAS that pass through the Bull Creek SWTP, Plaintiff's water distribution system, and into the Waccamaw River via Bucksport Regional and Conway WWTPs, then flow downstream into the Intracoastal Waterway, where they contaminate the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶ 61.

- In order to provide drinking water that is free from Elevate, Nan Ya, and other Defendants' PFAS and which complies with EPA's MCLs, Plaintiff must therefore implement new treatment technologies that are capable of removing PFAS. *Id.* at ¶¶ 6, 63.

*See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161–62 (4th Cir. 2000) (indicating Article III's fairly traceable standard is more lenient than tort causation, and holding that allegations that defendant discharged chemicals in excess or its permit limits that were also present in a downstream water body satisfied this standard); *see also, e.g.*, Order on MTDs, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111 (S.C. Ct. Comm. Pl. July 23, 2024) (attached as **Ex. 5**), at 4 (holding State's allegations that PFAS manufacturers produced PFAS and PFAS-containing products, "caused widespread contamination of the State's natural resources and property," and contaminated "identifie[d] areas in the State" "adequately pled causation"); *Weatherford v. E.I. du Pont de Nemours & Co.*, No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *4–5 (D.S.C. Sept. 27, 2023) (holding that allegations of PFAS' persistence and tendency to leach from wastewater and biosolids, of defendants' knowledge about PFAS and their customer's manufacturing processes, and of defendants failure to provide proper disposal instructions to their customer sufficiently alleged proximate causation); *Braswell v. Colonial Pipeline Co.*, 395 F. Supp. 3d 641 (M.D.N.C. 2019) (holding allegations that plaintiffs "suffered 'a loss of use and enjoyment and property value as a direct and proximate cause result of

[Colonial's] conduct, actions and inactions,'" and that the properties were "directly affected by the ongoing releases" and "inside 'the contamination plume,'" sufficiently alleged causation (quoting complaint)).

> **2.    PRET's causation arguments are also unavailing.**

PRET broadly advances two causation arguments. First is that "PRET does not discharge PFAS into the Lynches River—or any other body of water," but rather "conveys its wastewater to Johnsonville WWTP," which then discharges the effluent into the Lynches River, upstream from Plaintiff. PRET MIS, at 19; *see also id.* at 10, 12. This is a mislabeled, and misplaced, contention that the Johnsonville WWTP is a superseding cause. Second, PRET contends that "Plaintiff's claims against PRET in relation to Plaintiff's Myrtle Beach SWTP, must be dismissed because neither PRET nor the Johnsonville WWTP are upstream from the Myrtle Beach SWTP." *Id.* at 19; *see also id.* at 5, 10, 16. Both arguments lack merit.

> **a.    The Johnsonville WWTP's receipt and discharge of PRET's contaminated wastewater is not a superseding cause.**

"The touchstone of proximate cause in South Carolina is foreseeability," meaning that "the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842–43 (Ct. App. 1997). "For an intervening force to be a superseding cause that relieves an actor from liability, the intervening cause must be a cause that could not have been reasonably foreseen or anticipated." *Id.* at 467, 494 S.E.2d at 844.

The Johnsonville WWTP's actions here do not constitute a superseding cause. Plaintiff alleges that PRET "discharges industrial wastewater" that is contaminated "with products that contain or degrade to [MCL] PFAS to the Johnsonville WWTP," Complaint, ¶ 26, which "lack[s] filtration technologies to remove [PRET's] PFAS," *id.* at ¶ 53. As the complaint underscores,

PFAS are "persisten[t] in the environment," *id.* at ¶ 27, "cannot be adequately removed by conventional wastewater treatment processes," *id.* at ¶ 5, and "are highly mobile and water soluble," *id.* at ¶ 32. PRET is alleged to have possessed actual or constructive knowledge "that conventional water treatment technologies used by . . . WWTPs cannot remove PFAS from wastewater," and further "that [its] treated wastewater contaminates surface waters and the water Plaintiff draws for its customers," *id.* at ¶ 62; *see also id.* at ¶ 93. Thus, the operative pleading plainly demonstrates that the Johnsonville WWTP was a foreseeable passive conduit for PRET's PFAS to enter the river system and contaminate Plaintiff's downstream water sources and facilities. *See, e.g.*, *Weatherford*, 2023 WL 11015357, at *4–5 (holding textile mill that used and discharged PFAS-containing products purchased from defendants did not constitute superseding cause); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1332–33 (N.D. Ga. 2022) (same).

PRET, however, obfuscates the issue by arguing it does not "control how Johnsonville WWTP treats and filters its water," and that "PRET cannot be the 'but for' cause of PFAS entering" downstream water supplies "[b]ecause Johnsonville WWTP—not PRET—is responsible for filtering, treating, and discharging the water in accordance with SCDES, and other state and federal regulations." PRET MIS, at 19; *see id.* at 10, 12.

As to the first contention: foreseeability, not control, is the test for a superseding cause. Plaintiff has, moreover, already addressed Defendants' control-based arguments against their nuisance liability. *See supra* § III.C.1. In brief, PRET, like other Defendants that discharge to a WWTP, satisfies the control element for nuisance by controlling whether it sends toxic chemicals to the Johnsonville WWTP, via its sewer connection, which PRET knows or should know are resistant to conventional treatment methods.

As to the second contention: while but-for causation is indeed a prerequisite to proximate causation, the complaint leaves no doubt that PRET's discharges are a but-for cause of a portion of the PFAS impacting Plaintiff. *See Small*, 329 S.C. at 463, 494 S.E.2d at 842 ("Proximate cause requires proof of both causation in fact and legal cause."). Plaintiff alleges that PFAS are "man-made chemicals that do not occur naturally in the environment," Complaint, ¶ 27; that PRET uses PFAS "in the manufacture of plastics and resins,"[23] *id.* at ¶ 26; and that, "[a]s part of its processes," PRET discharges PFAS-contaminated wastewater to the Johnsonville WWTP, *id.* Notably absent from the pleading is any allegation that the Johnsonville WWTP adds any PFAS to the effluent stream that is discharged to the Lynches River. Rather, as stated earlier, the complaint demonstrates that the Johnsonville WWTP is merely a (foreseeable) passive conduit for the PFAS discharged by PRET.

### b. PRET's extrinsic evidence concerns a disputed and, in any event, non-dispositive matter.

Plaintiff ably pleads that PFAS discharged by PRET as well as other Defendants on the Pee Dee Watershed upstream from Bull Creek contaminates not only Plaintiff's Bull Creek SWTP but also its Myrtle Beach SWTP, which draws water from the Intracoastal Waterway. *See supra* § III.G.1. However, PRET contends that it is not liable for any damages to the Myrtle Beach SWTP because this facility is not downstream from PRET's Johnsonville facility or the

---

[23] PRET asserts that its Johnsonville facility "recycles carpet." PRET MIS, at 6. The Court need not consider this statement for the purposes of deciding PRET's Motion to Dismiss. *See Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1353–54 (N.D. Ga. 2021) (declining to consider defendant's argument that claims against it should be dismissed on the basis that the complaint mistakenly described its manufacturing activities). Nevertheless, Plaintiff notes that carpet recycling and "the manufacture of plastics and resins" are not necessarily mutually exclusive, and further that PFAS are known to have been extensively used in the manufacture of carpet and thus are present in post-consumer carpet. *See id.* at 1272 ("Due to their chemical stability and oil and water repellent properties, PFAS have been widely used in carpet and textile production to provide water and stain resistance."); *id.* at 1355–56 (denying motion to dismiss by carpet recycling facility).

Johnsonville WWTP. *See* PRET MIS, at 5, 10, 16, 19. In support, PRET submits extrinsic

evidence that purports to show "Plaintiff's Myrtle Beach SWTP on the Intracoastal Waterway . . .

***is not downstream*** from the Johnsonville WWTP." *Id.* at 5 (emphasis in original); *see id.* at Exs.

B, C, D, E.

 PRET's attempt to bypass the pleadings is as misplaced as it is premature. *See Skydive*

*Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 180, 826 S.E.2d 585, 587 (2019) ("Rule

12(b)(6) . . . address[es] the sufficiency of a pleading stating a claim; it is not a vehicle for

addressing the underlying merits of the claim."). Plaintiff's complaint expressly alleges that

PFAS-contaminated water received by the Bull Creek SWTP also reaches the Myrtle Beach

SWTP, in addition to explaining how. Complaint, ¶ 55–58. To wit, residential and industrial users

of Bull Creek potable water send it via sewers to Plaintiff's WWTPs on the Waccamaw River,

upstream of the Myrtle Beach SWTP. Since all plants involved utilize conventional treatment

systems that do not remove Defendants' PFAS products, some of the PFAS that enter the Bull

Creek SWTP also pass to the Myrtle Beach SWTP. *Id.* PRET's assertion that the Johnsonville

WWTP is not upstream of the Myrtle Beach SWTP misses the point.

 PRET's reliance on extrinsic evidence to dispute a complex hydrological and

environmental fate issue—one that will be subject to expert discovery—only underscores why

dismissal at this stage is improper. Moreover, PRET ignores additional environmental fate

allegations that its evidence does not even address. Because Plaintiff's Complaint adequately

pleads plausible causal pathways, and PRET's arguments rest on premature, contested, and

irrelevant factual determinations, its motion should be denied.

## H. This Court has personal jurisdiction over RRD and SCD.

 Defendants RRD and SCD contend that Plaintiff's claims against them should be decided

under South Carolina law—not North Carolina law, as Plaintiff contends—and that the Court

lacks personal jurisdiction over these claims. For the reasons that follow, RRD and SCD are wrong on both counts.

1.    **Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions.**

After discussions with counsel for GFL and Waste Industries, Plaintiff agreed to voluntarily dismiss its claims against them without prejudice. Plaintiff filed a notice of voluntary dismissal of these defendants on February 28, 2025 *See* **Ex. 6**. Accordingly, the Court need not consider these motions, as they became moot upon filing of the voluntary dismissal.

2.    **North Carolina law governs Plaintiff's claims against RRD and SCD.**

RRD and SCD argue that "under South Carolina choice-of-law rules," specifically *lex loci delicti*, "South Carolina law applies to Grand Stand's claims" against them. *See* RRD MIS, at 4. Defendants are incorrect for a straightforward reason: under the present circumstances, South Carolina law is preempted, and federal law compels the application of North Carolina law.

The U.S. Supreme Court's decision in *International Paper Co. v. Ouelette*, 479 U.S. 481 (1987) requires this result. There, Vermont property owners sued a polluter under Vermont law for discharges originating in New York. *Id.* at 483–84. But the Court held that under the federal Clean Water Act ("CWA"), an affected state's law is preempted and "inapplicable to" pollution originating from an out-of-state point source. *Id.* at 497.

This ruling applies with full force here. Because Defendants send their PFAS-containing leachate to a point source that discharges to surface waters in North Carolina, *see* Complaint, ¶¶ 22, 54, South Carolina law cannot govern the claims against it. *Ouelette*, 479 U.S. at 497.

*Ouelette* also confirms that the CWA's preemptive force extends beyond substantive law. Choice-of-law rules that require applying an affected state's law to an out-of-state point source

are likewise preempted. *Id.* at 499 n.20. Thus, both South Carolina's substantive law and its choice-of-law rules are preempted. *Id.*

But *Ouelette* makes clear that CWA preemption "does not leave [Plaintiff] without a remedy." *Id.* at 497. Instead, courts can and should apply the law of the source state—here, North Carolina. *Id.* Doing so "would not frustrate the goals of the CWA as would a suit governed by [South Carolina] law" and is exactly what *Ouelette* endorses. *See id.* at 498–99 (finding "no basis for holding that Vermont is an improper forum" for applying New York law); *id.* at 500 ("Nothing in the Act prevents a court sitting in an affected State from hearing a common-law nuisance suit, provided that jurisdiction otherwise is proper."). On remand, the federal district court followed the Supreme Court's directive and applied the substantive law of the source state. *See Ouelette v. Int'l Paper Co.*, 666 F. Supp. 58, 62 (D. Vt. 1987). *Ouelette* calls for the same result here.

### 3. This Court has personal jurisdiction over RRD and SCD.

RRD and SCD dispute personal jurisdiction on the grounds that they lack sufficient minimum contacts to demonstrate that they have purposefully availed themselves of the privilege of conducting activities within South Carolina. *See* RRD MIS, at 4–7. Both state that they are "not residents of South Carolina." RRD MIS, at 4. Defendants further state that their "sole business is operating [their respective] solid waste landfill[s] in North Carolina," which "do not accept waste from South Carolina," and that "[n]either Defendant does business, is registered to do business, . . . solicits business in South Carolina," or "own[s] any property or ha[s] any employees in South Carolina." RRD MIS, at 4–5.

As will be explained in greater detail below, because the landfills directly operated by RRD and SCD purposefully and knowingly send their PFAS-contaminated wastewater to a WWTP that discharges to a river that flows into South Carolina, this Court can exercise personal

48

jurisdiction over these Defendants. Lacking physical presence or other business operations in South Carolina are simply irrelevant to this jurisdictional determination.

A court's exercise of personal jurisdiction over an out-of-state defendant must conform with both South Carolina's Long-Arm Statute, section 36-2-803 of the South Carolina Code, and the U.S. Constitution's Due Process Clause. *S. Plastics Co. v. S. Com. Bank*, 310 S.C. 256, 259, 423 S.E. 128, 130 (1992). Because the Long-Arm Statute has been interpreted to be coextensive with the limits of due process, however, analysis under the Long-Arm Statute is folded into "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005).

Due process requires "that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there." *Id.* at 491–92, 611 S.E.2d at 508. This determination is a "two-prong analysis." *Moosally v. W.W. Norton Co., Inc.*, 358 S.C. 320, 331, 594 S.E.2d 878, 884 (Ct. App. 2004). Under the first "power," or "purposeful availment," prong, the court must "find that the defendant directed its activities to residents of South Carolina and that the cause of action arises out of or relates to those activities." *Id.* at 331–32, 594 S.E. at 884. Under the second "fairness" prong, the court weighs factors including "the burden on the defendant, the extent of the plaintiff's interest, South Carolina's interest, efficiency of adjudication, and the several states' interest in substantive social policies." *Id.* at 332, 594 S.E.2d at 885. Finally, in making the foregoing determinations at the pre-trial stage, the court assesses the pleadings and also may consider extrinsic evidence. *Springmasters, Inc. v. D&M Mfg.*, 303 S.C. 528, 531–32, 402 S.E.2d 192, 193–94 (Ct. App. 1991).

Here, RRD and SCD have purposefully availed themselves to personal jurisdiction in South Carolina by collecting the PFAS-contaminated leachate generated by their respective landfills and transporting it to Lumberton, North Carolina's WWTP, where their PFAS predictably pass through the Lumberton WWTP's treatment processes, are discharged into the Lumber River, and flow downstream into South Carolina. Complaint, ¶¶ 20, 26, 46–48, 52–53, 60, 92. It is these very PFAS chemicals, which are traceable to Defendants' North Carolina landfill operations, that give rise to Plaintiff's claims. *Id*. SCD persists in this tortious course of conduct by continuing to haul leachate to Lumberton for disposal, whereas RRD ceased this practice only after these facilities were named in this lawsuit on August 16, 2024. *See* GFL MIS, Ex. A, at ¶¶ 5(b), (f) (providing that the RRD landfill ceased transporting leachate to the Lumberton WWTP as of December 10, 2024).

Moreover, Defendants have known since before this lawsuit was filed that PFAS are extremely persistent (and thus resistant to conventional wastewater treatment), mobile in the environment, and are often present in landfill leachate in high concentrations. *See* **Ex. 7** (May 7, 2024 CWA Notice of Intent Letter to SCD and other entities) at 6–19; *see also* Complaint, ¶¶ 28, 32, 62, 65–66, 94. In fact, in August 2024 (the same month they were named as Defendants in Plaintiff's lawsuit), SCD entered a proposed consent decree to address PFAS releases at the Sampson County Landfill. *See generally* **Ex. 8**.

This case is on all fours with decisions across the nation that have found an out-of-state defendant's discharges of substances that cross into the forum state establish minimum contacts. *See, e.g.*, *Ex parte Aladdin Mfg. Corp.*, 305 So.3d 214, 237–39 (Ala. 2019) (finding minimum contacts and personal jurisdiction where Georgia manufacturers knowingly discharged PFAS to the local WWTP, which passed through the WWTP and into the river, where the PFAS flowed

downstream to impact Alabama water utilities), *cert. denied,* 141 S. Ct. 1258 (2021); *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577–78 (9th Cir. 2018) (finding purposeful availment and personal jurisdiction where Canadian smelter discharged wastes into the Columbia River that were transported downstream to Washington), *cert. denied*, 139 S. Ct. 2693 (2019); *Horne v. Mobile Area Water & Sewer Sys.*, 897 So.2d 972 (Miss. 2004) (finding minimum contacts and personal jurisdiction where Alabama utility knowingly released floodwaters that damaged downstream Mississippi property owners), *cert. denied*, 544 U.S. 922 (2005); *Triad Hunter, LLC v. Eagle Natrium, LLC*, 132 N.E.3d 1272, 1284–86 (Ohio Ct. App. 2019) (finding minimum contacts and personal jurisdiction where West Virginia mining operation injected brine solution that crossed into Ohio and disrupted Ohio drilling operation).

*Aladdin* is especially apposite: Like this case, *Aladdin* involved the contamination of a public water utility's property and water source with PFAS originating from out-of-state defendants' operations. 304 So. 3d at 222–23. Also like this case, the Georgia defendants argued that the actions of a third-party WWTP, which received their contaminated wastewater and discharged it to the river, insulated them from personal jurisdiction in Alabama. *Compare id.* ("The remaining defendants also argue that Dalton Utilities' treatment of the remaining defendants' wastewater, or its alleged failure to do so, is an intervening cause that breaks the chain of causation."), *with* RRD MIS, at 6 ("It is only Lumberton's unilateral actions in treating and discharging wastewater that allegedly connect Defendants' out-of-state contact with South Carolina, which cannot suffice."). The Alabama Supreme Court rejected this argument, holding that because the "defendants knew or should have known that the treatment processes could not and did not remove the [PFAS]-containing chemicals from the wastewater," the receiving WWTP's actions did not break the causal chain. *Ex parte Aladdin Mfg. Corp.*, 305 So.3d at 232–

51

33. The court emphasized that defendants' availment to the forum was based on more than mere foreseeability: by continuing to discharge contaminated wastewater, defendants engaged in a "purposeful direction of efforts towards" Alabama. *Id.* at 263–37 (quoting *Triad Hunter, LLC,* 132 N.E.3d at 1285).

By hauling their leachate dozens of miles across the State of North Carolina from their landfills to Lumberton's WWTP (which is far closer to South Carolina than the landfills themselves), RRD's and SCD's jurisdictional conduct is arguably more purposeful than the discharges in *Aladdin*. The fact that RRD has recently changed course, opting instead to discharge its leachate to the local sewer, only underscores that sending it to Lumberton was an elective choice. *Cf. Cockrell*, 363 S.C. at 494, 611 S.E.2d at 510 (no personal jurisdiction over defendants who certified baseball bat as meeting NCAA regulations where they "had no control over the distribution of the bats" in South Carolina).

Finally, due process fairness factors weigh heavily in favor of this Court's jurisdiction. South Carolina has a strong interest in adjudicating this dispute because it involves the contamination of waterways on which Plaintiff relies to provide drinking water to over 100,000 South Carolina residents. Resolving Plaintiff's claims in this Court in a single action is far more convenient and efficient than the alternative of bifurcating Plaintiff's claims via dual actions filed in separate states but for the same injuries. Defendants, which operate in North Carolina, will not suffer any unusual burden in having to litigate in the neighboring State of South Carolina. And although North Carolina also has an interest in this case, its interest is surely the same as South Carolina's in ensuring that landfills do not recklessly pollute public water supplies with toxic chemicals.

ELECTRONICALLY FILED 2025CP2603386 - 2025 Jul 28 3:07 PM BERKELEY COMMON PLEAS CASE#2025CP2603386

I.     **Plaintiff properly seeks an award of attorney's fees and prejudgment interest.**

PRET uniquely argues that Plaintiff's "prayer for relief for attorneys' fees should be dismissed" because attorney's fees are only recoverable when "authorized by contract or by statute." PRET MIS, at 20–21. Also, it wildly seeks dismissal of Plaintiff's request for prejudgment interest. *See id.* Both arguments are procedurally improper and baseless.

As a threshold matter, Rule 12(b)(6) tests the legal sufficiency of a complaint to state a cause of action, and here, Plaintiff's requests for attorney's fees and interest are not causes of action. Because Rule 12(b)(6) applies to claims, not remedies, PRET's motion is procedurally improper.

Nevertheless, Plaintiff "seeks a declaratory judgment," among other relief, alleging Defendants' contamination constitutes an "irreparable injury for which there is no adequate remedy at law"; and it requests an "order and decree" requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety." Complaint, ¶¶ 2, 76, 88. If Plaintiff prevails and obtains the requested declaratory judgment, attorney's fees are clearly available.

Plaintiff's recovery of attorney fees is authorized by South Carolina's Uniform Declaratory Judgments Act, which provides that "[i]n any proceeding under this chapter the court may make such award of costs as may seem equitable and just." S.C. Code Ann. § 15-53-100. Under this statute, courts have discretion to award attorney's fees and costs to a prevailing party. *See Greene-Mackey v. Bevins*, Op. No. 2021-UP-256, 2021 WL 2822419, at *1 (S.C. Ct. App. July 7, 2021); *cf. Marshall v. Ismie Mut. Ins. Co.*, 2:24-cv-00223-DCN, 2024 WL 4495355 *8 (D.S.C. Oct. 15, 2024) (insured entitled to costs and fees when prevailing against insurance company in declaratory judgment action); *Canopius U.S. Ins., Inc. v. Sloan*, 6:12-1919-TMC, 2013 WL 530318 (D.S.C. Feb. 11, 2013) (same); *Darden v. Witham*, 258 S.C. 380, 188 S.E.2d

776 (1972) (ex-husband in declaratory judgment ordered to pay attorney fees). *See generally Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 436, 673 S.E.2d 448, 458 (2009) (observing that the decision to award statutory attorney's fees "rest[s] within the sound discretion of the trial court"). In any event, PRET's argument is premature. This Court can address whether Plaintiff should recover attorney's fees if and when Plaintiff prevails on its claims and petitions the Court for such an award.

PRET's aim at Plaintiff's prayer for relief for pre-judgment interest is even less defensible. It argues that, "[b]ecause Plaintiff will not be required to comply with the EPA's regulation until 2029," there is no "fixed condition" for determining interest. PRET MIS, at 21. This strawman—that Plaintiff's only injury is future regulatory enforcement—must fail here as it does elsewhere. As explained throughout this brief, PRET cannot rewrite Plaintiff's complaint to allege future "regulatory enforcement" injuries instead of the existing property injuries that are plainly set out in the operative pleadings.

**J.      This Court should not stay this case or decline jurisdiction.**

Fiber and PRET ask the Court to stay or dismiss these cases so that they can be referred to the South Carolina Department of Environmental Services ("DES"). Fiber MIS, at 4, 15; PRET MIS, at 2, 9. They invoke the doctrine of primary jurisdiction as the basis for the stay or dismissal, vaguely contending that "the legislature [has] entrusted [DES] with addressing the exact harm alleged here" via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120. Fiber MIS, at 15; PRET MIS, at 9.

This unjustified delay tactic falls well outside the scope of the primary jurisdiction doctrine. *See Local Union No. 189, Amalgamated Meat Cutters Etc. v. Jewel Tea Co., Inc.*, 381 U.S. 676, 686 (1965) (Frankfurter, J., dissenting) ("[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative

proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" (quoting *Fed. Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481 (1958))).

Where a case or a factual issue therein is beyond "the conventional experience of judges" and "within the special competence" of an administrative agency, the primary jurisdiction doctrine provides courts discretion to stay a case or dismiss it without prejudice in order to refer the matter to the agency. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 449–50 (M.D.N.C. 2015). The doctrine is intended to promote "desirable uniformity" in regulation and leverage "the expert and specialized knowledge of the agenc[y] involved." *W. Pac. R.R. Co.*, 352 U.S. at 64.

This case involves only South Carolina common law claims, including claims of private and public nuisance, trespass, and negligence, gross negligence, and/or recklessness. These claims are firmly within this Court's conventional experience and competence. *See Nix v. The Chemours Company FC*, 2023 WL 6471690, at *6 (E.D.N.C. Oct. 4, 2023) (observing the Plaintiff's state law property claims "fit comfortably within" the court's expertise but not the state environmental agency's). Plaintiff asserts no claims under the SCSDWA, its federal analogue, or any other state or federal statute.

To invoke DES's purported exclusive authority to enforce the SCSDWA, Defendants suggest that the SCSDWA preempts cases such as this, involving common law claims against upstream polluters for contaminating a public water supply. *See* Fitesa MIS, at 4, 15; PRET MIS, at 2, 9. But nothing in the plain text of the act indicates a legislative desire to do so. Moreover, courts interpreting the federal SDWA have routinely held that the statute does not preempt state

common law claims. *See, e.g.*, *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1271, 1273 (N.D. Ala. 2020); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 597–98 (M.D. La. 2003); *Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1107 (Cal. 2002). Defendants' notion that DES possesses some unique authority or expertise necessary to resolving this case is belied by the fact the PFAS MCLs were issued *by EPA*, not DES.

Plaintiff is also unaware of—and neither Fiber nor PRET identifies—any action by DES to control the PFAS discharges by either Defendant.[24] This reality reinforces the conclusion that a judgment for Plaintiff would not interfere with DES's regulation of PFAS. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1313 (N.D. Ga. 2022) (emphasizing that the Georgia environmental agency "has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia" and has not "taken enforcement action against [defendant]," in denying stay). And even if DES was currently taking action against Fiber's or PRET's PFAS discharges, that, too, would not necessarily require staying or dismissing this case under primary jurisdiction doctrine. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 683 (W.D. Mich. 2021); *Cape Fear Pub. Util. Auth. v. The Chemours Company FC, LLC*, 2019 WL 13300188, at *10 (E.D.N.C. Apr. 19, 2019); *Dew v. E.I. du Pont de Nemours and Co.*, 2019 WL 13117100, at *10 (E.D.N.C. Apr. 17, 2019); *Yadkin Riverkeeper*, 141 F. Supp. 3d at 451.

Finally, Fiber and PRET Brass are not the first defendants in a PFAS contamination lawsuit to assert primary jurisdiction as grounds for a stay or dismissal. To date, most—and very likely *all*—of these attempts have been unsuccessful. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5-6;

---

[24] To be clear, DES has recently begun to include monitoring requirements for PFAS when discharge permits come up for renewal. However, these monitoring requirements do not set limits for the amount of PFAS that permittees may release via their wastewater discharges.

*Parris*, 595 F. Supp. 3d at 1312-13; *Zimmerman*, 542 F. Supp. 3d at 683; *Cape Fear Pub. Util. Auth.*, 2019 WL 13300188, at *10; *Dew*, 2019 WL 13117100, at *10. Defendants' attempt should meet the same result.

**K.     The United States is not a necessary party.**

Nan Ya argues the United States is a necessary party under Rule 19(a), SCRCP, due to potential PFAS discharge from the site of a former Air Force base in Myrtle Beach (the "AFB"), and this action should be dismissed under Rules 19(b) and 12(b)(7), SCRCP, because the United States is indispensable but cannot be joined as a party. *See* Nan Ya Am. MIS. This argument is devoid of merit—the United States is not a necessary, indispensable, or even ***relevant*** party to this action.

The first of many flaws in Nan Ya's position is that it seeks to inject issues of aqueous film forming foam ("AFFF") contamination where Plaintiff expressly disclaims any damage from AFFF. Nan Ya's exhibits make clear that the potential PFAS being discharged from the AFB is from the use of AFFF at the site. *See, e.g.*, Nan Ya Am. MIS, Ex. 2, at 2 (stating the subject of the memorandum is "Final Site Inspection Report for *Aqueous Form Filming Foam* [sic] Areas at Former Myrtle Beach Air Force Base" (emphasis added)); *id.* at 3 ("The following subsections describe migration pathways and potential targets within the range of influence of the former Myrtle Beach AFB. Because of the nature of areas where *potential releases of AFFF may have occurred*, groundwater, surface water, soil, and sediment were sampled and their migration pathways evaluated in this SI report." (emphasis added)).

Plaintiff's complaint precludes any relevance of AFFF contamination at all, with the following disclaimer:

> Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, MilSpec, or other

57

variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

Complaint, ¶ 8.

Such disclaimers are effectual. For example, in a case brought by the State of South

Carolina against 3M Company and other defendants asserting PFAS-related claims similar to

those brought by Plaintiff here, "South Carolina specifically disclaimed recovery for PFAS

contamination from Aqueous Film Forming Foam, or AFFF." *In re Aqueous Film-Forming*

*Foams Prods. Liab. Litig.*, C.A. No. MDL No. 2:18-mn-2873-RMG, 2024 U.S. Dist. LEXIS

64206, at *14 (D.S.C. Feb. 29, 2024). 3M removed the action to federal court, "invoking federal

officer removal under 28 U.S.C. § 1442(a)(1) and federal enclave jurisdiction under § 1441(a),"

and it argued "federal officer removal [was] proper because some of the contamination at issue in

this case overlaps with, or has commingled with, PFAS contamination from AFFF products that

3M supplied to the United States military per a military-created specification, referred to

as MilSpec AFFF." *Id.* at *14–15. In its order granting remand, however, the district court found

that the State's "disclaimers moot 3M's government contractor defense because, whether or not

3M meets the requirements for the defense, it cannot be held liable in this case for PFAS

contamination originating from AFFF." *Id.* at *19.

Plaintiff's disclaimer must be given its full effect in this litigation and squarely precludes

any notion that *any* AFFF discharger is a "necessary" or "indispensable" party. Needless to say,

Plaintiff cannot sue for injuries that it has disclaimed. The United States is not a relevant party to

this action, much less a necessary or indispensable one.

Even disregarding Plaintiff's AFFF disclaimer, the United States is not a necessary or

indispensable party under Rule 19. The Rule provides:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(a), SCRCP.

The South Carolina Supreme Court "has interpreted Rule 19, SCRCP to require that a party be a 'necessary party' to be joined in an action pursuant to the rule." *Ex parte Gov't Emps. Ins. Co. v. Goethe*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007). "A necessary party is one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Id.* (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)).

Here, no right of the United States "must be ascertained and settled" for the full adjudication of this action, and complete relief between Plaintiff and the existing defendants can be reached without the United States being made a party. Plaintiff seeks monetary damages from Defendants for property injures and the abatement of public and private nuisances through installation of upgraded water filtration technologies. Such relief "can[] be accorded among those already parties" to this action. Rule 19(a)(1); *see e.g.*, *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 658 (S.D. Cal. 2018) ("Plaintiffs seek only monetary damages from [Defendant]. Should Plaintiffs prevail, they could recover damages from [Defendant] in the United States' absence. The requested relief does not require the United States to take action or change any policy."); *id.* at 659 ("Therefore, the Court is able to fashion meaningful relief between Plaintiffs and [Defendant] in the United States' absence. The Court finds the United States is not a necessary party under Rule 19(a)(1)(A).").

Nan Ya argues there cannot be complete relief without the United States because (1) "[u]nless the United States is a party, it cannot be forced to provide documents (other than through the singularly imperfect use of a FOIA request) or witnesses" as part of discovery in this action, and (2) if any existing Defendant is found to be liable to Plaintiff, "there would have to be a determination of what percent of any damage suffered by plaintiff each defendant is responsible for. Inevitably, therefore, it must be determined what percentage of environmental contamination of the waters at each intake point is the result of discharge from the AFB site." Nan Ya Am. MIS, at 7–8. Neither of these is an appropriate ground for joinder.

First, Nan Ya's only claimed prejudice—its desire to serve discovery on the United States instead of seeking documents through FOIA requests—is immaterial to a Rule 19 analysis. *See S.C. Dep't of Health & Env't Control v. Fed-Serv Indus., Inc.*, 294 S.C. 33, 38, 362 S.E.2d 311, 314 (Ct. App. 1987) ("[G]eneral consideration of efficiency or convenience of the parties are not sufficient to require joinder . . . ."). Nan Ya cites no authority for the proposition that having to use FOIA instead of discovery tools moves the needle in any way, and courts that have considered the argument have rejected it. *See, e.g.*, *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1498 (10th Cir. 1983) ("According to Textron, if the federal rules are read liberally in light of the goals they were intended to promote, rules 14, 19, and 20 allow the joinder of immune parties solely for the purposes of discovery and the assessment of comparative fault. We disagree."); *id.* ("We have found no cases which approve of the use of rule 19 simply to allow greater discovery, and we can discern no policy which such an expansion of the rule would promote.").[25]

---

[25] As Nan Ya stated in its Amended Memorandum, "Rule 19 is the same as the federal rule, so that decisions by federal courts on issues surrounding necessary and indispensable parties are important to consider." Nan Ya Am. MIS, at 5.

Likewise, South Carolina law is clear that a party's status as a joint tortfeasor—who, if added as a defendant, would be subject to apportionment of liability under the South Carolina Uniform Contribution Among Tortfeasors Act ("UCATA")[26]—does not render it a necessary or indispensable party under Rule 19. "[A]dditional parties are not necessary to a complete determination of [a] controversy unless they have rights which must be ascertained and settled before the rights of the parties to the suit can be determined." *Smith v. Tiffany*, 419 S.C. 548, 562, 799 S.E.2d 479, 486 (2017) (quoting *Doctor v. Robert Lee, Inc.*, 215 S.C. 332, 335, 55 S.E.2d 68, 69 (1949)). "If the defendant and the parties sought to be brought in were joint tort-feasors, the decisions of this Court are clear to the effect that [the] defendant would have no right to bring in as an additional defendant a joint tortfeasor who was not made a party by the plaintiff." *Id.* at 562, 799 S.E.2d at 487. "Accordingly, mere joint tortfeasors are not necessary or indispensable parties to an action under Rule 19, SCRCP." *Id.* "To allow a defendant against the will of the plaintiff to bring in other joint tortfeasors as defendants would deny the plaintiff the right to name whom he should sue." *Id.* (quoting *Doctor*, 215 S.C. at 335, 55 S.E.2d at 69); *see also id.* at 564, 799 S.E.2d at 488 (recognizing "two centuries of common law establishing a plaintiff's right to choose which tortfeasors, if any, she will sue"); *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010) ("It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue."). As *Smith* makes evident, Nan Ya's desire to join the United States as a party for purposes of liability apportionment is contrary to South Carolina law.[27]

---

[26] S.C. Code Ann. §§ 15-38-10 to -70.

[27] In construing the UCATA, the *Smith* court recognized the act contemplates that not all tortfeasors may be defendants in an action and the courts do not have the authority to override that legislative determination. *See* 419 S.C. at 556–59, 799 S.E.2d at 483–85. However, Nan Ya does retain the right to argue the "empty chair" defense against the United States if it so chooses,

For its part, the United States has no—and indeed claims no—interest in Plaintiff's water supply, property, or water system, or any other interest "relating to the subject of th[is] action." Rule 19(a)(2). This Court should be skeptical of Nan Ya's attempt to achieve dismissal based on unarticulated, unclaimed, and unasserted rights of a non-party.

Nan Ya cites *Goddard v. Fairways Development General Partnership*, but this case is nothing like *Goddard*. Nan Ya Am. MIS, at 5. There, the plaintiffs sought the dissolution of a planned unit development ("PUD"), and the PUD's governing documents allowed dissolution only "with the consent of 100% of the [property] owners." 310 S.C. 408, 410, 426 S.E.2d 828, 830 (Ct. App. 1993). On appeal, the Court of Appeals found a property owner that had been dismissed from the action was an indispensable party because the relief sought in the action "affect[ed] her property interests." *Id.* at 412, 426 S.E.2d at 831.[28] Here, a judgment between Plaintiff and Defendants will not affect any property (or other) interest of the United States. *Cf. McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 951 (4th Cir. 2020) (recognizing that Fourth Circuit cases in which joinder was allowed "involve a situation where the contracts or obligations of the 'necessary' party were being interpreted or were otherwise directly at issue").

The fact that the United States, like Defendants, may have discharged PFAS into the environment does not create an interest in the United States related to this action. *See McKiver v.*

---

and it can seek contribution from the United States if it believes that is owed. *See* S.C. Code Ann. § 15-38-15(D) ("A defendant shall retain the right to assert that another potential tortfeasor, whether or not a party, contributed to the alleged injury or damages and/or may be liable for any or all of the damages alleged by any other party."); S.C. Code Ann. § 15-38-20(A) ("[W]here two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.").

[28] The same is true of *EEE Minerals, LLC v. North Dakota*, which Nan Ya also cites. There, the court similarly found the United States was "a required party because it owns significant oil, gas, and other mineral interests in and under the lands that are the subject of this lawsuit." 318 F.R.D. 118, 125 (D.N.D. 2016).

*Murphy-Brown, LLC*, 980 F.3d 937, 952 (4th Cir. 2020) ("'[E]ven if [an absent party] is alleged

to have played a central role' in the action at issue, 'and even if resolution of the action will

require the court to evaluate the absent party's conduct,' that party 'in many cases . . . will not

have interests that warrant protection under Rule 19(a)(1)(B)(i).'" (quoting *Ward v. Apple Inc.*,

791 F.3d 1041, 1050 (9th Cir. 2015))); *see, e.g.*, *Goethe*, 373 S.C. at 136, 644 S.E.2d at 701 ("We

find that although GEICO may be affected by the outcome of the family court action, its interest

is insufficient to meet the requirements for joinder pursuant to Rule 19(a)(2)(i), SCRCP.").

      Despite acknowledging that the United States "would not be bound by any judgment as to

its potential causation of Plaintiff's damages," Nan Ya argues that it could be "subject to being

forced to pay 'an equitable share' of the costs of correcting contamination for the release of these

chemicals" under the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"). Nan Ya Am. MIS, at 7, 8. But any obligation under CERCLA for the United States

to remedy PFAS pollution at the AFB exists independently of this action. Nan Ya does not, and

cannot, show how Plaintiff's case could create any "inconsistent obligations" for the United

States or itself. Again, Plaintiff has disclaimed causes of action and damages related to AFFF

PFAS, so no judgment in this action will have any effect on the AFB cleanup or the United

States' obligations under CERCLA.

      Finally, even if the United States were a necessary party and unable to be joined, it is not

indispensable such that dismissal of this action would be required.

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the
> court shall determine whether in equity and good conscience the action should
> proceed among the parties before it, or should be dismissed, the absent person being
> thus regarded as indispensable. The factors to be considered by the court include:
> first, to what extent a judgment rendered in the person's absence might be
> prejudicial to him or those already parties; second, the extent to which, by
> protective provisions in the judgment, by the shaping of relief, or other measures,

the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b), SCRCP.

As is shown above, a judgment in this action, even in the United States' absence, will adequately afford relief among the current parties and will not prejudice the United States or any current party as a result of the United States' nonjoinder. Nan Ya's desire to apportion liability to the United States and seek documents from the United States in discovery does not amount to prejudice under Rule 19. Moreover, Nan Ya's suggestion that Plaintiff has an adequate, alternative remedy against the United States is irrelevant, as Plaintiff is not seeking relief from the United States. Consequently, Rule 19(b)'s factors weigh heavily against finding the United States is an indispensable party.

In sum, the United States is not an indispensable, necessary, or even relevant party to this action. Thus, joinder under Rule 19(a) and dismissal under Rules 19(b) and 12(b)(7) would be inappropriate

## IV. CONCLUSION

Based on the foregoing, Plaintiff respectfully asks that this Court deny Defendants' motions in full and allow all of Plaintiff's claims to survive dismissal and proceed to discovery in this litigation.

Respectfully submitted,

_/s/ John B. White. Jr._
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

February 28, 2025

# EXHIBIT 3

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF GREENWOOD

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Greenwood Commissioners of Public Works,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-24-00735

STATE OF SOUTH CAROLINA
COUNTY OF LAURENS

IN THE COURT OF COMMON PLEAS
EIGHTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Laurens County Water and Sewer Commission,

*Plaintiff*,

v.

Cone Mills Receiver, LLC *et al.*,

*Defendants*.

C.A. No. 2024-CP-30-00734

1

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS**

Plaintiffs, Greenwood Commissioners of Public Works ("GCPW") and Laurens County Water and Sewer Commission ("LWSC") (collectively "Plaintiffs"), hereby submit this Response in Opposition to the Supplemental Memorandum in Support of Defendants' Motion to Dismiss filed on behalf of Defendants by Unichem Specialty Chemicals, LLC ("Unichem") on March 17, 2025.

## I.   INTRODUCTION

In their Amended Complaints, Plaintiffs alleged:

> Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into the Reedy River, Saluda River, and Lake Greenwood, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

Complaints, ¶ 91.

Many Defendants, in their motions to dismiss and supporting memoranda, argued that a duty to Plaintiffs could only "be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *E.g.*, T&S Brass and Bronze Works, Inc. Memo., at 17–18 (quoting *Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006)). Unichem similarly argued in its memorandum that it owed no duty to Plaintiffs because it had no duty "to control the conduct of another or to warn a third person or potential victim of danger." Unichem Memo., at 13 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656). Specifically, Unichem argued it "had no duty to ensure that the Mauldin Road WWTP would treat the wastewater in a way that avoids any risk of harm to third parties, and therefore owed no duty to the Plaintiff." *Id.*

2

Plaintiffs explained in their Consolidated Response in Opposition to Defendants' Motions to Dismiss ("Opposition") that they were not alleging Defendants had an affirmative duty to act that was untethered to their industrial operations, nor were they alleging Defendants had a duty to control any third party. Opp'n, at 24–26. Instead, and as will be discussed further below, Plaintiffs reiterated that the duty they alleged Defendants owed them was the duty to act with due care in carrying out their industrial operations, and specifically as it relates to this litigation, the duty not to discharge PFAS into the environment.[1] *Id.* at 26–30.

At the March 11, 2025 hearing on Defendants' motions, counsel for Defendants repeated the arguments from their filings and further argued that Plaintiffs were attempting to impose a duty on them under South Carolina tort law relating to "volunteers" or "Good Samaritans," wherein a person or entity provides aid or a service to a third party. *See* Mar. 11 Hr'g Tr., attached as Exhibit 1, at 79:22–80:7 ("Mr. Lutz talked about the assumes to act duty under negligence. And I would just point out to the court, I mean, this assumes to act body of law is where we get things like the Good Samaritan law. These are situations where someone's injured on the road and you stop to help out and the law says, 'If you undertake to render aid to someone who is injured on the road, then you have assumed an obligation to that person to not do something that would cause them greater harm or that because of Your—their reliance on you that—that someone else doesn't come

---

[1] *Compare* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7(a) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."), *with id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the *affirmative duties* provided in §§ 38-44 is applicable." (emphasis added)); *see also id.* §§ 38–44 (imposing a duty based on statute, prior conduct, special relationship, an undertaking, or taking charge of another); RESTATEMENT (SECOND) OF TORTS, § 284 ("Negligent conduct may be *either*: (a) an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, *or* (b) a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do." (emphases added)).

3

to help them.' This is not that situation at all."). However, Plaintiffs' position is not that Defendants' duty arises out of any aid or service they provided to a third party.

In its Supplemental Memorandum, Unichem maintains its erroneous position that Plaintiffs allege Defendants' duty to them arises out of a voluntary undertaking to a third party. *See, e.g.*, Unichem Supp. Memo., at 3 (asserting "the applicable standard for determining whether a duty exists in this litigation is reliant on Defendants providing a service to a third party). Once again, Plaintiffs make no such allegation in their Amended Complaints. By stating they owe Plaintiffs no duty under "affirmative duty" or "volunteer / Good Samaritan" tort law, Defendants are advancing straw man arguments. Plaintiffs alleged in their Amended Complaints, and have consistently argued, that Defendants' duty to them arises out of their industrial operations, which they voluntarily[2] engage in, and which create an unreasonable risk of harm to others.

Defendants' repeated attempts to improperly recharacterize Plaintiffs' allegations and the basis of their negligence liability should not be allowed to continue, and Plaintiffs should no longer be required to refute arguments by Defendants against a position Plaintiffs have never taken. Instead, Defendants must confront Plaintiffs' actual allegations and theory of liability head on. Once made to do so, their arguments all fail, and South Carolina law clearly imposes upon them a duty to Plaintiffs not to discharge PFAS into the waterways upstream of Plaintiffs and their properties.

---

[2] To be clear, use of this word is not intended to suggest that Defendants' industrial operations confer upon them "volunteer" or "Good Samaritan" status for purposes of applying South Carolina tort law. Rather, it is merely intended to note Defendants' volitional conduct—i.e., Defendants have willingly chosen to engage in their various industries.

## II. ARGUMENT

### A.    Defendants' Duty.

In their Opposition, Plaintiffs demonstrated that South Carolina tort law requires an actor to exercise due care to ensure its conduct does not create a risk of harm to others.[3] *See, e.g., Ramey v. Carolina Life Ins. Co.*, 244 S.C. 16, 24, 135 S.E.2d 362, 366 (1964) (acknowledging "there is a duty upon all to exercise reasonable care not to injure another"). Without a doubt, this duty applies to businesses, including Defendants, carrying out their operations. As our Supreme Court explained nearly a century and a half ago, "No doubt it is the legal duty of a person engaging in any business dangerous to others to exercise due care in providing against such dangers, and the absence of such care as the case requires would be negligence . . . ." *Davis v. Columbia & G. R. Co.*, 21 S.C. 93, 104 (1884); *see also Eargle v. Sumter Lighting Co.*, 110 S.C. 560, 566–67, 96 S.E. 909, 911 (1918) ("The law imposes on those who employ such agencies the duty of exercising the same degree of care for the protection of their employees *that it imposes upon them for the protection of the public*, and that is 'ordinary care'—such care as an ordinarily prudent person should exercise in the circumstances--sometimes called 'due care.'" (emphasis added)); *Jones v. Seaboard Air Line R.R. Co.*, 67 S.C. 181, 195, 45 S.E. 188, 193 (1903) (noting the duty of a railroad company to construct its piers and bridges prudently "flows from the duty imposed upon all to so use their own property as not to injure others").

This law has not changed, and Defendants' attempts to silo Plaintiffs' negligence claims into narrower, inapplicable branches of tort law do not relieve them of this fundamental duty. The cases that Plaintiffs cite in their Opposition further bolster the fact that this duty applies in the context of pollution generally, and with respect to PFAS specifically. Unichem complains that

---

[3] Plaintiffs incorporate the relevant arguments and cited law from their Opposition here. *See* Opp'n, at 24–30.

"these cases either (i) do not discuss the issue of whether a duty is recognized by South Carolina law or (ii) the relevant facts and law are plainly distinguishable." Unichem Supp. Memo., at 2. However, the fact that the cases do not contain extensive discussions of the duty merely reflects that this is settled, well-established law, and the facts in those cases are not materially distinguishable such that they would fail to support Defendants' duty to Plaintiffs here. Accordingly, Unichem's arguments are unfounded.

**B.     Plaintiffs' South Carolina Authorities.**

Unichem begins its attack on Plaintiffs' position with another attempt at misdirection: "To begin with, the Moving Defendants agree with Plaintiffs that *Madison* sets forth the applicable standard for determining whether a duty is created by a voluntary undertaking . . . ." Unichem Supp. Memo., at 3. Unichem then cites the following language from *Madison*:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Madison*, 371 S.C. at 136, 638 S.E.2d at 657 (quoting RESTATEMENT (SECOND) OF TORTS, § 323). This is disingenuous for two reasons: first, as stated above (and as argued in their Opposition, and as alleged in their Amended Complaints), Plaintiffs do not ground Defendants' liability on any "service[ they rendered] to another." *Id.* Thus, this quote from *Madison*, which describes the "volunteer" or "Good Samaritan" branch of tort law, as well as section 323 of the Restatement (Second) of Torts, is entirely irrelevant to this litigation. Second, Plaintiffs have never taken the position that *Madison* "sets forth the applicable standard for determining" Defendants' duty. Admittedly, Plaintiffs did cite to *Madison*—once—in their Opposition. But this was done *only* in response to Defendants' nearly uniform, and misguided, reliance on this case in their motions to

dismiss. *See e.g.*, T&S Brass and Bronze Works, Inc. Memo., at 17–18 (arguing a duty to Plaintiffs could only "be created by statute, a contractual relationship, status, property interest, or some other special circumstance" (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656–57); Opp'n, at 25 (citing the full relevant portion of *Madison*, which provides that a person who acts must do so with due care regardless of statutory, contractual, or other obligation, in order to refute Defendants' reliance on the isolated language they cited and provide "[a] fair and complete statement of the law Defendants invoke").[4] Unichem then similarly argues that under *Madison*, "there is there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." Unichem Supp. Memo., at 4 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656). Again, however, Plaintiffs do not argue that Defendants were required to control the conduct of others, such as relevant wastewater treatment plants ("WWTP"), or warn Plaintiffs of any danger. Unichem's assertion that Plaintiffs have taken the position that *Madison* controls is yet another straw man argument that Plaintiffs and this Court should not be forced to spend their time unraveling.

      1.    ***Chestnut*, *Joyner*, and *Parker*.**

As is shown above and in Plaintiffs' Opposition, South Carolina tort law clearly imposes a duty on businesses to act with due care in carrying out their operations. Moreover, Plaintiffs have cited  many cases that show that a duty of due care *has regularly* been found both in the context of water pollution generally in South Carolina and in the specific context of PFAS elsewhere. But because Unichem denies their applicability, Plaintiffs will address each of Unichem's arguments in turn.

---

[4] Unichem also notes Plaintiffs' "Amended Complaints do not identify any such voluntary undertaking by the Defendants as a service to the Plaintiffs, nor to any other person," but that is for good reason: it is not the basis of Defendants' duty. Unichem Supp. Memo., at 4.

Again, the fact that *Chestnut*, *Joyner*, and *Parker* do not expound upon the tort theories underpinning the duties they recognize is not the fatal omission Unichem would have this Court believe. *See* Unichem Supp. Memo., at 5 (complaining that these cases "do not even discuss the creation or existence of an actionable duty"). Rather, it should go without saying that judicial opinions often cite to or reference black letter law without reverting to first principles and "reinventing the wheel" in each instance. Likewise, the fact that these cases recognize and apply a duty of care to businesses that generate water pollution simply underscores that such a duty is well-recognized and need not be supported by thorough explication in every instance.

As for *Chestnut* in particular, the procedural posture of that case may have been the appeal of a dismissal of a negligence claim (among others) due to the type of damages alleged; however, for the Supreme Court to reverse and reinstate the claim on remand, the Court necessarily found that the plaintiffs alleged a cognizable duty. Unichem's assertion that the *Chestnut* court did "not [address] whether a duty had been properly alleged" is contradicted by the opinion itself, wherein the Court stated, "[h]ere, appellants have pled all four elements of a negligence claim[, including] duty." *Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015); *see also id.* ("[W]e find the complaint sufficiently pleads a negligence cause of action on behalf of appellants, and therefore reverse the dismissal of this claim.").[5]

Moreover, the *Chestnut* court likely did not discuss the existence of a duty because it cited *Babb v. Lee County Landfill S.C., LLC*, wherein such a duty was previously recognized. *See id.* ("In *Babb* . . . , we held a plaintiff could maintain an environmental negligence suit based upon

---

[5] Had the Supreme Court believed plaintiffs had not pled a cognizable duty, it almost assuredly would have affirmed the trial court's dismissal of the negligence claim on that basis rather than reinstating and remanding a non-viable claim, in order to preserve judicial resources. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

offensive odors if the complaint alleged either 'physical injury [to the plaintiff] or property damage.'" (quoting *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 153, 747 S.E.2d 468, 481 (2013))). Importantly, *Babb* answered the following certified questions (among others) from the United States District Court for the District of South Carolina:

> When a plaintiff contends that offensive odors have migrated from a neighbor's property onto the plaintiff's property, may the plaintiff maintain an independent cause of action for negligence or is the plaintiff limited to remedies under trespass and nuisance?
>
> [and]
>
> If an independent cause of action for negligence exists under South Carolina law when a plaintiff contends that offensive odors have migrated from a neighbor's property onto the plaintiff's property, does the standard of care for a landfill operator and breach thereof need to be established through expert testimony?

*Id.* at 136–37, 747 S.E.2d at 472.

The Supreme Court provided the following answer to the first question above: "We hold that while it may be possible for a plaintiff to recover in negligence for offensive odors, we stress that such a claim would have to satisfy the elements of negligence like any other claim, and the mere offensive *smell* of odors would not be enough." *Id.* at 152–53, 747 S.E.2d at 480–81. If South Carolina law did not recognize a duty in this context, the Supreme Court would have so stated. Rather than answering that the negligence claim could not be maintained due to a lack of duty, however, the *Babb* court even discussed the standard of care for a landfill operator that is responsible for migrating offensive odors. *See id.* at 153–54, 747 S.E.2d 468, 481. Such a discussion would have been irrelevant, and improper, if no duty existed, because without a duty of care, there can be no standard of care. *See Doe v. Wal-Mart Stores*, Inc., 393 S.C. 240, 247, 711 S.E.2d 908, 912 (2011) ("[I]f no duty has been established, evidence as to the standard of care is

irrelevant. Only when there is a duty would a standard of care need to be established."). Clearly, *Chestnut* and *Babb* both recognize a duty applicable to Defendants.

Concerning *Joyner*, Plaintiffs cited that case for the proposition that when Defendants carry out their industrial operations, they have a duty to do so with due care. Opp'n, at 25. Although *Joyner* may not explicitly discuss "duty," it essentially provides that acting with "due care" is the applicable duty, and failing to act with "due care" is a breach of that duty:

> Now, what is negligence? Negligence, as held in many cases and as laid down by all text-writers upon the subject, is defined to be the absence of due care. What is due care? Due care is a relative term, each case having its own requirements in that respect; or, in other words, each subject-matter under the control and management of a person having its own demands as to due care. Consequently, what would be due care as to one matter, would not necessarily be so as to another. On this account it has been impossible for the law to establish any precise standard or legal definition of due care suited to every case, and which the trial judge should deliver to the jury as matter of law, to be compared by them with the evidence, so as to reach a satisfactory conclusion on the question whether or not due care is absent or present in a special case. All, therefore, that the law has determined as a general rule, and all that the judge in charging upon this subject need say, is that the presence of due care negatives negligence, and that the absence of such care constitutes negligence, or, rather, affirms its presence . . . .

*Joyner v. S.C. Ry. Co.*, 26 S.C. 49, 51-52, 1 S.E. 52, 53 (1887).

The duty to act with due care, which *Joyner* long ago recognized, is the same duty that Plaintiffs invoke. This duty required Defendants to use due care in disposing of toxic chemicals and to avoid discharging PFAS into the waters upstream of Plaintiffs and their properties. Unichem asserts "the obligation to act with due care only arises following the creation of a duty," then cites the portion of *Madison* stating "one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care." Unichem Supp. Memo., at 6 n.5 (quoting *Madison*, 371 S.C. at 136, 638 S.E.2d at 656–57). But Unichem ignores the consequence of the

10

language it cites: once Defendants "assumed to act" in their industries, they were "obligated to act with due care."

Unichem next suggests that *Joyner* and *Parker* are not controlling because they addressed the propriety of jury instructions, and "a jury does not decide whether a duty exists; that responsibility remains with the court." Unichem Supp. Memo., at 6. This is nonsensical. Plaintiffs do not dispute that the existence of a duty is a question of law for the court; however, a jury instruction is a statement of the law *by* the trial court *to* a jury, and not the jury's determination of what it believes the law to be. *See Stephens v. CSX Transp., Inc.*, 415 S.C. 182, 197, 781 S.E.2d 534, 542 (2015) ("A trial court must charge the current and correct law."). Accordingly, when an appellate court approves a jury instruction, it is ruling that the statement of law in the instruction is correct, and the instructions approved in *Joyner* and *Parker* are correct statements of the law as determined by the South Carolina Supreme Court. Thus, their descriptions of negligence, once approved by the Supreme Court, carry as much weight as any other ruling by that court on the issue.

Notably, the *Parker* court explicitly approved the statement of law Plaintiffs cited in their Opposition. *See* Opp'n, at 27; *Parker v. Simmons*, 163 S.C. 42, 56, 161 S.E. 169, 173–74 (1931) ("The second question raised by the exceptions is: Was there error in the Judge's charge in reference to negligence and recklessness? In disposing of this question we deem it sufficient to state that an examination of the entire charge, which will be reported with the case, convinces us that the trial Judge, in charging the jury on the question of negligence and recklessness, was fair to the defendants and they have no cause for complaint.").

2.     *Ravan*, *Conestee Mills*, **and** *Johnston*.

Unichem argues *Ravan*, *Conestee Mills*, and *Johnston* are inapplicable because they are factually distinguishable—this is wrong. These cases may not present the exact same facts as are present this litigation, but the duties recognized therein nonetheless apply to Defendants here.

Unichem first argues *Ravan* is inapplicable because in that case, the defendant decided where to dispose of the industrial waste it transported, and was not a "mere hauler" of the waste, whereas here, Plaintiffs have not alleged "that Defendants were responsible for selecting where their wastewater was ultimately discharged." Unichem Supp. Memo., at 6–7. Not so. Plaintiffs alleged that, "[d]espite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health, Defendants indirectly discharged industrial wastewater contaminated with these chemicals into the Enoree River, which they knew or should have known contaminated Plaintiff's property and its water supply." Complaints, ¶ 57. In other words, despite knowing the consequences of doing so, Defendants chose to dispose of their PFAS in their wastewater instead of selecting alternative disposal methods.

Unichem also takes an overly narrow view of the significance of *Ravan*. The takeaway from the opinion is that, had Waste Management been a "mere hauler" of waste, the scope of its duty would have been confined to that role. However, because its role was broader, its duty was broader. *See Ravan v. Greenville Cnty.*, 315 S.C. 447, 468, 434 S.E.2d 296, 309 (Ct. App. 1993) (acknowledging there is "a significant difference between a company [that] brings abnormally hazardous waste into the world and one [that] as a conduit transports that waste without untoward incident." (quoting *Kenney v. Sci., Inc.*, 497 A.2d 1310, 1327 (N.J. Super. Ct. 1985))). In distinguishing the duties owed by a mere transporter of hazardous waste and a company that creates the waste and "brings [it] into the world," the court observed that the duty of a mere transporter was necessarily more limited because "the release of chemicals at the [disposal] site

12

was not a natural consequence of the transportation of waste." *Id.* at 468–69, 434 S.E.2d at 309. Here, however, as Plaintiffs alleged in their Amended Complaints, the proliferation of PFAS into the environment was the natural consequence of Defendants' discharge of PFAS-laden wastewater. The *Ravan* court imposed a duty of care on Waste Management because "Waste Management purchased the tickets from the county that permitted dumping in the landfill." *Id.* at 469, 434 S.E.2d at 309 (Ct. App. 1993).

Here, Defendants' role is even broader—they not only chose to dispose of PFAS via their wastewater (as Waste Management chose where to dispose of the hazardous waste at issue in that action), but they also chose to use PFAS in their industries, which necessitated the disposal of PFAS in the first place. Their role, therefore, is akin to that of both Waste Management (the waste transporter) and Waste Management's customers (which generated the hazardous waste), and their duty is correspondingly broader. *Ravan* clearly supports Plaintiffs' argument that as PFAS users and dischargers, Defendants had a duty to use and discharge their PFAS with due care.[6] Unichem's attempt to distinguish *Ravan* from this case is unpersuasive and should be rejected.

Concerning *Conestee Mills*, Unichem argues Defendants "are not alleged to have any statutory rights or obligations related to the maintenance of public sewage or water systems." Unichem Supp. Memo., at 7. Again, this misses the point and is immaterial. In *Conestee Mills*, the City of Greenville argued as a defense that the sewer system it constructed and maintained was authorized by legislation, but the court rejected the defense, reasoning:

---

[6] As noted above, Unichem protests in its Memorandum that some cases Plaintiffs cite in their Opposition do not directly discuss or address the defendants' duty. In *Ravan*, however, one of the discrete issues on appeal was whether Waste Management owed a duty of care to the plaintiff, and the opinion includes a discussion of that duty. *See id.* at 467, 434 S.E.2d at 308 ("On appeal, Waste Management argues (1) it did not owe a duty of care to Ravan . . . ."); *id.* ("In order for Ravan to recover in negligence against Waste Management, he must show Spartan had a duty of care not to dump toxic chemicals into the landfill . . . .").

> While it was lawful to construct the sewer system, and the plaintiffs
> have received compensation for the injury to their property incident
> to the construction thereof, it by no means follows that either the
> city authorities or the sewer commissioners have the right to act in
> excess of the powers conferred upon them by law. In short, it was
> the duty of the sewer commissioners to use due care in the
> construction of the sewer system, and the same duty devolved upon
> the city authorities in the operation and maintenance thereof.

*Conestee Mills v. Greenville*, 160 S.C. 10, 26, 158 S.E. 113, 119 (1931). As is made clear, the duty

recognized in *Conestee Mills* was not based on any statutory right or obligation. Rather, it was a

common law duty of due care that supported the plaintiff's negligence claim. *See id.* at 19, 158

S.E. at 116 ("The action in the instant case is grounded, not upon the construction of the sewerage

system, which was authorized by act of the Legislature, but upon the negligence of defendant in

the operation of that system—for which a cause of action clearly lies.").

Similarly, the duty recognized in *Johnston* did not arise out of the "violation of [any]

applicable regulations, permit requirements, or other rules" as Unichem suggests. Unichem Supp

Memo., at 8. In that case, the plaintiffs alleged that the defendants owed them "a duty of reasonable

care" and a "duty to follow the law . . . and other related rules as they apply to Defendants'

operation of the landfill." *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540

(D.S.C. 2024). This is because the plaintiffs asserted causes of action for *both* negligence/gross

negligence and negligence per se. *See id.* at 534. Although the *Johnston* court granted the

defendants' motion to dismiss the plaintiffs' negligence per se claim, *id.* at 542, it denied their

motion to dismiss the negligence/gross negligence claim because the plaintiffs sufficiently alleged

the claim, including a duty on the part of the landfill. Nowhere in its opinion did the *Johnston* court

state that the "duty of reasonable care" the plaintiffs alleged was inapplicable or that the

defendants' duty was based solely on statute, regulation, or rule. *See id.* at 540–41 ("Plaintiffs

allege that Defendants have been negligent, grossly negligent, and reckless in a number of specific

14

ways, including failing to utilize proper operating procedures and technology and attempting to handle more waste than they can handle. . . . The Court finds that these allegations are sufficient to state a claim for negligence, gross negligence, and recklessness at this stage of litigation."). Accordingly, Unichem's argument does nothing to diminish the applicability of *Johnston* to this litigation.

### 3.   *Byerly*, *Rayfield*, *Edwards*, and *Edward's of Byrnes Downs*.

Although these cases do not involve pollution, they nonetheless support Plaintiffs' position that Defendants had a duty of reasonable care in the operation of their industries. For example, in *Byerly*, the South Carolina Supreme Court found the undertaking voluntarily assumed by Santee Cooper was "yearly inspections of docks and piers solely for the purpose of ensuring that the docks and piers conform to structural requirements of permits issued by Santee Cooper." *Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992). As a result, Santee Cooper's duty was limited "to us[ing] due care to discover structural nonconformity with permits." *Id.* at 445, 415 S.E.2d at 799. Similarly, Defendants here voluntarily engaged in their various industries, and as a result, their duty was to exercise due care in the carrying out of their operations. Plaintiffs do not allege that their duty extends outside of their industrial operations, as Unichem's argument suggests. Plaintiffs do not allege, for example, that Defendants had a duty to control the conduct of the WWTPs or remove pollutants from their wastewater that they did not introduce. Although not in the pollution context, *Byerly* reiterated the broad principle that "[a]t common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care." *Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992).

Unichem's criticism of *Rayfield* is similarly unavailing. Unichem suggests that this case stands for the proposition that "duties created by voluntary undertaking a service to another are strictly limited under South Carolina law." Unichem Supp. Memo., at 9. Notwithstanding that

Plaintiffs have not alleged Defendants have "undertak[en] a service" to them, the WWTPs, or any other relevant entity (as is explained above), the portion of *Rayfield* that Unichem cites merely stands for the uncontroversial proposition "that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm not created by his own wrongful act. In other words, a person has no duty to protect another from harm inflicted by a third person." *Rayfield v. S.C. Dep't of Corrs.*, 297 S.C. 95, 100–01, 374 S.E.2d 910, 913 (Ct. App. 1988). To be clear yet again, Plaintiffs have not alleged that Defendants owe them any such duty. Instead, Plaintiffs cited *Rayfield* for the proposition that Defendants are liable for "harm . . . created by [their] own wrongful act[s]," i.e., their improper discharge of PFAS.

Unichem next argues that *Edwards* "emphasized the necessity of a special relationship to create an *affirmative* duty of care, which is simply not present here." Unichem Supp. Memo., at 9 (emphasis added). Again, however, Plaintiffs are not arguing Defendants had an affirmative duty to act that was independent of their conduct in carrying out their industrial operations. As Plaintiffs have alleged and repeatedly argued, Defendants voluntarily engaged in their industrial operations, and as a result they had a duty to do so with due care. Thus, no special relationship is required here. Additionally, the *Edwards* court found the defendants there owed the plaintiff a duty for two reasons: (1) their relationship with a third party, who assaulted the plaintiff, and (2) "their actions in creating the risk of harm." *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 293, 688 S.E.2d 125, 130 (2010). Plaintiffs do not rely on the first *Edwards* ground to establish Defendants' duty; instead, Plaintiffs cited *Edwards* because it recognizes that when an actor creates a risk of harm, it may be liable to those harmed by that conduct. Here, Defendants "creat[ed] the risk of harm" to Plaintiffs (and others) by improperly disposing of PFAS in their wastewater. Accordingly, Unichem's argument that *Edwards* requires a special relationship between Plaintiffs and

Defendants is incorrect. *Cf. id.* at 293–94, 688 S.E.2d at 130 ("Respondents created a situation that they knew or should have known posed a substantial risk of injury to Edwards. . . . Respondents' duty is one of due care . . . .").

Plaintiffs similarly cited *Edward's of Byrnes Downs* for the basic proposition that there is a "common law duty to exercise due care to avoid injury or damage to others." Opp'n, at 26. Unichem's attempt to require an isomorphic mapping between the facts of *Edward's* and this litigation do not change this fundamental tenet of South Carolina tort law or preclude its application here. The fact that Defendants did not "enter[] a contract with any party or third party for the construction or maintenance of a structure adjacent to or in which Plaintiffs resided . . . [or have] a contract to maintain Plaintiffs' water treatment system" is entirely irrelevant to whether they owed Plaintiffs a duty of care as alleged in Plaintiffs' Amended Complaints.

## C.    Plaintiffs' Out-of-State Authorities.

Unichem's primary argument against the out-of-state cases Plaintiffs cite in their Opposition relies on the fact that those states have adopted section 324A of the Restatement (Second) of Torts, while South Carolina has not. *See* Unichem Supp. Memo., at 10–11. This is yet another red herring argument that has no bearing on this litigation. Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS, § 324A.

Once again, Plaintiffs do not allege that Defendants have "undertake[n], gratuitously or for consideration, to render services to" Plaintiffs or any other third party. As a result, the fact that

South Carolina has not adopted section 324A or incorporated the rationale therein into South Carolina's common law is inconsequential.

Moreover, *Johnson* does not rely on section 324A[7] or suggest that its ruling was based on Georgia tort law recognizing a duty to third parties when services are rendered to another. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1319–24 (N.D. Ga. 2021). Instead, the *Johnson* court relied on the following proposition of tort law, which also applies in South Carolina:

> Certain duties are inherent in human society. A owes B the duty to so handle his affairs or conduct his business and control the material forces with which he deals as not to injure the person or property of B. A violation of this duty is a wrong which may support an action for damages. 'Negligence' itself is a failure to exercise the degree of care demanded by the circumstances.

*Id.* at 1321 (quoting *Sims v. Am. Cas. Co.*, 206 S.E.2d 121, 127 (Ga. App. 1974)); *see also id.* ("The Georgia courts recognize a duty not to engage in conduct that will result in pollution of state waters (including non-navigable streams) rendering them unfit for their ordinary purposes by downstream users."). This is the same duty recognized by the South Carolina cases cited above and in Plaintiffs' Opposition.

Additionally, the language Unichem cites, which references foreseeability, merely addresses the scope of the duty that the *Johnson* court recognized. *See* Unichem Supp. Memo., at 11; *Johnson*, 563 F. Supp. 3d at 1319 ("A legal duty to exercise ordinary care is the obligation to conform to a standard of conduct under the law for the protection of others against the foreseeable, unreasonable risk of harm from such conduct."); *id.* at 1320 ("Plaintiff counters that he is not alleging Defendants had a 'general duty to all the world,' but rather, that Defendants' duty arises from the foreseeability that their conduct would contaminate downstream water supplies with

---

[7] Section 324A is not cited once in the *Johnson* opinion.

PFAS chemicals. This alleged duty is not 'limitless,' as Defendants contend because the foreseeability of the risk of harm circumscribes the scope of the duty."). South Carolina law similarly requires a foreseeability analysis in determining the scope of a recognized duty. *See, e.g.*, *Easterling v. Burger King Corp.*, 416 S.C. 437, 449, 786 S.E.2d 443, 449 (Ct. App. 2016) (stating the court "must analyze the scope of Burger King's duty [to a customer] by employing [a] balancing test to determine . . . if a crime was foreseeable"). Unichem also cites *Oulla v. Velazques* for the proposition that foreseeability alone does not give rise to a duty. *See* Unichem Supp. Memo., at 11. However, foreseeability is relevant in determining the scope of a recognized duty, such as the duty Defendants owed Plaintiffs, and foreseeability of injury certainly does not preclude finding that a duty exists. Accordingly, Unichem's argument regarding foreseeability fails, just like its argument regarding section 324A.

In sum, section 324A has no bearing on *Johnson* or this litigation, and *Johnson*, along with the other out-of-state PFAS cases cited in Plaintiffs' Opposition, did not apply any tort law not recognized in South Carolina that would render their reasoning inapplicable here. And although not binding on this Court, they are nonetheless persuasive.

Finally, the fact that the out-of-state cases Plaintiffs cited involved individual plaintiffs also does not limit their applicability to this litigation. In all of the cases, the court found that the duty owed by the PFAS dischargers was a broad duty to exercise reasonable care in the disposal of PFAS and to avoid polluting the environment. *See* Opp'n, at 29–30. Such a duty certainly applies to Plaintiffs with the same force that it applied to the individual plaintiffs in those cases. *See also Aqua N.C., Inc. v. Corteva, Inc.*, No. 7:23-CV-16-D, 2024 U.S. Dist. LEXIS 120406, at *12 (E.D.N.C. July 9, 2024) (finding PFAS dischargers owed *a water utility provider* "a duty to exercise ordinary care"). Finally, Unichem suggests that *Utilities Board of Tuskegee v. 3M Co.* is

inapplicable here because "the claims were asserted against only PFAS manufacturers, not users, and proceeded under product liability theories not applicable here." Unichem Supp. Memo., at 12. However, that case involved a negligence claim, and not only products liability claims. *See Utils. Bd. of Tuskegee v. 3M Co.*, No. 2:22-CV-420-WKW, 2023 U.S. Dist. LEXIS 21983, at *22–34 (M.D. Ala. Feb. 9, 2023) (addressing the plaintiff's negligence claim). Additionally, the *Tuskegee* court found PFAS manufacturers had "a duty to exercise reasonable care when supplying chemicals where the foreseeable and normal use of those chemicals, as supplied, causes the dangerous contamination of public drinking water." *Id.* at *25. Although Defendants here are dischargers, not manufacturers, the reasoning underlying the recognition of the duty in *Tuskegee* applies here with equal force—Defendants similarly had "a duty to exercise reasonable care when [discharging] chemicals where the foreseeable and normal [release] of those chemicals, as [discharged], causes the dangerous contamination of public drinking water." *Id.*

### III. CONCLUSION

Based on the foregoing, Plaintiffs GCPW and LWSC respectfully ask that this Court reject Unichem's arguments, submitted on behalf of itself and other Defendants; find that, pursuant to well-established South Carolina tort law, Defendants owed Plaintiffs a duty of reasonable care; and deny dismissal of Plaintiffs' negligence claims on that ground.

Respectfully submitted,

 _/s/ John B. White. Jr.___
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

March 24, 2025

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT 4

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF SPARTANBURG
SOUTH CAROLINA CIRCUIT COURT 7
DOCKET NOS.: 2024-CP-24-00735; 2024-CP-30-00734
2025-CP-30-00005


GREENWOOD COMMISSIONERS OF PUBLIC WORKS,
LAURENS COUNTY WATER AND SEWER COMMISSION,
CITY OF CLINTON, SOUTH CAROLINA,
                    PLAINTIFFS,


vs.


CONE MILLS RECEIVER, ET AL.,
BASF CORPORATION, ET AL.,
                    DEFENDANTS.



                    H E A R I N G
        BEFORE THE HONORABLE GRACE G. KNIE




DATE:              MARCH 11, 2025
LOCATION:          SOUTH CAROLINA CIRCUIT COURT 7




LEGAL EAGLE
Post Office Box 5682
Greenville, South Carolina 29606
864-467-1373
depos@legaleagleinc.com

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

2

APPEARANCES:

      JEROME TAPLEY, ESQUIRE
      RYAN LUTZ, ESQUIRE
      AKIRA WATSON, ESQUIRE
      CORY WATSON, PC
      2131 MAGNOLIA AVE S.
      BIRMINGHAM, ALABAMA 35205

      JOHN B. WHITE, JR., ESQUIRE
      JOHN B. WHITE, JR. P.A.
      291 S. PINE STREET
      SPARTANBURG, SOUTH CAROLINA 29302

        ATTORNEY FOR THE PLAINTIFFS,

      RICHARD WILLIS,  ESQUIRE
      WILL DUBOSE, ESQUIRE
      JOHN TAMASITIS, ESQUIRE
      WILLIAMS MULLEN
      FIRST CITIZENS BANK BUILDING
      1230 MAIN STREET, SUITE 330
      COLUMBIA, SOUTH CAROLINA 29201

        ATTORNEY FOR THE DEFENDANT T&S BRASS & BRONZE
        WORKS, INC.,

      LOLY TOR, ESQUIRE
      K&L GATES, LLP
      ONE NEWARK CENTER, 10TH FLOOR
      NEWARK, NEW JERSEY 07102

        ATTORNEY FOR THE DEFENDANTS CRYOVAC, INC. &
        CRYOVAC, LLC,

      RYAN HEBSON, ESQUIRE
      BURR & FORMAN
      420 NORTH 20TH STREET, SUITE 3400
      BIRMINGHAM, ALABAMA 35203

        ATTORNEY FOR THE DEFENDANT FIRST SOURCE WORLDWIDE,
        LLC and OPPERMANN WEBBING, INC.,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

3

JAMES WEATHERHOLTZ, ESQUIRE
WOMBLE BOND DICKINSON LLP
5 EXCHANGE STREET
CHARLESTON, SOUTH CAROLINA 29401

    ATTORNEY FOR THE DEFENDANT UNICHEM SPECIALTY
    CHEMICALS, LLC,


JAMIE CARROLL, ESQUIRE
CARROLL & WEISS, LLP
2870 PEACHTREE ROAD NW, SUITE 193
ATLANTA, GEORGIA 30305

    ATTORNEY FOR THE DEFENDANT MILLIKEN & COMPANY,


GREG ENGLISH, ESQUIRE
WYCHE, P.A.
200 EAST BROAD STREET, SUITE 400
GREENVILLE, SOUTH CAROLINA 29601

    ATTORNEY FOR THE DEFENDANT FIBERTEX, INC., JAIN-
    CHEM, LTD., and NICCA USA INC.

4

INDEX

PROCEEDINGS.......................................... 5

CERTIFICATE OF TRANSCRIBER........................... 138

EXHIBITS

(NONE MARKED)

(THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH MATERIAL

IS REPRODUCED AS READ OR QUOTED BY THE SPEAKER.)

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

5

```
1        THE COURT:  All right.  Thank you all.  We're on the
2   record with civil action numbers 24-CP-42-734/735 and the
3   city of Clinton case as well, if y'all will bear with me.
4   Let me get that number.  And 25-CP-30-0005.
5        Thank you all very much for your materials.  I felt
6   there's a wall being built around me in my office and down
7   here, but I certainly do appreciate the effort that it takes
8   to put all that together and to get it here via FedEx, hand
9   delivery, or US Postal Service.  I do appreciate it.  I've
10  been reading, and I also want to tell you all how much I
11  appreciate the information because this topic is very
12  specialized.
13       So, in civil action numbers 24-735 and 734, that would
14  be -- I'm just going to make that easier, Greenwood and
15  Laurens County.  I understand there are nine defendants,
16  they're the same defendants, and that there are seven motions
17  to dismiss that have been filed on behalf of all defendants
18  except for what, Cone -- Cone Mills Receiver; is that
19  correct?  There was an answer filed, and I know there are
20  some answers that have been filed.  I see you, Shane, good
21  morning.  And -- and motions to dismiss, but there is not a
22  motion to dismiss regarding that defendant, correct?
23       MS. TOR:  Correct Your Honor.
24       THE COURT:  Okay.  And Cryovac, Inc. and Cryovac, LLC
25  filed a joint motion, correct?
```

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

6

1    MS. TOR:  We already filed two separate motions, one for

2    Greenwood and one for Laurens.

3    THE COURT:  Right, but the -- the two defendants filed

4    together.

5    MS. TOR:  Oh, yes, I apologize, yes.

6    THE COURT:  Yes, and you are?

7    MS. TOR:  Loly Tor for K&L Gates on behalf of Cryovac.

8    THE COURT:  Okay.  And I'll ask you all, sorry, forgot

9    to -- my AA told me to tell y'all, use the mics, and y'all

10   please identify yourselves.  I know y'all are famous

11   nationwide, but for my benefit, if you will please just

12   identify yourselves when you address me, okay?

13   All right.  And so I -- I  know that there are also

14   several motions to stay regarding discovery and I just want

15   to make sure that I understand that the plaintiffs have not

16   agreed to stay discovery in any case.  Would that be correct?

17   And who's going to be responding on behalf of the plaintiffs?

18   MR. TAPLEY:  Your Honor, Jerome Tapley for the

19   plaintiffs.

20   THE COURT:  And we stand up here.

21   MR. TAPLEY:  I apologize.

22   THE COURT:  Welcome.  Okay.  And so you all have not

23   agreed to stay the discovery, but you have granted some

24   extensions that I may not be aware of.

25   MR. TAPLEY:  That is correct, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

7

```
1        THE COURT:  Because the discovery has not been filed,
2    right?  In -- in the court's file?
3        MR. TAPLEY:  We haven't filed a motion to compel, no,
4    Your Honor.
5        THE COURT:  No, I mean, but -- but the discovery that
6    has been sent has not been included in the filings with the
7    clerk, correct?
8        MR. TAPLEY:  That's correct, Your Honor.
9        THE COURT:  That would be correct, okay.  And so y'all
10   just understand that I don't have the benefit of what you've
11   been exchanging, okay?
12       MR. TAPLEY:  Yes, Your Honor.
13       THE COURT:  With regard to that.  Okay.  So I have been
14   handed an agenda, thank you.  And so we will -- the way that
15   this will work, we have plenty of time, okay?  And I want you
16   all to take your time.  As Mr. Willis stressed to me at the
17   status conference, he -- I -- I believe that he wished to
18   treat these as separate cases, although some of the arguments
19   are going to be consolidated, right?
20       And let me just back up one more time and say that I
21   know that I boasted and said I was going to put together a
22   steering committee and I was going to do that by that Monday
23   following that Friday status conference.  But then after
24   reflecting on the arguments made, I thought that it might be
25   premature.  And so I -- I have -- I have a tentative list,
```

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

8

1    but the list is fluid and changing because as y'all know,

2    Richardson Lewis is now removed.  And -- and so those eight

3    or nine cases are no longer before me.  And I -- I would

4    stress to you all to let my office know if that happens with

5    any of the other pending cases.

6        I was notified yesterday by the clerk's office in

7    Gaffney that now there is a city of Gaffney case that -- that

8    has also, there have been some motions filed.  And y'all just

9    please understand that the way that I'm finding out about

10   this is through the clerk's offices throughout the State and,

11   of course, plaintiff's counsel as well, okay?

12       Okay.  And the last thing before -- before we start.  I

13   do have availability the last week of March going into April,

14   and I think my staff did email you all and let you know that

15   as -- as we are trying to schedule more hearings, okay?

16       All right.  And so does everybody have the agenda?  I'm

17   -- I'm assuming that Mr. Willis provided it since he's

18   featured first.

19       MR. WILLIS:  Yes, ma'am.

20       THE COURT:  Okay.  And does everybody have it?

21       MR. WHITE:  Yes.

22       THE COURT:  Okay.  And are we expecting anybody to be

23   addressing me on Webex, or are these all just folks

24   observing?

25       MR. WILLIS:  I think they're all observers for the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

9

1    defense, Your Honor.

2         THE COURT:  Okay.

3         MR. WILLIS:  They may have some issues they want to

4    raise with you, but we tried to get all of the lawyers who

5    are going to address you today on the issues of the motion to

6    be here live.

7         THE COURT:  Okay.  Thank you, and before you all leave,

8    let me have English Mosley, my law clerk, circulate a very

9    basic sign-in sheet or something so that I know who is here

10   physically, the Webex we have a record of.  All right.  So

11   this is Ms. Mosley (indicating), okay?

12        All right.  And this is Ms. Searcy (indicating).  I know

13   that you all have probably been dealing with her a lot about

14   this, and to keep it simple in my office, when you all are

15   communicating and emailing, it's best to email to my AA.  We,

16   English -- I'm also admin. for Common Pleas and the Circuit,

17   and so English is up to here with defaults, okay?  And so

18   it's just simpler that way.

19        All right.  And so is there any objection to then first

20   hearing from the movants?  I will give the then respondents

21   an opportunity to argue and then movants an opportunity to

22   reply, okay?  Okay.

23        MR. TAPLEY:  No objection, Your Honor.

24        THE COURT:  Okay.  And we -- the tech person did make

25   sure that was plugged in and working this morning.  If -- if

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

10

1    y'all want to feel more comfortable at the podium, that's

2    fine.  Okay.

3        MR. WILLIS:  Thank you, Your Honor.  May it please the

4    court.  I'm Richard Willis for, in -- in this motion, the

5    defendant, T&S Brass.  Although, as Your Honor knows, we

6    represent a number of other defendants, and obviously these

7    issues are related and -- and -- and cross-extend to -- to

8    the other cases.

9        Your Honor, I spoke with Mr. White before Your Honor

10   came in with regard to what the best way -- the best agenda

11   to handle this or the best process.  We have tried to

12   separate out the issues and had different lawyers address

13   different issues as we're going through.  If Your Honor finds

14   that you would prefer to hear this motion issue by issue,

15   rather than have the defendants get up and talk for an hour,

16   and then the plaintiffs talk for an hour, and then have a

17   reply, it -- we're -- we're flexible, Your Honor.  And

18   however you want to do it is -- is fine with us, and I think

19   Mr. White said the same thing.  It might be better to do this

20   issue by issue, and I will just leave that up to the court.

21       THE COURT:  How are y'all prepared to argue?

22       MR. WHITE:  Your Honor, for the court.  May I please the

23   court, John White.  We're prepared to issue, as you alluded

24   to earlier, in that we would take issue by issue.  You would

25   make your argument, we'd make our argument, and you would

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

11

1    have an opportunity to reply.

2        MR. WILLIS:  And if -- if that -- Your Honor ---

3        THE COURT:  If that's what y'all ---

4        MR. WILLIS:  --- if the court wants to do it that way,

5    that's fine.  We'll be glad to do it that way.

6        THE COURT:  Well, I'm not trying to interfere with your

7    thought process, okay?

8        MR. WILLIS:  Right.  There is -- there is some overlap.

9        THE COURT:  Issue by issue is fine, but whatever you

10   think is most efficient, okay?

11       MR. WILLIS:  Well, why don't we try it issue by issue

12   and see where we get, Your Honor?

13       THE COURT:  Okay.  Thank you.

14       MR. WILLIS:  And -- and Your Honor, with regard to the

15   stay, I think I can probably take care of that.  So the --

16   the basis for the stay, requesting a stay for discovery, is

17   we wanted discovery to be stayed until Your Honor got here

18   and decided these motions to dismiss.  And I think that

19   whether the plaintiff agreed to that or not -- that I think

20   that's sort of the process that we've sort of fallen into

21   here.

22       So if Your Honor grants the motions to dismiss,

23   obviously it might -- it would have an impact on discovery.

24   If the cases are dismissed completely, there would be no

25   discovery because the cases would be over, and presumably

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

12

1    they would go up on appeal.  But if Your Honor is going to

2    grant a partial motion to dismiss or deny them all, then

3    obviously discovery would then commence, and we have no

4    objection to that.

5         So, Your Honor, for the purposes of this motion today, I

6    wanted to say a little bit about T&S Brass.  Every defendant

7    in these cases is a little different.  T&S Brass is a

8    manufacturing company.  They're located in Travelers Rest,

9    South Carolina.  They employ approximately 250 people.

10   They've been in operation since 1947, and so they're one of

11   the older industrial manufacturing citizens of the State.

12        They manufacture brass fittings, specialty products for

13   food services, industry, commercial plumbing, essentially

14   plumbing equipment and -- and brass fittings for plumbing,

15   faucets, that sort of thing.

16        They discharge their wastewater to the Mauldin

17   Wastewater Treatment Plant pursuant to a pre-treatment permit

18   issued by Mauldin -- the Mauldin plant that's authorized by

19   the Federal Clean Water Act and by DHEC, now DES regulations,

20   and they're in compliance with their permit.  They don't

21   discharge wastewater to a stream or a river or to Lake

22   Greenwood.

23        And while there may be PFAS compounds, and I'm just

24   going to link -- lop all of these chemicals together, Your

25   Honor, and call them PFAS if that's okay.  While there may be

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

13

1   PFAS compounds in their wastewater, I don't know that for

2   sure, but that's alleged, and of course, Your Honor has to

3   assume that the factual allegations are true for the purposes

4   of this motion.

5        Like all the defendants in this litigation, their

6   contribution to the overall load of PFAS and drinking water

7   in South Carolina is very, very small.  And whether it finds

8   its way to plaintiff's intake is -- is obviously a factual

9   question.  But therein lies one of the problems with this

10  litigation, because the way it's brought, it seeks to impose

11  what could be enormous costs on a small subset of selected

12  industrial clients and whose contribution to the overall load

13  of PFAS in surface water and drinking water would -- is

14  grossly disproportionate, much smaller than what the -- the

15  total is.  And -- and that's particularly true because of the

16  way the case has been pled and the effort to disclaim any

17  liability for PFAS contamination related to firefighting

18  foam.  Now, we understand the reason that's been done is to

19  keep this case out of federal court.

20       If, Your Honor, I don't know whether Your Honor has had

21  a chance to look at the recent Fourth Circuit opinion on the

22  motions to remand in the cases that were removed, the

23  Maryland case and the State of South Carolina case.  I have a

24  copy of that opinion here, Your Honor, if -- if -- if you

25  haven't had a chance to see it.  And that -- that just --

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

14

1    that opinion just came out last week, Your Honor, and it's

2    interesting.  It doesn't directly affect our emotions, but it

3    illustrates one of the problems we have here with this case,

4    because in that case, the Fourth Circuit basically said the

5    effort to disclaim liability for firefighting foam when

6    contamination to surface water and groundwater caused by

7    firefighting foam is one of the major, if not the major

8    source of PFAS contamination to groundwater, are to surface

9    water is problematic.

10        And for the purposes of the removal, they basically

11   rejected that artful pleading and said there may be federal

12   officer jurisdiction here regardless of how the case has been

13   pled and they remanded the case back to Judge Gergel to make

14   some findings and so we expect he'll make a ruling on that,

15   and then it'll go back up to the Fourth Circuit.

16        But as a matter of introduction, I think it's important

17   to note what these cases before you are and what they're not.

18   How are they different from the cases that are in the

19   multi-district litigation in federal court?

20        T&S Brass, Your Honor, does not make PFAS compounds.  It

21   uses PFAS compounds, or it did at one time in its operation.

22   And unlike the cases that were before you but have been

23   removed to federal court, none of the so-called AFFF

24   manufacturing defendants, such as 3M, DuPont, Chemours, Tyco,

25   all the defendants who basically are in the MDL and who have

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

15

1     funded the -- the MDL settlement.  None of these

2     manufacturing clients have been sued in the cases that

3     Mr. White has brought.  And had they been sued, these cases

4     would also have been removed by 3M to federal court.

5     Instead, these cases have sued various defendants that are

6     alleged to use PFAS compounds in their processes, or perhaps

7     did so at some point in the past, and with regard to some, in

8     the quite distant past.

9          And as Your Honor is aware, the -- the effort to

10    disclaim liability for FFF -- AFFF, leaves a huge orphan

11    share in this case.  It leaves a -- a chemical that's

12    primarily responsible for the contamination that plaintiffs

13    are complaining of, but there's no one there to answer for

14    that.  And so the net result of this sort of selective choice

15    of targets by the plaintiff is that a small subset of the

16    total contribution to PFAS and drinking water, has -- the

17    plaintiffs have sort of chosen to impose all of their past,

18    present, and future costs on this small subset, which is not

19    only strikes our clients as sort of massively unfair, but it

20    -- it really is an existential threat to these defendants,

21    Your Honor.  These are not big companies.  This is -- most of

22    these claims are not covered by insurance.

23         And so if -- if this -- if these cases go forward in an

24    effort to impose, you know, what's been estimated by some as

25    50 million or 60 million dollars or some large number in

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

16

1    terms of what it's going to cost to install water treatment

2    systems in order to get the PFAS levels down to four parts

3    per trillion, and this is -- this is a massive cost that no

4    one really knows what it's going to be.  And that's again an

5    existential threat to a number of these defendants.

6        And what is also frustrating is that the plaintiffs seem

7    to be attempting to impose this liability through State of

8    South Carolina common law causes of action, nuisance,

9    negligence, and trespass.  And in so doing, we believe that

10   they are sort of trying to cram a square peg into a round

11   hole.  The square peg being their claims, the round hole

12   being the -- these common law causes of action that don't

13   really fit these claims or that will have to be bent out of

14   shape in order to accommodate them.

15       And interestingly, Your Honor, in an effort to avoid

16   federal court, plaintiffs have ignored a cause of action and

17   a remedy that Judge Gergel and other commentators have sort

18   of pointed to as, if there's going to be a litigation

19   solution to the PFAS problem, that remedy probably lies in a

20   private party cost recovery action under federal CERCLA.

21   Under Sections 107 and Section 113 of CERCLA, where a party

22   that's had to respond to the release of a hazardous substance

23   can sue the generators of that hazardous substance to recover

24   their response costs if they're consistent with federal

25   regulation.  And what -- what a CERCLA claim would do, Your

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

17

1    Honor, is provide a vehicle for fair allocation of

2    responsibility which we don't have, unfortunately, under

3    South Carolina law.

4        So if, Your Honor dismisses these cases, I -- I do want

5    the court to understand that there is a remedy for the

6    plaintiffs in this case.  They can go to federal court and

7    they can bring a CERCLA action against the parties that they

8    believe to be responsible.

9        So our clients came to court today concerned that

10   they're being selectively victimized for a problem that they

11   had no role in or an exceedingly small one, if at all, just

12   because they're industrial entities and they're easily and

13   unfairly demonized.  So that's really all I want to say from

14   an introductory standpoint.  That's why these motions are

15   important to us, Your Honor, and they're not your

16   run-of-the-mill Rule 12 motion.

17       I remember arguing a case before Judge Buckner many

18   years ago down in Hampton County and I said, "Your Honor, I

19   have a motion to dismiss." and he sort of rolled -- rolled

20   his eyes and I said, "Your Honor, this is not the your

21   run-of-the-mill motion to dismiss," and he said, "Mr. Willis,

22   every motion you make is a run-of-the-mill motion to

23   dismiss," and of course he denied that motion.  But I think

24   Your Honor has given -- in giving us the time and have -- and

25   looking at the briefs I think you recognize that these are

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

18

1    some interesting issues at least.

2        So, Your Honor, let me talk -- let me start by talking

3    about Rule 12.  And this is not surprisingly the only thing

4    that the defendants and the plaintiffs agree on.  So there --

5    there's at least one issue where there's a general agreement,

6    and that is Rule 12's pleading standards and how it's

7    supposed to work.  And it goes without saying, but I will say

8    it anyway, that the court's inquiry here is limited to the

9    four corners of the complaint, and we realize that.

10        We realize that the court must assume the well-pleaded

11    facts and reasonable inferences to be drawn from the

12    complaint are true, but the court is not required to presume

13    the propositions of law are correct.  And that in any motion

14    to dismiss, and these motions are no different.

15        The overriding question before the court is, do the

16    complaints read in a light most favorable to the plaintiff,

17    state a justiciable controversy.  Stated otherwise, do the

18    facts as alleged state valid causes of action under South

19    Carolina law.

20        Unfortunately, our agreement with the plaintiff ends

21    there.  They argue that they have stated causes of action,

22    and this is a justiciable controversy, and we argue that they

23    have not, and it is not.  So to conserve Your Honor's time

24    and attention, the moving defendants have conferred, and

25    we've attempted to identify some common arguments and assign

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

19

1    roles.  And we've handed up the agenda.

2         And so my role today, Your Honor, substantively, is to

3    address what we've identified as the justiciability issue,

4    specifically standing and ripeness.  Mr. Hebson will address

5    failure to join indispensable parties.  Ms. Tor will address

6    trespass and nuisance.  Mr. Weatherholtz will address

7    negligence and traceability.  Mr. Tamasitis will address the

8    municipal cost recovery rule.  Mr. Dubose will address

9    primary jurisdiction.  And Mr. Carroll will address statute

10   of limitations.  And then I'll try to wrap it up.  And so to

11   that extent, Your Honor, we'll permit that, we'll try to stay

12   in our lanes.

13        So let me begin to talk about justiciability.  And, Your

14   Honor, justiciability, as we pointed out in our brief,

15   incorporates stand -- sort of, both -- both the issue of

16   standing and the issue of ripeness.  But essentially what

17   we're saying is because of the uncertainty as to the finality

18   of the regulatory requirements that will ultimately apply to

19   PFAS contamination in groundwater, surface water, and

20   drinking water, and because the ultimate remediation

21   technologies and treatment technologies that will be required

22   to treat PFAS to drinking water standards are certain to

23   change over time.

24        We believe this litigation is premature, and we believe

25   that at least this aspect of the case should be dismissed

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

20

1    without prejudice or stayed until more is known and we have

2    more certainty.  And as Your Honor knows, the regular -- the

3    regulatory landscape continues to change and has changed even

4    after the plaintiffs have filed suit.

5         Most recently, on January 21, 2025, under the due

6    administration, the Office of Management and Budget has

7    withdrawn EPA's proposed rule on Clean Water Act effluent

8    limitation guidelines and standards for PFAS manufacturers.

9    And this decision was part of a broader regulatory freeze

10   that was mandated by an executive order from President Trump.

11   The -- these withdrawn rules would have established

12   technology-based effluent limitations that would apply to the

13   companies that were manufacturing PFAS and then, as a -- as a

14   consequence, had PFAS in their discharge.

15        Now, that doesn't affect the four parts per trillion --

16   10 parts per trillion maximum contaminant limit for drinking

17   water which is at the core plaintiffs case, but they do

18   affect the amount of PFAS that can be put into wastewater

19   which then has an effect on what the cost will be in terms of

20   hitting those drinking water standards.  Now, those drinking

21   water standards are also in a bit of flux because as we

22   pointed out in our brief on page six, there are three

23   separate legal actions pending that challenge EPA's PFAS

24   drinking water rules, including the MCLs, the maximum

25   contaminant limits for drinking water, including one of the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    very trade associations that purports to represent the water

2    provider plaintiffs in this case.

3        Now, plaintiffs say in their brief that we're wrong

4    about that.  Not because the litigation doesn't challenge the

5    regulations, because it does, but because they say it doesn't

6    challenge EPA's underlying scientific findings concerning the

7    need to remove PFOS and PFOA and related compounds from

8    drinking water.  But then they go on to say, and I quote,

9    they say, "Instead, the parties challenged the MCLs for

10   mixtures of various PFOS compounds, and they complained that

11   EPA's enforceable limits for PFOA and PFOS were too close to

12   MCL goals to be economically feasible, posing risk to water

13   affordability."

14       Now, Your Honor, I don't want to be obtuse here, but

15   that's exactly what we're saying.  That's consistent with our

16   point.  That there's ongoing litigation challenging whether

17   these standards are going to ultimately be in force and

18   effect in 2029 when they're alleged to become effect or when

19   they're planned to become effective.

20       So those are just two illustrations of why this case is

21   not ripe.  As the Court knows, these PFAS drinking water

22   standards are not planned to go into effect until April of

23   2029, so that's four-and-a-half years from now.  There are no

24   current legal standards for PFAS in drinking water, and the

25   underlying rule on PFAS in effluent has been withdrawn.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

22

1          There's no current requirement on the -- on the

2     plaintiff's part to incur any costs or damages with regard to

3     PFAS, and I -- I looked at their complaint carefully to see

4     whether there was a clear allegation that they had incurred

5     costs that identified those costs, and I really couldn't find

6     that.  There's some allusions to, well, maybe they would have

7     to, maybe there's some monitoring that they have to do, maybe

8     they've done some investigative analysis to determine what

9     defendants use PFAS.  I don't believe those would be

10    recoverable damages.  But we also know that the cleanup

11    technologies and its ultimate cost is certain to change over

12    the next four years.  Maybe it'll get worse.  Maybe it'll get

13    better.  No one knows.

14         But the bottom line, Your Honor, is there's no present

15    way for anyone, much less a jury, to determine with any

16    degree of certainty what the plaintiffs will be required to

17    do in 2029, if then or if ever.  Now, to get around that

18    argument, plaintiffs argue in their brief that the defendants

19    have mischaracterized their allegations, and they say that we

20    -- we've argued that plaintiffs' injuries arise from

21    regulatory obligations rather than defendants' ongoing

22    contamination of their properties.

23         But, Your Honor, again, if you're limited to the four

24    corners of the complaint and you just read the complaint, the

25    truth is they allege both.  Both damages they're going to

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

23

1    suffer because of future regulatory compliance costs.  The

2    cost of installing new water treatment systems to remove PFOS

3    and PFOA from drinking water, and they also allege that they

4    have current contamination on their property that they

5    believe they can sue for.

6        And, Your Honor, the -- if you just look at paragraph 73

7    of their complaint, you see they say -- they state,

8    "Plaintiff has sustained special injuries as a result of

9    defendant's public nuisance, including, but not limited to

10   the loss of use of its property."  And this is the operative

11   language that I'm focused on.  "The inability to provide

12   potable water to customers without concentrations of PFOA,

13   PFOS, et cetera, deemed unsafe by EPA.  Expenses associated

14   with future acquisition, installation, and operation of

15   required treatment technologies to remove unsafe

16   concentrations of these PFOS from water."  So, in fact, they

17   do seek future costs of required treatment technologies.  And

18   our point is, at this stage, that is uncertain and

19   speculative.

20       Your Honor, to have a justiciable controversy, you have

21   to have injury-in-fact, and their legally protected interests

22   must be both concrete and particularized.  That's language

23   from the US Supreme Court cases that we cite in our brief.

24   Their -- their damages have to be actual or imminent, which

25   means on the -- on the horizon, certain to happen, not

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

24

1    conjectural or hypothetical.  And where plaintiffs' claims

2    are contingent on future events that haven't come to pass and

3    may never, then this aspect of their claim is not ripe, and

4    it should be dismissed without prejudice for it to be brought

5    at a later time.

6        I think, Your Honor, if -- if we were here before you in

7    a -- in a simpler context, where this was just a lawsuit

8    between two private businesses, and one business was suing to

9    recover costs that it might have to incur four years from

10   now.  You would have no hesitancy in saying, "Okay.  That's

11   fine.  I'm going to dismiss the case, re-file it when that

12   eventuality comes to pass."  And you would be correct in

13   doing so.  And this case, while a little bit more complicated

14   than that, is really no different.

15       The fact that plaintiffs -- that plaintiffs are also

16   seeking damages for alleged past and present contamination

17   presently on its property that they claim devalues its

18   property, interferes with its ability to do business, that

19   doesn't save the claims for the -- the -- the future

20   treatment technologies they're going to have to incur.  And,

21   Your Honor, frankly, that's the big elephant in the room.

22   That's the big number that has an extential -- existential

23   threat to the defendants in this case.

24       So, the fact that there are no present regulatory

25   standards for permissible levels of PFOA or PFOS in soil or

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

25

1    groundwater means that there is, in fact, no present

2    ascertainable damages flowing from these allegations.  Some

3    sort of regulatory standard is necessary to determine what is

4    permissible, what levels would be considered negligent,

5    particularly since PFAS compounds, as the court knows, are

6    everywhere.  They're ubiquitous, and they're found in dozens

7    of different sources, including, even domestic wastewater

8    and, Your Honor, even rainfall has PFAS in it.

9         Let me mention briefly, Your Honor, the concept of

10   redressability.  For a -- for a case to be justiciable, the

11   injury must also be, "Redressable through the claims that

12   have been asserted."  For example, take -- take the claim for

13   injunctive relief.  Let's suppose that the court, after the

14   trial of this case, decides to enjoin T&S Brass from using or

15   discharging PFAS.  Well, that doesn't redress the issue, the

16   problem that the plaintiffs have, because publicly-owned

17   treatment works are the ones who directly discharge

18   wastewater to the lake and stream systems, the wastewater

19   treatment plants that we claim are indispensable parties but

20   aren't in the case, not T&S Brass.  They don't discharge to

21   lakes or stream systems where plaintiffs then draw their

22   water to convert to drinking water.  So if that's the case,

23   even if T&S Brass is discharged and joined, there will still

24   be high levels of PFAS from other sources who haven't been

25   sued, particularly the primary one, which is firefighting

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

26

1    foam.  So, Your Honor, the claim, what that means is the

2    plaintiff's claims are not redressable by the reliefs

3    plaintiffs seek, and therefore the case is not justiciable.

4         With regard to standing, Your Honor, as we say in our

5    brief, the plaintiffs don't own the water in Lake Greenwood.

6    They don't own the water in the Reedy River that they

7    withdraw from.  The State of South Carolina owns that water,

8    and it has its own lawsuit seeking damages, and that one is

9    the one that went up to the Fourth Circuit and has been sent

10   back down to Judge Gergel to deal with the question of

11   remand.  So plaintiffs can't seek the same damages that the

12   State of South Carolina is seeking.  And although they claim

13   -- although they claim that damage in their complaint, they

14   argue that the contamination interferes with their right to

15   use Lake Greenwood.  And there'll be more on that later, Your

16   Honor, when we get to the municipal cost recovery rule.

17        So, defendants aren't mischaracterizing the nature of

18   plaintiff's case.  They're mischaracterizing it in their

19   brief in an effort to get past this motion.  Your Honor,

20   don't take my word for it.  Just read the complaint.

21   Paragraph 40, it -- it -- it talks repeatedly about imposing

22   the future cost of treatment of water and PFAS in water,

23   which is what we believe is not ripe and is too uncertain to

24   seek recovery for at this time.

25        If you look at paragraph 44 of their complaint,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

27

1     paragraph 61, paragraph 67, 67B requests that the jury award

2     damages to fund the acquisition, installation, and operation

3     of new water treatment technology at plaintiff's wastewater

4     treatment plant or at plaintiff's drinking water treatment

5     plant to remove legacy PFOS, PFOA, et cetera.  So they are

6     seeking future costs.  Paragraph 76, and then in there,

7     prayer for relief, subparagraph E.

8          So, Your Honor, I'm referring the court to language

9     directly in the complaint, so we don't have to pretend that

10    plaintiffs aren't seeking recovery for future PFAS treatment

11    systems.  And that cost is -- is unknown, and it's

12    speculative.  It may never be required.  And so that's why

13    their claims are not ripe.

14         In conclusion, Your Honor, on the ripeness issue.  Your

15    Honor has the authority to dismiss this aspect of the case

16    until more is known.  Your Honor also has authority to -- to

17    just stay it or set it aside or bifurcate the case between

18    what the plaintiffs say -- now say in their brief, their

19    cases about current contamination.  Well, if that's the case,

20    we can deal with that.  If -- if their case is as they argue,

21    just like a run-of-the-mill groundwater contamination case

22    where ground waters move from one property to another and

23    it's caused property devaluation, that's one thing.

24         But to allege in their complaint that they're also

25    entitled to these future speculative damages that might be

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

28

1    massive as to, you know, asking a subset of defendants to

2    fund an entire wastewater treatment system that's going to

3    serve everyone, that -- that part of the case is not ripe.

4    It's premature, it's uncertain, it's speculative, it's

5    contingent on future events that may or may not occur.  So we

6    ask the court to dismiss these claims or stay these cases

7    until we can get some certainty as to what we're dealing

8    with.  Thank you, Your Honor.

9        THE COURT:  Thank you.

10        MR. TAPLEY:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. TAPLEY:  Jerome Tapley for the plaintiffs, and may

13    it please the court.  I have some responses to the argument

14    that was just made, but I would ask the court before I start,

15    if the court has any questions, I would be happy to take any

16    questions from the court.

17        THE COURT:  Yes, sir.  I'm happy (inaudible).

18        MR. TAPLEY:  Your Honor, I want to put these cases

19    before you this morning into a little better context than we

20    heard earlier.  Between Greenwood and Laurens County, the two

21    utilities collectively serve about 65,000 customers.  If you

22    assume for a moment that those customers average about four

23    people per household unit, we're getting real close, Your

24    Honor, then to a quarter of a million people affected by the

25    contaminated source of their drinking water.  And I know much

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

29

1    was made of T&S Brass's specific facts of how large their

2    company is or isn't, but the fact of the matter is these

3    defendants have collectively made a very big mess for the

4    people who live downstream.  And that mess has serious health

5    implications for the peoples in those communities.

6        Your Honor, I want to touch on the Fourth Circuit case

7    for a moment that was referenced.  It has nothing to do with

8    these cases.  It has to do with a very obscure federal

9    defense called federal officer defense.  None of these

10    defendants claim they're federal officers, nor could they.

11    That's something that's present in another series of

12    litigation, but really has nothing at all to do with the

13    cases at hand.

14        Moreover, Your Honor, there's no allegation in this case

15    that what's happening downstream in Laurens and Greenwood has

16    anything to do with AFFF.  There are no AFFF allegations in

17    the complaint.  There's no AFFF evidence in front of the

18    court.  We dispute that this is an AFFF case.  It's where it

19    belongs here in State court in South Carolina because this is

20    a South Carolina common law case.  And the facts of this case

21    fits the South Carolina common law perfectly, Your Honor.  I

22    did hear that the application of South Carolina common law

23    was somehow unfair.  I don' t know that I've ever heard a

24    lawyer argue that the common law was unfair.  At this point,

25    its foundations are about 900 years old.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

30

```
1          As to the justiciability of the claims in these -- in
2     these two cases, and the justiciability of the common law
3     claims specifically in these cases, these cases are about
4     past, present, and future property injuries under South
5     Carolina common law.  It is true that regulatory standards
6     are a yardstick by which some of those damages might be
7     measured.  But it is not true that the damages stem solely
8     from regulatory standards.
9          As far as the cases which are pending in federal court
10    challenging the drinking water standards as they concern
11    PFAS.  Two things are true there.  One, those standards are
12    sufficiently concrete to allow those cases to be ripe for
13    adjudication.  And I don't understand how, on the one hand,
14    defendants can argue that the standard is not sufficiently
15    concrete to make a challenge of the standard ripe for
16    adjudication, yet it's not ripe enough to be an issue in this
17    case.  The mere fact that that case exists shows that the
18    standard is live and actionable.
19         Your Honor, it's also true and it's in our complaint
20    that plaintiffs in these cases have until '29 to come into
21    compliance with the now valid drinking water standards.  But
22    they cannot wait until the '29 to do something.  What they're
23    going to have to do in terms of engineering solution, costing
24    out the construction of that solution, creating budgets,
25    coming up with the revenue to build that solution,
```

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

31

1    constructing that solution all in an environment, Your Honor,

2    where the need and the demand in the economy for this type of

3    technology and for this type of construction has ballooned

4    since the issue of the new regulations.

5        So what might have cost a certain dollar amount two

6    years ago is a very different environment now.  So they've

7    got to go through this process.  They've got to start

8    measuring, which they're doing now, coming up with the

9    different options, evaluating the different options with

10   engineering experts, design a plan for construction of a new

11   filtration plant, and begin that construction, and get that

12   done by 2029.  It is not entirely certain that that is even

13   possible.  It may be that some of our clients have to ask for

14   grace and an extension of time in order to come into

15   compliance with the new standard.  But to say this is not

16   real, that they don't have to do anything and we can wait

17   until 2029.  2029 is way too long.  I'm not sure right now is

18   enough time, nor are our clients.

19       Also, I want to be very clear, Your Honor, on this issue

20   of the PFAS, which these defendants undisputably discharged

21   upstream of our clients in South Carolina.  It is absolutely

22   clear that when they discharged these pollutants to their

23   local sewer, they knew or should have known that those

24   pollutants were going to get into the creeks, streams,

25   ultimately the rivers, and travel downstream.  They also knew

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

32

1    that under the law, they can't discharge any pollutants

2    without a permit.  It is undisputed and will remain

3    undisputed that no defendant in this case ever had a permit

4    to discharge PFAS pollutants.

5        On the issue of water and the use of water coming out of

6    Lake Greenwood.  Our clients -- our clients have property on

7    the lake.  They have riparian rights, the rights to access

8    and use that water under South Carolina law.  They also, Your

9    Honor, and I think this is critically important, they have a

10   permit from the State of South Carolina telling them how much

11   water they can remove.

12       Moreover, they can only take water from that source.

13   They can't decide, okay, this is polluted.  Let's go look for

14   another place and go start drawing water there.  The State

15   has to approve of their withdrawal of water, and that's

16   because the State manages all the waters of the State.  This

17   is their water source.  This is their property located on

18   this water source, and when they use that water source, they

19   now have to install additional filtration in order to meet

20   the standard.

21       Your Honor, also back to the standard and to the EPA's

22   determination, one thing that is in our papers and don't want

23   the court to lose sight of it, what has not been challenged

24   in any of the litigation challenging the drinking water

25   regulations is the health findings.  There's no challenge to

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

33

1    that, Your Honor.  There's no challenge to this huge body of

2    scientific research which says there's no safe level of these

3    chemicals in drinking water.  That's the MCLG.  The MCLG, the

4    health advisory, and the health determinations by EPA, no

5    matter how this litigation goes in federal court, will

6    remain.

7         So to be clear, Your Honor, we have current damages.

8    Those damages stem from the contamination of our property

9    with a pollutant that nobody ever gave them permission to

10   release into the environment.  Many of those chemicals were

11   released days ago, weeks ago, months ago, years ago.

12        PFAS is a very interesting chemical in how it reacts in

13   the environment.  This is not like a tractor-trailer wreck,

14   which occurs on the interstate and spills a bunch of diesel

15   fuel into a river.  Scientists can measure that.  They can

16   monitor that plume as it travels downstream all the way to

17   the ocean.  And they can give really precise, predictable

18   information to water utilities downstream as to when that

19   plumes going to pass them by, when not to take water out,

20   when to rely on reserves, and then when it's all clear again,

21   that's not PFAS.

22        PFAS binds to soil along the river and then it gets

23   stirred up again and makes another migration with the next

24   rain.  It binds to organic matter that's fallen from trees

25   and plants into the river, and then he gets stirred up again

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

34

1    and migrates a little further with the next rain.  It is

2    referred to as a forever chemical because there is not a

3    natural process in the environment which destroys these

4    chemicals or degrades these chemicals in any relevant period

5    of time.

6         This problem, Your Honor, will remain far past the

7    expiration of the lives in this courtroom.  It will for

8    generations be a problem in these rivers and in Lake

9    Greenwood.  The only practical, reliable, and sensible way to

10   address this problem is the method chose by plaintiffs.  It

11   is to install filtration where the water is taking -- is

12   taken from the environment and converted into drinking water,

13   and to remove the chemicals.  So that the citizens in

14   Greenwood and Laurens County that rely on these two utilities

15   for their drinking water can have reliable, safe drinking

16   water that is no longer contaminated with the PFAS, which

17   these defendants released into the environment.

18        And, Your Honor, there was mention of if this were a

19   different case, a simpler case between two businesses about

20   some future speculative damage which may or may not occur.  I

21   don't know how that has anything to do with this case.  This

22   case is not about something future and speculative.  I don't

23   know what the argument about changes in technology has to do

24   with this case, because I'll tell you, I think if this were a

25   different, simpler case of a man who herniated a disc in his

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

35

1    back at work, and the defendant in that case stood before

2    Your Honor and said, Your Honor, there's a lot of upcoming

3    new changes in back surgeries.  It might be cheaper in a year

4    or two from now.  We don't really know what it ought to cost

5    to fix his back, but his doctor says I know what surgery he

6    needs right now.  I don't think Your Honor would buy that

7    argument for a minute.  The same's true here.

8         Our clients are working with their engineers, and they

9    know what the available technologies are, and they're going

10   to choose from those to provide the water to their customers

11   in the way they're required to provide it, and in a way that

12   is safe, based on the health determinations that are yet to

13   be challenged, and frankly, aren't subject to challenge.

14        Your Honor, thank you for your time.

15        THE COURT:  Okay.  Thank you.  Okay.  Mr. Willis?

16        MS. WILLIS:  Briefly, Your Honor.  Counsel said these

17   defendants have made this mess, and as I'm sure the court

18   knows, if -- if the court has spent any time getting general

19   information about PFAS just from the Internet, the -- the

20   point is everyone has made this mess.  Homes generate PFAS

21   contamination in their domestic wastewater every time they

22   flush the toilet.  There's PFAS in rainfall.  It's not just

23   these defendants.

24        And -- and the reason why we brought, Your Honor, the --

25   the -- the Fourth Circuit case to your attention is it does

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

36

 1    have something to say about this litigation because it says

 2    this effort to disclaim any liability associated with

 3    firefighting foam.  When firefighting foam has been

 4    recognized by EPA and DHEC as the primary source of PFAS

 5    contamination to lakes and rivers, because this firefighting

 6    foam has been used for decades by fire departments, by

 7    airports, by Department of Defense facilities, by Department

 8    of Energy facilities.  And it's -- and it's concentrated with

 9    PFAS because that's good at putting out fires.  And it's

10    sprayed all over the ground, and it gets in ditches, and it

11    gets in storm water runoff, and it finds its way to streams

12    and lakes.  And it is the primary source, but not in this

13    case.

14        We can't point our finger at that and say our share of

15    PFAS is only one percent.  It's 99 percent firefighting foam

16    because South Carolina law does not permit us to do that.

17    And I take no umbrage from criticizing common law.  Your

18    Honor knows there is a debate raging in the legislature right

19    now about whether or not South Carolina's allocation law is

20    fair.  So that's the reason we -- we cited that.

21        With regard to the observation that because challenging

22    the regulations is right for adjudication, and therefore this

23    case should be ripe, well, there's obviously a difference.

24    You can challenge regulations before they're final.  And so

25    that's what's going on there.  So that doesn't mean this case

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

37

1    is ripe, it just means that case is ripe.

2          Defendants knew or should have known that there was PFAS

3    contamination in their wastewater.  That's a problem for the

4    plaintiff as well, Your Honor.  They knew or should have

5    known.  And they have statutes of limitations that they have

6    to comply with that Mr. Carroll will be talking about in a

7    minute.

8          Your Honor, if this case was just about the current

9    situation, current property damage at the plaintiff's

10   facility, I think we could probably figure out a way to go

11   forward, but it's about more than that.  It's about these

12   future costs that are huge.  And those are the ones we

13   believe are too speculative for a jury to base a decision on.

14   And -- and there's no prejudice, no harm at all to the

15   plaintiffs to separate that out, to carve that out, and say,

16   come back to me when you're more certain as to what it's

17   going to cost to respond to the federal regulations when they

18   become final.  Thank you.

19         THE COURT:  Thank you, Mr. Willis.  Okay.  Anything

20   else?  I'm being a little informal.  I don't want this to be

21   a ping-pong back and forth, back and forth, but on that

22   issue.  Any -- anything else, earth shattering?  I will let

23   Mr. Willis respond.

24         MR. TAPLEY:  Yep.

25         THE COURT:  You're not required to.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

38

1          MR. TAPLEY:  I'm going to be very brief.  Your Honor,

2     just to remind the court that the purpose of this hearing and

3     the court's inquiry into whether or not plaintiffs have pled

4     a case is limited to the four corners of the complaint.  All

5     this new supposed evidence about AFFF that we didn't plead in

6     our complaint really has nothing that needs the court's

7     attention.

8          THE COURT:  Okay.  Thank you.

9          MR. WILLIS:  We agree on the standard, Your Honor.  We

10    understand it's limited to the four corners of the complaint.

11    Thank you.

12         THE COURT:  Thank you.  Okay.  So are we ready now to

13    move Mr. Hebson?

14         MR. HEBSON:  Yes, Your Honor.

15         THE COURT:  Good morning.

16         MR. HEBSON:  Good morning, Your Honor.  May it please

17    the court.  My name is Ryan Hebson from Burr & Forman, and we

18    represent Oppermann Webbing and First Source Worldwide in

19    connection with these cases.   And my role today is just to

20    talk very briefly about the issue of the failure to join

21    indispensable parties.  And here, this is the wastewater

22    treatment facilities.

23         And, Your Honor, I just have three quick points that

24    really are based on the allegations of the complaint as

25    written.  And first, Your Honor, I'd just point out that not

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

39

1     all of the defendants have currently moved to dismiss or to

2     join these wastewater treatment plants as indispensable

3     parties.  However, as Your Honor is well aware more than I

4     am, not all defenses are subject to waiver in the same way

5     as, say, personal jurisdiction, and more like subject matter

6     jurisdiction.  The failure to join an indispensable party can

7     be raised -- later in the case, can be raised on a motion for

8     judgment on the pleadings.  It can be raised on a motion for

9     judgment on the pleadings. It can be raised on the court's

10    own motion and all the way up to trial, Your Honor.  And so

11    the failure to raise it is not subject any of the defendants

12    to waiver.

13         My second point, Your Honor, just goes straight to the

14    -- the text of Rule 19.  It states, in pertinent part, "A

15    person who is subject to service of process and whose joined

16    or will not deprive the court of jurisdiction over the

17    subject matter of the action shall be joined as a party in

18    the action if, in his absence, complete relief cannot be

19    accorded among those already parties."

20         And, Your Honor, on this issue, it really is all about

21    the allegations and the complaint.  In paragraph 72 is one

22    example, and it really does state these kind of facts, allege

23    them throughout.  It says that plaintiffs have a right to

24    potable water that is reasonably pure and safe and free from

25    PFAS.  And amongst the relief that's being sought in the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

40

1    complaint, and this is in a number of paragraphs, including

2    66, 72, and 89, "Plaintiff seeking injunction to require the

3    defendants to cease all discharges into the Reedy River, the

4    Saluda River and Lake Greenwood."

5         And, Your Honor, earlier plaintiffs counsel said

6    defendants have made a big mess for people who live

7    downstream.  And, Your Honor, that's where this issue of the

8    failure to join these wastewater treatment plants really come

9    in, come into fruition, and come into effect here because

10   these defendants do not discharge directly into any of the

11   river waters and did like into Lake Greenwood into the Saluda

12   River or into the lower Reedy River.  Rather they are taking

13   their wastewater to wastewater treatment plants who then

14   treat the water before it is discharged.  And so to say that

15   these defendants are discharging into the water is not

16   exactly the right way to look at it.  And, Your Honor, this

17   is also alleged specifically in the complaint and this is

18   paragraph four, where it says, "Defendants discharge these

19   products to surface water via certain wastewater treatment

20   plants located upstream.  These wastewater treatment plants

21   include the Mauldin Road Wastewater Treatment Plant, the

22   Lower Reedy Wastewater Treatment Plant, and Piedmont Regional

23   Wastewater Treatment Plant."

24        And so, Your Honor, it is, if this is about discharges

25   into the river, and certain of the relief that's being

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

41

1    requested is to have an injunction to stop the discharging

2    into the river, then it needs to be noted that it's the

3    wastewater treatment plants which, for whatever reason, have

4    not been named as defendants in these cases.  These are the

5    entities that are actually discharging into the river.  These

6    are the entities that are tasked with treating the wastewater

7    before discharging it into the river.

8         And, Your Honor, this is an issue that has come up

9    before in other cases and I would direct, Your Honor, to a

10   case from the Alabama Supreme Court which is ex parte advance

11   disposal services south.  That citation is 280 Southern 3rd

12   356 and in that case dealt with a similar fact pattern where

13   a landfill was disposing of leachate into a wastewater

14   treatment facility.  The wastewater treatment facility was

15   then treating it and discharging it into the river.  The

16   plaintiffs in those cases were asking for an injunction

17   against the discharges by advanced disposal, the defendant in

18   the case, into these wastewater treatment facilities.  And

19   the issue there was that advanced disposal in that case was

20   only making up a small portion of the amount of wastewater

21   that was going into the facilities being treated and then

22   discharging.  In part and part, here's what the Alabama

23   Supreme Court said, "The majority of the affluent being

24   discharged -- discharged into the river will continue to

25   reach the plaintiff's water supply even if an injunction is

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

42

1    ordered for advanced disposals leachate."

2         And here, Your Honor, that's exactly the same situation.

3    These defendants make up only a small portion of the

4    wastewater that is going into these wastewater treatment

5    plants.  It is then the wastewater treatment plants that are

6    treating it and discharging it into the river.  Any

7    injunction against the defendants that would cease them --

8    that would stop them from discharging into the wastewater

9    treatment plant will have no impact on any of the other

10   non-parties who are also using these wastewater treatment

11   plants.  And without these wastewater treatment plants in the

12   case, the same discharging will be occurring by the

13   wastewater treatment plants.

14        And finally, Your Honor, my third point that I just

15   wanted to bring up is in plaintiff's opposition brief, in

16   response to the issue of a necessary and indispensable party

17   not being joined in this case, they point out that under

18   South Carolina law, a joint tortfeasor is not considered a

19   necessary and indispensable party.  And, Your Honor, we don't

20   dispute that.  However, the law is also clear that when you

21   look at the allegations of these complaints, these wastewater

22   treatment plants are not mere joint tortfeasor.  They are

23   much more than that.

24        And I would direct, Your Honor, just to one case.  This

25   is an 11th Circuit opinion in Laker Airways versus British

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

43

1    Airways, and the citation is 182 Federal Third 843.  And in

2    that case, really the key issue there is that a joint

3    tortfeasor that would otherwise not be subject to being

4    joined as a necessary and indispensable party is no longer a

5    mere joint tortfeasor, but becomes necessary when an active

6    participant in the allegations.  And here that's exactly what

7    these wastewater treatment plants are.  They're alleged

8    throughout these complaint allegations.  They are the only

9    entities that are discharging into the water from anything

10   coming from the defendants.

11       And, Your Honor, as -- as you'll see as we kind of

12   continue through this, it kind of illuminate -- it's kind of

13   helps to illuminate the issues that you'll hear about on

14   these wastewater treatment plants being such a necessary and

15   indispensable party because they will come up time and again

16   throughout all of the other allegations -- throughout all of

17   the other arguments being made.  Thank you, Your Honor.

18       THE COURT:  Thank you.

19       MR. LUTZ:  Good morning, Your Honor.  Ryan Lutz on

20   behalf of the plaintiffs.  The plaintiff has a fundamental

21   right to choose which tortfeasors to sue.  South Carolina law

22   is clear on that and there's 200 years of precedent stating

23   that mere joint tortfeasors are not indispensable parties.

24   It's called the, "Plaintiff chooses rule," Your Honor.

25   You're not required to sue someone whom you make no claim.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

44

1    We have alleged in this case that the industrial

2    defendants use PFAS in their industrial process knowing that

3    PFAS is toxic, bio-accumulative, resists degradation, meaning

4    it can't be broken down in the environment, and incapable of

5    treatment at the wastewater treatment plant facilities.  They

6    knew all of these things, Your Honor, and they sent their

7    wastewater to the wastewater treatment facilities anyway.  We

8    allege, Your Honor, that the wastewater treatment facilities

9    are a mere passive conduit for defendants PFAS to contaminate

10   these rivers and lakes which plaintiff draws their water

11   source from.

12   It is the defendant's burden to prove under Rule 19 that

13   the wastewater treatment plants are indispensable parties,

14   and I didn't hear any argument on how Rule 19 applies to any

15   of the wastewater treatment plants that are involved in these

16   cases.  I didn't hear how complete relief, which is the first

17   subsection under the rule cannot be accorded among those

18   already parties.  And I didn't hear how there is an interest

19   from the wastewater treatment plants relating to the subject

20   of the action.

21   Rule 19 only requires joinder of necessary parties.  A

22   necessary party is one whose rights must be ascertained and

23   settled, ascertained and settled, before the rights of the

24   parties to the action can be determined.  And that's simply

25   not the case here, Your Honor.  There are no rights that must

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

45

1    be ascertained, and there are certainly no rights that must

2    be settled before plaintiff can seek the relief under

3    negligence and nuisance that they seek from these industrial

4    users of PFAS.  Thanks, Your Honor.

5        THE COURT:  Thank you.  Y'all be reminded to silence

6    your phones.

7        MR. HEBSON:  Your Honor, thank you again.  Ryan Hebson

8    from Burr & Forman.  First, Your Honor, I believe we did

9    address the text of Rule 19 as it is for this burden.  We

10    understand -- we understand that.  And the text is, again,

11    clear that if in the absence -- if in the absence of complete

12    relief, can -- that an absent party shall be joined as a

13    party in the action if, in his absence, complete relief

14    cannot be accorded among those already parties.  And here,

15    that's exactly what we've discussed today.

16        These wastewater treatment plants are the ones, as

17    alleged in the complaint and as are the facts, that are

18    discharging into the rivers.  If these nine defendants are

19    enjoined from using these wastewater treatment plants, that's

20    not going to stop these wastewater treatment plants from

21    discharging from every other customer's wastewater that they

22    receive.  And this is again alleged in paragraph four.

23        And, Your Honor, the fact the plaintiffs seek an

24    injunction to require these defendants to cease all

25    discharges will not stop any of the PFAS coming from regular

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

46

1    people who use sewers and regular customers, other industrial

2    customers.  All of those will still be utilizing these

3    wastewater treatment plants.  That is exactly going to the to

4    the rule itself, Rule 19.  And so while we understand that

5    there is some case law out there that discusses different

6    parameters of Rule 19 as a means of helping to understand

7    when certain fact patterns arise, such as the ex parte

8    government employees case the plaintiff's counsel cited from,

9    the rule itself is very clear that when complete relief

10   cannot be accorded, that that necessary party must be joined.

11   And that's exactly what we have here today, Your Honor.

12       And second, Your Honor, the other comment that was made

13   is how these are mere joint tortfeasors, and as I discussed,

14   that's not with respect what we see in the allegations of the

15   complaint, and that's not the fact that Rule 19 exists shows

16   that there are exceptions to the plaintiff chooses rule.

17   There are exceptions to not all joint tortfeasors have to be

18   joined when a plaintiff decides that the plaintiff does not

19   want to join them, because here, these are not mere joint

20   tortfeasors.  Here, as in Laker Airways, as the 11th Circuit

21   discussed, these are entities that emerge as active

22   participants in the allegations.  This case is about

23   discharges into the water, and the entities that are

24   discharging into the water are the wastewater treatment

25   plants.  Thank you, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

47

1          THE COURT:  Thank you.  Okay.  Anything else on that?

2          MR. TAPLEY:  No, Your Honor.  Thank you.

3          THE COURT:  Okay.  All right.  Next.

4          MS. TOR:  Good morning, Your Honor.  May it please the

5     court.  Loly Tor from K&L Gates, and I represent the Cryovac

6     defendants.  So I'm addressing both trespass and nuisance,

7     but I'll begin with trespass and then come back again to --

8     to discuss nuisance.

9          One thing I do want to just make a note of, too, that's

10    separate from the trespass and nuisance argument, one thing

11    that the plaintiff's counsel had said is that it's

12    undisputable that the defendants discharged PFAS into the

13    water.  I just want to note, for the record, it will, in

14    fact, be disputed if we get to that point that there was

15    these discharges into the water.

16         So just going to trespass, this is a basic law school

17    question.  What is trespass?  And the Supreme Court of South

18    Carolina has addressed this in detail in the Babb decision.

19    They defined it as an action to recover for an unlawful entry

20    by another onto one's real property.  And then a cause of

21    action for trespass, it protects a property owner's right to

22    exclusive possession of his land.  And there are multiple

23    infirmities in the plaintiff's claim for trespass based on

24    this very basic law.  One is that there's no entry onto the

25    plaintiff's property, and two, that there's no interference

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

48

1   with the possession.

2       So under South Carolina Supreme Court precedent and

3   Babb, there has been no physical invasion.  And what the

4   Supreme Court did, it distinguished between tangible and

5   intangible invasions of land.  And it held there that the

6   Supreme Court held in South Carolina, they're adhering to the

7   traditional rule requiring an invasion by a physical,

8   tangible thing for a trespass to exist.  And the parties do

9   not disagree that this is the law, but we do disagree about

10  whether PFAS in water is a tangible -- physical, tangible

11  thing.

12      And I submit, Your Honor, that Babb answers that

13  question.  The PFAS molecules in water are not a physical,

14  tangible thing.  And in Babb, the -- the thing at issue were

15  odors.  And what the plaintiffs say is that PFAS is not the

16  same as an odor.  It can be found and it can be measured.

17  But Babb expressly disagrees with the plaintiff's position.

18      The court held that South Carolina will not adhere to

19  this traditional rule requiring invasion -- I'm sorry, it

20  will adhere to the traditional rule requiring invasion by the

21  fiscal tangible thing, and it's going to adhere then to the

22  dimensional test.  And the court rejected those cases that

23  deviated from the dimensional test.  And those cases are like

24  the case here.  For example, the first case was Oregon Court

25  found a trespass when fluoride gases and microscopic

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

49

1    particles entered the plaintiff's property.

2         In the second case, Alabama Court found that lead and

3    sulfoxide emissions that settled onto the plaintiff's

4    property constituted a trespass.  But the Babb court said,

5    no, we are not going to do that in South Carolina.  The PFAS

6    molecules at issue in this case are the same as those

7    fluoride molecules, the microscopic particulates, and the

8    lead and sulfoxide emissions.  They do not constitute

9    trespass under the dimensional test adopted by Babb.

10        The plaintiff points to Judge Coble's decision in the

11   State of South Carolina versus 3M from July of 20 -- July

12   23rd, 2024 that they attached their brief, and Judge Coble

13   found that PFAS did constitute a trespass.  And with all due

14   respect to Judge Coble, his decision is inconsistent with

15   Babb.  And Judge Coble said that PFAS is a tangible thing,

16   but that is not consistent with Babb's holdings.

17        Now, plaintiff's counsel today gave a perfect example of

18   what a tangible invasion is.  The fuel spill after the

19   tractor-trailer crash.  And that, in fact, is a tangible

20   invasion into water, but that is not, and I agree with

21   plaintiff, that is not what PFAS is.

22        In every other case, the plaintiffs rely on to support

23   their position that PFAS can be an intrusion.  They all

24   predate Babb, except for one, the Weatherford case.  And that

25   is the only case that was decided after Babb from the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

50

1     District of South Carolina.  And respectfully to the court in

2     Weatherford, it's not consistent with Babb, and it should not

3     be followed by this case -- by this court.

4          In all the other cases, as I mentioned, they do predate

5     Babb, but they also have no discussion about trespass, or

6     they do actually involve tangible items.

7          So in Johnson versus Hoechst, there's no discussion

8     about trespass claim, because that wasn't the subject of the

9     appeal.  In Kelly versus Para-Chem, again, no details about

10    trespass, other than that there was a contamination.  In

11    Tillman, there was, in fact, tangible items.  The defendant

12    had pumped sludge and green fluids into the land.  And in

13    Shockley, you also had tangible items.  There were barrels of

14    hazardous waste.  Those are not the same as what we have

15    here.

16         The second point with respect to why there is no entry,

17    even putting aside the dimensional test, there was no entry

18    onto the plaintiff's property.  The plaintiff alleges the

19    defendants discharged the PFAS-contaminated wastewater into

20    the Reedy and Saluda rivers.  And that water then passes

21    through the wastewater treatment plants, as you've heard many

22    times today.  And then the water eventually reaches Lake

23    Greenwood.  And at that point, the plaintiffs use their water

24    intakes to draw the water out of Lake Greenwood and onto

25    their property.  The plaintiffs voluntarily caused the water

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

1     to enter their property.  The defendants did not cause the
2     water to enter the property.  The plaintiffs took the
3     affirmative action, and without that affirmative action of
4     drawing the water from Lake Greenwood, that water would not
5     have entered onto their property.
6          Now, the defendant -- the plaintiffs respond that the
7     defendants knew that the water would ultimately reach the
8     plaintiff's property.  Even if that were true, that is not a
9     substitute for the actual entry onto the plaintiff's
10    property.  And the plaintiffs -- the cases that the
11    plaintiffs cite in their brief, in support of their position,
12    all had actual entry onto their property.
13         In Snow versus City of Columbia, homeowners there had
14    standing water in their basement from a leaking pipe.  And,
15    in fact, in Snow, the city did not know that the pipe
16    underneath the home was leaking.  So there was no trespass at
17    the end of the day because the entry of the water into the
18    homeowner's land was not the result of the voluntary act by
19    the city.
20         In Weatherford versus DuPont, the allegations were that
21    the defendant sold chemicals to textile plants and didn't
22    provide disposal instructions.  The textile plants didn't
23    dispose of the chemicals properly, and the chemicals then
24    actually reached the defendant's soil -- I'm sorry, reached
25    the plaintiff's soil by leaching into the soil.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

52

1     Lastly, in Shockley versus Hoechst Celanese Corp., the

2     barrels of waste leak -- leaked chemicals into the soil and

3     eventually into the plaintiff's groundwater.  All different

4     from the allegations in the complaint here that did not have

5     any actual entry onto the plaintiff's property, unless the

6     plaintiff actually drew that water itself.

7     Lastly, Your Honor, here we have no interference with

8     possession as required for trespass.  The plaintiffs have no

9     exclusive right to possession of the water, as my colleagues

10    have already mentioned.  The riparian owner has a right to

11    use the water, but does not have an exclusive right of

12    possession.  And in the defendant's motions to dismiss, we

13    did cite the case for that proposition, White versus Whitney.

14    One last point, Your Honor, with respect to trespass.

15    The trespass claim, this is set forth in Babb.  Damages for

16    trespass are not the damages that the plaintiffs seek here,

17    so even if they can establish their claim, they're not

18    entitled to the damages that they seek.  The damages

19    available for trespass is a loss of the rental value of the

20    property, and not the damages that the plaintiffs seek here.

21    Thank you, Your Honor.

22    THE COURT:  Thank you.

23    MR. TAPLEY:  Thank you, Your Honor, Jerome Tapley again.

24    Our complaint makes clear that plaintiffs have alleged the

25    common law toward a trespass.  There has been a physical,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

53

1    tangible intrusion onto plaintiffs' property.  The amount of

2    PFAS in the water that is their water source and their

3    riparian right is tangible and measurable.  They say that

4    these chemicals aren't tangible, that there's somehow some

5    intangible thing out there, like a thought.  But they bought

6    them in buckets and drums, and used them in their industrial

7    process in their businesses, and then discharged the leftover

8    in their industrial sewage.  Judge Coble's decision is

9    absolutely in line with Babb.  There's nothing about PFAS

10   that's any different than the PCB in the Tillman case.

11       Your Honor, the fact remains they intended to use PFAS

12   in their businesses.  They knew or should have known it was

13   going to be present in their industrial sewage coming from

14   their plants.  They knew no one ever permitted them to have

15   PFAS in their industrial sewage.

16       They knew or should have known that the WWTPs where they

17   were sending their sewage had no ability to remove PFAS from

18   their industrial sewage.  They knew or should have known that

19   the WWTP, when it was done treating the sewage, would

20   discharge that water to the streams and rivers of South

21   Carolina.  And it'd be hard for them to convince anyone they

22   didn't know that rivers flowed downstream and that folks

23   lived down there.

24       The notion that the trespass really doesn't occur until

25   the plaintiff takes the water out of Lake Greenwood and that

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

54

1    -- this is not part of something they did -- completely

2    alters the facts in the case and in life.  The very purpose

3    of these pieces of property along Lake Greenwood is to

4    withdraw water and make drinking water that serves the

5    communities around it.  It's not accidental that some water

6    came out of the lake and into their filter plant.  That's the

7    reason these utilities bought that property.  It's the reason

8    they maintain that property because it is adjacent to the

9    water, which is their water source for their utility.

10        Their PFAS is on plaintiff's property.  It was the

11   natural occurrence of events that that would occur.  They

12   knew all this would happen or should have known this would

13   happen when they released it into the environment.  Thank

14   you, Your Honor.

15       THE COURT:  Thank you.

16       MS. TOR:  Your Honor, Loly Tor.  I think this cause of

17   action is the perfect example of the square peg and round

18   hole that my colleague mentioned earlier today.

19       First, I want to say that the defendants are not the

20   ones saying that the PFAS is intangible -- intangible.  It is

21   the Supreme Court and Babb that says this, and I would just

22   like to read from Babb because it addresses exactly the

23   argument that the plaintiffs are now raising.

24       And so in Babb, at page 146, the court says, "In

25   reaction to modern science's understanding of microscopic

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

55

1    anatomic particles, a divergent lines of decisions have

2    discarded the dimensional test and permitted recovery for

3    trespass without regard to whether the intrusion was by a

4    tangible object, but rather by considering the nature of the

5    interest harmed."  That is what Babb has rejected.  And it is

6    not -- Babb is not saying that PFAS or that a molecule cannot

7    be measured.  Even odors can be measured.  Even the molecules

8    that are in odors can be measured.  That is not what Babb is

9    saying.  What Babb is saying is that it is going to adopt the

10   dimensional test, and plaintiffs cannot satisfy that test

11   here.

12        And what Babb is also saying is that it is not the

13   molecules that are the items that have the dimension, but

14   it's the water.  The water itself that may be traveling

15   through, and not the trace chemicals in the water.  There is

16   simply no trespass here onto the plaintiff's property.

17        The plaintiffs cannot change the elements of what a

18   trespass is by arguing that they are the ones that have this

19   property for the sole purpose of doing this thing of taking

20   -- cleaning the water.  Trespass requires that the water be

21   purposefully put onto the property by the water or the

22   element, whatever it might be.  It has to purposely be put

23   onto the property by the defendant and that's not what

24   occurred here.  And plaintiffs admit that they are the ones

25   that drew the water onto the property.  Thank you, Your

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

56

1    Honor.

2         THE COURT:  Thank you.  Okay.  Anything else on

3    trespass?

4         MR. TAPLEY:  No, Your Honor.

5         THE COURT:  Okay.  Nuisance.

6         MS. TOR:  Loly Tor, Your Honor, for the Cryovac

7    defendants.  With respect to nuisance, there are two, what --

8    the first argument I'd like to point out for you, Your Honor,

9    is that there is no control over the instrumentality.  For

10   both public and private nuisance, one of the elements is that

11   the defendant has to have control over the instrumentality of

12   the nuisance at the time that it occurs.

13        And again, Supreme Court precedent on this issue, Clark

14   versus Greenville County.  And the Supreme Court there said,

15   "If the defendant doesn't have control of the property at the

16   time of the alleged nuisance, that defendant cannot be held

17   liable for the nuisance."

18        And in Clark, "The defendant sent materials to a

19   landfill.  The plaintiffs allege that the areas downstream of

20   the landfill showed evidence of impact from those materials."

21   The Supreme Court -- or the court affirmed, the circuit court

22   said the defendants could not be held liable because they had

23   no control over the materials once they reached the landfill.

24   The plaintiff's argument here is that nothing more than

25   saying, no, defendants, you did, in fact, have control, but

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

57

1     this is not what is pled in the complaint.  For example, as

2     to Cryovac, but it's the same allegation made as to all the

3     defendants.  The allegation is, "Cryovac's facility

4     discharges industrial wastewater contaminated with products

5     that contain -- that contain or degrade to these PFAS to the

6     lower Reedy WWTP.  The lower Reedy WWTP cannot remove

7     Cryovac's PFAS, which it discharges into the Reedy River

8     upstream of Lake Greenwood and plaintiff's water intakes.  It

9     is the defendants that discharge into the wastewater

10    treatment plants, and it's the wastewater treatment plants

11    that then discharge to the rivers upstream of Lake Greenwood.

12    This is no different than the solid waste and Clark going to

13    landfill.

14          Now, with respect specifically to the private nuisance.

15    Nope, a private nuisance cannot result from alleged

16    contamination of a public body of water.  And a private

17    nuisance that produces damages -- a private nuisance, excuse

18    me, and it produces damages to one or two people.  And it

19    can't be a damage to the public.

20          And one example of this, Your Honor, that we provided in

21    our briefs, the Priselac versus Chemours case, it's about a

22    body of water being contaminated.  Although it's a North

23    Carolina case, it does provide insight as to what this would

24    look like.  So the alleged contamination there was to the

25    Cape Fear River, surrounding air, soil, and groundwater.  And

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

58

1    what the court said there, that the alleged contamination of

2    drinking water was not something that affected only the

3    plaintiff.  It affected the public because the water was from

4    a public utility.  In response, the plaintiffs point to Cape

5    Fear versus -- Cape Fear versus Chemour's case in their

6    brief.  And the court there said there was a private

7    nuisance.

8         But in that case, Your Honor, there was no argument

9    about whether the defendants had actually discharged or had

10   control -- excuse me, had control over the instrumentality of

11   the nuisance, that it wasn't an issue in the Cape Fear case.

12   So that is not something that can be used to establish or to

13   support their argument that they do have a private nuisance

14   here.

15        Now, the same is actually true here, as in the Priselac

16   case.  There's alleged contamination of a public body of

17   water, Lake Greenwood, where we can see here, even from the

18   two lawsuits brought by the two different water districts,

19   it's a public interest and it's not a private one.

20        Plaintiff says, "But I have alleged injury."  The

21   plaintiffs -- both of them say, "We've alleged injuries to

22   our own private property."  But that's not correct.  What

23   they've alleged is injury to the water that the plaintiffs

24   are taking in from Lake Greenwood.  And the plaintiffs, in

25   their complaint, define nuisance, and this is in paragraph

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

59

1    60.  They define the nuisance as the contamination of the

2    Reedy River, Saluda River, and Lake Greenwood.  In their

3    briefs they tend to define it differently but that's not what

4    it is alleged in the complaint.  And this is no different

5    from a public nuisance.

6         And a public nuisance, Your Honor -- so the public

7    nuisance claim, that cannot be brought by a private entity.

8    It must be brought by the State, unless that private entity

9    has suffered a special injury.  But here, there is no special

10   injury.  The plaintiffs have alleged the same injury that's

11   suffered by the public-at-large based on their allegations.

12   It's a contamination of drinking water.

13        And pointing to Cape Fear, again, which the plaintiffs

14   had relied on, the court there found no special injury to the

15   public water district.  That would allow the public water

16   district to assert a claim of its own for public nuisance.

17   There, the nuisance was a contamination of the water, and

18   that was a public nuisance that was not -- did not create a

19   special injury to the plaintiff.

20        And again, Your Honor, I want to point out the remedy

21   available for a nuisance is the same as trespass, as pointed

22   out by the court in Babb.  It is the loss of rental value.

23   It is not the damages that the plaintiffs seek here.  Thank

24   you, Your Honor.

25        THE COURT:  Thank you.  And to be clear throughout, you

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

60

1     we're referring to the amended complaints that were filed on

2     August the 23rd in both, correct?

3          MS. TOR:  Yes.

4          THE COURT:  Okay.  Thank you.  Please continue.

5          MR. TAPLEY:  Your Honor, Jerome Tapley again.  On this

6     issue of control, the defendants, I don't think, are ever

7     going to argue in this case that they somehow lacked control

8     of their property and their facility.  I think it's going to

9     be undisputed, although somebody might tell me I'm wrong,

10    that they used the PFAS.  Nobody snuck in at night and poured

11    it down the drain.  They locked their facilities when people

12    weren't there.  Their property was secured, and the PFAS got

13    there through an operation of their business, the way they

14    wanted to operate it.  And they controlled that operation.

15    They controlled the use of that PFAS.  They controlled the

16    discharge of that PFAS, the amounts of more PFAS that they

17    bought, the amounts they discharged down their sewer.  And

18    they knew what was going to happen to that PFAS when it went

19    down their industrial sewer.

20          Now, on this topic of special injury, the water

21    utilities, which I think should be clear from our complaint,

22    are not like the public-at-large.  They're not complaining of

23    some injury -- some injury from not being able to enjoy Lake

24    Greenwood like members of the public do to recreate.  They're

25    not complaining of some ability to boat up and down the river

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

61

1    or some ability to fish up and down the lake that's been

2    impaired by the contamination with PFAS.  They're talking

3    about their unique situation, their special injury, which

4    gives them standing to bring a claim in public nuisance.

5         As I've mentioned before, their property is on Lake

6    Greenwood.  And owning property adjoining a body of water

7    comes with riparian rights for the property owner.  These

8    riparian rights have been interfered with.  That's an injury

9    for nuisance as a result of the PFAS contamination.  And

10   defendants did this through their acts, which they controlled

11   at their factories and their buildings upstream.  When they

12   released that PFAS, knowing it was going to a sewer which

13   could not treat it, and emptying into a stream or river which

14   flowed downstream to Lake Greenwood, where the riparian owner

15   sat on the banks of the lake, drawing water out to filter and

16   treat it for the surrounding community.  This is clearly a

17   special injury under South Carolina law.  And the injury

18   suffered by Greenwood and Laurens County is very different

19   from the injury suffered by the public-at-large.  Thank you,

20   Your Honor.

21        THE COURT:  Thank you.

22        MS. TOR:  Two quick points, Your Honor.  First is that I

23   did not hear the plaintiff argue at any point that the

24   control -- that the defendants did not have control of the

25   water after it left, or excuse me, once it reached the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

62

1    wastewater treatment plant.  The arguments that the

2    plaintiffs are making with respect to control all address

3    what happens on the plaintiff's -- I'm sorry, on the

4    defendant's property before it reached the wastewater

5    treatment plant.  At that point, the defendants no longer

6    have control, and that's simply a matter of fact, based on

7    the allegations in the complaint and based on the law.

8        Second, Your Honor, with respect to, I guess, the

9    elements with respect to reaching the riparian rights, Your

10   Honor.  So nuisance is a disturbance with the plaintiff's

11   property, not with the riparian rights, Your Honor.  And I

12   don't believe that the plaintiffs have actually alleged in

13   their complaint that it is their riparian rights that have

14   been affected by the nuisance.  They allege that the water

15   has been contaminated and that is a public nuisance.  That is

16   not a special injury to the -- to the plaintiffs.  They

17   simply have not alleged anything different from what the

18   public -- public's injury would be, which is the alleged

19   inability to have water that does not contain PFAS or does

20   not meet the MCLs.  Thank you, Your Honor.

21       THE COURT:  Thank you.

22       MR. TAPLEY:  Your Honor, I just want to make two brief

23   points.  One, Sloan versus City of Conway, a 2001 South

24   Carolina decision, recognized a utility's proprietary

25   interest in the drinking water, that it removes and treats

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

63

1    for its customers.

2         Second, it's important to note, Your Honor, that their

3    control occurs every time they flush a toilet in their

4    facility.  Every time they flush PFAS water down.  There's a

5    new participation in the nuisance every time they discharge.

6    It didn't happen one time, and then it was over.

7         It's a continuing action by the way they run and operate

8    their business.  It has been continuing over time.  They

9    continue to engage in the maintenance of the nuisance, and

10   they do it at their facility with their personnel.  This is

11   not a stagnant thing that occurred once.  It ain't a car

12   wreck.  This happens again and again and again throughout the

13   day.  I just want to make sure that's real clear because

14   that's in our complaint, and their arguments don't always

15   directly address our complaint, but rather a case they wish

16   we'd filed.  Thank you, Your Honor.

17        THE COURT:  Thank you.  Anything else on that?

18        MS. TOR:  No, Your Honor.  Thank you.

19        THE COURT:  Okay.  Why don't we take 10 minutes before

20   we get to negligence, okay?  Thank you.

21                         (OFF THE RECORD)

22        THE COURT:  All right.  We're back on the record with

23   civil action numbers 24-24-735.  Okay.  We have finished with

24   nuisance.  Thank you, Ms. Tor and Mr. Tapley.  And now we're

25   moving on to negligence.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

64

1    MR. WEATHERHOLTZ:  That is correct, Your Honor.  Good

2    morning, James Weatherholtz.  May it please the court.  I'm

3    here on behalf of defendant, Unichem Specialty Chemicals,

4    LLC.  And with me here in the courtroom today is Andi

5    McDonald.  She's an associate at my firm in Charleston.

6    We're both with Womble.  And just wanted the court to be

7    aware that she's here today.  All of the work that went into

8    the briefing and to providing these materials to the court

9    came directly from -- from her.

10   THE COURT:  Well, thank you.  People are not normally

11   that generous.

12   MR. WEATHERHOLTZ:  No, she's -- she -- she deserves all

13   the credit for what you're about to hear, Your Honor.

14   Assuming it's pleasing to the court.

15   Your Honor, my job this morning is to cover the

16   negligence argument on behalf of all of the defendants.

17   There are certain arguments that everyone has made.  There

18   are other arguments that only Unichem has made.  I will walk

19   through each of those as a -- as a short preview.  I will

20   spend most of my time this morning talking about the

21   existence of a legal duty, but I will also touch on breach,

22   proximate cause, and damages.

23   Your Honor, you have heard at length this morning from

24   my colleagues about the facts and the context that are

25   important for the negligence argument, but I just want to

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

65

1    reiterate because -- because one fact in particular is

2    central to, I think, the negligence and the nuisance and

3    trespass claims.  And that is the fact that these defendants

4    did not discharge their waste into the environment.  They

5    didn't discharge directly into any rivers or streams or to

6    Lake Greenwood.  They discharged their waste pursuant to

7    permits to wastewater treatment plants.

8         So what we have here for the negligence analysis is a

9    situation where the plaintiffs in this case, who are not

10   members of the public, they are water providers.  The

11   plaintiffs are suing these defendants for discharges that

12   they did not make either directly onto their property or even

13   into the water from which they draw to provide their services

14   to their residents.  They're suing us for discharges of waste

15   that came from wastewater treatment plants.  Companies that

16   -- that are in the business of treating the water that --

17   that is then discharged to the bodies of water that -- that

18   plaintiffs complain of.

19        Your Honor, as you know, the existence of a duty is a

20   legal question.  That's a question for the court.  If there

21   is no legal duty, then the negligence claim fails.  In order

22   for a duty to arise, the parties must have a relationship

23   under South Carolina law.  There are a number of different

24   ways that our courts have said a relationship that's

25   sufficient to give rise to a duty can arise, and some of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1      those are by statute, by contract, relationship, property

2      interest, or some other special circumstance.  There are a

3      number of cases in this State that talk about individualized

4      sets of circumstances where our courts have reviewed those

5      facts and made a determination that as a matter of law, a

6      duty does exist in this situation.

7           Our position here today, Your Honor, and the position

8      that we put forth in our briefs is that there is simply no

9      legal duty in this situation that has been recognized by

10     South Carolina law.

11          Plaintiffs, in their complaint, have not even alleged

12     facts that would be sufficient to give rise to the existence

13     of a duty because they haven't alleged the different ways

14     that our courts recognize how a duty comes about, and I've

15     mentioned those previously.

16          In their opposition brief, the plaintiffs say two

17     things, essentially.  The first thing that they say is that

18     these defendants voluntarily undertook a duty.  And this

19     comes up in the context of a first party who does something

20     that causes an injury to a third party, which is the

21     situation that we have here.  What they say is that if you

22     volunteer to perform some act or to do something for another

23     person, then by virtue of the fact that you volunteered, you

24     now owe a duty.  And what I would say is just on its face,

25     Your Honor, that's -- that's really a misinterpretation and a

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

67

1    misapplication of the voluntary duty standard under South

2    Carolina law.

3         I think the best case to use to talk about this concept

4    is the Madison case.  That was a vulnerable adult who was put

5    into the custody and care of a mental facility.  She snuck

6    out one night, and she was abused by some third-party actors.

7    A claim was brought on behalf of her and her family against

8    the facility, and the facility took the position that it did

9    not owe a duty to her because it couldn't control the actions

10    of these third parties, and it didn't have a duty to warn.

11    The State looked carefully at that and said, no, as a

12    facility that took her in with knowledge that she is a

13    vulnerable adult, under these circumstances, we will

14    recognize a duty.  The Madison case specifically defines what

15    it means under South Carolina law when someone voluntarily

16    undertakes a duty, and it says, "To render services to

17    another which he should recognize as necessary for the

18    protection of the other person or their things."

19         And there's just no allegation here that these

20    businesses who are doing nothing but operating their

21    businesses undertook a special duty to protect the interests

22    of these water providers downstream who receive water from

23    the lakes that has passed through a wastewater treatment

24    plant.  I think if you took the plaintiff's argument about

25    voluntary -- voluntarily undertaking duties at face value,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

68

1    then every business in the State of South Carolina that is

2    simply operating its businesses would therefore have a

3    general duty of care to -- to the public, and -- and -- and

4    that's simply not the case under our law.

5         The next thing, Your Honor, they say is that these

6    defendants knew or should have known that what they were

7    doing posed a substantial risk of injury to them or to the

8    public.  And essentially what they're saying here is that

9    because this was foreseeable, that -- that their activities

10   would cause harm, that they therefore have a duty under South

11   Carolina law.  And -- and I would submit, Your Honor, and the

12   position of the defendants in this case is that that is

13   simply not -- not the law in South Carolina.

14        There's a great discussion of this concept in the Oulla

15   case, and that's O-u-l-l-a.  I'll have to spell it for you

16   because I'm sure I'm not pronouncing it right.

17        THE COURT:  I'm following along.

18        MR. WEATHERHOLTZ:  Oh, okay.

19        THE COURT:  Okay.  In your brief.

20        MR. WEATHERHOLTZ:  Okay.  Wonderful.

21        THE COURT:  Moving from Madison to, and you pronounce

22   it, Oulla.

23        MR. WEATHERHOLTZ:  Oulla, yes, ma'am.  Court of Appeals

24   case from 2019, that's a situation where the Court of Appeals

25   was able to analyze and answer this question of what duty

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1     does a first-party actor owe to a third party, even if it is

2     foreseeable that something that the first party does could

3     cause harm.

4          And just briefly, Your Honor, the facts of that case,

5     Super-Sod was loading a truck for a customer.  The customer

6     left with pallets of sod on the truck.  One of those pallets

7     fell off on the roadway.  It caused a backup on the roadway.

8     Somewhere in that line of traffic, there was a rear-end

9     collision.  The plaintiff got injured.  The plaintiff sued

10    both the driver of the truck who was operating the truck on

11    the highway with the pallets and the loader of the truck.

12         What the Supreme Court said in that case was basically

13    two things.  One, under the statutes of South Carolina, the

14    loader does not have a duty to protect the interests of the

15    public when they are simply loading these vehicles.

16         The other thing that it said that's important for

17    today's discussion is that under the common law, the State of

18    South Carolina does not recognize Restatement of Torts

19    second, Section 324A.  What South Carolina does recognize is

20    Section 323.  And 323 talks about the duties that a first

21    party owes to a second party when the first party voluntarily

22    decides to -- to undertake a duty to provide protection to

23    that person or their things.  What South Carolina

24    specifically rejected is 324A, which extends that duty to

25    third parties.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

70

1          And -- and -- and ultimately, the conclusion of that

2     case leaves us with the holding that under South Carolina

3     law, even if a first party does something that is

4     foreseeable, that it's foreseeable that it could cause damage

5     to a third party, that first party does not have a duty

6     unless one of these special circumstances applies, because

7     we've rejected that section of the restatement that -- that

8     gives rise to that potential claim.

9          And so what the court said in that case is that the

10    loader has no -- no liability.  And what the court said is

11    the loader may have responsibility to the truck driver for

12    the way that they loaded the pallets on the truck if that

13    contributed to the accident later on, but that the -- that

14    the loader doesn't have a duty to the plaintiff who was drive

15    -- riding in the car.

16         And the parallel here is that we're the loader.  These

17    defendants who discharge their waste to the wastewater

18    treatment plants are third parties as to the water providers.

19    And under South Carolina law, there's just -- there's no duty

20    that arises in that situation.

21         The third thing that the plaintiffs do in their

22    opposition brief in response to this argument is they quote a

23    series of cases.  Some of these cases are South Carolina law

24    cases.  Others are cases from outside this jurisdiction.

25         Your Honor, I would say with respect to the cases that

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

71

1     are outside this jurisdiction, those states may not have the

2     same interpretation of -- of the common law as to where

3     duties arise to third parties.  They likely have different

4     adoptions of the restatement.  And -- and those cases

5     wouldn't be applicable or binding on this court.

6          Your Honor, there are four or five cases that deal with

7     South Carolina law.  Those cases are distinguishable for

8     various reasons.  I -- I won't walk through those, but if the

9     court is interested, I could talk about them, or if the court

10    is interested, we could do some supplemental briefing on

11    those, but for each of the cases that the plaintiffs cite,

12    those cases are not this case.  This is a case where water

13    providers are alleging that water discharged by defendants

14    that has passed through a water -- a wastewater treatment

15    plant has caused them injury, and they're alleging that under

16    South Carolina law, a duty is owed, and -- and none of those

17    cases they cite are that case.

18         One other aspect, too, that we would ask the court to

19    consider in the context of the negligence claim, is this

20    concept of control.  And Ms. Tor has already explained to the

21    court our position on that.  But I would submit to the court

22    that the same concept is at play here.

23         The Miller case is the best example of where our courts

24    in South Carolina have said, "If a party doesn't have control

25    of the thing that causes the harm, then that party cannot

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    have any duty to the person who is harmed."  And that

2    involved an operator of a plant next to a lake that had a

3    specific agreement with the local municipal -- municipality

4    that they had obligations to control the water level to the

5    extent that they couldn't take too much out, but all

6    responsibility for controlling the water level getting too

7    high was with the local municipality.  And the court said

8    that -- that they just didn't have a duty because they didn't

9    control the water level and its discharge over the dam.

10        I want to talk just briefly, Your Honor, about breach.

11    That's one of the elements that the amended complaint is

12    required to plead in order to survive the 12(b)(6) pleading

13    standard.  They, the plaintiffs, in this case have not

14    alleged a specific violation of any standard of care.  As

15    they've set forth, I think, in their pleadings and in the

16    complaint, there were no rules or regulations.  There were no

17    statutes or standards that governed the discharge of these

18    chemicals, and they have not been able to cite to any actual

19    breach of a standard that would be required in order to

20    sustain a claim for negligence.

21        And then the last point, Your Honor, I would make is as

22    to damages.  In order to establish a claim for negligence,

23    you have to have suffered damages under South Carolina law,

24    and this is the Babb case.  You have to have suffered damages

25    in the form of physical injury or property damage, and I

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

73

1    think that there should be no dispute that the plaintiffs

2    here are not alleging physical injury.  The plaintiffs have

3    said that they have suffered property damage, but I -- I

4    haven't yet heard them articulate how their systems, or their

5    property, or their equipment has actually been damaged today

6    by the alleged presence of the PFAS from -- from these

7    selected defendants that they have chosen to -- to sue in

8    this case.

9        So I think that -- that's an issue that the plaintiffs

10   will have to wrestle with as they figure out what their

11   specific allegations of damages are in this case.  But I

12   would submit to the court that until the plaintiffs can

13   articulate actual property damage today to their facilities

14   or equipment caused by this, the presence of this PFAS, that

15   they -- they would not be able to sustain a claim for

16   negligence.

17       And then, Your Honor, I will cover in a moment an

18   argument on traceability.  There is one final piece of the

19   negligence cause of action related to primary assumption of

20   the risk, and Mr. John Tamasitis is going to cover that.  I

21   don't know if, Jerome, would you prefer to do that after you

22   respond to this, or?

23       MR. TAPLEY:  Sure.

24       MR. WEATHERHOLTZ:  Ryan?

25       MR. LUTZ:  Yeah, let's do it.  Let's respond to this.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

74

1     MR. WEATHERHOLTZ:  Okay.  Let's do it one at a time,

2     Your Honor.  Well, then I'll yield the floor to Mr. Lutz, and

3     -- and we'll do assumption of the risk next.

4     MR. LUTZ:  Good morning, Your Honor.  Ryan Lutz again on

5     behalf of plaintiffs.  Defense counsel spent most of his time

6     on duty, and I think that's a good place to start because

7     plaintiffs have provided the -- the court with a number of

8     cases that are directly on point to this case, where courts

9     across the country have found negligence has been adequately

10    pled against industrial dischargers who send their PFAS-laden

11    waste to a wastewater treatment plant that passes through and

12    contaminates rivers and lakes downstream.  They haven't

13    attempted at all to distinguish this case, their duty under

14    South Carolina, with the cases that we have provided the

15    court in, Your Honor.

16    I'm just going to, there's a few cases to talk about.

17    One is the -- first one is the Johnson case, and that's a

18    case that we are lead counsel in.  It's a case pending in

19    federal court in front of Judge Totenberg in the Northern

20    District of Georgia.  And she found that defendants have a

21    duty, this is a quote, "To exercise reasonable care in their

22    use and disposal of unreasonably dangerous chemicals such as

23    PFAS and/or products containing PFAS in operating their

24    various facilities to avoid pollution of the State's

25    waterways and injury to members of the downstream public."

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

75

1   That's this case, Your Honor.  Those are the allegations that

2   we've made here.

3        Another case, Ryan versus Greif.  Facilities that use

4   and dispose of PFAS contaminated materials knowing of the

5   risks associated with PFAS ingestion and the risks of

6   environmental contamination following improper disposal owe

7   foreseeable victims of such contamination a duty of care.

8        There's another case in the Northern District of

9   Georgia, Paris versus 3M.  Discharger of PFAS, "Has a duty to

10  exercise reasonable care in its use and disposal of

11  unreasonably dangerous chemicals, such as PFAS, to avoid

12  pollution of State waterways and injury to downstream users."

13       Finally, Your Honor, there's another case, Severa, that

14  was in the -- in New Jersey, finding that defendants had a

15  duty of care with regard to the proper handling of PFAS.

16       So, Your Honor, that's the duty of care that we have

17  alleged that defendants have.  They have a duty of care when

18  they chose to use these PFAS chemicals in their industrial

19  process.  They acted.  They chose to act to use these in

20  their industrial process, and that means that they had a duty

21  of care to handle them, use them, and dispose of them with

22  due care.

23       And, Your Honor, not only do we have other PFAS cases

24  that we' ve cited in our brief.  We have a case here in South

25  Carolina, dealing with pollution, and you -- you -- you -- I

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

76

1    -- I think you -- you'll notice when you look at these cases,

2    none of the cases that defendants cite have anything to do

3    with pollution.  We're talking about pollution cases here,

4    Your Honor.  They cite cases that have nothing to do with

5    pollution.

6         But another case that is on point with our case that we

7    cited in our brief, Your Honor, is Ravan versus Greenville

8    County.  And in that case, there was a waste disposer who was

9    hired to haul the waste to a landfill and that toxic,

10   hazardous waste left the -- the landfill and contaminated

11   plaintiff's property.  And the hauler of the waste contended

12   that it had no duty under South Carolina law because it was a

13   mere hauler of the waste, but the -- the court on appeal

14   agreed that a -- a mere hauler of hazardous waste extends

15   only to the safe transfer -- transport of the waste while it

16   is in the hauler's possession and control.  But because waste

17   management and not its customers chose the location for the

18   disposal of the waste, its role consisted of more than mere

19   hauling of waste to the landfill.

20        That's no different here, Your Honor.  The defendants

21   who had control of their use of PFAS and the control of the

22   methods that they disposed of their PFAS sent their waste

23   just like from a landfill to a third party and it

24   contaminated the plaintiffs' property.

25        So we've cited, Your Honor, a bunch of cases that are on

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

77

1    point dealing with pollution, dealing with PFAS, and

2    defendants haven't even attempted to distinguish this case

3    from any of those.  And that, frankly, Your Honor, just goes

4    to the -- the -- the strength of -- of -- of the duty in

5    plaintiff's argument.

6        One thing I'd like to mention, too, about the duty, you

7    know, the defendants make the argument in their briefs and

8    they make the argument here that there has to be a duty

9    created by statute, a contractual relationship, some sort of

10   status, or property interests, or some other special

11   interest.  And while that's correct, that's only part of the

12   law.  The other part of the law, which is precedent from 100

13   -- more than 100 years ago that has been followed ever since,

14   states, "Moreover, it has long been the law that one who

15   assumes to act even though under no obligation to do so,

16   thereby becomes obligated to act with due care."

17       And that's the situation here, Your Honor.  The

18   defendants assumed to act when they chose to use PFAS in

19   their industrial processes, and they assumed to act when they

20   chose how to dispose of these chemicals that they knew were

21   toxic, persistent, resistant to degradation, bioaccumulative,

22   and incapable of treatment at the conventional wastewater

23   treatment plants that they sent their waste to.

24       Your Honor, I'm just going to address, obviously you

25   have a ton of paper to -- to look at, and so I'm just going

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

78

1    to address the arguments that were raised by the defense

2    counsel.  I think the next argument that they raised was that

3    we didn't adequately allege a -- a breach of -- of a duty.

4    We've already discussed, Judge, we allege a duty, which was

5    the duty to use due care in handling, using, and disposing of

6    PFAS to avoid creating an unreasonable risk of harm.  And

7    that includes preventing direct and/or indirect discharges of

8    PFAS to South Carolina waters.  And they breached this duty

9    by allowing PFAS to escape their facilities and contaminate

10   the South Carolina waters.  That's all that's required under

11   Rule 8, Your Honor, is fair notice.  We've provided that.

12   And I think that's it on breach.

13       With respect to damages, we've pled that defendants

14   contaminated and injured plaintiffs' properties by placing

15   toxic and environmentally persistent chemicals into

16   plaintiffs' drinking water source, which they have a

17   proprietary interest in, which my colleague, Mr. Tapley,

18   talked about earlier, onto their land, which runs adjacent to

19   these lakes and rivers, into their treatment plants, and

20   their facilities and the infrastructure.  We have clearly

21   alleged that they have damaged our property.

22       And we've cited a case, the Chestnut case, which is

23   dispositive here.  In Chestnut, the holding, the court found,

24   appellants have pled all four elements of a negligence claim,

25   duty, breach, proximate cause, and damages.  In alleging

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

79

1    damages, appellants contend their property is damaged, is

2    worthless, damaged, and/or devalued by the harmful and

3    dangerous chemicals on their real property.

4         And that's exactly what we have alleged here, Your

5    Honor.  Nothing more is required.  And with that, I'm done.

6    Thank you.

7         MR. WEATHERHOLTZ:  Very briefly.  Your Honor, Mr. Lutz

8    talked about a number of cases from Georgia that he says are

9    exactly on point with this case where the Georgia courts have

10   found that a duty exists.  What I would point out is that

11   Georgia has adopted Restatement of tort second, Section 324A,

12   which is the third-party liability section that our courts in

13   South Carolina have specifically rejected.  So whatever the

14   courts in Georgia have done are not binding on this court,

15   and -- and even more, they were making decisions under a body

16   law that -- that just doesn't exist here, Your Honor.

17        Ultimately, I would just go back to the Oulla case.  The

18   -- the plaintiffs, in order to sustain a claim for negligence

19   here, they have to overcome the language of that case that

20   rejects 324A and that says that -- that there is no liability

21   to third parties, even where it's potentially foreseeable.

22        Mr. Lutz talked about the assumes to act duty under

23   negligence.  And I would just point out to the court, I mean,

24   this assumes to act body of law is where we get things like

25   the Good Samaritan law.  These are situations where someone's

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

80

1      injured on the road and you stop to help out and the law

2      says, "If you undertake to render aid to someone who is

3      injured on the road, then you have assumed an obligation to

4      that person to not do something that would cause them greater

5      harm or that because of Your -- their reliance on you that --

6      that someone else doesn't come to help them."  This is not

7      that situation at all.  I mean, again, we're talking about

8      businesses who allegedly discharged PFAS to a wastewater

9      treatment plant, and the claims are not by the public.  The

10     claims of injury here are being brought by water providers

11     whose -- whose sole obligation to their customers is to

12     provide clean water and to do with that water whatever they

13     need to do to -- to satisfy their obligations to their

14     customers.

15          Your Honor, the Ravan case, just briefly, that -- that

16     case was looking specifically at the hauler of the toxic

17     waste.  It looked closely at what the role of that company

18     was.  I would point out that that case was on review from a

19     motion for directed verdict and a judgment notwithstanding

20     the verdict, so it was a highly deferential standard that was

21     applied, and the parties don't line up in that case in the

22     same way that the parties are structured here.  And I'll stop

23     there.  Thank you, Your Honor.

24          THE COURT:  Okay.  Thank you.  Anything else, Mr. Lutz?

25          MR. LUTZ:  Yes, Your Honor, just one quick.  Ryan Lutz,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

81

1     again, for the plaintiff.  The Oulla case involved a sod

2     manufacturer that placed pallets on a truck -- truck -- truck

3     trailer that later fell and injured a motorist.  But the

4     Oulla case is distinguishable from our case because the sod

5     manufacturer loaded the pallets at the direction of the

6     customer who negligently failed to secure them.  So they did

7     not find a duty on behalf of the sod manufacturer by merely

8     placing the pallets of the sod on the trailer as its customer

9     directed.

10          This case is not similar to our case.  There was no

11    direction by the wastewater treatment plants to discharge

12    PFAS into their facilities, and that was a choice that

13    defendants made on their own.  Thank you, Your Honor.

14          THE COURT:  Okay.  So Mr. Weatherholtz, before you come

15    back up on the next issue, and Mr. Lutz, with regard to

16    Mr. Weatherholtz's request, if I wanted supplemental briefing

17    concerning common law of different States, because the cases

18    that were cited would be held to a different standard, and

19    that argument -- or that request was made, I think, at 11:43.

20    Yes, five days.

21          MR. WEATHERHOLTZ:  Thank you, Your Honor.

22          THE COURT:  Is that all right with you?

23          MR. LUTZ:  And do you want us to respond?

24          THE COURT:  Five and five.

25          MR. LUTZ:  So respond at the same time?

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

82

1       THE COURT:  No, five.

2       MR. LUTZ:  Five and five.  Yes, Your Honor, that works

3  for us.

4       THE COURT:  Thank you.  Okay.  Next.  Traceability.

5       MR. WEATHERHOLTZ:  Your Honor, just before I get to

6  traceability, I'm going to ask Mr. Tamasitis to talk about

7  this assumption of risk argument as part of the negligence

8  argument.

9       MR. TAMASITIS:  Your Honor, John Tamasitis on behalf of

10  T&S Brass.  This is an argument that only T&S Brass brought,

11  and it's in addition to the arguments made by Mr.

12  Weatherholtz with regards to negligence.

13       T&S Brass contends that plaintiff's negligence claims

14  fails because it's voluntary -- voluntary conduct of

15  intaking, treating, and selling potable water and additional

16  public utilities to residents in its respective areas of

17  service, constitute a primary implied assumption of risk

18  which is recognized under South Carolina law for any injury

19  it now complains of.

20       Primary implied assumption of risk arises when the

21  plaintiff impliedly assumes those risks that are inherent in

22  a particular activity.  It is not an affirmative defense.

23  Rather, the doctrine goes to the initial determination of

24  whether defendant's legal duty actually encompasses the risks

25  that are encountered by plaintiff.  And that's the Davenport

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    case from 1998.

2         Under the doctrine, the focus is not on the plaintiff's

3    conduct in assuming the risk, but it's on the defendant's

4    general duty of care, and so it pairs nicely with

5    Mr. Weatherholtz's arguments earlier.  The doctrine is simply

6    another way of stating that a plaintiff has failed to

7    establish a prima facie case of negligence by failing to

8    establish that a duty exists.

9         This situation in South Carolina courts most often is

10   recognized when a plaintiff is a spectator or a participant

11   in sporting events.  That's how it originated.

12        However, the South Carolina courts have applied the

13   doctrine in other situations.  There's the Singleton case,

14   which is a personal injury action involving injuries

15   sustained from a wild animal bite.  There's the Humphrey

16   case, which is cited in our brief, where a chemical plant

17   worker was found to impliedly assume the risk of injury

18   cutting into a line containing -- containing hazardous

19   chemicals while attempting to remove a potable water line.

20        Involuntarily assuming the role of a public water

21   provider, plaintiffs freely and involuntarily exposed

22   themselves to PFAS and other unregulated contaminants, which

23   it clearly knew and appreciated it as a known risk inherent

24   in its role -- in its role as a public water provider.

25        Indeed, there is an entire regulatory and permitting

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

84

1    scheme that is imposed by state and federal governments under

2    the Clean Water Act that provides for handling waterborne

3    contaminants that apply to public water systems.  Those

4    standards and techniques protect public health by limiting

5    the levels of -- of a minimum of 90 contaminants in drinking

6    water.  Plaintiffs assumed to act and accepted permits to

7    intake raw water to subsequently treat and produce potable

8    drinking water and assume the inherent risk that the water

9    may contain unregulated contaminants like PFAS.

10        I took notes earlier.  Plaintiff had stated that

11   defendants must have a permit for every pollutant that it

12   sends to the POTWs.  That's not the law.  They only need a

13   permit for those pollutants the PI -- POTWs have identified

14   in their permits, and PFAS has not yet been identified.

15        While plaintiffs use water sources to sell water

16   pursuant to a permit, that permit is not required of the

17   plaintiffs.  They sought out a permit to treat water in a

18   reservoir and to sell it to the community regardless of the

19   pollutants, whether it be lead, organic matter, PFAS, et

20   cetera.  The plaintiffs assume that responsibility for

21   whatever purpose and now want to guarantee against what they

22   agreed to do.

23        As such, any duty of defendants to discharge their

24   industrial wastewater to the wastewater treatment plants with

25   reasonable care does not encompass the injuries allegedly

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

85

1    sustained by the plaintiff's intake of raw water that they

2    assumed to act under the doctrine of the primary implied

3    assumption of risk.  Thank you.

4         THE COURT:  Okay.  Thank you.

5         MR. LUTZ:  Ryan Lutz again, Your Honor.  First and most

6    obvious, PFAS contamination is not a risk inherent to water

7    providers that is unlike the getting hit by a baseball at a

8    baseball game.  We don' t assume that industrial users will

9    discharge toxic, bioaccumulative, persistent chemicals either

10   directly or indirectly into the waters of the State of South

11   Carolina.

12        The plaintiff has established, I believe, Your Honor, a

13   duty here, and that duty is dispositive of this issue.  They

14   had a duty to exercise due care in their use, handling, and

15   disposal of PFAS.  As the defense counsel argued, Your Honor,

16   I mean, this is just a duty, and it's just an allegation that

17   plaintiffs have not adequately led a prima facie case of

18   defendant's duty.  We just went over that, Your Honor.  I'm

19   not going to repeat what we just discussed, but this primary

20   implied assumption of the risk does not apply here because

21   the defendants had a duty that they breached.  Thank you,

22   Your Honor.

23        THE COURT:  Thank you.

24        MR. TAPLEY:  Your Honor, if I might on this permit

25   issue, because I think it would help the court.  Defense

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

86

1    counsel just said that they can discharge anything they want

2    to as long as their permit doesn't say they can't.  That's

3    absolutely not the law.  It's exactly backwards.

4        I would point the court to city and county of San

5    Francisco versus the EPA.  A decision that came out March 4th

6    of this year where the Supreme Court finally, clearly

7    identified for all courts, including the federal courts, of

8    what a permit under the Clean Water Act actually allows.  The

9    court said, "A critical component of the Clean Water Act

10   regulatory scheme is the National Pollutant Discharge

11   Elimination System, NPDES, which makes it unlawful to

12   discharge pollutants into covered bodies of water unless

13   authorized by permit."  And it makes sense, Your Honor.  A

14   parking permit to park here at the courthouse doesn't give me

15   permission to park at the hospital.  You're permitted to do

16   what the permit says you can do, and nothing more.  Thank

17   you, Your Honor.

18       MR. TAMASITIS:  Your Honor, just to clarify, T&S Brass

19   doesn't have an NPDES permit.  It only has a pretreatment

20   permit.  Thank you.

21       THE COURT:  Okay.  Thank you.  Traceability?

22       MR. WEATHERHOLTZ:  Your Honor, James Weatherholtz again

23   on behalf of defendant, Unichem.  I believe that Unichem may

24   be the only party who made this argument about traceability.

25   Simply, the position we're taking here is that we don't

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

87

1    believe the plaintiffs in their amended complaint are able to

2    show or even allege properly that the PFAS they claim is on

3    their property is the same PFAS that was discharged by these

4    defendants.  And the reason we believe that -- that this is

5    an argument that's squarely before the court today is because

6    of the other allegations in the plaintiffs' amended

7    complaint.

8        I understand that the plaintiffs will say this is

9    premature and that proof will bear this out, but their

10   complaint also alleges that PFAS is pervasive in industrial,

11   commercial, consumer products.  They say that it's persistent

12   in the environment.  It's highly mobile, water-soluble.  It

13   remains in the environment for decades of legacy industrial

14   use.  I think that -- that even today during these hearings,

15   the plaintiffs have said that every time somebody flushes the

16   toilet, they're putting PFAS into their discharge, which

17   makes its way to their water.

18       And -- and what I would submit to the court is I don't

19   think you can have it both ways, Your Honor.  Even at the

20   pleading stage of this case, to say that it's everywhere all

21   the time and it's being put out by -- by all users of water,

22   but then at the same time allege that -- that you are able to

23   identify the -- the discharge from these defendants in a way

24   that could sustain a claim, in this case, for negligence.

25   Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

88

1          THE COURT:  Thank you.

2          MR. LUTZ:  Ryan Lutz again, Your Honor.  Thank you.

3     Defendants contend that we cannot specifically trace at the

4     pleading stage the chemicals they discharged from their

5     facilities to the chemicals that are in the waters and that

6     have, that the plaintiffs intake for their -- for their

7     drinking water.

8          It's obvious, obviously, Judge, that's a fate and

9     transport issue.  There are experts and discovery that is

10    certainly going to be required to -- to identify that and to

11    -- and to show the specific ways in which PFAS chemicals

12    travel from the defendant's facilities all the way downstream

13    to the intake where plaintiffs obtain their water.  So not

14    only is this -- not only is this a premature argument, it's

15    also -- it also conflates the -- the pleading standard with

16    the underlying merits of the case.

17         And, Your Honor, we cited -- I mean, there -- there's a

18    whole page of allegations where we are citing that defendants

19    use chemical -- use these PFAS chemicals in their processes,

20    they send them to the wastewater treatment plants, they pass

21    through the plant -- plants, they -- they travel downstream

22    and they contaminate a plaintiff's water supply, they damage

23    plaintiff's property and plaintiff's infrastructure.  And

24    we've made all those allegations, Your Honor.  Those are on

25    page 47 of our brief.  So I'm not going to sit here and read

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

89

1    them to you, but there's plenty of allegations that would

2    defeat their argument.

3        Not only that, Your Honor, we've cited too, a number of,

4    again, PFAS cases.  Outside of this jurisdiction, the Johnson

5    case we've cited, where -- where the court denied dismissal

6    based on the argument that PFAS are ubiquitous and that

7    plaintiffs can't state a claim.

8        And then there's other -- there's two other cases,

9    Judge, that are actually cases here in South Carolina.  One

10   is the State's case and the other is a case in -- in the --

11   in the District Court of South Carolina.  Those cases are

12   South Carolina versus 3M and Weatherford versus EI DuPont.

13   And those are cases we cited that support our position that

14   we have adequately alleged the facts that are necessary to --

15   to get past this argument.

16       And so, Your Honor, in sum, I mean, this is a -- this is

17   a premature argument.  This is part of what the -- the

18   discovery process will -- an extensive part of the discovery

19   process will -- will deal with this.  This will be part of an

20   extensive amount of expert proof.  It's also conflating the

21   pleading standard that we have, Your Honor, with the

22   underlying merits.  And so it's premature.  Nonetheless,

23   plaintiff has adequately alleged the traceability of these

24   chemicals.  Thank you, Your Honor.

25       THE COURT:  Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

90

1          MR. WEATHERHOLTZ:  Your Honor, James Weatherholtz,

2     again.  Just one thing.  I think that the plaintiffs continue

3     to talk about PFAS in general terms.  They've alleged that

4     all of these defendants put it into the water system, but

5     what we're talking about is the specific allegation of how

6     the plaintiffs intend to prove or even allege that the PFAS

7     they complain of that causes property damage to their

8     property comes specifically from each of these defendants and

9     we don't believe they can do it.  And our point at this

10    pleading stage is that they haven't even alleged or attempted

11    to do that in the amended complaint.

12         MR. LUTZ:  Nothing further.

13         THE COURT:  Okay.  All right.  Thank you.  We're moving

14    to Mr. Tamasitis.  Municipal cost recovery rule.

15         MR. TAMASITIS:  Thank you, Your Honor.  John Tamasitis

16    on behalf of T&S Brass.  May it please the court.  Excuse me.

17         As stated in their complaints, plaintiffs are duly

18    elected commissions authorized to provide potable water and

19    additional public utility services to their residents

20    pursuant to statute.

21         Under the municipal cost recovery rule, whereas

22    plaintiffs are going to refer to it later, the free cost

23    recovery or the free cost recovery rule, public expenditures

24    made in the performance of governmental functions and

25    services, like those sought by plaintiff to monitor its water

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

91

1     quality and upgrade its surface water treatment plants, are

2     not recoverable in tort.  This rule is based in large part on

3     the constitutional separation of powers.  It was first

4     identified by the US Supreme Court in 1947 in the Standard

5     Oil case.

6          And the seminal case on this doctrine is from the Ninth

7     Circuit in 1983, the City of Flagstaff versus Atchison,

8     Topeka, and Santa Fe Railroad Company.  In that case, the

9     city attempted to recover from the railway the cost

10    associated with emergency response after the derailment of

11    tank cars carrying explosive gas.  The city's theories were

12    negligence and conduct of an ultra-hazardous activity.

13         The court held that the cost of public services from

14    protection from safety hazards is to be borne by the public

15    as a whole, not a sense against -- not assessed against the

16    tortfeasor whose negligence creates the need for the service.

17         What the decision in Flagstaff basically said was it did

18    not turn -- the analysis did not turn on the underlying

19    theory of tort liability, whether it be negligence, trespass,

20    nuisance, or on the question of proximate cause, but it

21    turned on two things, the identity of the claimant, a

22    government entity, and the nature of the cost.

23         Essentially, where such services are provided for by the

24    government, and the costs are spread across the public

25    through fees and taxes, the tortfeasor, as well as insurance

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1     companies, business entities, the public-at-large, and other

2     municipalities, do not expect a demand for reimbursement.

3          There's an expectation from the business community and

4     the public that would be upended if the court were to create

5     an entirely new scheme of liability to compensate governments

6     for increased costs to provide the services that they agreed

7     to provide.

8          The fundamental premise behind tort law is to allocate

9     losses by courts in the most efficient and practical way

10     possible.  Creating an expectation among businesses and the

11     public that certain losses are going to be allocated

12     appropriately so that individuals may govern their conduct

13     accordingly.  Here, there's a regulatory structure, as I

14     talked about before, and a permitting scheme that overlays

15     the provision of public water in South Carolina.  These

16     commissions and municipalities receive federal and state

17     funding to support and improve those services.  None of these

18     funding mechanisms are even mentioned in plaintiffs in this

19     case.  The expectation of the parties in this case is that it

20     will be handled through a regulatory mechanism.  However,

21     plaintiffs come to court asking to break the societal

22     contract.

23          Plaintiffs are correct that South Carolina has not yet

24     had reason to consider and adopt this doctrine.  However, we

25     believe that the analysis is perfectly suited for this unique

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

93

1    case and should be adopted by the court.  And we've cited to

2    several courts that have adopted a municipal cost recovery

3    rule.

4         The plaintiff presents four arguments in opposition to

5    this doctrine.  First, they argue that the doctrine does not

6    apply here for the, "Simple reason that plaintiffs'

7    respective water provisions of drinking water to paying

8    customers is neither free nor public as contemplated by the

9    doctrine."

10        And then they cited the case in the Northern District of

11   Georgia that I believe was talked about earlier, where an

12   individual filed suit against the PFAS manufacturers.  First

13   of all, because it was an individual plaintiff, not a

14   government entity bringing the claim, the court's analysis of

15   the doctrine passed its initial determination that the

16   doctrine wasn't applicable is simply dicta.

17        Section 531.670 of the South Carolina Code provides that

18   any city or town or special service district may, after

19   acquiring a waterworks or sewer system, furnish water to

20   persons for reasonable compensation within such city or town

21   or such special service district.

22        Our Supreme Court has recently rejected the unsupported

23   premise that plaintiffs present here, that the public freely

24   enters into contracts with public water providers for water

25   and sewer service -- services.  That's the Azar v. City of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

94

1    Columbia case, 414 SC 307 from 2015.  I don't believe we

2    cited that in our brief, but I do have copies that I can hand

3    up to the court.

4         Let me -- I just want to go through some of the

5    ordinances in Laurens County.  Section 3381 of the Laurens

6    County Code of Ordinances, which governs residential

7    subdivision standards and construction, "Provides that a

8    certificate of occupancy shall not be granted to a building

9    or use without a connection to a well or public water."

10        Section 33-101, which discusses general standards for

11   multifamily residential developments, "Provides that all

12   proposed multifamily development consisting of greater than

13   15 dwelling units must be served by public water."

14        Section 33-113, "Requires that all proposed open space

15   residential developments must be served by public water and

16   sewer utilities."  Greenwood County has the same.  Under its

17   subdivision regulation, Greenwood County defines utilities as

18   any utility service to a subdivision, including water, and

19   says in Section 6-6-34b that all subdivision proposals within

20   the county to have public utilities and water systems located

21   and constructed.

22        The services of water and sewer are essential in a

23   civilized society, and it strains credulity that plaintiffs

24   argue on one hand, they are bringing these actions to protect

25   the public.  And on the other hand, such services are the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

95

1     result of a -- result of a commercial arm's length

2     transaction where they are operating as an independent

3     commercial-like entity.  Plaintiffs can't have it both ways.

4          Second, plaintiffs contend that the doctrine recognizes

5     exceptions where the acts of a private party create a public

6     nuisance which the government seeks to abate and where the

7     government incurs expenses to protect its own property.  We

8     cited the case of Chicago versus Beretta USA Corp from the

9     Illinois Supreme Court.  This actually addresses this issue

10    head on, and it does disagree with the court in Flagstaff.

11         Admittedly, the rule in Flagstaff does seem to suggest

12    that the doctrine is only available where we're dealing with

13    single discrete disasters, such as fires, explosions.

14    However, we contend that it defies common sense to suggest

15    that the more predictable the expense, such as alleged

16    contamination of the water supply by previously unknown

17    contaminants that the EPA deems to be a contaminant that has

18    escaped federal and permitting oversight, which, Your Honor,

19    will happen again in the future, the greater the ability of

20    the city to recover its costs in tort.  The potential

21    unintended consequences of that rule are staggering.

22         I don't want to look at this case that we have right now

23    in a vacuum.  There are 18 cases right now that have been

24    brought under these local PFAS litigation cases.  There are

25    similar defendants in all of these cases.  Bankrupt these

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

96

1    companies in an effort to upgrade government facilities and

2    the consequences and to avoid consequences at the ballot box

3    are not something that should be allowed to happen.  And the

4    municipal cost recovery rule addresses that.

5        We argue that when the need for government services in

6    response to an alleged and continuing nuisance that impacts

7    the public is ongoing and significant, as the plaintiffs

8    allege here.  The municipal cost recovery rule is even

9    stronger, not weaker, because the legislature is better able

10   to handle and consider the need for cost recovery legislation

11   than in the case of sudden disasters.

12       Indeed, if the legislator -- legislature concludes that

13   the cost of conduct necessitates improvements to services

14   rather than by the taxpayers in general, it has the ability

15   to enact a statute expressly authorizing the recovery of such

16   costs.  No such statute exists for these cases.

17       Third, the plaintiffs argue that the Supreme Court has

18   recognized that a public water provider has a proprietary

19   interest in the water it sells.  And because the doctrine

20   only relates to a governmental services and functions, then

21   the doctrine does not apply to water provider cases.

22       Again, in Azar, the Supreme Court called into question a

23   similar argument made by the city of Columbia in that case

24   and its so-called proprietary interest in the sale of water.

25   In fact, proprietary in this context is essentially an

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    accounting concept that refers to governmental activities for

2    which a fee is charged to external users for goods or

3    services, thus bearing a closer resemblance to a private

4    business in terms of funding rather than a tax.

5        With no supporting authority, the city vastly

6    overestimates the significance of its purported proprietary

7    interest in arguing that it somehow holds a private ownership

8    stake in the water.  And thus makes the sale of that water

9    into the community more akin to a private commercial

10   transaction.  These are government services that they are

11   seeking to recover costs for.

12       Pursuant to statute and -- and as a public water

13   provider, plaintiffs enjoy a monopoly in their service areas

14   for providing and selling water services.  Unlike

15   investor-owned utilities, plaintiffs' rates are not subject

16   to review and regulation by the Public Service Commission.

17   Instead, those rates are set by elected politicians, their

18   commissioners, with no independent third-party review.

19       Accordingly, the legislative functions and regulatory

20   framework in place to set the rates and negotiate with the

21   public for future enhancements to their facility are most

22   appropriately borne by the government through the legislative

23   process.  This is not an area for judicially created common

24   law to govern the reimbursement to governments for the

25   services that are they are mandated by statute to provide.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

98

1     In reality, the relief sought by the plaintiffs in these

2     cases represents a form of taxation by litigation where the

3     taxpayers actually reside outside of the service areas so

4     that the commissioners can avoid the democratic process

5     within their service areas by adjusting rates.  As a result,

6     the claims on this should be dismissed.  As to the judicial

7     system, it is not the appropriate branch of government to

8     handle these types of claims.  Thank you.

9     THE COURT:  Thank you.  And yes, I would like to review

10    that case, the 2015 City of Columbia.

11    MR. TAMASITIS:  Yes, Your Honor.

12    MR. WATSON:  Good morning, Your Honor.  My name is Akira

13    Watson.  I represent Greenwood and Laurens County.  First of

14    all, I think that we are now on the same page with defense

15    counsel on the fact that it is not clear at all that the

16    State of South Carolina recognizes the free public services

17    doctrine or the municipal cost recovery rule.  Defendants

18    have cited no South Carolina clause -- cases applying the

19    doctrine or recognizing it.  I've searched and found no such

20    cases either.  For the reasons I'll explain, this case is not

21    an appropriate vehicle for a South Carolina court to

22    recognize free public services doctrine for the first time.

23    Now, the doctrine holds that for certain government

24    services, legislative bodies have already determined the

25    funding mechanism.  For example, fire and police services are

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

99

1    funded through general taxation in their communities.  In

2    those instances, allowing these government entities to

3    recover the cost of their services in tort would interfere

4    with that legislative determination.  Indeed, the case of

5    Flagstaff versus Santa Fe Railway out of the Ninth Circuit is

6    -- is the lead case on free public services doctrine.

7        And as defense counsel stated, application of the

8    doctrine turns on two factors, the identity of the claimant

9    and the nature of the costs, and that is the public and free

10   components of the doctrine, respectively.  However, where the

11   defense argument fails is that they have only really focused

12   on plaintiffs' identity as governmental -- governmental

13   entities, as water utilities.  They've totally bypassed the

14   nature of the costs involved.

15       Indeed, free public services doctrine doesn't apply here

16   because our clients' provision of drinking water to paying

17   customers is neither free nor public as contemplated by the -

18   - by the doctrine.  It's not free because our utilities bill

19   for their water service on a usage rate, and second of all,

20   it's not public because it's not available to the

21   public-at-large.  Our water is only available to paying

22   customers within our service area.  When the fire department

23   puts out a fire, you don't get a bill from them, but every

24   month you pay a water bill to your utility.

25       Defendants have cited no cases in which free public

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    services doctrine has barred a tort recovery by a water

2    system, a public utility, or indeed any government agency

3    that's funded primarily by billing customers.

4        South Carolina Code 5-31-670 authorizes municipal water

5    authorities in water districts like plaintiff to charge

6    reasonable rates for their water service.  This is the

7    legislative determination here.  Water utilities are

8    responsible for funding themselves, not funded through taxes.

9    We collect -- we collect rates based on water used.  And so,

10   the determination isn't upset by a tort recovery.

11       Defense counsel also mentioned the fact that Flagstaff

12   recognizes exemptions from the doctrine for tort recovery by

13   government entities to abate public nuisances, which we

14   allege, and to address damage to the government's own

15   property, which we also allege.

16       Now, they brought up the case City of Chicago versus, I

17   believe it was Beretta.  And that case involved an alleged

18   nuisance posed by gun violence in the city of Chicago.

19   However, the services in that case were unlike the services

20   that are present here.  In that case, it was the increased

21   strain on police and emergency medical care services, which

22   again, the nature of the cost factor is funded through

23   taxation, not through usage rates.  And with that, I yield my

24   time.

25       MR. TAMASITIS:  Briefly, Your Honor, if I may approach,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

101

1    I've got that case here to hand up to you.

2         THE COURT:  And if you don't mind handing that to

3    opposing counsel, thank you.

4         MR. TAMASITIS:  I have plenty of copies for everybody.

5    Your Honor, just one point.  And this is the distinction with

6    regards to the payments that are made, and the distinction

7    that the plaintiffs are trying to make regarding the nature

8    of the cost being billing for services for the use versus

9    taxes.  And while I try not to be flippant, the water use, as

10   I cited in some of those ordinances, is mandated by these

11   counties in some areas.  And so whether you're paying for

12   that service, that fire service or police service, with your

13   real estate taxes or local taxes at the end of the year, or

14   you're paying for it on a month-to-month basis, you are still

15   paying those fees to a government entity.

16        And as I discussed and as is highlighted in the Azar

17   case, the proprietary interest or the proprietary capacity

18   that the water providers routinely cite is essentially just

19   an accounting tool to say it's not a tax, it's a proprietary

20   -- it's a proprietary interest.  Thank you, Your Honor.

21        THE COURT:  Thank you.

22        MR. WATSON:  May it please the court.

23        THE COURT:  Yes.

24        MR. WATSON:  You know, the Azar case, I may have seen it

25   in researching this, but I'll reiterate, this case doesn't

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

102

1    recognize free public services doctrine in the State of South

2    Carolina.  And that's all.

3         THE COURT:  Okay.  Next.

4         MR. DUBOSE:  Good afternoon, Your Honor, and may it

5    please the court.  Will Dubose of Williams Mullen, appearing

6    on behalf of T&S Brass.  I'm here to discuss the primary

7    jurisdiction issue, and this applies to T&S Brass.  It

8    applies to the -- the Greenwood case, as well as the Laurens

9    case, and I understand that Fiesta-Simmonsville has also

10   moved on this basis.  But if Your Honor is so inclined, I

11   would represent to the court that this issue applies to all

12   of these PFAS cases, inherently.

13        I'd like to start by calling back to something that,

14   Your Honor, noted at the beginning of this hearing.  When you

15   were talking about all the boxes and papers that are stacking

16   up in your office, this is a very specialized topic.  And

17   when you said that, it made my ears perk up because it goes

18   right to the heart of primary jurisdiction.  The key inquiry

19   in primary jurisdiction is whether there are factual issues

20   within the special competence of an administrative agency.

21   And the reality is that water regulation, water quality on a

22   molecular level like this are complex and technical issues.

23        Since the Clean Water Act was passed in 1948, the

24   legislature has stacked statutes, and then agencies have

25   stacked regulations on that foundation.  We've got the South

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    Carolina Pollution Control Act in 1950.  We've got the
2    Federal Safe Drinking Water Act in 1974.  We've got the South
3    Carolina Safe Drinking Water Act in 1976.  And then in the
4    years after those statutes and acts were passed, we've got
5    the regulatory and permitting scheme that we have today.  And
6    the wastewater discharges that are complained of in this
7    case, they were done pursuant to that permitting scheme.
8    They were done under permits.

9        And earlier in this hearing, plaintiff's counsel said
10   that no permit has ever been issued to discharge PFAS, but I
11   think that kind of misses the point.  There are multiple
12   different kinds of permits.  You've got an NPDES permit.
13   That's for direct discharge.  Well, most of the defendants in
14   this case don't do direct discharge.  They send their water
15   to a wastewater treatment plant or POTW first, and that
16   regulatory scheme is for pretreatment.   That's the kind of
17   permitting that T&S Brass has.  Then the wastewater treatment
18   plants and POTWs, they have their own permitting scheme as
19   well.

20       And if you dig into the hundreds of pages of regulations
21   connected to this permitting scheme, in reality, the
22   defendants here, in pretreatment context, only need to
23   identify the permit -- need to identify and get permitting
24   for the substances identified by the wastewater treatment
25   plants.  And PFAS to date has not been identified by the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    POTWs.

2         Plaintiffs also claim that this is their only practical

3    and reliable way to address PFAS in water, and that it would

4    be too late if they have to wait until 2029 to do anything

5    about it.  But they have an opportunity to appeal every

6    single POTW permit, NPDES permit, pretreatment permit, any

7    regulatory decision made by DES, they have an opportunity to

8    appeal that and say, hey, Department of Environmental

9    Services, we have to comply with PFAS drinking water

10   standards in 2029.  We need your help.  We need you to start

11   considering PFAS as a part of these permits.  They chose not

12   to do that and chose to attempt to circumvent 77 years of

13   regulatory schemes after just four months after the EPA

14   announced the PFAS drinking water standards.  That's when

15   this case was filed.

16        Now, even if you do dismiss this case, they can still do

17   that.  And they also claim DES isn't taking action here.  But

18   they acknowledge that the department is and has implemented

19   new monitoring requirements specific to PFAS.  And that's the

20   first step in regulatory action as it relates to this

21   framework.

22        Now, speaking about the law here, I think the plaintiffs

23   and the defendants in this case agree on the principles

24   underlying primary jurisdiction.  It applies when there are

25   factual issues that are within the special competence of an

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

105

1    administrative agency, and it gives the trial court

2    discretion to either stay or dismiss without prejudice in

3    order to refer the matter to the agency.  We both agree that

4    the goal is to promote uniformity and regulation and leverage

5    the expert and specialized knowledge of the agency.

6        So what are the issues of fact that need specialized

7    knowledge?  For one, where exactly is the PFAS coming from?

8    Traceability questions that have been raised earlier in this

9    hearing.  How long has the PFAS been in the environment?  Who

10   discharged it?  What impact does AFFF have on plaintiffs'

11   claim damages, on plaintiffs' ability to comply with PFAS

12   drinking water standards in 2029?  What impact does PFAS --

13   what impact is coming from wastewater in terms of the PFAS

14   that's in the environment?  And most importantly, what's the

15   most efficient way to treat it?  What are the feasibility

16   concerns related to treatment?  There are many factual

17   questions that need the specialized knowledge and expert

18   knowledge of agencies, but the reality is these are not

19   common questions considered by South Carolina common law.

20   These are regulatory questions, commonly considered by

21   agencies.

22       If this case proceeds to a jury trial, even with all the

23   expert testimony in the world, it's not within the keen of a

24   jury to determine the cost of upgrades to a water treatment

25   facility.  That's for regulatory bodies.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

106

1        If the court grants an injunction in this case, that'd
2   be upending the current regulatory scheme.  That'd be
3   essentially adding permit requirements into every single
4   NPDES permit, every single wastewater treatment permit, and
5   the pretreatment permits that most of the defendants in this
6   case have.  And it would essentially invalidate the existing
7   permits for wastewater.
8        I also want to briefly clarify what primary jurisdiction
9   is not.  It's not ripeness.  We heard plenty from Mr. Willis
10  about ripeness earlier this morning.  But it's also not
11  exhaustion.  Exhaustion deals with exclusive jurisdiction.
12  Primary jurisdiction is also not preemption.  There's no
13  complete conflict between state and federal law here.
14  Instead, we've got concurrent jurisdiction.  The court has
15  subject matter jurisdiction to decide negligence claims.
16  We're not arguing with that.  But the agencies also have
17  jurisdiction to determine how we should go about getting PFAS
18  out of our water.  And they haven't been afforded an
19  opportunity to do so.
20       And so we're asking, Your Honor, to stay this case or
21  dismiss it without prejudice to allow a regulatory decision
22  to be made.  Thank you.
23       THE COURT:  Thank you.  All right.  Yes, sir.
24       MR. WATSON:  All right.  May it please the court.  Akira
25  Watson again.  First off, like free public services doctrine,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    it's also unclear the extent to which South Carolina

2    recognizes the doctrine of primary jurisdiction.  There's

3    only one published decision, Fullbright versus Spinnaker

4    Resorts, out of the South Carolina Supreme Court in 2017 that

5    addresses primary jurisdiction, and the Supreme Court was

6    skeptical about the doctrine.  It also noted the lack of

7    South Carolina cases involving primary jurisdiction, and it

8    ultimately didn't grant a dismissal or a stay on the basis of

9    the doctrine.

10        Now, as far as the substance of primary jurisdiction

11   doctrine, it's discretionary doctrine, where a case or

12   factual issue is beyond the conventional experience of

13   judges, but within the special competence of an

14   administrative agency, the court may stay or dismiss the case

15   and refer the matter to the agency.

16        Now, this case involves common law tort and property

17   claims that are well within this court's competence and

18   experience.  The Department of Environmental Services, on the

19   other hand, doesn't resolve these types of claims and has

20   little to offer in resolving them.  I'd point out the fact

21   that the MCLs at issue, which the defendants cite in their

22   briefs as a basis for primary jurisdiction being invoked,

23   were issued by EPA, not the Department of Environmental

24   Services.

25        Defense counsel mentioned state and federal statutes

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

108

1    that implicate the permitting scheme that is potentially at

2    issue in this case.  However, I would note that nothing in

3    the text of either the South Carolina Safe Drinking Water Act

4    or the Water Pollution Control Act indicates that the

5    Department of -- of Environmental Services has exclusive

6    jurisdiction over issues touching safe drinking water or

7    industrial discharges of PFAS.  And, in fact, the federal

8    statutes that are the analog to the State statutes, and that

9    is the Safe Drinking Water Act and the Clean Water Act,

10   expressly provide a right for citizen plaintiffs to sue to

11   enforce, thus negating an inference that the responsibility

12   for enforcing clean water and discharges of pollutants rests

13   solely with the administrative agencies.

14        Moreover, the South Carolina Safe Drinking Water Act and

15   its federal counterpart are really about regulating

16   plaintiffs' utilities and the water that they provide, not

17   about regulating discharges from industrial facilities into

18   State waters.

19        There are a lot of practical problems with defendants'

20   requests here.  Defendants have just asked for a stay or

21   dismissal, and essentially for the court to figure out what

22   the substance of that dismissal, or more specifically, what

23   the stay would be.  What issues would the court be referring

24   to DES?  Defendants haven't specified a list.  The court

25   cannot -- or excuse me, the Department of Environmental

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    Services cannot adjudicate tort claims.  What would be the

2    time line for a stay?  The proposed end date?  How would the

3    court know when to lift the stay?  Here, defendants have no

4    answers.

5         As mentioned in our brief, defendants can point to no

6    regulatory action by the Department of Environmental Services

7    to regulate PFAS, nor any PFAS-related enforcement actions

8    that are specific to their facilities.  Moreover, even if

9    they could, that still would not warrant staying or

10   dismissing the case under primary jurisdiction doctrine.

11        Indeed, in the case of Nix versus Chemours out of the

12   Eastern District of North Carolina in 2023, that case

13   involved contamination from a PFAS manufacturing facility

14   that had contaminated local drinking water supplies.  That

15   facility was subject to a consent order by the North Carolina

16   Department of Environmental Quality.  Defendants raised

17   primary jurisdiction doctrine, the Court denied it.  And in

18   fact, I'd point out, Your Honor, that this argument has been

19   raised by defendants in a lot of PFAS contamination cases.

20   Those cases are cited in our brief.  As far as I can tell, it

21   has never been successful.

22        Really, this argument about primary jurisdiction, and --

23   and as well as free public services, these are obscure

24   doctrines.  The fact that defendants are arguing for

25   dismissal on these bases really shows that they're grasping,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

110

1    and it underscores the strength of our case and why their

2    motion should be denied.  Thank you.

3        MR. DUBOSE:  Your Honor, there is another reported case

4    in South Carolina that considers the primary jurisdiction

5    doctrine.  It's the Medical University of South Carolina

6    versus Taylor.  Citation is 249 SC 99 1987.  It is a Court of

7    Appeals case, but in that case, the court declined to rule

8    and found that primary jurisdiction applied and that the

9    matter should have been decided by the agency.  That is South

10   Carolina authority.  Additionally, other courts in South

11   Carolina, the Supreme Court specifically, has not had a lot

12   of opportunities to consider the doctrine.  They haven't

13   needed to.  But the US Supreme Court has recognized the

14   doctrine since 1907.

15       Additionally, DES and permitting decisions do go to the

16   underlying problem here, PFAS and water.  And it's a whole

17   lot more feasible for the Department of Environmental

18   Services to implement new regulations that apply to all of

19   the permits that everybody who discharges wastewater has to

20   have than for defendants to drag -- or for plaintiffs to drag

21   every single defendant that emits wastewater into a case and

22   try to resolve it that way.  We're also not arguing for

23   exclusive jurisdiction here.  This is primary jurisdiction.

24   And as I said earlier, it's a matter that occurs where

25   there's concurrent jurisdiction, but an inherently regulatory

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

111

1    matter.

2         Plaintiffs made reference to the Safe Drinking Water Act

3    and how that applies to the plaintiffs.  I don't disagree

4    with that, but the South Carolina Pollution Control Act, the

5    related regulations that apply to discharge permits, and the

6    Clean Water Act, that's what speaks to the defendant's duties

7    here and that regulatory scheme.

8         As for the questions about the specifics of any kind of

9    a stay in this case, we're happy to provide additional

10   briefing to outline those specifics.  But really, it's as

11   simple as the case has stayed.  Plaintiffs put the issue to

12   the department, and if they're not satisfied with whatever

13   develops, we'll come back here.  But right now, there's been

14   no opportunity for the department to make a decision on this.

15        Additionally, you said that these are obscure doctrines,

16   that primary jurisdiction is obscure.  Well, these are fairly

17   unprecedented cases, and we ask that, Your Honor, consider

18   these arguments.  Thank you.

19        THE COURT:  Thank you, Mr. Dubose.  Anything else?

20        MR. WATSON:  No, Your Honor.

21        THE COURT:  Okay.  Let me just ask you all for planning

22   purposes.  I was going to break for about 10 minutes and come

23   back and finish up the statute of limitations and motion to

24   stay, or do y'all want an hour?

25        MR. WILLIS:  We're prepared to move forward, Your Honor.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

112

1    It's obviously up to you.

2         THE COURT:  Ten minutes.  Thank you.  I'll see y'all at

3    one o'clock.  Thank you.

4                        (OFF THE RECORD)

5         THE COURT:  Be seated, please.  Okay.  We are back on

6    the record with civil action numbers 24-CP-30-734 and

7    24-24-735, as well as 25-30-05.  Okay.  We are up to statute

8    of limitations.  It's an issue that we're taking up in the

9    motions to dismiss.

10        MR. CARROLL:  Good afternoon, Your Honor.  My name is

11   Jamie Carroll, and I'm appearing for Milliken.  At the risk

12   of everybody's blood sugar getting even lower, I'll -- I'll

13   try to -- to move along fairly promptly.

14        I'm speaking, Your Honor, because while Milliken raises

15   many of the same arguments that the other defendants do,

16   there is one that it alone raises, which is the statute of

17   limitations.  And our -- an overview of my argument is, Your

18   Honor, is that the discovery rule obviously applies, but it

19   is a legal issue, and, Your Honor, can decide it.  So we'll

20   go through the facts that are in the complaint.  And then the

21   plaintiffs try to preserve the action, even applying the

22   discovery rule, by arguing nuisance and trespass, continuing

23   nuisance and continuing trespass.  And I don't believe either

24   of those hold up.

25        So first, Your Honor, let's look at the facts as alleged

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

113

1   in the complaint and the time line for Milliken.  So Milliken

2   owned the Judson Mill from 1960 to 2015 and sold it in 2017.

3   The plaintiffs added Milliken to their lawsuit in 2024

4   Obviously, South Carolina has a three-year statute of

5   limitations for property damage, and Milliken has not had any

6   ownership or control in seven years.  So on the face, it's

7   time-barred, but obviously the plaintiffs say, we didn't know

8   about it.

9         So let's, Your Honor, look at the -- the timing that

10  they have in their complaint.  So they cite the 2016 EPA

11  health advisory, and that's at paragraph 34 of their

12  complaint.  And in that, Your Honor, the EPA recounts the

13  actions which led to the advisory opinion.  One of those was

14  in 2012, and what it says is, "The EPA required all water

15  systems with more than 10,000 customers to measure PFOS and

16  PFOA for at least one year in the 2013 to 2015 time period."

17        And as the plaintiffs admit in their complaints, Your

18  Honor, both of those were covered by that.  In paragraph two

19  of the Laurens complaint, it states that it serves

20  approximately 40,000 customers.  Greenwood states at

21  paragraph two that it serves 23,500 customers.  So the upshot

22  is, Your Honor, both of these water systems had to measure

23  PFOS and PFOA for at least a year in either 2013, 2014, 2015.

24        Now, I mentioned the health advisory, and let's look at

25  what it says, Your Honor.  And this is what the plaintiff,

1    I'm only citing how the plaintiff characterizes it.  In

2    paragraph 34, they say that it is, this health advisory arose

3    from peer-reviewed studies of the effects of PFOA and PFOS on

4    laboratory animals and epidemiological studies of the human

5    population exposed to PFOA, PFOS.  What they note is that

6    exposure over certain levels may result in adverse health

7    effects, including developmental delays to fetuses, cancer,

8    testicular and kidney, liver effects, immune effects, thyroid

9    effects, and other adverse effects.  So that occurred in

10   2016.

11       2019, the MDL with Judge Gergel is established, and

12   there are many water system cases in there.  2022, the EPA

13   updates the health advisory, and plaintiffs again quote this

14   in their complaints at paragraph 36, saying, "The level at

15   which negative health effects occur are much lower than

16   previously understood, and the EP lowered the interim levels

17   for maximum contaminant goals for PFO -- for all PFAS.  Then

18   in 2023, they proposed maximum contaminant levels.  Then

19   these were finalized in April 2024, and that's detailed in

20   the complaints at paragraphs 38 to 42.

21       So, Your Honor, if you look at all that, and that was

22   all we had, I assume the plaintiffs would say that their

23   statute did not begin to run until 2024.  If that's all we

24   had, but the plaintiffs themselves say this is not what they

25   had.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

115

1       I've got two quotes, Your Honor, at pages 5 and 6 of

2    their complaints.  So this is the plaintiff's language from

3    page five.  "Defendants recast plaintiffs' cases

4    fundamentally concerning regulatory compliance rather than

5    what they actually are, straightforward State law claims

6    arising from past, present, and future property claims."  So,

7    Your Honor, a regulatory time line is not the be-all and

8    end-all, according to the plaintiffs.

9       Now, if there were any question about what the

10   plaintiffs' complaints say, go to the next page.  They say on

11   page six, and I quote, "Plaintiffs' complaints speak for

12   themselves.  These are not regulatory compliance claims, but

13   straightforward State law causes of action based on

14   defendants' ongoing contamination of the land, surface water

15   treatment plants, infrastructures, and water sources -- water

16   sources," excuse me, "with PFAS chemicals."  See complaints

17   paragraphs 1-7, 57 to 95.  That's on page six.

18      So, Your Honor, if it's not about regulatory compliance,

19   and the plaintiffs state it's not, and it is about past,

20   present, and future property claims, then, Your Honor, we do

21   need to look at when the discovery rule accrued.  And you,

22   Your Honor, that is an objective decision that -- that you

23   can make, not a subjective one.  And that's stated in the

24   Hedgepath case, which both the plaintiffs and we cite as --

25   as the authority on this.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

116

1      So I will give you three quotes, Your Honor, from

2   Hedgepath.  So obviously, I've already said it's objective

3   and not subjective.  These quotes, Your Honor, "Whether a

4   particular plaintiff knew he had a claim is not the test.

5   Rather, courts must decide whether the circumstances of the

6   case would put a person of common knowledge and experience on

7   notice that some right of his had been invaded or some claim

8   against another party might exist."  So, Your Honor, the

9   objective determination is whether a regular old person might

10  be on notice that some claim -- I'm sorry, some right had

11  been invaded or some claim might exist.

12      Now, Hedgepath goes on to say, Your Honor, that statutes

13  of limitation begin to run from this point and not when

14  advice of counsel is sought or a full-blown theory of

15  recovery is developed.

16      So, Your Honor, that is when you start to look. So if

17  you apply Hedgepath to this case, since it's not a regulatory

18  compliance case, doesn't really matter when 2024 comes,

19  right, and the -- and the standards are finalized by the EPA.

20  We submit, Your Honor, that when that statute began to run,

21  could have been 2013 to 2015, when they had to measure PFAS

22  and PFOS, according to the EPA, and both these water systems

23  had to do it, or 2016, when they put the health advisory out

24  and cited the adverse health effects, including developmental

25  delays to fetuses, again, this is a quote, cancer, liver

1    effects.

2         Your Honor, even if the PFOS and PFOA were below the

3    2024 standards, then in 2013 and 2015 when they measured

4    them, that doesn't matter because the plaintiffs themselves

5    say it doesn't matter.  The plaintiffs say judge us on

6    straightforward State law claims.

7         Your Honor, if -- if you judge these on when a -- a

8    someone with common knowledge should have known that a claim

9    might accrue or some right might have been invaded, it can't

10   be past 2016, Your Honor.  These are water systems.  They've

11   been measuring PFAS.  They get the EPA advisory in 2009 that

12   says, hey, and this is, again, quoted in the plaintiff's

13   complaint. 2009, it says, "We're -- we're not sure about

14   human health effects."  2016, they say, "Human health

15   effects."  2019, Judge Gergel, right down the road, sets up

16   an MDL talking about PFAS in not only AFFF.  I'm not going

17   down and dragging that red here, Your Honor. What I'm saying

18   is, water systems are in Judge Gergel's MDL.  These guys, the

19   plaintiffs should have known, they do this every day, no

20   later than 2016.  And that's a decision, Your Honor, that you

21   get to make.  This is an objective standard, not a subjective

22   standard.  So it really doesn't matter what they're going to

23   tell you about what they knew and when.  You can look at the

24   record they have put before you and make this decision.

25        Now, how do they try to save it?  They say, well,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

118

1    continuing nuisance and continuing trespass.  Both of those,

2    Your Honor, fail for this reason.  Clark v. Greenwood County

3    has already been cited on the -- by Ms. Tor, I think, on the

4    nuisance issue.  And there was talk about control.  I think

5    Mr. Tapley was arguing about control.  Your Honor, the -- the

6    -- the control that is at issue in a continuing nuisance

7    claim is not the control of the alleged polluters.  Here's

8    what Clark says, and here's a quote, Your Honor, appellants

9    neither -- and this is speaking of the Clarks, "Appellants

10   neither alleged nor produced any evidence that corporate

11   respondents had control over the landfill or the hazardous

12   waste once it was deposited at the landfill.  As such, they

13   couldn't be held liable for nuisance."  Your Honor, the

14   control is not what we do at the plant.  The control is what

15   happens downriver.  We have no control over what happens for

16   a continuing nuisance claim, and that is fatal to their

17   claim.

18        As to trespass, Your Honor, continuing trespass, similar

19   reasoning applies, but the test is slightly different.  It's

20   black letter South Carolina law, as quoted in Hedgepath,

21   "Trespass is any intentional invasion of the plaintiff's

22   property."  That's been -- that's been  South Carolina law

23   for at least 40 years, probably earlier.  Hedgepath site's

24   case is going back 40 years.

25        It's undisputed that Milliken intended to send its

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

119

1    wastewater to the Mauldin Road treatment plant, But there is

2    no evidence, there's no allegation that it intended for the

3    wastewater to go to plaintiffs' intake valves.

4        Now, Ms. Tor also made the -- made the arguments about

5    intangible matter and about no entry, but Your Honor, there's

6    no intent as well here.

7        So, in sum, Your Honor gets to decide when the discovery

8    rule runs. And for -- from what the plaintiffs have put in

9    their complaint, that's 2016. If Your Honor wanted to say it

10   went to 2019 when Judge Gergel said, y'all come on down, and

11   plenty of water systems did. But you can't -- that's when

12   the discovery rule runs, 2016, and you can't save it with

13   continuing nuisance or continuing trespass, because it's

14   fatal to have no control and no intent. Thank you, Your

15   Honor.

16       THE COURT: Thank you.

17       MR. TAPLEY: Your Honor, I think there's finally an

18   agreement in the courtroom that plaintiff is master of his

19   complaint. And that the case on a motion to dismiss has to

20   be judged by plaintiff's actual complaint, not the one

21   defense lawyers wished we'd filed. Let's be clear about

22   what's in the complaint, and let's be clear about South

23   Carolina law. South Carolina is clear that Your Honor has

24   the ability and the power to dismiss this case if plaintiff

25   has pled a time-barred action. Plaintiff has not pled a

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

120

 1    time-barred action.

 2         2016 Health Advisory absolutely notified these

 3    plaintiffs that 70 parts per trillion or more of PFOA or PFOS

 4    was troublesome.  Even said might be health effects above 70

 5    parts per trillion.  That was told of them in 2016.

 6         Plaintiffs never had a reading that high of PFOS and

 7    PFOA.  Plaintiffs do not, Your Honor, have epidemiologists on

 8    staff.  Plaintiffs do not have toxicologists on staff.  Our

 9    plaintiffs don't do medical studies, and our plaintiffs don't

10    do animal studies.  We rely on other people to do that and

11    tell us what it means.  And as of 2016, based on the samples

12    plaintiffs in this case took, they were led to understand

13    that there was nothing to worry about at the time.

14         Now, counsel is correct.  That changed in 2024 for

15    plaintiffs.  In 2024, they were told with the new health

16    advisory and with the MCLG, that in terms of health effects

17    for human populations, it's now the -- the overall view of

18    the scientific community that there is no safe level.  No

19    safe level as of 2024.  That's the only time that the statute

20    could have reasonably begun to run.

21         Moreover, Your Honor, Milliken may have sold this

22    property or shut this plant down in 2015, you said.  But they

23    shut it down and didn't remediate the property.  And now

24    every time there is a significant rainfall event, the PFAS is

25    scattered all across that property, makes it way to the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    surface waters again, and is flushed down the river toward

2    our intake.

3        Also, Your Honor, in their pleadings, they make a very

4    interesting argument, or in their briefing.  They claim that

5    the claim involving the Judson Mill site is both unripe and

6    time-barred.  Unripe and time-barred.  They say too much time

7    has passed from first suffering an injury and then the injury

8    was never suffered.  Their argument on the application of the

9    statute of limitations falls from its own internal

10   contradiction.  Again, their argument is both too late and

11   too early.  But they've got it right when they read our

12   complaint.  It is plaintiff's allegation that the statute of

13   limitation is continuing to run with every release from that

14   old, unremediate -- unremediated property.

15       And finally, Your Honor, I'll just touch on the other

16   part of our argument, that this court's powers for

17   restitution, when it invokes its power in equity, is very

18   broad.  And there's South Carolina opinions and authority

19   that we've cited to the court in our brief on this issue.

20   But South Carolina courts recognize that, Your Honor, when

21   fashioning the remedy of abatement, exercising its equity

22   powers, absolutely has the authority to force Milliken and

23   others to participate in an abatement remedy which results in

24   the construction and funding of new water filtration on the

25   plaintiff's properties so they can continue in its role of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

122

1     providing safe drinking water.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. CARROLL:  Your Honor, Jamie Carroll again, two brief

4     points.  If Mr. -- Mr. Tapley wants to say that Greenwood and

5     Laurens, the argument's sort of like, ain't nobody here but

6     us chickens.  We don't know anything until we were told this

7     by the EPA.

8          Your Honor, that's not the test.  The test, and we both

9     cite it in our briefs, is Hedgepath.  It's an objective test,

10    and it's if someone knew when some right might have been

11    violated or some claim might arise.  Hedgepath specifically

12    says it's not when you go to a lawyer and have a full-blown

13    theory of recovery.  So it's not when they met -- went to Mr.

14    White, it's when you knew something.  And since they are

15    so -- plaintiffs do want to have it both ways, they want to

16    say, well -- we'll rely on the regulation sometimes, we'll

17    rely on the tort claim sometimes.  But, Your Honor, if you

18    say this PFAS needed to be remediated now, you worried about

19    it then.  That's when the statute began to run.

20         When these two water systems were unnoticed, that some

21    right might have been violated.  And, Your Honor, that can't

22    be passed 2016.  Doesn't really matter when Milliken had the

23    plant.  I would argue that if the plant were still up and

24    running.

25         And then lastly, on this point about arguments being

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

123

1    internally inconsistent, as you -- that's a fantastic jury

2    argument, Your Honor, but it doesn't work on a judge because

3    Your Honor knows that people make series of arguments all the

4    time.  I'm sure you've had a dog bite case where the guy

5    said, my dog didn't bite you, and if he did, he was provoked.

6    Well, those two things are internally inconsistent, right?

7    How can you make those?  Well, you make them because we make

8    these arguments because any one of these arguments, if Your

9    Honor grants them, are fatal to the claim.  Thank you, Your

10   Honor.

11        THE COURT:  Thank you.

12        MR. TAPLEY:  Your Honor, I'll finish very briefly.  I

13   promise you, if Greenwood and Laurens had to file this case

14   in 2017, they would be arguing, but your levels are way below

15   70 parts per trillion, and you don't have an injury.  You

16   don't have an injury.  But now, with the benefit of hindsight

17   and the attempts to get a case dismissed, they say even

18   though you had no proof that you were injured in 2016, and

19   everything your regulator told you led you to believe you

20   weren't injured in 2016, you had a case.  That ain't South

21   Carolina law, Your Honor.

22        In order to bring a claim, you have to have a concrete

23   injury.  And they didn't know they had an injury.  Until the

24   medical and scientific community coalesced, and in 2024,

25   finally determined no safe level.  It went from 70 to

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

124

1    nothing, and 70 to nothing was all the world to determine

2    whether or not there was an injury in these cases.  Thank

3    you, Your Honor.

4         MR. CARROLL:  Nothing further, Your Honor.  Thank you.

5         THE COURT:  Thank you.  Okay.  Are y'all ready to move

6    back to Mr. Willis?

7         MR. WILLIS:  Thank you, Your Honor.

8         THE COURT:  For the discovery issues.

9         MR. WILLIS:  Yes, ma'am.  So as I said earlier, Your

10   Honor, all -- all our motion for stay asks is that there be

11   no discovery until Your Honor decides these motions to

12   dismiss.  And we know whose parties are in and what claims

13   are in or out.  And the plaintiffs to their credit, have

14   cooperated with us on that and have not pushed that issue.

15   So we're -- we're content to simply say let's not do

16   discovery until Your Honor can decide these motions. And then

17   if Your Honor denies them or grants them in part, denies them

18   in part, then discovery would go forward.  So that's all we

19   really have to say about the stay.  We're not seeking to stay

20   beyond Your Honor's decision on the motions.

21        What I do want to ask, or I guess alert the court, is

22   what we're going to be doing tomorrow.  We -- we don't

23   intend, Your Honor, to come in and replow all the old ground

24   that we plowed today.  Your Honor's been taking furious notes

25   and paying close attention to the arguments.  And we greatly

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

125

1    appreciate the time that you've given us.  Frankly, this is

2    unprecedented for a motion to dismiss.  And so we -- we don't

3    want to abuse the court's time and resources.

4        There are some lawyers that have some additional things

5    to say.  The cases tomorrow are a little different than the

6    cases today.  So you'll be hearing from Mr. Barnett on a

7    failure to join the United States government.  You'll be

8    hearing from Merritt Abney with Nelson Mullins on some of the

9    negligence, trespass, and nuisance aspects of that.  The

10   cases tomorrow that are different from what we talked about

11   today.  And Mr. Knowlton on prejudgment interest and

12   attorney's fees and on primary jurisdiction, and he's been on

13   the call, so I'm sure he'll -- he's been listening and won't

14   try to plow old ground.

15       We have an issue dealing with personal jurisdiction that

16   we'd like to talk about with regard to one of -- or two of

17   the landfill clients in the Grand Strand case.  And so that's

18   all we have for tomorrow.  We don't think it'll be nearly as

19   long and as arduous as today.  I just want to thank, Your

20   Honor, for Your time.

21       With regard to what the court should do, as -- as Your

22   Honor knows, we're asking for all of the cases to be

23   dismissed, but the court certainly has the power to dismiss

24   some aspects of some claims, but not dismiss as to others.

25   To dismiss some damages that aren't recoverable under some

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

126

1    causes of action, even though they've been pled, the court

2    has the authority to ask the plaintiffs to make their

3    complaint more definite and certain.  We still haven't really

4    seen any specific allegation of any costs that they have

5    incurred thus far which would be part of the justiciability

6    argument.

7         But Your -- Your Honor certainly knows what you can and

8    can't do with a Rule 12 motion to dismiss.  You don't need me

9    to tell, Your Honor.  So thank you for your time.  I want to

10   thank our opponents for their civility and the substantive

11   nature of the arguments.  This is an interesting case, and we

12   ask that our motions be granted.  Thank you very much.

13        THE COURT:  Thank you, Mr. Willis.

14        MR. TAPLEY:  Your Honor, just briefly as far as

15   plaintiffs' position on the motions to stay discovery.  At

16   this point, defendants have sort of fashioned their own stay

17   of discovery by not responding until the court rules.  We --

18   we do believe that the motions are due to be denied and the

19   cases should move forward, Your Honor, and we hope the court

20   rules in that way.

21        And we've heard from defense counsel that they believe

22   that once your court -- once Your Honor has ruled that

23   Discover will be live and open, we haven't filed the

24   discovery in front of Your Honor, as I told you earlier

25   today, but then much hay was made about the fact that we sued

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

127

1    some people and not other people.  I want to be real clear.

2    The discovery, which is pending right now, is very targeted

3    Who'd you buy the PFAS from?  How much did you buy?  And when

4    did you buy it?  Because if there are other people that need

5    to be added to this case, we want to do that, Your Honor, but

6    we need discovery from defendants to get there.  Thank you.

7        THE COURT:  Okay.  Anything about tomorrow?

8        MR. TAPLEY:  Your Honor, I agree that it'd be a travesty

9    to waste the court's time replowing old ground, so we'll be

10   here and ready to address anything raised by the defendants,

11   but hopefully we can be very respectful of the court's time.

12       THE COURT:  Okay.  Okay.  But also today we have -- I

13   mean, some of you, I think, are going to leave, but we also

14   have the city of Clinton's cases, right?

15       MR. ENGLISH:  Yes, ma'am.

16       THE COURT:  Okay.  Our motions.  And so this is a little

17   unusual because I don't have representatives from the clerk's

18   office here who are usually very vocal about when we break

19   for lunch, and court reporters as well.  And so I'm happy to

20   keep going, but happy to take a break.  I think my staff may

21   need to take a break for, y'all can maybe alternate if you

22   want to, but I'm happy to keep going if y'all are.  It

23   doesn't matter to me.  I rarely eat lunch, so, okay?

24       MR. ENGLISH:  Your Honor, I think my argument will be

25   about five minutes or less, so I think, but I'm happy to take

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

128

1    a break if people need it.

2          THE COURT:  I'm fine, then.  Let's keep going.

3          MR. ENGLISH:  Thank you, Your Honor.  I'm Greg English

4    with the Wyche Law Firm.  With me is my law partner, Rita

5    Bolt Barker.

6          In the city of Clinton case, which was just filed in

7    2025, we represent three defendants, Fibertex, Nicca, and

8    Jain-Chem.  And so I'd -- I'd like to -- we filed a motion to

9    dismiss the amended complaint on February 27th.  I'd like to

10   incorporate the arguments made in that motion in support of

11   our motion to dismiss and incorporate the arguments that have

12   been made by the defense counsel on the Laurens and Greenwood

13   cases in support of that.

14         I would like briefly to elaborate on one of those

15   arguments, and that is that the plaintiffs lack standing to

16   seek as damages the cost of removing State license discharges

17   from waters of the State.  All of these cases, Your Honor,

18   present the court with a fundamental question, and that is

19   whether the plaintiffs, on the one hand, have a property

20   right to water of the State to be free of discharges by the

21   defendants, even though those discharges flow through

22   state-licensed water treatment plants.  Or do the plaintiffs,

23   on the other hand, take waters of the State subject to those

24   discharges licensed by the State?

25         And you heard, Your -- Your Honor heard the plaintiffs

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

129

1   assert that they have a property right to this water, and

2   that's important to their case because tort law, as the Babb

3   case points out, provides for damages to bodily injury, which

4   isn't an issue here, or property damages.  And the

5   plaintiff's complaint is based, at least in part, on this

6   theory that they own the water and that their water has been

7   damaged.  But that's not the case.

8        The -- the truth is the plaintiffs take the waters of

9   the State subject to the discharges licensed by the State and

10  so have no standing to complain about the quality of the

11  water allowed by the State because the State, not the

12  plaintiffs, owns the water that the plaintiffs use.  And

13  that's the Jowers versus DHEC case that was in, that's tab 17

14  of the notebook we delivered on behalf of Milliken.  And the

15  Jowers case makes clear that the State owns all the property

16  below the high water mark of any navigable stream, and all

17  navigable rivers are juris publicae.

18       That's also the theory behind the Attorney General's

19  case in the State versus 3M.  The State of South Carolina is

20  currently suing the manufacturers of PFAS, saying that you've

21  damaged our water.  We want to recover the cost of repairing

22  the damage that you've done to the water, and the plaintiffs

23  here, in essence, are trying to double dip on their theory.

24       So for its waters, it is the State that decides when and

25  how to meet its water quality standards.  And that's under

1    the South Carolina Pollution Control Act that we cited in our

2    motion, and that's South Carolina Code Section 48-1-100 that

3    says it is DHEC -- DHEC or DES now, that has jurisdiction to

4    determine and set standards and enforcement for the waters of

5    the State.

6        That's also clear from the State Safe Drinking Water

7    Act, which is South Carolina Code section 44-55-410, which

8    was tab 21 of the -- the binder we delivered on behalf of

9    Milliken in the Greenwood and Laurens case.  And that statute

10   basically says that the counties are authorized to set up

11   wastewater treatment plants to take waters that are

12   discharged by industrial users.

13       Now, currently, the State has until 2029 to decide how

14   to address PFAS, and that may change, but even if it doesn't,

15   the State is likely going to require the wastewater treatment

16   plants to remove PFAS, who can then turn around and seek

17   money from these same defendants for that cost.  And here,

18   the plaintiffs have not ownership of that water, but the

19   right to use it.

20       And the Jowers case cites White versus Whitney

21   Manufacturing that says, "That a person alongside a stream

22   has no property in the water itself but a simple usufruct

23   which, while it passes along," a right to use.  And so that

24   use is subject to discharges allowed by the States, including

25   from those wastewater treatment plants.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

131

1      So therefore, these defendants should not be faced with

2  all of the cost of removing their own PFAS from their

3  discharges, the cost of new equipment, that the wastewater

4  treatment plants will likely obtain, and that's part of the

5  reason these wastewater treatment plants, and we submit DES,

6  are necessary parties in this case.

7      And then on top of that, new equipment by the plaintiffs

8  to clean up the waters of the State.  So whatever else Your

9  Honor rules, we ask that you rule that plaintiffs lack

10  standing to recover damages to the waters of the State --

11  waters of the State of discharges from the wastewater

12  treatment plants.

13      And I'll say that we also ask for an extension of time

14  to answer because this is a fairly new case for us.  I know

15  normally if you deny motions, there's 15 days.  We ask for

16  60, and we would ask that we not have to do discovery until

17  we're able to put together our answer.  Thank you.

18      MR. WATSON:  May it please the court?

19      THE COURT:  Yes.

20      MR. WATSON:  Akira Watson, on behalf of the city of

21  Clinton.  These defendants' arguments fails for two reasons.

22  First of all, they grossly misconstrued our lawsuit as

23  seeking to require these defendants to clean up waters of the

24  State.  They say that we have an ownership, or that we are

25  claiming an ownership interest in these waters of the State,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

132

1    and that's a term of art referring to the surface waters like

2    rivers and streams.

3        The reality is, is we've made clear in our earlier

4    arguments, this case is about contamination of plaintiffs'

5    property with defendants' PFAS, impairment of our ability to

6    use our property, our real property, to treat and supply

7    drinking water to our customers.  It's not about redressing

8    damage to State waters.  Defendants' contamination of our

9    property is a ripe concrete injury for which we have

10   standing, as my colleagues -- colleagues have explained.

11       Second, their arguments, although they're labeled as

12   standing arguments, are really based on preemption.  And even

13   under their misframing of the case, the cited Pollution

14   Control Act of South Carolina doesn't preempt suits like

15   this.  Now, defendants, misframing starts with saying that we

16   seek to impose a zero-part patrolling standard for PFAS upon

17   waters of the State by requiring defendants to clean up the

18   waters to this standard.  They say South Carolina, not the

19   city of Clinton, owns the waters of the State.  We have no

20   issue with that proposition.

21       They say South Carolina is given the Department of

22   Environmental Services Jurisdiction to enforce water quality

23   standards in waters of the State, and they cite from the

24   South Carolina Pollution Control Act, South Carolina Code

25   48-1-100.  According to them, because imposing a zero-part

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

133

1    per trillion PFAS standard on State waters would usurp DES's

2    jurisdiction over those waters are claims we don't have

3    standing for.

4         Again, this case is not about cleaning up waters of the

5    State.  It's about redressing damage to our water treatment

6    facilities and other properties that have been contaminated

7    with the penance PFAS.

8         Now, the text of the Pollution Control Act doesn't vest

9    exclusive jurisdiction in the Department of Environmental

10   Services with respect to waters of the State.  That cited

11   section of the act provides that the Department of

12   Environmental Services, "Is the agency of State government

13   having jurisdiction over the quality of air and waters of the

14   State of South Carolina."

15        Note that the statute refers to DES being the agency of

16   State government having jurisdiction, it doesn't say that DES

17   is the only agency or entity that has jurisdiction.  And in

18   fact, the Pollution Control Act's federal analog, the Clean

19   Water Act, has been held in International Paper versus

20   Ouellette from the Supreme Court in 1987.  Not to preempt the

21   application of a State's common law against discharges

22   occurring in that State.  And that covers the situation that

23   we're dealing with today.

24        Moreover, the Clean Water Act, as well as the Federal

25   Safe Drinking Water Act, both have savings clauses that

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

134

1    establish that federal standards are the floor, not the
2    ceiling.  And moreover, authorizing citizen suits to enforce
3    those acts.
4         Now, important point here is that the State water
5    quality standards for waters of the State that defendants
6    refer to are incorporated into the permit limits that are set
7    pursuant to the Clean Water Act.  And under the Clean Water
8    Act, because plaintiffs are able to bring a citizen suit, it
9    tends to show that there is no exclusive interest in the
10   Department of Environmental Services with respect to those
11   waters.  But again, that's taking defendant's framing of the
12   case, which goes against the pleadings.
13        Finally, with their request for a stay, we are strongly
14   opposed to a 60-day stay of discovery in these cases.  These
15   defendants haven't even been served with discovery right.  I
16   believe they haven't.  But again, as my colleague,
17   Mr. Tapley, has explained, discovery at this stage is -- is
18   targeted towards identifying what other entities should be in
19   this suit, and with a 60-day stay, we're talking about at
20   least three months before we get any response to discovery
21   from these defendants.  Thank you, Your Honor.
22        THE COURT:  Okay.  And so in this case, 25-35, City of
23   Clinton, discovery was not served with the initial pleadings?
24        MR. WATSON:  Yes, that's correct.
25        THE COURT:  It was.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

135

1       MR. WATSON:  It was not served.

2       THE COURT:  It was not served.

3       THE COURT:  So right now there's no outstanding

4   discovery, Mr. English?

5       MR. ENGLISH:  That's correct, Your Honor.

6       THE COURT:  Okay.  Thank you for clarifying that.  Those

7   filings are not part of the record generally, so I didn't

8   want to have to email you all later and get five different

9   responses.  Okay.

10      MR. TAPLEY:  Just to add to plaintiff's argument, we

11  likewise, for the city of Clinton case, adopt the arguments

12  made in Greenwood and Laurens from this morning, Your Honor.

13      THE COURT:  Thank you.  Mr. English?

14      MR. ENGLISH:  Briefly in reply, the plaintiffs claim

15  that their suit does not seek cleanup of the water of the

16  State.  It's just their property.  But in the city of Clinton

17  case, and I'm -- I'm sure this is in the other complaints

18  too, paragraph 55 says, "Defendant's conduct has

19  approximately caused the contamination of the Enoree river

20  and of plaintiff's land."  In paragraph 56, it says,

21  "Defendants, a lot of other words, cause unreasonable

22  interference with plaintiff's right to use and enjoy its

23  property and its right to use the water of the Enoree river."

24      So they're definitely claiming some sort of property

25  right in the waters of the State.  And the solution to that,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

136

1     if they're really not, would be for Your Honor to issue an

2     order dismissing the complaint to the extent that it seeks to

3     recover cost for a water filtration system or other systems

4     designed to clean up the waters of the State.  I'm sure they

5     won't consent to that because they really are seeking that,

6     even though it's not their water and they don't have a

7     property right in it.

8          With regard to the preemption claim, we're not claiming

9     preemption.  They cite to the Pollution Control Act that says

10    that it -- it's not preemptive, but it also says that it

11    doesn't give a private right of action, and they've not pled

12    a cause of action under the Pollution Control Act.

13         And he talked about citizen suits under the Clean Water

14    Act, that they could bring that, but they -- those haven't

15    been pled.  So I think those arguments are non-responsive.

16    Thank you.

17         THE COURT:  Okay.  Thank you.  Anything else?

18         MR. WATSON:  No, Your Honor.

19         THE COURT:  All right.  Anything else that y'all want me

20    to take up while we're all here?

21         MR. WILLIS:  Nothing further from T&S Brass, Your Honor,

22    thank you.

23         MR. WEATHERHOLTZ:  Your Honor, James Weatherholtz.  One

24    question to clarify the supplemental briefing.  Was it South

25    Carolina cases or cases outside of South Carolina?  What --

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

137

1     what specifically was the court asking for?

2          THE COURT:  You -- you suggested that you would be

3     willing to do that, and so whatever you deem is approved.

4          MR. WEATHERHOLTZ:  Perfect.  Thank you, Your Honor.

5          THE COURT:  Anything else?  Okay.  So tomorrow I'll see

6     y'all at 9:30.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     (THERE BEING NOTHING FURTHER, THIS HEARING IS CONCLUDED.)

138

**CERTIFICATE OF TRANSCRIBER**

State of South Carolina

County of Spartanburg


    I, JENNIFER JAEGER, a court-approved transcriber, do
hereby certify that the foregoing is a true, accurate and
complete Transcript of Record of the proceedings had and
evidence introduced in the hearing of the captioned case,
relative to appeal, in South Carolina Circuit Court 7,
Spartanburg County, South Carolina, on the 11th day of March,
2025.

    That I am not related to nor the employee of any of the
parties hereto, nor related to or employed by any attorney or
counsel employed by the parties hereto, nor interested in the
outcome of this action.


_Jennifer Jaeger_
_____

Jennifer Jaeger, Reporter
Notary Public for S.C.
Commission Expires: 10/28/2032

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# EXHIBIT 5

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

```
STATE OF SOUTH CAROLINA          Docket Number
                                 2024-CP-26-05523
GENERAL SESSIONS

COUNTY OF HORRY

---------------------------------

GRAND STRAND WATER AND                )
                                      )
SEWER AUTHORITY,                      )
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )
                                      )
BURLINGTON INDUSTRIES, INC.,          )
                                      )
          Defendant.                  )
                                      )
--------------------------------      )
                                      )
```

March 12, 2025

MOTION TO DISMISS HEARING

B E F O R E:

The Honorable Grace Gilchrist Knie, Presiding Judge.

C O U R T:

South Carolina Circuit Court 7

T R A N S C R I B E D   B Y:

Barbie Teboe, Transcriber


Legal Eagle
107 LeGrand Blvd.
Greenville, SC 29607
864-467-1373
transcripts@legaleagleinc.com

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

A P P E A R A N C E S:

**ATTORNEYS FOR THE PLAINTIFFS**

JOHN B WHITE, Esq.
John B White Law, PA
PO Box 2465
Spartanburg, SC 29304

F. JEROME TAPLEY, Esq.
HIRLYE "RYAN" LUTZ, Esq.
AKIRA WATSON, Esq.
Cory Watson Attorneys
2131 Magnolia Avenue South
Birmingham, AL 35205

**ATTORNEYS FOR THE DEFENDANTS**

RICHARD H. "DICK" WILLIS, Esq.
Williams Mullen
First Citizens Bank Building
1230 Main Street
Suite 330
Columbia, SC 29201

MERRITT ABNEY, Esq.
Nelson Mullins Riley & Scarborough, LLP
151 Meeting St., Ste. 600
Charleston, SC 29401

ROBERT KNOWLTON, Esq.
Haynsworth Sinkler Boyd, PA
PO Box 11889
Columbia, SC 292111889

STAN BARNETT, Esq.
305 North Civitas Street
Mt. Pleasant, SC 29464

ZACHARY BROWN, Esq.
McAngus Goudelock & Courie, LLC
201 West. Mcbee Ave
2nd Floor
Greenville, SC 29601

KONSTANTINE DIAMADUROS, Esq.
Maynard Nexsen
104 South Main Street, Suite 900
Greenville, SC 29601

ROBERT OSBORNE, III, Esq.
Parker Poe Adams & Bernstein, LLP
850 Morrison Dr., Suite 400
Charleston, SC 29403

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

3

<u>INDEX</u>

DESCRIPTION                                                    PAGE

    <u>WEDNESDAY, MARCH 12, 2025</u>                                <u>4</u>

RIGHTNESS
    Argument by Mr. Willis - Defense                      6, 9
    Argument by Mr. Tapley - Plaintiff                   10, 10
    Argument by Mr. Barnett - Defense              11, 23, 26
    Argument by Mr. Lutz - Plaintiff                     18, 26
    Argument by Mr. Abney - Defense                         26

TRESPASS
    Argument by Mr. Tapley - Plaintiff                   31, 32
    Argument by Mr. Lutz - Plaintiff                        34
    Argument by Mr. Abney - Defense                         36

PRE-JUDGMENT AND ATTORNEYS' FEES
    Argument by Mr. Knowlton - Defense                   37, 49
    Argument by Mr. Lutz - Plaintiff                        48

PRIMARY JURISDICTION
    Argument by Zach Brown - Defense                     51, 54
    Argument by Mr. Watson - Plaintiff                   53, 55

PERSONAL JURISDICTION
    Argument by Mr. Willis - Defense                     56, 84

DUE PROCESS
    Argument by Mr. Willis - Defense                        61
    Argument by Mr. Watson - Plaintiff                      75

JURISDICTIONAL DISCOVERY
    Argument by Mr. Watson - Plaintiff                      88
    Argument by Mr. Willis - Defense                        89

    Argument by Mr. Osborne - Defense                       90
CLOSING

    By Mr. Tapley - Plaintiff                               91
    By Mr. Willis - Defense                                 91

Recess                                                   50, 94

Certificate of Transcriber                                  95

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

4

```
1                          P R O C E E D I N G S

2       (Whereupon, the following proceedings started at 04:22.)

3           THE COURT:  All right.  Thank you.  We are on the record.

4   It is now 9:40, and I apologize for the delay.  There was a

5   technical issue.

6           On WebEx, we are on the record with regard to Grand

7   Strand Water and Sewer Authority versus Aladdin Manufacturing

8   Corporation, et al.  This is Civil Action Number 2024-CP-26-

9   5523.

10          I'm Judge Knie.  Today is March the 12th.

11          Let me have -- well, there's a lot of folks here.  Is

12  there a point person today?  We had hearings yesterday.  And

13  so that started, I guess, an outline of how we would be -- or

14  an agenda of how we would be handling at least these initial

15  motions to dismiss.

16          Is this it, Mr. Willis?

17          MR. WILLIS:  Yes, ma'am, Your Honor.

18          THE COURT:  Okay.  Is that correct, Mr. White?

19          MR. WHITE:  Yes, ma'am, Your Honor.

20          THE COURT:  Okay.

21          And so the agenda -- there's a paper agenda here.  I'm

22  not sure if the folks on WebEx have had an opportunity to

23  review it.  But we are going to start with an opening from

24  Mr. Willis and continue.

25          Have there been any filings or anything exchanged that
```

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    has not made it into the Court's file since -- yesterday there

2    was a reply in support of a motion to -- of the Motion to

3    Dismiss filed by Red Rock Disposal, LLC.  Is there anything

4    else on the way or anything that has not made its way into the

5    file that you-all are aware of?

6         (No audible response.)

7         THE COURT:  Okay.  And so there are six motions to

8    dismiss.  And GFL and Waste Industries are no longer

9    defendants?

10        MR. WATSON:  That's correct, Your Honor.

11        MR. WILLIS:  That's correct, Your Honor.

12        THE COURT:  Okay.

13        MR. WILLIS:  (Indiscernible) --

14        THE COURT:  Are there any other defendants that have been

15   dismissed that you-all -- I know you-all have a lot of stuff

16   going on, but are you-all aware of any other that have been

17   dismissed?

18        MR. TAPLEY:  No, Your Honor.

19        THE COURT:  Okay.

20        MR. WILLIS:  And, Your Honor, just for clarity, there

21   were four GFL entities that had been sued in the Grand Strand

22   case.  (Indiscernible) has voluntarily dismissed two of them.

23   Two are still in:  Sampson County Disposal, it's an LLC in

24   North Carolina; and Red Rock Landfill is an LLC in North

25   Carolina.  Those are both GFL entities, and they remain

MR. WILLIS                                    6

1    defendants in the case.

2         THE COURT:  Okay.

3         Okay.  And so is everyone in agreement that the format --

4    that the way that we argued yesterday will work?  And we will

5    handle the issues and -- at one at a time and allow you all to

6    argue those?  That worked very well for me, okay, in my note

7    taking and being able to follow you-all in your respective

8    memoranda and briefs that have been filed.  I have those and

9    I'm able to flip and tab.  And, understand, I'm numbering your

10   arguments as well.  So it's very helpful to me.

11        Okay.  So unless there's anything else, we'll start then

12   with Mr. Willis.

13        MR. WILLIS: Thank you, Your Honor.  May it please the

14   Court.

15        I told Ryan Lutz that I was going to steal a joke from

16   him to start off.  He said to me this morning, "Why am I

17   thinking about the movie, 'Groundhog Day,' as I walk in?

18        And, of course, to make sure Your Honor doesn't get bored

19   with us and throw us out of the courtroom, we are not going to

20   replow the ground yesterday -- the ground today that we plowed

21   yesterday.

22        There are some lawyers that are going to argue the same

23   issues that we dealt with yesterday, but different clients,

24   different context.  So we're -- but we'll try not to belabor

25   any points that we went over yesterday.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                                    7

1        THE COURT:  Thank you.

2        MR. WILLIS: But with the exception of one thing, and

3    that's why I'm -- I just wanted to start on this

4    justiciability issue.

5        We learned a lot yesterday by listening to Mr. Tarpley

6    (sic) and plaintiff's' counsel argue.  And we were a little

7    confused, frankly, coming into the hearing from the brief,

8    which seemed to say that the plaintiffs were not asking for

9    the future cost of upgrading their water treatment system in

10   order to remove PFAS or whatever standards would be applicable

11   at the time.  But, again, it seemed to be very clear from the

12   complaint that that was one of the things they were seeking.

13       And so I opened yesterday by saying, "I think the truth

14   is that they're seeking both: damages for the current

15   condition of their property, as well as future damages or

16   future costs of having to upgrade their wastewater systems to

17   deal with PFAS."

18       And I just want to make sure that I'm right about that.

19   If -- I should stand corrected.  I'd like to know that because

20   I think it's important that the defendants know very clearly

21   what they're being sued for.  I think it's clear from the

22   complaint, but if for some reason I'm wrong, I would ask my

23   colleagues on the other side to correct me.

24       The second point I would make as I went back over the

25   amended complaint last night, trying to find a clear

MR. TAPLEY                                    8

1    allegation that the plaintiffs have incurred past costs, not

2    that there are -- not that there is PFAS on their property;

3    that's clearly alleged.  But whether or not they've incurred

4    any costs or damages, out-of-pocket money that they've paid as

5    a result of that up to this point.  And I still don't see

6    that.  And so maybe we can get some clarity on that today in

7    so far as the Grand Strand case supplies, because the

8    complaints, while they're similar, are not identical.

9        So that's really all we have to say about rightness, Your

10   Honor.  And with that, I'll be happy to answer any questions

11   the Court might have.  But I think we made our positions, both

12   sides, clear yesterday.

13       Thank you very much.

14       THE COURT:  Okay.  Thank you, Mr. Willis.

15       MR. TAPLEY:  Your Honor, I would start by saying I think

16   our complaint is clear, that the plaintiffs are seeking

17   damages for the current condition of their property and what

18   it will take to restore their property to a usable condition,

19   either through damages and tort or abatement under nuisance

20   through equity.  And that does include the necessary

21   construction of new apparatus to filter out the PFASs in their

22   source waters.

23       I think our complaint's also clear that the plaintiffs

24   have incurred past damages as of this moment.  They have

25   certainly spent money to test to ascertain what the levels of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    9

1   PFAS are in their source waters; to evaluate which

2   technologies would be feasible giving the current condition

3   and construction of their filtration operations; to consult

4   with experts on pilot programs to test various technologies in

5   order to get some real, on-the-ground field measurements as to

6   the effectiveness of the technologies; and they've also been

7   in the process of evaluating what the costing would be, both

8   for construction and operation and maintenance of those new

9   filtering technologies on their properties.

10       But, Your Honor, I guess I'll just sum up by saying this:

11  those are all great questions for discovery.  And once

12  discovery's no longer stayed, we'll fully develop this case.

13  And that's the way they normally proceed.

14       Thank you, Your Honor.

15       THE COURT:  Thank you, Mr. Tapley.

16       Mr. Willis?

17       MR. WILLIS: Yes, ma'am.

18       I just point out --

19       That's helpful, by the way.  Thank you, Mr. Tarpley.

20  (sic)

21       And I agree that ferreting all that out is the purpose of

22  discovery, but I do think it has to be alleged in the

23  complaint for a cause of action to be stated.

24       And I would point out that the testing requirement would

25  apply to plaintiffs anyway, whether there was PFAS from these

1   defendants or not, the need to evaluate what technologies

2   would be viable for removing PFAS would have to be incurred

3   anyway, even if these defendants that they've sued never put a

4   molecule of PFAS into their waste stream because there's so

5   many other sources of PFAS out there where they -- that they

6   have not sued over or they've attempted to disclaim and the

7   same with regard to consulting with experts.  So I'm not sure

8   those are damages that could be recoverable against the

9   defendants.  But if they have alleged that, I think that

10  checks that box.

11      Thank you, Your Honor.

12      MR. TAPLEY:  Just very briefly.

13      Your Honor, I want to clear.  Again, these motions are to

14  heard on the four corners of the plaintiffs' document.  There

15  are no allegations of other sources of PFAS.  There's no

16  evidence of other sources of PFAS.  The facts in front of the

17  Court are these defendants being the source of PFAS.  And so

18  they keep saying it like it's Gospel-truth that it's coming

19  from other places, but it's just not in front of the Court.

20      THE COURT:  Anything on that, Mr. Willis?

21      MR. WILLIS:  No, ma'am.  Thank you.

22      (Pause.)

23      THE COURT:  Okay.  Mr. Barnett?

24      MR. BARNETT:  Yes, ma'am.

25      It is my task -- and I will apologize to everyone that

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1  has to listen to me.  I managed to come down with a really bad

2  cold yesterday --

3      THE COURT:  Can you turn on your camera?

4      MR. BARNETT:  -- which is why I'm not there.

5      Pardon?

6      THE COURT:  Can you turn -- there you are.  Okay.

7      Well, we appreciate your joining us this way.  And I hope

8  that you feel up to making your argument.  If not, there are

9  plenty of lawyers here.

10     MR. BARNETT:  No.  No.  She called me, but I certainly

11 didn't want to inflict my contamination -- to use an over-used

12 word -- on anybody else.

13     It is my task to talk about why --

14     THE COURT:  Mr. Barnett, who do you represent?

15     MR. BARNETT:  I represent Nan Ya Plastics Corporation,

16 America.

17     THE COURT:  Thank you.  Yes, sir?

18     MR. BARNETT:  We believe that the United States

19 government is an indispensable party, and not just a necessary

20 party, but an indispensable party.  My colleague just said

21 about the -- plaintiff that there was no evidence that there

22 was no other source of PFAS chemicals before the Court.

23     As is I think appropriate in making such a motion, I sent

24 portions of two reports prepared by the Department of Defense

25 about the old Myrtle Beach Air Force Base, which, unless the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1  Department of Defense is involved, and I suggest to you that

2  they are not, but Myrtle Beach Air Force Base is a

3  contributing source of the PFAS chemicals that the plaintiff

4  complains about:  PFOS, PFOA, PFDS, PFHXS.  And the

5  concentrations of these chemicals in the surface water and

6  ground water, which is flowing and has been flowing for

7  decades, into the Intracoastal Waterway, range from two-and-a-

8  half million parts per trillion to 51,900 parts per trillion.

9  These are enormous concentrations.  When some of the

10  literature talks about extremely small concentrations, these

11  are huge.

12      In my reply memo that I filed last week, I included a

13  copy of a report that DHEC, now DES, made public, in which

14  they identify current and former military bases in South

15  Carolina as the largest contributor of PFAS chemicals into

16  sources for drinking water.  The Myrtle Beach data shows that

17  that is obviously the case.

18      (Indiscernible) I think undisputed (indiscernible) Myrtle

19  Beach Air Force Base site is putting these chemicals into the

20  Intracoastal Waterway only two-and-a-half miles from the

21  waterway intake point that plaintiff has and about 10 miles,

22  give or take, from the Bull Creek intake point.  I don't think

23  that it could be argued with a straight face that the

24  government's acts -- and continuing acts because they're not

25  doing anything to clean this up -- aren't contributing

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BARNETT                                    13

1  whatever PFAS molecules are found at the plaintiffs' intake

2  points.

3      The plaintiff is, as my colleague, Mr. Willis, noted, in

4  its complaint, is specifically seeking to recover an amount of

5  money sufficient to pay for the removal of these various

6  chemicals from plaintiffs' water system by funding the

7  acquisition, installation, operation, and treatment technology

8  and so forth.

9      Well, it's -- this plea is cast in terms of requiring

10 them, the defendants, to remove their chemicals.  Well, I

11 suggest that it's most -- it's not possible for Nan Ya,

12 assuming it -- and it denies that it's contributing any -- and

13 your refraining of the others of the 14 defendants' name, to

14 clean up their chemicals, when the United States government is

15 contributing such a huge amount.  And there are probably other

16 sources as well, but I doubt any of them are on par with, you

17 know, two-and-a-half million parts per trillion of one of

18 these chemicals.

19     The prayer for relief also asks that all the defendants

20 abate the nuisance they have created and abate their trespass.

21 I don't know how you do that either if there are such huge

22 contributions of pollutants -- same pollutants from other

23 sources.  Because a PFOS molecule that comes down the Pee Dee

24 River from one of the defendants' facilities -- if that is, in

25 fact, current at all, is indistinguishable from a PFOS

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1  molecule that comes from the old Myrtle Beach Air Force Base

2  site.  I'm mean they're -- it's not like they carry little

3  signs that say, "I'm from the Myrtle Beach Air Force Base

4  site," or "I'm from the Lake City POTW."  That's just not the

5  way it is.

6      If this case goes forward without the United States as a

7  party, I would suggest that that would run afoul of Rule

8  19(b).  Excuse me.  I'm shuffling here.  I don't think it can

9  be argued based on the undisputed -- about the contribution of

10  PFAS chemicals by the old air force base site that there can

11  be complete relief without the United States as a party.

12      The plaintiff claims the United States is not claiming an

13  interest.  That's true.  United States hasn't said a word in

14  this litigation about it.  United States in its DOD reports

15  has, as one would expect because it's obvious -- has noted how

16  close a -- the discharge is to one of plaintiff's intake

17  points.  They mentioned it in the report that deals with the

18  air force base site.  They don't have to claim an interest to

19  have an interest.

20      The United States can be sued in a cost recovery action,

21  under CERCLA or RCRA or the Safe Drinking Water Act, they can

22  be sued under the Federal Tort Claims Act.  The notion that

23  this case would go forward and a jury would make, perhaps, the

24  declaration that United States government was responsible for

25  99 percent of the contamination the plaintiffs complain of,

1    the notion that that wouldn't have an effect on the federal

2    government, I think is just incorrect.

3        It's much like the case that I've cited from a court, I

4    think in North Dakota, which dealt with a land ownership -- a

5    mine ownership question in which the Court acknowledged the

6    United States government could not be bound by a finding, but

7    that it would be affected by a finding in supplemental --

8    subsequent proceedings.

9        Where the federal government potentially is prejudiced by

10   a case like this going forward without it presence, the

11   Supreme Court has said there's a very strong bias into not

12   letting cases like that go forward, even where the federal

13   government cannot be made a party.  Because avoiding a

14   prejudice to the federal sovereign is of preeminent importance

15   in the minds of the Supreme Court.

16       In this case, the federal government can be made a party.

17   There are several routes to do that.  The Federal Tort Claims

18   Act is one, although it -- there's a very short statute of

19   limitation for the Federal Tort Claims actually -- it's only

20   two years, also the Safe Drinking Water Act, CERCLA and RCRA.

21       Now, the best evidence that that is true is the MDO case

22   that Judge Gergel has, just across the harbor from where I am

23   in Charleston, where he has all of the federal PFAS in the

24   country.  He issued an order on February the 27th, not too

25   many days ago, in which he denied a motion to dismiss by the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BARNETT                                      16

1    United States government in all of the cases in which people

2    were seeking relief from them.  And he noted that there were

3    over 30 of them.  I apologize; I haven't had a chance to wade

4    through the --- all the many, many, many, many cases on the

5    MDO site.  But I take Judge Gergel at his word, that there are

6    over 30 of them.

7        And he notes the kinds of claims made against the

8    government:  Federal Tort Claims Act, CERCLA, RCRA.  He did

9    not mention, oddly, the Safe Drinking Water Act, but I believe

10   there is one case before him where that is an issue, I think

11   brought by the state of Mexico.  The State of New Jersey has a

12   case as well.  It isn't just states, though, that have filed

13   these actions against the federal government.  Private

14   entities, non-government entities, a bunch of dairies have

15   sued the United States government for contribution of PFAS

16   chemicals into the water that affects their operations.

17       So it is clearly possible for the plaintiff to pursue the

18   federal government in achieving what it says its goal is.

19   They say the goal is to get something in place to allow

20   administrative orders who are to filter out these chemicals.

21   Well, if the United States government is by far the largest

22   contributor of these chemicals, as they seem to be -- and they

23   certainly are well-funded -- I can't imagine why they wouldn't

24   want to go after the federal government because that's the

25   best way to achieve the goal.  But they get to make that

1   decision.  But they don't get to say, I don't believe -- God
2   knows I've been wrong many times before, but I don't think
3   they get to say that it's irrelevant, that the United States
4   government is contributing such huge amounts of these
5   chemicals into the water, two-and-half-miles away from one of
6   their intake points.
7        The plaintiff also says that discovery is not necessary
8   to consider this question about whether the government's
9   responsible or not.  I suggest that it is.  FOIA can be a very
10  effective tool, but it's imperfect.  (Indiscernible)
11  depositions under FOIA.  And it may be that the government
12  would -- I don't know, I -- the government sometimes takes
13  position that -- particularly with defense-related documents,
14  that they're just not going to turn them over.  And you've got
15  to -- you have to fight for them.  They can't get away from
16  that in discovery if they're a party.
17       Last point I would make is just a factual point.  The
18  Intracoastal Waterway at the place where plaintiffs' intake
19  structures are -- where both of them are, on the Intracoastal
20  Waterway and then down the southwest a little bit at Bull
21  Creek, those are both tidal waterways.  So half the day water
22  flows one direction, half the day, the water flows in the
23  other direction.  So the intake point is slightly to the --
24  two-and-a-half miles to the northeast of the old air force
25  base site, now the airport -- Myrtle Beach Airport.  That does

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. LUTZ                                    18

1   not mean it's upstream because there is no upstream and

2   downstream on a tidal waterway.  The water that is draining

3   from the Myrtle Beach Air Force Base will flow, twice a day,

4   to the intake point that plaintiff has on the Intracoastal

5   Waterway.  And the rest of the day, it will flow to the

6   southwest.  And eventually, that water gets down to where the

7   Bull Creek intake point is.

8       Your Honor, I've covered my points, I believe, hopefully

9   without too much irritation from my voice.

10      THE COURT:  Thank you, sir.

11      MR. BARNETT:  Yes.

12      (Pause.)

13  .....MR. LUTZ:  Good morning, Your Honor.

14      Ryan Lutz again, on behalf of Grand Strand.

15      The defendants have made a big deal out of this potential

16  contribution of the United States to the PFAS load that is

17  found in plaintiffs' water sources.  In their brief, Your

18  Honor, they cite the final site inspection report for Aqueous

19  Form Filming Foam areas at the former Myrtle Beach Air Force

20  Base.

21      And they state -- this is a quote directly from the

22  report: "Because of the nature of areas where potential --

23  potential releases of AFFF may have occurred, ground water,

24  surface water, soil, and sediment were sampled and their

25  migration pathways evaluated in this SI report."  "May have

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. LUTZ                              19

1   occurred," "potential."

2       What the defendants don't tell you, what's also in this

3   report is the conclusion that both the ground water and

4   surface water pathways were deemed incomplete, meaning that

5   the government, through this complex fate and transport

6   evaluation that required many experts and all sorts of

7   testing, the government could not establish that PFAS from the

8   old air force base was causing contamination in the

9   Intracoastal Waterway.

10      Now, Judge, that's not in our complaint, clearly.  But

11  that just reinforces the reason why this extra stuff the

12  defendants want to come in and argue about that's not in the

13  complaint, can be the subject of discovery.  And it's also

14  going to be the subject of extreme expert proof.  The fate and

15  transport of chemicals from anywhere -- from the defendant's

16  facilities, from the air force base, that has got to be

17  evaluated in discovery and in -- by our experts, by their

18  experts.  And that just shows you why this stuff should not be

19  considered in a motion to dismiss.

20      But, Judge, the -- I still -- the defendants are still

21  dancing around this Rule 19.  They haven't explained how

22  Rule 19 requires the U.S. as a necessary or indispensable

23  party.  They didn't explain how the wastewater treatment

24  plants were a necessary or indispensable party yesterday.  And

25  the reason they don't explain it is because they can't.  It

1    doesn't apply to Rule 19.

2         And we have cited the case law, Your Honor.  It's --

3    their argument is really about apportionment.  It's about

4    contribution of a potential joint tortfeasor.  And as we

5    discussed yesterday, Your Honor, mere joint tortfeasors are

6    not necessary or indispensable parties to an action under

7    Rule 19.  That's been the law for 200 years, two centuries of

8    law; it's called the Plaintiff Chooses Rule.  We get to choose

9    the tortfeasors that we believe are liable to the plaintiff.

10        So, Your Honor, back to necessary and indispensable

11   parties.  Rule 19 requires that a necessary party is one whose

12   rights must be ascertained and settled before the rights of

13   the parties to the action can be determined.  What rights of

14   the United States must be ascertained and settled before we

15   can proceed on a tort theory against these defendants for

16   polluting the waterways?  None.  None.

17        And so, Judge, we've identified and provided a bunch of

18   case law on this subject, examples of where there are

19   necessary parties.  And that arises in a contractual

20   obligation or where a party has a property interest, okay.

21        The McKiver case versus Murphy-Brown recognized -- this

22   is the Fourth Circuit cases.  And they collect -- the fourth

23   circuit case and the collected cases in which joinder was

24   allowed.  And they state joinder was allowed.  It involves

25   situations where contracts or obligations of the necessary

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    party were being interpreted or were otherwise directly at

2    issue.  That's not the case here.

3         And this is a quote: "Even in/if an absent party is

4    alleged to have played a central role in the action at issue,

5    and even if resolution of the action will require the Court to

6    evaluate the absent party's conduct, that party in many cases

7    will not have interest that warrant protection under Rule 19.

8    The same is true here.

9         We cited another case:  EEE Minerals, LLC.  This is the

10   case that Mr. Barnett discussed; cited by defendants.  The

11   court -- that -- in that case, the court found that the United

12   States was a required party because, "It owns a significant

13   oil, gas, and other mineral interest in and under the lands

14   that are subject of this lawsuit."  That's not the case here.

15        Another case cited by the defendants, Goddard, involved a

16   planned unit development.  And the governing documents allowed

17   dissolution only with the consent of all the property owners.

18   Again, contractual.  And when one of the property owners had

19   been dismissed from the action, the court found that it was

20   an -- or he was an indispensable party because the relief

21   sought in action, "Affected her property interests."

22        And then, Judge, we also cited Tenneco versus San Diego

23   Gas and Electric Company:  "Should plaintiffs prevail, they

24   could recover damages from the defendant in the United

25   States's absence."  This is where plaintiffs were seeking

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. LUTZ                                          22

1    monetary damage from defendants.

2        So, "Plaintiffs seek only monetary damages from

3    defendant.  Should plaintiffs prevail, they could recover

4    damages from the defendant in the United States' absence.  The

5    requested relief does not require the United States to take

6    action or change any policy.  Therefore the Court is able to

7    fashion meaningful relief between plaintiffs and defendant in

8    the United States' absence.  The court finds the U.S. is not a

9    necessary party under Rule 19."  It's not one here, Judge.

10       They argue they can't get complete relief because they

11   can't obtain the discovery they want from the United States

12   because FOIA is an imperfect method of discovery.

13       Judge, we've cited a number of cases that have

14   specifically rejected that contention.  I'm not going to go

15   into them, Your Honor.  They're cited in our brief.  That's

16   the Hefley versus Textron case.  And there's a few other

17   cases.

18       So Your Honor, their desire to portion liability and to

19   seek documents from the United States does not amount to

20   prejudice, and it does not amount to the complete relief

21   element that they are complaining about.

22       So in conclusion, Your Honor, the U.S. is not a necessary

23   party.  There will be complete relief without the U.S.  They

24   have no claim and, in fact, claims no interest in the

25   plaintiffs' water supply, the property that plaintiffs own,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BARNETT                                23

1    the water system, the infrastructure, or any other interest

2    relating to the subject of this case.  They had no contractual

3    obligation and they have no property interest in the matter.

4    Rule 19 does not apply here.

5         Thank you.

6         THE COURT:  Anything in reply?

7         MR. BARNETT:  Yes, Your Honor.  Briefly.  I promise I'll

8    be brief.

9         First, of all, my colleague talked about certain

10   statements in the -- one of the reports I submitted, the one

11   that is cite specific for the Myrtle Beach Air Force Base.  He

12   left out this -- I'll just read the sentence:  "PFOS and PFOA

13   were present in surface water collected from AFFF Area 9 at

14   concentrations exceeding the US EPA LHAs suggesting a release-

15   to-surface water has occurred.  This includes surface water at

16   northernmost discharge point where surface water leaves the

17   former base boundary and enters the Intracoastal Waterway."

18        That is an unambiguous statement by the (indiscernible)

19   Department that these chemicals are leaving the old Myrtle

20   Beach Air Force Base and were flowing into the Intracoastal

21   Waterway two-and-a-half miles from one of the intake points.

22        My colleague also said that the only prejudices we're

23   arguing is we can't do discovery.  No.  That is, one, that is

24   a problem; but it's not the main prejudice.  The main

25   prejudice derives from what the plaintiff is seeking, the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BARNETT                                           24

1    prayer for relief, which is asking, not just for money damages

2    for past damages suffered, whatever those are; it's asking

3    that the nuisance be abated; that the nuisance created by

4    these 14 defendants would be abated and that their trespass

5    would be abated.

6         Well, if the United States government -- which I said it

7    is clear, it is contributing huge quantities of this stuff

8    into the waterway, is not a party and can -- and therefore

9    can't be forced not to do that anymore, it's just not possible

10   for these defendants to abate their nuisance and their

11   trespass.  You can't just carve it out from someway.

12        The problem here is -- that I think -- not to be too

13   obnoxious, but it seemed that what the plaintiff is doing is

14   the old square peg in a round hole; they're trying to pursue a

15   cost-recovery action as if this were a CERCLA action or a RCRA

16   action or a Safe Drinking Water action, without actually

17   pursing those remedies created by Congress for this specific

18   fact scenario.  That's why Congress created those.  Plaintiff

19   doesn't want to use those for whatever reason.  They're trying

20   to use common law concepts to avoid whatever problem they

21   wanted to avoid.

22        To seek a judgment requiring these 14 defendants to

23   "remove their" and it lists all the chemicals, "from

24   plaintiffs' water system by funding the acquisition,

25   installation, and operation of treatment technology capable of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BARNETT                          25

1    removing them."

2         To say that it is in any way fair or equitable or

3    sensible to go forward and to achieve that goal while leaving

4    completely out of the picture the United States government,

5    which is apparently, according to Dick, one of the largest

6    contributors of these chemicals.  It makes no sense.  It just

7    makes no sense.  I -- so I suggest it would be fundamental

8    error to allow this case to go forward without -- well, to

9    dismiss it and let the plaintiffs do what the Congressionally

10   created remedies allow them to do, which is to pursue

11   everybody, including the United States government.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Anything else?

15        MR. LUTZ:  Yeah.  One -- Yes, Your Honor.  Just real

16   quick.

17        THE COURT:  Mr. Barnett, we're being very informal.  I'll

18   let you reply if it's something (indiscernible).

19        MR. BARNETT:  Pardon me?

20        THE COURT:  You're being very informal.  Mr. Lutz is

21   going to address the Court one more time.

22        MR. BARNETT:  Oh.  Okay.

23        THE COURT:  And then I will allow you to reply.

24        Yes.

25        MR. BARNETT:  Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    MR. LUTZ:  Your Honor, it's not fair is not an element of

2  a Rule 19 issue.  It seems like they're complaining about

3  joint and several liability.  And, again, that's not a Rule 19

4  issue.

5    That's it.  Thanks.

6    THE COURT:  Thank you.

7    Anything else, Mr. Barnett?

8    MR. BARNETT:  I don't -- I'll just read the part of the

9  Rule.

10    Rule 19(b) provides,  "If a party -- it is necessary

11  under criteria set forth in 19(a) cannot be made a party, the

12  Court shall determine whether inequity, which, of course,

13  means fairness and good conscience the action should proceed

14  among the parties."

15    And I'm just suggesting that it can't, for the reasons

16  I've maybe beaten to death already.

17    THE COURT:  Thank you very much.

18    Are we ready to move to the next issue?

19    MR. ABNEY:  Thank you, Your Honor.

20    I'm Merritt Abney with Nelson Mullins in Charleston.  And

21  I have two defendants in this case: Mohawk Industries and

22  Aladdin Manufacturing.

23    Aladdin is a subsidiary of Mohawk, and it operated what

24  was known as the Oak River Mill near Bennettsville until the

25  mill closed in 2020.  The mill lies near the Pee Dee River

1    approximately 80 miles from plaintiff's Bucksport facility on

2    Bull Creek.

3         Of course, Mohawk is a flooring company and Mohawk makes

4    carpet, but Mohawk did not make carpet at Oak River Mill.  It

5    made yarn, which it then shipped out of state to be used in

6    the making of carpet.

7         And I understand the 12(b)(6) standard.  I understand you

8    have to accept as true plaintiff's allegation that we used

9    PFAS at the mill.  But I wanted to make that point clear at

10   the outset of this case.

11        I'm going to address plaintiff's claims for trespass,

12   negligence, and nuisance.  Mr. Weatherholtz and others

13   yesterday stole most of my thunder on these arguments, so I'm

14   just going to make a few brief points, primarily related to

15   the trespass claim.  And then I'll take my seat.

16        First, I want to follow up on the discussion yesterday

17   related to the BABB case.  Plaintiff's trespass claim fails

18   because alleged contamination by PFAS is not an invasion by a

19   physical, tangible thing as required by BABB.  BABB expressly

20   held that intrusions by microscopic particulates or similarly

21   intangible infiltrations of contaminants onto plaintiffs'

22   property do not constitute actionable trespass.  The plaintiff

23   tries to distinguish BABB by arguing -- as did Judge Coble in

24   the AG case, that BABB was really just about odors.  But

25   that's just not the case.  While it is true that BABB involved

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. ABNEY                                    28

1    odors emanating from a landfill and that's how the district

2    court framed the certified question to our Supreme Court, the

3    Court's holding is undeniably much broader than that.

4        By retaining the dimensional test, the Supreme Court

5    rejected the opinions in Oregon and Alabama that held that

6    intrusions of fluoride particles and sulfoxide emissions,

7    respectively, were sufficient to constitute a trespass despite

8    their intangible nature.  BABB flatly rejected that notion for

9    South Carolina.

10       So the point that I really want to emphasize today is

11   that there is no meaningful distinction, for purposes of the

12   trespass claim as plaintiffs would have it, between supposedly

13   benign molecules that comprise the odors at issue in the BABB

14   case on the one hand, and the allegedly harmful PFAS molecules

15   at issue here.  That distinction may matter for some causes of

16   action, but it absolutely does not for trespass.  The

17   distinction that does matter and the one that the court

18   adopted in BABB is between mere molecules and other

19   particulates on the one hand and tangible bodies on the other.

20   Only the latter can constitute trespass under BABB.

21       Plaintiff's trespass claim fails because PFAS, just like

22   fluoride or sulfoxide, are just molecules and they're measured

23   in parts per trillion, and therefore they are the

24   quintessential example of microscopic particulates that BABB

25   says cannot constitute trespass.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. ABNEY                                    29

1    What BABB also makes clear is that trespass today is

2  really reserved for situations where, for example, I walk onto

3  your property without your permission.  It requires an

4  intentional, unauthorized entry onto another's property by a

5  tangible body.  And in that situation, you're entitled to

6  damages, whether I do any harm on your property or not.

7    But, Aladdin, by discharging water into the Great Pee Dee

8  River, whether that water contained PFAS or not, plainly did

9  not enter onto plaintiffs' property more than 80 miles

10  downstream.  And that's true particularly, given the

11  plaintiff, by turning on it's pumps is the one who voluntarily

12  brought that water onto that property.  Plaintiffs' cause of

13  action for trespass simply does not fit the facts that

14  plaintiff has pled in this complaint.

15    Now, I want to turn very briefly to the negligence cause

16  of action and discuss just the question of the duty of care in

17  connection with the negligence claim.

18    I wholeheartedly agreed with Mr. Weatherholtz' argument

19  yesterday regarding why those Georgia cases that the

20  plaintiffs rely on very heavily, for the proposition that

21  defendants here had a duty of care are inapplicable in South

22  Carolina, which has expressly rejected the standard applied in

23  those -- by those courts.  I know you're going to get some

24  supplemental briefing on that issue, so I'm not going to

25  address that in detail here today.

1    But I do want to follow up on the question of duty in

2  light of some of the comments made by plaintiffs' counsel

3  during the discussion on the statute of limitations yesterday.

4    As we know, a duty may be created by statute, contractual

5  relationship, status property interest, or some other special

6  circumstance.  The foreseeability of an injury standing alone

7  does not give rise to a duty absent one of those relationships

8  or circumstances.

9    The plaintiff here does not allege that defendants'

10  discharges into the river violated any statute, any

11  regulation, or the conditions of any permit.  The only

12  regulation mentioned in the complaint that I saw is the MCL

13  Rule which was adopted in 2024, two years after my client

14  closed the Oak River Mill.

15    Moreover, plaintiffs' facility in Bucksport lies more

16  than 80 miles from the Mill.  And plaintiff does not claim any

17  relationship of any kind with my clients or any other

18  defendant in this case.  Instead, they make the conclusory

19  allegation that we have a duty to use care in the handling,

20  use, and disposal of products degrading to PFAS.

21    Setting aside the failure to allege any relationship or

22  circumstance giving rise to a duty, plaintiff fails to allege

23  how the risk of the harm for which it seeks recovery, in the

24  complaint, the cost of complying with the rule was foreseeable

25  years before the rule was ever enacted in 2004.  And as for

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. ABNEY                                                31

1   any harm that the plaintiff claims to have already incurred,

2   plaintiff's counsel argued yesterday that despite knowing for

3   years that PFAS was in the water and that litigation regarding

4   that was already underway, they did not have knowledge

5   sufficient to give rise to a cause of action until 2024

6   because it wasn't until that time that regulators and

7   scientists reached some consensus that no level of PFAS in

8   drinking water is appropriate.

9         If that's the case, how on earth would the potential harm

10  about which the plaintiffs are suing here be foreseeable to

11  the defendants before that time?  These plaintiffs are the

12  ones providing drinking water to the people in South Carolina.

13  If they could not foresee that PFAS was dangerous until 2024,

14  how could we have?

15        Because the plaintiff hasn't alleged any facts to

16  establish foreseeability, much less a relationship or

17  circumstance giving rise to a duty under South Carolina law,

18  we argue the negligence claim should be dismissed as well.

19        And the -- as to the nuisance claim, I think those issues

20  were pretty thoroughly covered yesterday, so as promised, I

21  will take my seat.

22        Thank you.

23        THE COURT:  Okay.  Thank you.

24        And so who is responding to trespass?

25        MR. TAPLEY:  I will, Your Honor.

1       THE COURT:  Mr. Tapley?

2       MR. TAPLEY:  Jerome Tapley for the plaintiffs.  May it

3  please the Court.

4       Your Honor, we talked about this briefly yesterday, so I

5  won't belabor the point.  But I do think it's worth pointing

6  out.  He talks about how many miles their facility is from the

7  Bull Creek intake.  I want to call the Court's attention back

8  to the simple fact that there is nothing which happens in

9  nature that can remove or degrade PFAS.  Everything they put

10  in the water from their tail pipe -- and I want to be clear

11  about Mohawk and their operation.  They have a NPDES discharge

12  permit.  They pour their contaminated water directly into the

13  river.  They don't run it through somebody else first.  It's

14  just pouring out right there into the river.  And every gallon

15  of contaminated water that comes out of that lagoon where they

16  hold their industrial wastewater from that old mill goes

17  directly into the river and travels undisturbed all the way to

18  the Bull Creek intake.  There's nothing which happens in that

19  river environment to remove it, degrade it, or diminish it.

20       Your Honor, we cited a whole host of cases saying that

21  contaminated water, water with chemicals in it, is a trespass

22  under South Carolina law.  And I would call the Court's

23  attention back to those cases.

24       On the final issue, and then I'll turn it over to my

25  colleague, Mr. Watson.  But on the final issue that he

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1  raised -- and I just want to touch on the statute of

2  limitation issue, he pointed out that plaintiffs didn't know

3  until 2024 when the scientific community as a whole made known

4  to the public that it was now the consensus that no level of

5  PFAS was appropriate in drinking water.  And he raised the

6  question of, "If plaintiffs didn't know until 2024, how could

7  Mohawk have known?"

8       Well, Your Honor, discovery's going to show you how

9  Mohawk could know.  We have deposed Mohawk before in other

10 cases.  We've got the receipts.  They knew.  And that's going

11 to come to be clear here in this court case when we present

12 evidence from discovery here about what Mohawk knew and when

13 it knew it.

14      I'll turn it over now to Mr. Watson.

15      THE COURT:  So is Mr. Watson responding to nuisance or

16 negligence or both?

17      MR. TAPLEY:  Your Honor --

18      THE COURT:  Mr. Lutz?

19      MR. TAPLEY:  Yes.

20      THE COURT:  Okay.  I'm learning you-all's names now, so

21 its much easier.

22      MR. TAPLEY:  Your Honor, I really didn't offer much on

23 nuisance because he really just adopted arguments from

24 yesterday.  I'll do the same.

25      THE COURT:  From his -- was it Ms. Torr or Lorr?

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. LUTZ                                              34

1          MR. ABNEY:  Ms. Torr, I believe.

2          THE COURT:  Ms. Torr --

3          MR. ABNEY:  Yes.

4          THE COURT:  -- did an excellent job --

5          MR. ABNEY:  I thought so.

6          MR. TAPLEY:  So I'll adopt my position --

7          THE COURT:  -- yesterday as well.  She brought attention

8   to Judge Coble's order and the problems in BABB.

9          Yes.  Okay.  Mr. Lutz?

10         MR. LUTZ:  Your Honor, Ryan Lutz again.  Thank you.

11         Since Mr. Willis stole my Groundhog Day joke, I --

12         MR. WILLIS:  I'm sorry about that.  Take credit.

13         MR. LUTZ:  You know, we have stealing arguments, stealing

14  jokes.  I mean, what's next?  All kidding, Your Honor, for the

15  record.

16         But, Your Honor, we went over this yesterday.  Duty --

17  the defendants leave out half of the duty.  They always talk

18  about the affirmative duty that may be created by statute,

19  contractual relation status, property interest, or some other

20  special circumstance.  But what they don't tell you, Your

21  Honor, is -- and this in Madison.  This is a case they cite.

22  This is 100 years of precedent.  "It has long been the law

23  that one who assumes to act, even though under no obligation

24  to do so, thereby becomes obligated to act with due care."

25  And that's exactly what the defendants did here when they

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    used, disposed of, and handled PFAS chemicals that they knew

2    were toxic, bioaccumulative, can't be broken down in the

3    environment, and incapable of treatment at the wastewater

4    treatment plants.  They knew this stuff.  It was entirely

5    foreseeable to them when they know that their chemicals that

6    they allowed to escape their premises and they didn't dispose

7    of properly, would go the wastewater treatment plan untreated,

8    and into the rivers.  That is entirely foreseeable.

9    Environmental contamination and pollution is entirely

10   foreseeable.

11       We have cited a number of cases, not just in Georgia, but

12   for around the country.  Your Honor, we've cited cases here in

13   South Carolina: Chestnut, Raven -- I discussed Raven

14   yesterday, Conestee Mill, Johnston; all cases involving

15   pollution.  They've cited none; no cases on point -- cite --

16   talking about pollution and duties.

17       And so, Your Honor, we've discussed duties.  They had a

18   duty under this -- they had a duty to exercise due care when

19   they handled these chemicals and when they disposed of it.

20   And they had choices.  They had many choices.  They didn't

21   have to dispose of them through the wastewater treatment

22   plants.  They could have hired an environmental carrier to

23   haul these chemicals off.  They can be treated through other

24   methods.  I mean, this is -- it's not like -- defendants act

25   like they can use whatever chemicals they want in their

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. ABNEY                                    36

1  industrial processes and send them off to the wastewater

2  treatment plants, and then they wipe their hands of it.

3      What if they sent radioactive material to the wastewater

4  treatment plants.  No duty?  Of course they have a duty,

5  Judge, especially where the failure to exercise due care

6  creates an unreasonable risk of physical harm and injury.

7  That's common law.

8      Judge, that is -- we cite it.  That's Edwards of Burns-

9  Downs recognizing there is a common-law duty to exercise due

10 care to avoid injury or damage to others.

11     So, Your Honor, this duty argument that the defendants

12 make should not hold water.  With respect to foreseeability,

13 I've sort of touched on foreseeability, Your Honor, but that's

14 basically a causation argument.  What are the natural and

15 probably consequences of sending toxic PFAS to a wastewater

16 treatment plant that can't treat it?  Widespread,

17 environmental contamination; that's what the natural and

18 probably consequences are.

19     And that's all I have, Your Honor.  Thank you.

20     THE COURT:  Anything else?

21     MR. ABNEY:  Just very briefly, Your Honor.

22     The -- I'll just say that the cases I think they are

23 referring to were discussed yesterday, which, Mr.

24 Weatherholtz, I think characterized as cases applying the Good

25 Samaritan rule; where you go out and volunteer to help

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    someone, you've got to use due care in assisting them.  Those

2    are not a good fit for this case.  They don't seem to apply

3    here.  I understand that will be part of the subject of

4    supplemental briefing that is coming, and so I won't wade into

5    that again.

6        Thank you.

7        THE COURT:  Thank you, Mr. Abney.

8        Okay.  Anything else, Mr. Lutz?  Mr. Tapley?

9        MR. TAPLEY:  No, Your Honor.

10        THE COURT:  Okay.

11        Prejudgment interest and attorneys' fees?

12        MR. KNOWLTON:  Thank you, Your Honor.  I'm Robert

13    Knowlton with Haynsworth Sinkler Boyd, to represent PRET

14    Advanced Materials in this lawsuit.  Our law firm also

15    represents about five other defendants in other cases before

16    you and those that have been removed.

17        I want to touch on not only attorneys' fees and

18    prejudgment interests, but a third topic as well, that have

19    not been addresses before.

20        First, if you will, Your Honor, let me give you a little

21    bit of context about PRET.  It is the current owner of the

22    plant in Johnsonville, South Carolina, where it recycles

23    carpet.  And I know this is Rule 12, but I think I will tie

24    this back in on my third point that I'll be addressing.

25        PRET has only owned the plant since 2015, but purchased

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    the plant from Wellman out of bankruptcy.  And Wellman

2    operated the plant for decades before then.  So that's going

3    to present a lot of issues.

4        The complaint does not allege and PRET does not make,

5    sell, or distribute PFAS as defined in the complaint, nor does

6    it -- as far as I can ascertain at this point, purchase it to

7    use in the recycling of carpet.

8        PRET, like some of the other defendants, does not

9    discharge its waster water into a public body of water, rather

10   it sends it to the Johnsonville Wastewater Treatment Plant,

11   where it treats it, where it's hired to treat it, and then

12   discharges it into the river.  There is no -- into the Lynches

13   River.  There's no allegation that PRET or Johnsonville

14   Wastewater Treatment Plant operated in violation of a permit.

15       And, Your Honor, I'm, I guess, a visual learner.  If I

16   can turn on the overhead?

17       THE COURT:  Okay.  As I understand it from my technical

18   expert, that is going to block WebEx -- the WebEx camera.

19       MR. KNOWLTON:  Well, Your Honor, if you would prefer, if

20   you'd rather not --

21       THE COURT:  And since there's no jury here, do you-all

22   object to -- I'm assuming that opposing counsel has seen this?

23       MR. KNOWLTON:  This is the exhibits to my memorandum.

24       THE COURT:  Okay.

25       MR. KNOWLTON:  So we can do it by just having you refer

1    to it, if you prefer.

2        THE COURT:  Okay.  I have it.

3        MR. KNOWLTON:  Okay.  We'll do it --

4        THE COURT:  And I'm happy to view it as you go through it

5    as long as there's no objection from counsel for the

6    plaintiffs.

7        Any objection?

8        MR. TAPLEY:  No, Your Honor.

9        THE COURT:  And so you-all see what I'm refering to?  It

10   is a bound, spiral tabs A through E.  Thank you very much for

11   this.

12       MR. KNOWLTON:  This is -- the motion and the memorandum

13   both have the same five exhibits.  And they're previously

14   filed and produced.

15       Your Honor, Exhibit A simply shows you that the

16   Johnsonville Wastewater Treatment Plant, where PRET sends its

17   discharge, is 22-and-a-half miles as the crow flies, from

18   plaintiff's Bull Creek Surface wastewater treatment plant.

19       Exhibit B simply shows that that Johnsonville Wastewater

20   Treatment Plant is even farther away; it's 32.4 miles,

21   roughly, from the Myrtle Beach plant -- Surface Wastewater

22   Treatment Plant owned by plaintiffs.  And those are the two

23   intake points that are at issue.  And I'll circle back to that

24   in my third point.

25       But here's, basically, the theory of the plaintiff

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                    40

1    against PRET, and that is that some third party made

2    Scotchguard or some PFAS, sold it to another third party that

3    applied it to carpet; that carpet was sold to yet another

4    third party who used the carpet for its entire, useful life;

5    washing it, cleaning it, vacuuming it, and then sent it to

6    PRET for recycling.  And they say some of those PFAS molecules

7    may still have been lingering on by the time it got at the end

8    of its useful life to PRET; and that some of those molecules

9    may have gone to its discharge to Johnsonville, go down the

10   stream over 20 miles to their intake point.  In the meantime,

11   as I think plaintiff said yesterday, everyone flushing between

12   there and then is going to be discharging PFAS because anybody

13   who used a Teflon pan or Scotchguard on their clothes or --

14   there are hundreds of uses that created PFAS that are being

15   discharged into the waste stream.  Plaintiff knowingly

16   withdraws its water in Bull Creek for -- to treat it and then

17   send it out as drinking water.

18        Now, let me get back to the discrete topics.  First, the

19   claim for attorneys' fee should be stricken.  In plaintiffs'

20   complaint, in Paragraphs 78, 90, 111, and the prayer at

21   Paragraph D seeks attorneys' fees.  And those would be in its

22   private and public nuisance claims and in its negligence claim

23   and, of course, in the general prayer for relief.  It's well

24   known that South Carolina follows the American Rule, which is,

25   unless you have a contract or statute that authorizes the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                          41

1   award of attorneys' fees, you pay your own (indiscernible).

2       Plaintiff alleges no contract with PRET.  As plaintiffs'

3   counsel has made it very clear that they've only asserted four

4   common law causes of action against PRET in this lawsuit: the

5   two nuisance claims, trespass, and negligence.  That is no

6   statutory basis for attorneys' fees.  There is no such basis

7   for an award of attorneys' fees in this case, and it should be

8   stricken and void further litigation on the point.

9       In response, at Page 53 and 54 in its -- plaintiffs'

10  brief, plaintiff posits that it has alleged a claim for

11  declaratory judgment under the South Carolina Declaratory

12  judgment Act, which is -- it starts at 15-53-100 of the South

13  Carolina Code.  That statute is mentioned nowhere in the

14  complaint.  The word "declaratory judgment" is set forth in

15  Paragraph 2.  There is no separately identified cause of

16  action but for declaratory judgment.  Plaintiff has not said

17  what it would want the Court to declare.  That usually is

18  reserved to interpret party's obligations under written

19  instruments.  And those are the kind of cases they cite.

20      They cite -- here -- first of all, there's no contract at

21  all between these parties.  And anything would be entirely

22  duplicative of the common law causes of action.  It just --

23  has not been alleged and there's not a basis.  And even under

24  that statute, the cases they've cited are entirely inapposite.

25  They cited a couple of insurance cases.  It's well-known and

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                              42

1   an exception if you're an insurance company and you see you're

2   insured for declaration of one of those coverage under policy,

3   and the insurance company loses, the insured gets some

4   attorneys' fees.  That's obviously not the case here.

5        If there is -- there's another case they cite, Darden

6   versus Witham, which relied on an underlying statute involving

7   divorces.  Obviously, not the case here.

8        There's another case they cite that was a boundary line

9   dispute between two neighbors where the Court had to ascertain

10  the boundary between those two neighbors; nothing like that

11  here.

12       The final case they cite --

13       And that's an unpublished decision that wouldn't be

14  binding anyway.

15       Finally, they cite the historic Charleston Holdings verus

16  Milon case -- or Mallon, I suppose, is how you pronounce that.

17  And that involved an argument by the plaintiff for an award of

18  attorneys' fee under an LLC statute that authorized prevailing

19  party attorneys' fees if you prevailed in a derivative action.

20  The Court on appeals reversed the trial court and said the

21  award was improper because the plaintiff had not even properly

22  claimed it or pled a case under that LLC statute.  Obviously,

23  we have no such statute here.

24       So the point is, there is no proper claim for attorneys'

25  fees.  There is no declaratory judgment action fee.  And that

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                                43

1   claim should be stricken and void further litigation on that

2   point.

3       Similarly, the claim -- the plaintiff claims -- or asks

4   for, in its prayer at Paragraph D, for pre-judgment interest.

5   Under South Carolina Code Section 34-31-20, a party may

6   receive an award of pre-judgment interest if it is for a claim

7   for a sum certain.  Obviously, here, the claim is completely

8   unknown.  A typical tort claim where nobody has any idea at

9   the outset what the amount in controversy is.  And it

10  certainly does not fit that.  And we've also cited the

11  Brooklyn Bridge case.  And there's abundant case law under 34-

12  31-20 showing that this common law torts for unknown amounts

13  does not entitle you to award a pre-judgment interest.  Again,

14  that should be stricken at this point and no need for further

15  litigation on that.

16      Your Honor, let me -- may I address the third point I

17  wanted to make.  And it ties in to foreseeability and some of

18  these other claims.  And that is, we argued that the PRET or

19  Johnsonville Wastewater Treatment Plant is not upstream from

20  the Grand Strands Myrtle Beach Surface Water Treatment Plant.

21  And if you look at Exhibit C, you will see labeled on there

22  the Myrtle Beach Surface Water Treatment Plant.  And "B" on

23  that map is Winyah Bay.  And the bridge going over towards

24  Winyah Bay, where it's one of the more beautiful spots in

25  South Carolina, I think.  You come out of Georgetown; you see

1   the confluence of some of the rivers to the left.  You see

2   Winyah Bay to the right, the marshes; you see osprey nests.

3   Beautiful site and you feel like you're getting close to the

4   beach.

5       Here, plaintiff does not seem to -- and by the way, this

6   is a U.S. -- United States Geological Survey Map that shows

7   which way the water is flowing in the water way.  And you'll

8   see the monitoring location.  It shows it is flowing

9   downstream from there, past the Myrtle Beach Surface Water

10  Treatment Plant, on to Bull Creek, and then into the Winyah

11  Bay and the Atlantic Ocean.  Charleston folks that just the

12  Ashlee and Cooper Rivers form the Atlantic Ocean, but these

13  rivers contribute to  it as well.

14      And "D", once again shows U.S.G.S. map, and it shows

15  where the Johnsonville wastewater treatment plant is.  And,

16  Your Honor, the Google maps reflects that from the confluence

17  of Bull Creek and the waterway, it is 14 miles upstream on the

18  waterway, to the Myrtle Beach Surface Water Treatment Plant.

19      And we have cited case law in our footnote on Page 5 of

20  our memo, making it clear the Court can take judicial notice

21  even in a Rule 12 motion of government maps.  The Court can

22  obviously take judicial notice of the law of gravity: water

23  flows downhill.  And it's -- you do not have to accept an

24  allegation that water flows 14 miles upstream.  That is not

25  what happened.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                              45

1        Now, plaintiffs address this in their memo.  And I found

2   it confusing, but I'm sure I'll be corrected if I

3   misinterpreted it.  But this is what I understand.  They

4   addressed this in the footnote on page 19 and in their

5   opposition at Page 45 to 46.  And my understanding of their

6   argument is that they do not dispute that the Myrtle Beach

7   Surface Water Treatment Plant is not downstream from

8   Johnsonville wastewater treatment plant.  What they argue

9   instead is that the Bull Creek Surface Water Treatment Plant,

10  which I showed you was on the map at the Exhibit A.  Their --

11  my understanding is that Bull Creek pulls water out -- that

12  station pulls water out of Bull Creek for treatment and

13  distribution to customers for drinking water.

14       The argument they're making is that Bull Creek sends its

15  drinking water to customers, apparently upstream of the Myrtle

16  Beach Surface Water Treatment Plant and then they discharge it

17  to a wastewater treatment plants -- all these customers do,

18  who all flush their PFAS into a wastewater treatment plant

19  upstream of the Myrtle Beach plant, back into the waterway,

20  and then the Myrtle Beach treatment plant takes it in

21  voluntarily from there.

22       And I submit, Your Honor, if that is what they're

23  saying -- and I think it is.  I'm sure they will correct me if

24  I'm wrong, but that breaks the chain of causation so thin so

25  many times, it can't possibly be foreseeable that somebody 23

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. LUTZ                                46

1    miles upstream from Bull Creek intentionally sent molecules to

2    its drinking water intake at Myrtle Beach, 14 miles upstream

3    after the confluence.  And that's half the claim here.  And

4    that's why I think that's important.  We could spend a lot of

5    resources trying to deal with all of that, but I just think

6    that is an implausible, unworkable theory that has got to

7    break the foreseeability causation change as well.

8         And so that's why we would ask that the claim for

9    recovery for damages with respect to the Myrtle Beach Surface

10   Water Treatment Plant be stricken, because it would have to go

11   through not only that -- those molecules downstream into the

12   bull Creek plant, but then to customers -- then to their

13   wastewater treatment plant upstream, and then to Myrtle Beach.

14   And if they get the treatment facility they're talking about

15   in Bull Creek, that water will be clean before it -- of PFAS

16   before it ever went to customers.  So there would be no need

17   to have the identical expensive technology for -- with respect

18   to the PRET PFAS at that location.

19        Thank you, Your Honor.

20        THE COURT:  Thank you.

21        MR. LUTZ:  Thank you, Your Honor.  Ryan Lutz, again.

22        PRET recycles carpet.  Carpet contains PFAS.  And PRET

23   disposes of the PFAS in their waste stream.  Those are the

24   allegations that we've made about PRET.

25        On the issue of attorneys' fees and pre-judgment

1    interest, it's our contention that both arguments are, really,

2    procedurally improper and premature.  These are issues that

3    are typically handled, you know, when we have a judgment way

4    down the line.

5        Rule 12(b)(6) tests the legal sufficiency of plaintiffs

6    to state a cause of action.  It applies to claims, attorneys'

7    fees, and  pre-judgment interest are not causes of action.

8    They're not claims.  So 12(b)(6) is the wrong vehicle to

9    challenge this.

10        Even so, we have alleged that we are seeking a

11    declaratory judgment.  We don't have to cite the statute in

12    our complaint to adequately allege a declaratory judgment

13    under the Declaratory Judgment Act, it authorizes an

14    prevailing party to obtain fees, costs; and that's at the

15    discretion of the Court.  It happens after the end of the

16    case.  You know, the cases that we cited were just cited for

17    the proposition that fees and expenses of this case can be

18    awarded under the Declaratory Judgment Act.  I'm not saying

19    that they're on point in the sense of having to do with a

20    nuisance/negligence/pollution case versus some other insurance

21    breech.

22        With respect to the  pre-judgment interest, we've set out

23    present injuries.  We've talked about the real property

24    damages.  And the pre-judgment interest is -- can be available

25    to us just like in a car wreck, Your Honor, when someone

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    suffers an injury and doesn't get treatment for a year later

2    or two years later, they still get to recover pre-judgment

3    interest.

4         With respect to PRET's argument about it not being

5    responsible for the Myrtle Beach treatments plants having --

6    or actually the plaintiffs' water having been contaminated

7    with their PFAS, they introduced extrinsic evidence that we

8    contest, obviously, and we have explained in the complaint how

9    their PFAS goes from their facility all the way down to the

10   Intracoastal Waterway.  It goes into Bull Creek, passes

11   through the systems, discharges into the Waccamaw River and it

12   flows into the Intracoastal Waterway where plaintiff pulls

13   their water.

14        Your Honor, that is -- we explicitly explain how this

15   occurs in Paragraphs 55 through 58.  This will also be a

16   subject of expert testimony on fate and transport, which is

17   why this extrinsic evidence should not be considered,

18   especially on a Rule 12(b)(6), where you are required to look

19   at the four corners of the complaint.

20        We have alleged plausible pathways by which the

21   defendants' chemicals pollute the water ways.

22        And that's all I have, Your Honor.  Thank you.

23        THE COURT:  Thank you.

24        Anything else?  Mr. Knowlton?

25        MR. KNOWLTON:  Just -- could I be very brief, Your Honor?

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. KNOWLTON                                    49

1       THE COURT:  Yes, sir.

2       MR. KNOWLTON:  I think dismissal of the attorneys' fees

3   and  pre-judgment interest without prejudice at this point is

4   appropriate.  They have not asserted a claim for declaratory

5   judgment.

6       But on this argument about the wastewater treatment

7   plants in Myrtle Beach, in Paragraph 56 through 59, they do

8   talk about it.  And that I find confusing.  But what they say

9   is that the -- in 58, they say the Conway WWP is an industrial

10  users and that use portable water from Bull Creek. So they're

11  not -- they do not argue -- and I've not heard them argue -- I

12  do not understand them to argue against gravity, that somehow

13  it gets down to Bull Creek and goes 14 miles upriver to this

14  intake.  You can take judicial notice that that is not the

15  case.

16      What they say is that they send this water from Bull

17  Creek to other customers, and then because that water is then

18  set in above the wastewater treatment -- I mean, the intake in

19  Myrtle Beach.  That has got to be a break in the causation and

20  foreseeability.

21      It says in 61, again, that the PFAS was not removed in

22  the wastewater treatment plants that went in upstream of the

23  waterway.  But that is two times removed from Bull Creek where

24  this flows, and I submit that for foreseeability and

25  causation, that that is going to be completely inappropriate

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1   and rule -- that is a proper Rule 12 issue, that

2   foreseeability is beyond the breaking point at that point for

3   sure.  And we rely on the other arguments, of course, that the

4   entire case should be dismissed, but certainly the claim with

5   respect to the expenses for the Myrtle Beach plant should be

6   stricken.

7        Thank you.

8        THE COURT:  Thank you very much.

9        Okay.

10       MR. LUTZ:  Nothing further.

11       THE COURT:  Okay.  Thank you.

12       All right.  Why don't we take 10 minutes.  When we come

13   back, Mr. Knowlton will be up again.

14       MR. KNOWLTON:  I think that was it for me, Your Honor.

15       THE COURT:  Okay.

16       So you have also covered the advanced materials?

17       MR. KNOWLTON:  Yes.  PRET Advanced Materials is the name

18   of my client.  But that third point was what I wanted to make.

19       THE COURT:  Okay.  All right.  Thank you.

20       Okay.  And so then next it's going to be primary

21   jurisdiction.  Okay?

22       Thank you-all.  We'll be right back.

23       (Recess from 01:26:52 to 01:46:37.)

24       THE COURT:  All right.  We're back on the record with

25   Civil Action Number 24-CP-26-5523, Grand Strand Water and

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. BROWN                                        51

1    Sewer Authority versus Aladdin Manufacturing Corporation, et

2    al.

3        We are on the agenda prepared by defense counsel.  And

4    next, according to the agenda, is primary jurisdiction.

5        MR. BROWN:  Yes.  Thank you, Your Honor.  Good morning.

6    May it please the Court.

7        Zach Brown, here, from Fiber Industries.  McAngus

8    Goudelock & Courie is my firm.  And we actually represent

9    multiple defendants in both cases that you are handling, but

10   also that have been removed.

11       Your Honor, I'm going to speak briefly.  I know that's

12   famous, last words.  But I'm going to address primary

13   jurisdiction arguments.  And our position that in the

14   alternative, if you do not decide to dismiss this case, you

15   should stay this case on the grounds of primary jurisdiction.

16       Primary jurisdiction applies where a claims originally

17   cognizable in the courts and comes into play whenever

18   enforcement of the claim requires the resolution of issues,

19   which under a regulatory scheme have been placed within the

20   special competence of an administrative body.

21       Your Honor, in that case, the judicial process -- or

22   under that doctrine, the judicial process is suspended pending

23   referral of such issues to the administrative body for review.

24   The legislature in South Carolina entrusted the Department of

25   Environmental Services with the regulatory authority to

MR. BROWN                                                          52

1   address the exact claims, the exact harms that the plaintiffs

2   have brought this suit to recover.

3        In the South Carolina State Safe Drinking Water Act, SC

4   Code 44-55-10, it outlines both the regulatory scheme, the

5   framework, but also the enforcement power of the Department of

6   Environmental Services.

7        Your Honor, the act exclusively vests enforcement

8   authority in the Department, and if requested by the

9   department, the attorney general.  That's 44-55-60 within the

10  code.  The doctrine of primary jurisdiction is intended to

11  promote desired uniformity in regulation.

12       Your Honor, this is a portion of both briefs.  And,

13  actually, I think that portion that I just read is from the

14  plaintiffs' brief in response.  It is not that the courts do

15  not have the ability to handle issues at common law that the

16  plaintiff have alleged in their complaint.  That is not what

17  we're saying.

18       We're saying that for these claims to be addressed by a

19  court or this Court, they have to first be addressed by the

20  Department of Environmental Services to determine what exactly

21  should be recovered and what should be reviewed and enforced

22  by the Department of Environmental Services.

23       The entire reason the regulation exists is to leverage

24  the expertise and specialized knowledge of the agency.  And in

25  primary jurisdiction of DES, they would be able to address all

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1   of the issues that stem from both the EPA and the South

2   Carolina Safe Drinking Water Act under that scheme.

3        And thank you, Your Honor.

4        THE COURT:  Thank you, Mr. Brown.  Nice to see you.

5        MR. BROWN:  Yes.

6        MR. WATSON:  Good morning, Your Honor.

7        Akira Watson here for Grand Strand.

8        I covered primary jurisdiction doctrine yesterday.  So

9   I'm going to go ahead and incorporate the arguments that were

10  made by plaintiffs in the Greenwood and Lawrence County cases.

11  I'm just going to hit the main points, though, of those

12  arguments.

13       primary jurisdiction doctrine gives the Court discretion

14  where a case or factual issue therein is beyond the

15  conventional experience of judges and within the special

16  competence of an administrative agency.  The Court may stay or

17  dismiss the case and refer the case to agency.

18       As I said yesterday, this case here involves common law

19  tort and primary claims that are well within the Court's

20  competence and experience.  DES doesn't adjudicate tort claims

21  and has little to offer.  Again, defendants just asked for a

22  stay without saying exactly the Court would be referring to

23  the Department, what specific issues, what would be the

24  timeline of the stay, the proposed end date; how would the

25  Court know that the stay needs to be lifted?  The defendants

MR. BROWN                                    54

1    don't say.

2        Again, if we're looking at agency expertise that could be

3    useful to this case DES didn't propose the PFAS MCL Rule; EPA

4    did.  Furthermore, defendants are unable to point to any

5    regulatory action taken by DES to either control or regulate

6    PFAS generally or take enforcement at their facilities

7    specifically.

8        And, finally, in our brief we provided a number of cases

9    in which defendants have -- will raise this argument in the

10   context of common law claims for PFAS contamination.  Again,

11   most -- and I think very likely, all of these primary

12   jurisdiction arguments have been rejected in the PFAS

13   contamination cases.

14       Thank you, Your Honor.

15       THE COURT:  Thank you.

16       Mr. Brown?

17       MR. BROWN:  Your Honor, very brief.

18       The reason that DES has not addressed PFAS under their

19   regulatory authority is because the rule from the EPA only

20   became effective in April of 2024, not even a year ago.

21       Additionally, Your Honor, I want to bring up one of the

22   cases that was cited by counsel from a different jurisdiction,

23   the Hartwell Court versus Superior Court matter.  I believe

24   it's out of California.  In the concurring opinion in the

25   court's opinion in that case, in Hartwell Court, they envision

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                                    55

1    a scenario where an award of damages in an underlying case and

2    in that underlying case, would actually interfere with the

3    agency's official duties under the California Regulatory

4    Framework.  That's why we're asking for the stay in the

5    alternative of a dismissal, because we've had this rule from

6    the EPA for less than a year and DES needs to look at these

7    issues to determine if there's anything that could be

8    addressed by the courts down the road.

9        Thank you, Your Honor.

10       THE COURT:  Thank you.

11       Anything else on that, Mr. Watson?

12       MR. WATSON:  Yes, Your Honor.

13       Your Honor, the reply by defense counsel just illustrates

14   why this request for a stay is nothing more than an

15   unjustified delay tactic.

16       DES has been sitting on this rule forever a year before

17   deciding whether it's going to do anything with respect to

18   PFAS.  How long are our water utilities expected to wait on

19   the agency to take some sort of action of its own to regulate

20   PFAS?  We've got contamination now and a deadline under that

21   EPA rule by 2029 to get the PFAS out.

22       That's all, Your Honor.

23       MR. BROWN:  Nothing further, Your Honor.

24       THE COURT:  Okay.

25       MR. BROWN:  Thank you.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    56

1          THE COURT:  Thank you, both.

2          Okay.  Mr. Willis?

3          MR. WILLIS:  May it please the Court.

4          Your Honor, this is our 12(b)(2) motion to dismiss for

5     lack of personal jurisdiction.

6          In this case, in the Grand Strand case, Mr. Diamaduros

7     and I represent two landfills in North Carolina.  One is

8     called the Sampson Regional Disposal site.  It's called -- I

9     think we've referred to it as SRD.  And then the other one is

10    the Red River Disposal site.

11         RRD, Red River, is -- or Red Rock.  I apologize.  Is

12    about 40 miles from the Lumberton Wastewater Treatment Plants

13    where its leachate goes.  And the Sampson Landfill is about 70

14    miles from the Lumberton waster water discharge.  The

15    Lumberton Wastewater Discharge is about 20 miles from the

16    border of North Carolina/South Carolina, I think.  I may be a

17    little wrong on that, but somewhere between 15 and 20 miles.

18         The -- I have maps here if the Court needs that, but I

19    don't think the Court does.  And given the document camera

20    issues, we'll -- if the Court wants to see it, I'm happy to

21    hand them up.

22         So the reason that it's important that the Court realize

23    that this is a 12(b)(2), not a 12(b)(6) motion is that the

24    rules on personal jurisdiction motions under Rule 12 are a

25    little different than under 12(b)(6).  There's no presumption

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                               57

1    given to the plaintiffs' allegations of personal jurisdiction

2    that the Court must assume that they're true.  It works a

3    little different.

4        If personal jurisdiction is alleged in the complaint and

5    supported by well-pleaded facts, then that states a prima

6    facie case.  But that case can be rebutted by affidavits from

7    the defense supporting the argument that there should be no

8    personal jurisdiction.  And that's what's occurred here.

9        And that essentially shifts the burden back to the

10   plaintiffs to decide whether they want to rest on their

11   allegations and their pleadings or whether they want to submit

12   counter affidavits or whether they want to conduct

13   jurisdictional discovery.

14       We made this motion in December of 2024.  There's been no

15   request, no effort to conduct jurisdictional discovery, and,

16   of course, there's no stay of discovery in this case.  That

17   was a part of the motion that was made.  So Your Honor

18   basically has the record before you to decide this issue.

19       So in sort of confirming that that was the process in

20   South Carolina, I went back to the office last night.  And I

21   ran across a case, Your Honor, that we did not include in our

22   brief.  And I'd like to hand it up.  I've got copy for the

23   plaintiffs.

24       (Pause.)

25       MR. WILLIS:  Your Honor, this is a Court of Appeals

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    58

1    called Sullivan versus Hawker Beechcraft Corporation.  And it
2    involves an airplane crash that occurred in York County where
3    the flight originated from Ohio.  And plaintiffs originally
4    brought the case in Ohio.  Then they -- it was dismissed.
5    They missed the statute of limitation.  So they came to South
6    Carolina because we had a longer statute of limitations and
7    they filed it there.  And so some of the Ohio defendants moved
8    to dismiss for lack of personal jurisdiction.  The trial court
9    granted the motion, denied the request for jurisdictional
10   discovery, and then it went up to the Court of Appeals.

11       And I think it was Judge Konduros that wrote the opinion.
12   And it's a typical -- Konduros, yeah.  It's a typical opinion.
13   She's a very good writer.  And it's just very clear.  And as I
14   read the opinion last night, I thought, you know, this is
15   going to be helpful to provide this to the Court today.

16       And so, Your Honor, it -- on page 4 of that opinion, the
17   -- Judge Konduros begins her analysis.  And she says, "The
18   determination of whether a court may exercise personal
19   jurisdiction over a non-resident" -- which is what we have
20   here -- "involves a two-step analysis.  The trial court must,
21   Number 1, determine whether the South Carolina long-arm
22   statute applies.  And, Number 2, whether the non-resident's
23   contacts with -- his contacts in South Carolina are sufficient
24   to satisfy due process.

25       And I've argued these motions before, Your Honor, and

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    59

1  read briefs.  And both sides tend to take the Supreme Court --

2  the South Carolina Supreme Court's statement that the long-arm

3  statute extends to the farthest bounds of jurisdiction

4  permitted under the due process clause of the United States

5  Constitution.  And they sort of conflate those two issues and

6  the argument on personal jurisdiction just becomes about

7  minimum contacts.

8       But I actually went back and I read the long-arm statute.

9  And it's interesting because plaintiffs can't satisfy the

10 long-arm statute here.  And so if that's the first step --

11 let's take a look at the long-arm statute and what it says.

12      And that long-arm statute, as the Court is aware, can be

13 found at 36-2-803.  And it says in sub-paragraph A:  "a Court

14 may exercise personal jurisdiction over a person who acts

15 directly or by an agent as to a cause of action arising from

16 the persons."  Number -- part 3 would be the first one that'd

17 be relevant: the person's commission of a tortuous act, in

18 whole or in part in this state; or Number 4: causing tortious

19 injury or death in this state by an act or omission outside

20 this state if he regularly does or solicits business in state.

21 Now, under our affidavits, neither Sampson nor Red Rock do

22 that.  In fact, they're not even permitted by law to do that.

23 They can only take North Carolina waste.  They don't solicit

24 any waster material, any solide waste or trash, that sort of

25 thing, from South Carolina.

1    The second bullet point would be whether the defendant

2    engages in any other persistent course of conduct.  So

3    persistent source of conduct means it would be something that

4    you would do over and over again, that directly causes

5    tortious injury or death in the state.

6    And then the last bullet point would be "or derives

7    substantial revenue from goods used or services rendered in

8    this state."  So the only bullet point, then, that would be

9    relevant would be "Engages in any other personal -- persistent

10   course of conduct in this state."  That phrase, "In this

11   state" modifies each one of those bullet points.  And that

12   case makes that clear.

13   So, Your Honor, just looking at the allegations of the

14   plaintiff's complaint through the lense of the South Carolina

15   long-arm statue, the long-arm statute does not provide

16   personal jurisdiction.

17   Plaintiffs' complaint alleges, very clearly, that Red

18   Rock and Sampson Acts occurred in North Carolina.  And, of

19   course, that's what they allege because that's what they must

20   allege.  There's no evidence that Red Rock or Sampson do any

21   business do any business in South Carolina, come to South

22   Carolina, directly dispose of waters in South Carolina.  They

23   say at Paragraph 20, that their first allegation in the

24   complaint, that says:  Red Rock and Sampson's act occurred in

25   North Carolina.  They quote: "Sampson and Red Rock transport

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                                    61

1    leachate from these North Carolina landfills to the Lumberton

2    Wastewater Treatment Plant in Lumberton, North Carolina.  So

3    that's the act.  The transportation -- or sending of leachate,

4    which is waster water from a landfill, to a plant in

5    Lumberton, North Carolina.

6        So what you have here is under the long-arm statute, it

7    clearly falls within sub-paragraph 4, causing tortious injury

8    or death in this state, which is alleged, by an act or mission

9    outside the state, which is what we have. And so for there to

10   be personal jurisdiction, both Sampson and Red Rock have to

11   engage in any other persistent course of conduct in this

12   state.  And they clearly do not do that.

13       And, really, realistically, the inquiry should end there.

14   The Court really doesn't need to go and read South Carolina

15   and U.S. Supreme Court cases about personal jurisdiction and

16   what's required if right up front the long-arm statute can't

17   be met.  But if for some reason the Court thinks it can be

18   met, then lets go on to the due process issue.

19       With the exercise of personal jurisdiction over Sampson

20   and Red Rock comport with due process.  The affidavit that we

21   submitted in support of our motion is attached to this exhibit

22   A to our motion and it very clearly says -- and I don't think

23   it's even possible to dispute this, that Sampson is a North

24   Carolina company.  Their sole business is operation the

25   Sampson County landfill, which is in Roseboro, North Carolina.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                                    62

 1  They are not registered to do business in South Carolina.

 2  They do not do business in South Carolina.  They don't own,

 3  lease, maintain any property in South Carolina.  They don't

 4  have an office, place, or business -- or a mailing address in

 5  South Carolina.  They don't have any employees here.  They

 6  don't advertize, solicit business, or engage any marketing in

 7  South Carolina.  In fact, they could not do that because

 8  they're only authorized to take waste from North Carolina.

 9  And that's finally -- and it says, the Sampson County landfill

10  does not accept waste from outside of North Carolina.  And

11  same applies to Red Rock.

12      So there is literally no connection to South Carolina by

13  any conduct by Sampson or Red Rock.  So would it be fair,

14  under the due process clause, would it be authorized under due

15  process for them to be sued in South Carolina and have to

16  defend a case here?

17      And, Your Honor, the controlling case law for you, as you

18  know, is not cases from Montana or Ohio or Alabama.  It's what

19  does the South Carolina Supreme Court said about this?

20  That's -- those are your masters in this case.  You have to

21  follow South Carolina Supreme Court precedent and United

22  States Supreme Court precedent.

23      And the leading case that comes closest to fitting the

24  facts here, where you've got an out-of-state defendant

25  engaging in out-of-state activity that may arguabley be

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    63

1  foreseeable that it might have some indirect impact in South

2  Carolina.  But leading case on that is Coggeshall versus

3  Reproductive Endocrine Associations of Charlotte, that -- and

4  then the other one would be the baseball bat case. And we'll

5  talk about that in a minute, the Cockrell case.

6       So, Coggeshall, it's a 2007 case -- it says,

7  "Jurisdiction can only attach if the plaintiff identifies some

8  act by which the defendant purposefully avails itself of the

9  privilege of conducting activities within the forum state.  So

10 it's the purposeful availment that we're dealing with here.

11 And clearly that does not exist under the facts that the

12 plaintiff have pled.

13      And note that the South Carolina Supreme Court doesn't

14 say, "Or an act that the defendant knows or should know could

15 cause in South Carolina."  That's the foreseeability test. And

16 that doesn't appear in any South Carolina Supreme Court

17 statements.  The South Carolina doesn't base personal

18 jurisdiction on foreseeability of harm.  That's not the test.

19 Purposeful availment of the privilege of conducting activities

20 within the state is the test.

21      Other language, Your Honor, that the South Carolina

22 Supreme Court has used, in the South Plastics versus Southern

23 Community Bank case, that's 423 South Carolina.2d 128 cited in

24 our briefs.  It's a 1992 case.  "Due process requires showing

25 that defendants have directed their activities to a resident

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                        64

1    of South Carolina."

2         Well, Sampson and Red Rock have only directed their

3    activities to Lumberton, North Carolina's wastewater treatment

4    plant.  And foreseeability, again, is not the test.

5         In a U.S. Supreme Court case, the Nicastro case, where

6    the U.S. Supreme Court rejected the stream of commerce test

7    for the purposeful availment test.  Supreme Court said, "The

8    Court's principal inquiry in this type of jurisdictional

9    assessment is whether the defendant derives -- or, I'm sorry -

10   - whether the defendant's activities manifest an intention to

11   submit to the power of the sovereign, being South Carolina.

12   No mention of foreseeability as part of that test.

13        So the question is, is foreseeability enough?  Because

14   that's the argument that plaintiffs make in their brief, is,

15   "Well, you purposefully -- Sampson, you and Red Rock

16   purposefully send your leachate to Lumberton.  And it's

17   foreseeable that that's going to flow downstream to -- through

18   the Pee Dee River and eventually find its way some 150 miles

19   to Myrtle Beach."  So the question is, is foreseeability

20   enough?  And both the Supreme Court of the United States and

21   South Carolina Supreme Court say it's not.

22        The U.S. Supreme Court says, "It's consistently held that

23   foreseeability of causing injury in another state is not a

24   sufficient benchmark for exercising personal jurisdiction."

25   That's the Burger King versus Rudzewicz case, 471 U.S.462.

MR. WILLIS                                    65

1   It's a 1985 case.  We cite that in our brief.  And then again

2   in this Nicastro case, "It is the defendants' actions, not his

3   expectations, that empower a state to subject him to

4   judgment."

5        So let's look at the South Carolina cases and what they

6   say about foreseeability.  And controlling South Carolina

7   cases have consistently held foreseeability of an impact in

8   another state isn't enough to comport with due process.

9        So I mentioned the Cockrell case, Your Honor, that's

10  cited in our brief.  And I would suggest Your Honor take a

11  look at that case.  It's in our materials that we sent to the

12  Court.  It's the baseball bat case where a student athlete was

13  hit in the head by a line drive when he was pitching and was

14  seriously injured.  And it was an aluminum baseball bat.

15       And so the student sued Hillerich & Bradsby, who

16  manufacture baseball bats, H&B.  And they also sued the

17  University of Massachusetts Research Center that studied the

18  bat and the director of that research center.  And so the

19  University of Massachusetts and the director moved to dismiss

20  on lack of personal jurisdiction.  And the trial court granted

21  the motion.  But the plaintiff in that case argued, "Well, its

22  foreseeable that a bat that they certified might be sold in

23  South Carolina.  In fact, it's virtually certain that that

24  would happen.  And the Supreme Court again said, "The

25  foreseeability that is critical to due process analysis is not

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                              66

1    the mere likelihood that a product" -- in that case a bat, but
2    you could substitute the word leachate for bat and you get
3    instructive authority -- the foreseeability to due process
4    analysis is not the mere likelihood that a product, a bat," or
5    a leachate, "will find its way into the forum state.  Rather,
6    it is that the defendant's conduct and connection with the
7    forum state are such that he should reasonably anticipate
8    being hailed into court there."  And they cite the World-Wide
9    Volkswagen case as authority for that.  And that's an opinion
10   by Justice Whaler in that baseball bat case.

11       And then if you look at -- Your Honor, if you look at
12   World-Wide Volkswagen.  And that's a U.S. Supreme Court case
13   that talks again about foreseeablility.  And it clearly holds
14   that the mere foreseeability that a product -- in this case a
15   Volkswagen -- would wind up in an accident in Oklahoma is not
16   enough to establish personal jurisdiction.  Personal
17   jurisdiction under the due process clause requires purposeful
18   availment of the laws of the forum state by the defendants'
19   direct conduct.

20       Now, that baseball bat case also talks about third-party
21   conduct.  And we have that here, as well, Your Honor.
22   Cockrell is also controlling because it deals with contacts
23   that are due to the unilateral actions of some other entity.
24   In that case, it was Hillerich and Bradsby that distributed
25   the bat in South Carolina.  And so like the Lumberton

1  wastewater treatment plant, we have here, where the plaintiff

2  alleges that Sampson and Red Rock send their leachate to

3  Lumberton for treatment, just as Hillerich and Bradsby send

4  the bat to South Carolina.  There's no jurisdiction as to

5  University of Massachusetts or the director because they don't

6  control that.  And the court state that, "Further, the focus

7  must center on the contacts generated by the defendant and not

8  on the unilateral actions of some other entity."  They go on

9  to say, "The bats did not arrive in South Carolina through the

10 respondent's efforts.  H&B unilaterally distributed and sold

11 them in South Carolina.  The respondents had no control over

12 the distribution of the bats and did not profit from their

13 sale."

14      And, similarly here, once the leachate goes to Lumberton,

15 Sampson and Red Rock have no control over where Lumberton

16 ultimately, discharges its wastewater.

17      The Cockrell case also cites another case called Mussalli

18 versus W.W. Norton and Company.  This is a -- sort of a

19 strange case, involving somebody who wrote an article and made

20 a movie that was arguably defamatory.  And it was shown in

21 South Carolina.  They were sued here.  And the Supreme

22 Court -- our South Carolina Supreme Court said in that case,

23 "The fruits of the defendant's labor arrived in South Carolina

24 not through his efforts, but through the efforts of others,

25 and therefore cannot be the basis for jurisdiciton."  And

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                          68

1    that's what we have here.  The leachate from Sampson and Red

2    Rock arrives in South Carolina according to the plaintiffs'

3    allegations, through the actions of the Lumberton wastewater

4    treatment plant, not directly through Sampson and Red Rocks'

5    actions.

6         Now, not surprisingly, Your Honor, the main case the

7    plaintiffs cite in opposition to our position is an Alabama

8    case.  And it's the ex parte Aladdin case.  And I went back

9    last night and I reread this.  And I don't know whether Your

10   Honor has a copy of it.  We didn't cite it in our briefs.  And

11   I asked Mr. Tarpley if he had provided you with case law

12   notebooks, and he said he had not.  So I would like to hand

13   this case up, too.

14        Thank you, Your Honor.  Well --

15        and I don't know whether Mr. Tarpley was involved in that

16   case.  He probably was.

17        Was that one of you-all's cases?

18        MR. TAPLEY:  Who's the plaintiff?  No.

19        MR. WILLIS:  No.  Okay.

20        But in any way -- in any event, Your Honor, that -- it's

21   a interesting case to read.  And it's interesting because at

22   the outset, it's important for the Court to see that if you're

23   going to follow that Aladdin case, as opposed to controlling

24   case law in South Carolina, you need to know what the

25   procedural background of that case was.  Because that case

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    69

1    turns on a couple of procedural points that would apply in

2    Alabama, but they don't apply here.

3        First, it was before the Alabama Supreme Court on an

4    extraordinary writ called a Petition for Mandamus."  And

5    I'm -- I've got some experience with that.  I had a case in

6    Mobile where a lawnmower turned over, and there was a case of

7    privilege there that we had to deal with.  And we went up to

8    the Supreme Court on a Petition for Mandamus.

9        And the Petition for Mandamus in Alabama -- and I'm sure

10   Mr. Tarpley can correct me if I'm wrong; I'm not an Alabama

11   lawyer -- but my experience from that lawnmower case and from

12   the -- reading this opinion, the Court makes it clear that the

13   petitioner must satisfy a heavier burden than an ordinary

14   appeal.  In an appeal based on Mandamus, the petitioner must

15   show a "Clear, legal right to the order sought."  So the Court

16   sort of has a benefit of the doubt standard of proof that they

17   apply in Mandamus.  And they give the benefit of the doubt to

18   the plaintiff -- or to the non-moving party.  And that

19   obviously doesn't exist here.

20       Second, Alabama has a procedure that's a little different

21   than we use here in considering a motion to dismiss based upon

22   lack of personal jurisdiction.  And the opinion -- the Aladdin

23   opinion, goes into all of that.

24       Where the plaintiff's allegations of personal

25   jurisdiction over the defendant are initially taken as true in

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                                70

1   Alabama, here it would be considered a prima facie

2   establishment.  But if the defendants contest those statements

3   with affidavits, then in Alabama the plaintiffs must submit

4   counter affidavits.  And then if there's a conflict between

5   the defendants' affidavit and the plaintiff's affidavits, then

6   the Court "Must resolve all conflicts in favor of the

7   plaintiff.  And only if no affidavit -- no counter affidavits

8   are submitted by the plaintiff can the motion be granted."

9        Well, needless to say, we don't do it that way here.

10  Here, if the jurisdictional allegations are disputed by the

11  defendant, which we have done, and supported by an affidavit,

12  which we have done, then the plaintiff's entitled to

13  jurisdictional discovery.  They can't rely on the allegations

14  of their pleadings.

15       And if the plaintiff fails to conduct jurisdictional

16  discovery, there's no presumption or obligation to read the

17  complaint as it pertains to personal jurisdiction in a light

18  most favorable to the plaintiff.  The court simply looks at

19  the evidence and decides whether there's personal

20  jurisdiction.  And so, again, although this motion to dismiss

21  has been pending since December, there's been no effort to

22  seek any jurisdictional discovery.

23       Now, Your Honor, if you look at the substance of the

24  Aladdin case, it was a very split court.  As best I can tell,

25  there are a lot of justices on the Alabama Supreme Court.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                            71

1   This appears to me, as I counted it last night, to be a 4-to-3

2   decision with a couple of justices having to recuse

3   themselves.  So it's a split court.  It's just not an

4   authoritative decision.  And the cases that they cite -- the

5   Alabama Supreme Court cites, that the find persuasive, are

6   cases from outside their jurisdiction.  But if you read those

7   cases, none of them involve discharges of waste to or by a

8   third party that is not in the forum state, which is what

9   we've got here.

10      All of those cases that the Aladdin court found

11   persuasive, all involved a direct targeted discharge by the

12   defendant into the forum state, which we don't have here.

13      Finally, Your Honor, as both sides point out, elements of

14   fairness and practicality enter into the court's due process

15   analysis.  And the reason this is important is because the

16   claims against Sampson and Red Rock in this case, have a

17   little twist on them that isn't present as to the other 12

18   defendants.

19      Because Sampson and Red Rock are North Carolina

20   companies, we initially believe that Lex Loci Delicti would

21   govern choice of law here, the substantive choice of law

22   that's going to apply to the substantive claims -- I think

23   both sides -- the plaintiffs and the defendant agree that

24   South Carolina law applies to the personal jurisdiction

25   question.  In fact, they allege that directly in their

1  complaint.  But the underlying substantive law of negligence,

2  nuisance, trespass, contribution allocation, plaintiffs allege

3  in their complaint that the North Carolina Law would apply to

4  Sampson and Red Rock.  We don't necessarily agree with that,

5  but it's interesting to give that some thought.  And they talk

6  about in their brief why that is.  And I, frankly, had not

7  read the international paper case, but it's a very interesting

8  case, Your Honor.

9      And I've got a copy of that as well.  And I'd like to

10  hand that up to the Court.

11      (Pause.)

12      MR. WILLIS:  And I think it was maybe Mr. Lutz cited this

13  case yesterday in a context of clean water act preemption.

14  But this is a really interesting case.  And this was a case

15  where International Paper Company had a paper mill on Lake

16  Champlain.

17      I've been to Lake Champlain.  It's a giant, beautiful,

18  fresh water lake.  It's one of the few natural lakes in the

19  United States.  And the border of Lake Champlain -- part of

20  Lake Champlain border is in New York; part of it is in

21  Vermont.  Sort of the border goes right through the lake.

22      And so International Papers' waste is discharged into the

23  New York side of Lake Champlain.  But they got sued by

24  residents of the Vermont shore, claiming that their discharge

25  created a nuisance.  And so International Paper moved to

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    73

1    dismiss the case.  And the argued that the Clean Water

2    actually had a preemptive effect and preempted state law

3    claims being brought against them.

4         And for a rather convoluted analysis, the Supreme Court

5    says, "No, that's not right.  But it would be unfair to

6    subject International Paper to Vermont Clean Water laws.  And

7    so what we're going to do here is we're going to have New York

8    law apply to International Papers' discharges.  New York law

9    applies to the substantive claims, but they can still be

10   brought in Vermont.

11        And so imagine if we had to do that here.  If Your Honor

12   doesn't grant this motion to dismiss and there are 2

13   defendants from North Carolina and 12 defendants from South

14   Carolina and we go in front of a jury, imagine the complexity

15   of Your Honor's jury charge, when 12 defendants have South

16   Carolina law but 2 have North Carolina law.

17        And those practical considerations enter into the due

18   process analysis.  And so the most practical and fair result

19   here, Your Honor, would be for you to dismiss Sampson and Red

20   Rock because there is no direct activity that they engaged in

21   directed at a South Carolina resident, and foreseeability is

22   not the test.  The most practical result would be to dismiss

23   them and the plaintiffs can always sue them in North Carolina.

24   In fact, the plaintiffs make the argument in their brief that

25   it would be convenient for South Carolina Red Rock to defend

MR. WILLIS                                  74

1    the case in South Carolina.  They're just right across the

2    border.

3         Well, if it's convenient for them, it would be just as

4    convenient to the plaintiff to go to North Carolina if they

5    feel like Red Rock and Sampson have made a substantial

6    contribution to the PFAS that they're complaining about.  So

7    they can sue these companies in North Carolina.  That's where

8    that -- there is general jurisdiction over them there.  And

9    they can sue them for  tort in South Carolina.  But they can't

10   sue them here in South Carolina because there is no contact.

11        In conclusion, and I'm sure the -- everybody is happy to

12   hear me use that phrase -- Sampson and Red Rock have no --

13   there's no evidence of any purposeful availment;

14   foreseeability in South Carolina is not enough.  Jurisdiction

15   can't be based on the acts of a third party.  Under the long-

16   arm statute, jurisdiction here cannot be based upon acts

17   occurring in North Carolina because there is not persistent

18   course of conduct that takes place in this state.  So

19   plaintiff's claims fail to satisfy the long-arm statute.  And

20   there's just no evidence that defendants could purposely

21   directed their activities to a resident of South Carolina.

22        Sending leachate to a North Carolina wastewater treatment

23   plant, even if it's possible that the PFAS might eventually

24   wind up in South Carolina isn't purposeful availment or a

25   conduct directed at a South Carolina resident.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                                    75

1     Now, if the Court is inclined to hold your ruling in

2  abeyance and order jurisdictional discovery here, obviously if

3  the Court wants us to do it, we'll participate in that.  But

4  that's one reason I handed up that Sullivan case, because in

5  that Sullivan case, the lower court held you don't need

6  jurisdictional discovery.  And that was affirmed.  And I don't

7  believe jurisdictional discovery is necessary here.  I don't

8  think it will show anything that hasn't already been put in

9  our affidavit or alleged by the plaintiff.

10     That's all I have, Your Honor.  Thank you for listening

11  to me.

12     THE COURT:  Thank you.

13     Mr. Watson?

14     MR. WATSON:  May it please the Court.  Akira Watson.

15     I promise I won't be as long-winded as Mr. Willis here.

16     I want to start with this matter that defense counsel

17  raised at the beginning of his argument about whether separate

18  analysis under the South Carolina long-arm statute is also

19  required in addition to the due process analysis.

20     I want to note that defense counsel filed two replies

21  yesterday; one of them less than 24 hours before the start of

22  this hearing, didn't raise this issue of a separate statutory

23  analysis. Also didn't raise it in their main brief.  The first

24  time that we're hearing about it is at this hearing.

25     Defense counsel relies a lot on the case -- or excuse

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                                          76

1   me -- yes, relies on the case of Cockrell.  That's a Supreme

2   Court case.  And I've got some language here from it.

3        South Carolina Supreme Court said, "South Carolina's

4   long-arm statute, which includes the power to exercise

5   personal jurisdiction over causes of action arising from

6   tortous injuries in South Carolina has been construed to

7   extend to the outer limits of due process.  Because South

8   Carolina treats its long-arm statute as co-extensive with the

9   due process cause, the sole question becomes whether the

10  exercise of personal jurisdiction would violate due process."

11       And indeed, in that case -- that's the baseball bat case.

12  The court only engaged in the due process analysis, sort of

13  skipping over the statutory analysis.

14       And, okay, it's worth noting, we also cite Cockrell in

15  our opposition brief for that same point.  To the extent that

16  the Court believes that separate analysis under the language

17  of the long-arm statute would be helpful to the Court, we

18  would request 5 days for supplemental briefing on that issue.

19       That's our request on that.

20       THE COURT:  Okay.  Thank you.

21       MR. WATSON:  I also want to address what defense counsel

22  said about the sort of matters that the Court has allowed to

23  consider under 12(b)(2), motion to dismiss over personal

24  jurisdiction.

25       Yes, defendants are allowed to rebut the jurisdictionally

1  relevant complaint allegations with extrinsic evidence, such

2  as through affidavits.  However, as to jurisdictional

3  allegations that are unrebutted by such extrinsic evidence,

4  those allegations are taken as true.

5      And I'll note -- I've got a lot of paper up here -- the

6  affidavit submitted on behalf of these North Carolina

7  landfills -- we'll just cover the facts, the counsel spoke

8  about the fact that North Carolina landfills, they only

9  operate in North Carolina, they only take North Carolina

10 waste, they don't have employees in South Carolina .  That's

11 fine.  because in this case, there's not nexus between those

12 hypothetical, having employees or the other business activity

13 that would be in South Carolina, and the causes of issue are -

14 - excuse me -- causes of action brought by Grand Strand.

15     Now, in the purposeful availment prong, North Carolina

16 landfills' relevant jurisdictional conduct here is collecting

17 their leachate from their landfills.  And I will note, Your

18 Honor, those landfills are not located, themselves, in any

19 watersheds that are relevant to this case.  The watersheds

20 that those landfills are located on empty into the Atlantic

21 Ocean in North Carolina.  What these landfills do is, instead

22 of, for example, having a direct discharge of their leachate

23 into those watersheds or sending it to a local wastewater

24 treatment provider located on those watersheds, they collect

25 all of the leachate from their landfills, haul it across the

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1  state of North Carolina to a location that is much closer than

2  their landfills actually are, to the border of South Carolina.

3  And they send that leachate to the Lumberton wastewater

4  treatment plant where their PFAS pass through the wastewater

5  treatment plant to enter the Lumber River, which shortly flows

6  downstream into South Carolina.  The relevant jurisdictional

7  conduct here is sending their waste into the formed state of

8  South Carolina.

9       Your Honor, we have pleaded and it is not rebutted by any

10 extrinsic evidence submitted by the landfills that this

11 defendant knew that PFAS are persistent in the environment,

12 that they knew that they resist conventional wastewater

13 treatment like that used in Lumberton.  They knew that these

14 PFAS are mobile in the environment, especially in water.

15      Morever, Your Honor, in light of the affidavit submitted

16 by these defendants, we also submitted to the Court a consent

17 decree entered in a case involving the Sampson County

18 landfill.  It was brought by residents around that landfill

19 that complained that the landfill was leaking PFAS and

20 contaminating their water supply.

21      Sampson County settled that case and is a participant in

22 the Consent Decree.  They have actual knowledge that the

23 leachate, including the leachate that they are sending to

24 Lumberton is, in fact, contaminated with PFAS.  We also

25 submitted the Clean Water Act Notice of Intent letter that was

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                                          79

1    sent to Sampson Landfill as well as other entities related to

2    both Sampson Landfill and Red Rock Disposal.  That letter

3    discusses the issue, not only of the PFAS specifically at the

4    Sampson Landfill, but the issue of PFAS and landfill and

5    leachate generally.  This was knowledge that was generally

6    aviailable to these landfills.

7         So, again, these defendants know, or at the very least

8    should know that they are sending leachate to Lumberton, that

9    that leachate is contaminated with PFAS that is persistent in

10   the environment, mobile in the environment, and passes through

11   conventional wastewater treatment processes, and these

12   defendants know or should that they PFAS, in fact, pass

13   through the Lumberton wastewater treatment system.  And they

14   know or should know that the Lumberton system discharges to a

15   river.

16        Your Honor, knowing that your conduct is causing harm in

17   a forum and nevertheless persisting in that conduct, that is

18   purposeful direction to the forum.  Every time those landfills

19   collect that leachate, knowing that there's PFAS in it, and

20   they send it to the wastewater treatment plant that is closer

21   to the state of South Carolina than their actual landfills

22   are, they are purposefully directing their actions towards

23   South Carolina.

24        And, indeed, this case is on all fours with cases we've

25   cited in our briefs that involve purposeful availament based

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1   on knowingly sending pollution to he forum.  Defense counsel

2   wants to say, that's mere foreseeability.

3        Let me just read a passage from the ex parte Aladdin

4   case, decided by the Alabama Supreme Court.  And this is

5   holding the -- these carpet manufacture defendants in Georgia

6   purposefully availed themselves to the jurisdiction of Alabama

7   by sending their PFAS-contaminated waster water through a

8   treatment plant and into the river.  This is at Page 20 of the

9   document, bottom paragraph.

10       THE COURT:  Which paragraph?

11       MR. WATSON:  Right-hand column, bottom paragraph, begins,

12  'We reiterate."

13       THE COURT:  Yes, sir.

14       MR. WATSON:  We reiterate that foreseeability alone is

15  insufficient to concur specific personal jurisdiction.  In

16  this situation, however, Center Waters and Gadsden Waters,

17  allegations, which we were required to take as true,

18  demonstrate that the remaining defendants continue to

19  discharge PFC -- and that's a synonym for PFAS, containing

20  chemicals in their industrial waster water, despite allegedly

21  knowing that the chemicals would enter the Kush River.  The

22  remaining defendants are alleged to have expressively and

23  directly aim the polluted water not only at Dalton utitlies or

24  the LAS, which was part of Dalton Utilities Treatment system

25  in Georgia, but also Alabama through the continuing flow of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                                          81

1    the polluted waster water from the remaining defendant's

2    clients into the Coosa River and it's tributaries and

3    ultimately to the sites in Alabama where the injuries

4    conclude.  Thus we conclude that pursuant to the allegations

5    in these complaints, the remaining defendants knowingly and

6    directly aimed tortious actions at Alabama.

7        Sending your wastewater is activity.  And knowing that

8    the wastewater is likely to cause injury in the forum state

9    and doing it anyways, that's purposeful direction.

10       Now, defendants say, "Hold on a minute; the wastewater

11   plant, that's unilateral conduct of a third party, and you

12   can't -- that breaks off the jurisdictional train.

13       Let's talk about the cases in which a unilateral conduct

14   of a third-party's been held to bar jurisdiction -- personal

15   jurisdiction, and see how those cases compare to these

16   pollution cases.

17       The baseball bat case, Cockrell versus Hillerich and

18   Bradsby is a great example.  You've got the student who's

19   injured during a baseball game.  He was pitching the ball .

20   The ball was hit with the bat, inures the student.  Student

21   sues the manufacture of the bat, and in issue, they sued this

22   research center in Massachusetts.

23       Now, there are only -- jurisdictional conduct that was

24   alleged was that they certified all of the bats that are sold

25   in the United States as meeting NCAA regulations.  Court held

1    these Massachusetts defendants did not have influence over the

2    bat and manufacturers distribution of the bats to the markets,

3    including South Carolina.  That's not what this case is.

4         Another case the defendants cite:  Helicopteros, Masimal

5    de Columbia, from the U.S. Supreme Court, 1984.  There, the

6    Columbian helicopter operator accepted a check drawn from a

7    Texas bank account.  I should have said, "Accepting a check

8    drawn from a Texas bank account."  That's unilateral conduct

9    from a third-party.  That doesn't subject you to specific

10   personal jurisdiction in Texas.  Again, that's not what this

11   case is.

12        We've got ex parte Aladdin, appealed from the 9th

13   circuit, Horne versus Mobile water and Sewer system from

14   Mississippi, Triad Hunter from -- Versus Eagle Natrium in

15   Ohio.  Those are all cases in which sending your contaminants

16   across state lines with knowledge that they are likely to

17   cause harm there and continuing in it, that subjects you to

18   personal jurisdiction.  That's what's going on in this case.

19        As far as the due process fairness factors, Your Honor,

20   South Carolina has a clear interest in the contamination of

21   its water bodies and the impairment of the South Carolina

22   utilities' ability to provide clean drinking water.  North

23   Carolina surely got an interest that is compatible with that.

24   North Carolina doesn't want its industry sending pollutants

25   into rivers across state lines.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WATSON                     83

1     Defense counsel's already mentioned and agrees their

2  burden is minimal.

3     And, finally, it's more efficient for us to litigate this

4  in this action than have to refile in North Carolina.  That's

5  just silly.

6     Now, I don't know --

7     Are you covering towards the law separately?  Or --

8         UNIDENTIFIED SPEAKER:  I'm happy to talk about it.

9     THE COURT:  He just pointed out that it would be

10 difficult on the trial judge in charging the law to a jury in

11 2-and-a-half to three years from now when this is actually

12 tried, if it gets to that point.  Right?

13    MR. WATSON:  Right.

14    THE COURT:  Okay.  He was just pointing out that that

15 would not be practical, but really didn't argue the conflicts

16 of laws.

17    MR. WATSON:  Well, Your Honor, I think --

18    THE COURT:  I'm happy for you -- I mean, I think that's

19 premature.

20    MR. WATSON:  Yeah.

21    THE COURT:  I think Mr. Willis was just informing the

22 Court that that would be a possibility.

23    MR. WILLIS:  Counsel may be right, Your Honor.  North

24 Carolina substantive law may apply to our clients.  I haven't

25 looked at that carefully.  I think the case could be

1    distinguished, but I don't think Your Honor has to resolve

2    that issue to decide this issue.

3          I do think we agree that it's South Carolina substantive

4    law on personal jurisdiction.

5          THE COURT:  Okay.

6          And, so I'm not going to force you to --

7          MR. WATSON:  Okay.  Well, I'll just say, Your Honor,

8    we're just following what the Supreme Court has said in

9    International Paper versus (indiscernible).  We want to have

10   these common law claims (indiscernible) holds that applying

11   South Carolina common law to a North Carolina entity would

12   preemptive.  That's all we're trying to avoid here.

13         Thank you, Your Honor.

14         THE COURT:  Does the plaintiffs -- or does the plaintiff

15   in this case agree to jurisdictional discovery on this issue?

16   I mean, it just --

17         MR. WATSON:  We can.  I'm not sure how much -- if the

18   Court would like it, we would consent to it.  Yes.

19         THE COURT:  Okay.  All right.  Thank you, sir.  Thank

20   you, Mr. Watson.

21         Anything else, Mr. Willis, on that?

22         MR. WILLIS:  Yes, ma'am.

23         We don't believe jurisdictional discovery is necessary,

24   Your Honor, but if they want to do it, obviously, we'll

25   participate in it.  I mean, that's commonly done in cases

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                          85

1   where personal jurisdiction is established.

2        And, frankly, Your Honor, these arguments aren't silly.

3   This is a substantive issue.  And why -- I mean, the Court

4   needs to be right on this, however it rules.  And if it needs

5   discovery in order to feel more confident in its ruling, then

6   we'll do the discovery.  Because we don't want to build -- I

7   mean, we don't want to lead Your Honor into an error and

8   neither do the plaintiffs.  It's a complicated case.

9        If we build a jurisdictional defect into this case from

10  the get-go, I think 2 or 3 years from now we're going to

11  regret having done that.  Now, obviously, the -- it can be

12  raised then.  I mean, this isn't a raise it now and forever

13  give it up.  If we decide a year from now that there's no

14  personal jurisdiction, Your Honor, can revisit that.  But I

15  just -- you know, I take umbrage on that argument being called

16  silly.  It's not silly.  You know, the argument that Sampson

17  and Red Rock are not in the relevant water shed, that's not in

18  the complaint.  That's interesting to know.  I'd like to look

19  at that.

20       The argument that proximity is somehow relevant, there's

21  really no case law that supports that in South Carolina.  It's

22  proximity of the action out of state is -- if it's in

23  Charlotte as opposed to in Raleigh, that -- it doesn't matter.

24  If it's out of state, it's out of state.

25       You know, as we've already said and has been alleged,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                    86

1  these landfills don't send their wastewater directly into

2  South Carolina.  And the reason that's important, Your Honor,

3  is because the Horne case and the Triad case that the Aladdin

4  Court cited as persuasive -- one's from Mississippi, I think

5  the other one is from a case in the mid-west.  Those cases

6  involve direct discharge by the defendant.  The one was the

7  city of Mobile.  They were sending water to Mississippi

8  because they wanted to get it out of Alabama because a

9  hurricane was coming and it did damage in Mississippi.  And so

10 it was a direct discharge by the defendant to Mississippi.

11      And I think in the other case -- involved direct

12 discharge from a smelter that it was in-- one state into a

13 river in the other state.  Here, we don't have that.  We have

14 this indirect issue.

15      And I hear counsel arguing strongly and effectively,

16 "Defendants knew, defendants knew, defendants knew."

17      Well, that's just not a relevant personal jurisdiction

18 factor.  If it was, World-wide Volkswagen would have been

19 decided differently.  Volkswagen knew that their vehicle could

20 be in a wreck in Oklahoma.  That wasn't enough.

21      The research lab in Massachusetts and the research

22 director knew that Hillerich and Bradsby sold bats all over

23 the country and one of -- a bat that they certified could wind

24 up in South Carolina.  That's not enough.  But the courts talk

25 about this in terms of foreseeability as opposed to knowledge.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. WILLIS                                      87

1    But it's the same thing.

2         But the courts do say, and we cite it in our brief, it's

3    what the defendant does.  It's the act, not what the defendant

4    knows.  And that's why if you look at the -- that's why you

5    have to look at the long-arm statute.  It's all talking about

6    conduct, actions, actions; not knowledge or expectations.

7         One thing I neglected to mention, Your Honor, and I

8    apologize to the Court and to my co-counsel.  Phil Comella,

9    the Taff Law Firm; we're local counsel for them for these

10   landfill cases.  They are regular counsel for GFL, who owns

11   these landfills.  Mr. Camilla is on the call.  We just haven't

12   gotten them -- we still have some information to get them

13   admitted pro-hop.  But they're going to be involved in the

14   case.  And -- but I wanted to note that they are on the call.

15   And I wanted to introduce Mr. Comella and -- to the Court, and

16   also note that we do distinguish the Aladdin case, Your Honor,

17   in our reply brief.

18        And I realize it was only filed yesterday.  And we're

19   happy for -- I want -- I didn't want to sandbag my friends on

20   the other side by coming up with an argument that I hadn't put

21   in my brief.  We're happy to brief this issue of -- with the

22   long-arm strategy.  Five days is fine for us if the Court

23   wants -- if the Court feels like it needs it.  I think that's

24   pretty basic stuff.  I frankly don't think we need to brief

25   it.  But if the Court wants briefing on it, we're happy to

MR. WATSON                                    88

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1    participate in that.

2         Thank you, Your Honor.

3         THE COURT:  Okay.  Thank you very much.

4         And Mr. Comella, I've -- C-o-m-e-l-l-a.  Thank you for

5    joining us.

6         All right.

7         MR. COMELLA:  Thank you.

8         THE COURT:  Anything else, Mr. Watson, before Mr. Willis

9    makes his closing?  And I'll give you, what, Mr. Willis 5

10   days, and then Mr. Watson 5 days.  Would that be fair, since

11   Mr. Watson is stating that that is not included in the amended

12   reply in support of motion to dismiss that was filed on

13   yesterday at 11:30 a.m.  Is that correct?

14        MR. WATSON:  That works for us, Your Honor.

15        THE COURT:  Okay.  So --

16        MR. WILLIS:  Yes, ma'am.  Thank you, Your Honor.

17        THE COURT:  Mr. Willis will have 5 days and then Mr.

18   Watson.

19        MR. WATSON:  I just want to speak briefly on the issue of

20   jurisdictional discovery.  I believe in our brief, we cite

21   some case law about the court's consideration about extrinsic

22   evidence versus complaint allegations that have not been

23   rebutted by such evidence.  Our position is that the relevant

24   jurisdictional allegations are still unrebutted. And we don't

25   believe that jurisdictional discovery is necessary.  However,

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. OSBORNE                    89

1    if the Court disagrees or thinks that it would assist and be

2    determination here of personal jurisdiction over these

3    landfills, but we're happy to agree to it.  I think that's

4    sort of similar.  Yeah.

5         Thank you.

6         THE COURT:  Thank you.  Anything else, Mr. Willis, on

7    that -- for the 12(b)(2)?

8         MR. WILLIS:  No, ma'am.  That's fine.  We'll be happy to

9    brief the long-arm statute issue.  And I -- we finally found

10   something we agree on.  We don't think jurisdictional

11   discovery is necessary.  But if the Court wants us to do it,

12   we will.  I don't think it will take long.

13        Really, Your Honor, in terms of closing, Your Honor knows

14   our positions.  You --

15        THE COURT:  Okay.  Wait a minute.  Just one moment.

16        Anything else from anyone before Mr. Willis makes his

17   closing?

18        Yes, sir.

19        MR. OSBORNE:  Good afternoon, Your Honor.  Robert

20   Osborne, on behalf of Elevate Textiles, INC.

21        I just wanted to be clear.  We filed a --

22        THE COURT:  Can you come up to the mic, please?

23        MR. OSBORNE:  Sure.

24        THE COURT:  I'm sorry.  WebEx is not going to pick you

25   up.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. OSBORNE                                90

1        MR. OSBORNE:  Understood.

2        THE COURT:  Even though your voice carries pretty well.

3        Can you state that again?

4        MR. OSBORNE:  Yes, ma'am.

5        I'm Robert Osborne, on behalf of Elevate Textiles, INC.

6   This was not on the agenda, but Elevate, as a precautionary

7   measure, when it filed its motion to dismiss in December,

8   filed a motion to stay discovery.  Just for a matter of

9   housekeeping.  It's largely moot at this point.  The

10  plaintiffs, as Mr. Willis mentioned yesterday, have not pushed

11  the issue.  I know Mr. Willis addressed this yesterday.  We'd

12  adopt those arguments and simply say we believe it's within

13  the court's discretion to issue a stay until the Court's made

14  their decision on these motions to dismiss.

15       THE COURT:  Okay.  Yes, sir.

16       MR. OSBORNE:  Thank you.

17       THE COURT:  I do see that motion listed.  And I apologize

18  for not calling on you independently.  And you said you're Mr.

19  Osborne?

20       MR. OSBORNE:  Osborne.  That's right.

21       THE COURT:  All right.  Thank you.

22       MR. OSBORNE:  Thank you, Your Honor.

23       THE COURT:  Okay.  Anything else before we have closing?

24  I see some new faces in the crowd but none brave enough to

25  come up and address the Court yet.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

1        Normally, you're not very shy.  So okay.

2        Come on, Mr. Willis, then.  We'll have your closing, sir.

3   Thank you.

4        MR. WILLIS:  Your Honor, I had nothing substantive to

5   add.  Just to thank the Court for your attention and your

6   furious note taking.  This is -- it's been a lot to go

7   through, probably the longest motion to dismiss hearing I've

8   ever participated in my 42 years of being a lawyer.  And I

9   just really appreciate the Court for giving us the time and

10  effort.  And that's just what being a lawyer is all about.

11  And we've enjoyed it.

12       THE COURT:  Okay.  Thank you very much.

13       MR. WILLIS:  Thank you.

14       THE COURT:  And Thank you all for your preparation, your

15  efficiency.

16       Yes, sir?  Mr. Tapley?

17       MR. TAPLEY:  I just wanted to offer a closing, too, Your

18  Honor.

19       Your Honor, I'll be brief.  A lot of facts, frankly, got

20  made up here in the past two days.  And they certainly are

21  outside the four corners of the complaints at issue.

22       Your Honor, these cases are not exactly simple, but

23  they're not impossible, either.  And a lot of comments were

24  made that somehow these cases are undoable or unworkable.

25  Well, not to boast, Your Honor, but I tried one of these

1  cases.  I mean, we're still early in the U.S. history of PFAS

2  litigation.

3      But in 2020, before any of these regulations came out

4  from EPA, I tried a case for 7 weeks in front of a federal

5  jury in Ohio on behalf of a man who had cancer that was caused

6  by PFAS.  He got a $50 million verdict from the jury, and it

7  was affirmed on appeal all the way to the U.S. Supreme Court.

8  I say that because I know there haven't been many of these

9  cases tried.  And I think I know every lawyer whose tried one.

10  And I don't see one of them in this courtroom.  But it's been

11  done.  And it's doable.

12      Your Honor, we also did our homework before we filed

13  these cases.  And we've done testing with our experts.  These

14  defendants did and are doing what we alleged they've done.

15  And I think the one fact that sort of has to get cleared up

16  that was repeated numerous times was that somehow, everybody

17  in the community is adding PFAS to the water when they flush

18  the toilets in their home.  That's not what I said and that's

19  not what I meant.

20      It is true that almost every toilet that's flushed in a

21  home in South Carolina releases PFAS.  And it's because people

22  in South Carolina are polluted with PFAS, these defendants'

23  PFAS.  Human beings are what's known as an environmental sink

24  for PFAS.  Our bodies absorb it.  It's a foreign chemicals not

25  known in nature before the 1930s.  Our bodies have a hard time

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

MR. TAPLEY                              93

1    processing it, don't know what to do with it.  And so it

2    builds up in the body until the body can finally excrete it.

3         But it's not because it's coming from somewhere other

4    than the predominant source for people, which is drinking

5    water.  And that's why we now have a drinking water

6    regulation.

7         Finally, Your Honor, I heard that we should wait for

8    everything to become more certain and wait and let Grand

9    Strand find out what its regulators are going to do about this

10   and what they're going to tell them.

11        Well, I can tell you, you can ask Grand Strand right now.

12   They know what their regulator has told them to do.  And they

13   know what they're going to do, which is meet this requirement

14   to be in compliance by 2029.  And they're going to spend huge

15   sums of money getting prepared and building the infrastructure

16   that will allow them to do that.  There's nothing uncertain

17   about my client's obligations from what the regulators have

18   told them.  And they know what they've got to do in order to

19   stay in compliance.

20        Thank you, Your Honor.

21        THE COURT:  Thank you.

22        Anything else?

23        MR. WILLIS:  No, Your Honor.  We'll save our jury

24   argument for when we're in front of the jury.  But we look

25   forward from learning from Mr. Tarpley and help try one of

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

94

1    these cases.

2         THE COURT:  Okay.  Thank you.

3         All right.  And so from a practical standpoint, the

4    business end of it, I'm going to review everything.  That's

5    the beauty of WebEx.  I can review you all; I can review parts

6    of it.  I've made notes as to the beginning and end of the

7    timing of everyone's arguments.  I've numbered your arguments.

8    And so I will issue probably instructions for orders.  And --

9    but it won't be a one-line instruction.  And I will do that as

10   quickly as I can.  I think we've had about 8 or 9 hours of

11   court.  And so it may take a while for me to go back through

12   it, listen to it, and make more notes about it.

13        I also am waiting.  Yesterday, there's a 10-day deadline

14   from Mr. Weatherholtz.  I believe he requested an opportunity

15   to -- he and Mr. Lutz are on my sheet with red checkmarks to

16   get me something within 10 days.  And now, Mr. Willis and Mr.

17   Watson, also, are that status.

18        If you get it in sooner, that's better.

19        Okay.  I start a new docket next week, civil jury trials

20   here.  And so this just happened to be a chambers week for me,

21   which is fortunate.  So I'll devote some time to this today

22   and tomorrow.

23        Thank you very much.  That will conclude the hearing.

24             (At 02:59, the hearing concluded.)

25   | **END OF TRANSCRIPT.** |

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

95

CERTIFICATE OF TRANSCRIBER

State of South Carolina

County of Horry

    I, BARBIE TEBOE, a court-approved transcriber, do hereby certify that the foregoing is a true, accurate, and complete Transcript of Record of the proceedings and evidence introduced in the trial of the captioned case, relative appeal, in the Court of General Sessions for Horry County, South Carolina, on the 12th day of March, 2025.

    I further certify that I am neither of kin, counsel, nor interest to any party hereto.

March 25, 2025

Barbie Teboe,
Transcriber

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

South Carolina Public Service Authority, a/k/a
Santee-Cooper,

*Plaintiff*,

v.

China Jushi USA Corporation; Jushi USA Fiberglass
Co., Ltd.; Lindau Chemicals, Inc.; Milliken &
Company; and Waste Management of South
Carolina, Inc.,

*Defendants*.

C.A. No. 2024-CP-08-03336

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff, South Carolina Public Service Authority ("Plaintiff" or "Santee-Cooper"), hereby

responds to the pending motions to dismiss filed by Defendants China Jushi USA Corporation and

Jushi USA Fiberglass Co., Ltd. (together, "Jushi"); Lindau Chemicals, Inc. ("Lindau"); Milliken

and Company ("Milliken"); and Waste Management of South Carolina, Inc. ("WMSC").[1]

## I.  FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Broad River, Saluda

River, Congaree River, Santee River, Lake Marion, and Lake Moultrie (together, the "Santee River

Basin") with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiff relies on these vital

---

[1] Defendants filed separate memoranda in support of their motions to dismiss. In citations,
Plaintiff abbreviates these memoranda to "MIS."

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

water sources to supply potable drinking water to local water utilities, which in turn supply this water to tens of thousands of South Carolinians. Compl., ¶¶ 1-3. Defendants, operators of industrial facilities and a landfill, have systematically discharged PFAS into the rivers that feed Lake Marion and Lake Moultrie, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiff's use of its properties, including its water treatment and distribution infrastructure. *Id.* at ¶¶ 4-6, 42-48. Defendants' pollution has rendered Plaintiff's water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 49-52.

Plaintiff is a public corporation and agency of the State of South Carolina responsible for supplying safe drinking water to several local water utilities in Berkeley County, Calhoun County, Dorchester County, and Orangeburg County. *Id.* at ¶¶ 2-3, 13-16. Via these wholesale customers, Plaintiff supplies drinking water to almost a quarter-million South Carolinians. *Id.* at ¶¶ 2, 15-16. Plaintiff operates two surface water treatment plants ("SWTPs"): the Lake Marion SWTP, which services the Lake Marion Regional Water System, and the Lake Moultrie SWTP, which services the Lake Moultrie Regional Water System. *Id.* at ¶ 14. The Lake Marion SWTP draws water from Lake Marion, and downstream from it, the Lake Moultrie SWTP draws water from Lake Moultrie. *Id.* Both lakes are sustained by the Santee River Basin system. *Id.* at ¶ 42.

Upstream from Plaintiff, at various locations within the Santee River Basin, Defendants—companies engaged in textile, chemical, and materials manufacturing—have utilized products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater to municipal wastewater treatment plants ("WWTPs"). *Id.* at ¶¶ 4-5, 17-20, 45. In addition, one Defendant is engaged in waste management operations that generate PFAS-

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

containing leachate wastewater, which it likewise discharges to a municipal WWTP. *Id.* at ¶¶ 20. The receiving WWTPs use conventional methods that are ineffective at treating PFAS. *Id.* at ¶¶ 17-20, 48. Defendants' PFAS-contaminated wastewater passes through these treatment works into the Broad, Saluda, and Congaree Rivers unabated, flowing downstream to Lake Marion and Lake Moultrie. *Id.* at ¶¶ 42-48.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiff's. *Id.* at ¶¶ 48, 52. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id.* at ¶¶ 5-6, 21-22. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id.* at ¶¶ 22, 24, 26. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id.* at ¶¶ 21-22.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id.* at ¶¶ 27, 32-34, 36. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), in 2009 and 2016. *Id.* at ¶¶ 30-32. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id.* at ¶¶ 33-34. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

PFOS and at 10 ppt for perfluorononanoic ("PFNA"), perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id.* at ¶¶ 39-40. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id.* at ¶¶ 35-36, 40. MCL compliance is due by April 29, 2029. *Id.* at ¶ 41.

As a direct and foreseeable result of Defendants' improper, ongoing use and disposal of PFAS, Plaintiff's properties have been contaminated by Defendants' PFAS—including its land, SWTPs, and supporting infrastructure. *Id.* at ¶¶ 49-52. Worse, Plaintiff cannot currently provide potable drinking water that is free of these toxic chemicals. *Id.* Plaintiff's water treatment systems were never designed to, and in fact do not, remove PFAS. *Id.* at ¶¶ 6, 49-52. Plaintiff now suffers, and will continue to suffer, significant property injuries resulting in enormous operational and financial burdens. *Id.* at ¶¶ 49-52. Plaintiff seeks both monetary and equitable relief to remedy the past, present, and future PFAS contamination of its properties to protect its community from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6-7, 49-52, 62-63, 74-75, Prayer for Relief.

## II. ARGUMENT

The overwhelming majority of Defendants' arguments mirror those asserted by defendants in the related lawsuits, *Greenwood Commissioners of Public Works v. Cone Mills Receiver, LLC et al.*, C.A. No. 2024-CP-24-000735 (hereinafter "*Greenwood*"); *Laurens County Water and Sewer Commission v. Cone Mills Receiver, LLC et al.*, 2024-CP-30-00734 (hereinafter "*Laurens*"); and *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al.*, C.A. No. 2024-CP-26-05523 (hereinafter "*GSWSA*"). In the interest of efficiency and to avoid further

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

redundancy, Plaintiff incorporates the standard of review and arguments contained in the consolidated opposition brief filed by Plaintiffs Greenwood Commissioners of Public Works and Laurens County Water and Sewer Authority ("GW/L Opp'n," attached as **Ex. 1**), the consolidated opposition brief filed by Plaintiff Grand Strand Water and Sewer Authority ("GSWSA Opp'n," attached as **Ex. 2**), and the supplemental memorandum filed by Plaintiffs Greenwood Commissioners of Public Works and Laurens County Water and Sewer Authority ("GW/L Supp. Memo.," attached as **Ex. 3**), as well as the arguments made by those Plaintiffs' counsel at the motions hearings on March 11 and 12, 2025 (Mar. 11, 2025 Hr'g Tr., attached as **Ex. 4**; Mar. 12, 2025 Hr'g Tr., attached as **Ex. 5**). Santee-Cooper further incorporates by reference the arguments contained in the responses in opposition filed by Plaintiffs Gaffney Board of Public Works and the City of Union. Where Defendants in the present lawsuit have raised new arguments distinct from those raised previously in the aforementioned litigation, Plaintiff addresses their arguments in Section II.B of this Opposition.

**A.     Defendants' motions fail for the same reasons explained in other plaintiffs' oppositions to dismissal.**

Defendants argue that Plaintiff's case should be dismissed as unripe; that the trespass claim fails because PFAS are not tangible, and their trespasses were authorized and not intentional; that the public and private nuisance claims fail because they had no control over the nuisance, and moreover, that Plaintiff cannot base its private nuisance claim on the contamination of public waterways; that the negligence claim fails because of a lack of duty, breach, proximate causation, and actionable damages; and furthermore, that Plaintiff's recovery is barred by the free public services doctrine (also known as the municipal cost recovery rule).

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

Again, as with defendants' motions to dismiss *Greenwood*, *Laurens*, and *GSWSA*, many of these arguments rely on mischaracterizations of the plain allegations and substance of Plaintiff's Complaint. Defendants' recurring arguments fail for the following reasons:

Plaintiff's claims are ripe. Defendants' arguments that this case is unripe rest upon the false premise, contrary to the pleadings, that Plaintiff's only injuries are its future need to comply with the PFAS MCLs. *See* Lindau MIS, at 16-17; Milliken MIS, at 2-6; WMSC MIS, at 2-5. These arguments fail because Plaintiff expressly and repeatedly pleads past, present, and future injuries to its properties from Defendants' PFAS contamination. *See* Compl., ¶¶ 2, 5-7, 46-47, 49-50, 57-60, 69-70, 84-85, 91; GW/L Opp'n, at § III.A; GSWSA Opp'n, at § III.A. By invoking the possibility that the PFAS MCLs might be revoked in the future, Defendants moreover turn the Article III justiciability analysis on its head by speculating that Plaintiff's already-ripe case might become moot if the regulations change. *See* Lindau MIS, at 17; Milliken MIS, at 5-6; WMSC MIS, at 4-5; GW/L Opp'n, at § III.A.2; GSWSA Opp'n, at § III.A.2; *see also* WMSC MIS, at 2 (speculating that Plaintiff's claims might be moot by 2029 because of changes in "PFAS contributions (such as would results [sic] from the installation of third-party wastewater pretreatment systems)," "river flow rates," or "any other developments.").

Defendants intentionally invaded Plaintiff's property with tangible PFAS-contaminated water, to which Plaintiff did not consent. Defendants attack Plaintiff's trespass claim on the grounds that (1) PFAS are "intangible matter" that cannot give rise to a trespass; (2) Defendants did not intend their PFAS to intrude on Plaintiff's property because the PFAS transits through third-party WWTPs before the chemicals are "voluntarily" brought onto Plaintiff's property via the operation of Plaintiff's water pumps; and (3) Plaintiff lacks "exclusive possession" of the public waterways from which it withdrawals water for treatment. *See* Jushi MIS, at 9-11; Lindau MIS, at

6

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

8-12; Milliken MIS, at 11-14; WMSC MIS, at 7-10. These arguments have previously been raised by defendants in *Greenwood*, *Laurens*, and *GSWSA*, and fail for the same reasons detailed in those plaintiffs' oppositions. *See* GW/L Opp'n, at § III.B; GSWSA Opp'n, at § III.B.

In brief, South Carolina law is clear that intrusions of chemically contaminated water—such as Defendants' PFAS-contaminated water—constitute tangible, physical invasions. *See* GW/L Opp'n, at § III.B.1; GSWSA Opp'n, at § III.B.1; *see also* Compl., ¶¶ 79-84 (referring to invasions of Plaintiff's properties by "water contaminated with high concentrations of these Defendants' PFAS," "PFAS-contaminated leachate," "water contaminated with [MCL PFAS]," "PFAS-contaminated water," and "PFAS-containing wastewater"). With respect to the intentional, affirmative act required to sustain a trespass claim, a trespasser need only "intend the act which constitutes the unwarranted entry onto another's land"—he need not intend the damaging consequence of his entry." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). Plaintiff meets this requirement by alleging that Defendants willfully discharged their PFAS-contaminated wastewater when they knew or should have known that their receiving WWTPs were incapable of removing Defendants' PFAS from the wastewater before it passed through the WWTPs into the Santee River Basin upstream from Plaintiff; that Plaintiff draws water from Lakes Marion and Moultrie for treatment into drinking water; that the water Plaintiff withdraws from these sources is contaminated with Defendants' PFAS; and that Defendants' PFAS-contaminated water invades Plaintiff's property. *See* Compl., ¶¶ 45-48, 79-80; GW/L Opp'n, at § III.B.2; GSWSA Opp'n, at § III.B.2. Moreover, there can be no genuine dispute that Plaintiff did *not* consent to or authorize Defendants' invasion by withdrawing water from Lakes Marion

and Moultrie for treatment (i.e., by performing Plaintiff's essential function).[2] *See* GW/L Opp'n, at 14-15; GSWSA Opp'n, at 15

Finally, Defendants' argument that Plaintiff lacks a right of exclusive possession to the surface waters from which it draws water for treatment is inapposite because Plaintiff never alleged a trespass of those waters, but instead that Defendants trespassed "into Plaintiff's properties, including its land, SWTPs, and related buildings, improvements, and equipment that make up its water transmission system."[3] Compl., ¶ 84; *see* GW/L Opp'n, at 12 n.8; GWSA Opp'n, at 13 n.9.

<u>Defendants had the requisite control, and their contamination of public waters has also contaminated Plaintiff's property, thereby providing standing to sue for both public and private</u>

---

[2] Jushi and Lindau also frame the actions of their receiving WWTP and Plaintiff as breaking causation, citing *Snow*, 305 S.C. at 554, 409 S.E.2d at 802, for the proposition that their conduct must be the "immediate cause of the entry" on Plaintiff's property. Jushi MIS, at 10-11; Lindau MIS, at 10. These Defendants misconstrue *Snow*. The passage they quote states in full: "In this case, the immediate cause of the entry on the Snows' land was the discharge of water from the leaking pipe joint. However, the City did not intentionally discharge the water." *Snow*, 305 S.C. at 554, 409 S.E.2d at 802. Indeed, the accurate statement of the causation requirement for trespass is provided earlier: "To constitute an actionable trespass, . . . there must be an affirmative act, the invasion of land must be intentional, and *the harm caused must be the direct result of that invasion*." *Id.* at 553, 409 S.E.2d at 802 (emphasis added). That is, the requisite direct causal connection is between the *invasion* and *the harm*—not the defendant's affirmative act and the invasion, as Jushi and Lindau wrongly contend.

These Defendants' position furthermore cannot be reconciled with prior cases allowing trespass claims to proceed under South Carolina law where the causal chain between defendants' intentional conduct and the invasion of the plaintiff's property was similarly mediated by intervening factors. *See, e.g.*, *Weatherford v. E.I. DuPont de Nemours & Co.*, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023) (trespass premised on defendant PFAS manufacturers supplying PFAS to textile mill, which then discharged the PFAS to surface waters and also disposed of resulting PFAS-contaminated wastewater sludge on farmland, thereby contaminating plaintiffs' properties); *Comm'rs of Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *7-8 (D.S.C. Dec. 13, 2021) (trespass premised on defendant manufacturers and vendors of flushable wipes misleadingly advertising the products as "flushable," and the products then being flushed down toilets by consumers to enter plaintiff's sewer systems).

[3] It should also be noted that Plaintiff owns the lake beds beneath the waters of Lake Marion and Lake Moultrie. Compl., ¶¶ 14, 55.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

nuisance. Defendants uniformly disclaim having control over the PFAS-laden wastewater they discharge because this contaminated wastewater first goes to third-party WWTPs before entering the surface waters of the Santee River Basin. *See* Jushi MIS, at 7-8; Lindau MIS, at 5-7; Milliken MIS, at 8-10; WMSC MIS, at 5-6. But Defendants plainly do own and control the facilities where they use PFAS-containing products, generate PFAS-laden wastewater, and from which they continually discharge their contaminated wastewater to the WWTPs—all the time knowing that it passes through the WWTPs to flow downstream to impact Plaintiff's properties. *See* Compl., ¶¶ 17-20, 45-48. Defendants' attempt to shift blame to their receiving WWTPs (which are merely passive conduits for their PFAS) as controlling the source of the nuisance is blind to the pleadings and fundamentally misapplies *Clark v. Greenville County*, 313 S.C. 205, 437 S.E.2d 117 (1993). *See* GW/L Opp'n, at § III.C.1; GSWSA Opp'n, at § III.C.1.

Defendants also argue Plaintiff's private nuisance claim must fail because a private nuisance cannot be based on the contamination of public waterways. *See* Jushi MIS, at 9; Lindau MIS, at 7-8; Milliken MIS, at 10-11; WMSC MIS, at 6-7. This argument ignores Plaintiff's unambiguous pleadings that its lands, SWTPs, and related infrastructure—i.e., Plaintiff's *property*—has been harmed by Defendants' PFAS contamination. *See* Compl., ¶¶ 2, 5-7, 46-47, 49-50, 57-60. Indeed, because of this contamination, "Plaintiff cannot use its properties and property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs." *Id.* at ¶ 49. These allegations clearly demonstrate that Defendants have directly and substantially interfered with Plaintiff's use and enjoyment of its properties and support a private nuisance claim. *See* GW/L Opp'n, at ¶ III.C.2; GSWSA Opp'n, at § III.C.3. Moreover, these property injuries constitute "special injuries" that provide Plaintiff standing to sue to abate the public nuisance posed by Defendants' contamination. *See id.*

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

<u>Plaintiff ably pleads all four elements of negligence</u>. South Carolina law recognizes that once a party voluntarily undertakes an act, it has a duty to exercise due care in doing so. *See* GW/L Opp'n, at § III.D.1; GSWSA Opp'n, at § III.D.1; *see also* GW/L Supp. Memo. (regarding duty). Defendants, however, misleadingly conflate this duty, which attaches when one undertakes an act, with the *affirmative* duty to protect another from harm inflicted by a third party, which only arises under certain circumstances. *See id.*; Jushi MIS, at 3-4; Lindau MIS, at 13-14; Milliken MIS, at 7-8; WMSC MIS, at 10-11. By voluntarily engaging in the use and disposal of PFAS in their various industries, Defendants were required under South Carolina law to do so with due care—this is the duty underpinning Plaintiff's negligence claim. *See* Compl., ¶ 88; GW/L Opp'n, at § III.D.1; GSWSA Opp'n, at § III.D.1.

Jushi implausibly argues that "Plaintiff also alleges no facts that would support a conclusion that Jushi USA breached any duty owed Plaintiff." Jushi MIS, at 4. However, the Complaint states that the duty Jushi and other Defendants owed to Plaintiff expressly "includes preventing the direct and/or indirect discharge of [MCL] PFAS into surface waters upstream of Plaintiff's SWTPs." Compl., ¶ 88. Of course, Plaintiff goes on to allege that Defendants failed to do exactly this, thereby breaching their duties to Plaintiff. *See id.* at ¶¶ 17-20, 45, 49; GW/L Opp'n, at § III.D.2.

Plaintiff also sufficiently pleads causation in fact and legal cause to satisfy the requirement of proximate causation—contrary to Jushi and Lindau's protestations that the causal chain is "too remote and attenuated," broken by the Columbia WWTP's intervening actions, and only completed by Plaintiff's withdrawal of the water they polluted. *See* GW/L Opp'n, at § III.D.3; GSWSA Opp'n, at § III.D.2; Jushi MIS, at 5-6; Lindau MIS, at 14-16. But for Defendants' discharges of persistent, "man-made chemicals that do not occur naturally in the environment," Plaintiff alleges, those

10

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

PFAS would not be present in the waterways to flow downstream to contaminate Plaintiff's property. Compl., ¶ 21; *see id.* at ¶¶ 17-20, 44-46, 50. The Columbia WWTP's and other WWTPs' respective receipt of Defendants' contaminated wastewater prior to surface-water discharge do not supersede Defendants' liability because, as the Complaint states, Defendants knew, or at least should have known, that the PFAS they put into their wastewater resisted the treatment methods used by those WWTPs. Compl., at ¶ 48. Finally, as to Defendants' contention that Plaintiff would not be injured but for its withdrawal of water contaminated with their PFAS, this radical position strains credulity. What Defendants are saying is effectively this: in order to avoid bringing their PFAS into Plaintiff's water treatment systems, Plaintiff should have ceased its essential function of withdrawing water. But in so doing, Plaintiff would have arrived at the same result—being unable to use its property for the treatment and distribution of drinking water because of Defendants' PFAS contamination. *See also* GW/L Opp'n, at § III.D.5 (addressing the related implication that Plaintiff has assumed the risk by withdrawing water); GSWSA Opp'n, at § III.D.4 (same).

Lastly, Defendants argue that "Plaintiff fails to allege any identified damage or physical injury to its property." Jushi MIS, at 6; *see id.* at 6-7; Lindau MIS, at 16; WMSC MIS, at 11. This argument is baseless. As the Complaint makes clear, Plaintiff has suffered real past, present, and future property injuries as a result of Defendants putting their persistent, bioaccumulative, and toxic chemicals onto Plaintiff's lands and into its SWTP and other water treatment infrastructure. *See* Compl., ¶¶ 2, 5-7, 46-47, 49-50, 57-60, 69-70, 84-85, 91; GW/L Opp'n, at § III.D.4; GSWSA Opp'n, at § III.D.3.

<u>Plaintiff's provision of drinking water to paying customers is neither "free" nor "public"</u> <u>as contemplated by the free public services doctrine</u>. Like the defendants in *Greenwood*, *Laurens*,

11

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

and *GSWSA*, Defendants here focus only on Plaintiff's identity as a governmental entity to say the free public service doctrine (also known as the municipal cost recovery rule) bars Plaintiff's claims. *See* Jushi MIS, at 11-12; Lindau MIS, at 17-18; Milliken MIS, at 6. In so doing, they ignore "the nature of the cost"—which *together* with "the identity of the claimant" operate to preclude tort recovery under the doctrine. *Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983). Unlike the costs of fire and police services, for instance, which are allocated across the public via taxes, the Legislature has authorized Santee-Cooper to charge customers within its service area for the water it treats and supplies. *See* S.C. Code Ann. § 58-31-30(A). Hence, the costs of the enhanced water treatment for which Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021). The free public services doctrine (if even ultimately recognized in South Carolina[4]) does not bar Plaintiff's recovery. *See* GW/L Opp'n, at § III.E; GSWSA Opp'n, at § III.E.

## B.     New arguments raised by Defendants also fail.

### 1.     Jushi's argument that it did not proximately cause the nuisances at issue fails for the same reasons as Defendants' proximate causation argument against the negligence claim.

Jushi argues that Plaintiff fails to show proximate causation in support of its nuisance claims for the same reasons that Plaintiff also purportedly fails to show proximate causation with respect to its negligence claim—i.e., because of the receipt of Jushi's wastewater by its receiving WWTP and Plaintiff's withdrawal of contaminated water from Lakes Marion and Moultrie. *See* Jushi MIS, at 8-9. Consequently, this argument fails for the same reasons Jushi's proximate causation argument in the negligence context also fails. *See supra*; GW/L Opp'n, at §§ III.D.3 &

---

[4] Lindau at least acknowledges that "the application of this doctrine in South Carolina does not appear to have been specifically addressed by South Carolina appellate courts." Lindau MIS, at 18.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

III.D.5; GSWSA Opp'n, at §§ III.D.2 and III.D.4; *see also* GW/L Opp'n, at 18 (further clarifying that the receiving WWTPs do not constitute a superseding cause that extinguishes defendants' control of the nuisance); GSWSA Opp'n, at 18-19 (same).

### 2. Milliken's argument about its former Monarch Mill facility ignores the standard of review on a motion to dismiss.

In a footnote, Milliken complains that Plaintiff's allegations concerning Monarch Mill, a now defunct, former textile facility located in Union, South Carolina, fail to demonstrate "a substantial and unreasonable interference" with Plaintiff's use and enjoyment of its property, emphasizing the facility is "more than 100 miles away" from Plaintiff. Milliken MIS, at 10 n.9 (quoting *FOC Lawshe Ltd. P'ship v. Int'l Paper Co.*, 352 S.C. 408, 413, 574 S.E.2d 228, 231 (Ct. App. 2002)). Milliken's merits-based dispute should be disregarded because it improperly ignores the standard of review applicable to a Rule 12(b)(6) motion: "In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006); *see also, e.g.*, *Gressette v. S.C. Elec. and Gas Co.*, 370 S.C. 377, 378-79, 635 S.E.2d 538, 538 (2006) ("A motion to dismiss pursuant to Rule 12(b)(6) must be based solely on the allegations set forth in the complaint and we must presume all well-pled facts to be true.").

Here, Plaintiff pleads that "[w]hile the Monarch Mill is no longer operational, wastewater lagoons on the property remain contaminated with [MCL] PFAS and their precursors, which discharge from the property to tributaries upstream of the Broad River, Lake Marion, and Lake Moultrie," and that Milliken's PFAS from this facility "resist environmental degradation, flow downstream from the Broad . . . River[], and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs." Compl., ¶ 19. Plaintiff's SWTPs cannot filter PFAS, and consequently, the PFAS contamination to which the Monarch Mill

13

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

contributes interferes with Plaintiff's ability to use these SWTPs to treat and supply safe, clean drinking water that is free from PFAS. *See id.* ¶ 5-7, 49, 51, 56-63. Taking these well-pled facts as true, Plaintiff plainly alleges a substantial and unreasonable interference with the use and enjoyment of its properties that should survive Milliken's motion to dismiss.

### 3. Lindau's generalized argument against the negligence claim grossly mischaracterizes Plaintiff's case.

Before launching into its arguments about Plaintiff's purported inability to establish duty, proximate causation, and actionable damages for its negligence claim, Lindau invites the Court to "consider the broader context of the situation here and recognize that it cannot possibly give rise to a negligence claim." Lindau MIS, at 12. What follows is a gross mischaracterization of the case that Plaintiff has pled against Lindau:

> Plaintiff alleges that (i.) a facility fifty (50) miles away from the Plaintiff's surface water treatment plant (ii.) may have used or unknowingly discharged miniscule amounts of certain chemical compounds, (iii.) which chemical compounds have only recently been discovered, (iv.) and the discharge of which was not prohibited by the facility's discharge permits, (v.) in water sent to a licensed municipal wastewater treatment plant, (vi.) and that these actions constituted legal negligence in such a way as to injure the Plaintiff. On its face, this allegation betrays credibility.

*Id.* Like Milliken's argument pertaining to its Monarch Mill, Lindau's merits-based attack should also be disregarded. Lindau ignores and flat-out disputes Plaintiff's well-pled facts. As to Lindau's incredulity that its PFAS could travel fifty miles downstream to impact Plaintiff's SWTPs, as expressed in point (i), the Complaint makes clear that PFAS are "persisten[t] in the environment," "have no known environmental breakdown mechanism," and are "highly mobile and water soluble." Compl. ¶¶ 22, 26. As to point (ii), Plaintiff does not allege Lindau's facility "may have used or unknowingly discharged miniscule amounts of" PFAS. Lindau MIS, at 12. Quite the opposite: Plaintiff alleges that Lindau *did* and *continues to* use and discharge PFAS *with knowledge* that those PFAS cannot be treated by its receiving WWTP and that Lindau's PFAS-contaminated

wastewater "contaminates surface waters and the water Plaintiff draws for its customers." Compl., ¶¶ 18, 48. As to point (iii), while Plaintiff *itself* has only "recently discovered" that Defendants have discharged and continue to discharge products that contain or degrade to . . . PFAS to surface waters" upstream from Plaintiff's facilities, *id.* ¶ 2, nothing in the Complaint suggests that PFAS "have only recently been discovered" from the perspective of Lindau, Lindau MIS, at 12. Moreover, Plaintiff alleges that "[u]nlike Plaintiff, Defendants knew well before EPA's publications that PFOA, PFOS, PFHxS, PFBS, and GenX Chemicals are hazardous to human health." Compl., ¶ 52 Finally, Lindau's contention in point (iv) that its PFAS discharges were "not prohibited by the facility's discharge permits," finds no support anywhere in the Complaint, which does not allege one way or another that Lindau's discharges of PFAS were authorized by its industrial user permit.[5] Lindau MIS, at 12.

###### 4.      Lindau's *parens patriae* argument is a red herring.

Lindau argues that Plaintiff lacks *parens patriae* standing to sue "on behalf of 'Plaintiff's customers, and . . . all residents in Plaintiff's community.'" Lindau MIS, at 17 (quoting Compl., ¶ 68). But Plaintiff neither invokes nor requires *parens patriae* under the present circumstances because, as stated *supra* and explained in greater detail in prior briefing in related litigation, Plaintiff has sustained special injuries that entitle it to abate the public nuisance impacting

---

[5] In fact, Lindau's discharges of PFAS almost certainty violate its industrial user permit. As an industrial user of the Columbia WWTP, Lindau is subject to pretreatment regulations under the Clean Water Act that prohibit the discharge of "any pollutant(s)" that "pass through" the receiving WWTP—referring to when an industrial user's discharge "alone or in conjunction with a discharge or discharges from other sources" causes a violation of the receiving WWTP's National Pollutant Discharge Elimination System ("NPDES") permit. 40 C.F.R. §§ 403.3(p), 403.5(a)(1). As the U.S. Supreme Court has recently confirmed, NPDES "makes it unlawful to discharge pollutants into covered bodies of water *unless authorized by permit.*" *San Francisco v. EPA*, 145 S. Ct. 704, 712 (2025). Therefore, unless Lindau and Columbia's respective permits expressly authorize them to discharge PFAS, Lindau's permit prohibits it from discharging PFAS that pass through Columbia's WWTP into the Congaree River.

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Plaintiff's customers and community. *See* GW/L Opp'n, at § III.C.2; GSWSA Opp'n, at § III.C.2; *see also* Compl., ¶ 69.

### III. CONCLUSION

For the reasons provided above and in the incorporated opposition briefs by plaintiffs in the *Greenwood*, *Laurens*, and *GSWSA* cases, Plaintiff respectfully asks the Court to deny Defendants' motions in full and allow Plaintiff's claims to proceed.

*Signature Page Follows*

Respectfully submitted,

 /s/ John B. White. Jr.
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

F. Jerome Tapley (*pro hac vice*)
Hirlye R. "Ryan" Lutz, III (*pro hac vice*)
Brett C. Thompson (*pro hac vice*)
R. Akira Watson (*pro hac vice*)
Hunter Phares (S.C. Bar No. 107158)
Hannah C. Caldwell (*pro hac vice*)
Hamilton Jordan (*pro hac vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
Phone: 205-328-2200
Fax: 205-324-7896
rlutz@corywatson.com
jtapley@corywatson.com
bthompson@corywatson.com
awatson@corywatson.com
hphares@corywatson.com
hcaldwell@corywatson.com
hjordan@corywatson.com

*Attorneys for Plaintiffs*

March 28, 2025

ELECTRONICALLY FILED - 2025 Mar 28 2:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Mar 31 8:59 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN RE: PFAS LITIGATION
COORDINATED DOCKET

South Carolina Public Service Authority,
a/k/a Santee Cooper, an agency of the State
of South Carolina

               Plaintiff,

    v.

China Jushi USA Corporation, et.al

               Defendants.

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

Case No. 2024-CP-08-03336

**DEFENDANT LINDAU CHEMICALS, INC.'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Defendant Lindau Chemicals, Inc. (hereinafter "Lindau") submits this reply to Plaintiff's Response in Opposition to Defendants' Motions to Dismiss. In response to Lindau's Motion to Dismiss contending that Plaintiff failed to state any facts to support it unsubstantiated claim that Lindau used PFAS products, Plaintiff cannot point to one fact supporting its bald allegation and, consequently, the case against Lindau should be dismissed.

**I.   This Court should dismiss Plaintiff's Complaint against Lindau – in its entirety – because Plaintiff does not plead sufficient factual matter to support its conclusion that Lindau has used or continues to use PFAS-containing products.**

Each of the claims asserted by South Carolina Public Service Authority, a/k/a Santee Cooper (hereinafter "Santee Cooper") against Lindau relies on Santee Cooper's unsupported and conclusory allegation that Lindau uses PFAS-containing products.[1] And when addressing Lindau's

---

[1] As stated in its Motion to Dismiss and Memorandum in Support of Motion, Lindau is not aware of PFAS chemicals ever being used in its production process and is not aware of any of its products that contain PFAS.

1

ELECTRONICALLY FILED - 2025 Mar 31 8:59 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

arguments specifically in its Opposition to Defendants' Motions to Dismiss, Santee Cooper repeats its unsupported allegation about Lindau's alleged PFAS use:

> Page 14: "Plaintiff alleges that Lindau *did* and *continues to* use and discharge PFAS…." (italics in original)

But the problem with Santee Cooper's conclusion about Lindau's supposed PFAS use is that these are the type of "mere statement[s] of legal conclusions" that South Carolina courts have long recognized "can never be made the foundation of an action." *Talbott v. Padgett*, 30 S.C. 167, 8 S.E. 845, 847 (1899). Instead, to survive dismissal, "the facts upon which the legal conclusions rest must be given." *Id.*

"It is axiomatic that no cause of action is stated absent sufficient allegations of fact." *Akers v. Hard*, 275 S.C. 100, 102, 267 S.E.2d 536, 537 (1980). Under Rule 12(b)(6), an allegation supported by factual content is deemed a "well-pled" allegation and accepted as true and construed in the light most favorable to the plaintiff. But "bare assertion[s]" are "not" "factual allegation[s]" but instead, "merely" "conclusion[s] of law." *Akers*, 275 S.C. at 102, 267 S.E.2d at 537. When a plaintiff fails to state sufficient facts, no "inference can be drawn." *Id.* In other words, "legal conclusions cannot be substituted for ultimate facts." *Stroud v. Riddle*, 260 S.C. 99, 103, 194 S.E.2d 235, 237 (1973).

While the Court's ruling on Lindau's Motion to Dismiss must be based on the allegations set forth on the face of Santee Cooper's Complaint and detailed factual allegations are not required, Rules 8(a)(2) and 12(b)(6) require more than mere conclusions. "[E]ven under the liberal standard applicable on a motion to dismiss, a mere conclusory allegation, *unsupported by any particularized allegations of fact*, is insufficient." *Skywaves I Corp. v. Branch Banking & Tr. Co.*, 423 S.C. 432, 455, n. 9, 814 S.E.2d 643, 656, n. 9 (Ct. App. 2018) (citing *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986) (emphasis added).

ELECTRONICALLY FILED - 2025 Mar 31 8:59 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Put another way: Santee Cooper cannot simply conclude that Lindau has used or uses PFAS-containing products and springboard itself upon these "bare assertions" into more litigation. Even at this early stage, Santee Cooper has to offer something more. Otherwise, Santee Cooper could assert this conclusion and keep <u>anyone</u> in this (or any other) lawsuit—a premise that runs contrary to SCRCP 1's requirement "to secure the just, speedy, and inexpensive determination of every action" and important tenets of public policy as well. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S. Ct. 1955, 1959, 167 L. Ed. 2d 929 (2007) ("The requirement of [particularized] allegations [in a complaint] . . . serves the practical purpose of preventing a plaintiff with a largely groundless claim from taking up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.") (internal quotations omitted, cleaned up).

Santee Cooper's reliance on conclusory allegations about Lindau's purported PFAS use are not enough, and the Court should dismiss Plaintiff's claims against Lindau.

## CONCLUSION

For these reasons, this Court should dismiss Plaintiff Santee Cooper's claims against Defendant Lindau Chemicals, Inc. with prejudice, or, in the alternative, issue summary judgment in its favor, and grant such other and further relief as is just and proper.

Respectfully submitted,

**CALLISON TIGHE & ROBINSON, LLC**

<u>s/ Ian T. Duggan</u>
D. Reece Williams, III, Bar No. 6120
Ian T. Duggan, Bar No. 80074
P.O. Box 1390
1812 Lincoln Street, Second Floor (29201)
Columbia, South Carolina 29202
Ph: 803-404-6900
Fax: 803-404-6902

3

ELECTRONICALLY FILED - 2025 Mar 31 8:59 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

reecewilliams@callisontighe.com
ianduggan@callisontighe.com

**EARTH AND WATER LAW LLC**

John A. Sheehan (*pro hac vice*)
Edward (Ned) B. Witte (*pro hac vice*)
Heather A. Davis (*pro hac vice*)
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20004
Tel: 202-280-6362
john.sheehan@earthandwatergroup.com
ned.witte@earthandwatergroup.com
heather.davis@earthandwatergroup.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

Columbia, South Carolina
March 31, 2025

ELECTRONICALLY FILED - 2025 Mar 31 9:54 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA          )     IN THE COURT OF COMMON PLEAS
COUNTY OF SPARTANBURG            )
                                )
                                )
IN RE:                          )
                                )          NOTICE OF HEARING
                                )
PFAS LITIGATION                 )
COORDINATED DOCKET              )
                                )
                                )
_____ )

Pending motion hearings have been set in the PFAS Litigation cases (2024-CP-08-03336 South Carolina Public Service Authority, a/k/a Santee Cooper v. China Jushi USA Corporations; Jushi USA Fiberglass Co., LTD; Lindau Chemicals, Inc.; Milliken & Company; and Waste Management of South Carolina, Inc.) for **9:30 a.m. on Tuesday, April 1, 2025**, at the **Spartanburg County Courthouse in Courtroom 6D** and will be on Judge Knie's virtual courtroom.

Counsel has been notified via electronic mail.

IT IS SO ORDERED at Spartanburg, South Carolina this 28ᵗʰ day of March, 2025.

_____
Honorable Grace Gilchrist Knie
Circuit Judge
S.C. PFAS Litigation

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF BERKELEY | ) | CIVIL ACTION NO. 2024-CP-08-03336 |
| | ) | |
| SOUTH CAROLINA PUBLIC | ) | |
| SERVICE AUTHORITY, a/k/a SANTEE | ) | |
| COOPER, an agency of the State of | ) | **MOTION FOR ADMISSION** |
| South Carolina, | ) | **PRO HAC VICE** |
| | ) | **FOR PHILIP L. COMELLA** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHINA JUSHI USA CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Comes now, Defendant WASTE MANAGEMENT OF SOUTH CAROLINA, INC., by and through its undersigned counsel, and respectfully moves the Court to admit PHILIP L. COMELLA, Esquire, *pro hac vice* as counsel for the aforesaid defendant in the above-captioned case in Berkeley County. In support of this motion, Defendant relies upon the Verified Statement in Support of Application of PHILIP L. COMELLA, Esquire, submitted herewith, pursuant to Rule 404.

WHEREFORE, Defendant respectfully requests this Court enter its Order admitting the above-referenced attorney *pro hac vice* together with such other and further relief as this Court deems just and proper.

*SIGNATURE PAGE FOLLOWS.*

1

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

COSMICH SIMMONS & BROWN, PLLC

By:   /s/ James B. Glenn
      James B. Glenn
      SC Bar No. 077731
      E-Mail: jase.glenn@cs-law.com
      Telephone: (803) 529-1782
      Robert O. Meriwether
      SC Bar No. 0009828
      E-Mail:  robert.meriwether@cs-law.com
      Telephone: (803) 529-1783
      2711 Middleburg Drive, Suite 216
      Columbia, SC 29204
      sc-asbestos@cs-law.com

***Attorneys for Defendant Waste Management of South Carolina, Inc.***

Columbia, South Carolina

April 11, 2025

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this 11th day of April 2025

      /s/ James B. Glenn
      James B. Glenn
      SC Bar No. 077731

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE*
# IN THE STATE OF SOUTH CAROLINA

SOUTH CAROLINA PUBLIC
SERVICE AUTHORITY, a/k/a
SANTEE COOPER, an agency of
the State of South Carolina
            Plaintiff

2024-CP-08-03336
Case No.

Berkeley County Common Pleas
Tribunal

vs.

Mailing Address of Tribunal:    Berkeley County Courthouse

CHINA JUSHI USA
CORPORATION, ET AL.
            Defendant

300-B California Avenue
Moncks Corner, SC 29461

Comes now  Philip L. Comella                              , applicant herein, and respectfully represents the
following:

    1.  Applicant resides at:
169 Sea Island Drive
Street Address

| Ponte Vedra Beach | St. Johns | Florida | 32082 |
| City | County | State | Zip Code |

(630) 853-5346
Telephone

    2.  Applicant is an attorney and a member of the law firm of (or practices law under the name of)
Taft Stettinius & Hollister LLP                                                    , with offices at

111 East Wacker Drive, Suite 2600
Street Address

| Chicago | Cook County | Illinois | 60601 |
| City | County | State | Zip Code |
| (312) 527-4000 | (630) 853-5346 | (312) 527-4011 | pcomella@taftlaw.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

    3.  Applicant has been retained personally or as a member of the above-named law firm by
GFL Environmental USA, Inc., Red Rock Disposal, LLC, Sampson
County Disposal, LLC, and Waste Industries, LLC                  to provide legal representation in
connection with the above case now pending before the above-named tribunal of the State of South Carolina.

    4.  Since  November  of  1983                        , applicant has been, and presently is, a
member in good standing of the bar of the highest court of the District of Columbia or the State of
Illinois                                        where applicant regularly practices law.  Attached is a certificate of good
standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State
where applicant regularly practices law.

5.  Applicant has been admitted to practice before the following courts: (List all of the following courts applicant has been admitted to practice before:  United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and courts of other states or the District of Columbia.)

| Court: | Date Admitted: |
|---|---|
| U.S. Supreme Court | 2006 |
| U.S. Court of Appeals for 7th Circuit | 2005 |
| U.S. District Court for the Northern District of Illinois | 1983 |
| U.S. District Court for the Eastern District of Michigan | 2012 |
| Illinois State Bar | 1983 |
| U.S. District Court for the Southern District of Illinois | 2023 |
|  |  |

Applicant is presently a member in good standing of the bars of those courts listed above, except as listed below:  (List any court named in the preceding paragraph that applicant is no longer admitted to practice before.)

| Yes |
|---|

6.  Applicant presently is not subject to any suspension or disbarment proceedings, and has not been formally notified of any complaints pending before a disciplinary agency, except as provided below (give particulars, e.g., jurisdiction, court date):

| No |
|---|

7.  Applicant never has had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked, except as provided below (give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation):

| No |
|---|

8.  Applicant never has had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked, except as provided below (give particulars, e.g., date, court, administrative body, date of suspension and reinstatement):

| No |
|---|

9.  Local counsel of record associated with applicant in this case is   James B. Glenn
of the  Cosmich Simmons & Brown, PLLC                                                        law firm, which has offices at:

2711 Middleburg Drive, Suite 216
Street Address
Columbia                              Richland                     SC                 29204
City                                        County                       State            Zip Code
601-202-0175                                                          601-863-0078    jase.glenn@cs-law.com
Primary Telephone              Cell Phone                 Fax Number    Email Address
077731
South Carolina Bar Number

10.  Applicant has previously filed an application to appear *pro hac vice* in the following South Carolina cases (give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted).

*Page 2 of 5*

Yes.

Grand Strand Water and Sewer Authority (C.A. 2024-CP-26-05523) (15th Judicial Court) (Local Counsel of record in this case is Richard Willis of Williams Mullen)

11. Applicant agrees to comply with the applicable statutes, laws and rules of the State of South Carolina and will familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct. Applicant consents to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

12. Applicant respectfully requests to be admitted to practice in the above-named tribunal for this case only.

DATED this ___26th_____ day of ___March_____, 20_25____

_____
                    APPLICANT

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# VERIFICATION

STATE OF  ILLINOIS                    )

COUNTY OF  COOK                    )

I,  Philip L. Comella                              , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this    26th            day of    March                    , 20  25

_____
Notary Public for the State of      Illinois

My Commission Expires:    04/25/25

"OFFICIAL SEAL"
LORRAINE A M MAPLES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/24/2025

# LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this    31st          day of    March        , 20 25

_____
LOCAL COUNSEL OF RECORD

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this    31st    day of    March                , 20 25

_____
APPLICANT/AFFIANT

171884484v1

*Page 5 of 5*

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# CERTIFICATE OF GOOD STANDING



*United States of America*

}**ss.** Philip L. Comella

*Northern District of Illinois*

I, Thomas G. Bruton , Clerk of the United States District Court
for the Northern District of Illinois,

DO HEREBY CERTIFY That Philip L. Comella
was duly admitted to practice in said Court on (07/26/1984)
and is in good standing as a member of the bar of said court.

Dated at Chicago, Illinois
on (03/19/2025 )

Thomas G. Bruton , Clerk,

By:

Deputy Clerk

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# Certificate of Admission
# To the Bar of Illinois

I, Cynthia A. Grant, Clerk of the Supreme Court of Illinois, do hereby certify that

Philip L. Comella

has been duly licensed and admitted to practice as an Attorney and Counselor at Law within this State; has duly taken the required oath to support the CONSTITUTION OF THE UNITED STATES and of the STATE OF ILLINOIS, and also the oath of office prescribed by law, that said name was entered upon the Roll of Attorneys and Counselors in my office on 11/09/1983 and is in good standing, so far as the records of this office disclose.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said Court, this 1st day of April, 2025.

*Cynthia A. Grant*

Clerk,
Supreme Court of the State of Illinois

ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
                                      )   NINTH JUDICIAL CIRCUIT

COUNTY OF BERKELEY )

SOUTH CAROLINA PUBLIC )   Civil Action No. 2024-CP-08-03336
SERVICE AUTHORITY, a/k/a )
SANTEE COOPER, an agency of the )
State of South Carolina, )
                                        )   **AFFIDAVIT OF PHILIP L. COMELLA**
                Plaintiffs, )
        vs. )

CHINA JUSHI USA )
CORPORATION, ET AL. )
                    Defendants. )

Philip L. Comella, after being first duly sworn, states as follows:

1.      I am not a resident of the State of South Carolina.

2.      I am not regularly employed in the State of South Carolina.

3.      I am not regularly engaged in the practice of law or other professional activities in the State of South Carolina.

Further, the affiant saith not.

_____

[Name}

SWORN to and subscribed before me

this 11ᵗʰ day of April, 2025

_____ (L.S.)

Notary Public for ILLinois

My Commission Expires: 4/24/2025

"OFFICIAL SEAL"
LORRAINE A M MAPLES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/24/2025



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394

April 7, 2025

The Honorable Leah Guerry Dupree
Clerk of Court
Post Office Box 219
Moncks Corner, SC 29461

RE:     South Carolina Public Service Authority v. China Jushi USA Corporation, et al.

Case No.: 2024-CP-08-03336

Dear Ms. Dupree:

I certify that the Office of Bar Admissions has received the verified application requesting Philip L. Comella be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:     Philip L. Comella
        James B. Glenn

ELECTRONICALLY FILED - 2025 Apr 11 10:14 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336
ELECTRONICALLY FILED - 2025 Apr 11 7:15 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Apr 15 3:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF BERKELEY | ) | CIVIL ACTION NO.  2024-CP-08-03336 |
| | ) | |
| SOUTH CAROLINA PUBLIC | ) | |
| SERVICE AUTHORITY, a/k/a SANTEE | ) | |
| COOPER, an agency of the State of | ) | |
| South Carolina, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHINA JUSHI USA CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | | |

---

**ORDER GRANTING ADMISSION FOR
PHILIP L. COMELLA PRO HAC VICE**

On this day, the Court considered the Application of Waste Management of South Carolina, Inc. for Admission *Pro Hac Vice* of Philip L. Comella, Esquire.  This Court, finding the application to be proper, is of the opinion that the application should be granted.  The issuance of this *Pro Hac Vice* Order will not impact the ability of the Court to proceed with a future trial of this case should admitted out of state counsel be unable to participate in the future trial.

It is hereby ORDERED that Philip L. Comella, Esquire, is admitted *pro hac vice* in the above-styled action.

Entered this the _____ day of _____, 2025.



Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**     Order/Pro Hac Vice

It is so ordered.

/s Roger M. Young, Sr. S.C. Circuit Judge 2134

Electronically signed on 2025-04-15 15:02:40     page 2 of 2

ELECTRONICALLY FILED - 2025 Apr 15 3:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Archroma U.S.,
Inc.; Arkema, Inc.; Atotech USA, LLC; Carlisle
Partners, LLC; Carlisle WW Holdings, LLC; China
Jushi USA Corporation; Clariant Corporation;
Coatex, Inc.; Corteva, Inc.; Daikin America, Inc.;
DS Smith PLC; DuPont de Nemours, Inc.; EIDP,
Inc.; Graphic Packaging International, LLC;
Huntsman Advanced Materials Americas, LLC;
Huntsman International, LLC; Interstate Container
Columbia, LLC; INV Performance Surfaces, LLC;
Jushi USA Fiberglass Co., Ltd.; Lindau Chemicals,
Inc.; Milliken & Company; Organic Dyes and
Pigments, LLC; Precoat Metals Corp.; Republic
Services of South Carolina, LLC; Shaw Industries
Group, Inc.; Solvay Specialty Polymers USA, LLC;
Springs Global US, Inc.; Springs Industries, LLC;
Standard Textile Carolina, Inc.; Synthomer, Inc.;
The Chemours Company; and Waste Management
of South Carolina, Inc.,

*Defendants*.

C.A. No. 2024-CP-08-03336

**AMENDED SUMMONS**
(JURY TRIAL DEMANDED)

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to answer the Amended Complaint in

this action, a copy of which is hereby served on you, and to serve a copy of your Answer to the

Amended Complaint on the subscriber at 291 S. Pine Street, Spartanburg, SC 29302, within 30 days after service hereof, exclusive of the day of such service, and if you fail to answer the Amended Complaint, judgment by default will be rendered against you for the relief demanded in the Amended Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

                                    *Plaintiff*,

                    v.

AGC Chemicals Americas, Inc.; Archroma U.S.,
Inc.; Arkema, Inc.; Atotech USA, LLC; Carlisle
Partners, LLC; Carlisle WW Holdings, LLC; China
Jushi USA Corporation; Clariant Corporation;
Coatex, Inc.; Corteva, Inc.; Daikin America, Inc.;
DS Smith PLC; DuPont de Nemours, Inc.; EIDP,
Inc.; Graphic Packaging International, LLC;
Huntsman Advanced Materials Americas, LLC;
Huntsman International, LLC; Interstate Container
Columbia, LLC; INV Performance Surfaces, LLC;
Jushi USA Fiberglass Co., Ltd.; Lindau Chemicals,
Inc.; Milliken & Company; Organic Dyes and
Pigments, LLC; Precoat Metals Corp.; Republic
Services of South Carolina, LLC; Shaw Industries
Group, Inc.; Solvay Specialty Polymers USA, LLC;
Springs Global US, Inc.; Springs Industries, LLC;
Standard Textile Carolina, Inc.; Synthomer, Inc.;
The Chemours Company; and Waste Management
of South Carolina, Inc.,

                                    *Defendants*.

C.A. No. 2024-CP-08-03336

**AMENDED COMPLAINT**
(JURY TRIAL DEMANDED)

Plaintiff, SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a SANTEE

COOPER, by and through the undersigned counsel, brings this action against the above-named

1

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

## STATEMENT OF THE CASE

1.     Plaintiff, South Carolina Public Service Authority ("Santee Cooper" or "Plaintiff"), brings this action to address Defendants' ongoing contamination of the Broad River, Saluda River, Catawba River, Wateree River, Congaree River, Santee River, Lake Marion, and Lake Moultrie, including their tributaries (collectively "Santee River Basin"); and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2.     As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Santee River Basin, which travel downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, thereby contaminating Plaintiff's properties and the domestic water supply for over 234,000 water customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.     Plaintiff provides wholesale potable drinking water to local water providers in various counties in South Carolina, including Berkeley County. It owns and occupies riparian property on Lake Marion in Santee, South Carolina; and on Lake Moultrie in Moncks Corner, South Carolina. On these respective properties, Plaintiff operates the Lake Marion Surface Water Treatment Plant ("SWTP"), the Lake Moultrie SWTP, and their related buildings, improvements,

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

property, and equipment that make up these water treatment and transmission systems. Plaintiff's SWTPs draw raw water from Lake Marion and Lake Moultrie for treatment before distributing treated water to customers.

4.     Defendants own and/or operate industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes ("Discharger Defendants") or otherwise supply these products to Discharger Defendants' manufacturing facilities ("Supplier Defendants"). Discharger Defendants then discharge wastewater contaminated with these products to surface waters in the Santee River Basin upstream of Plaintiff's water intakes. Some Defendants directly discharge PFAS-contaminated wastewater, while others do so indirectly via certain public wastewater treatment plants ("WWTPs"). These WWTPs include the Columbia WWTP in Columbia, South Carolina; the Cannons Creek WWTP in Prosperity, South Carolina; the Little River WWTP in Laurens, South Carolina; the Tosch's Creek WWTP in Union, South Carolina; the Manchester Creek WWTP in Rock Hill, South Carolina; and the Rocky Creek WWTP in Chester, South Carolina.

5.     Industrial wastewater from Discharger Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes. Defendants' PFAS are discharged upstream of, and flow downstream to, Plaintiff's intakes. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.     Defendants' PFAS contaminate Plaintiff's water sources at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

7.      As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTPs that will remove Defendants' PFAS from drinking water. In addition, based on Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## **DISCLAIMER**

8.      Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.      All Plaintiff's causes of action arise under South Carolina law, and Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

## **JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 14-1-80 and 58-31-30 of the South Carolina Code.

4

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

11.     This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

12.     Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Berkeley County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Berkeley County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

<u>**PARTIES**</u>

### I.     Plaintiff

13.     Plaintiff Santee Cooper is a public corporation and agency of the State of South Carolina vested with authority, among other things, to acquire, treat, distribute, and sell drinking water. *See* S.C. CODE ANN. § 58-31-30; *see also id.* §§ 58-31-10 to -740.

14.     Plaintiff owns several properties at issue, beginning with its SWTPs. The first is located at 817 Water Plant Road, Moncks Corner, South Carolina 29461, where it operates the Lake Moultrie SWTP, which services the Lake Moultrie Regional Water System. The Lake Moultrie SWTP is riparian to, and draws raw water from, Lake Moultrie. The second is located at 149 Graveyard Rock Road, Santee, South Carolina 29142, where it operates the Lake Marion SWTP, which services the Lake Marion Regional Water System. The Lake Marion SWTP is riparian to, and draws raw water from, Lake Marion. In addition to its SWTPs, Plaintiff also owns all lands beneath Lake Marion and Lake Moultrie up to their high-water marks.

15.     The Lake Moultrie Water System utilizes 20 miles of transmission pipeline that delivers drinking water throughout the Lake Moultrie Water Agency, which consists of wholesale

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

customers Berkely County, City of Goose Creek, Moncks Corner Public Works Commission, and the Summerville Commissioners of Public Works. Ultimately, the Lake Moultrie Water system delivers drinking water to approximately 234,000 water subscribers of Plaintiff's wholesale customers.

16.     The Lake Marion Water System utilizes over 46 miles of transmission pipeline to serve, currently, five wholesale customers within the Lake Marion Regional Water Agency, which consists of Berkeley, Calhoun, Dorchester, and Orangeburg Counties and the Town of Santee. At the retail level, the Lake Marion Water System ultimately delivers drinking water to approximately 3,000 water subscribers.

## II.     Discharger Defendants

17.     Defendants **Carlisle Partners, LLC** and **Carlisle WW Holdings, LLC** (**collectively "Carlisle"**) are Wyoming limited liability companies authorized to do business in South Carolina. Carlilse owns multiple parcels of property that comprise the site of a former industrial facility operated by Cone Mills Corporation, located at 3863 Carlisle Highway, Carlisle, South Carolina 29031. From the mid-1950s until the early 2000s, Cone Mills Corporation used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. These PFAS have accumulated on Carlisle's property, including in wastewater lagoons and other storage basins, which migrate to the Broad River. These PFAS resist environmental degradation, flow downstream from the Broad River to Lake Marion and Lake Moultrie, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

18.     Defendants **China Jushi USA Corporation** and **Jushi USA Fiberglass Co., Ltd.** (**collectively "Jushi"**) are South Carolina corporations that operate a facility located at 2971 Shop

Road, Columbia, South Carolina 29209. There, Jushi uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of fiberglass products. As part of its processes, the Jushi facility discharges industrial wastewater with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Jushi's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Jushi's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

19.     Defendant **Coatex, Inc. ("Coatex")** is a Delaware corporation authorized to do business in South Carolina. Coatex is a subsidiary of Arkema, Inc. ("Arkema"). Coatex and Arkema operate a facility located at 547 Ecology Lane, Chester, South Carolina 29706. There, Coatex and Arkema use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of coatings and adhesive chemicals. As part of its processes, the Coatex/Arkema facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Coatex and Arkema's PFAS, which it discharges to a tributary of the Catawba River upstream from Plaintiff's water intakes. Coatex and Arkema's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

20.     Defendant **Graphic Packaging International, LLC ("GPI")** is a Delaware limited liability company authorized to do business in South Carolina. GPI owns and operates an industrial facility located at 139 South Carolina Highway 773, Prosperity, South Carolina 29127,

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

where is uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of packaging products. As part of its processes, the GPI facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Cannons Creek WWTP. The Cannons Creek WWTP cannot remove GPI's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. GPI's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

21.     Defendant **Huntsman Advanced Materials Americas, LLC ("Huntsman AMA")** is a Delaware limited liability company authorized to do business in South Carolina. Huntsman AMA operates a facility located at 808 Celriver Road, Rock Hill, South Carolina 29730. There, Huntsman AMA uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of chemical products. As part of its processes, the Huntsman AMA facility discharges industrial wastewater contaminated with these PFAS to the Manchester Creek WWTP. The Manchester Creek WWTP cannot remove Huntsman AMA's PFAS, which it discharges to the Catawba River upstream from Plaintiff's water intakes. Huntsman AMA's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie WWTPs.

22.     Defendant **Interstate Container Columbia, LLC ("ICC")** is a Delaware limited liability company authorized to do business in South Carolina; and Defendant **DS Smith PLC ("DS Smith")** is a United Kingdom public limited company and the parent company of ICC. DS Smith owns, and ICC operates, an industrial facility located at 128 Crews Drive, Columbia, South

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Carolina 29210, where ICC uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of corrugated packaging products. As part of its processes, the DS Smith and ICC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Defendants' PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Defendants' PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

23.     Defendant **Lindau Chemicals, Inc. ("Lindau")** is a South Carolina corporation that owns and operates an industrial facility located at 731 Rosewood Drive, Columbia, South Carolina 29201. There, Lindau uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in organic chemical manufacturing. As part of its processes, the Lindau facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Lindau's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Lindau's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

24.     Defendant **Milliken & Company ("Milliken")** is a Delaware corporation with its principal place of business in South Carolina. Milliken owns or has owned at least three facilities at issue in this case: (1) the Cedar Hill Plant, located at 225 Bob Little Road, Jonesville, South Carolina 29353; (2) the Gilliland Plant, located at 1108 Church Street, Laurens, South Carolina 29360; and (3) the Monarch Mill, located at 129 Monarch Highway, Union, South Carolina 29379.

9

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

At each facility, Milliken uses and/or used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of Milliken's processes, the Cedar Hill and Gilliland Plant discharge industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP and the Little River WWTP, respectively. The Tosch's Creek WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. The Little River WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Saluda River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. While Monarch Mill is no longer operational, wastewater lagoons on the property remain contaminated with these PFAS and their precursors, which discharge from the property to tributaries upstream of the Broad River, Lake Marion, and Lake Moultrie. Milliken's PFAS resist environmental degradation, flow downstream from the Broad and Saluda Rivers, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

25. Defendant **Organic Dyes and Pigments, LLC ("ORCO")** is a Delaware limited liability company authorized to do business in South Carolina. ORCO owns and operates an industrial facility located at 100 Industrial Drive, Union, South Carolina 29379, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of chemicals for the textile industry. As part of its processes, the ORCO facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove ORCO's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. ORCO's PFAS resist environmental degradation, flow downstream

10

from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

26.     Defendant **Precoat Metals Corp. ("PMC")** is an Indiana corporation authorized to do business in South Carolina. PMC owns and operates an industrial facility located at 650 Rosewood Drive, Columbia, South Carolina 29201, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the processing of metal coils. As part of its processes, the PMC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove PMC's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. PMC's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

27.     Defendant **Republic Services of South Carolina, LLC ("RSSC")** is a Delaware limited liability company authorized to do business in South Carolina. RSSC owns and operates the Union County Regional Landfill located at 868 Wildcat Road, Enoree, South Carolina 29335. RSSC transports leachate from its landfill, which contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove these PFAS from RSSC's leachate before the WWTP discharges RSSC's PFAS to a tributary of the Broad River upstream of Lake Marion and Lake Moultrie. RSSC's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

28.     Defendant **Shaw Industries Group, Inc. ("Shaw")** is a Georgia corporation authorized to do business in South Carolina. Shaw owns and operates an industrial facility located at 4401 St. Andrews Road, Columbia, South Carolina 29210. There, Shaw uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of carpet and textile products. As part of its processes, the Shaw facility directly discharges industrial wastewater with products that contain or degrade to these PFAS to the Saluda River. Shaw's PFAS resist environmental degradation, flow downstream from the Saluda River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

29.     Defendant **Springs Global US, Inc. ("Springs Global")** is a Delaware corporation authorized to do business in South Carolina, and Defendant **Springs Industries, LLC ("Springs Industries")** is a Delaware corporation that is a successor in interest to and was formerly known as Springs Industries, Inc., a South Carolina corporation that no longer exists (Springs Global and Springs Industries are referred to collectively as **"Springs"**). From approximately 1948 until the mid-2000s, Springs Industries' corporate predecessors owned and operated an industrial facility located at 294 Grace Avenue, Lancaster, South Carolina 29720. There, they used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacturing of textile products. Defendant Springs Global purchased this property in 2005, and to this day it continues to discharge these PFAS and their precursors to the Catawba River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Springs' PFAS resist environmental degradation, flow downstream from the Catawba River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

12

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

30.     Defendant **Standard Textile Carolina, Inc. ("STC")** is an Ohio corporation authorized to do business in South Carolina. STC owns and operates an industrial facility located at 100 Highpoint Drive, Union, South Carolina 29379, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, the STC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove STC's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. STC's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

31.     Defendant **Synthomer, Inc. ("Synthomer")** is an Ohio corporation authorized to do business in South Carolina. Synthomer operates an industrial facility located at 1455 J A Cochran Bypass, Chester, South Carolina 29706, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of specialty chemical products. As part of its processes, the Synthomer facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Synthomer's PFAS, which it discharges to a tributary of the Catawba River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Synthomer's PFAS resist environmental degradation, flow downstream from the Catawba River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

32.     Defendant **Waste Management of South Carolina, Inc. ("WM")** is a South Carolina corporation, and it operates the Richland Landfill located at 1047 Highway Church Road, Elgin, South Carolina 29045. WM discharges leachate from its landfill, which contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the Columbia WWTP. The Columbia WWTP cannot remove these PFAS from WM's leachate before the WWTP discharges WM's PFAS into the Congaree River upstream of Lake Marion and Lake Moultrie. WM's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**III.     Supplier Defendants**

33.     Defendant **AGC Chemicals Americas, Inc. ("Asahi")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Asahi has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

34.     Defendant **Arkema, Inc. ("Arkema")** is a Pennsylvania corporation authorized to do business in South Carolina. Among other acts and omissions, Arkema has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action. Furthermore, Arkema operates a facility located at 547 Ecology Lane, Chester, South Carolina 29706 in conjunction with its subsidiary Coatex, Inc. ("Coatex"). There, Arkema and Coatex use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of coatings and adhesive chemicals. As part of its processes, the Arkema/Coatex facility discharges industrial wastewater contaminated with products that contain

14

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Arkema and Coatex's PFAS, which it discharges to a tributary of the Catawba River upstream from Plaintiff's water intakes. Arkema and Coatex's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

35.    Defendant **Atotech USA, LLC ("Atotech")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Atotech has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more Discharger Defendants in this Action. Furthermore, Atotech operates a facility located at 1750 Overview Drive, Rock Hill, South Carolina 29730. There, Atotech manufactures products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of its processes, the Atotech facility discharges industrial wastewater contaminated with these PFAS to the Manchester Creek WWTP. The Manchester Creek WWTP cannot remove Atotech's PFAS, which it discharges to the Catawba River upstream from Plaintiff's water intakes. Atotech's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie WWTPs.

36.    Defendant **Clariant Corporation ("Clariant")** is a New York corporation authorized to do business in South Carolina. Among other acts and omissions, Clariant has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

37.    Defendant **Archroma U.S., Inc. ("Archroma")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Archroma has for

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

38.     Defendant **Daikin America, Inc. ("Daikin")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Daikin has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

39.     Defendant **EIDP, Inc. ("Old DuPont")**, f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Old DuPont has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

40.     Defendant **The Chemours Company ("Chemours")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Chemours has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

41.     Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, Corteva has assumed PFAS-related liabilities from Old DuPont.

42.     Defendant **DuPont de Nemours, Inc. ("New DuPont")**, f/k/a DowDuPont, Inc., is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, New DuPont has assumed PFAS-related liabilities from Old DuPont.

16

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

43.     Defendant **INV Performance Surfaces, LLC ("Invista")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Invista has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action. Furthermore, Invista operates a facility located at 643 US-1, Lugoff, South Carolina 29078. The facility was formerly operated by Invista's predecessor, Old DuPont. At the facility, Invista manufactures and/or uses in the manufacture of synthetic fibers and polymers products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of its processes, the Invista facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Wateree River upstream from Plaintiff's water intakes. Invista's PFAS resist environmental degradation, flow downstream from the Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

44.     Defendant **Huntsman International, LLC ("Huntsman")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Huntsman has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

45.     Defendant **Solvay Specialty Polymers USA, LLC ("Solvay")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Solvay has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

46.     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

47.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

48.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold and utilized by Defendants.

49.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

50.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

51.     Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization.

52.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

53.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

54.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

55.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

56.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[1] The advisory levels at that time were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

57.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

58.     EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over

---

[1] U.S.E.P.A., Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), *available at* https://www.epa.gov/ sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

[2] *Id.*

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

[4] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

59.    On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

60.    Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[8] For

---

[5] *Id.*

[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[7] *Id.*

[8] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

61. In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[9] An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

62. At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[10] Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[11]

63. Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX

---

[9] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

[10] *Id.*

[11] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[12] If greater than 1.0, then "potential risk is indicated."[13]

64.    EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[14]

65.    EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[15] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[16]

---

[12] *Id.*

[13] *Id.*

[14] U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[15] U.S.E.P.A., PFAS Nat'l Primary Drinking Water Regulation Rulemaking (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

[16] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., Final PFAS Nat'l Drinking Water Regulation Landing Page, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

66. The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts."[17] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[18]

67. EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

68. EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

69. On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[19] Although EPA announced its intention to rescind the MCLs concerning PFNA,

---

[17] U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024).

[18] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

[19] U.S.E.P.A., *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), *available at* https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter *EPA 2025 MCL Announcement*].

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act.," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS is linked to significant health risks.[20] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[21]

70.    EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[22] Under the April 10, 2024 final National Primary Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

## II.    Contamination of Lake Marion and Lake Moultrie with PFAS

71.    Lake Marion and Lake Moultrie were formed by the construction of the Santee Dam and Pinopolis Dam in the 1940s. They sit near the tail end of the Santee River Basin, downstream of, and hydrologically connected to, the Broad River, Saluda River, Congaree River, Catawba River, Wateree River, and Santee River.

72.    Defendants' industrial facilities, and/or their applicable WWTPs, operate upstream of Lake Marion and Lake Moultrie.

73.    PFAS sampling of the Broad River, Saluda River, Congaree River, Catawba River, Wateree River, Lake Marion, and Lake Moultrie confirms the presence of PFOA, PFOS, PFHxS,

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PFNA, PFBS, and GenX Chemicals throughout these bodies of water. These PFAS flow downstream and contaminate the water at Plaintiff's water intakes on Lake Marion and Lake Moultrie at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

74.     Discharger Defendants are, or were, owners and operators of manufacturing plants and related industrial facilities throughout or upstream of the Santee River Basin. In their industrial processes, Discharger Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Discharger Defendants' industrial processes generate industrial wastewater containing these PFAS, which Discharger Defendants ultimately discharge to surface waters upstream of Lake Marion and Lake Moultrie.

75.     Defendants' PFAS and their precursors flow downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, damaging Plaintiff's property and contaminating its water sources.

76.     All Defendants knew or should have known that the conventional wastewater treatment technologies used by those Discharger Defendants that directly discharge to surface waters and by the WWTPs that receive wastewater from the other Discharger Defendants cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

77.     Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, Supplier Defendants did not require, instruct, advise, or otherwise direct the Discharger

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's properties.

78.     The Lake Marion SWTP utilizes membrane filtration technology, and the Lake Moultrie SWTP utilizes conventional water treatment technology, neither of which remove PFAS from water, and the SWTPs require new water treatment technologies to do so.

79.     All Defendants knew or should have known that conventional treatment technologies and membrane filtration technology used by public water systems like Plaintiff's cannot remove Defendants' PFAS from water that is treated and distributed as potable drinking water.

## III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.

80.     All Defendants have long known that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic; that they cannot be removed by conventional water and wastewater treatment methods; and that there is no safe dose for PFOA and PFOS.

81.     Old DuPont pioneered the field of PFAS chemistry in the middle of the twentieth century, and it was long a leader in the industry. Old DuPont's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, and the public.

82.     Old DuPont has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. Old DuPont was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

27

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

83.     By the early 1960s, Old DuPont understood PFOA and PFNA to be toxic based on studies that found exposure to the chemicals to increase liver size in rats, and by the mid-1960s, if not earlier, Old DuPont knew that PFOA could leach from waste into water and groundwater.

84.     In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but it did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility near Parkersburg, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

85.     In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of Old DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

86.     By 1999, at the latest, Old DuPont knew that PFOA was present in its products based on telomer PFAS chemistry.

87.     In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2005, EPA levied a record-setting $16.5 million civil penalty against Old DuPont for failing to disclose to EPA information about the health risks of PFOA and about the company's environmental releases of PFOA in West Virginia and Ohio.

88.     For decades, Old DuPont purchased the PFOA it used in the manufacture of Teflon and other products from 3M Company ("3M").

89.     In May 2000, 3M announced it would phase out its manufacture and sale of products based on long-chain PFAS, including PFOA and PFOS, by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public.

90.     In response to 3M's phaseout announcement, and despite the public concerns 3M cited for its phaseout decision and Old DuPont's own internal knowledge of the risks to human health and the environment posed by PFOA, Old DuPont did not cease using PFOA or eliminate PFOA from its products. Instead, Old DuPont opened its own plant to manufacture PFOA to use in the manufacture of Old DuPont's products.

91.     As demonstrated by its material safety data sheet for PFOA, Old DuPont knew PFOA required disposal by incineration by at least 1991.

92.     Old DuPont participated in the Telomer Research Program ("TRP") that was convened by EPA in the early 2000s to coordinate research and data on PFOA and PFAS manufactured by the telomerization process. The TRP consisted of the leading telomer-based

29

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

PFAS manufacturers. Through its participation in the TRP, Old DuPont obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

93.     In 2015, Old DuPont spun off its Performance Chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours. Chemours inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

94.     Invista was formed in 2004 through the sale of Old DuPont's Textiles & Interiors division to Koch Industries and conducted bundled sales of textile products with Old DuPont PFAS products that it knew could degrade to PFOA. Invista inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

95.     Huntsman uses PFAS manufactured by other Supplier Defendants, including Old DuPont and Chemours, to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Huntsman has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

96.     Daikin is a subsidiary of Daikin Industries, Ltd., which has been in the PFAS business in Japan since the 1940s. It entered the U.S. market in the early 1990s, establishing manufacturing operations in Decatur, Alabama, adjacent to 3M's plant there.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

97.     Daikin purchased PFOA from 3M for use as a processing chemical in its manufacture of fluoropolymers. Daikin knew from the early 1990s that PFOA was carcinogenic, bioaccumulative, environmentally persistent, and soluble in water.

98.     Though fully aware of the reasons that 3M decided to withdraw its products based on long-chain PFAS in 2000, Daikin rushed to fill as much of the PFAS market left by 3M as possible, with the specific intent to prevent customers from shifting to non-PFAS products.

99.     Underscoring its position as one of the world's leading PFAS manufacturers, Daikin participated in the TRP  during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

100.     Daikin was well aware of the need to incinerate or otherwise treat wastewater to remove PFAS; indeed, Daikin practiced incineration for the PFAS-containing wastewater generated at its Decatur, Alabama facility by in or around the mid-2000s.

101.     Asahi is a subsidiary of AGC, Inc., f/k/a Asahi Glass Co., Ltd., a Japanese company that has manufactured and sold PFAS products since at least the 1970s. Upon information and belief, Asahi has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

102.     Underscoring its position as one of the world's leading PFAS manufacturers, Asahi participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

103.     Arkema is a subsidiary of Arkema S.A., a French company formed in 2004 from a reorganization of Total S.A.'s chemicals business. Arkema S.A. and its predecessors have been manufacturing PFAS since at least the 1950s. Upon information and belief, Arkema has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

104.     Atotech uses PFAS manufactured by other Supplier Defendants to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Atotech has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOS, and/or their precursors, are present in the products it manufactures and sells.

105.     Atotech was aware of the environmental and human health concerns that 3M cited in its phaseout of PFOS-based products from the U.S. market, yet for years after 3M's phaseout announcement it continued to supply products it knew contained or could degrade to PFOS.

106.     Clariant was formed in 1995 and was previously known as Sandoz Chemical Corporation and as Sodeyco, Inc. Upon information and belief, Clariant has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

107.     Underscoring its position as one of the world's leading PFAS manufacturers, Clariant participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their

chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

108.    Archroma was formed in 2013 through the sale of Clariant's textile, paper, and emulsions business to SK Capital Partners. Archroma inherited Clariant's expertise, resources, and knowledge of PFAS.

109.    Solvay is the successor of Solvay Solexis, Inc. and Ausimont USA, Inc. Upon information and belief, Solvay has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells. At its Gloucester County, New Jersey facility, Solvay's use of PFOA and PFNA in the manufacture of fluoropolymer products has caused severe contamination of drinking water, surface waters, groundwater, and soils in the surrounding vicinity. In 2023, Solvay settled a lawsuit brought by the State of New Jersey arising from this contamination for $393 million.

110.    Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of Supplier Defendants' own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if Supplier Defendants had not chosen to ignore the clear evidence of health and environmental dangers they possessed many years ago.

111.    Despite Supplier Defendants' knowledge that their products contained or degraded to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove

33

their PFAS from wastewater; and that Discharger Defendants discharged these PFAS to the Santee River Basin, damaging and interfering with Plaintiff's property rights and public health, Supplier Defendants continued to sell products containing or degrading to these PFAS to Discharger Defendants. Specifically:

(a)     Asahi continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Asahiguard and Surflon;

(b)     Arkema continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Kynar;

(c)     Atotech continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Fumetrol;

(d)     Clariant continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva;

(e)     Archroma continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva and Fluowet;

(f)     Daikin continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Unidyne;

(g)     Old DuPont continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Teflon, Zonyl, and Capstone;

(h)     Chemours continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Capstone;

(i)     Invista continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Stainmaster and Antron;

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

(j)    Huntsman continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Phobol and Oleophobol; and

(k)    Solvay continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Algoflon and Halar.

## IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.

112.    At all times relevant hereto, Supplier Defendants were directly involved in, and exercised control over, Discharger Defendants' use, handling, application, and disposal of Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

113.    Supplier Defendants specified the type and amount of PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

114.    Supplier Defendants designed and provided equipment for the use of their PFAS-containing products at Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

115.    Supplier Defendants jointly conducted research with Discharger Defendants for new PFAS-containing products as well as methods of using or applying these products.

116.    Supplier Defendants monitored the products manufactured by Discharger Defendants for the amount of PFAS-containing products used in the manufacture of Discharger Defendants' products in order to ensure those products met Supplier Defendants' specifications on the amount of PFAS-containing products to be used or applied.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

117.    Some Supplier Defendants, including Archroma, Arkema, Atotech, Invista, and Huntsman, maintained offices and/or laboratories near Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie, and all Supplier Defendants were in constant contact with the Discharger Defendants concerning the use, handling, application, and disposal of their PFAS-containing products.

118.    Employees of the Supplier Defendants were routinely present in Discharger Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of Supplier Defendants' PFAS-containing products.

119.    Supplier Defendants provided information to the Discharger Defendants concerning the health and environmental impacts of Supplier Defendants' PFAS-containing products, and the Discharger Defendants, at least in part, relied on this information.

120.    Supplier Defendants were familiar with the wastewater disposal practices of the Discharger Defendants' facilities, including that a portion of the Supplier Defendants' PFAS-containing products went into the Discharger Defendants' wastewater streams and that the treatment methods used by the Discharger Defendants' on-site treatment works and/or receiving WWTPs could not remove Defendants' PFAS from the effluent. Supplier Defendants nevertheless failed to require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. Supplier Defendants continued to sell their PFAS-containing products to Discharger Defendants they knew or should have known were disposing of the products in an environmentally irresponsible manner.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

121.     Supplier Defendants have been aware for many years of the presence of their PFAS chemicals in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

**V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

122.     Supplier Defendants actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of their PFAS-containing products, distorting public discourse on and downplaying the harmful effects of PFAS, misleading EPA on the safety of their PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to their position.

123.     Supplier Defendants, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote products they knew to be dangerous to the environment and human health. Supplier Defendants engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

124.     The delay in PFAS regulation resulted directly from Supplier Defendants' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

**VI.     Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

125.     By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

126.     Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

127.     The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

128.     Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

129.     Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

130.     In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

131.    Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

132.    This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont), which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

133.    Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

**VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.**

134.    Discharger Defendants have, for decades, discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Santee River Basin, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's current health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

135.    Supplier Defendants have supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, while knowing that Discharger Defendants discharge wastewater laden with these PFAS to wastewater treatment facilities that cannot remove them from the wastewater before it is discharged to the Santee River Basin upstream of Plaintiff's water intakes.

136.    Defendants' conduct has proximately caused the contamination of the Santee River Basin; and of Plaintiff's land, its Lake Marion and Lake Moultrie SWTPs, and its water treatment and transmission systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals— including PFOA and PFOS at concentrations above EPA's current MCLGs and MCLs.

137.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the waters of Lake Marion and Lake Moultrie, and have caused Plaintiff additional past, present, and future injury to property.

138.    Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFHxS, PFBS, and GenX Chemicals are hazardous to human health,

(a)    Discharger Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Santee River Basin, which they knew or should have known contaminated Plaintiff's property; and

(b)    Supplier Defendants continued to supply these chemicals to Discharger Defendants, knowing that they discharged these chemicals into the Santee River Basin, which Supplier Defendants knew or should have known contaminated Plaintiff's property.

40

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## FIRST CAUSE OF ACTION

### Private Nuisance

139.   Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

140.   Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water into potable drinking water, and the transmission of treated potable drinking water to customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties.

141.   Plaintiff owns riparian property abutting Lake Marion and Lake Moultrie, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers. Plaintiff also owns the land beneath each lake, up to the high-water mark.

142.   Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals at concentrations exceeding those EPA deems unsafe for consumption.

143.   Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

144.   Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

145.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

146.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Santee River Basin and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

147.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

148.     The ongoing contamination of Lake Marion, Lake Moultrie, and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of Lake Marion and Lake Moultrie to supply potable water to its customers.

149.     Defendants' interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

150.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## SECOND CAUSE OF ACTION

### Public Nuisance

151.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

152.    Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water into potable drinking water, and the transmission of treated potable drinking water to customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties.

153.    Plaintiff's wholesale customers sell the water Plaintiff provides to their customers, who use it for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

154.    Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

155.    Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's right to use Lake Marion and Lake Moultrie;

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

interference with the use of Plaintiff's SWTPs and water treatment and transmission systems; and lost revenue.

156.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, and Plaintiff's properties.

157.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

158.    As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

159.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

160.    Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and to ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

161.    Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

162.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, the costs of abatement in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### Trespass

163.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

164.     Plaintiff owns, possesses, and actively exercises its right to use its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

165.     Discharger Defendants Coatex, Jushi, GPI, Huntsman AMA, ICC, Lindau, Milliken, ORCO, PMC, STC, and Synthomer, and Supplier Defendants Arkema and Atotech intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to their applicable WWTPs, notwithstanding that they knew and/or reasonably should have known that:

(a)     these WWTPs cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

(b)     Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to these WWTPs; and, thereby,

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

(d)      water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

166.     Discharger Defendants RSSC and WM intentionally deliver leachate contaminated with PFAS and/or PFAS-containing products to their applicable WWTPs, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)      the WWTPs cannot remove their PFAS and/or PFAS-containing products from the leachate before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

(b)      Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe potable water to its customers;

(e)      water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants send to the WWTPs; and, thereby,

(c)      water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

167.     Discharger Defendants Carlisle, Milliken, Shaw, and Springs and Supplier Defendant Invista intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to surface waters in the Santee River Basin, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)      the wastewater treatment methods used by these Defendants cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging it to the Santee River Basin;

46

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

(b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe drinking water to its customers;

(c)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to surface waters in the Santee River Basin; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

168.    Supplier Defendants intentionally supplied and continued to supply PFAS-containing products and/or PFAS to Discharger Defendants notwithstanding that Supplier Defendants knew and/or reasonably should have known that:

(a)    Discharger Defendants discharged and continue to discharge, directly or indirectly, Supplier Defendants' PFAS-containing products and/or PFAS to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove Supplier Defendants' PFAS-containing products and/or PFAS from wastewater before discharge to the Santee River Basin;

(b)    Plaintiff draws water from the Santee River Basin for provision of safe potable water to its customers;

(c)    water Plaintiff draws from the Santee River Basin is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS that Discharger Defendants directly or indirectly discharged to each river; and, thereby

(d)    water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

169.     Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

170.     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

171.     Defendants Arkema, Atotech, Coatex, Jushi, GPI, Huntsman AMA, ICC, Lindau, Milliken, ORCO, PMC, STC, and Synthomer intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs. Defendants RSSC and WM intend that their PFAS-contaminated leachate be disposed of by their applicable WWTPs. Defendants Carlisle, Invista, Milliken, Shaw, and Springs intend and/or intended that, while using PFAS in their industrial processes, PFAS-containing wastewater be discharged to surface waters in the Santee River Basin. Discharger Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

172.     Supplier Defendants intend that Discharger Defendants, while using Supplier Defendants' PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with Supplier Defendants' PFAS-containing products by discharging it, directly or indirectly, to surface waters. Supplier Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

173.     Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTPs, and related buildings,

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

improvements, property, and equipment that make up its water treatment and transmission systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

174.    As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

175.    Defendants' ongoing trespasses can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

<u>**FOURTH CAUSE OF ACTION**</u>

**Negligence, Gross Negligence, and/or Recklessness**

176.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

177.    Discharger Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTPs, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

178.    Discharger Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including those in the Santee River Basin—were vulnerable to the contamination that has taken and now takes place.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

179.     Discharger Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Santee River Basin, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

180.     Supplier Defendants have a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to ensure the proper use and disposal of these products and prevent their improper use and disposal.

181.     Supplier Defendants had superior knowledge that their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contained in or degrading from their products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies, including membrane filtration, utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Santee River Basin, were vulnerable to the contamination that now takes place.

182.     By continually supplying their PFAS-containing products without providing their customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of their PFAS to surface waters, Supplier Defendants breached their duty of care and negligently, recklessly, wantonly, and willfully created the risk that their PFAS would contaminate the Santee River Basin, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

183.     As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Defendants' PFAS; and other damages to be proved at trial.

184.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

185.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

186.     Supplier Defendants design, manufacture, formulate, promote, market, and/or distribute products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

187.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are used by Discharger Defendants in a reasonably foreseeable manner and without substantial change in the condition of such products, and Supplier Defendants knew that Discharger Defendants purchase and use their products without inspection for defects.

188.     Supplier Defendants knew that the use of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals purchased or otherwise acquired

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

from them would result in their products being discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

189.     Supplier Defendants knew that their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent and bioaccumulative, that not all of their products are exhausted or adhere in Discharger Defendants' applications, that a portion of their products enter wastewater and are thus discharged via Discharger Defendants' sewer pipes, and that wastewater treatment facilities utilize conventional wastewater treatment methods that cannot remove their products from wastewater before it is discharged to surface waters that Plaintiff relies on to supply potable water to the public, making Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals unreasonably dangerous.

190.     Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Supplier Defendants fail to provide adequate warnings to Discharger Defendants and other users or to take any other precautionary measure to mitigate these hazards.

191.     Supplier Defendants fail to adequately describe such dangers or provide precautionary statements regarding such hazards, and they fail to provide instruction or direction on the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of their products.

192.     As a direct and proximate result of Supplier Defendants' failure to warn of the dangers and hazards posed by discharging their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, such PFAS have damaged Plaintiff's SWTP and

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

related buildings, improvements, property, and equipment that make up its water treatment and transmission systems, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

193.    As a direct, proximate, and foreseeable result of Supplier Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

194.    Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SIXTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

195.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

196.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

197.    Supplier Defendants manufactured, formulated, handled, sold, and/or distributed products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, knowing that these PFAS have been, and are presently, discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

198.     Rather than require the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Supplier Defendants required or permitted Discharger Defendants to discharge these products, which they knew to be hazardous, to surface waters upstream from Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

199.     Supplier Defendants knew that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent, bioaccumulative, dose-additive, and toxic; and Supplier Defendants knew there was no safe dose of PFOA or PFOS.

200.     Supplier Defendants knew or expected that these hazardous PFAS that they were manufacturing, formulating, handling, selling, and/or distributing would reach Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems while in essentially the same condition as when they left the hands of Supplier Defendants.

201.     Supplier Defendants manufactured, formulated, handled, sold, and/or distributed their products that were dangerous and unsafe for the uses and purposes for which they were intended despite knowing the consequences of their use and of exposure to their products.

202.     Supplier Defendants or their agents were responsible for the unreasonably dangerous products sold and distributed to Discharger Defendants and received financial benefits from their sale and distribution.

203.     As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

204.     As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

205.     Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect
### (Supplier Defendants)

206.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

207.     PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

208.     Supplier Defendants knew that Discharger Defendants would purchase and use their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals without inspection for defects.

55

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

209.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

210.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were used in a reasonably foreseeable manner and without substantial change in their condition.

211.    Supplier Defendants knew that the use of their products containing or degrading to these PFAS in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contaminating the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

212.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals sold and/or distributed to Discharger Defendants were and are defective in design and unreasonably dangerous for their intended use because:

    (a)    PFAS resist environmental degradation;

    (b)    PFAS cause extensive and persistent surface water contamination when used and discharged to surface waters in their foreseeable and intended manner;

    (c)    PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

(d)     Supplier Defendants failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(e)     There are and were safe or safer alternatives to PFAS that Supplier Defendants could have employed in their products.

213.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were and are dangerous to a degree beyond that which was and is contemplated by the ordinary consumer.

214.    The foreseeable risk of harm to public health and property posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals outweighed and outweigh the utility of such products and the cost to Supplier Defendants of reducing or eliminating those risks.

215.    A reasonable product manufacturer would have known of the significant dangers posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

216.    As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, these PFAS have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

217.    As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS,

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

and/or GenX Chemicals, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

218.     Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

219.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

220.     Supplier Defendants manufacture, sell, and distribute products to be used in Discharger Defendants' ordinary industrial applications with knowledge of the purposes for which Discharger Defendants use their products.

221.     Supplier Defendants' products include those that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Supplier Defendants know or have reason to know that such products are not fit for the known and ordinary uses at Discharger Defendants' facilities.

222.     Supplier Defendants know that Discharger Defendants indirectly discharge Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to surface waters, including the Santee River Basin.

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

223.     Supplier Defendants know that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic, and Supplier Defendants know there is no safe dose of PFOA or PFOS.

224.     Supplier Defendants have breached applicable implied warranties, and as a result, Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems are contaminated with Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

225.     As a direct, proximate, and foreseeable result of Supplier Defendants' breaches of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Supplier Defendants' breaches of implied warranties.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief where available:

(a)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate their trespasses onto Plaintiff's properties;

(c)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the evaluation, testing, acquisition, installation, operation, and maintenance of treatment technology capable of removing them;

(d)     Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)     Award such other relief and further relief as this Court deems just, proper, and equitable.

<div style="text-align:center">

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

</div>

June 5, 2025

ELECTRONICALLY FILED - 2025 Jun 05 2:45 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
―――――――――――――――――――――――――――

South Carolina Public Service Authority, a/ka/
Santee Cooper,

*Plaintiff*,

v.

China Jushi USA Corporation; Jushi USA
Fiberglass Co., Ltd.; Lindau Chemicals, Inc.;
Milliken & Company; and Waste Management of
South Carolina, Inc.,

*Defendants*.

C.A. No. 2024-CP-08-03336

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

This matter came before the Court on motions to dismiss pursuant to Rules 8(a), 12(b)(1),
and 12(b)(6), SCRCP, that were filed in the above-captioned case by Defendants China Jushi USA
Corporation and Jushi USA Fiberglass Co., Ltd. (collectively, "Jushi USA"), Defendant Lindau
Chemicals, Inc. ("Lindau"), Defendant Milliken & Company ("Milliken"), and Defendant Waste
Management of South Carolina, Inc. ("WMSC"). In this case, which has been assigned to this
Court and is part of the *In re: PFAS Litigation Coordinated Docket*, Plaintiff South Carolina Public
Service Authority, a/k/a Santee Cooper ("Plaintiff") asserts causes of action for private nuisance,
public nuisance, trespass, and negligence, gross negligence, and/or recklessness.

This Court held a hearing on April 1, 2025, during which the Court heard argument on the pending motions in this case. Before the hearing, the parties filed briefs in support of their positions.

Having carefully considered the arguments, submissions, and the record in this case, as well as the applicable law, the Court concludes that Defendants' motions are respectfully **DENIED**.

## BACKGROUND[1]

Plaintiff alleges that, for decades, Defendants have knowingly and recklessly discharged toxic per- and polyfluoroalkyl substances ("PFAS") to the Broad River, Saluda River, Congaree River, Santee River, Lake Marion, and Lake Moultrie (together, the "Santee River Basin"), contaminating Plaintiff's properties and the drinking water supplied to its customers with the chemicals. Plaintiff relies on and uses Lake Marion and Lake Moultrie, both of which are sustained by the Santee River Basin system, as vital sources to draw and supply drinking water to thousands of water customers. But Plaintiff alleges that Defendants' PFAS contamination threatens the health of South Carolina residents who receive potable water treated by Plaintiff and harms Plaintiff's properties, including, for example, its water treatment and distribution infrastructure. These man-made "forever chemicals" do not break down naturally in the environment, and they cannot be removed with conventional water treatment processes. As a result of Defendants' alleged PFAS pollution, Plaintiff alleges that its water treatment system cannot provide water that is not contaminated with these dangerous chemicals to nearly a quarter-million South Carolinians that rely on Plaintiff for their drinking water.

---

[1] The following background is based on the allegations in Plaintiff's Complaint, filed November 26, 2024 (the "Complaint"), and does not constitute findings of fact by the Court.

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Plaintiff is a public corporation and agency of the State of South Carolina responsible for supplying safe drinking water to its wholesale customers, several local water utilities in Berkeley County, Calhoun County, Dorchester County, and Orangeburg County. Plaintiff owns and operates two surface water treatment plants ("SWTPs") that are part of its water treatment and distribution system. The Lake Marion SWTP services the Lake Marion Regional Water System,[2] and it is riparian to and draws water from Lake Marion. Downstream from Lake Marion, Plaintiff's Lake Moultrie SWTP services the Lake Moultrie Regional Water System,[3] and it is riparian to and draws water from Lake Moultrie. In addition to its SWTPs, Plaintiff owns all lands beneath Lake Marion and Lake Moultrie up to their high-water marks.

Plaintiff alleges that Defendants Jushi USA, Lindau, and Milliken own and operate industrial facilities upstream of Plaintiff's drinking water intakes, and that these Defendants have used and continue to use PFAS chemicals in their manufacturing operations. Additionally, Plaintiff alleges that WMSC owns and operates the Richland Landfill, which engages in waste management operations and generates PFAS-contaminated leachate. The Complaint alleges that Defendants' operations generated and/or continue to generate PFAS-laden wastewater, which they discharge to the Santee River Basin.

According to Plaintiff, Milliken owns or has owned at least three facilities at issue in this case, one of which is no longer operational (Monarch Mill) but allegedly continues to release

---

[2] As set forth in the Complaint, "[t]he Lake Marion Water System utilizes over 46 miles of transmission pipeline to serve, currently, five wholesale customers within the Lake Marion Regional Water Agency, which consists of Berkeley, Calhoun, Dorchester, and Orangeburg Counties and the Town of Santee," and this system "delivers drinking water to approximately 3,000 water subscribers." (Compl. ¶ 16.)

[3] Also as set forth in the Complaint, "[t]he Lake Moultrie Regional Water System utilizes 20 miles of transmission pipeline that delivers drinking water throughout the Lake Moultrie Water Agency, which consists of wholesale customers Berkeley County, City of Goose Creek, Moncks Corner Public Works Commission, and the Summerville Commissioners of Public Works," and this system "delivers drinking water to approximately 234,000 water subscribers of Plaintiff's wholesale customers." (Compl. ¶ 15.)

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

contaminated wastewater to the Santee River Basin via contaminated wastewater lagoons, and two of which (the Cedar Hill Plant and the Gilliland Plant) discharge allegedly PFAS-contaminated wastewater to public wastewater treatment plants ("WWTPs") upstream of Plaintiff's properties and water sources. Plaintiff alleges that like Milliken's Cedar Hill Plant and Gilliand Plant, Jushi USA and Lindau discharge their allegedly PFAS-contaminated wastewater to WWTPs, and WMSC transports its PFAS-contaminated leachate wastewater to an upstream WWTP for disposal.

Further, Plaintiff alleges that the treatment processes used by the municipal WWTPs that receive Defendants' wastewater cannot remove PFAS, and the polluted effluent passes through the treatment processes and into surface waters unabated. Plaintiff further alleges that Defendants' PFAS-contaminated water then migrates downstream to Plaintiff's intakes on Lake Marion and Lake Moultrie, causing injury to Plaintiff and its properties, which include the Lake Marion SWTP, the Lake Moultrie SWTP, the land beneath both lakes and up to their high-water marks, Plaintiff's transmission pipelines, and the related buildings, improvements, infrastructure, and equipment that comprise Plaintiff's water treatment and distribution system.

Plaintiff further alleges that Defendants all knew or should have known that their chosen methods for disposing of their PFAS-contaminated wastewater would cause harm downstream. By their very nature, PFAS are persistent in the environment and resist natural breakdown methods and water treatment methods. PFAS chemicals' stability, resistance to breakdown, and ability to repel oil and water make them desirable in Defendants' manufacturing and industrial applications but also render them an environmental menace and a hazard to human health.

The Environmental Protection Agency ("EPA") and numerous scientific studies have linked PFAS exposure to serious human health effects, including immune system suppression,

thyroid disorders, liver damages, reproductive and developmental harms (particularly in infants and pregnant women), and kidney, testicular, and liver cancers. While PFAS are used in a variety of products, a major source of human PFAS exposure is through consuming PFAS-contaminated drinking water.

In March 2023, EPA issued proposed maximum contaminant levels ("MCLs")—the enforceable maximum amount of a contaminant that may be delivered to any public water system user (based on existing detection technology)—and maximum contaminant level goals ("MCLGs")—a purely safety-based standard for the maximum amount of a contaminant in drinking water at which adverse human health effects are not known or anticipated to occur—for certain PFAS compounds. Then, in April 2024, EPA issued the final MCLs—the agency's first ever binding regulatory limits for PFAS in drinking water. EPA set MCLs at 4 parts per trillion ("ppt") for PFOA and PFOS, 10 ppt for certain other PFAS compounds, and issued a "hazard index" approach to control mixtures of those other PFAS compounds. At that time, EPA also set MCLGs for PFOA and PFOS at zero ppt based on the agency's determination that there is no safe level of exposure to these two compounds.

Public drinking water systems such as Plaintiff's must comply with the enforceable MCLs by April 2029, but the MCLGs mean that any level of PFOA and PFOS in drinking water presents a risk of adverse health impacts. PFAS levels at Plaintiff's drinking water sources currently exceed both the MCLs and MCLGs, and Plaintiff alleges that its water treatment system was never designed to, and cannot, remove PFAS from the water. Plaintiff alleges that, as a result of Defendants' PFAS contamination, Plaintiff cannot supply drinking water to its customers that is free of PFAS contamination, and Plaintiff's property rights and properties—e.g., its land, SWTPs, distribution lines, and other infrastructure—have been harmed. Plaintiff claims that, because of the

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

contamination, it has suffered, currently suffers, and will continue to suffer significant harm and property injuries, resulting in enormous operational and financial burdens. Plaintiff therefore seeks both monetary and equitable relief to remedy that harm and protect the communities it serves from the consumption of Defendants' PFAS.

Defendants deny Plaintiff's allegations and argue that the common law claims Plaintiff asserts are not appropriate avenues by which Plaintiff can seek relief.

## STANDARD OF REVIEW

South Carolina's pleading rules state that "[e]ach averment of a pleading shall be simple concise, and direct," and they do not require any "technical forms of pleading." Rule 8(e)(1), SCRCP. Courts must liberally construe pleadings "to do substantial justice to all parties." Rule 8(f), SCRCP; *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000). Pleadings provide notice to litigants of the issues in the case—"It is elementary that the principal purpose of pleadings is to inform the pleader's adversary of legal and factual positions which he will be required to meet on trial." *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 574, 743 S.E.2d 778, 785 (2013) (quoting *S.C. Nat'l Bank v. Joyner*, 289 S.C. 382, 387, 346 S.E.2d 329, 332 (Ct. App. 1986)). While a complaint must plead facts showing that the plaintiff is entitled to relief, the complaint need not allege "the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987); Rule 8(a), SCRCP.

A motion under Rule 12(b)(6), SCRCP, tests the legal sufficiency of a plaintiff's complaint, but "it is not a vehicle for addressing the underlying merits" of the claims asserted. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925 (Ct. App. 2022). A court should only dismiss a claim under this rule if it fails "to state facts sufficient to constitute a cause of action." Rule 12(b)(6), SCRCP. "A ruling on a 12(b)(6) motion to dismiss must be based solely upon the

allegations set forth on the face of the complaint and the motion cannot be sustained if facts alleged and inferences reasonably deducible therefrom would entitle the plaintiff to any relief on any theory of the case." *Toussaint v. Ham*, 292 S.C. 415, 416, 357 S.E.2d 8, 9 (1987); *accord Stiles v. Onorato*, 318 S.C. 297, 300, 457 S.E.2d 601, 602–03 (1995). Additionally, the court "must presume all well pled facts to be true" and "every doubt" should be resolved in the plaintiff's favor. *Morrow Crane Co. v. T.R. Tucker Constr. Co.*, 296 SC. 427, 429, 373 S.E.2d 701, 702 (Ct. App. 1988); *Cole Vision Corp. v. Hobbs*, 394 S.C. 144, 149, 714 S.E.2d 537, 539 (2011). "Further, the complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action," *Plyler v. Burns*, 373 S.C. 637, 645, 647 S.E.2d 188, 192 (2007), and "novel questions of law should not ordinarily be resolved on a Rule 12(b)(6) motion," *Chestnut v. AVX Corp.*, 413 S.C. 224, 227, 776 S.E.2d 82, 84 (2015).

## CONCLUSIONS

In their motions, Defendants make the following arguments[4]: (1) Plaintiff's claims are non-justiciable because they are not ripe and Plaintiff lacks standing to bring them; (2) Plaintiff's claim for trespass fails because it did not adequately allege that Defendants committed any intentional, unauthorized entry resulting in a tangible intrusion that interfered with Plaintiff's exclusive possession of its properties; (3) Plaintiff's private and public nuisance claims fail because Plaintiff did not adequately allege Defendants controlled the source of the nuisance, interfered with

---

[4] Many of Defendants' arguments mirror those asserted by defendants in motions to dismiss filed in other lawsuits that are part of the *In re: PFAS Litigation Coordinated Docket*. *See Greenwood Comm'rs of Pub. Works v. Cone Mills Receiver, LLC et al.*, C.A. No. 2024-CP-24-00735 (Greenwood Cnty. Ct. Comm. Pleas); *Laurens Cnty. Water & Sewer Comm'n v. Cone Mills Receiver, LLC et al.*, C.A. No. 2024-CP-30-00734 (Laurens Cnty. Ct. Comm. Pleas); *Grand Strand Water & Sewer Auth. v. Aladdin Mfg. Corp. et al.*, C.A. No. 2024-CP-26-05523 (Horry Cnty. Ct. Comm. Pleas); *City of Union, SC v. Milliken & Co. et al.*, C.A. No. 2024-CP-44-00558 (Union Cnty. Ct. Comm. Pleas); *City of Clinton, SC v. BASF Corp. et al.*, C.A. No. 2025-CP-30-00005 (Laurens Cnty. Ct. Comm. Pleas); *Gaffney Bd. of Pub. Works v. Bommer Indus., Inc. et al.*, C.A. No. 2025-CP-11-00073 (Cherokee Cnty. Ct. Comm. Pleas).

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Plaintiff's properties, committed an unlawful act, or proximately caused any cognizable damages; (4) Plaintiff's negligence claim fails because: Defendants owed it no duty; Plaintiff failed to allege facts to show Defendants breached any duty or proximately caused any recoverable damages that have been suffered by Plaintiff; and Plaintiff assumed the risk of any injury; (5) the "municipal cost recovery rule" precludes Plaintiff from recovering; and (6) Plaintiff lacks standing under the *parens patriae* doctrine to bring its claims.

Having carefully and fully considered the allegations in Plaintiff's Complaint, the parties' submissions, the arguments presented, and the applicable law, the Court makes the following conclusions:

**1.     Plaintiff's claims are justiciable.**

"Our courts will not address the merits of any case unless it presents a justiciable controversy." *Jowers v. S.C. Dep't of Health and Env't Control*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018) (quoting *Byrd v. Irmo High Sch.*, 321 S.C. 426, 430–31, 468 S.E.2d 861, 864 (1996)). "Justiciability encompasses several doctrines, including ripeness, mootness, and standing." *James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010) (citing *Jackson v. State*, 331 S.C. 486, 490 n.4, 489 S.E.2d 915, 917 n.4 (1997)). "A plaintiff has standing to challenge legislation when he sustained, or is in immediate danger of sustaining, actual prejudice or injury from the legislative action." *Jowers*, 423 S.C. at 353, 815 S.E.2d at 451 (citing *Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Nat. Res.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001)). South Carolina courts "have explained ripeness by defining what is not ripe, stating 'an issue that is contingent, hypothetical, or abstract is not ripe for judicial review.'" *Id.* (quoting *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006)). "The principles of justiciability developed by South Carolina appellate courts have grown out of the federal court's interpretation of 'the case or controversy' requirement contained

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

in Article III of the United States Constitution." *Crescent Homes SC, LLC v. CJN, LLC*, 445 S.C. 164, 184, 912 S.E.2d 389, 399 (Ct. App. 2024) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina*, at 125 (3d ed. 2016)).

Defendants contend that Plaintiff's action is premature because enforcement of the MCLs for PFAS will not begin until April 2029, and that Plaintiff's obligations to comply with those regulations remain speculative and dependent on future developments. Defendants further cite pending litigation in the D.C. Circuit that may affect the final form of those regulations. As to standing, Defendants argue that Plaintiff does not own the waters at issue, which are instead owned by the State of South Carolina, and therefore Plaintiff lacks a concrete injury.

Plaintiff's Complaint pleads state common law causes of action, alleging that Defendants have maintained an ongoing PFAS contamination of its properties, including its land, SWTPs, water distribution infrastructure, and water sources. Plaintiff therefore alleges that it has suffered direct property injuries and interference with the use and enjoyment of its properties, including the inability to supply water free from unsafe concentrations of PFAS, incurring significant costs in investigating and identifying the sources of PFAS contamination, and property devaluation.

The Court concludes that the issues of ripeness and standing boil down to the same question here—does Plaintiff allege that it currently suffers concrete injury? Plaintiff's claims are not based on speculative future regulatory burdens but rather on existing and ongoing contamination of its land, infrastructure, and water sources with PFAS. Plaintiff thus does not assert claims premised solely on compliance with future regulations. Instead, it seeks relief for actual and continuing property injuries allegedly caused by Defendants' discharges of PFAS-containing wastewater into rivers upstream of Plaintiff's water intakes. The Complaint describes specific harms to Plaintiff's

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

properties and water treatment and distribution system that have already occurred and continue to occur. Accordingly, the claims are ripe for judicial review.

The Court also concludes that standing requirements are satisfied because Plaintiff has sufficiently alleged that it has a personal stake in the outcome of the controversy and that its injuries are fairly traceable to Defendants' conduct. The Complaint alleges that Defendants' conduct has directly resulted in the contamination of Plaintiff's SWTPs, water distribution infrastructure, and underlying properties. Plaintiff further alleges that it has suffered and will continue to suffer concrete injuries, including contamination of its system, interference with its properties and operations, and the imposition of significant investigative and remedial costs. That Plaintiff does not own the waters of the State does not bar its ability to seek relief for injuries to its legally protected interests in its land and infrastructure.

Accordingly, Defendants' motions to dismiss on the grounds of justiciability are hereby **DENIED**.

**2.      Plaintiff has alleged an actionable claim for trespass.**

Under South Carolina law, "a trespass is any interference with one's right to the exclusive, peaceable possession of his property." *Ravan v. Greenville Cnty.*, 315 S.C. 447, 463, 434 S.E.2d 296, 306 (Ct. App. 1993); *see also Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (Ct. App. 2001) ("[T]respass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property . . . ." (quoting *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001))). To state a claim for actionable trespass, a plaintiff must allege that the defendant invaded his property without permission through an affirmative, intentional act. *Snow v. City of Columbia*, 305 S.C. 544, 552–53, 409 S.E.2d 797, 802 (Ct. App. 1991). "The gist of trespass is the injury to possession, and generally either actual or

10

constructive possession is sufficient to maintain an action for trespass." *Hawkins v. City of Greenville*, 358 S.C. 280, 296, 594 S.E.2d 557, 566 (Ct. App. 2004).

Plaintiff alleges that Defendants are liable for trespass because Defendants have intentionally discharged wastewater containing PFAS products, and Defendants knew or should have known their PFAS-contaminated wastewater would enter and invade Plaintiff's properties, which include Plaintiff's land, SWTPs, related buildings, improvements, and infrastructure and equipment that comprise Plaintiff's water treatment and distribution system. Further, Plaintiff alleges that Defendants' products and wastewater have physically invaded and altered its properties, and they continue to do so.

Defendants contend that Plaintiff has not sufficiently alleged two necessary elements in support of its trespass claim—a tangible, physical intrusion by Defendants and that their conduct was intentional. Defendants argue that PFAS cannot support an actionable invasion or interference, relying on *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013). They also argue that any alleged trespass was neither intentional nor unauthorized because their PFAS-contaminated wastewater passes through WWTPs before reaching Plaintiff's water sources, where Plaintiff affirmatively withdraws water by activating its own water pumps.

In *Babb*, the South Carolina Supreme Court answered certified questions from the federal district court, one of which asked if "South Carolina law recognizes a cause of action for trespass solely from invisible odors, rather than from a physical invasion such as dust or water." 405 S.C. at 144, 747 S.E.2d at 476. The Supreme Court answered that South Carolina law requires "an invasion by a physical, tangible thing for a trespass to exist, and accordingly, [it held] that odors cannot give rise to a trespass claim." *Id.* at 145, 747 S.E.2d at 476. While Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that cannot constitute a trespass under

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

*Babb*, Plaintiff alleges that its properties were physically invaded with Defendants' PFAS-contaminated wastewater—indisputably tangible substances—causing past and continuing harm. Wastewater contaminated with PFAS, which persist indefinitely in the environment, is distinguishable from ephemeral, dissipating odors, and the *Babb* court even recognized that water constitutes a physical invasion. *See id.* at 144, 747 S.E.2d at 476. Plaintiff's allegations are therefore sufficient under *Babb* and decades of South Carolina precedent recognizing that chemical contamination via water is a physical invasion and actionable trespass, even if the individual contaminants are microscopic.[5]

Plaintiff also sufficiently alleges that Defendants' invasion via PFAS-contaminated wastewater was intentional. Intent exists if "the defendant acted voluntarily and [either] he knew or should have known the result would follow from his act." *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. "[W]hile the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land." *Id.* That Defendants' allegedly PFAS-contaminated wastewater passes through WWTPs and travels

---

[5] *See, e.g.*, *Kelly v. Para-Chem. S., Inc.*, 311 S.C. 223, 224, 428 S.E.2d 703, 703 (1993) (affirming a jury verdict for plaintiff in an "action for trespass through groundwater contamination"); *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 418–19, 453 S.E.2d 908, 910–11 (Ct. App. 1995) (noting that the jury returned a trespass verdict in favor of Plaintiff whose properties were either within a plume of chemically-contaminated groundwater or near a contaminated creek); *In re Wildewood Litig.*, 52 F.3d 499, 501–02 (4th Cir. 1995) (noting that trespass claim was submitted to the jury in a case alleging "the release by [Defendant]'s plant of trichloroethane (TCE) into the groundwater in and surrounding the owners' properties"); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (finding Plaintiff stated a trespass claim under South Carolina law where the complaint alleged chemical contamination of Plaintiff's property via Defendant's storm water discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (upholding jury's determination that Defendant was liable for trespass in a case where Defendant's spilled chemicals contaminated groundwater and the contamination migrated to Plaintiff's property), *aff'd in part*, 996 F.2d 1212 (4th Cir. 1993) (affirming the jury's verdict for Plaintiff on trespass); *Weatherford v. E.I. Dupont de Nemours & Co.*, C.A. No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023) (concluding Plaintiff "plausibly alleged a trespass claim" under South Carolina law based on PFAS-contaminated wastewater entering the environment via river discharges and agricultural sludge and contaminating Plaintiff's wells).

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

downstream before reaching Plaintiff's intakes, where Plaintiff withdraws water for treatment, does not negate Defendants' intent; constructive knowledge that an unwarranted entry will occur is sufficient. *See id.*; *Comm'rs of Pub. Works v. Costco Wholesale Corp.*, C.A. No. 2:21-cv-42-RMG, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (finding allegations "that Defendants knew or should have known that their flushable wipes are misleadingly labeled, do not disperse as advertised, and enter directly into Plaintiff sewer system" are "affirmative or willful acts, even if the actual flushing of the wipes into Plaintiff's sewer system is done by third parties"). If proven, Plaintiff's allegations that Defendants voluntarily discharged and disposed of their industrial wastewater containing PFAS when they knew or should have known their contaminated wastewater would enter and pollute Plaintiff's properties would establish the intent requirement of Plaintiff's trespass claim.

Additionally, Plaintiff's trespass claim is actionable because the unauthorized entry of Defendants' PFAS-contaminated wastewater onto Plaintiff's properties interfered with Plaintiff's right to the exclusive possession of its properties and caused harm to Plaintiff and its properties. *See Ravan*, 315 S.C. at 463, 434 S.E.2d at 306; *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. Plaintiff does not allege trespass to the surface waters of Lake Marion and Lake Moultrie, from which it draws water for treatment. Instead, Plaintiff alleges that Defendants trespassed into the properties that Plaintiff owns—e.g., the lake beds beneath the waters of Lake Marion and Lake Moultrie and the land up to their high-water marks, its SWTPs, its pipelines, and other components of Plaintiff's water treatment and transmission system—and from which Plaintiff has "the right to exclude all others," thereby invading Plaintiff's property rights and causing Plaintiff's damages. *Snow*, 305 S.C. at 552–53, 409 S.E.2d at 802; *see Weatherford v. E.I. DuPont de Nemours & Co.*, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023). And Plaintiff did not authorize the wrongful entry onto

13

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

its properties by Defendants' PFAS-contaminated wastewater by withdrawing water from Lake Marion and Lake Moultrie for treatment as part of its routine operations, nor did Plaintiff somehow consent to PFAS contamination by performing its essential function. In fact, Plaintiff expressly alleges that it did not consent to the entry of PFAS-contaminated water onto its properties.

In sum, Plaintiff's Complaint alleges all that is required to state a claim for unlawful entry onto its properties—Defendants affirmatively and intentionally discharged and disposed of PFAS-contaminated wastewater, knowing that it would invade Plaintiff's properties, and Plaintiff did not authorize or consent to the entry of PFAS-contaminated wastewater, which cannot be treated by Plaintiff's water treatment system and which has caused harm to Plaintiff's properties.

Accordingly, Defendants' motions to dismiss Plaintiff's trespass claim are hereby **DENIED**.

**3.    Plaintiff's allegations state claims for both private and public nuisance.**

"A nuisance is anything which works hurt, inconvenience, or damage; anything which essentially interferes with the enjoyment of life or property." *Neal v. Darby*, 282 S.C. 277, 285, 318 S.E.2d 18, 23 (Ct. App. 1984). A claim for private nuisance generally protects against unreasonable interference with the use and enjoyment of property, while public nuisance generally protects public rights—such as public order, health, and morals. *O'Cain v. O'Cain*, 322 S.C. 551, 560–62, 473 S.E.2d 460, 466 (Ct. App. 1996); *Overcash v. S.C. Elec. & Gas Co.*, 364 S.C. 569, 573–74, 614 S.E.2d 691, 621–22 (2005). Whether an interference constitutes a nuisance, however, depends on the facts. *Lefurgy v. Long Cove Club Owners Ass'n*, 313 S.C. 555, 558–59, 443 S.E.2d 577, 579 (Ct. App. 1994). Even lawful conduct "may become a nuisance by reason of circumstances, location, or surroundings." *Neal*, 282 S.C. at 286, 318 S.E.2d at 23.

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

Defendants argue they cannot be liable for creating a private or public nuisance because Plaintiff has not sufficiently alleged control, unreasonable interference, recoverable damages, or any "special injury." Defendants claim they lacked the requisite "control" over their respective contributions to the nuisance, disclaiming control over their PFAS-contaminated wastewater, because Defendants send their wastewater to WWTPs. Relying principally on *Clark v. Greenville County*, 313 S.C. 205, 437 S.E.2d 117 (1993), Defendants contend that the WWTPs' properties are the source of the PFAS contamination rather than their own. They also contend that the contamination of public bodies of water, such as those comprising the Saluda River Basin, cannot give rise to private or public nuisance because Plaintiff has not suffered any private property injuries.

The Court concludes that Plaintiff has stated claims for actionable nuisance—both private and public. While Defendants argue that contamination of public waters cannot support a nuisance claim, Plaintiff alleges that Defendants' PFAS contamination of surface waters has interfered with Plaintiff's private property, resulting in private injury. Further, in addition to Plaintiff's allegations that Defendants are causing substantial and unreasonable interference with Plaintiff's use of its properties, Plaintiff alleges that Defendants' PFAS-contaminated wastewater has endangered and continues to endanger the public health of the communities that Plaintiff supplies with drinking water. Plaintiff's allegations of discrete injuries to its properties constitute a substantial and unreasonable interference with Plaintiff's property rights for purposes of stating a private nuisance claim, as well as special injuries to allow Plaintiff to sue for public nuisance. *See Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989); *Overcash*, 364 S.C. at 573–75, 614 S.E.2d at 621–22.

Additionally, the Court disagrees with the argument that Plaintiff's nuisance claim should be dismissed because Defendants that discharge wastewater or dispose of leachate to WWTPs lack "control." Plaintiff alleges that Defendants, not the WWTPs, are the source of the nuisance. Plaintiff alleges that Defendants Jushi USA, Lindau, and Milliken owned and controlled their industrial facilities and the PFAS products used in their operations, and they disposed of their PFAS-contaminated wastewater at those facilities in a way that prevents Plaintiff from enjoying the use of its own properties. *See Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Similarly, Plaintiff alleges that Defendant WMSC owns and controls its landfill, where WMSC generated PFAS-contaminated leachate, which it controls and disposes of knowing it will interfere with Plaintiff's property rights. *See id.* Plaintiff alleges that Defendants continually send their PFAS-contaminated wastewater from their facilities to WWTPs with knowledge that the contamination passes through the WWTPs unchanged and flows directly into surface waters and onto Plaintiff's properties. Plaintiff has sufficiently alleged that Defendants controlled the nuisance.

Accordingly, Defendants' motions to dismiss Plaintiff's claims for private nuisance and public nuisance are hereby **DENIED**.

**4.     Plaintiff's allegations state a claim for negligence.**

"An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 85, 502 S.E.2d 78, 81 (1998). The existence of a legal duty is a question of law. *McCord v. Laurens Cnty. Health Care Sys.*, 429 S.C. 286, 296, 838 S.E.2d 220, 225 (Ct. App. 2020). Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others . . . ." (Compl. ¶ 88.)

16

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

In opposing Plaintiff's negligence claim, Defendants cite case law providing that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006). Because they deliver their industrial wastewater to various WWTPs and owe no duty to ensure that the WWTPs treat their wastewater in a way that does not risk harm to third parties, Defendants argue that they owe no duty of care to Plaintiff. Defendants further argue that a duty to Plaintiff may only be created "by statute, a contractual relationship, status, property interest, or some other special circumstance," none of which are applicable here. *Id.*

Plaintiff responds that it does not allege Defendants have a duty to protect it from third parties, and that Defendants conflate different tenets of South Carolina law. Plaintiff argues that while an affirmative duty to act may only be created in certain circumstances, once a party voluntarily undertakes an act, it must exercise due care in doing so. Plaintiff contends that, by voluntarily engaging in their industrial activities, Defendants were required to do so with due care. Additionally, Plaintiff asserts that Defendants also owed Plaintiff a duty because they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").

The Court agrees with Plaintiff and concludes that the Complaint sufficiently alleges a legal duty of care under the circumstances. Plaintiff does not allege that Defendants owed a duty to protect Plaintiff from the independent actions of a third party, but instead that Defendants owed a duty of care arising from their own conduct, which created a risk of harm. Moreover, South

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Carolina courts have consistently recognized a duty of care in environmental pollution contexts, where parties who released pollution into the environment owed a duty to those exposed to the pollutants. *See, e.g.*, *Chestnut v. AVX Corp.*, 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015) (finding that a manufacturer who released hazardous chemicals beyond its plant's boundaries, contaminating surrounding properties, owed a duty of care to the affected property owners); *Ravan v. Greenville Cnty.*, 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993) (holding that the defendant transporter of toxic chemicals owed a duty of care not only during the transport but also in selecting a landfill location, thus extending its duty to mitigate risks associated with industrial waste disposal). The Court concludes that the allegations in the Complaint, taken as true, sufficiently establish that Defendants owed a duty of care to Plaintiff because of Defendants' undertaking of industrial operations that posed a substantial risk of harm to Plaintiff's water system.

The Court furthermore finds that the Complaint adequately pleads that Defendants breached their duties of due care in the handling, use, and disposal of PFAS by sending the chemicals to municipal WWTPs with knowledge that PFAS are hazardous to human health, resistant to the treatment methods used by receiving WWTPs, and persist in the environment, and, further, that the receiving WWTPs discharge Defendants' PFAS to rivers upstream from Plaintiff's water intakes.

As for causation, "[p]roximate cause requires proof of both causation in fact and legal cause." *Bishop v. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.* "Ordinarily, the question of proximate cause is one of fact for the jury . . . ." *Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998)).

Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants discharge PFAS-contaminated wastewater into bodies of water upstream of Plaintiff's properties, PFAS do not naturally degrade in the environment, and the PFAS that Defendants discharged flow downstream onto Plaintiff's properties. Plaintiff moreover alleges that Defendants knew that PFAS were in their waste streams and that PFAS are persistent and resistant to conventional wastewater treatment methods like those used by their on-site treatment works or receiving WWTPs. The Court finds that Plaintiff has sufficiently alleged causation-in-fact and proximate cause. Plaintiff's allegations, taken as true, are sufficient to allege that Defendants are "but-for" causes of Plaintiff's injuries, and that its injuries were the "natural and probable consequences" of Defendants' alleged conduct. *Bishop*, 331 S.C. at 89, 502 S.E.2d at 83.

As for Defendants' argument that Plaintiff fails to allege actionable physical injury or property damage to support its negligence claim, the Court rejects this argument for the same reasons stated in Section 1 pertaining to justiciability. The Court concludes that the Complaint plainly alleges direct injuries to Plaintiff's properties caused by Defendants' PFAS, including the contamination of its land and treatment system and the inability to use its facilities to treat and supply drinking water without hazardous levels of PFAS.

Finally, Plaintiff argues that it did not assume the risk of PFAS contamination by voluntarily undertaking the role of a public drinking water utility, which necessarily requires Plaintiff to withdraw water from South Carolina waterways. The Complaint alleges that PFAS are manmade chemicals that do not occur naturally in the environment, such that PFAS contamination is not a risk inherent in Plaintiff's treatment and provision of clean drinking water. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 81, 508 S.E.2d 565, 570 (1998). The Complaint further alleges Defendants owed Plaintiff a duty to use due care in their handling, use, and disposal of PFAS chemicals to avoid causing an unreasonable risk of harm, and Plaintiff alleges that Defendants breached these duties by discharging these hazardous chemicals into South Carolina surface waters, contaminating Plaintiff's properties and causing Plaintiff's injuries. Plaintiff has sufficiently alleged facts to support the elements of its negligence claim.

Accordingly, Defendants' motions to dismiss Plaintiff's claim for negligence are hereby **DENIED**.

**5.      The "municipal cost recovery rule" does not apply.**

Defendants seek dismissal of Plaintiff's claims based on the municipal cost recovery rule (also known as the "free public services doctrine"), which they contend precludes the tort recovery Plaintiff seeks. The basis for the argument is that Plaintiff is a government entity pursuing tort claims in order to upgrade its SWTPs, and that, under the municipal cost recovery rule, public expenditures made in the performance of governmental functions, like the costs of upgrading the SWTPs, are not recoverable in tort.

Neither Defendants nor Plaintiff cite any South Carolina decisions applying the municipal cost recovery rule, and it is unclear whether the rule has been previously recognized in our jurisprudence. Nevertheless, in jurisdictions that have recognized it, the rule generally "provides that absent specific statutory authorization or damage to government-owned property, a county [or

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

other government entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Walker Cnty. v. Tri-State Crematory*, 284 Ga. App. 34, 37, 643 S.E.2d 324, 327 (2007). The municipal cost recovery rule rests on the premise that when legislative authorities have allocated the costs of public services across the public as whole, such as through taxes, courts should not intrude upon this legislative determination by authorizing tort recovery against the tortfeasor whose negligence creates the need for the service. *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983). In the *Flagstaff* decision, the Ninth Circuit explained that application of the doctrine turns on "the identity of the claimant and the nature of the cost," which "combine to deny recovery." *Id.* at 324.

According to Plaintiff, Defendants' only real basis for invoking the municipal cost recovery rule is the fact that Plaintiff is a government entity. Plaintiff argues that the rule does not apply here because Plaintiff's provision of drinking water to paying customers is neither free nor public as contemplated by the doctrine. Rather, Plaintiff only provides drinking water to those customers who pay for the service.

The Court concludes that Plaintiff's claims should not be dismissed at this stage based on the municipal cost recovery rule. Plaintiff is a public corporation and state agency, but its water services are not funded by taxes paid by the general public. Instead, its water services are funded through rates and fees collected from Plaintiff's customers, as the Legislature has expressly authorized Plaintiff to do. *See* S.C. Code Ann. § 58-31-30. Therefore, while Plaintiff is a government entity, its water services are neither "free" nor "public" for the purposes of applying the doctrine. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) ("Unlike services such as police or fire protection, water service to paying customers is not free for all the public[.]"). In addition, the Court concludes that the municipal cost recovery rule does not apply because the

claims at issue involve "damage to government-owned property." *Walker Cnty.*, 284 Ga. App. at 37, 643 S.E.2d at 327.

Accordingly, Defendants' motions to dismiss Plaintiff's claims on the basis of the municipal cost recovery rule are hereby **DENIED**.

### 6.     Plaintiff neither invokes nor requires *parens patriae* standing.

While Defendant Lindau admits that Plaintiff has the power "to sue and be sued," Lindau asserts that Plaintiff lacks *parens patriae* standing to sue on behalf of its customers and the residents of Plaintiff's community and, to the extent Plaintiff makes allegations on their behalf, Plaintiff's claims should be dismissed.

Plaintiff responds that it neither invokes nor requires *parens patriae* standing to bring its claims, and the Court agrees. As explained above, Plaintiff has sufficiently alleged that it currently suffers concrete injuries to its own interests that are fairly traceable to Defendants' conduct as alleged in the Complaint. Rather than suing to redress injuries to customers and community members, Plaintiff is suing to obtain relief for harm to its own, legally protected interests.

Accordingly, *parens patriae* standing does not apply, and Lindau's request to dismiss Plaintiff's claims on that basis is hereby **DENIED**.

### CONCLUSION

In summation and based on the foregoing, the Court **DENIES** the motions to dismiss the Complaint filed by Defendants Jushi USA, Lindau, Milliken, and WMSC in this matter.

**SO ORDERED.**

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



Berkeley Common Pleas

**Case Caption:**     South Carolina Public Service Authority , plaintiff, et al VS   China Jushi Usa Corporation , defendant, et al

**Case Number:**     2024CP0803336

**Type:**     Order/Other

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-06-05 17:15:16     page 23 of 23

ELECTRONICALLY FILED - 2025 Jun 06 9:40 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**STATE OF SOUTH CAROLINA**

**COUNTY OF BERKELEY**

**IN THE COURT OF COMMON PLEAS**

**CASE NO: 2024-CP-08-03336**

---

SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, a/k/a SANTEE COOPER,
an agency of the State of South Carolina,

      *Plaintiff,*

vs.

CHINA JUSHI USA CORPORATION,
et al.,

      *Defendants.*

**ANSWER OF CHINA JUSHI USA
CORPORATION AND JUSHI USA
FIBERGLASS CO, LTD. TO
PLAINTIFF'S AMENDED COMPLAINT**

---

COME NOW Defendants China Jushi USA Corporation and Jushi Fiberglass Co., Ltd. (collectively "Jushi USA" solely for purposes of this Answer), by and through the undersigned counsel, responding to Plaintiff South Carolina Public Service Authority's ("Plaintiff") Complaint, as follows:

Defendant Jushi USA denies each and every allegation of Plaintiff's Complaint not specifically admitted herein.

1.      Defendant Jushi USA denies the allegations in Paragraph 1.

2.      Defendant Jushi USA denies the allegations in Paragraph 2.

3.      Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 3. To the extent a response is required, Jushi USA denies the allegations.

1

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

4.      Defendant Jushi USA denies the allegations in Paragraph 4.

5.      Defendant Jushi USA denies the allegations in Paragraph 5.

6.      Defendant Jushi USA denies the allegations in Paragraph 6.

7.      Defendant Jushi USA denies the allegations in the first sentence of Paragraph 7. Jushi USA admits that Plaintiff is seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation and maintenance of water treatment technologies at Plaintiff's SWTPs, and is seeking punitive damages, but denies the remainder of the allegations in Paragraph 7.

## DISCLAIMER

8.      Paragraph 8 contains Plaintiff's characterization of the complaint and requires no response. To the extent a response is required, Defendant Jushi USA denies the allegations.

9.      Paragraph 9 contains Plaintiff's characterization of the complaint and requires no response. To the extent a response is required, Defendant Jushi USA denies the allegations.

## JURISDICTION AND VENUE

10.      The allegations in Paragraph 10 contain legal conclusions and require no response. To the extent a response is required, Defendant Jushi USA denies the allegations.

11.      The allegations in Paragraph 11 contain legal conclusions and require no response. To the extent a response is required, Defendant Jushi USA denies the allegations.

12.      The allegations in Paragraph 11 contain legal conclusions and require no response. To the extent a response is required, Defendant Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## PARTIES

13.     Defendant Jushi USA admits that Plaintiff Santee Cooper is a public corporation and agency of the State of South Carolina authorized to acquire, treat, distribute, and sell drinking water. S.C. CODE ANN. § 58-31-30; see also id. §§ 58-31-10 to -740.

14.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 14. However, to the extent that a response is required, Defendant denies the allegations.

15.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 15. However, to the extent that a response is required, Defendant denies the allegations.

16.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 16. However, to the extent that a response is required, Defendant denies the allegations.

17.     The allegations in paragraph 17 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 17. To the extent that a response is required, Jushi USA denies the allegations.

18.     Defendant Jushi USA admits that China Jushi USA Corporation is a South Carolina corporation that operates a facility located at 2971 Shop Road, Columbia, South Carolina 29209. Jushi USA denies the remainder of the allegations in Paragraph 18.

19.     The allegations in paragraph 19 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

information sufficient to form a belief as to the allegations in Paragraph 19. To the extent that a response is required, Jushi USA denies the allegations.

20.    The allegations in paragraph 20 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 20. To the extent that a response is required, Jushi USA denies the allegations.

21.    The allegations in paragraph 21 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 21. To the extent that a response is required, Jushi USA denies the allegations.

22.    The allegations in paragraph 22 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 22. To the extent that a response is required, Jushi USA denies the allegations.

23.    The allegations in paragraph 23 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 23. To the extent that a response is required, Jushi USA denies the allegations.

24.    The allegations in paragraph 24 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 24. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

25.     The allegations in paragraph 25 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 25. To the extent that a response is required, Jushi USA denies the allegations.

26.     The allegations in paragraph 26 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 26. To the extent that a response is required, Jushi USA denies the allegations.

27.     The allegations in paragraph 27 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 27. To the extent that a response is required, Jushi USA denies the allegations.

28.     The allegations in paragraph 28 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 28. To the extent that a response is required, Jushi USA denies the allegations.

29.     The allegations in paragraph 29 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 29. To the extent that a response is required, Jushi USA denies the allegations.

30.     The allegations in paragraph 30 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

information sufficient to form a belief as to the allegations in Paragraph 30. To the extent that a response is required, Jushi USA denies the allegations.

31.     The allegations in paragraph 31 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 31. To the extent that a response is required, Jushi USA denies the allegations.

32.     The allegations in paragraph 32 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 32. To the extent that a response is required, Jushi USA denies the allegations.

33.     The allegations in paragraph 33 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 33. To the extent that a response is required, Jushi USA denies the allegations.

34.     The allegations in paragraph 34 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 34. To the extent that a response is required, Jushi USA denies the allegations.

35.     The allegations in paragraph 35 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 35. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

36.     The allegations in paragraph 36 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 36. To the extent that a response is required, Jushi USA denies the allegations.

37.     The allegations in paragraph 37 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 37. To the extent that a response is required, Jushi USA denies the allegations.

38.     The allegations in paragraph 38 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 38. To the extent that a response is required, Jushi USA denies the allegations.

39.     The allegations in paragraph 39 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 39. To the extent that a response is required, Jushi USA denies the allegations.

40.     The allegations in paragraph 40 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 40. To the extent that a response is required, Jushi USA denies the allegations.

41.     The allegations in paragraph 41 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

information sufficient to form a belief as to the allegations in Paragraph 41. To the extent that a response is required, Jushi USA denies the allegations.

42.     The allegations in paragraph 42 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 42. To the extent that a response is required, Jushi USA denies the allegations.

43.     The allegations in paragraph 43 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 43. To the extent that a response is required, Jushi USA denies the allegations.

44.     The allegations in paragraph 44 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 44. To the extent that a response is required, Jushi USA denies the allegations.

45.     The allegations in paragraph 45 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 45. To the extent that a response is required, Jushi USA denies the allegations.

### FACTUAL ALLEGATIONS

46.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 46. To the extent a response is required, the allegations are denied.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

47.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 47. To the extent a response is required, the allegations are denied.

48.     Defendant Jushi USA denies the allegations in Paragraph 48.

49.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 49. To the extent a response is required, the allegations are denied.

50.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 50. To the extent a response is required, the allegations are denied.

51.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 51. To the extent a response is required, Jushi USA denies the allegations.

52.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 52. To the extent a response is required, the allegations are denied.

53.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 53. To the extent a response is required, the allegations are denied.

54.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 54. To the extent a response is required, the allegations are denied.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

55.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 55. To the extent a response is required, the allegations are denied.

56.     Defendant Jushi USA admits that in 2009, the EPA published provisional drinking water health advisories for PFOA and PFOS, and set the advisory levels to 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. Jushi USA denies the remainder of the allegations in Paragraph 56.

57.     Defendant Jushi USA admits that in 2016, EPA published lifetime health advisory levels for each chemical in drinking water. Jushi USA admits that said advisory, which superseded the 2009 provisional levels, set the 2016 levels for PFOA and PFOS at 70 ppt. The quoted language in Paragraph 57 speaks for itself and no response is required. To the extent a response is required, Jushi USA admits to the extent it correctly quotes the document. Jushi USA denies the remainder of the allegations in Paragraph 57, particularly Plaintiff's assertion that said advisory was established by the EPA "due to the evolution of science on the health effects of PFOA and PFOS."

58.     The quoted language in Paragraph 58 speaks for itself and no response is required. To the extent a response is required, Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations in Paragraph 58 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

59.     The quoted language in Paragraph 59 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. Jushi USA admits that on June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels. Jushi USA

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

further admits that EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals, at 0.004 ppt for PFOA and 0.02 ppt for PFOS. Jushi USA also admits that EPA stated that concerns regarding the public health implication of the data led to its issuance of interim levels.

60.     The quoted language in Paragraph 60 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. Jushi USA admits that on June 15, 2022 the EPA issued health advisories covering PFBS and GenX Chemicals. Jushi USA further admits that the EPA released final health advisories for GenX Chemicals at 10 ppt and PFBS at 2,000 ppt. The remainder of the allegations in Paragraph 60 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

61.     Defendant Jushi USA admits that EPA issued proposed maximum contaminant level ("MCLs")s  and maximum contaminant level goals ("MCLGs")  for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals. The remainder of the allegations in Paragraph 61 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

62.     The quoted language in Paragraph 62 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations in Paragraph 62 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

63.     The allegations in Paragraph 63 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

64.     The quoted language in Paragraph 64 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document.

65.     The quoted language in Paragraph 65 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations contain Plaintiff's characterization of federal agency actions or regulations, to which no response is required. To the extent a response is required, Jushi USA admits to the extent it accurately characterizes the document.

66.     The quoted language in Paragraph 66 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations contain Plaintiff's characterization of federal agency actions or regulations, to which no response is required. To the extent a response is required, Jushi USA admits to the extent it accurately characterizes the document.

67.     The allegations in Paragraph 67 contain Plaintiff's characterizations of federal agency actions or regulations, to which no response is required. To the extent a response is required, the allegations are denied.

68.     The allegations in Paragraph 68 contain Plaintiff's characterization of a federal agency action or regulation, which speaks for itself, and no response is required. To the extent a response is required, the allegations are admitted insofar as they accurately state the provisions of the agency action or regulation.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

69.    The quoted language in Paragraph 69 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations in Paragraph 69 contain plaintiff's characterizations of said EPA press release and requires no response. To the extent a response is required, Jushi USA admits the allegations.

70.    The quoted language in Paragraph 70 speaks for itself and no response is required. To the extent a response is required, Defendant Jushi USA admits to the extent it correctly quotes the document. The remainder of the allegations contains Plaintiff's characterization of a federal agency action or regulation, to which no response is required. To the extent a response is required, Jushi USA admits the allegations to the extent that the allegations properly characterize the federal agency action or regulation.

71.    Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 71. To the extent a response is required, the allegations are denied.

72.    Defendant Jushi USA denies the allegations in Paragraph 72 as it pertains to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief as to the allegations as they pertain to other defendants. To the extent a response is required, the allegations are denied.

73.    Defendant Jushi USA denies the allegations in Paragraph 73.

74.    Defendant Jushi USA admits that it owns and operates an industrial facility. Jushi USA is without knowledge or information sufficient to form a belief as to the allegations regarding the location of Jushi USA's industrial facility relative to the Santee River Basin. To the extent a

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

response is required as to that allegation, Jushi USA denies the allegation. Jushi USA denies the remainder of the allegations in Paragraph 74.

75.    Defendant Jushi USA denies the allegations in Paragraph 75.

76.    Defendant Jushi USA denies the allegations in Paragraph 76.

77.    Defendant Jushi USA denies the allegations in Paragraph 77.

78.    Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 78. To the extent a response is required, Jushi USA, denies the allegations.

79.    Defendant Jushi USA denies the allegations in Paragraph 79.

80.    Defendant Jushi USA denies the allegations in Paragraph 80 as it pertains to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other Defendants. To the extent that a response is required, Jushi USA denies the allegations.

81.    The allegations in Paragraph 81 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 81. To the extent that a response is required, Jushi USA denies the allegations.

82.    The allegations in Paragraph 82 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 82. To the extent that a response is required, Jushi USA denies the allegations.

83.    The allegations in Paragraph 83 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

information sufficient to form a belief as to the allegations in Paragraph 83. To the extent that a response is required, Jushi USA denies the allegations.

84.     The allegations in Paragraph 84 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 84. To the extent that a response is required, Jushi USA denies the allegations.

85.     The allegations in Paragraph 85 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 85. To the extent that a response is required, Jushi USA denies the allegations.

86.     The allegations in Paragraph 86 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 86. To the extent that a response is required, Jushi USA denies the allegations.

87.     The allegations in Paragraph 87 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 87. To the extent that a response is required, Jushi USA denies the allegations.

88.     The allegations in Paragraph 88 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 88. To the extent that a response is required, Jushi USA denies the allegations.

89.     The allegations in Paragraph 89 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 89. To the extent that a response is required, Jushi USA denies the allegations.

90.     The allegations in Paragraph 90 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 90. To the extent that a response is required, Jushi USA denies the allegations.

91.     The allegations in Paragraph 91 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 91. To the extent that a response is required, Jushi USA denies the allegations.

92.     The allegations in Paragraph 92 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 92. To the extent that a response is required, Jushi USA denies the allegations.

93.     The allegations in Paragraph 93 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 93. To the extent that a response is required, Jushi USA denies the allegations.

94.     The allegations in Paragraph 94 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

information sufficient to form a belief as to the allegations in Paragraph 94. To the extent that a response is required, Jushi USA denies the allegations.

95.    The allegations in Paragraph 95 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 95. To the extent that a response is required, Jushi USA denies the allegations.

96.    The allegations in Paragraph 96 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 96. To the extent that a response is required, Jushi USA denies the allegations.

97.    The allegations in Paragraph 97 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 97. To the extent that a response is required, Jushi USA denies the allegations.

98.    The allegations in Paragraph 98 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 98. To the extent that a response is required, Jushi USA denies the allegations.

99.    The allegations in Paragraph 99 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 99. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

100.    The allegations in Paragraph 100 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 100. To the extent that a response is required, Jushi USA denies the allegations.

101.    The allegations in Paragraph 101 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 101. To the extent that a response is required, Jushi USA denies the allegations.

102.    The allegations in Paragraph 102 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 102. To the extent that a response is required, Jushi USA denies the allegations.

103.    The allegations in Paragraph 103 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 103. To the extent that a response is required, Jushi USA denies the allegations.

104.    The allegations in Paragraph 104 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 104. To the extent that a response is required, Jushi USA denies the allegations.

105.    The allegations in Paragraph 105 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

information sufficient to form a belief as to the allegations in Paragraph 105. To the extent that a response is required, Jushi USA denies the allegations.

106. The allegations in Paragraph 106 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 106. To the extent that a response is required, Jushi USA denies the allegations.

107. The allegations in Paragraph 107 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 107. To the extent that a response is required, Jushi USA denies the allegations.

108. The allegations in Paragraph 108 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 108. To the extent that a response is required, Jushi USA denies the allegations.

109. The allegations in Paragraph 109 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 109. To the extent that a response is required, Jushi USA denies the allegations.

110. The allegations in Paragraph 110 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 110. To the extent that a response is required, Jushi USA denies the allegations.

111.    Defendant Jushi USA denies the allegations in Paragraph 111 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

112.    Defendant Jushi USA denies the allegations in Paragraph 112 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

113.    Defendant Jushi USA denies the allegations in Paragraph 113 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

114.    Defendant Jushi USA denies the allegations in Paragraph 114 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

115.    Defendant Jushi USA denies the allegations in Paragraph 115 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

116.    Defendant Jushi USA denies the allegations in Paragraph 116 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

117.     Defendant Jushi USA denies the allegations in Paragraph 117 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

118.     Defendant Jushi USA denies the allegations in Paragraph 118 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

119.     Defendant Jushi USA denies the allegations in Paragraph 119 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

120.     Defendant Jushi USA denies the allegations in Paragraph 120 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

121.     The allegations in Paragraph 121 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 121. To the extent that a response is required, Jushi USA denies the allegations.

122.    The allegations in Paragraph 122 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 122. To the extent that a response is required, Jushi USA denies the allegations.

123.    The allegations in Paragraph 123 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 123. To the extent that a response is required, Jushi USA denies the allegations.

124.    The allegations in Paragraph 124 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 124. To the extent that a response is required, Jushi USA denies the allegations.

125.    The allegations in Paragraph 125 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 125. To the extent that a response is required, Jushi USA denies the allegations.

126.    The allegations in Paragraph 126 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 126. To the extent that a response is required, Jushi USA denies the allegations.

127.    The allegations in Paragraph 127 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

information sufficient to form a belief as to the allegations in Paragraph 127. To the extent that a response is required, Jushi USA denies the allegations.

128.    The allegations in Paragraph 128 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 128. To the extent that a response is required, Jushi USA denies the allegations.

129.    The allegations in Paragraph 129 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 129. To the extent that a response is required, Jushi USA denies the allegations.

130.    The allegations in Paragraph 130 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 130. To the extent that a response is required, Jushi USA denies the allegations.

131.    The allegations in Paragraph 131 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 131. To the extent that a response is required, Jushi USA denies the allegations.

132.    The allegations in Paragraph 132 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 132. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

133.    The allegations in Paragraph 133 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 133. To the extent that a response is required, Jushi USA denies the allegations.

134.    Defendant Jushi USA denies the allegations in Paragraph 134.

135.    Defendant Jushi USA denies the allegations in Paragraph 135 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

136.    Defendant Jushi USA denies the allegations in Paragraph 136 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

137.    Defendant Jushi USA denies the allegations in Paragraph 137 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

138.    Defendant Jushi USA denies the allegations in Paragraph 137 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

## FIRST CAUSE OF ACTION

### Private Nuisance

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

139.     Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

140.     Defendant Jushi USA admits the allegations in the first sentence of Paragraph 140. Jushi USA is without knowledge or information sufficient to form a belief as to the remainder of the allegations. To the extent a response is required, Jushi USA denies the allegations in Paragraph 140 not specifically admitted.

141.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 141. To the extent a response is required, Jushi USA denies the allegations.

142.     Defendant Jushi USA denies the allegations in Paragraph 142 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

143.     Defendant Jushi USA denies the allegations in Paragraph 143 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

144.     Defendant Jushi USA denies the allegations in Paragraph 144 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

145.     Defendant Jushi USA denies the allegations in Paragraph 145 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

146.    Defendant Jushi USA denies the allegations in Paragraph 146 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

147.    Defendant Jushi USA denies the allegations in Paragraph 147 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

148.    Defendant Jushi USA denies the allegations in Paragraph 148 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

149.    Defendant Jushi USA denies the allegations in Paragraph 149 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

150.    Defendant Jushi USA denies the allegations in Paragraph 150 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

<u>**SECOND CAUSE OF ACTION**</u>

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**Public Nuisance**

151.    Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

152.    Defendant Jushi USA admits the allegations in the first sentence of Paragraph 152. Jushi USA is without knowledge or information sufficient to form a belief as to the remainder of the allegations. To the extent a response is required, Jushi USA denies the allegations in Paragraph 152 not specifically admitted.

153.    Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 153. To the extent a response is required, Jushi USA denies the allegations in Paragraph 153.

154.    Defendant Jushi USA denies the allegations in Paragraph 154 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

155.    Defendant Jushi USA denies the allegations in Paragraph 155 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

156.    Defendant Jushi USA denies the allegations in Paragraph 156 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

157.    Defendant Jushi USA denies the allegations in Paragraph 157 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

158.    Defendant Jushi USA denies the allegations in Paragraph 158 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

159.    Defendant Jushi USA denies the allegations in Paragraph 159 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

160.    Defendant Jushi USA denies the allegations in Paragraph 160 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

161.    Defendant Jushi USA denies the allegations in Paragraph 161 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

162.    Defendant Jushi USA denies the allegations in Paragraph 162 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

### THIRD CAUSE OF ACTION

#### Trespass

163.    Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

164.    Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 164. To the extent a response is required, Jushi USA denies the allegations.

165.    Defendant Jushi USA denies the allegations in Paragraph 165 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

166.    The allegations in paragraph 166 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 166. To the extent that a response is required, Jushi USA denies the allegations.

167.    The allegations in paragraph 167 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 167. To the extent that a response is required, Jushi USA denies the allegations.

168.    Defendant Jushi USA denies the allegations in Paragraph 168 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

169.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 169. To the extent a response is required, Jushi USA denies the allegations.

170.     Defendant Jushi USA denies the allegations in Paragraph 170 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

171.     Defendant Jushi USA denies the allegations in Paragraph 171 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

172.     Defendant Jushi USA denies the allegations in Paragraph 172 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

173.     Defendant Jushi USA denies the allegations in Paragraph 173 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

174.     Defendant Jushi USA denies the allegations in Paragraph 174 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

176.    Defendant Jushi USA denies the allegations in Paragraph 175 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

176.    Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

177.    Defendant Jushi USA denies the allegations in Paragraph 177 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

178.    Defendant Jushi USA denies the allegations in Paragraph 178 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

179.    Defendant Jushi USA denies the allegations in Paragraph 179 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

180.     The allegations in paragraph 180 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 180. To the extent that a response is required, Jushi USA denies the allegations.

181.     The allegations in paragraph 181 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 181. To the extent that a response is required, Jushi USA denies the allegations.

182.     The allegations in paragraph 182 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 182. To the extent that a response is required, Jushi USA denies the allegations.

183.     Defendant Jushi USA denies the allegations in Paragraph 183 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

184.     Defendant Jushi USA denies the allegations in Paragraph 184 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

185.    Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

186.    The allegations in paragraph 186 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 186. To the extent that a response is required, Jushi USA denies the allegations.

187.    Defendant Jushi USA denies the allegations in Paragraph 187 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

188.    The allegations in paragraph 188 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 188. To the extent that a response is required, Jushi USA denies the allegations.

189.    Defendant Jushi USA denies the allegations in Paragraph 189 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

190.    Defendant Jushi USA denies the allegations in Paragraph 190 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

191.    The allegations in paragraph 191 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 191. To the extent that a response is required, Jushi USA denies the allegations.

192.    The allegations in paragraph 192 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 192. To the extent that a response is required, Jushi USA denies the allegations.

193.    The allegations in paragraph 193 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 193. To the extent that a response is required, Jushi USA denies the allegations.

194.    The allegations in paragraph 194 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 194. To the extent that a response is required, Jushi USA denies the allegations.

## SIXTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity

195.    Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

196.    Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 196. To the extent a response is required, the allegations are denied.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

197.    Defendant Jushi USA denies the allegations in Paragraph 197 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

198.    Defendant Jushi USA denies the allegations in Paragraph 198 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

199.    The allegations in paragraph 199 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 199. To the extent that a response is required, Jushi USA denies the allegations.

200.    The allegations in paragraph 200 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 200. To the extent that a response is required, Jushi USA denies the allegations.

201.    The allegations in paragraph 201 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 201. To the extent that a response is required, Jushi USA denies the allegations.

202.    Defendant Jushi USA denies the allegations in Paragraph 202 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

203.     The allegations in paragraph 203 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 203. To the extent that a response is required, Jushi USA denies the allegations.

204.     The allegations in paragraph 204 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 204. To the extent that a response is required, Jushi USA denies the allegations.

205.     The allegations in paragraph 205 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 205. To the extent that a response is required, Jushi USA denies the allegations.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect

206.     Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

207.     Defendant Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 207. To the extent a response is required, the allegations are denied.

208.     Defendant Jushi USA denies the allegations in Paragraph 208 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding

the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

209.   The allegations in paragraph 209 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 209. To the extent that a response is required, Jushi USA denies the allegations.

210.   The allegations in paragraph 210 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 210. To the extent that a response is required, Jushi USA denies the allegations.

211.   The allegations in paragraph 211 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 211. To the extent that a response is required, Jushi USA denies the allegations.

212.   The allegations in paragraph 212 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 212. To the extent that a response is required, Jushi USA denies the allegations.

213.   The allegations in paragraph 213 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 213. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

214.    The allegations in paragraph 214 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 214. To the extent that a response is required, Jushi USA denies the allegations.

215.    The allegations in paragraph 215 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 215. To the extent that a response is required, Jushi USA denies the allegations.

216.    The allegations in paragraph 216 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 216. To the extent that a response is required, Jushi USA denies the allegations.

217.    The allegations in paragraph 217 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 217. To the extent that a response is required, Jushi USA denies the allegations.

218.    The allegations in paragraph 218 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 218. To the extent that a response is required, Jushi USA denies the allegations.

<div align="center">

**EIGHTH CAUSE OF ACTION**

**Breach of Implied Warranties**

</div>

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

219.     Defendant Jushi USA incorporates all prior responses by reference as if fully set forth herein.

220.     Defendant Jushi USA denies the allegations in Paragraph 220 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

221.     Defendant Jushi USA denies the allegations in Paragraph 221 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

222.     Defendant Jushi USA denies the allegations in Paragraph 222 as they pertain to Jushi USA. Jushi USA is without knowledge or information sufficient to form a belief regarding the allegations as it pertains to other defendants. To the extent that a response is required, Jushi USA denies the allegations.

223.     The allegations in paragraph 223 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 223. To the extent that a response is required, Jushi USA denies the allegations.

224.     The allegations in paragraph 224 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 224. To the extent that a response is required, Jushi USA denies the allegations.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

225.    The allegations in paragraph 225 pertain to defendants other than Defendant Jushi USA and therefore require no response. Furthermore, Jushi USA is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 225. To the extent that a response is required, Jushi USA denies the allegations.

## AFFIRMATIVE DEFENSES

1.    The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Jushi USA.

2.    Plaintiffs' Complaint should be dismissed to the extent Plaintiffs lack sufficient process and/or service of process against Jushi USA.

3.    Plaintiffs' claims are barred or limited for lack of standing.

4.    The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitation.

5.    The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of repose.

6.    The Complaint, and each alleged cause of action or count alleged therein, fails to join all necessary and indispensable parties.

7.    The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches.

8.    The Complaint, and each alleged claim contained therein, is barred, in whole or in part, because Plaintiffs are not the real parties in interest or lack capacity to bring their claims, including claims indirectly maintained on behalf of their citizens and/or customers and claims brought as *parens patriae.*

9.    Plaintiffs' claims are premature to the extent that neither the State nor the United

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

States Environmental Protection Agency have set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

10.     Plaintiffs' claims are not ripe and/or have been mooted.

11.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs have failed to exhaust administrative remedies.

12.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

13.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel and/or waiver.

14.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of *res judicata* and collateral estoppel.

15.     Plaintiffs' claims are barred, in whole or in part, under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or similar or related doctrines available under applicable law.

16.     Any injuries and/or damages alleged to have been sustained by Plaintiffs may have been caused or contributed to by the negligence or actual conduct of Plaintiffs and/or other persons, firms, corporations, or entities over whom Jushi USA had no control or right of control and for whom Jushi USA is not responsible.

17.     Any injuries and/or damages alleged to have been sustained by Plaintiffs are barred by the doctrines of intervening cause and/or superseding cause.

18.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of election of remedies.

19.     Plaintiffs' claims are subject to all defenses that could be asserted if Plaintiffs'

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

claims were properly made by individuals on whose behalf or for whose alleged damages Plaintiffs seek to recover.

20.    Plaintiffs' claims are barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

21.    Plaintiffs' claims are barred, in whole or in part, because any alleged levels of alleged contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

22.    Plaintiffs' claims are barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Jushi USA that are the subject of Plaintiffs' claims. Jushi USA is not responsible or liable for any acts or omissions undertaken by, or at the direction of, any governmental authority or agency.

23.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of primary jurisdiction.

24.    The claims against Jushi USA fail because Jushi USA does not exercise sufficient control over the property that is allegedly causing the nuisance and does not exercise sufficient control over the instrumentality of the alleged nuisance.

25.    The claims against Jushi USA fail because there was no intentional act by Jushi USA that would support a claim for trespass.

26.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted, promulgated, and/or issued by Congress,

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

federal agencies, or the executive branch, including, without limitation, to the extent Plaintiffs' claims constitute an impermissible challenge to a response or remediation action under CERCLA, 42 U.S.C. § 9613(h).

27.     Plaintiffs' claims are, or may be, barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies.

28.     Plaintiffs' strict liability claims, if any, are barred to the extent strict liability is not (or was not during the applicable time period) recognized as a cause of action under applicable law.

29.     Plaintiffs' damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Jushi USA, and in the event that Jushi USA is found to be liable to Plaintiffs (which Jushi USA denies), Jushi USA will be entitled to indemnification, contribution, and/or apportionment.

30.     Jushi USA asserts its right to allocation or apportionment of fault pursuant to applicable state law, as well as its rights to a proportionate reduction of any damages found against Jushi USA based on the negligence or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiffs.

31.     Any claims based on market share theories of liability fail and should be dismissed to the extent that market share liability is not available under the applicable law and/or because Jushi USA's products and sales do not qualify for market share liability.

32.     There are no allegations against Jushi USA stated with sufficient particularity to constitute a cause of action for fraud, fraudulent misrepresentation, concealment, intentional or willful acts or the like which would meet the requirements of the Rules of Civil Procedure, and any such claims asserted should be dismissed.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

33.     Plaintiffs' claims against Jushi USA are barred or limited by the economic loss rule.

34.     Plaintiffs may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on its part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiffs' failure to mitigate damages, if any.

35.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of acquiescence, accord and satisfaction, ratification, settlement, and/or release.

36.     Plaintiffs' claims are barred, in whole or in part, under the free public services doctrine or municipal cost recovery rule.

37.     To the extent that Plaintiffs have split their claims, Plaintiffs' claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

38.     Plaintiffs' claims are barred, in whole or in part, because Jushi USA did not owe a legal duty to Plaintiffs or, if it owed such a duty, it did not breach, and/or fully discharged that duty.

39.     Plaintiffs' claims are barred, in whole or in part, because, at all relevant times, Jushi USA exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

40.     Plaintiffs' claims are barred, in whole or in part, because none of the alleged acts or omissions of Jushi USA proximately caused the purported injuries and damages allegedly sustained by Plaintiffs.

41.     Plaintiffs' claims for trespass or nuisance are barred, in whole or in part, because any alleged trespass or nuisance was unintentional, unforeseen, a necessity, and/or *de minimis* and

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

therefore non-compensable.

42.     Plaintiffs' claims are barred, in whole or in part, due to a lack of privity between the Plaintiffs and Jushi USA.

43.     Plaintiffs' claims for alleged injuries and damages are barred, in whole or in part, because these claims are speculative, uncertain, and conjectural.

44.     Plaintiffs' claims are barred, in whole or in part, under the doctrines of contributory negligence, comparative negligence, and/or related doctrines available under applicable law.

45.     Jushi USA denies any liability, but in the event Jushi USA is found to have any liability to Plaintiffs, Jushi USA is entitled to any offset against any such liability on its part for the greatest of: (i) any amounts actually paid by any person or entity heretofore or hereafter for any of the injuries, costs, damages, and expenses alleged in the Complaint; (ii) any amounts stipulated or otherwise agreed to in any release or covenant not to sue any person or entity heretofore or hereafter for any of the injuries, costs, damages, and expenses alleged in the Complaint; or (iii) the equitable share of the liability of any person or entity that heretofore has received, or hereafter receives, any release from liability or covenant not to sue with respect to any of the injuries, costs, damages, and expenses alleged in the Complaint.

46.     Jushi USA cannot be held jointly and severally liable for the acts or omissions of third parties because their acts or omissions were separate and distinct and the alleged harm is divisible from, and greater than, any harm allegedly caused by acts or omissions of Jushi USA.

47.     Plaintiffs' claims are barred, in whole or in part, for failing to link any of their alleged exposure to any product(s) distributed or sold by Jushi USA.

48.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs cannot establish that their alleged injuries were caused by exposure to PFAS or from any product(s)

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

attributable to Jushi USA.

49.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs cannot establish that PFAS, or any other exposure alleged by Plaintiffs, has been reliably established, through scientific means, to be capable of causing their alleged injuries.

50.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs cannot establish that they were exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing their alleged injuries.

51.     Plaintiffs' claims are barred, in whole or in part, because Jushi USA acted reasonably and in good faith.

52.     Any damages Plaintiffs may have suffered were not reasonably foreseeable by Jushi USA at the time of the conduct alleged.

53.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs seek to retroactively impose liability for conduct that was not actionable at the time it occurred, and Jushi USA may not be held liable under retroactive theories not requiring proof of fault or causation.

54.     Plaintiffs' claims are barred, in whole or in part, because Jushi USA neither knew, nor should have known, that any of the substances to which Plaintiffs were allegedly exposed allegedly were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Jushi USA at all times relevant to the claims or causes of action asserted by Plaintiffs.

55.     Jushi USA is entitled to all the procedural, substantive, and other protections, caps, and limitations provided by the state statutes and other state and federal law regarding Plaintiffs' claims for compensatory and punitive damages.

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

56.     The Complaint fails to state a claim upon which punitive or exemplary damages may be awarded.

57.     Jushi USA did not engage in any conduct which would warrant or form a valid basis for an award of punitive or exemplary damages.

58.     Plaintiffs have failed to adequately plead and/or allege that Jushi USA acted with the requisite state of mind to warrant an award of punitive or exemplary damages.

59.     Jushi USA has complied with all applicable statutes and regulations set forth by local, state, and/or federal government(s) with regard to the conduct alleged in the Complaint, and, therefore, to the extent that consideration is given to Plaintiffs' claims, punitive or exemplary damages are unwarranted in law and fact.

60.     Punitive or exemplary damages are not available because all conduct and activities of Jushi USA related to matters alleged in the Complaint conformed to industry standards based upon the state of medical, scientific, and/or industrial knowledge which existed during the relevant and material time period.

61.     Punitive or exemplary damages are not available because Jushi USA neither knew nor should have known that the substances to which Plaintiffs were allegedly exposed constituted a reasonable or foreseeable risk of physical harm, and Jushi USA therefore lacked notice that its conduct was unlawful or subject to punishment and an award of punitive or exemplary damages would violate Jushi USA's constitutional right to due process.

62.     Plaintiffs' claims for punitive or exemplary damages are barred or reduced by applicable law or statute, or are unconstitutional insofar as they violate the due process protections afforded by the United States Constitution, including without limitation the Fifth, Eighth, and Fourteenth Amendments to and the Excessive Fines Clause and Full Faith and Credit Clause of

the United States Constitution, and any other applicable provisions of the Constitution of any other state whose laws may apply.

63.     Plaintiffs' claims are barred, in whole or in part, to the extent that the alleged injuries and damages, if any, were due to preexisting conditions, for which Jushi USA cannot be held responsible.

64.     To the maximum extent allowed by applicable law, Jushi USA is entitled to recover its costs and attorneys' fees incurred in defending Plaintiffs' claims.

65.     Jushi USA reserves the right to assert all applicable defenses under Rules of Civil Procedure 8(c) and 12(b), as investigation and discovery proceeds.

Jushi USA does not admit or acknowledge that it bears the burden of proof and/or burden of persuasion with respect to any of the above defenses. All of the preceding defenses are pled in the alternative and none constitutes an admission that Jushi USA is liable to Plaintiffs, that Plaintiffs have been or will be injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever. Jushi USA reserves its rights to (i) rely on any and all defenses and presumptions set forth in or arising from any rule of law or statute of any state whose substantive law might control the relevant action, (ii) rely upon any other defenses set forth in any Answer or disclosure of affirmative defenses of any Defendant in the above-captioned action (including, without limitation, any case transferred to the above-captioned action), (iii) rely upon any other defenses that may become apparent during fact or expert discovery in this matter, and (iv) amend this document to assert any such defenses.

WHEREFORE, Defendants China Jushi USA Corporation and Jushi Fiberglass Co., Ltd. pray that this Honorable Court will dismiss the claims in Plaintiffs' Complaint, issue an order in favor of Defendant, and award Defendant damages, including but not limited to attorneys' fees and costs.

Dated: July 8, 2025                                        Respectfully submitted,

                                                         */s/ Celine Amini*
                                                         Celine Amini (Bar No. 106206)
                                                         Randall M. Levine (*pro hac vice*)
                                                         April Knight (*pro hac vice*)
                                                         MORGAN, LEWIS & BOCKIUS, LLP
                                                         1111 Pennsylvania Avenue, NW
                                                         Washington, DC 20004-2541
                                                         T: (202) 739-3000
                                                         F: (202) 739-3001
                                                         celine.amini@morganlewis.com
                                                         randall.levine@morganlewis.com
                                                         april.knight@morganlewis.com

                                                         Mark Donatiello (*pro hac vice*)
                                                         MORGAN, LEWIS & BOCKIUS, LLP
                                                         502 Carnegie Center
                                                         Princeton, NJ 08540
                                                         T: (609) 919-6476
                                                         F: (609) 919-6600
                                                         mark.donatiello@morganlewis.com

                                                         *Attorneys for Defendants China
                                                         Jushi USA Corporation and Jushi
                                                         USA Fiberglass Co., Ltd.*

ELECTRONICALLY FILED - 2025 Jul 08 4:10 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELY

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

---

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

C.A. No. 2024-CP-08-03336

*Plaintiff*,

v

AGC Chemicals Americas, Inc.; Archroma
U.S. Inc.; Arkema, Inc.; Atotech USA, LLC;
Carlisle Partners, LLC; Carlisle WW Holdings,
LLC; China Jushi USA Corporation; Clariant
Corporation; Coatex, Inc.; Corteva, Inc.; Daikin
America, Inc.; DS Smith PLC; DuPont de
Nemours, Inc.; EIDP, Inc.; Graphic Packaging
International, LLC; Huntsman Advanced
Materials Americas, LLC; Huntsman
International, LLC; Interstate Container
Columbia, LLC; INV Performance Surfaces,
LLC; Jushi USA Fiberglass Co., Ltd.; Lindau
Chemicals, Inc.; Milliken & Company; Organic
Dyes and Pigments, LLC; Precoat Metals
Corp.; Republic Services of South Carolina,
LLC; Shaw Industries Group, Inc.; Solvay
Specialty Polymers USA, LLC; Springs Global
US, Inc.; Springs Industries, LLC; Standard
Textile Carolina, Inc.; Synthomer, Inc.; The
Chemours Company; and Waste Management
of South Carolina, Inc.,

*Defendants*.

## MILLIKEN & COMPANY'S ANSWER

Defendant MILLIKEN & COMPANY ("Milliken") answers Plaintiff's Amended

Complaint and states as follows:

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## GENERAL DENIAL

Milliken denies each and every allegation of Plaintiff's Amended Complaint which is not specifically and expressly admitted hereafter.

## SPECIFIC DENIALS

Milliken denies the specific allegations of Plaintiff's Amended Complaint as follows:

## STATEMENT OF THE CASE

1.      Milliken admits Plaintiff asserts claims in this action, but Milliken denies any claims asserted against it have merit. Milliken denies all remaining allegations in this paragraph as to it.

2.      Milliken admits Plaintiff seeks certain relief in this action, but denies Plaintiff is entitled to any relief. Milliken denies all remaining allegations in this paragraph as to it.

3.      Milliken is without sufficient information to answer the allegations in this paragraph and therefore denies the same.

4.      Milliken admits it owns and operates industrial facilities in South Carolina, and those facilities discharge wastewater to some wastewater treatment plants pursuant to valid discharge permits. Milliken denies it currently uses the products described in this paragraph at any location upstream of Plaintiff's water intake. Milliken is without sufficient information to answer the remaining allegations in this paragraph and therefore denies the same as to it.

5.      Milliken denies all allegations in this paragraph as to it.

6.      Milliken denies all allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

7.    Milliken admits Plaintiff seeks punitive damages in this action, but denies Plaintiff is entitled to any such damages. Milliken denies all remaining allegations in this paragraph as to it.

## DISCLAIMER

8.    This paragraph states legal conclusions that do not require a response. To the extent a response is required, Milliken denies the same.

9.    This paragraph states legal conclusions that do not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## JURISDICTION AND VENUE

10.    Milliken admits this Court has subject matter jurisdiction over the asserted claims, but Milliken denies any claims asserted against it have merit.

11.    Milliken admits this Court may exercise personal jurisdiction over it, but denies that jurisdiction rests on South Carolina's long-arm statute. Milliken is not required to answer allegations as to any other defendant.

12.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## PARTIES

I.    **Plaintiff**

13.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

14.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

15.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

16.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## II.    Discharger Defendants

17.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

18.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

19.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

20.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

21.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 18 11:11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

22.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

23.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

24.     Milliken admits it is a Delaware corporation with its principal place of business in South Carolina. Milliken admits it owned and operated the Cedar Hill Plant in Jonesville, South Carolina, and the Gilliland Plant in Laurens, South Carolina that discharge industrial wastewater to the Tosch's Creek WWTP and the Little River WWTP, respectively, and the Monarch Mill in Union, South Carolina, that is no longer operational. Milliken denies the remaining allegations in this paragraph.

25.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

26.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

27.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

28.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

29.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

30.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

31.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

32.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

### III.     Supplier Defendants

33.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

34.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

35.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

36.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

37.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

38.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

39.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

40.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

41.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

42.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

43.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

44.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

45.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same

## FACTUAL ALLEGATIONS

I.    **Background and Hazards of PFAS**

46.    Milliken admits PFAS are man-made chemicals with strong carbon-fluorine bonds that have a number of characteristics and applications. Milliken denies the remaining allegations in this paragraph.

47.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

48.    Milliken admits there are different types of PFAS. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

49.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

50.     Milliken admits that polymer PFAS can degrade to terminal PFAS and precursor PFAS. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

51.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

52.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

53.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

54.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

55.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

56.     Milliken admits EPA published provisional drinking water health advisories related to PFOA and PFOS in 2009. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

57.     Milliken admits EPA published lifetime health advisory levels related to PFOA and PFOS in 2016. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

58.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

59.     Milliken admits EPA published health advisory levels related to PFOA and PFOS in 2022. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

60.     Milliken admits EPA published health advisory levels related to PFBS and GenX Chemicals in 2022. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

61.     Milliken admits EPA published MCLs and MCLGs for certain PFAS in 2023. Milliken is without knowledge and information sufficient to respond to the remaining allegations in this paragraph and therefore denies the same.

62.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

63.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

64.     The paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

65.     Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

66.    Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be a statement from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

67.    Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be statements of law, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

68.    Milliken admits EPA issued regulations regarding PFAS in 2024. The remainder of the paragraph consists of what purports to be statements of law, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

69.    Milliken admits EPA announced its intention to extend the MCL compliance deadline by two years, to 2031. The remainder of the paragraph consists of what purports to be statements from a third party, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

70.     Milliken admits EPA announced its intention to extend the MCL compliance deadline by two years, to 2031. The remainder of the paragraph consists of what purports to be statements from a third party and statements of law, and no admission or denial from Milliken is required. To the extent a response is required, Milliken states it is without knowledge and information sufficient to admit or deny the contents of the statement.

## II.     Contamination of Lake Marion and Lake Moultrie with PFAS

71.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

72.     Milliken admits it owned and operated the Cedar Hill Plant in Jonesville, South Carolina, the Gilliland Plant in Laurens, South Carolina, and the Monarch Mill in Union, South Carolina, that is no longer operational. Milliken denies the remaining allegations in this paragraph as to it.

73.     Milliken is without knowledge and information sufficient to admit or deny the accuracy of the information in this paragraph and therefore denies the same. Milliken further denies that its facilities are sources of PFAS contamination.

74.     Milliken admits it owned and operated the Cedar Hill Plant in Jonesville, South Carolina, the Gilliland Plant in Laurens, South Carolina, and the Monarch Mill in Union, South Carolina, that is no longer operational. Milliken denies the remaining allegations in this paragraph as to it.

75.     Milliken denies the allegations in this paragraph as to it.

76.     Milliken denies the allegations in this paragraph as to it.

77.     Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

78.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

79.     Milliken denies the allegations in this paragraph as to it.

### III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.

80.     Milliken denies the allegations in this paragraph as to it.

81.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

82.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

83.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

84.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

85.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

86.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

87.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

88.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

89.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

90. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

91. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

92. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

93. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

94. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

95. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

96. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

97. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

98. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

99. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

100. Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

101.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

102.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

103.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

104.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

105.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

106.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

107.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

108.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

109.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

110.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

111.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

IV.     **Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal**

112.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

113.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

114.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

115.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

116.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

117.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

118.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

119.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

120.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

121.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

V.    **Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

122.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

123.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

124.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

VI.    **Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

125.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

126.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

127.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

128.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

129.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

130.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

131.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

132.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

133.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

**VII.     Defendants Have Harmed Plaintiff and Plaintiff's Community.**

134.     Milliken denies the allegations in this paragraph as to it.

135.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

136.     Milliken denies the allegations in this paragraph as to it.

137.     Milliken denies the allegations in this paragraph as to it.

138.     Milliken denies the allegations in this paragraph as to it.

**<u>FIRST CAUSE OF ACTION</u>**
Private Nuisance

139.     Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

140.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

141.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

142.     Milliken denies the allegations in this paragraph as to it.

143.     Milliken denies the allegations in this paragraph as to it.

144.     Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

145.    Milliken denies the allegations in this paragraph as to it.

146.    Milliken denies the allegations in this paragraph as to it.

147.    Milliken denies the allegations in this paragraph as to it.

148.    Milliken denies the allegations in this paragraph as to it.

149.    Milliken denies the allegations in this paragraph as to it.

150.    Milliken denies the allegations in this paragraph as to it.

## SECOND CAUSE OF ACTION
Public Nuisance

151.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

152.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

153.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

154.    Milliken denies the allegations in this paragraph as to it.

155.    Milliken denies the allegations in this paragraph as to it.

156.    Milliken denies the allegations in this paragraph as to it.

157.    Milliken denies the allegations in this paragraph as to it.

158.    Milliken denies the allegations in this paragraph as to it.

159.    Milliken denies the allegations in this paragraph as to it.

160.    Milliken denies the allegations in this paragraph as to it.

161.    Milliken denies the allegations in this paragraph as to it.

162.    Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

## THIRD CAUSE OF ACTION
Trespass

163.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

164.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

165.    Milliken denies the allegations in this paragraph, including subparts (a)-(d), as to it.

166.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

167.    Milliken denies the allegations in this paragraph, including subparts (a)-(d), as to it.

168.    Milliken denies the allegations in this paragraph, including subparts (a)-(d), as to it.

169.    Milliken denies the allegations in this paragraph as to it.

170.    Milliken denies the allegations in this paragraph as to it.

171.    Milliken denies the allegations in this paragraph as to it.

172.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

173.    Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

174.    Milliken denies the allegations in this paragraph as to it.

175.    Milliken denies the allegations in this paragraph as to it.

**FOURTH CAUSE OF ACTION**
Negligence, Gross Negligence, and/or Recklessness

176.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

177.    Milliken denies the allegations in this paragraph.

178.    Milliken denies the allegations in this paragraph as to it.

179.    Milliken denies the allegations in this paragraph as to it.

180.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

181.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

182.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

183.    Milliken denies the allegations in this paragraph as to it.

184.    Milliken denies the allegations in this paragraph as to it.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## FIFTH CAUSE OF ACTION
Strict Products Liability – Failure to Warn
(Supplier Defendants)

185.     Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

186.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

187.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

188.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

189.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

190.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

191.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

192.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

193.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

194.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

### SIXTH CAUSE OF ACTION
Strict Products Liability – Ultrahazardous Activity
(Supplier Defendants)

195.    Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

196.    Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

197.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

198.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

199.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

200.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

201.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

202.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

203.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

204.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

205.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

<u>**SEVENTH CAUSE OF ACTION**</u>
Strict Products Liability – Design Defect
(Supplier Defendants)

206.     Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

207.     Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

208.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

209.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

210.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

211.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

212.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

213.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

214.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800303336

215.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

216.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

217.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

218.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

## EIGHTH CAUSE OF ACTION
Breach of Implied Warranties
(Supplier Defendants)

219.     Milliken restates and incorporates its responses to all prior paragraphs as if fully set forth herein.

220.     This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

221.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

222.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

223.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

224.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

225.    This paragraph does not address or allege any facts concerning Milliken and therefore does not require a response. To the extent a response is required, Milliken is without knowledge and information sufficient to respond to the allegations in this paragraph and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## PRAYER FOR RELIEF

Answering the WHEREFORE paragraph following Paragraph 225, including subparagraphs (a)-(e) Milliken denies that Plaintiff is entitled to any of the relief requested, and prays:

    a.  For judgment in Milliken's favor on each and every Count contained in Plaintiff's Amended Complaint;

    b.  That all costs of the action, including reasonable attorneys' fees, be taxed upon Plaintiff;

    c.  That a trial by jury be had on all triable issues in this case; and

    d.  That this Court grant Milliken such other and further relief as the Court deems just, equitable, and proper.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims, in whole or in part, fail to state a claim upon with relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based on the doctrines of waiver, release, and/or estoppel.

### THIRD AFFIRMATIVE DEFENSE

Milliken reserves any actions for contribution or indemnity against such third parties and reserves its right to remedies.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's failure to mitigate damages bars or reduces Plaintiff's recovery.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## FIFTH AFFIRMATIVE DEFENSE

Should this Court find Plaintiff has sustained damages for which Milliken is responsible, which is expressly denied, Milliken is entitled to a set-off for payments paid or payable to Plaintiff for such damages.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations and/or the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

This Court is the improper venue for the claims asserted against Milliken, or in the alternative, venue would be more appropriate in another forum.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of repose.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by assumption of risk.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Milliken owed no legal duty to Plaintiff as alleged in the First Amended Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based on a lack of causation. Milliken did not cause the alleged injury described by Plaintiff in the First Amended Complaint.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that there is no proximate cause between any alleged act or omission on the part of Milliken and any injury or damage allegedly suffered by Plaintiff.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that they are caused by the acts or omissions of Plaintiff or a third party. Additionally, to the extent Milliken was negligent, which negligence is denied and referenced only for purpose of this defense, Plaintiff was contributorily and/or comparatively negligent, such that Plaintiff's negligence exceeds any negligence of Milliken, and Plaintiff should be barred from recovery and/or or any recovery should by Plaintiff be off-set by the percentage of Plaintiff's negligence.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to join one or more indispensable parties.

## FIFTEENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff availed and/or failed to avail itself of funds from unnamed third parties, including without limitation unnamed potentially responsible parties, Milliken is entitled to a set off including interest.

## SIXTEENTH AFFIRMATIVE DEFENSE

The doctrine of unclean hands bars Plaintiff's claims.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are not justiciable for multiple reasons, including but not limited to because Plaintiff's claims are not ripe and/or have been mooted, and Plaintiff lacks standing

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

and/or capacity to sue for its claims under federal and/or state constitutional, statutory, and common law.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are preempted by state and/or federal statutes, rules, and regulations, including but not limited to, the Clean Water Act, 33 U.S.C. § 1365 *et seq.*

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because all relevant actions by Milliken were permitted, privileged, and/or otherwise authorized under applicable federal, state, and/or local law, including but not limited to because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times, and Milliken used proper methods in designing, testing, and manufacturing its products in conformity with (i) federal and state regulations, standards, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured and tested.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of primary jurisdiction.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

An independent, intervening, and superseding cause, event, or negligence prevents any recovery by Plaintiff against Milliken.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

The damages sought by Plaintiff are too speculative or remote.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the municipal cost recovery rule and/or the public duty doctrine.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Although Milliken denies Plaintiff is entitled to punitive damages, Milliken affirmatively pleads that any award of punitive damages would violate the South Carolina and United States Constitutions.

## TWENTY- FIFTH AFFIRMATIVE DEFENSE

Milliken may not be found liable for punitive damages where the conditions that form the basis of Plaintiff's claims are, and have been, the subject of state and/or federal regulatory oversight or action, and where there has been substantial compliance with the findings, orders, and directives of the responsible state and/or federal regulatory agency.

## TWENTY- SIXTH AFFIRMATIVE DEFENSE

The recovery of punitive damages by Plaintiff based on the claims contained in the complaint would violate the constitutional safeguards provided to Milliken by the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States of America.

## TWENTY- SEVENTH AFFIRMATIVE DEFENSE

Milliken affirmatively pleads that any claim for punitive damages must comply with the South Carolina Noneconomic Damages Awards Act of 2005, S.C. Code Ann. § 15-32-200, *et seq.*, including, but not limited to, the punitive damages recovery limits imposed by S.C. Code Ann. § 15-32-530.

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## TWENTY- EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for attorneys' fees and costs of litigation should be barred because Milliken has at no time been stubbornly litigious, acted in bad faith, or caused Plaintiff undue trouble or expense.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for special damages are not stated with sufficient specificity and therefore should be dismissed.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of election of remedies.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the economic loss rule.

## RESERVATION OF RIGHTS

Milliken does not admit or acknowledge that it bears the burden of proof and/or burden of persuasion with respect to any of the above defenses. The preceding defenses are pled in the alternative and do not constitute an admission Milliken is liable to Plaintiff, that Plaintiff has been or will be injured or damaged in any way, or that Plaintiff is entitled to any relief whatsoever. Milliken reserves its rights to rely on (i) any and all defenses and presumptions set forth in or arising from rule of law or statute of any state whose substantive law might control the relevant action, (ii) any other defenses set forth in any Answer or disclosure of affirmative

ELECTRONICALLY FILED - 2025 Jun 18 11:24 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

defenses of any defendant in this action, (iii) any other defenses that may become apparent

during fact or expert discovery in this matter, and (iv) to amend this document to assert any such

defenses.

Respectfully submitted, this 18th day of June, 2025.

*/s/ Gregory J. English*
Gregory J. English (SC Bar No. 65470)
Rachel L. Anna (SC Bar No. 100486)
Rita Bolt Barker (SC Bar No. 77600)
WYCHE, P.A.
200 East Broad Street, Suite 400
Greenville, SC 29601-2892
Tel: (864) 242-8200
Fax: (864) 235-8900
ranna@wyche.com
rbarker@wyche.com

-and-

Jameson B. Carroll (*pro hac vice* admission to be sought)
Michael Weiss (*pro hac vice* admission to be sought)
CARROLL & WEISS LLP
2870 Peachtree Rd NW, Suite 193
Atlanta, GA 30305-2918
Tel: (404) 514-5061
jcarroll@carrollweiss.com
mweiss@carrollweiss.com

*ATTORNEYS FOR DEFENDANT*
*MILLIKEN & COMPANY*

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
FOR THE NINTH JUDICIAL CIRCUIT

Case No. 2024-CP-08-03336

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority,
a/k/a Santee Cooper, an agency of the State of
South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Archroma U.S.,
Inc.; Arkema, Inc.; Atotech USA, LLC; Carlisle
Partners, LLC; Carlisle WW Holdings, LLC;
China Jushi USA Corporation; Clariant
Corporation; Coatex, Inc.; Corteva, Inc.; Daikin
America, Inc.; DS Smith PLC; DuPont de
Nemours, Inc.; EIDP, Inc.; Graphic Packaging
International, LLC; Huntsman Advanced
Materials Americas, LLC; Huntsman
International, LLC; Interstate Container
Columbia, LLC; INV Performance Surfaces,
LLC; Jushi USA Fiberglass Co., Ltd.; Lindau
Chemicals, Inc.; Milliken & Company; Organic
Dyes and Pigments, LLC; Precoat Metals Corp.;
Republic Services of South Carolina, LLC; Shaw
Industries Group, Inc.; Solvay Specialty Polymers
USA, LLC; Springs Global US, Inc.; Springs
Industries, LLC; Standard Textile Carolina, Inc.;
Synthomer, Inc.; The Chemours Company; and
Waste Management of South Carolina, Inc.,

*Defendants*.

**DEFENDANT LINDAU
CHEMICALS, INC.'S ANSWER TO
PLAINTIFF'S AMENDED
COMPLAINT**

Defendant, Lindau Chemicals, Inc. ("Defendant" or "Lindau"), by and through its

undersigned counsel, hereby answers the allegations of Plaintiff, South Carolina Public Service

Authority, a/k/a Santee Cooper, an agency of the State of South Carolina's Amended Complaint as

follows:

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## **FOR A FIRST DEFENSE**

1.      Defendant denies all allegations of the Amended Complaint (including any subparts, qualifications, or characterizations) unless otherwise specifically admitted, qualified, or explained.

2.      To the extent the Amended Complaint contains allegations regarding matters or events shown on the public land records of Berkeley County, those allegations are admitted to the extent they accurately reflect those matters as shown on the public land records of Berkeley County and are denied to the extent they do not.

3.      Defendant denies the allegations of paragraphs 1 and 2 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 1 and 2 of Plaintiff's Amended Complaint and, therefore, denies the same.

4.      Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 3 of Plaintiff's Amended Complaint and, therefore, denies the same.

5.      Defendant denies the allegations of paragraphs 4, 5, 6 and 7 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 4, 5, 6 and 7 of Plaintiff's Amended Complaint and, therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

6.      No response is necessary from Defendant in regard to the disclaimers in paragraphs 8 and 9 of Plaintiff's Amended Complaint. Any factual allegations requiring a response from Defendant are denied.

7.      Defendant admits the allegations of paragraphs 10, 11 and 12 of Plaintiff's Amended Complaint.

8.      Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 13, 14, 15, 16, 17, 18, 19, 20, 21 and 22 of Plaintiff's Amended Complaint and, therefore, denies the same.

9.      In regard to paragraph 23, Defendant admits that it is a South Carolina corporation that owns and operates the industrial facility located at 731 Rosewood Drive, Columbia, South Carolina 29201. Defendant denies all other allegations of paragraph 23 of Plaintiff's Amended Complaint.

10.      Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44 and 45 of Plaintiff's Amended Complaint and, therefore, denies the same.

11.      Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 46 through 55 of Plaintiff's Amended Complaint and, therefore, denies the same.

12.      As for paragraphs 56 through 70 of Plaintiff's Amended Complaint, Defendant craves reference to the documents cited therein for their full and complete contents, and further states that these documents speak for themselves, and to the extent the allegations misstate the contents of said documents, they are denied. Defendant is without knowledge and information

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

sufficient to form a belief as to the truth or falsity of the remaining allegations of paragraphs 56 through 70 of Plaintiff's Amended Complaint and therefore denies the same.

13.    Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 71 of Plaintiff's Amended Complaint and, therefore, denies the same.

14.    As they pertain to this Defendant, Defendant admits the allegations of paragraph 72 of Plaintiff's Amended Complaint. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 72 of Plaintiff's Amended Complaint and, therefore, denies the same.

15.    Defendant denies the allegations of paragraph 73 of Plaintiff's Amended Complaint as they pertain to this Defendant. As the allegations of paragraph 73 of Plaintiff's Amended Complaint pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of same and, therefore, denies the same.

16.    As they pertain to this Defendant, Defendant admits that it owns and operates a manufacturing plant upstream of the Santee River Basin as alleged in paragraph 74 of Plaintiff's Amended Complaint. As to the remaining allegations in paragraph 74 of Plaintiff's Amended Complaint pertaining to this Defendant, Defendant denies the same. As to the remaining defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 74 of Plaintiff's Amended Complaint and, therefore, denies the same.

17.    Defendant denies the allegations of paragraphs 75, 76, 77, 78 and 79 of Plaintiff's Amended Complaint as they pertain to this Defendant. As the allegations of paragraphs 75, 76, 77,

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

78 and 79 of Plaintiff's Amended Complaint pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of same and, therefore, denies the same.

18.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 80 through 111 of Plaintiff's Amended Complaint and, therefore, denies the same.

19.     To the extent paragraphs 112 through 124 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 112 through 124 of Plaintiff's Amended Complaint and, therefore, denies the same.

20.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 125, 126, 127, 128, 129, 130, 131, 132 and 133 of Plaintiff's Amended Complaint and, therefore, denies the same.

21.     Defendant denies the allegations of paragraphs 134, 135, 136, 137 and 138 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 134, 135, 136, 137 and 138 of Plaintiff's Amended Complaint and, therefore, denies the same.

22.     As to the reiterated allegations of paragraph 139 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

23.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 140 and 141 of Plaintiff's Amended Complaint and, therefore, denies the same.

24.     Defendant denies the allegations of paragraphs 142, 143, 144, 145, 146, 147, 148, 149 and 150 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 142, 143, 144, 145, 146, 147, 148, 149 and 150 of Plaintiff's Amended Complaint and, therefore, denies the same.

25.     As to the reiterated allegations of paragraph 151 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

26.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 152 and 153 of Plaintiff's Amended Complaint and, therefore, denies the same.

27.     Defendant denies the allegations of paragraphs 154, 155, 156, 157, 158, 159, 160, 161 and 162 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 154, 155, 156, 157, 158, 159, 160, 161 and 162 of Plaintiff's Amended Complaint and, therefore, denies the same.

28.     As to the reiterated allegations of paragraph 163 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

29.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 164 of Plaintiff's Amended Complaint and, therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

30.     Defendant denies the allegations of paragraph 165 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 165 of Plaintiff's Amended Complaint and, therefore, denies the same.

31.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 166 and 167 of Plaintiff's Amended Complaint and, therefore, denies the same.

32.     Defendant denies the allegations of paragraph 168 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 168 of Plaintiff's Amended Complaint and, therefore, denies the same.

33.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 169 of Plaintiff's Amended Complaint and, therefore, denies the same.

34.     Defendant denies the allegations of paragraphs 170, 171, 172, 173, 174 and 175 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in paragraphs 170, 171, 172, 173, 174 and 175 of Plaintiff's Amended Complaint and, therefore, denies the same.

35.     As to the reiterated allegations of paragraph 176 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

36.     Defendant denies the allegations of paragraphs 177, 178 and 179 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants,

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in paragraphs 177, 178 and 179 of Plaintiff's Amended Complaint and, therefore, denies the same.

37.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 180, 181 and 182 of Plaintiff's Amended Complaint and, therefore, denies the same.

38.     Defendant denies the allegations of paragraphs 183 and 184 of Plaintiff's Amended Complaint as they pertain to this Defendant. As they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in paragraphs 183 and 184 of Plaintiff's Amended Complaint and, therefore, denies the same.

39.     As to the reiterated allegations of paragraph 185 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

40.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 186 of Plaintiff's Amended Complaint and, therefore, denies the same.

41.     To the extent paragraph 187 of Plaintiff's Amended Complaint relies on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 187 of Plaintiff's Amended Complaint and, therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

42.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 188 of Plaintiff's Amended Complaint and, therefore, denies the same.

43.     To the extent paragraphs 189 and 190 of Plaintiff's Amended Complaint relies on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 189 and 190 of Plaintiff's Amended Complaint and, therefore, denies the same.

44.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 191, 192, 193 and 194 of Plaintiff's Amended Complaint and, therefore, denies the same.

45.     As to the reiterated allegations of paragraph 195 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

46.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 196 of Plaintiff's Amended Complaint and, therefore, denies the same.

47.     To the extent paragraphs 197 and 198 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

allegations of paragraphs 197 and 198 of Plaintiff's Amended Complaint and, therefore, denies the same.

48.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 199, 200 and 201 of Plaintiff's Amended Complaint and, therefore, denies the same.

49.     To the extent paragraph 202 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 202 of Plaintiff's Amended Complaint and, therefore, denies the same.

50.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 203, 204 and 205 of Plaintiff's Amended Complaint and, therefore, denies the same.

51.     As to the reiterated allegations of paragraph 206 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

52.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 207 of Plaintiff's Amended Complaint and, therefore, denies the same.

53.     To the extent paragraph 208 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without

10

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP080336

knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 208 of Plaintiff's Amended Complaint and, therefore, denies the same.

54.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 209, 210 and 211 of Plaintiff's Amended Complaint and, therefore, denies the same.

55.     To the extent paragraph 212 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 212 of Plaintiff's Amended Complaint and, therefore, denies the same.

56.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 213 through 218 of Plaintiff's Amended Complaint and, therefore, denies the same.

57.     As to the reiterated allegations of paragraph 219 of the Amended Complaint, Defendant repeats and re-alleges each of the preceding paragraphs as if set forth verbatim herein.

58.     To the extent paragraphs 220, 221 and 222 of Plaintiff's Amended Complaint rely on Defendant's use of PFAS-containing products at its facility, Defendants denies these allegations as they pertain to this Defendant. To the extent these allegations do not rely on Defendant's use of PFAS-containing products at its facility, and as they pertain to the other defendants, Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 220, 221 and 222 of Plaintiff's Amended Complaint and, therefore, denies the same.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

59.     Defendant is without knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of paragraphs 223, 224 and 225 of Plaintiff's Amended Complaint and, therefore, denies the same.

## FOR A SECOND DEFENSE
### (*Rule 12(b)(6), SCRCP*)

60.     Each and every allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

61.     Plaintiff's Amended Complaint fails to state facts sufficient to constitute a cause of action and should be dismissed.

## FOR A THIRD DEFENSE
### (*Statute of Limitations*)

62.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

63.     Some or all of Plaintiff's claims are barred by the applicable statute of limitations.

## FOR A FOURTH DEFENSE
### (*Laches*)

64.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

65.     Some or all of Plaintiff's claims are barred by the doctrine of laches.

## FOR A FIFTH DEFENSE
### (*Waiver, Estoppel, and Unclean Hands*)

66.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

67.     Some or all of Plaintiff's claims are barred by the doctrine of waiver, estoppel, and unclean hands.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

### FOR A SIXTH DEFENSE
*(Statutes of Repose)*

68.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

69.     The Amended Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of repose.

### FOR A SEVENTH DEFENSE
*(Failure to Join Necessary Parties)*

70.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

71.     The Amended Complaint, and each cause of action or claim alleged therein, fails to join necessary parties.

### FOR AN EIGHTH DEFENSE
*(Acquiescence and/ or Approval by Government Authority or Agency)*

72.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

73.     Plaintiff's claims are barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in the actions or omissions that are the subject of Plaintiff's claims. Defendant is not liable for any acts or omissions taken by, at the direction of, or with the acquiescence and/or approval of any government authority or agency.

### FOR A NINTH DEFENSE
*(Parens Patriae)*

74.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

75.     The Amended Complaint, and each alleged claim contained therein, is barred, in whole or in part, because Plaintiff is not the real parties in interest or lacks capacity to bring its

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

claims, including claims indirectly maintained on behalf of their citizens and/or customers and claims brought as *parens patriae*.

### FOR A TENTH DEFENSE
### *(Res Judicata/ Collateral Estoppel)*

76.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

77.    Plaintiff is barred by the doctrines of res judicata or collateral estoppel from all forms of relief sought in the Amended Complaint.

### FOR AN ELEVENTH DEFENSE
### *(No Control/ Right of Control)*

78.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

79.    Any injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence or actual conduct of Plaintiff and/or other persons, firms, corporations, or entities over whom Defendant had no control or right of control and for whom Defendant is not responsible.

### FOR A TWELFTH DEFENSE
### *(Intervening Cause/ Superseding Cause)*

80.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

81.    Any injuries and/or damages sustained by Plaintiff is barred by the doctrines of intervening cause and/or superseding cause.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## FOR A THIRTEENTH DEFENSE
### *(Common Law/ Statutory Doctrines)*

82.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

83.    Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

## FOR A FOURTEENTH DEFENSE
### *(No Exceedance of Applicable Laws/ Binding Regulatory Standards)*

84.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

85.    Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## FOR A FIFTEENTH DEFENSE
### *(Federal Preemption)*

86.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

87.    Plaintiff's claims are or may be barred, in whole or in part, under the doctrine of Federal Preemption, including without limitation express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issued by Congress, federal agencies, or the executive branch, including, without limitation, the Clean Water Act, 33 U.S.C. § 1365 *et seq.* and to the extent Plaintiff's claims

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

constitute an impermissible challenge to a response or remediation action under CERCLA, 42 U.S.C. § 9613(h).

### FOR A SIXTEENTH DEFENSE
*(Contribution/ Allocation/ Apportionment)*

88.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

89.     Plaintiff's damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Defendant. In the event Defendant is found liable to Plaintiff, Defendant asserts its right to contribution, allocation or apportionment of fault pursuant to applicable law, as well as its right to a proportionate reduction of any damages found against Defendant based on the negligence or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

### FOR A SEVENTEENTH DEFENSE
*(Res Judicata/ Collateral Estoppel)*

90.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

91.     The doctrines of res judicata or collateral estoppel bar Plaintiff from all forms of relief sought in the Amended Complaint.

### FOR AN EIGTHTEENTH DEFENSE
*(Failure to Mitigate)*

92.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

93.     Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on its part, or by expenditures which might reasonably have been

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

### FOR A NINETEENTH DEFENSE
### *(No Legal Duty)*

94. Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

95. Plaintiff's claims are barred, in whole or in part, because Defendant did not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

### FOR A TWENTIETH DEFENSE
### *(No Duty to Warn)*

96. Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

97. Plaintiff's failure to warn claims, if any, against Defendant are barred because Defendant had no duty to warn and did not breach any duty to warn Plaintiff. In addition, Defendant's alleged failure to warn, which is denied, was not a proximate cause of Plaintiff's alleged damages.

### FOR A TWENTY-FIRST DEFENSE
### *(No Basis for Punitive Damages)*

98. Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

99. Defendant did not participate in any of the activities for which Plaintiff asserts that punitive damages may be assessed. Punitive damages would be unconstitutional against Defendant and, if punitive damages were imposed, this would be in violation of the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and the corresponding provisions of the Constitution of the State

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

of South Carolina and would be based upon a standard which is impermissible, vague, imprecise, and inconsistent. Further, all statutory caps or limitations of recovery of punitive damages are hereby asserted. Additionally, Defendant may not be found liable for punitive damages where the conditions that form the basis of Plaintiff's claims are, and have been, the subject of state and/or federal regulatory oversight or action, and where there has been substantial compliance with the findings, orders, and directives of the responsible state and/or federal regulatory agency.

### FOR A TWENTY-SECOND DEFENSE
*(No PFAS-Containing Products)*

100.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

101.     Plaintiff's Amended Complaint should be dismissed against this Defendant because this Defendant did not design, market, sell, advertise or distribute PFAS-containing products, and is not the successor to any corporation that may have designed, marketed, sold, advertised or distributed any PFAS-containing products.

### FOR A TWENTY-THIRD DEFENSE
*(Contributory/ Comparative Negligence)*

102.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

103.     Plaintiff's claims are or may be barred in whole or in part under the doctrines of contributory negligence, comparative negligence, and/or related doctrines available under applicable law.

### FOR A TWENTY-FOURTH DEFENSE
*(Economic Loss Rule)*

104.     Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

105.    Plaintiff's claims against Defendant are barred or limited by the economic loss rule.

106.    Defendant affirmatively pleads that any claim for punitive damages must comply with the South Carolina Noneconomic Damages Awards Act of 2005, S.C. Code Ann. § 15-32-200, *et seq*., including not limited to, the punitive damages recovery limits imposed by S.C. Code Ann. § 15-32-530, and the Constitutions of the State of South Carolina and the United States.

### FOR A TWENTY-FIFTH DEFENSE
#### *(Too remote)*

107.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

108.    Plaintiff's purported exposure to the PFAS allegedly discharged by this Defendant, if any, was too remote, too removed, indefinite, de minimis, and insufficient to establish a reasonable degree of probability that any such discharge caused any alleged injury, damage or loss to Plaintiff.

### FOR A TWENTY-SIXTH DEFENSE
#### *(No Concert of Action)*

109.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

110.    There was no concert of action between this Defendant and any of the other Defendants herein; therefore, the Defendants are not joint tortfeasors and this Defendant may not be held jointly and severely liable with the other Defendants.

### FOR A TWENTY-SEVENTH DEFENSE
#### *(Free Public Services/ Municipal Cost Recovery Rule)*

111.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

112.   Plaintiff's claims are or may be barred in whole or in part under the free public services doctrine or municipal cost recovery rule.

### FOR A TWENTY-EIGHTH DEFENSE
*(No Proximate Causation)*

113.   Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

114.   Plaintiff's claims are or may be barred for lack of proximate causation between any alleged act or omission of Defendant and the claims, damages, and harm alleged in the Plaintiff's Amended Complaint.

### FOR A TWENTY-NINTH DEFENSE
*(No Actionable Trespass or Nuisance)*

115.   Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

116.   Plaintiff's claims for trespass or nuisance are or may be barred in whole or in part because any alleged trespass or nuisance was unintentional, unforeseen, a necessity, and/or de minimis and therefore non-compensable.

### FOR A THIRTIETH DEFENSE
*(Reservation of Rights)*

117.   Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

118.   Defendant incorporates all other defenses and affirmative defenses raised by or available to any other party and reserves any additional and/or affirmative defenses that may become available during this case.

119.   Defendant does not admit or acknowledge that it bears the burden of proof and/or burden of persuasion with respect to any of the above defenses. All of the preceding defenses are

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

pled in the alternative and none constitutes an admission that Defendant is liable to Plaintiff, that Plaintiff has been or will be injured or damaged in any way, or that Plaintiff is entitled to any relief whatsoever.

### FOR A THIRTY-FIRST DEFENSE
#### (*Primary Jurisdiction*)

120.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

121.    Plaintiff's claims are barred by the doctrine of primary jurisdiction.

### FOR A THIRTY-SECOND DEFENSE
#### (*No Basis for Award of Attorneys' Fees & Costs*)

122.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

123.    Plaintiff's claims for attorney's fees and costs of litigation should be barred because Lindau has at no time been stubbornly litigious, acted in bad faith, or caused Plaintiff undue trouble or expense.

### FOR A THIRTY-THIRD DEFENSE
#### (*Failure to Plead Special Damages*)

124.    Each allegation, denial, objection, and/or defense asserted in this Answer is re-alleged as if repeated verbatim herein.

125.    Plaintiff's claims for special damages are not stated with sufficient specificity and therefore should be dismissed.

WHEREFORE, having fully answered Plaintiff's Amended Complaint, Defendant, Lindau Chemicals, Inc., request the Court to issue an order:

A.  Dismissing Plaintiff's Amended Complaint as to the causes of action against Defendant, Lindau Chemicals, Inc.

B. Awarding Defendant, Lindau Chemicals, Inc., attorney's fees and the costs of this action (to the extent allowable); and,

C. Awarding any such further relief as the Court deems just and proper.

**CALLISON TIGHE & ROBINSON, LLC**

*s/ Ian T. Duggan*
D. Reece Williams, III, Bar No. 6120
Ian T. Duggan, Bar No. 80074
P.O. Box 1390
1812 Lincoln Street, Second Floor (29201)
Columbia, South Carolina 29202
Ph: 803-404-6900
Fax: 803-404-6902
reecewilliams@callisontighe.com
ianduggan@callisontighe.com

**EARTH AND WATER LAW LLC**

John A. Sheehan (*pro hac vice*)
Edward (Ned) B. Witte (*pro hac vice*)
Heather A. Davis (*pro hac vice*)
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20004
Ph: 202-280-6362
john.sheehan@earthandwatergroup.com
ned.witte@earthandwatergroup.com
heather.davis@earthandwatergroup.com

**ATTORNEYS FOR DEFENDANT
LINDAU CHEMICALS, INC.**

June 20, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 Jun 20 2:30 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA
COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS
NINTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Archroma U.S., Inc.; Arkema, Inc.; Atotech USA, LLC; Carlisle Partners, LLC; Carlisle WW Holdings, LLC; China Jushi USA Corporation; Clariant Corporation; Coatex, Inc.; Corteva, Inc.; Daikin America, Inc.; DS Smith PLC; DuPont de Nemours, Inc.; EIDP, Inc.; Graphic Packaging International, LLC; Huntsman Advanced Materials Americas, LLC; Huntsman International, LLC; Interstate Container Columbia, LLC; INV Performance Surfaces, LLC; Jushi USA Fiberglass Co., Ltd.; Lindau Chemicals, Inc.; Milliken & Company; Organic Dyes and Pigments, LLC; Precoat Metals Corp.; Republic Services of South Carolina, LLC; Shaw Industries Group, Inc.; Solvay Specialty Polymers USA, LLC; Springs Global US, Inc.; Springs Industries, LLC; Standard Textile Carolina, Inc.; Synthomer, Inc.; The Chemours Company; and Waste Management of South Carolina, Inc.,

*Defendants*.

C.A. No. 2024-CP-08-03336

**DEFENDANT WASTE MANAGEMENT OF SOUTH CAROLINA, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant WASTE MANAGEMENT OF SOUTH CAROLINA, INC., ("WMSC" or "Defendant") by its undersigned counsel, for its Answer and Affirmative Defenses to Plaintiff

1

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

South Carolina Public Service Authority, a/k/a Santee Cooper's ("Plaintiff") Amended Complaint (the "Complaint"), hereby states as follows:

<div align="center">

**STATEMENT OF THE CASE**

</div>

1       Plaintiff, South Carolina Public Service Authority ("Santee Cooper" or "Plaintiff"), brings this action to address Defendants' ongoing contamination of the Broad River, Saluda River, Catawba River, Wateree River, Congaree River, Santee River, Lake Marion, and Lake Moultrie, including their tributaries (collectively "Santee River Basin"); and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

**ANSWER:     WMSC denies each and every allegation in paragraph 1.**

2       As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Santee River Basin, which travel downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, thereby contaminating Plaintiff's properties and the domestic water supply for over 234,000 water customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

**ANSWER:     WMSC denies each and every allegation in paragraph 2.**

3       Plaintiff provides wholesale potable drinking water to local water providers in various counties in South Carolina, including Berkeley County. It owns and occupies riparian property on Lake Marion in Santee, South Carolina; and on Lake Moultrie in Moncks Corner, South Carolina. On these respective properties, Plaintiff operates the Lake Marion Surface Water

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Treatment Plant ("SWTP"), the Lake Moultrie SWTP, and their related buildings, improvements, property, and equipment that make up these water treatment and transmission systems. Plaintiff's SWTPs draw raw water from Lake Marion and Lake Moultrie for treatment before distributing treated water to customers.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies them.**

4      Defendants own and/or operate industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes ("Discharger Defendants") or otherwise supply these products to Discharger Defendants' manufacturing facilities ("Supplier Defendants"). Discharger Defendants then discharge wastewater contaminated with these products to surface waters in the Santee River Basin upstream of Plaintiff's water intakes. Some Defendants directly discharge PFAS-contaminated wastewater, while others do so indirectly via certain public wastewater treatment plants ("WWTPs"). These WWTPs include the Columbia WWTP in Columbia, South Carolina; the Cannons Creek WWTP in Prosperity, South Carolina; the Little River WWTP in Laurens, South Carolina; the Tosch's Creek WWTP in Union, South Carolina; the Manchester Creek WWTP in Rock Hill, South Carolina; and the Rocky Creek WWTP in Chester, South Carolina.

**ANSWER:     WMSC denies each and every allegation in paragraph 4.**

5      Industrial wastewater from Discharger Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes. Defendants' PFAS are discharged upstream of, and flow downstream to, Plaintiff's intakes. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

**ANSWER:     WMSC denies each and every allegation in paragraph 5.**

6     Defendants' PFAS contaminate Plaintiff's water sources at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

**ANSWER:     WMSC denies each and every allegation in paragraph 6.**

7     As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTPs that will remove Defendants' PFAS from drinking water. In addition, based on Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

**ANSWER:     WMSC denies each and every allegation in paragraph 7.**

## DISCLAIMER

8     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER: Paragraph 8 sets forth legal conclusions to which no response is required or made. To the extent an answer is required, WMSC denies each and every allegation in paragraph 8.**

9       All Plaintiff's causes of action arise under South Carolina law, and Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

**ANSWER: Paragraph 9 sets forth legal conclusions to which no response is required or made. To the extent an answer is required, WMSC denies each and every allegation in paragraph 9.**

### JURISDICTION AND VENUE

10      This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina and sections 14-1-80 and 58-31-30 of the South Carolina Code.

**ANSWER: Paragraph 10 sets forth legal conclusions to which no response is required. Answering further, WMSC states that it does not contest the Court's subject matter jurisdiction.**

11      This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

**ANSWER: Paragraph 11 sets forth legal conclusions to which no response is required. Answering further, WMSC states the it does not dispute that it is subject to this Court's jurisdiction.**

12      Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Berkeley County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Berkeley County. See id. at § 15-7-30(B) ("If there is

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

**ANSWER:     Paragraph 12 sets forth legal conclusions to which no response is required or made. To the extent an answer is required, WMSC denies each and every allegation in paragraph 12.**

## PARTIES

I.     **Plaintiff**

13     Plaintiff Santee Cooper is a public corporation and agency of the State of South Carolina vested with authority, among other things, to acquire, treat, distribute, and sell drinking water. See S.C. CODE ANN. § 58-31-30; see also id. §§ 58-31-10 to -740.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 and therefore denies them.**

14     Plaintiff owns several properties at issue, beginning with its SWTPs. The first is located at 817 Water Plant Road, Moncks Corner, South Carolina 29461, where it operates the Lake Moultrie SWTP, which services the Lake Moultrie Regional Water System. The Lake Moultrie SWTP is riparian to, and draws raw water from, Lake Moultrie. The second is located at 149 Graveyard Rock Road, Santee, South Carolina 29142, where it operates the Lake Marion SWTP, which services the Lake Marion Regional Water System. The Lake Marion SWTP is riparian to, and draws raw water from, Lake Marion. In addition to its SWTPs, Plaintiff also owns all lands beneath Lake Marion and Lake Moultrie up to their high-water marks.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 and therefore denies them.**

15     The Lake Moultrie Water System utilizes 20 miles of transmission pipeline that delivers drinking water throughout the Lake Moultrie Water Agency, which consists of wholesale

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

customers Berkely County, City of Goose Creek, Moncks Corner Public Works Commission, and the Summerville Commissioners of Public Works. Ultimately, the Lake Moultrie Water system delivers drinking water to approximately 234,000 water subscribers of Plaintiff's wholesale customers.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 and therefore denies them.**

16     The Lake Marion Water System utilizes over 46 miles of transmission pipeline to serve, currently, five wholesale customers within the Lake Marion Regional Water Agency, which consists of Berkeley, Calhoun, Dorchester, and Orangeburg Counties and the Town of Santee. At the retail level, the Lake Marion Water System ultimately delivers drinking water to approximately 3,000 water subscribers.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 and therefore denies them.**

## II.     Discharger Defendants

17     Defendants Carlisle Partners, LLC and Carlisle WW Holdings, LLC (collectively "Carlisle") are Wyoming limited liability companies authorized to do business in South Carolina. Carlilse owns multiple parcels of property that comprise the site of a former industrial facility operated by Cone Mills Corporation, located at 3863 Carlisle Highway, Carlisle, South Carolina 29031. From the mid-1950s until the early 2000s, Cone Mills Corporation used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. These PFAS have accumulated on Carlisle's property, including in wastewater lagoons and other storage basins, which migrate to the Broad River. These PFAS resist environmental degradation, flow downstream from the Broad River to Lake Marion and

7

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Lake Moultrie, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:  The allegations in paragraph 17 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 and therefore denies them.**

18     Defendants China Jushi USA Corporation and Jushi USA Fiberglass Co., Ltd. (collectively "Jushi") are South Carolina corporations that operate a facility located at 2971 Shop Road, Columbia, South Carolina 29209. There, Jushi uses products that contain or degrade to PF OA, PF OS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of fiberglass products. As part of its processes, the Jushi facility discharges industrial wastewater with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Jushi's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Jushi's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:  The allegations in paragraph 18 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 and therefore denies them.**

19     Defendant Coatex, Inc. ("Coatex") is a Delaware corporation authorized to do business in South Carolina. Coatex is a subsidiary of Arkema, Inc. ("Arkema"). Coatex and Arkema operate a facility located at 547 Ecology Lane, Chester, South Carolina 29706. There,

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

Coatex and Arkema use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of coatings and adhesive chemicals. As part of its processes, the Coatex/Arkema facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Coatex and Arkema's PFAS, which it discharges to a tributary of the Catawba River upstream from Plaintiff's water intakes. Coatex and Arkema's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:  The allegations in paragraph 19 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 and therefore denies them.**

20      Defendant Graphic Packaging International, LLC ("GPI") is a Delaware limited liability company authorized to do business in South Carolina. GPI owns and operates an industrial facility located at 139 South Carolina Highway 773, Prosperity, South Carolina 29127, where is uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of packaging products. As part of its processes, the GPI facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Cannons Creek WWTP. The Cannons Creek WWTP cannot remove GPI's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. GPI's PFAS resist environmental degradation, flow downstream from

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:** **The allegations in paragraph 20 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 and therefore denies them.**

21      Defendant Huntsman Advanced Materials Americas, LLC ("Huntsman AMA") is a Delaware limited liability company authorized to do business in South Carolina. Huntsman AMA operates a facility located at 808 Celriver Road, Rock Hill, South Carolina 29730. There, Huntsman AMA uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of chemical products. As part of its processes, the Huntsman AMA facility discharges industrial wastewater contaminated with these PFAS to the Manchester Creek WWTP. The Manchester Creek WWTP cannot remove Huntsman AMA's PFAS, which it discharges to the Catawba River upstream from Plaintiff's water intakes. Huntsman AMA's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie WWTPs.

**ANSWER:** **The allegations in paragraph 21 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and therefore denies them.**

22      Defendant Interstate Container Columbia, LLC ("ICC") is a Delaware limited liability company authorized to do business in South Carolina; and Defendant DS Smith PLC ("DS

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Smith") is a United Kingdom public limited company and the parent company of ICC. DS Smith owns, and ICC operates, an industrial facility located at 128 Crews Drive, Columbia, South Carolina 29210, where ICC uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of corrugated packaging products. As part of its processes, the DS Smith and ICC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Defendants' PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Defendants' PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER: The allegations in paragraph 22 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies them.**

23      Defendant Lindau Chemicals, Inc. ("Lindau") is a South Carolina corporation that owns and operates an industrial facility located at 731 Rosewood Drive, Columbia, South Carolina 29201. There, Lindau uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in organic chemical manufacturing. As part of its processes, the Lindau facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove Lindau's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Lindau's PFAS resist environmental degradation, flow downstream

ELECTRONICALLY FILED - 2025 Jun 20 11:11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:  The allegations in paragraph 23 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 and therefore denies them.**

24     Defendant **Milliken & Company ("Milliken")** is a Delaware corporation with its principal place of business in South Carolina. Milliken owns or has owned at least three facilities at issue in this case: (1) the Cedar Hill Plant, located at 225 Bob Little Road, Jonesville, South Carolina 29353; (2) the Gilliland Plant, located at 1108 Church Street, Laurens, South Carolina 29360; and (3) the Monarch Mill, located at 129 Monarch Highway, Union, South Carolina 29379.At each facility, Milliken uses and/or used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of Milliken's processes, the Cedar Hill and Gilliland Plant discharge industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP and the Little River WWTP, respectively. The Tosch's Creek WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. The Little River WWTP cannot remove Milliken's PFAS, which it discharges to a tributary of the Saluda River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. While Monarch Mill is no longer operational, wastewater lagoons on the property remain contaminated with these PFAS and their precursors, which discharge from the property to tributaries upstream of the Broad River, Lake Marion, and Lake Moultrie. Milliken's PFAS resist environmental degradation, flow downstream from the Broad and Saluda Rivers, and

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

     **ANSWER:  The allegations in paragraph 24 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 and therefore denies them.**

     25    Defendant **Organic Dyes and Pigments, LLC ("ORCO")** is a Delaware limited liability company authorized to do business in South Carolina. ORCO owns and operates an industrial facility located at 100 Industrial Drive, Union, South Carolina 29379, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of chemicals for the textile industry. As part of its processes, the ORCO facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove ORCO's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. ORCO's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie S WTPs.

     **ANSWER:  The allegations in paragraph 25 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 and therefore denies them.**

     26    Defendant Precoat Metals Corp. ("PMC") is an Indiana corporation authorized to do business in South Carolina. PMC owns and operates an industrial facility located at 650

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Rosewood Drive, Columbia, South Carolina 29201, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the processing of metal coils. As part of its processes, the PMC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Columbia WWTP. The Columbia WWTP cannot remove PMC's PFAS, which it discharges to the Congaree River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. PMC's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie S WTPs.

**ANSWER: The allegations in paragraph 26 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies them.**

27     Defendant Republic Services of South Carolina, LLC ("RSSC") is a Delaware limited liability company authorized to do business in South Carolina. RSSC owns and operates the Union County Regional Landfill located at 868 Wildcat Road, Enoree, South Carolina 29335. RSSC transports leachate from its landfill, which contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove these PFAS from RSSC's leachate before the WWTP discharges RSSC's PFAS to a tributary of the Broad River upstream of Lake Marion and Lake Moultrie. RSSC's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie S WTPs.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:** **The allegations in paragraph 27 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies them.**

28    Defendant Shaw Industries Group, Inc. ("Shaw") is a Georgia corporation authorized to do business in South Carolina. Shaw owns and operates an industrial facility located at 4401 St. Andrews Road, Columbia, South Carolina 29210. There, Shaw uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of carpet and textile products. As part of its processes, the Shaw facility directly discharges industrial wastewater with products that contain or degrade to these PFAS to the Saluda River. Shaw's PFAS resist environmental degradation, flow downstream from the Saluda River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:** **The allegations in paragraph 28 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies them.**

29    Defendant Springs Global US, Inc. ("Springs Global") is a Delaware corporation authorized to do business in South Carolina, and Defendant Springs Industries, LLC ("Springs Industries") is a Delaware corporation that is a successor in interest to and was formerly known as Springs Industries, Inc., a South Carolina corporation that no longer exists (Springs Global and Springs Industries are referred to collectively as "Springs"). From approximately 1948 until the mid-2000s, Springs Industries' corporate predecessors owned and operated an industrial facility

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

located at 294 Grace Avenue, Lancaster, South Carolina 29720. There, they used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacturing of textile products. Defendant Springs Global purchased this property in 2005, and to this day it continues to discharge these PFAS and their precursors to the Catawba River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Springs' PFAS resist environmental degradation, flow downstream from the Catawba River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:    The allegations in paragraph 29 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies them.**

30    Defendant Standard Textile Carolina, Inc. ("STC ") is an Ohio corporation authorized to do business in South Carolina. STC owns and operates an industrial facility located at 100 Highpoint Drive, Union, South Carolina 29379, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, the STC facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Tosch's Creek WWTP. The Tosch's Creek WWTP cannot remove STC's PFAS, which it discharges to a tributary of the Broad River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. STC's PFAS resist environmental degradation, flow downstream from the Broad River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:** The allegations in paragraph 30 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies them.

31     Defendant Synthomer, Inc. ("Synthomer") is an Ohio corporation authorized to do business in South Carolina. Synthomer operates an industrial facility located at 1455 J A Cochran Bypass, Chester, South Carolina 29706, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of specialty chemical products. As part of its processes, the Synthomer facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Synthomer's PFAS, which it discharges to a tributary of the Catawba River upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie. Synthomer's PFAS resist environmental degradation, flow downstream from the Catawba River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:** The allegations in paragraph 31 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

32     Defendant Waste Management of South Carolina, Inc. ("WM") is a South Carolina corporation, and it operates the Richland Landfill located at 1047 Highway Church Road, Elgin, South Carolina 29045. WM discharges leachate from its landfill, which contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, to the

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Columbia WWTP. The Columbia WWTP cannot remove these PFAS from WM's leachate before the WWTP discharges WM's PFAS into the Congaree River upstream of Lake Marion and Lake Moultrie. WM's PFAS resist environmental degradation, flow downstream from the Congaree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:** **WMSC admits that it is a South Carolina corporation. WMSC denies each and every remaining allegation in paragraph 32 that is directed at WMSC. WMSC states that the remaining allegations in paragraph 32 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 32 and therefore denies them.**

III.    **Supplier Defendants**

33     Defendant AGC Chemicals Americas, Inc. ("Asahi") is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Asahi has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:** **The allegations in paragraph 33 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and therefore denies them.**

34     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation authorized to do business in South Carolina. Among other acts and omissions, Arkema has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Furthermore, Arkema operates a facility located at 547 Ecology Lane, Chester, South Carolina 29706 in conjunction with its subsidiary Coatex, Inc. ("Coatex"). There, Arkema and Coatex use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of coatings and adhesive chemicals. As part of its processes, the Arkema/Coatex facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Rocky Creek WWTP. The Rocky Creek WWTP cannot remove Arkema and Coatex's PFAS, which it discharges to a tributary of the Catawba River upstream from Plaintiff's water intakes. Arkema and Coatex's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:    The allegations in paragraph 34 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies them.**

35    Defendant Atotech USA, LLC ("Atotech") is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Atotech has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more Discharger Defendants in this Action. Furthermore, Atotech operates a facility located at 1750 Overview Drive, Rock Hill, South Carolina 29730. There, Atotech manufactures products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of its processes, the Atotech facility discharges industrial wastewater contaminated with these PFAS to the Manchester Creek WWTP. The Manchester Creek WWTP cannot remove Atotech's PFAS, which it discharges to the Catawba

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

River upstream from Plaintiff's water intakes. Atotech's PFAS resist environmental degradation, flow downstream the Catawba River and Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie WWTPs.

**ANSWER:** **The allegations in paragraph 35 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 and therefore denies them.**

36     Defendant Clariant Corporation ("Clariant") is a New York corporation authorized to do business in South Carolina. Among other acts and omissions, Clariant has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:** **The allegations in paragraph 36 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore denies them.**

37     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Archroma has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFBS, and/or Gen X Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:** **The allegations in paragraph 37 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

38     Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Daikin has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or Gen X Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:   The allegations in paragraph 38 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies them.**

39     Defendant EIDP, Inc. ("Old DuPont"), f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Old DuPont has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or Gen X Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:   The allegations in paragraph 39 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies them.**

40     Defendant The Chemours Company ("Chemours") is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Chemours has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or Gen X Chemicals to one or more of the Discharger Defendants in this action.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:** **The allegations in paragraph 40 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies them.**

41      Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, Corteva has assumed PFAS-related liabilities from Old DuPont.

**ANSWER:** **The allegations in paragraph 41 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies them.**

42      Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont, Inc., is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, New DuPont has assumed PFAS-related liabilities from Old DuPont.

**ANSWER:** **The allegations in paragraph 42 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore denies them.**

43      Defendant INV Performance Surfaces, LLC ("Invista") is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Invista has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action. Furthermore, Invista operates a facility located at 643 US-1, Lugoff,

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

South Carolina 29078. The facility was formerly operated by Invista's predecessor, Old DuPont. At the facility, Invista manufactures and/or uses in the manufacture of synthetic fibers and polymers products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of its processes, the Invista facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Wateree River upstream from Plaintiff's water intakes. Invista's PFAS resist environmental degradation, flow downstream from the Wateree River, and thereby contaminate Plaintiff's properties and its water sources at the Lake Marion and Lake Moultrie SWTPs.

**ANSWER:   The allegations in paragraph 43 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore denies them.**

44     Defendant Huntsman International, LLC ("Huntsman") is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Huntsman has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:   The allegations in paragraph 44 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore denies them.**

45     Defendant Solvay Specialty Polymers USA, LLC ("Solvay") is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions,

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

Solvay has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**ANSWER:   The allegations in paragraph 45 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies them.**

## FACTUAL ALLEGATIONS

I.     **Background and Hazards of PFAS**

46     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

**ANSWER:   WMSC admits that PFAS are a group of man-made chemicals that do not occur naturally in the environment. WMSC lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 46 and therefore denies them.**

47     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

**ANSWER:   WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

48     There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold and utilized by Defendants.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 and therefore denies them.**

49     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS-meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 and therefore denies them.**

50     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 and therefore denies them.**

51     Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

52    PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 and therefore denies them.**

53    While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 and therefore denies them.**

54    PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

55      Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 and therefore denies them.**

56      Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[11] The advisory levels at that time were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

**ANSWER:     WMSC states that the publication referred to in paragraph 56 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 56.**

57      On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt,

---

[1] U.S.E.P.A., Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), available at https://www.epa.gov/ sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.
[2] Id.
[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

**ANSWER:    WMSC states that the publication referred to in paragraph 57 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 57.**

58     EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

**ANSWER:    WMSC states that the publication referred to in paragraph 58 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 58.**

59     On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are

---

[4] Id.
[5] Id.
[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"-finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

**ANSWER:    WMSC states that the publication referred to in paragraph 59 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 59.**

60      Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[8] For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

**ANSWER:    WMSC states that the publication referred to in paragraph 60 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 60.**

61      In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[9] An MCLG is the maximum level of a contaminant in drinking water at which

---

[7] Id.
[8] Id.
[9] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

**ANSWER:     WMSC states that the publication referred to in paragraph 61 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 61.**

62     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[10] Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[11]

**ANSWER:     WMSC states that the publication referred to in paragraph 62 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 62.**

63     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PF HxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt;

---

[10] Id

[11] Id.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[12] If greater than 1.0, then "potential risk is indicated."[13]

**ANSWER:    WMSC states that the publication referred to in paragraph 63 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 63.**

64    EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[14]

**ANSWER:    WMSC states that the publication referred to in paragraph 64 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 64.**

65    EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[15] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[16]

---

[12] id

[13] id

[14] U.S.E.P.A., EPAReleases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution (Dec. 14, 2023), available at https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[15] U.S.E.P.A., PFAS Nat'l Primary Drinking Water Regulation Rulemaking (Apr. 10, 2024), available at https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

[16] U.S.E.P.A., Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation (Apr. 10, 2024); see also U.S.E.P.A., Final PFAS Nat'l Drinking Water Regulation Landing Page, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

**ANSWER:** **WMSC states that the publications referred to in paragraph 65 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 65.**

66      The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts."[17] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[18]

**ANSWER:** **Paragraph 66 sets forth legal conclusions to which no response is required or made. WMSC also states that the publications referred to in paragraph 66 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 66.**

67      EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

**ANSWER:** **Paragraph 67 sets forth legal conclusions to which no response is required or made. To the extent an answer is required, WMSC denies each and every allegation in paragraph 67.**

---

[17] U.S.E.P.A., Presentation: Overview EPA PFAS NPDWR (Apr. 10, 2024).
[18] U.S.E.P.A., Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation (Apr. 10, 2024).

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

68      EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

**ANSWER:    WMSC states that the publication referred to in paragraph 68 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 68.**

69      On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[19] Although EPA announced its intention to rescind the MCLs concerning PFNA, PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act.," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS is linked to significant health risks.[20] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[21] violations.

**ANSWER:    WMSC states that the publication referred to in paragraph 69 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 69.**

---

[19] U.S.E.P.A., EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS (May 14, 2025), available at https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter EPA 2025 MCL Announcement].
[20] Id.
[21] Id.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

70     EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[22] Under the April 10, 2024 final National Primary Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

**ANSWER:     WMSC states that the publications referred to in paragraph 70 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, WMSC denies the allegations in paragraph 70.**

## II.     Contamination of Lake Marion and Lake Moultrie with PFAS

71     Lake Marion and Lake Moultrie were formed by the construction of the Santee Dam and Pinopolis Dam in the 1940s. They sit near the tail end of the Santee River Basin, downstream of, and hydrologically connected to, the Broad River, Saluda River, Congaree River, Catawba River, Wateree River, and Santee River.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 and therefore denies them.**

72     Defendants' industrial facilities, and/or their applicable WWTPs, operate upstream of Lake Marion and Lake Moultrie.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies them.**

73     PFAS sampling of the Broad River, Saluda River, Congaree River, Catawba River, Wateree River, Lake Marion, and Lake Moultrie confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout these bodies of water. These PFAS flow

---

[22] Id.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

downstream and contaminate the water at Plaintiff's water intakes on Lake Marion and Lake Moultrie at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

**ANSWER:     WMSC denies that it is the source of any PFAS at Plaintiff's water intakes. WMSC lacks knowledge or information sufficient to form a belief with respect to the other allegations in paragraph 73 and therefore denies them.**

74     Discharger Defendants are, or were, owners and operators of manufacturing plants and related industrial facilities throughout or upstream of the Santee River Basin. In their industrial processes, Discharger Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Discharger Defendants' industrial processes generate industrial wastewater containing these PFAS, which Discharger Defendants ultimately discharge to surface waters upstream of Lake Marion and Lake Moultrie.

**ANSWER:     WMSC denies each and every allegation in paragraph 74.**

75     Defendants' PFAS and their precursors flow downstream to Plaintiff's water intakes on Lake Marion and Lake Moultrie, damaging Plaintiff's property and contaminating its water sources.

**ANSWER:     WMSC denies each and every allegation in paragraph 75.**

76     All Defendants knew or should have known that the conventional wastewater treatment technologies used by those Discharger Defendants that directly discharge to surface waters and by the WWTPs that receive wastewater from the other Discharger Defendants cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:    WMSC denies each and every allegation in paragraph 76.**

77    Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, Supplier Defendants did not require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's properties.

**ANSWER:    The allegations in paragraph 77 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 and therefore denies them.**

78    The Lake Marion SW TP utilizes membrane filtration technology, and the Lake Moultrie SW TP utilizes conventional water treatment technology, neither of which remove PFAS from water, and the SW TPs require new water treatment technologies to do so.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 and therefore denies them.**

79    All Defendants knew or should have known that conventional treatment technologies and membrane filtration technology used by public water systems like Plaintiff's cannot remove Defendants' PFAS from water that is treated and distributed as potable drinking water.

**ANSWER:    WMSC denies each and every allegation in paragraph 79.**

**III.    Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties**.

80    All Defendants have long known that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic; that

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

they cannot be removed by conventional water and wastewater treatment methods; and that there is no safe dose for PFOA and PFOS.

**ANSWER:     WMSC denies each and every allegation in paragraph 80.**

81     Old DuPont pioneered the field of PFAS chemistry in the middle of the twentieth century, and it was long a leader in the industry. Old DuPont's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, and the public.

**ANSWER:     The allegations in paragraph 81 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 and therefore denies them.**

82     Old DuPont has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. Old DuPont was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

**ANSWER:     The allegations in paragraph 82 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 and therefore denies them.**

83     By the early 1960s, Old DuPont understood PFOA and PFNA to be toxic based on studies that found exposure to the chemicals to increase liver size in rats, and by the mid-1960s, if not earlier, Old DuPont knew that PFOA could leach from waste into water and groundwater.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:  The allegations in paragraph 83 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 and therefore denies them.**

84     In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but it did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility near Parkersburg, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

**ANSWER:  The allegations in paragraph 84 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and therefore denies them.**

85     In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of Old DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

**ANSWER:  The allegations in paragraph 85 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required,**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and therefore denies them.**

86      By 1999, at the latest, Old DuPont knew that PFOA was present in its products based on telomer PFAS chemistry.

**ANSWER:   The allegations in paragraph 86 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and therefore denies them.**

87      In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2005, EPA levied a record-setting $16.5 million civil penalty against Old DuPont for failing to disclose to EPA information about the health risks of PFOA and about the company's environmental releases of PFOA in West Virginia and Ohio.

**ANSWER:   The allegations in paragraph 87 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required,**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

**WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and therefore denies them.**

88     For decades, Old DuPont purchased the PFOA it used in the manufacture of Teflon and other products from 3M Company ("3M").

**ANSWER:   The allegations in paragraph 88 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and therefore denies them.**

89     In May 2000, 3M announced it would phase out its manufacture and sale of products based on long-chain PFAS, including PFOA and PFOS, by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public.

**ANSWER:   The allegations in paragraph 89 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and therefore denies them.**

90     In response to 3M's phaseout announcement, and despite the public concerns 3M cited for its phaseout decision and Old DuPont's own internal knowledge of the risks to human health and the environment posed by PFOA, Old DuPont did not cease using PFOA or eliminate PFOA from its products. Instead, Old DuPont opened its own plant to manufacture PFOA to use in the manufacture of Old DuPont's products.

**ANSWER:   The allegations in paragraph 90 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required,**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and therefore denies them.**

91      As demonstrated by its material safety data sheet for PFOA, Old DuPont knew PFOA required disposal by incineration by at least 1991.

**ANSWER:    The allegations in paragraph 91 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 and therefore denies them.**

92      Old DuPont participated in the Telomer Research Program ("TRP") that was convened by EPA in the early 2000s to coordinate research and data on PFOA and PFAS manufactured by the telomerization process. The TRP consisted of the leading telomer-based PFAS manufacturers. Through its participation in the TRP, Old DuPont obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

**ANSWER:    The allegations in paragraph 92 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies them.**

93      In 2015, Old DuPont spun off its Performance Chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

Chemours. Chemours inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

**ANSWER: The allegations in paragraph 93 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 and therefore denies them.**

94     Invista was formed in 2004 through the sale of Old DuPont's Textiles & Interiors division to Koch Industries and conducted bundled sales of textile products with Old DuPont PFAS products that it knew could degrade to PFOA. Invista inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

**ANSWER: The allegations in paragraph 94 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 and therefore denies them.**

95     Huntsman uses PFAS manufactured by other Supplier Defendants, including Old DuPont and Chemours, to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Huntsman has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

**ANSWER: The allegations in paragraph 95 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

96     Daikin is a subsidiary of Daikin Industries, Ltd., which has been in the PFAS business in Japan since the 1940s. It entered the U.S. market in the early 1990s, establishing manufacturing operations in Decatur, Alabama, adjacent to 3M's plant there.

**ANSWER:   The allegations in paragraph 96 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 and therefore denies them.**

97     Daikin purchased PFOA from 3M for use as a processing chemical in its manufacture of fluoropolymers. Daikin knew from the early 1990s that PFOA was carcinogenic, bioaccumulative, environmentally persistent, and soluble in water.

**ANSWER:   The allegations in paragraph 97 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and therefore denies them.**

98     Though fully aware of the reasons that 3M decided to withdraw its products based on long-chain PFAS in 2000, Daikin rushed to fill as much of the PFAS market left by 3M as possible, with the specific intent to prevent customers from shifting to non-PFAS products.

**ANSWER:   The allegations in paragraph 98 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 and therefore denies them.**

99     Underscoring its position as one of the world's leading PFAS manufacturers, Daikin participated in the TRP during the 2000s, through which it obtained and shared with other PFAS

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

**ANSWER:    The allegations in paragraph 99 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies them.**

100     Daikin was well aware of the need to incinerate or otherwise treat wastewater to remove PFAS; indeed, Daikin practiced incineration for the PFAS-containing wastewater generated at its Decatur, Alabama facility by in or around the mid-2000s.

**ANSWER:    The allegations in paragraph 100 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies them.**

101     Asahi is a subsidiary of AGC, Inc., f/k/a Asahi Glass Co., Ltd., a Japanese company that has manufactured and sold PFAS products since at least the 1970s. Upon information and belief, Asahi has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

**ANSWER:    The allegations in paragraph 101 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required,**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies them.**

102     Underscoring its position as one of the world's leading PFAS manufacturers, Asahi participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

**ANSWER:     The allegations in paragraph 102 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies them.**

103     Arkema is a subsidiary of Arkema S.A., a French company formed in 2004 from a reorganization of Total S.A.'s chemicals business. Arkema S.A. and its predecessors have been manufacturing PFAS since at least the 1950s. Upon information and belief, Arkema has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

**ANSWER:     The allegations in paragraph 103 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies them.**

104     Atotech uses PFAS manufactured by other Supplier Defendants to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

belief, Atotech has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOS, and/or their precursors, are present in the products it manufactures and sells.

**ANSWER:** **The allegations in paragraph 104 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore denies them.**

105     Atotech was aware of the environmental and human health concerns that 3M cited in its phaseout of PFOS-based products from the U.S. market, yet for years after 3M's phaseout announcement it continued to supply products it knew contained or could degrade to PFOS.

**ANSWER:** **The allegations in paragraph 105 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore denies them.**

106     Clariant was formed in 1995 and was previously known as Sandoz Chemical Corporation and as Sodeyco, Inc. Upon information and belief, Clariant has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

**ANSWER:** **The allegations in paragraph 106 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

107     Underscoring its position as one of the world's leading PFAS manufacturers, Clariant participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

**ANSWER:     The allegations in paragraph 107 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore denies them.**

108     Archroma was formed in 2013 through the sale of Clariant's textile, paper, and emulsions business to SK Capital Partners. Archroma inherited Clariant's expertise, resources, and knowledge of PFAS.

**ANSWER:     The allegations in paragraph 108 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 and therefore denies them.**

109     Solvay is the successor of Solvay Solexis, Inc. and Ausimont USA, Inc. Upon information and belief, Solvay has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells. At its Gloucester County, New Jersey facility, Solvay's use of PFOA and PFNA in the manufacture of fluoropolymer products has caused severe contamination of drinking water, surface waters, groundwater, and soils in the surrounding vicinity. In 2023, Solvay

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

settled a lawsuit brought by the State of New Jersey arising from this contamination for $393 million.

     **ANSWER:   The allegations in paragraph 109 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore denies them.**

     110    Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of Supplier Defendants' own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if Supplier Defendants had not chosen to ignore the clear evidence of health and environmental dangers they possessed many years ago.

     **ANSWER:   The allegations in paragraph 110 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 and therefore denies them.**

     111    Despite Supplier Defendants' knowledge that their products contained or degraded to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove their PFAS from wastewater; and that Discharger Defendants discharged these PFAS to the Santee River Basin, damaging and interfering with Plaintiff's property rights and public health, Supplier Defendants continued to sell products containing or degrading to these PFAS to Discharger Defendants. Specifically:

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

(a)     Asahi continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Asahiguard and Surflon;

(b)     Arkema continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Kynar;

(c)     Atotech continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Fumetrol;

(d)     Clariant continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva;

(e)     Archroma continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva and Fluowet;

(f)     Daikin continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Unidyne;

(g)     Old DuPont continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Teflon, Zonyl, and Capstone;

(h)     Chemours continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Capstone;

(i)     Invista continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Stainmaster and Antron;

(j)     Huntsman continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Phobol and Oleophobol; and

(k)     Solvay continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Algoflon and Halar.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:   The allegations in paragraph 111 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111, including subparts (a)-(k), and therefore denies them.**

IV.     **Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

112     At all times relevant hereto, Supplier Defendants were directly involved in, and exercised control over, Discharger Defendants' use, handling, application, and disposal of Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

**ANSWER:   The allegations in paragraph 112 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 112.**

113     Supplier Defendants specified the type and amount of PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

**ANSWER:   The allegations in paragraph 113 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 113.**

114     Supplier Defendants designed and provided equipment for the use of their PFAS-containing products at Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER: The allegations in paragraph 114 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 114.**

115    Supplier Defendants jointly conducted research with Discharger Defendants for new PFAS-containing products as well as methods of using or applying these products.

**ANSWER: The allegations in paragraph 115 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 115.**

116    Supplier Defendants monitored the products manufactured by Discharger Defendants for the amount of PFAS-containing products used in the manufacture of Discharger Defendants' products in order to ensure those products met Supplier Defendants' specifications on the amount of PFAS-containing products to be used or applied.

**ANSWER: The allegations in paragraph 116 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 116.**

117    Some Supplier Defendants, including Archroma, Arkema, Atotech, Invista, and Huntsman, maintained offices and/or laboratories near Discharger Defendants' facilities in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie, and all Supplier Defendants were in constant contact with the Discharger Defendants concerning the use, handling, application, and disposal of their PFAS-containing products.

**ANSWER: The allegations in paragraph 117 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 117.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

118    Employees of the Supplier Defendants were routinely present in Discharger Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of Supplier Defendants' PFAS-containing products.

**ANSWER:    The allegations in paragraph 118 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 118.**

119    Supplier Defendants provided information to the Discharger Defendants concerning the health and environmental impacts of Supplier Defendants' PFAS-containing products, and the Discharger Defendants, at least in part, relied on this information.

**ANSWER:    The allegations in paragraph 119 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 119.**

120    Supplier Defendants were familiar with the wastewater disposal practices of the Discharger Defendants' facilities, including that a portion of the Supplier Defendants' PFAS-containing products went into the Discharger Defendants' wastewater streams and that the treatment methods used by the Discharger Defendants' on-site treatment works and/or receiving WWTPs could not remove Defendants' PFAS from the effluent. Supplier Defendants nevertheless failed to require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. Supplier Defendants continued to sell their PFAS-containing products to Discharger Defendants they knew or should have known were disposing of the products in an environmentally irresponsible manner.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:     The allegations in paragraph 120 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC denies each and every allegation in paragraph 120.**

121     Supplier Defendants have been aware for many years of the presence of their PFAS chemicals in the Santee River Basin upstream from Plaintiff's intakes on Lake Marion and Lake Moultrie.

**ANSWER:     The allegations in paragraph 121 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121 and therefore denies them.**

**V.     Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

122     Supplier Defendants actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of their PFAS-containing products, distorting public discourse on and downplaying the harmful effects of PFAS, misleading EPA on the safety of their PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to their position.

**ANSWER:     The allegations in paragraph 122 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 and therefore denies them.**

123     Supplier Defendants, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

products they knew to be dangerous to the environment and human health. Supplier Defendants engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

**ANSWER: The allegations in paragraph 123 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 and therefore denies them.**

124     The delay in PFAS regulation resulted directly from Supplier Defendants' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

**ANSWER: The allegations in paragraph 124 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 and therefore denies them.**

**VI.     Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

125     By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

**ANSWER: The allegations in paragraph 125 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required,**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and therefore denies them.**

126    Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

**ANSWER:   The allegations in paragraph 126 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 and therefore denies them.**

127    The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

**ANSWER:   The allegations in paragraph 127 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 and therefore denies them.**

128    Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business-regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:** The allegations in paragraph 128 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 and therefore denies them.

129     Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

**ANSWER:** The allegations in paragraph 129 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 and therefore denies them.

130     In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

**ANSWER:** The allegations in paragraph 130 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and therefore denies them.

131     Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

**ANSWER:   The allegations in paragraph 131 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 and therefore denies them.**

132     This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont), which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

**ANSWER:   The allegations in paragraph 132 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132 and therefore denies them.**

133     Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

**ANSWER:   The allegations in paragraph 133 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**VII.     Defendants Have Harmed Plaintiff and Plaintiff's Community.**

134     Discharger Defendants have, for decades, discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Santee River Basin, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's current health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

**ANSWER:     WMSC denies each and every allegation in paragraph 134.**

135     Supplier Defendants have supplied products containing or degrading to PFOA, PFOS, PF HxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, while knowing that Discharger Defendants discharge wastewater laden with these PFAS to wastewater treatment facilities that cannot remove them from the wastewater before it is discharged to the Santee River Basin upstream of Plaintiff's water intakes.

**ANSWER:     The allegations in paragraph 135 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 and therefore denies them.**

136     Defendants' conduct has proximately caused the contamination of the Santee River Basin; and of Plaintiff's land, its Lake Marion and Lake Moultrie SWTPs, and its water treatment and transmission systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals-including PFOA and PFOS at concentrations above EPA's current MCLGs and MCLs.

**ANSWER:     WMSC denies each and every allegation in paragraph 136.**

137     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the waters of Lake Marion and Lake Moultrie, and have caused Plaintiff additional past, present, and future injury to property.

**ANSWER:     WMSC denies each and every allegation in paragraph 137.**

138     Despite knowing that there is no safe dose for PFOA or PFOS, and that PF HxS, PFNA, PF HxS, PFBS, and GenX Chemicals are hazardous to human health,

> (a)     Discharger Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Santee River Basin, which they knew or should have known contaminated Plaintiff's property; and

> (b)     Supplier Defendants continued to supply these chemicals to Discharger Defendants, knowing that they discharged these chemicals into the Santee River Basin, which Supplier Defendants knew or should have known contaminated Plaintiff's property.

**ANSWER:     WMSC denies each and every allegation in paragraph 138, including subparts (a)-(b), that is directed at WMSC. WMSC states that the allegations in paragraph 138 that are not directed at WMSC do not require a response from WMSC. To the extent a response is required, WMSC states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 138 and therefore denies them.**

## FIRST CAUSE OF ACTION

### Private Nuisance

139     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

**ANSWER:     WMSC incorporates its answers to paragraphs 1-138 above, as if fully set forth herein.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

140    Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water into potable drinking water, and the transmission of treated potable drinking water to customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140 and therefore denies them.**

141    Plaintiff owns riparian property abutting Lake Marion and Lake Moultrie, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers. Plaintiff also owns the land beneath each lake, up to the high-water mark.

**ANSWER:    Paragraph 141 sets forth legal conclusions to which no response is required or made. WMSC lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 141 and therefore denies them.**

142    Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals at concentrations exceeding those EPA deems unsafe for consumption.

**ANSWER:    WMSC denies each and every allegation in paragraph 142.**

143    Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

**ANSWER:    WMSC denies each and every allegation in paragraph 143.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

144     Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

**ANSWER:     WMSC denies each and every allegation in paragraph 144.**

145     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

**ANSWER:     WMSC denies each and every allegation in paragraph 145.**

146     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Santee River Basin and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

**ANSWER:     WMSC denies each and every allegation in paragraph 146.**

147     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

**ANSWER:     WMSC denies each and every allegation in paragraph 147.**

148     The ongoing contamination of Lake Marion, Lake Moultrie, and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of Lake Marion and Lake Moultrie to supply potable water to its customers.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

**ANSWER:     WMSC denies each and every allegation in paragraph 148.**

149     Defendants' interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

**ANSWER:     WMSC denies each and every allegation in paragraph 149.**

150     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**ANSWER:     WMSC denies each and every allegation in paragraph 150.**

<u>**SECOND CAUSE OF ACTION**</u>

**Public Nuisance**

151     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

**ANSWER:     WMSC incorporates its answers to paragraphs 1-150 above, as if fully set forth herein.**

152     Plaintiff is a state agency created to acquire, treat, distribute, and sell wholesale drinking water to members of the Lake Marion and Lake Moultrie Water Agencies. It uses its properties for those purposes, including the withdrawal of raw water from Lake Marion and Lake Moultrie, the treatment of raw water into potable drinking water, and the transmission of treated potable drinking water to customers in Berkeley, Calhoun, Dorchester, and Orangeburg Counties.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

153     Plaintiff's wholesale customers sell the water Plaintiff provides to their customers, who use it for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

**ANSWER:     WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 and therefore denies them.**

154     Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use-and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

**ANSWER:     WMSC states that paragraph 154 sets forth legal conclusions to which no response is required or made. WMSC denies each and every remaining allegation in paragraph 154.**

155     Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's right to use Lake Marion and Lake Moultrie; interference with the use of Plaintiff's SWTPs and water treatment and transmission systems; and lost revenue.

**ANSWER:     WMSC denies each and every allegation in paragraph 155.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

156     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Santee River Basin, including Lake Marion and Lake Moultrie, and Plaintiff's properties.

**ANSWER:     WMSC denies each and every allegation in paragraph 156.**

157     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

**ANSWER:     WMSC denies each and every allegation in paragraph 157.**

158     As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

**ANSWER:     WMSC denies each and every allegation in paragraph 158.**

159     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

**ANSWER:     WMSC denies each and every allegation in paragraph 159.**

160     Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and to ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**ANSWER:    WMSC denies each and every allegation in paragraph 160.**

161    Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

**ANSWER:    WMSC denies each and every allegation in paragraph 161.**

162    Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, the costs of abatement in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**ANSWER:    WMSC denies each and every allegation in paragraph 162.**

### THIRD CAUSE OF ACTION

### Trespass

163    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

**ANSWER:    WMSC incorporates its answers to paragraphs 1-162 above, as if fully set forth herein.**

164    Plaintiff owns, possesses, and actively exercises its right to use its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems.

**ANSWER:    WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 and therefore denies them.**

165    Discharger Defendants Coatex, Jushi, GPI, Huntsman AMA, ICC, Lindau, Milliken, ORCO, PMC, STC, and Synthomer, and Supplier Defendants Arkema and Atotech

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to their applicable WWTPs, notwithstanding that they knew and/or reasonably should have known that:

(a)    these WWTPs cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

(b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe potable water to its customers;

(c)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to these WWTPs; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

**ANSWER:    The allegations in paragraph 165 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165, including subparts (a)-(d), and therefore denies them.**

166    Discharger Defendants RSSC and WM intentionally deliver leachate contaminated with PFAS and/or PFAS-containing products to their applicable WWTPs, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)    the WWTPs cannot remove their PFAS and/or PFAS-containing products from the leachate before discharging to surface waters upstream of Plaintiff's water intakes on Lake Marion and Lake Moultrie;

(b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe potable water to its customers;

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

(c)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants send to the WWTPs; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

**ANSWER:    WMSC denies each and every allegation in paragraph 166, including each and every allegation in subparts (a)-(d).**

167    Discharger Defendants Carlisle, Milliken, Shaw, and Springs and Supplier Defendant Invista intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to surface waters in the Santee River Basin, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)    the wastewater treatment methods used by these Defendants cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging it to the Santee River Basin;

(b)    Plaintiff draws water from Lake Marion and Lake Moultrie for the provision of safe drinking water to its customers;

(c)    water Plaintiff draws from Lake Marion and Lake Moultrie is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to surface waters in the Santee River Basin; and, thereby,

(d)    water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

**ANSWER:    The allegations in paragraph 167 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167, including subparts (a)-(d), and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

168     Supplier Defendants intentionally supplied and continued to supply PFAS-containing products and/or PFAS to Discharger Defendants notwithstanding that Supplier Defendants knew and/or reasonably should have known that:

(a)     Discharger Defendants discharged and continue to discharge, directly or indirectly, Supplier Defendants' PFAS-containing products and/or PFAS to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove Supplier Defendants' PFAS-containing products and/or PFAS from wastewater before discharge to the Santee River Basin;

(b)     Plaintiff draws water from the Santee River Basin for provision of safe potable water to its customers;

(c)     water Plaintiff draws from the Santee River Basin is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS that Discharger Defendants directly or indirectly discharged to each river; and, thereby

(d)     water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

**ANSWER:     The allegations in paragraph 168 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168, including subparts (a)-(d), and therefore denies them.**

169     Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFB S, and/or GenX Chemicals at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

**ANSWER:     WMSC denies each and every allegation in paragraph 169.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

170     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

**ANSWER:     WMSC denies each and every allegation in paragraph 170.**

171     Defendants Arkema, Atotech, Coatex, Jushi, GPI, Huntsman AMA, ICC, Lindau, Milliken, ORCO, PMC, STC, and Synthomer intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to their applicable WWTPs. Defendants RSSC and WM intend that their PFAS-contaminated leachate be disposed of by their applicable WWTPs. Defendants Carlisle, Invista, Milliken, Shaw, and Springs intend and/or intended that, while using PFAS in their industrial processes, PFAS-containing wastewater be discharged to surface waters in the Santee River Basin. Discharger Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

**ANSWER:     WMSC denies each and every allegation in paragraph 171.**

172     Supplier Defendants intend that Discharger Defendants, while using Supplier Defendants' PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with Supplier Defendants' PFAS-containing products by discharging it, directly or indirectly, to surface waters. Supplier Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

**ANSWER:     The allegations in paragraph 172 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

173     Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and transmission systems. The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

**ANSWER:     WMSC denies each and every allegation in paragraph 173.**

174     As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

**ANSWER:     WMSC denies each and every allegation in paragraph 174.**

175     Defendants' ongoing trespasses can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

**ANSWER:     WMSC denies each and every allegation in paragraph 175.**

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

176     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

**ANSWER:     WMSC incorporates its answers to paragraphs 1-175 above, as if fully set forth herein.**

177     Discharger Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTPs, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

**ANSWER: Paragraph 177 sets forth legal conclusions to which no response is required or made. WMSC denies each and every remaining allegation in paragraph 177.**

178     Discharger Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters-including those in the Santee River Basin-were vulnerable to the contamination that has taken and now takes place.

**ANSWER: WMSC denies each and every allegation in paragraph 178.**

179     Discharger Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to P FOA, P FOS, P FHxS, PFNA, P FBS, and/or GenX Chemicals to escape their premises and contaminate the Santee River Basin, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

**ANSWER: WMSC denies each and every allegation in paragraph 179.**

180     Supplier Defendants have a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to ensure the proper use and disposal of these products and prevent their improper use and disposal.

**ANSWER: The allegations in paragraph 180 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180 and therefore denies them.**

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

181     Supplier Defendants had superior knowledge that their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contained in or degrading from their products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies, including membrane filtration, utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Santee River Basin, were vulnerable to the contamination that now takes place.

**ANSWER:   The allegations in paragraph 181 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181 and therefore denies them.**

182     By continually supplying their PFAS-containing products without providing their customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of their PFAS to surface waters, Supplier Defendants breached their duty of care and negligently, recklessly, wantonly, and willfully created the risk that their PFAS would contaminate the Santee River Basin, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

**ANSWER:   The allegations in paragraph 182 are not directed at WMSC and therefore do not require a response from WMSC. To the extent a response is required, WMSC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182 and therefore denies them.**

183     As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Defendants' PFAS; and other damages to be proved at trial.

**ANSWER:    WMSC denies each and every allegation in paragraph 183.**

184    Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**ANSWER:    WMSC denies each and every allegation in paragraph 184.**

## FIFTH CAUSE OF ACTION

### Strict Products Liability - Failure to Warn
### (Supplier Defendants)

The Fifth Cause of Action (paragraphs 185-194) is not directed at WMSC and therefore no response is required from WMSC. To the extent a response is required, WMSC denies each and every allegation in the Fifth Cause of Action.

## SIXTH CAUSE OF ACTION

### Strict Products Liability - Ultrahazardous Activity
### (Supplier Defendants)

The Sixth Cause of Action (paragraphs 195-205) is not directed at WMSC and therefore no response is required from WMSC. To the extent a response is required, WMSC denies each and every allegation in the Sixth Cause of Action.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

## SEVENTH CAUSE OF ACTION

### Strict Products Liability - Design Defect
### (Supplier Defendants)

The Seventh Cause of Action (paragraphs 206-218) is not directed at WMSC and therefore no response is required from WMSC. To the extent a response is required, WMSC denies each and every allegation in the Seventh Cause of Action.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

The Eighth Cause of Action (paragraphs 219-225) is not directed at WMSC and therefore no response is required from WMSC. To the extent a response is required, WMSC denies each and every allegation in the Eighth Cause of Action.

## PRAYER FOR RELIEF

In response to the paragraph beginning with "WHEREFORE" and appearing under the heading "PRAYER FOR RELIEF" below paragraph 225 of the Complaint, WMSC denies that Plaintiff is entitled to any judgment or decree in its favor, injunctive relief of any kind, compensatory or punitive damages, or costs, and asks that the Court dismiss the Complaint in its entirety.

### WMSC'S AFFIRMATIVE DEFENSES

WMSC asserts the following affirmative defenses in response to the allegations in Plaintiff's Amended Complaint filed or consolidated in the above-captioned action as follows:

1.    WMSC's actions have at all times been pursuant to express permits and directives of various state and federal regulatory agencies with which WMSC has at all relevant times and parameters been fully compliant. Accordingly, WMSC pleads license as an affirmative defense to Plaintiff's claims.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

2.      Plaintiff has failed to state facts sufficient to constitute a cause of action and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure.

3.      Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date when the State or United States Environmental Protection Agency will require it to upgrade their systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

4.      Further, Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered any injury.

5.      Plaintiff lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law, the claims set forth in the Complaint.

6.      Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the *parens patriae* doctrine.

7.      Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

8.      Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the property.

9.      Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

10.      Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

11.      Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

12.      Plaintiff has failed to name all necessary and indispensable parties in its action.

13.      Plaintiff's claims are barred, in whole or in part, because WMSC does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

14.      Plaintiff's claims are barred, in whole or in part, because, at all relevant times, WMSC exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

15.      Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of WMSC proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

16.      Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which WMSC had no control, thereby precluding any recovery against WMSC.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0800336

17.     Even assuming WMSC was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages. For that reason, WMSC is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

18.     Plaintiff's claim for punitive damages is violative of both the United States Constitution and the South Carolina Constitution, and WMSC pleads that sections 15-32-530 *et seq.*, of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

19.     Plaintiff fails to state any basis upon which punitive damages are recoverable against WMSC and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or 12(f) of the South Carolina Rules of Civil Procedure.

20.     Pursuant to S.C. Code Ann. § 15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

21.     Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's conduct, and its recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

22.     Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against WMSC.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

23.     WMSC is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

24.     Plaintiff's claims are barred, in whole or in part, because WMSC did not own, operate, or otherwise control the facilities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

25.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to WMSC.

26.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

27.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that its residents and/or customers were exposed to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

28.     Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by WMSC at the time of the conduct alleged.

29.     Plaintiff's claims against WMSC are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

30.     Plaintiff's claims are preempted or otherwise precluded by State and Federal law to the extent Plaintiff seeks recovery of costs or damages for contamination of water supplies, the enforcement of which is vested exclusively in State and Federal agencies pursuant to State and Federal statutes, including but not limited to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the South Carolina Hazardous Waste Management Act, S.C. Code Ann. § 44-56-10 *et seq.*

31.     Plaintiff's claims are barred, in whole or in part, because WMSC neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to WMSC at all times relevant to the claims or causes of action asserted by Plaintiff.

32.     Further, Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by WMSC, throughout the relevant and material time period, conformed to the then-existing custom and practice, and WMSC exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

33.     Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

34.    Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

35.    The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

36.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

37.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

38.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the nuisance.

39.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of primary implied assumption of risk.

40.    Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

41.    Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

42.    WMSC is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

43.    Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, res judicata, estoppel, ratification, and unclean hands.

44.    Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

45.    Plaintiff's claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. §§ 44-56-10 *et seq.* to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

46.    Plaintiff's claims are barred because they failed to exhaust administrative remedies.

47.    Plaintiff is not entitled to recover from WMSC more than WMSC's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from WMSC more than the amount of such relief, if any, for which WMSC is liable.

48.    Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability. WMSC may not be held liable under retroactive theories not requiring proof of fault or causation.

49.    All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

50.     Plaintiff's claims are barred to the extent that Plaintiff seeks to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

51.     The damages sought by Plaintiff, if awarded, should be reduced by any amounts they recover from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

52.     Plaintiff's claims are barred, in whole or in part, because WMSC did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

53.     Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

54.     Plaintiff's claims are barred because WMSC's conduct was not a substantial factor in causing the injures alleged.

55.     Plaintiff's claims are barred by the economic loss rule. *Sapp v. Ford Motor Company*, 386 S.C. 143, 687 S.E.2d 47 (2009).

56.     Plaintiff's recovery for any alleged trespass or nuisance, which is expressly denied, is limited to the lost rental value of Plaintiff's real property interest.

57.     Without admitting liability, WMSC alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were too removed, indefinite, *de minimus* and insufficient to establish a reasonable degree of probability that any such activity caused any alleged injury, damage or loss to Plaintiff.

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

58.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that its alleged injuries were caused by exposure to PFAS from any product(s) attributable to WMSC.

59.     Plaintiff's claims are barred by the doctrine of contributory negligence.

60.     WMSC asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other defendants in this action to Plaintiff's Complaint.

61.     WMSC has not completed its investigation of Plaintiff's allegations. WMSC intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, WMSC hereby gives notice of its intent to assert any further affirmative defenses that it may learn to be supported by facts and law, including but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. WMSC reserves the right to amend this Answer to assert any such additional defenses.

**WHEREFORE**, having fully answered the Amended Complaint, Waste Management of South Carolina, Inc. prays that the Complaint be dismissed with prejudice, that Waste Management of South Carolina, Inc. be awarded its attorneys' fees and costs associated with defending this action, and for such other and further relief as the Court may deem just and proper.

*Signature Page Follows*

ELECTRONICALLY FILED - 2025 Jun 20 11:29 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Respectfully submitted,

COSMICH SIMMONS & BROWN, PLLC

By:  *s/ Robert O. Meriwether*
    Robert O. Meriwether
    SC Bar No. 0009828
    E-Mail: robert.meriwether@cs-law.com
    Telephone: (803) 529-1783
    James B. Glenn
    SC Bar No. 077731
    E-Mail: jase.glenn@cs-law.com
    Telephone: (803) 529-1782
    2711 Middleburg Drive, Suite 216
    Columbia, SC 29204

    Counsel for Defendant WASTE MANAGEMENT
    OF SOUTH CAROLINA, INC.

June 20, 2025
Columbia, South Carolina

ELECTRONICALLY FILED - 2025 Jul 17 3:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant The Chemours Company ("Chemours") via certified mail, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to Chemours's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 14, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 17, 2025

ELECTRONICALLY FILED - 2025 Jul 17 3:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 17 3:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Chemours Company
c/o Registered Agent, CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4905 91

2. Article Number *(Transfer from service label)*

9589 0710 5270 3193 6965 90

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Pam Johnson_      ☐ Agent
                     ☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

**RESTRICTED DELIVERY**

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery
   *(over $500)*

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053      Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 21 2:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

                                        *Plaintiff*,

                    v.

AGC Chemicals Americas, Inc. *et al.*,

                                        *Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant EIDP, Inc. ("EIDP") via certified mail, return receipt requested, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to EIDP's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 15, 2025, as shown on the attached signed USPS Return Receipt Card.

                              */s/ John B. White, Jr.*_____
                              John B. White, Jr. (SC Bar No. 05996)
                              Marghretta H. Shisko (SC Bar No. 100106)
                              Christopher R. Jones (SC Bar No. 101265)
                              Griffin L. Lynch (SC Bar No. 72518)
                              JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 21, 2025

ELECTRONICALLY FILED - 2025 Jul 21 2:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 21 209 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

EIDP, Inc.
c/o Registered Agent, CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

RESTRICTED DELIVERY

9590 9402 9285 4295 4907 99

2. Article Number (Transfer from service label)

9589 0710 5270 3193 6965 69

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *Pam Johnson*

☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053       Domestic Return Receipt

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant INV Performance Surfaces, LLC ("INV Performance") via certified mail, return receipt requested, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to INV Performance's registered agent, United Agent Group, Inc., 6650 Rivers Avenue, North Charleston, SC 29406. The date of delivery was July 15, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)

ELECTRONICALLY FILED - 2025 Jul 21 2:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 21, 2025

ELECTRONICALLY FILED - 2025 Jul 21 2:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 21 2:09 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

INV Performance Surfaces, LLC
c/o Registered Agent, United Agent Group, Inc.
6650 Rivers Avenue
North Charleston, SC 29406

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 9285 4295 4906 69

2. Article Number (Transfer from service label)
9589 0710 5270 3193 6966 44

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Amy Overcash            7/15/2[?]

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

RESTRICTED
DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ___ Mail
☐ ___ Mail Restricted Delivery
   (___)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Graphic Packaging International, LLC ("Graphic Packaging") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Graphic Packaging's registered agent, Prentice Hall Corporation System, Inc., 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)

Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Graphic Packaging International, LLC
c/o Registered Agent, Prentice Hall Corporation
System, Inc.
508 Meeting Street
West Columbia, SC 29169

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X  *Daniele Kriz*    ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

Daniele Kriz
RESTRICTED
DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

9590 9402 9285 4295 4907 51

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0428 36

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

Plaintiff,

v.

AGC Chemicals Americas, Inc. *et al.*,

Defendants.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Coatex, Inc. ("Coatex") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Coatex's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*

John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Coatex, Inc.
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4907 44

2. Article Number (Transfer from service label)

9589 0710 5270 2831 0428 29

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
18 JUL 2025

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

Daniele Kriz
RESTRICTED
DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

     Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Clariant Corporation ("Clariant") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Clariant's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

                                       */s/ John B. White, Jr.*_____

                                       John B. White, Jr. (SC Bar No. 05996)
                                       Marghretta H. Shisko (SC Bar No. 100106)
                                       Christopher R. Jones (SC Bar No. 101265)
                                       Griffin L. Lynch (SC Bar No. 72518)
                                       JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clariant Corporation
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4907 37

2. Article Number (Transfer from service label)

9589 0710 5270 3193 6967 12

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*

☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

16 JUL 2025

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

le Kriz

RESTRICTED
DELIV

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

     Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Arkema, Inc. ("Arkema") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Arkema's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

                                           */s/ John B. White, Jr.*_____
                                           John B. White, Jr. (SC Bar No. 05996)
                                         Marghretta H. Shisko (SC Bar No. 100106)
                                         Christopher R. Jones (SC Bar No. 101265)
                                         Griffin L. Lynch (SC Bar No. 72518)
                                         JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 9:36 AM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Arkema, Inc.
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4906 90

2. Article Number (Transfer from service label)

9589 0710 5270 3193 6966 75

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
1 8 JUL 2025

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Daniele Kriz

RESTRICTED
DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 12:48 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

FOR THE NINTH JUDICIAL CIRCUIT

In Re:
PFAS Litigation Coordinated Docket

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff,*

v.

ACG Chemicals Americas, Inc., et al.

*Defendants.*

C.A. No. 2024-CP-08-03336

**ACCEPTANCE OF SERVICE
ON BEHALF OF
SPRINGS INDUSTRIES, LLC**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Amended Summons and Amended Complaint in the above captioned matter on behalf of Defendant Springs Industries, LLC ("Springs"), effective this 24th day of July, 2025, with no further service on Springs being necessary.

Robert Bryan Barnes
Rogers Townsend, LLC
PO Box 100200
Columbia, SC 29202-3200
(803) 744-1273
bryan.barnes@rogerstownsend.com

*Counsel for Springs Industries, LLC*

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Shaw Industries Group, Inc. ("Shaw Industries") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Shaw Industries' registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Shaw Industries Group, Inc.
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4907 75

2. Article Number (Transfer from service label)

9589 0710 5270 2831 0428 50

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*    ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

Daniele Kriz

RESTRICTED DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Organic Dyes and Pigments, LLC ("Organic Dyes") via certified mail, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to Organic Dyes' registered agent, Cogency Global, Inc., 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was July 21 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*

John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Organic Dyes and Pigments, LLC
c/o Registered Agent, Cogency Global, Inc.
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4906 21

2. Article Number *(Transfer from service label)*

9589 0710 5270 3193 6966 13

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X   *Pam Johnson*    ☐ Agent
                      ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery
Pam Johnson                        7/21/25

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

**RESTRICTED DELIVERY**

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

Plaintiff,

v.

AGC Chemicals Americas, Inc. *et al.*,

Defendants.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Huntsman International, LLC ("Huntsman") via certified mail, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to Huntsman's registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. The date of delivery was July 15, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)

Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Huntsman International, LLC
c/o Registered Agent, Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

9590 9402 9285 4295 4906 38

2. Article Number (Transfer from service label)

9589 0710 5270 3193 6966 20

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X    Ryan MacArthur    ☐ Agent
    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:    ☐ No

RESTRICTED DELIVE

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ il
☐ ____ il Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# USPS Tracking®

FAQs >

Tracking Number:

Remove ✕

958907105270319369620

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was picked up at a postal facility at 10:08 am on July 15, 2025 in WILMINGTON, DE 19808.

**Get More Out of USPS Tracking:**

   USPS Tracking Plus®

### Delivered

Delivered, Individual Picked Up at Postal Facility
WILMINGTON, DE 19808
July 15, 2025, 10:08 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

| Text & Email Updates | ˅ |
|---|---|

| USPS Tracking Plus® | ˅ |
|---|---|

| Product Information | ˅ |
|---|---|

See Less ˄

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Feedback

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Huntsman Advanced Materials Americas, LLC ("Huntsman Advanced Materials") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Huntsman Advanced Materials' registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Huntsman Advanced Materials Americas, LLC
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4907 68

2. Article Number (Transfer from service label)

9589 0710 5270 2831 0428 43

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *Daniele Kriz*   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

le Kriz
RESTRICTED
DELIVERY

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...ail
☐ ...ail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

# USPS Tracking®

Tracking Number:                                                                                    Remove ✕

## 9589071052702831042843

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item was delivered to the front desk, reception area, or mail room at 9:24 am on July 18, 2025 in WEST COLUMBIA, SC 29169.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

### Delivered

Delivered, Front Desk/Reception/Mail Room
WEST COLUMBIA, SC 29169
July 18, 2025, 9:24 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

Text & Email Updates                                                                    ⌄

USPS Tracking Plus®                                                                        ⌄

Product Information                                                                          ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

ELECTRONICALLY FILED - 2025 Jul 24 2:07 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

Feedback

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

                                        *Plaintiff*,

                        v.

AGC Chemicals Americas, Inc. *et al.*,

                                        *Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Springs Global US, Inc. ("Springs Global") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Springs Global's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

                                        */s/ John B. White, Jr.*_____
                                        John B. White, Jr. (SC Bar No. 05996)
                                        Marghretta H. Shisko (SC Bar No. 100106)
                                        Christopher R. Jones (SC Bar No. 101265)
                                        Griffin L. Lynch (SC Bar No. 72518)
                                        JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Springs Global US, Inc.
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 6821 1074 1985 82

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0428 74

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery
16 JUL 2025

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

*Daniele Kriz*

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery
*(over $500)*

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811,** July 2020 PSN 7530-02-000-9053       Domestic Return Receipt

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Solvay Specialty Polymers USA, LLC ("Solvay") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Solvay's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- ■ C——— ———— nd 3.
- Print you————— ——nress on the reverse so that we ca— —en return card to you.
- ■ Attach this card to the —— ck of —— or on the front if space perm—.

1. Article Addressed to:

Solvay Specialty Polymers USA, LLC
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 6821 1074 1992 20

2. Article Number ———

9589 0710 5270 2831 0428 67

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                          ☐ Agent
                                           ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
              8 JUL 2025

D. Is delivery address different from Item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

                                        *Plaintiff*,

                        v.

AGC Chemicals Americas, Inc. *et al.*,

                                        *Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

        Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Standard Textile Carolina, Inc. ("Standard") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Standard's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was July 18, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

                                        */s/ John B. White, Jr.*
                                        John B. White, Jr. (SC Bar No. 05996)
                                        Marghretta H. Shisko (SC Bar No. 100106)
                                        Christopher R. Jones (SC Bar No. 101265)

Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Standard Textile Carolina, Inc.
c/o Registered Agent, Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 6821 1074 1985 99

2. Article Number *(Transfer from service label)*

9589 0710 5270 2831 0428 81

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*       C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Jul 24 2:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

# USPS Tracking®

FAQs >

Tracking Number:                                Remove ✕

9589071052702831042881

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was delivered to the front desk, reception area, or mail room at 9:23 am on July 18, 2025 in WEST COLUMBIA, SC 29169.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

## Delivered

Delivered, Front Desk/Reception/Mail Room
WEST COLUMBIA, SC 29169
July 18, 2025, 9:23 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

Text & Email Updates          ⌄

USPS Tracking Plus®          ⌄

Product Information          ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

Feedback

ELECTRONICALLY FILED - 2025 Jul 24 4:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc. *et al.*,

*Defendants*.

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Interstate Container Columbia, LLC ("Interstate Container") via certified mail, restricted delivery, mailed on July 11, 2025, from Spartanburg, SC to Interstate Container's registered agent, Registered Agent Solutions, 317 Ruth Vista Road, Lexington, SC 29073. The date of delivery was July 16, 2025, as shown on the attached signed USPS Return Receipt Card..

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 24, 2025

ELECTRONICALLY FILED - 2025 Jul 24 4:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336



ELECTRONICALLY FILED - 2025 Jul 24 4:28 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 29 5:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

_____

South Carolina Public Service Authority, a/k/a
Santee Cooper, an agency of the State of South
Carolina,

                                    *Plaintiff*,

                    v.

AGC Chemicals Americas, Inc. *et al.*,

                                    *Defendants*.

IN THE COURT OF COMMON PLEAS

NINTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-08-03336

**PROOF OF SERVICE**

Plaintiff South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina ("Plaintiff") served Plaintiff's Amended Summons and Amended Complaint on Defendant Carlisle Partners, LLC ("Carlisle") via certified mail, restricted delivery, mailed on July 15, 2025, from Spartanburg, SC to Carlisle's registered agent, Registered Agents, Inc., 6650 Rivers Ave., Ste. 100, Charleston, SC 29406. The date of delivery was July 21, 2025, as shown on the attached signed USPS Return Receipt Card..

*/s/ John B. White, Jr.*_____
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA

PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
July 29, 2025

ELECTRONICALLY FILED - 2025 Jul 29 5:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

ELECTRONICALLY FILED - 2025 Jul 29 5:37 PM - BERKELEY - COMMON PLEAS - CASE#2024CP0803336

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Carlisle Partners, LLC
c/o Registered Agents, Registered Agents, Inc.
6650 Rivers Ave., Ste. 100
Charleston, SC 29406

9590 9402 9285 4295 4906 76

2. Article Number (Transfer from service label)

9589 0710 5270 3193 6966 51

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____
☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery
1/21/25

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

RESTRICTED DELIVE

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ____ ail
☐ ____ ail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt